ACCEPTED
15-25-00005-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/25/2025 2:57 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/25/2025 2:57:25 PM
CHRISTOPHER A. PRINE
Clerk

No. 15-25-00005-CV

# In The
# Fifteenth Court Of Appeals

◆

JOHNNY PARTAIN
*Appellant*

v.

STATE OF TEXAS
*Appellee*

◆

## Appellant's Brief

◆

JOHNNY R. PARTAIN
7020 N 16th Street
McAllen, Texas 78504
956-240-1821

No. 15-25-00005-CV

---

# In The
# Fifteenth Court Of Appeals

— ♦ —

JOHNNY PARTAIN
*Appellant*

v.

STATE OF TEXAS
*Appellee*

— ♦ —

**Appellant's Brief**

— ♦ —

TO THE HONORABLE JUSTICES OF THIS COURT:

COMES NOW JOHNNY PARTAIN, Appellant in the above styled and numbered cause and files his *Appellant's Brief*, and respectfully shows unto the Court the following.

## IDENTITY OF PARTIES AND COUNSEL

Appellant:

- JOHNNY PARTAIN, individually, residing at 7020 N 16th Street, McAllen, Texas 78504; phone  956-240-1821.

Appellee:

- STATE OF TEXAS, through Attorney General Kenneth Paxton, represented by Assistant Attorney General Ali Thorburn, P.O. Box 12548, Austin, Texas, 78711-2548; phone 512-475-4392.

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION | ……………. | ii |
| IDENTITY OF PARTIES AND COUNSEL | ……………. | iii |
| TABLE OF CONTENTS | ……………. | iv |
| INDEX OF AUTHORITIES | ……………. | v |
| STATEMENT OF THE CASE | ……………. | 1 |
| ISSUES PRESENTED | ……………. | 3 |
| STATEMENT OF FACTS | ……………. | 4 |
| SUMMARY OF THE ARGUMENT | ……………. | 10 |
| ARGUMENT | ……………. | 13 |
| The State of Texas lacks authority to deprive Partain his civil right to just and adequate compensation. | ……………. | 13 |
| Texas had no standing to complain and the District Court had no jurisdiction. | ……………. | 28 |
| Partain's Due Process Rights Were Denied. | ……………. | 35 |
| PRAYER | ……………. | 40 |
| CERTIFICATE OF COMPLIANCE | ……………. | 41 |
| CERTIFICATE OF SERVICE | ……………. | 41 |

# INDEX OF AUTHORITIES

## CASELAW

Page

*Alden v. Maine, 527 U.S. 706, 754–755 (1999) (The constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution.)* ................. 16

*Ableman v. Booth, 62 U.S. 506 (1858) (state courts cannot issue rulings that contradict the decisions of federal courts).* ................. 29

*Boyce's Executors v. Grundy, 28 U.S. 210 (1830) (The law, which abhors fraud, does not permit it to purchase indulgence, dispensation, or absolution.; "Fraud vitiates the most solemn contracts, documents and even judgments.")* ................. 26

*Brown v. Todd, 53 S.W.3d 297, 305 (Tex. 2001) (The common-law rules governing standing require "a real controversy between the parties)* ................. 30

*Browning, 165 S.W.3d 346* ................. 33

*Burrow v. Arce, 997 S.W.2d 229, 245 (Tex. 1999)* ................. 36

*Chicago, Burlington & Quincy Railroad Co. v. Chicago, 166 U.S. 226 (1897) ("It must be observed that the prohibitions of the [Fourteenth] amendment refer to all the instrumentalities of the state,—to its legislative, executive, and judicial authorities, —and, therefore, whoever by virtue of public position under a state government deprives another of any right protected by that amendment against deprivation by the state, 'violates the constitutional inhibition)* ................. 34

*City of Beaumont v. Bouillion, 896 S.W.2d 149 (Tex. 1995) (A law conflicting with rights guaranteed by the Texas Bill of Rights is void "because the Bill of Rights is a limit on State power.")* .................. 17

*City of Dallas v Mitchell, 245 S.W. 944 (To take away all remedy for the enforcement of a right is to take away the right itself. But that is not within the power of the State.)* .................. 21

*Daimler Chrysler Corp. v. Inman, 252 S.W.3d 299, 304 (Tex.2008) (if injury is only hypothetical, there is no real controversy.)* .................. 30

*Daryl J. Levinson, Rights Essentialism and Remedial Equilibration, 99 CoLum. L. REV. 857, 914 (1999)* .................. 17

*Devillier v. Texas , 601 U.S. 285 (2024)* .................. 15, 20

*Directv, Inc. v. Imburgia, 577 U.S. 47, 53 (2015) "U.S. Const., Art. VI, cl. 2 ([T]he Judges in every State shall be bound" by "the Laws of the United States)* .................. 28

*Dolan v. City of Tigard, 512 U.S. 374, 383 (1994)* .................. 34

*E.I. du Pont de Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995) (A judge abuses his discretion by acting "without reference to any guiding rules or principles" or by acting arbitrarily or unreasonably)* .................. 36, 37

Edgar v. MITE Corp., 457 U.S. 624 (1982) (the Supreme Court ruled: "A state statute is void to the extent that it actually conflicts with a valid Federal statute) .................. 29

Ex parte Spaulding, 687 S.W.2d at 745 (Teague, J.,concurring). .................. 7

*Ex parte Virginia, 100 U.S. 339, 346 (1880). (A State acts by its legislative, its executive, or its judicial authorities...and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.)* .................. 20

vi

*First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304 (1987) (A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment.)* ................. 20, 22

*Heckman v. Williamson Cnty, 369 S.W.3d 137 (Tex. 2012) (requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.)* ................. 34

*Hemphill v. Watson, 60 Tex. 679, 681 (1884) (When a law conflicts with rights guaranteed by Article 1, the Constitution declares that such acts are void because the Bill of Rights is a limit on State power)* ................. 31

*Hill v. Shamoun & Norman, LLP, 544 S.W.3d 724, 741 (Tex. 2018) (When contested fact issues must be resolved before equitable relief can be determined, a party is entitled to have that resolution made by a jury.)* ................. 36

*Jacobs v. United States 290 U.S. 13 (1933) (the right to just compensation could not be taken away by statute or qualified by the omission of a provision for interest where such an allowance was appropriate in order to make the compensation adequate)* ................. 14, 19

*King Ranch, 118 S.W.3d 752 (Tex. 2003) (Extrinsic fraud is fraud that denied a party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted)* ................. 37

*Levinson, supra note 2, at 858 (describing rights and remedies as "inextricably intertwined" and noting that rights rely on remedies "for their scope, shape, and very existence")* ................. 17, 18

*Manning v. Mining & Mins. Div. of the Energy, Min. & Nat'l Res. Dep't, 144 P.3d 87, 90–91 (N.M. 2006) (citing First English as holding that the "compensation remedy is required by the Constitution")* ................. 20

*Marbury v. Madison, 5 U.S. 137 (1803) ("every right, when withheld, must have a remedy")* ................. 18

*Michael Coenen, Right-Remedy Equilibration and the Asymmetric Entrenchment of Legal Entitlements, 61 B.C. L. RENT. 129, 139 (2020) (defining "legal entitlement" to mean "remedy made available in response to a particular violation of a substantive right" (emphasis omitted))* ................. 17

*Miranda v. Arizona, 384 U.S. 426, 491; 86 S. Ct. 1603, (Where rights secured by the Constitution are involved, there can be no 'rule making' or legislation which would abrogate them." "The claim and exercise of a constitutional right cannot be converted into a crime.)* ................. 17, 37

Nollan v. California Coastal Commission, 483 U.S. 825 (1987) ................. 34

*O'Meara v. O'Meara, 181 S.W.2d 891 (Tex. Civ. App. 1944)* ................. 37

*Penn Central Transp. Co. v. New York City, 438 U.S. 104, 122 (1978)* ................. 34

*Pennoyer v. Neff, 95 U. S. 714, 732-733 (1878) (A judgment rendered in violation of due process is void in the rendering State and is not entitled to full faith and credit elsewhere.)* ................. 26

*PNS Stores, Inc. v. Rivera ex rel. Rivera 55 Tex. Sup. Ct. J. 1400 (Tex. 2012) (We have described a judgment as void when the court rendering judgment had no jurisdiction to enter the particular judgment.)* ................. 33

Republican Party of Texas v. Dietz, 940 SW 2d 86 (1997) (the provisions in section 29 excepting everything in the Bill of Rights "out of the general powers of government" and providing that "all laws" contrary to the Bill of Rights shall be void demonstrates that the Bill of Rights serves as a shield against the powers and laws of government) ................. 16, 31

*SDDS, Inc. v. State*, 650 N.W.2d 1, 9 (S.D. 2002) (recognizing ................. 20
that First English means "the [compensation] remedy does not
depend on statutory facilitation)

*Seaboard Airline R. Co. v US*, 261 U.S. 299 (The requirement ................. 14, 31
that 'just compensation' be paid is comprehensive and includes
all elements and no specific command to include is necessary
when interest or its equivalent is a part of such compensation)

*State Dep't of Highways & Pub. Transp. v. Gonzalez 82 S.W.3d* ................. 35
322, 327 (Tex. 2002) (Whether a trial court has subject-matter
jurisdiction is a question of law for the court, requiring de novo
review)

State ex. rel Latty v. Owens, 907 S.W.2d 484, 486 (Tex. 1995) ................. 7
(A Party Affected by VOID Judicial Action Need Not APPEAL)

*Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980) (The ................. 23
constitutional remedy of compensation is mandatory. [T]he
Constitution itself is . . . a waiver of governmental immunity for
the taking, damaging or destruction of property.)

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, ................. 19
560 U.S. 702, 740–41 (2010) (Kennedy & Sotomayor, JJ.,
concurring in part) ([T]he Court subsequently held that the
Takings Clause requires the availability of a suit for
compensation against the States [in] First English[.])

*Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 863 (Tex.2010) ................. 33

*Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007 ................. 17, 32
(Tex.1934), (we stated that the Bill of Rights "consists of express
limitations of power" on the legislature, executive officers, and
the judiciary.)

*Williams v. New Orleans Public Service, Inc., 728 F.2d 730, 735* .................. 37
*(5th Cir. 1984) (A judgment "is void only if the court that*
*rendered it lacked jurisdiction of the subject matter, or of the*
*parties, or if it acted in a manner inconsistent with due process*
*of law.)*

Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990) ................. 36

*Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18, 21 (1940) ([I]f* ................. 22
*the authorized action ... does constitute a taking of property for*
*which there must be just compensation under the Fifth*
*Amendment, the Government has impliedly promised to pay*
*that compensation and has afforded a remedy for its recover)*


## TEXAS CIVIL PRACTICE & REMEDY CODE

TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.003 ................. 30
TEX. CIV. PRAC. & REM. CODE ANN. §§ 65.001 ................. 12, 30
TEX. CIV. PRAC. & REM. CODE ANN. §§ 65.011 ................. 30


## TEXAS BUSINESS AND COMMERCE CODE

Texas Business and Commerce Code Sec. 9.336 ................. 18
Texas Business and Commerce Code section 9.5185 ................. 1, 4, 17, 27, 28, 29, 31, 36


## TEXAS CONSTITUTION

Tx. Const. Art. 1, Sec. 3 ................. 22
Tx. Const. Art. 1, Sec. 9 ................. 22
Tx. Const. Art. 1, Sec. 13 ................. 22
Tx. Const. Art. 1, Sec. 15 ................. 36
Tx. Const. Art. 1, Sec. 17 ................. 1, 4, 5, 8, 11, 14, 22, 28, 29, 30, 31, 32, 34, 38

x

Tx. Const. Art. 1, Sec. 13 ................. 22, 29, 38

Tx. Const. Art. 1, Sec. 29 ................. 1, 14, 15, 16, 17, 24, 28, 29, 31, 34, 44

Tx. Const. Art. III Sec. 49 (a)(3) ................. 19

Tx.Const. Art. V, Sec. 10 ................. 36


## UNITED STATED CODE

18 USC § 242 ................. 25


## UNITED STATES CONSTITUTION

Supremacy Clause, Art. VI, Cl. 2, of the US Constitution ................. 28, 29, 30, 34

US Const. Amd. 4 ................. 4

US Const. Amd. 5 ................. 1, 7, 11, 18, 22, 28, 30, 38

US Const. Amd. 9 ................. 22

US Const. Amd. 14 ................. 22

U.S. Const. amend. XIV, § 1 ................. 7, 35

## STATEMENT OF THE CASE

Travis Count District Court case no. D-1-GN-24-002560 was filed on April 24, 2024 in the 126th District Court for the State of Texas (Appellee) through Attorney General Kenneth Paxton's petition seeking declaratory and injunctive relief pursuant to Texas Business and Commerce Code section 9.5185. Texas argued that, to its best belief, Johnny Partain (Appellant), who exercised his civil rights under United States Constitution Amendment 5 and Texas Constitution Art. 1, Sec. 17, and collected approximately $340 million in compensation from Texas, had intentionally or knowingly filed a financing statement claim (UCC-1) with the Texas Secretary of State that contained a material false statement, or was groundless. Partain disagreed because his property was taken, used, and destroyed without compensation, creating the inviolate debt interests which had to be compensated (mandatory per the US and Texas Constitutions), and that he could not be deprived of said rights by Texas through a statute or a declaration. Basically, Texas stole Partain's property and Partain took it back. Partain filed his plea to the jurisdiction and motion to dismiss pursuant to Texas Constitution Art. 1, Sec. 29 on August 21, 2024.

Texas filed an amended petition on November 4, 2024 and requested a hearing for a temporary restraining order against Partain from using his UCC-1. Since Partain had already collected his compensation, the complaint was moot. The injunction was actually meant to stop Partain from continuing to exert dominion over his property and to reverse-compensate him by declaring him a fraud. A hearing was set for December 17, 2024.

Texas filed a brief in support of its motion for a temporary injunction on December 13, 2024, just before the hearing date, and then filed a response to Partain's plea to the jurisdiction. Partain filed a hurried response to Texas' brief while enroute from McAllen to Austin for hearing, which he filed on December 16, 2024.

On December 17, 2024, visiting District Judge Scott McCown heard Partain's plea to the jurisdiction, withheld his findings on Texas' standing and the court's jurisdiction, denied Partain's application in open court for a jury - informing him that he was not entitled to a jury for an injunction, and then held a hearing on Texas' motion for a temporary injunction. Before the hearing the judge requested Partain to accept the hearing as a final hearing for a permanent injunction. Partain refused and stated that he would not waive his right to a jury. At the end of hearing the judge declared he had general jurisdiction and that he would sign a permanent injunction, once

Texas wrote him a judgment, so that Partain could immediately appeal, if he agreed. The judge advised that if he did not agree that Partain would come back and they would just do the same thing again, that it would be a waste of time. Partain agreed to a permanent injunction under duress so he could appeal immediately, but Partain did not agree to a finding of fact on the cause of action since that still required a jury which was being denied. The final judgment being appealed was signed on December 19, 2024. It did not address any constitutional arguments raised by Partain and it has a finding of facts that Partain did not agree to. Jurisdiction, standing, and due are being appealed.

## ISSUES PRESENTED

1. The State of Texas lacks authority to deprive Partain his civil right to just and adequate compensation.

2. Texas had no standing to complain and the District Court had no jurisdiction.

3. Partain's due process rights were denied.

## STATEMENT OF FACT

This is an appeal from a final court order (Rec. 201-205) in Travis County District Court, case no. D-1-GN-24-002560, filed on December 19, 2024, by a traveling judge, after a Temporary Restraining Order hearing (Rec. 21-22; 265) held on December 17, 2024. The hearing was held without a jury, despite Appellant's (Partain) request for a jury in his answer and despite Partain's application for a jury in open court at the hearing. The TRO hearing was immediately preceded by an alleged hearing on Partain's plea to the jurisdiction (*App. 1, Defendant's Plea To The Jurisdiction and Motion To Dismiss*) and motion to dismiss which ended without a ruling or a finding before starting the TRO hearing. Although a court reporter was present, the hearings are alleged to have no reporter record available per the Court Reporter, Kasi Chapman. Also, significant amounts of evidence were electronically filed[1] in the court's "Box" and not with the clerk as required by the court. It is not obvious how to retrieve the "Box" if there is no reporter record. The district case is not developed.

---

[1]Partain was unaware of this process and was required by the Court to deposit his evidence in the "Box" during hearing.

4

The State of Texas (Texas) brings this case under Texas Business and Commerce Code section 9.5185, for a finding that Partain knowingly or intentionally filed a fraudulent financing statement so that Texas can reverse Partain's exercise of his constitutional right to compensation under Tx. Const. Art. 1, Sec. 17 and challenge control his properties. Texas argues that there is no court approved debt or remedy owed to Partain since Texas courts have not approve any. *(Rec. 49; "Partain has provided no Order from a Texas court with competent jurisdiction over the matter establishing that he has any right to relief of ANY kind from the State. Because of this, Partain fails to establish a legitimate "debt,"")*. Partain argues that there is no judicial remedy available since the courts claim sovereign immunity to the US and Texas Constitutions, and deny him due process. *See App. 3. Letters To Governor and Attorney General.* Texas has never actually challenged its debt owed to Partain pursuant to Tx. Const. Art. 1, Sec. 17. It has only claimed immunity to litigating the constitutional debt in its own courts. Texas made this argument after closing its courts to Partain for over 4 years (Rec. 142-200) after a Hidalgo County District Court received a mandate (Rec. 127-134) from the 13th Court of Appeals to take Partain to trial; and after the court failed to sign a technically unchallenged summary judgment

5

order for $250,000,000 against Texas for Partain. After Governor Abbott got involved, the District Court finally opened its doors. Texas claimed immunity[2] to inverse condemnation, for the taking and destruction of Partain's property, and to civil rights violation in it's plea to the jurisdiction in Hidalgo County District Court in case no. C-0929-12-F *(App. 2, Third Amended Petition; See also Rec. 155-168),* in violation of the Opinion and Mandate (Rec. 246-252) from 13th Court of Appeals, case no. 13-13-00341-CV, which reversed the court's earlier illegal order to dismiss.[3] Partain attempted to appeal but the clerks originally refused to accept his Notice of Appeal. Partain then filed his appeal online. In response, Texas invented multiple fraudulent appeal cases (Partain was not a party), altered the court's records, and then dismissed the multiple appeal cases through a singular order (Rec. 140-141)(the appeals court called them multiple final judgments) to destroy Partain's due process rights to an appeal without Partain participating in

_____

[2]Texas mainly complained that Partain didn't identify injuries against Texas in an inverse condemnation complaint, which shouldn't be a surprise since that kind of complaint isn't about injuries, its about compensation for property taken, used, or destroyed. Texas diddestroy Partain's right to due process which destroyed his property rights.

[3]The 13th Court of Appeals lost Partain's first appeal, case no. 13-13-00341-CV, over the dismissal of his complaints on "the authority of the judge" and Partain had to request intervention from the Texas Supreme Court. Texas Supreme Court Chief Justice Nathan Hecht assigned retired Justice Don Wittig from the 14th Court of Appeals in 2015, to find out what was going on and Justice Wittig found completely for Partain, reversing the District Court's dismissal and mandating conformance to his Opinion (Rec. 127-133). However, the District Court did not conform.

6

any of the fraudulent actions.   Partain was made aware of the fraudulent

appeal cases and the altered public records, and he informed the appeals

court through a letter to the appeals clerk that he had not filed them

and would not participate in the multiple cases, to take his name off the

cases.  *Rec. 241-244.*  The appeals court did not remove Partain's name

from the fraudulent cases filed by Texas, and instead used the

fraudulent cases to maleffect Partain's significant property rights,

violating Partain's due process[4] and apparently protecting the illegal,

unconstitutional, and void declarations of immunity from the District

Court filed on January 4, 2021.  The 13th Court of Appeal refused to

hear Partain's actual appeal which was fully briefed in case no.13-21-

00037-CV.  However, "*A Party Affected by VOID Judicial Action Need*

*Not APPEAL." State ex. rel Latty v. Owens, 907 S.W.2d 484, 486 (Tex.*

*1995).  Such a judicial action is entitled to no respect whatsoever*

*because it does not affect, impair, or create legal rights." Ex parte*

*Spaulding, 687 S.W.2d at 745 (Teague, J.,concurring).* Despite the fact

---

[4]U.S. Const. amend. V ( "[N]or shall any person . . . be deprived of life, liberty, or property, without due process of law." ).  U.S. Const. amend. XIV, § 1 ( "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." ).

that Partain was denied due process or that a judge has no authority under the constitution to dispose of an inviolate debt, there is another fact which upsets a final judgment in case no. C-0929-12-F. There is still a Cameron County defendant persisting and unadjudicated in Hidalgo County case no. C-0929-12-F because the court failed to respond to Cameron County's multiple requests for a hearing (Rec. 210).

Concurrently, Partain was communicating with Governor Abbott and Attorney General Paxton that there was no judicial remedy since Texas refused to provide open courts or due process and since Texas has no process to remedy Tx. Const. Art. 1, Sec. 17. Partain informed the Governor and AG that they needed to provide adequate compensation, or a means thereto, or Partain would provide it. *App. 3, Letters To Governor and Attorney General.* Partain made an application to the Texas Comptroller for compensation. *App. 6, Miscellaneous Claim Application with Response.* The Governor and Attorney General eventually responded[5] through the Comptroller's attorney that Partain needed to sue to get a court to enforce his right to payment, even

_____

[5]This is the response from Comptroller's attorney, not the Governor's or AG's attorney, approximately 3 months after Partain made a miscellaneous request for compensation from the Texas Comptroller. Partain had a lengthy and productive conversation with the Comptroller's attorney. Partain requested the Comptroller's attorney send Partain the letter documenting the Governor's and AG's position. The letter does not discuss the Comptroller's opinion which is quite different.

8

though its officials claim immunity to suit. While it would have been nice to get a court to enforce Partain's right to payment, years of due process violations and lawfare proved that it was improbable to get judicial enforcement even after he became a judgment creditor since the courts have demonstrated over and over that they don't enforce their decrees.[6]

President Biden forced Governor Abbott to exercise Texas' rights under the constitution as Governor Abbott stated in his January 24, 2024, Press Release. *App. 8, Governor Abbott's Press Release.* Texas forced Partain to exercise his rights under the constitutions. Partain was able to collect approximately $340 million in compensation from Texas using different techniques, including recording his efforts through the UCC code, while also releasing tax liens on his property that had been illegally seized several times but never returned, repaired, or compensated as required by law. *App. 4, Tranfer Statement.*[7] Partain became fully compensated, his preceding

_____

[6]Hidalgo County Court case no. CL-29,530-H was dismissed "for want of prosecution" approximately 14 years after a jury found for Partain and he became a judgment creditor for about $452,000. Partain had already executed an abstract of judgment 3 times and became a super-creditor in the debtor's bankruptcy, but the courts refused to enforce their decrees and finally ordered the dismissal for want of prosecution after Partain refused to participate in brand new re-litigation of the same case 14 years later. (*App. 7, County Case Summary, Certified*).
[7]This example of the use of the transfer statement removes liens that were placed on the property by Hidalgo County and City of Mcallen the year after they seized the property from Partain. Partain recovered the property but could not use it because of the damages to the structure and could not sell it because of the liens. The county and the city continue to attempt to seize the property through a 13 year

9

judicial complaints became moot, and the 25+ year feckless attempts at litigation were over.

Then Texas sued Partain under the color of law pursuant to an irrelevant statute to override the constitution[s], to reverse Partain's just and adequate compensation through Travis County case no. D-1-GN-24-002560, the underlying case to this appeal. *Rec. 8-20.* Texas sought to subvert Partain's rights again through declaration on a moot issue, to seize his property through an illegal injunction, but not really to litigate the issues with actual due process. (Rec. 201-205). The law does not support the State of Texas in any way. It does however side with Partain 100 percent and thats a fact.

## SUMMARY OF ARGUMENT

**1.** <u>The State of Texas lacks authority to deprive Partain his civil right to just and adequate compensation.</u> Partain filed an accurate UCC-1 financing statement on October 6, 2023 at 10:56am. This case is based on what Partain knew or intended when he filed the UCC-1. Partain knew he had the constitutional right to just and adequate compensation

---

long tax suit for ad valorem taxes, and for costs and fines for maintaining the property while under their control. They only added Partain as the owner recently.

10

when his property is taken, used, or destroyed by Texas or its agents. The constitution[s] fully empower citizens to protect their own rights by voiding Texas' authority to act against them. The constitution[s] do not prevent citizens from exercising rights extra-judicially; the remedy does not qualify the right. US Const. Amd. 5 and Tx. Const. Art. 1, Sec. 17 do not require a judicial remedy since the remedy is already provided in the constitutions as just and adequate compensation. Texas lacks any authority to violate this right through civil or criminal statutes, or even fraud, since the constitutions are controlling. Texas' denial, deflection, diffusion, obfuscation, fraud, gamesmanship, and lawfare are all illegitimate means to avoid just and adequate compensation to Partain and have no effect, except to keep Texas in continuing violation of the constitutions – which Texas calls a debt, an increasing debt. Since states cannot violate the constitutions, Texas lacks authority to deprive Partain his civil right to just or adequate compensation through this case.

**2.** <u>Texas had no standing to complain and the District Court had no jurisdiction.</u> Texas acts unconstitutionally by using a state statute to violate Partain's civil right under the constitutions and caselaw. Texas lacks authority to violate the law. Texas cannot put up roadblocks to exercising a right to compensation or to continue, to revert back, to violating Partain's civil rights. It has no authority at all. Even the injunction issued in this district court case is specifically unavailable under TEX. CIV. PRAC. & REM. CODE ANN. §§ 65.001 because it violates the law and is based on fraud. Texas' actions to uncompensate Partain voids the state's authority to complain and destroys its standing. Texas can't allege an actual injury. Its like a thief complaining that they are the victim when the owner repossesses their property from the thief.

The district court lacks jurisdiction because Texas lacks authority, lacks standing, and because there is no order the district court could issue that wouldn't violate Partain's right to just and adequate compensation that he has already collected. Texas had no standing to complain and the District Court had no jurisdiction.

3.  <u>Partain's Due Process Rights Were Denied.</u>  Due process or due course of law ensures that individuals are treated fairly and that legal matters are resolved according to established rules and principles.  The district case included no discovery, no dispositive motions (except Partain's plea to the jurisdiction), no notice of a final hearing, no jury as requested by Partain, and no findings of jurisdiction based on Partain's constitutionally based plea to the jurisdiction.  The case is based on Partain's exercise of his constitutional rights to compensation as stated in his financing statement. Partain raised a constitutional defense and yet there is no response at all from the court or Texas regarding the constitition[s] and how they do or don't apply.  Partain's due process rights were denied.

ARGUMENTS

**1.**  <u>The State of Texas lacks authority to deprive Partain his civil right to just and adequate compensation.</u>

On October 6, 2023, at 10:56am, Johnny Partain recorded his UCC Financing Statement, document no. 23-0043292984 (UCC-1), with the Texas Secretary of State. Partain stated in his UCC-1 that "Payment and record is authorized and required by the Debtor's herein pursuant to Tex. Const. Art. 1, Sec. 17, and protected without exception under Sec. 29." That's accurate. This is what Partain intended and this is what Partain knows.

Art. 1, Sec. 17, authorizes expenditures of state assets. *Seaboard Airline R. Co. v US, 261 U.S. 299 (The requirement that 'just compensation' be paid is comprehensive and includes all elements and no specific command to include is necessary when interest or its equivalent is a part of such compensation).* One of the elements incontrovertible to this case is an interest in the state's assets based on the debt as made clear through the use of the words "just" compensation and "adequate" compensation in US Const. Amd. 5 and Tx. Const. Art. 1, Sec. 17, to reach said compensation. *"Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay." Jacobs v. United States 290 U.S. 13 (1933) (the right to just compensation could not be taken away by statute or qualified by the omission of a provision for interest where such an*

14

*allowance was appropriate in order to make the compensation adequate). "We (US Supreme Court) should not "assume the States will refuse to honor the Constitution," including the Takings Clause, because "States and their officers are [also] bound by obligation imposed by the Constitution." DeVillier v. Texas, 601 U.S. 285 (2024) (Texas Solicitor General Aaron Nielson explains to the U.S. Supreme Court that when compensation is not paid at the instance of a taking that a debt is created and the state is in constant violation of the constitution until the debt is paid); see also App. 5, R.R.p47:2-p48:24.* Tx. Const. Art. III Sec. 49 (a)(3) confirms that such a debt may be created by the constitution. Tx. Const. Art. 1, Sec. 29, protects the right to compensation.

> *Tx. Const. Art. 1 Sec. 29. PROVISIONS OF BILL OF RIGHTS EXCEPTED FROM POWERS OF GOVERNMENT; TO FOREVER REMAIN INVIOLATE - To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general*

*powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.*

The US Supreme Court has often recognized that the US Constitution applies to States: *"The constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution." Alden v. Maine, 527 U.S. 706, 754–755 (1999); Republican Party of Texas v. Dietz, 940 SW 2d 86 (1997) -TEX. CONST. art. I, § 29. The first clause of section 29 establishes that the purpose of the Texas Bill of Rights is to "guard against transgressions of the high powers" delegated to the state government by the Texas Constitution. Nowhere does the Texas Constitution contain similar language indicating an intent to have the Bill of Rights generally guard against transgressions by individuals. Further, the provisions in section 29 excepting everything in the Bill of Rights "out of the general powers of government" and providing that "all laws" contrary to the Bill of Rights*

*shall be void demonstrates that the Bill of Rights serves as a shield against the powers and laws of government.*

Therefore, statutory law cannot restrain the constitution[s] or Partain's civil right to compensation, including through Section 9.5185(a) of the Texas Business and Commerce Code, even if Congress, Governor, or Judiciary wanted to. *Travelers' Ins. Co. v. Marshall, 124 Tex. 45, 76 S.W.2d 1007 (Tex.1934), "we stated that the Bill of Rights "consists of express limitations of power" on the legislature, executive officers, and the judiciary." A law conflicting with rights guaranteed by the Texas Bill of Rights is void "because the Bill of Rights is a limit on State power." City of Beaumont v. Bouillion, 896 S.W.2d 149 (Tex. 1995); Miranda v. Arizona, 384 U.S. 426, 491; 86 S. Ct. 1603, "Where rights secured by the Constitution are involved, there can be no 'rule making' or legislation which would abrogate them." "The claim and exercise of a constitutional right cannot be converted into a crime."; Daryl J. Levinson, Rights Essentialism and Remedial Equilibration, 99 CoLum. L. REV. 857, 914 (1999) ("[R]ights and remedies operate as part of a single package."); Michael Coenen, Right-Remedy Equilibration and the*

17

*Asymmetric Entrenchment of Legal Entitlements, 61 B.C. L. RENT. 129,*

*139 (2020) (defining "legal entitlement" to mean "remedy made available*

*in response to a particular violation of a substantive right" (emphasis*

*omitted)).  Levinson, supra note 2, at 858 (describing rights and*

*remedies as "inextricably intertwined" and noting that rights rely on*

*remedies "for their scope, shape, and very existence"). Marbury v.*

*Madison, 5 U.S. 137 (1803) ("every right, when withheld, must have a*

*remedy").*

At this time on October 6, 2023, at 10:56am, Partain also recorded in his UCC-1 that his assets were probably commingled with the Debtors' assets ( Texas Business and Commerce Code Sec. 9.336) since Partain's assets had been taken without the required compensation, and there was no evidence that Partain's compensation or his assets had been segregated from the debtors assets.  Not that Partain needed another security interest because statutes do not control, but its there anyways.  This is what Partain knows.

At this same time on October 6, 2023, at 10:56am, Partain had already sued for inverse condemnation, civil rights violations, and RICO[8], in Hidalgo County case no. C-0929-12-F, to enforce the remedy to compensate him for his property that was taken and destroyed. But the South Texas judiciary and District Attorney had already made it blatantly obvious through targeted lawfare (*see App. 2, Third Amended Petition*) against Partain and through protection of criminal acts against Partain that they would not enforce or honor the remedy required by the constitution[s] to compensate Partain.

Jacobs v. United States, 290 U.S. 13 (1933) - Jacobs makes clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner is entitled to compensation as soon as the government takes his property without paying for it. The constitutional remedy of compensation is mandatory. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot., 560 U.S. 702,*

[8]The State of Texas was used as a RICO enterprise to interfere with an interstate motorcoach company owned by Partain which killed 23 people after a court took control of his company causing Partain to be served with over a billion dollars in claims from the victim's families. Then Partain was placed under a gag order and threatened, including through incarceration for 72 days until suing out a habeas corpus in federal court, to quiet liability. The families had to settle for a single $5 million insurance payout. Partain's company was destroyed, and Partain was also not compensated.

19

*740–41 (2010) (Kennedy & Sotomayor, JJ., concurring in part) ("[T]he Court subsequently held that the Takings Clause requires the availability of a suit for compensation against the States [in] First English[.]"); accord Manning v. Mining & Mins. Div. of the Energy, Min. & Nat'l Res. Dep't, 144 P.3d 87, 90–91 (N.M. 2006) (citing First English as holding that the "compensation remedy is required by the Constitution"); SDDS, Inc. v. State, 650 N.W.2d 1, 9 (S.D. 2002) (recognizing that First English means "the [compensation] remedy does not depend on statutory facilitation");* The Texas Constitution requires Texas to pay its debts, no ifs, ands, or buts. *App. 5, Certified Transcript in Devillier v. Texas , 601 U.S. 285 (2024) (App. 5, R.R.p38:19-25; R.R.p39:2-3,9-11; R.R.p40:11-12,15-19; R.R.p47:2-25; R.R.p48:18-25; R.R.p49:1-p68:4).*

Further, even if the state never provided a procedure for remedy, "the form of the remedy does not qualify the right." *First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304 (1987).* The constitution does not preclude extra-judicial acts to collect a constitutional debt against the state, and Congress could never write

20

a law forbidding it. *Ex parte Virginia, 100 U.S. 339, 346 (1880). "A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State."* Texas refused to provide Partain with any recourse at all for the taking and destroying of his property, and for the years of lawfare against Partain and his property in other cases, many where he wasn't even a party.

Any final remedy required by the constitution[s] would have required just and adequate compensation, or be void per the constitution[s], since the debt accrued was inviolate. *City of Dallas v Mitchell, 245 S.W. 944 "To take away all remedy for the enforcement of a*

21

*right is to take away the right itself. But that is not within the power of the State." The Constitution itself recognizes the remedy which is thus "self-executing." See Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18, 21 (1940) ("[I]f the authorized action ... does constitute a taking of property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery...."). This is what Partain knows.*

At this same time on October 6, 2023, at 10:56am, Texas was in violation of Partain's civil rights under US Const. Amd. 4, 5, 9, 14, and Tx. Const. 3, 9, 13, 17, and 19.[9] US Const. Amend. 5 and Tx. Const. Art. 1, Sec. 17 provided the remedies of just and adequate compensation. *First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304 (1987) "The suits were based on the right to recover just*

---

[9]Amendments 4 (The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated), 5 (nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation), 9 (that United States citizens have far more rights than those currently listed and that their absence doesn't diminish their importance), and 14 (due process), of the United States Constitution. Article 1 of the Texas Constitution has associated sections which the Defendants violated including 3 (equal rights), 9 (unreasonable seizures), 13 (remedy by due course of law), 17 (right to compensation for property taken, used, or destroyed), 19 (no deprivation, or in any manner disfranchised).

22

*compensation for property taken by the United States for public use in the exercise of its power of eminent domain. That right was guaranteed by the Constitution. The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment. The suits were thus founded upon the Constitution of the United States." The constitutional remedy of compensation is mandatory. [T]he Constitution itself is . . . a waiver of governmental immunity for the taking, damaging or destruction of property." Steele v. City of Houston, 603 S.W.2d 786, 791 (Tex. 1980).* The constitution[s] did not require judicial review or blessings, but they did specify "just" and "adequate" which included all elements necessary to achieve compensation. A security interest in Texas' assets became necessary elements of just and reasonable in current law to achieve the

compensation due to Partain and to place Texas in a lawful condition pursuant to the constitutions. This is what Partain knows.

At this same time on October 6, 2023, at 10:56am, the debtors, Texas and its political subdivisions, failed to challenge the debt or to compromise in any way. The doctrine of laches imposes an equitable time limit to challenge the debt, therefore vindicating the debt when the debtor is silent. It is understood that Texas not only claims immunity to civil right violations, but that Texas also excuses itself from the doctrine of laches to challenge its interests decades into the future. However, this case is not about Texas now or in the future, it is about Partain on October 6, 2023, at 10:56am. It is about what Partain knew at the time he recorded his UCC-1. That Texas had taken and destroyed his property and that Texas was compelled by the constitution to compensate him, and that Partain had the constitutional right to compensation; or the debt as Texas calls it. Texas itself acknowledges that taking, using, and destroying a person's property creates an "inviolate" debt. *Tx. Const. Art. 1, Sec. 29; App. 5, Transcript.* Texas did not challenge, negotiate, or in any way mitigate the debt, it

24

only claimed immunity to the law, which has been resolutely determine to be illegal and void in the previously cited caselaw. This is what Partain knows.

At this same time on October 6, 2023, at 10:56am, Partain had already made multiple contacts with Texas Governor Abbott, Attorney General Paxton, and the Texas Comptroller's office for compensation for his property that was taken and destroyed. *App. 3, Letter to the Governor and Attorney General.* Partain had already communicated to Governor Abbott and AG Paxton that their was no judicial remedy – although there still was a specific constitutional remedy. Texas Governor Abbot and Attorney General Paxton responded that they refused to provide Partain compensation, claiming that Partain needed to sue Texas again even though they claimed immunity to suit. The Governor and AG made a color of law argument violating Partain's rights under criminal code 18 USC § 242. This is what Partain knows.

At this same time on October 6, 2023, at 10:56am, citizen Partain had already petitioned each and every member of the Texas Legislature (App. 9, Petition to Texas Legislature) for compensation (twice) for his

25

property that was taken and destroyed. Only 3 members of the Texas Legislature responded to citizen Partain's petition for relief, claiming they were too busy to provide relief at the time - but at least they responded. This is what Partain knows.

At this same time on October 6, 2023, at 10:56am, Texas had engaged in fraud against Partain in its own courts to prevent Partain from appealing any illegal orders pursuant to his right compensation through due process, and destroyed any opportunity Partain might use to reach a final remedy through the judiciary. *(Boyce's Executors v. Grundy, 28 U.S. 210 (1830) (The law, which abhors fraud, does not permit it to purchase indulgence, dispensation, or absolution.; "Fraud vitiates the most solemn contracts, documents and even judgments."))*. Texas ultimately destroyed Partain's property rights through fraud and due process violation. *"A judgment rendered in violation of due process is void in the rendering State and is not entitled to full faith and credit elsewhere." Pennoyer v. Neff, 95 U. S. 714, 732-733 (1878)*. This is what Partain knows.

Partain knows that the law fully supports his increasingly aggressive efforts to enforce the remedy provided by the constitution[s], and he is certain a jury would agree. Texas' willingness to engage in unethical, unconstitutional, and even criminal acts against Partain to escape its debts will never lay. Unlawful declarations, manhandling, and threats of violence from the Texas Attorney General are just plain embarrassing to the state. Partain demonstrates what he knows pursuant to Texas' complaint under 9.5185 of the Texas Business and Commerce Code, not because he is showing compliance with the UCC code, but because he is showing how Texas' complaint is so irrelevant against the backdrop of its malfeasance and dirty hands. Partain could have filed a complete fabrication with the Secretary of State and it wouldn't have mattered if it was necessary to collect compensation from the state. There can be no law abrogating constitutional rights. The State of Texas lacks authority to deprive Partain his civil rights to just and adequate compensation.

2.  <u>Texas had no standing to complain and the District Court had no jurisdiction.</u>

Texas had no standing to complain and the District Court had no jurisdiction. Texas' complaint against Partain pursuant to 9.5185 of the Texas Business and Commerce Code is not only a frivolous complaint, but is an unconstitutional act by Texas to usurp the Supremacy Clause[10], Art. VI, Cl. 2, of the US Constitution to violate Partain's exercise of his constitutional rights under US Constitution, Amendment 5, and Texas Constitution, Art. 1, Sec. 17, which is also protected by Art. 1, Sec 29. Texas seeks to reverse the constitution[s] mandated compensation that Partain collected by impeaching his UCC-1 as fraud to challenge the title to his properties and to seize them, without compensation, per Texas' own admissions in the US District Court, Southern District of Texas, case no.7:24-CV-00528.[11] Even duly enacted

---

[10]The Supremacy Clause: This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
[11]Federal District Court case no. 7:24-CV-00528 is Partain's complaint against AG Ken Paxton and Land Commissioner Dawn Buckingham, officially and individually, pursuant to 42 U.S.C §1983 and made actionable (Ex Parte Young) through years of recorded civil rights abuses by the State of Texas.

28

statutes do not supply rules of decision for courts to the extent that the statutes become unconstitutional. *"U.S. Const., Art. VI, cl. 2 ("[T]he Judges in every State shall be bound" by "the Laws of the United States")" Directv, Inc. v. Imburgia, 577 U.S. 47, 53 (2015). Ableman v. Booth, 62 U.S. 506 (1858) (state courts cannot issue rulings that contradict the decisions of federal courts).* In Edgar v. MITE Corp., 457 U.S. 624 (1982), the Supreme Court ruled: *"A state statute is void to the extent that it actually conflicts with a valid Federal statute".* This means that a state law will be found to violate the Supremacy Clause when either of the following two conditions (or both) exist:

1.Compliance with both the Federal and State laws is impossible

2."State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"

Consequently, Tx. Bus. & Com. Code 9.5185 violates the Supremacy Clause because it is being used by Texas to adversely effect Partain's rights to compensation and due process under the US Constitution. Tx. Bus. & Com. Code 9.5185 is also void under Texas law when used to

obstruct Art 1. Sec 13, 17, and 29 of the Texas Constitution. Texas had no standing to complain and the District Court had no jurisdiction.

Texas also sought an injunction pursuant to Tx. Bus. & Com. Code 9.5185 arguing that TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.003, 65.011 was controlling. This is false since TEX. CIV. PRAC. & REM. CODE ANN. §§ 65.001 specifically restrains injunctive relief to that which does not violate Chapter 65, or other laws, including civil rights under the constitutions. The order appealed herein violates TEX. CIV. PRAC. & REM. CODE ANN. §§ 65.001, Tx. Const. Art. 1, Sec. 17, US Const. Amd. 5, and The Supremacy Clause. Texas has no standing and the Court has no jurisdiction.

To have standing, a party must allege an actual injury. *Brown v. Todd, 53 S.W.3d 297, 305 (Tex. 2001); Daimler Chrysler Corp. v. Inman, 252 S.W.3d 299, 304 (Tex.2008)*. The state cannot evade its duty to pay an inviolate debt and then claim to be a victim of injury when it is forced to conform to the law, to pay its bills. Its like a thief complaining to be a victim because there is no security agreement, when the owner collects his property from the thief. Texas lacks authority to violate the

30

law, and therefore, to petition to evade its debt, to use its powers of government, or to use a court's authority (even through a mistake) to destroy an inviolate debt that the state accrues under Tx. Const. Art. 1, Sec. 17 and the 5th Amendment of the US Constitution. It lacks authority because Tx. Const. Art. 1, Sec. 29 also explicitly says so. Sec. 29. states,

> "BILL OF RIGHTS EXCEPTED FROM POWERS OF GOVERNMENT AND INVIOLATE. To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void."

Section 29 has been interpreted to mean that any provision of the Bill of Rights is self executing to the extent that anything done in violation of it is void. *Hemphill v. Watson, 60 Tex. 679, 681 (1884).*[12]  Additionally,

---

[12]Republican Party of Texas v. Dietz, 940 SW 2d 86 (1997) -TEX. CONST. art. I, § 29. The first clause of section 29 establishes that the purpose of the Texas Bill of Rights is to "guard against transgressions of the high powers" delegated to the state government by the Texas Constitution. Nowhere does the Texas Constitution contain similar language indicating an intent to have the Bill of Rights generally guard against transgressions by individuals. Further, the provisions in section 29 excepting everything in the Bill of Rights "out of the general powers of government" and providing that "all laws" contrary to the Bill of Rights shall be void demonstrates that the Bill of Rights serves as a shield against the powers and laws of government.

the remedy compelled by the Fifth Amendment "cannot be taken away by statute." *Seaboard Air Line Railway Co. v. United States, 261 U.S. 299, 304 (1923).* Texas' abuse of Tx. Bus. & Com. Code 9.5185 is about taking the remedy away mandated by the Fifth Amendment and Sec. 17 from Partain. That is illegal. Texas has no standing and the Court has no jurisdiction.[13]

There is no order, except dismissal that a district court can issue under Texas' petition that wouldn't violate Partain's civil rights under the US and Texas Constitutions. The order appealed in this case is an excellent example. After getting past the conspicuous fraud which alleges Partain gave up his rights and agreed to no due process or jury prior to a TRO hearing, the order blows past any constitutional issues Partain raised, ad nauseum, and lands its conclusions, its authority, on the fiction that it (the UCC-1) is "not predicated on a security interest". Technically, Texas UCC financing statements generally do not contain a grant of the security interest and generally are not signed or otherwise authenticated by the Debtor and therefore would not satisfy the

---

[13]Travelers' Ins. Co. v. Marshall,124 Tex. 45, 76 S.W.2d 1007 (Tex.1934), we stated that the Bill of Rights "consists of express limitations of power" on the legislature, executive officers, and the judiciary.

requirement of a security agreement anyways. So it doesn't matter, expecially from a constitutional point of view. Even if the law or financing statement format changed to support Texas' argument (that a mandatory debt created under Tx. Const. Art. 1, Sec. 17, doesn't create any interest or a security agreement), it would still be irrelevant because Texas' complaint is an effort to use inferior statutory law to violate the constitutions. There is little Texas can do to squash the exercise of a constitutional right, especially one with an attached remedy, except pay its debt. Why doesn't Texas just pay its debt? Fortunately, Partain has already collected the debt so the issue is moot. Texas' complaint is moot. Texas cannot put up roadblocks to prevent compensating a citizen pursuant to the constitutions, even if it uses statutes to pursue alleged crimes. Texas must conform to the law. Otherwise its actions are void, just like the order appealed in this case. *PNS Stores, Inc. v. Rivera ex rel. Rivera 55 Tex. Sup. Ct. J. 1400 (Tex. 2012) (We [Texas Supreme Court] have described a judgment as void when "the court rendering judgment had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the*

*particular judgment, or no capacity to act." Travelers Ins. Co. v.*

*Joachim, 315 S.W.3d 860, 863 (Tex.2010) (quoting Browning, 165*

*S.W.3d 346)).* Texas has no standing and the Court has no jurisdiction.

The standing inquiry "requires careful judicial examination of a

complaint's allegations to ascertain whether the particular plaintiff is

entitled to an adjudication of the particular claims asserted." *Heckman*

*v. Williamson Cnty, 369 S.W.3d 137.* Texas' petition is solely designed

to violate Johnny Partain's right to compensation under Texas

Constitution, Art. 1, Sec. 17 and 29, and to put the Texas back into the

position of violating Partain's civil rights. Court's have no authority to

violate the law. *Chicago, Burlington & Quincy Railroad Co. v. Chicago,*

*166 U.S. 226 (1897) ("It must be observed that the prohibitions of the*

*[Fourteenth] amendment refer to all the instrumentalities of the state,—*

*to its legislative, executive, and judicial authorities, —and, therefore,*

*whoever by virtue of public position under a state government deprives*

*another of any right protected by that amendment against deprivation by*

*the state, 'violates the constitutional inhibition' … This must be so, or, as*

*we [SCOTUS] have often said, the constitutional prohibition has no*

34

*meaning[.]) See Dolan v. City of Tigard, 512 U.S. 374, 383 (1994); Penn Central Transp. Co. v. New York City, 438 U.S. 104, 122 (1978); Nollan, 483 U.S. 827.*  Texas can't sue to violate Partain's right to compensation because that power is excepted by Sec. 29 of the constitution and the Supremacy Clause.  Whether a trial court has subject-matter jurisdiction is a question of law for the court, requiring de novo review. *State Dep't of Highways & Pub. Transp. v. Gonzalez 82 S.W.3d 322, 327 (Tex. 2002).*  Texas had no standing to complain and the District Court had no jurisdiction.

3.  Partain's Due Process Rights Were Denied

Partain's due process rights were denied.  The Texas Constitution's due-course-of-law guarantee provides that *"[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19.* It is nearly identical to the Fourteenth Amendment's due-process clause, which provides that "[n]o State shall make or enforce any law which shall abridge the privileges or

35

immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ." U.S. CONST. amend. XIV, § 1.

The judge misrepresented to Partain that he was not entitled to a jury trial as he applied for a jury in open court, and then deprived Partain his due process of law. *TEX.CONST. art.I, § 15 ("The right of trial by jury shall remain inviolate."); TEX.CONST. art. V, § 10 ("In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury."). "When contested fact issues must be resolved before equitable relief can be determined, a party is entitled to have that resolution made by a jury." Hill v. Shamoun & Norman, LLP, 544 S.W.3d 724, 741 (Tex. 2018) (quoting Burrow v. Arce, 997 S.W.2d 229, 245 (Tex. 1999)).* In arguendo that Texas could complain, what Partain knew or intended pursuant to Texas Business and Commerce Code section 9.5185 when he filed his UCC-1 on October 6, 2023, at 10:56am, requires a finding of fact. A judge abuses his discretion by acting "without reference to any guiding rules or principles" or by acting arbitrarily or unreasonably. *E.I.*

36

*du Pont de Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990).* The judge abused his discretion.

The judge went further by signing a fraudulent order, provided by the State of Texas after the TRO hearing, claiming that Partain waived his due process right prior to a full hearing on the merits. This is fraud on the court, extrinsic fraud in fact. There is no evidence this happened, because it did not. Extrinsic fraud is conduct that prevents a real trial upon the issues involved. *O'Meara v. O'Meara, 181 S.W.2d 891 (Tex. Civ. App. 1944).* Extrinsic fraud denies a litigant the opportunity to fully litigate at trial all the rights or defenses that could have been asserted. *King Ranch, 118 S.W.3d 752 (Tex. 2003).* Partain has never even appeared in court for a trial. He did appear for a TRO and was told he wasn't entitled to a jury since it was only for a temporary injunction. Extrensic fraud denies due process.

Denial of due process makes a judgment void. *"A judgment "is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due*

*process of law."" Williams v. New Orleans Public Service, Inc., 728 F.2d 730, 735 (5th Cir. 1984).* The district case included no discovery, no dispositive motions (except Partain's plea to the jurisdiction which is still not fully adjudicated on the constitutional issues[14]), no notice of a final hearing, nor even responses to any constitutional claims on which the case is actually based. The judge acted "without reference to any guiding rules or principles." Id. *E.I. du Pont de Nemours.*

Finally, the judge signed the fraudulent order declaring that the State of Texas does not owe the inviolate debt alleged in the Financing Statement. How does he know? He doesn't. Where does he have the authority to make that order? He doesn't. The debt alleged has never been litigated or even challenged by Texas – remember, this case is about what Partain knew or intended on October 6, 2023, at 10:56am. Litigation over the debt owed to Partain has been avoided on Texas' claims of sovereign immunity and by denying Partain due process. Just

---

[14]A court has no authority to move onto a TRO hearing without first affirmatively determining its jurisdiction. Bland Indep. Sch. Dist., 34 S.W.3d 554; Miranda, 133 S.W.3d at 226, 229; Austin & N.W.R. Co. v. Cluck, 97 Tex. 172, 77 S.W. 403, 405 (1903) ("[T]here can be no doubt that the courts of Texas must look to the Constitution of this state, the enactments of the Legislature, and the common law for their authority to proceed ….").

because the Texas judiciary refuses to provide an open court or a process to support the remedy (a simple inverse condemnation claim) required by the constitutions doesn't mean the debt goes away. *Tx. Const. Art. 1 sec. 13 - Excessive Bail or Fines; Cruel and Unusual Punishment; Remedy by Due Course of Law,* "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."; *Texas Const. Art. 1 sec. 19 - Deprivation of Life, Liberty, Etc.; Due Course of Law,* "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."* The debt alleged is an inviolate debt per US Const. Amd. 5 and Tx. Const. Art. 1, Sec. 17, beyond the authority of the Court, excepted out of the general powers of government, and forever remaining inviolate. *Tx. Const. Art. 1, Sec. 29.* A judicial, executive, or even legislated order to affect the inviolate debt is void. Partain's due process rights were denied.

## PRAYER

WHEREFROM PREMISES CONSIDERED, Appellant Johnny Partain prays the 15th Court of Appeals strikes down the *District Court's Order Granting Permanent Injunction And Other Relief* for being illegal and void, and declares any actions taken under the color of law from the order or on basis of the state's claim are also Void. Johnny Partain prays the 15th Court of Appeals dismisses the State of Texas' lawsuit in D-1-GN-24-002560 with prejudice for violating the restraints of the US Constitution and the Texas Constitution. Johnny Partain prays for all other relief in equity and law he may be entitled.

Respectfully Submitted,

_____
JOHNNY R. PARTAIN
7020 N 16th Street
McAllen, Texas 78504
956-240-1821

40

## CERTIFICATE OF COMPLIANCE

I, Johnny Partain, do hereby certify this *Appellant's Brief* that pursuant to TRAP 9.4 (i) (3), the number of words in this document as provided by the LibreOffice Writer is 7292 words.

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered a true and correct copy of the Appellant's Brief and Appendix on this March 25, 2025, pursuant to the Texas Rules of Appellant Procedure to:

ZACHARY L. RHINES Assistant Attorney General General Litigation Division, Zachary.Rhines@oag.texas.gov and to ALI THORBURN Assistant Attorney General General Litigation Division, Ali.Thorburn@oag.texas.gov.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98867869
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellant's Brief with Separate Appendix
Status as of 3/25/2025 4:17 PM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ali Thorburn | | Ali.Thorburn@oag.texas.gov | 3/25/2025 2:57:25 PM | SENT |

No. 15-25-00005-CV

# In The
# Fifteenth Court Of Appeals

◆

JOHNNY PARTAIN
*Appellant*

v.

STATE OF TEXAS
*Appellee*

◆

**Appellant's Brief Appendix**

◆

JOHNNY R. PARTAIN
7020 N 16th Street
McAllen, Texas 78504
956-240-1821

APPENDIX

1. Defendant's Plea To The Jurisdiction and Motion To Dismiss

2. Third Amended Petition, case no. C-0929-12-F

3. Letters To Governor and Attorney General

4. Transfer Statement

5. Certified Transcript in Devillier v. Texas, 601 U.S. 285 (2024)

6. Miscellaneous Claim Application With Response

7. Hidalgo County Court case no. CL-29,530-H, Summary (Certified)

8. Governor Abbott's Press Release

9. Petition To Texas Legislature

1. Defendant's Plea To The Jurisdiction and Motion To Dismiss

CAUSE NO. <u>D-1-GN-24-002560</u>

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| | § | 126TH JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| | § | TRAVIS COUNTY,TEXAS |
| JOHNNY PARTAIN | § | |
| Defendant | § | |

<u>DEFENDANT'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS</u>

TO THE JUDGE OF THIS COURT

    COMES NOW JOHNNY PARTAIN, Defendant, in the above styled and numbered cause and brings his *Defendant's Plea To The Jurisdiction and Motion To Dismiss*, and in support thereof shows unto the Court the following.

<u>INTRODUCTION</u>

1.    The State of Texas brought this pointless suit pursuant to an inferior Texas subchapter of the UUC statute to violate and control Johnny Partain's exercise of his constitutional rights under US Constitution, Amendment 5, and Texas Constitution, Art. 1, Sec. 17, protected by Sec 29. Texas seeks to <u>reverse compensating and to unpay</u> Johnny Partain as part of their decades long gamesmanship of Texas laws.

2.    Johnny Partain sued the State of Texas and its officers in Hidalgo County District case no. C-0929-12-F, for Inverse Condemnation, US 5th Amendment violations, and RICO, seeking $250,000,000.00 sum certain, plus interest. *Exhibit 1, Petition (only)*. The case was dismissed on the "authority of the judge." The dismissal was reversed and the case remanded with a mandate (case no. 13-13-00341-CV) from the 13th Court of Appeals, written by a justice out of the 14th Court of appeals assigned by the Chief Justice of the Texas Supreme Court, to take Johnny Partain to trial and to pay his legal costs. *Exhibit 2, Mandate*. The lower court resisted.

1

3.      Johnny Partain motioned for a $250,000,000 summary judgment against the State of Texas.  Texas failed to provide a written response but argued against the motion in summary judgment hearing.  Instead of awarding Johnny Partain summary judgment as required, the court refused to entertain any hearings in the case for over 4 years until Johnny Partain contacted Texas Governor Greg Abbott and Attorney General Kenneth Paxton for payment.  Johnny Partain pointed out the Texas Constitution already provided a self-executing compensation remedy which didn't require a court's opinion and never required a lawsuit in the first place. *Exhibit 3, Certified Letters.* Also note that Texas doesn't have an inverse condemnation statute or any administrative process for paying compensation pursuant to USCA 5 or Tx. Const. Art. 1, Sec. 17.

4.      Within approximately a week, Johnny Partain was informed by the Texas State Commission on Judicial Conduct that an investigation against four district judges for bank fraud, money laundering, RICO, official abuse, bribery, and other offenses had been started.  Ironically the investigations were dismissed in form letters from the Texas State Commission on Judicial Conduct claiming that it does not have jurisdiction over judges.?. - so there was no investigation.  Approximately, two weeks after the investigation was supposed to start a hearing was scheduled in the court, case no. C-0929-12-F – the same court that had refused to have a hearing for over 4 years.

5.      At the hearing the Attorney General's office argued that "someone needed to pay that man", referring to Johnny Partain, but he also argued Texas was immune to suit.  The other public defendants pointed fingers at one and another, arguing who was liable, while also claiming immunity to suit.  Finally, the district judge acknowledged that he had a mandate to take Johnny Partain to trial but that if there were no defendants there could be no trial.  The district judge gifted the State of Texas with a general order of immunity. He also gifted the other defendants with general orders of immunity.  The merits of the case were never reviewed.  Johnny Partain was not allowed to appeal although he tried.

6.      Johnny Partain again communicated to Texas Governor Greg Abbott and Attorney General Kenneth Paxton that he had sued the State of Texas for $250,000,000, sum certain debt, which was self-executing, providing a remedy, under Texas Constitution, Art. 1, Sec. 17, and inviolate against any state actions to adversely effect the debt as

strictly stated under Texas Constitution, Art. 1, Sec. 29. Johnny Partain communicated that the court refused it duty to entertain any constitutional recourse as provided under its own case law which left the Governor and Attorney General responsible to pay the state's $250,000,000 – since the governor and attorney general were not empowered to substitute their own opinions in for a court's opinion. Johnny Partain respectfully requested payment and cautioned the Governor and Attorney General that he would collect if they failed to abide by the law. About 2 weeks, Johnny Partain's business was audited by the Texas Comptroller's office which is still ongoing to this day.

7.      Approximately 8 months later Johnny Partain informed Governor Abbott and Attorney General Paxton that it appeared they would not pay him. Johnny Partain made a formal request to the Texas Comptroller for payment which was neither accepted or denied until nearly 4 months later when Johnny Partain spoke to the Texas Comptroller's attorney who claimed that Governor Abbott and Attorney General Paxton objected to paying Johnny Partain. The attorney claimed that Governor Abbott and Attorney General Paxton required Johnny Partain to sue the State of Texas - which the the officials also claimed was immune to suit. Johnny Partain made criminal complaints against Greg Abbott and Kenneth Paxton to United States Attorney General Attorney Merrick Garland for using the color of law under 18 U.S. Code § 242 to violate his constitutional rights. Johnny Partain advised AG Merrick Garland that he was collecting compensation against the state and welcomed any information they may provide to avoid collecting against federal interests. Johnny Partain then collected his adequate compensation through different methods within the restraints of US Constitution and Texas Constitution, as he cautioned the Governor and Attorney General that he would. The debt has been mostly collected, and should be completely collected within September of 2024.

8.      There are no statutory remedies or pleas in equity available for judicial discretion to overturn a constitutional mandate or to unpay the compensation required by the US Constitution and Texas Constitution. In law, the powers of government are excepted from violating civil rights of its citizens through the voiding of its actions. The State of Texas brought this pointless suit through an inferior Texas subchapter of the UUC statute to violate and control Johnny Partain's exercise of his constitutional rights under US Constitution, Amendment 5, and Texas Constitution, Art. 1, Sec. 17, protected by Sec 29.

3

## STANDARD OF REVIEW

9.      A plea to the jurisdiction is a procedural device used to challenge a court's subject-matter jurisdiction over a given claim. *Tex. Dep't. of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 232 (Tex. 2004)*. Whether a trial court has subject-matter jurisdiction is a question of law for the court, requiring de novo review. *State Dep't of Highways & Pub. Transp. v. Gonzalez 82 S.W.3d 322, 327 (Tex. 2002)*. While reviewing a plea to the jurisdiction, a court should limit itself to the jurisdictional issue at hand and avoid considering the merits of claims made by the plaintiff. *Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000)*. During a court's review of its jurisdiction over a given claim, it is the plaintiff who has the burden to allege facts affirmatively demonstrating that the trial court has subject matter jurisdiction. State Dep't of Highways at 446. If a trial court determines that it lacks subject-matter jurisdiction over a given claim, it should dismiss the case with prejudice. *See, Daimler-Chrysler Corp v. Inman, 252 S.W.3d 299, 304 (Tex. 2008)*.

## BASIS FOR DISMISSAL

Even if this Court takes as true all of Plaintiff's allegations against Defendants, as it must for the purposes of this Plea, this Court must grant Defendant's Plea for the following reasons:

10.      The Plaintiff lacks standing to complain.  Plaintiff alleges that Defendant filed a UCC Financing Statement to collect a constitutionally imposed debt accruing under Tex. Const. Art. 1, Sec. 17, and protected, without exception, by Art. 1, Sec. 29.  It says so on the financing statement provided in the Plaintiff's Petition Exhibit 1.  The debt cannot be legally ignored by the Plaintiff and is protected by res judicata through litigation in Hidalgo County District Court case no. C-0929-12-F.  The Plaintiff cannot be injured by having its debt collected.  The Plaintiff cannot use any any inferior state statute to breach Defendant's

4

constitutional right to compensation. The Plaintiff lacks standing to complain.

11.     This case is beyond the jurisdiction of the Court. The Court lacks jurisdiction because the Plaintiff lacks standing. Also, there is no order the Court can issue on the Plaintiff's petition that would not violate the Defendant's civil rights under the US and Texas Constitutions since the Plaintiff's petition is solely designed to violate Johnny Partain's right to compensation under Texas Constitution, Art. 1, Sec. 17 and 29, and to put the Plaintiff back into the position of violating the Defendant civil rights. Any order supporting the Plaintiff's petition would be void. This case is beyond the jurisdiction of the Court.

ARGUMENTS & AUTHORITIES

12.     Texas has no standing. The State of Texas lacks authority to petition to evade its debt, to use its powers of government, or to use this court's authority to destroy an inviolate debt that the state accrues under Tx. Const. Art. 1, Sec. 17 and the 5th Amendment of the US Constitution. It lacks authority because under Tx. Const. Art. 1, Sec. 29 explicitly says so. Sec. 29. states,

> *"BILL OF RIGHTS EXCEPTED FROM POWERS OF GOVERNMENT AND INVIOLATE. To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.*

Section 29 has been interpreted to mean that any provision of the Bill of Rights is self-executing to the extent that anything done in violation of it is void. *Hemphill v. Watson, 60 Tex. 679, 681 (1884).*[1] Additionally, the remedy compelled by the Fifth Amendment

---

1. Republican Party of Texas v. Dietz, 940 SW 2d 86 (1997) -TEX. CONST. art. I, § 29. The first clause of section 29 establishes that the purpose of the Texas Bill of Rights is to "guard against transgressions of the high powers" delegated to the state government by the Texas Constitution. Nowhere does the Texas Constitution contain similar language indicating an intent to have the Bill of Rights generally guard against transgressions by individuals. Further, the provisions in section 29 excepting everything in the Bill of

"cannot be taken away by statute." *Seaboard Air Line Railway Co. v. United States, 261 U.S. 299, 304 (1923).* Texas has no standing.[2]

13. Texas has no standing. To have standing, a party must allege an actual injury. *Brown v. Todd, 53 S.W.3d 297, 305 (Tex. 2001).* The state cannot evade its duty to pay its debts and then claim to be a victim of injury when it is forced to conform to the law. Texas' constitutionally impose debt is the nexus of the state's complaint. But Texas has had no review of the merits of its debt to Johnny Partain to support its complaint. Instead, Texas' gamesmanship creates a paradox were the state has already pled immunity to suit - which certainly doesn't exist under the law[3] - to evade review of the merits of its debt – a debt which is inviolate under the constitution (see Sec. 29) - in a prior district court case, giving rise to the restraints of res judicata to reopen a case to review something that the State could have reasonably litigated already, and was prevented from being appealed – by the state. Texas' petition is disingenuous and baits this Court into a minefield of constitutional violations, misapplications of law, and malfeasance just to reach the nexus – where the law is 100% on Johnny Partain's side. In the end *Jacobs v. United States,* 290 U. S. 13 (1933) would control. *Jacobs* makes clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner is entitled to compensation as soon as the government takes his property without paying for it. See *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot., 560 U.S. 702, 740–41 (2010) (Kennedy & Sotomayor, JJ., concurring in part) ("[T]he Court subsequently held that the Takings Clause requires the availability of a suit for compensation against the States [in] First English[.]"); accord Manning v. Mining & Mins. Div. of the Energy, Min. & Nat'l Res. Dep't, 144 P.3d 87, 90–91 (N.M. 2006) (citing First English as holding that the "compensation remedy is required by the Constitution"); SDDS, Inc. v. State, 650 N.W.2d 1, 9 (S.D. 2002) (recognizing that First*

---

Rights "out of the general powers of government" and providing that "all laws" contrary to the Bill of Rights shall be void demonstrates that the Bill of Rights serves as a shield against the powers and laws of government.

2. Travelers' Ins. Co. v. Marshall,124 Tex. 45, 76 S.W.2d 1007 (Tex.1934), we stated that the Bill of Rights "consists of *express limitations of power*" on the legislature, executive officers, and the judiciary.

3  The US Supreme Court has often recognized that the Constitution applies to States: "The constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution."52 Alden v. Maine, 527 U.S. 706, 754–755 (1999).

6

*English means "the [compensation] remedy does not depend on statutory facilitation").* The Texas Constitution requires Texas to pay its debts, no ifs, ands, or buts. *Exhibit 4, Brief For Respondent (State of Texas) to the US Supreme Court, page 1-3, in Devillier v. Texas , 601 U.S. 285 (2024) (The State of Texas takes property rights extremely seriously. Indeed, the Texas Constitution goes beyond the U.S. Constitution by providing that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, §17 (emphasis added). Texas courts also decide takings claims and award full compensation under both the U.S. Constitution and the more protective Texas Constitution.);* See also the attached *Exhibit 5, Certified Transcript in Devillier v. Texas , 601 U.S. 285 (2024) (Texas Solicitor General Aaron Nielson discussing conformance to constitutional requirement and a rogue state hypothesis)(R.R.p38:19-25; R.R.p39:2-3,9-11; R.R.p40:11-12,15-19; R.R.p47:2-25; R.R.p48:18-25; R.R.p49:1-p68:4).* Further, even if the state never provided a procedure for remedy, the constitution does not preclude extra-judicial acts to collect a constitutional debt against the state, and Congress could never write a law forbidding it.  The Plaintiff lacks standing to complain.

14.     This case is beyond the authority of the Court.  If a plaintiff lacks standing to assert one of his claims, the court lacks jurisdiction over that claim and must dismiss it. *Daimler Chrysler Corp. v. Inman, 252 S.W.3d 299, 304 (Tex.2008).*  The standing inquiry *"requires careful judicial examination of a complaint's* allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Heckman v. Williamson Cnty, 369 S.W.3d 137*.  Texas Officials are required to enforce the Constitution - they can't sue to violate it because that power is excepted by Sec. 29 of the constitution.   "*It must be observed that the prohibitions of the [Fourteenth] amendment refer to all the instrumentalities of the state,—to its legislative, executive, and judicial authorities, —and, therefore, whoever by virtue of public position under a state government deprives another of any right protected by that amendment against deprivation by the state, 'violates the constitutional inhibition' … This must be so, or, as we [SCOTUS] have often said, the constitutional prohibition has no meaning[.] See Dolan v. City of Tigard, 512 U.S. 374, 383 (1994); Penn Central Transp. Co. v. New*

7

*York City, 438 U.S. 104, 122 (1978); Nollan, 483 U.S. at 827; Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot., 560 U.S. 702, 717 (2010). Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 306 n.1 (2002) (The Just Compensation Clause "applies to the States as well as the Federal Government.").* There is no order the court could issue to relieve the Plaintiff its duty to pay it debts without putting the State of Texas in the position again of violating Johnny Partain's civil rights under the US and Texas Constitutions. This case is beyond the authority of the Court.

15. WHEREFORE PREMISES CONSIDERED, the Defendant moves the Court to dismiss this lawsuit.

Respectfully submitted by,

JOHNNY PARTAIN
7020 N. 16th Street
McAllen, Texas 78504
956-687-4966
partain@atlastechnologies.biz

## CERTIFICATE OF SERVICE

This certifies that a true and correct copy Defendant's Plea To The Jurisdiction and Motion To Dismiss, has been serviced by email to ZACHARY L. RHINES Assistant Attorney General General Litigation Division, Zachary.Rhines@oag.texas.gov and to ALI THORBURN Assistant Attorney General General Litigation Division, Ali.Thorburn@oag.texas.gov on this August 20, 2024.

Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz
956-240-1821

8

EXHIBIT 1

FILED
AT 3:54 O'CLOCK P M
NUV 09 2015
LAURA HINOJOSA, CLERK
District Courts, Hidalgo County
By_____ Deputy#30

CAUSE NO. C-0929-12-F

| | | |
|---|---|---|
| JOHNNY PARTAIN | § | IN THE 332 DISTRICT COURT |
| Plaintiff | § | |
| | § | OF HIDALGO COUNTY, TEXAS |
| VS. | § | |
| | § | |
| CONSTABLE J.E. "EDDIE" GUERRA, | § | |
| HIDALGO COUNTY PRECINCT 4 in his | § | |
| Official Capacity, and JAMES H. MAPLES | § | |
| Defendants | | |

## PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION CONSOLIDATING SEC. 1983 CIVIL RIGHTS VIOLATIONS, RICO COMPLAINTS, AND "TAKINGS CLAUSE"

TO THE JUDGE OF THIS COURT

1.      COMES NOW JOHNNY PARTAIN, Plaintiff in the above filed and numbered cause and files his *Plaintiff's Second Amended Petition Consolidating Sec. 1983 Civil Rights Violations, Rico Complaints, and "Taking Clause"* respectfully shows unto the Court as follows.

### DISCOVERY

2.      Plaintiff intends that discovery be conducted under Level 3.

### PARTIES

A. Plaintiff, JOHNNY PARTAIN may be contacted at 7020 N 16th Street, McAllen, Texas 78504; phone 956-240-1821;

B. Defendant, STATE OF TEXAS, through KEN PAXTON, OFFICE OF THE ATTORNEY GENERAL, and may be served at 300 W. 15th Street, P.O. Box 12548, Austin, TX 78701; (512) 463-2100;

C. Defendant, HIDALGO COUNTY SHERIFF/CONSTABLE J.E."EDDIE" GUERRA, HIDALGO COUNTY PRECINCT 4, in his official position and individually, and may be served at 711 El Cibolo Road, Edinburg, TX 78541; phone (956) 383-8114;

D. Defendant, DEPUTY CONSTABLE CARLOS GONZALEZ, HIDALGO COUNTY PRECINCT 4, in his official position and individually, and may be served at 2418 S. Business Hwy. 281, Edinburg, Texas 78539; phone 956-383-8560;

E. Defendant, JUSTICE OF THE PEACE HOMER JASSO SR., in his official position and individually, and may be served at his office at 224 N. 12th Edinburg, TX 78539; (956) 383-0921;

F. Defendant, DISTRICT JUDGE (RETIRED) ALEX W. GABERT, in his official position and individually, and may be served at his office at 502 N Britton Ave., Rio Grande City, 78582;

G. Defendant, DISTRICT JUDGE JOSE MANUEL BANALES, in his official position and individually, may be served at One Shoreline Plaza, 800 N. Shoreline Blvd., Suite 302 South Tower, P.O. Box 2412, Corpus Christi, Texas 78403; (361)726-9430;

H. Defendant, SENIOR DISTRICT JUDGE ROBERT MAX BLACKMON, in his official position and individually, and may be served at 101 N. Shoreline, Suite 350, Corpus Christi, Texas 78401;

I. Defendant, COUNTY JUDGE SERGIO VALDEZ, in his official position and individually, and may be served at Hidalgo County Court At Law Number No. 7, 100 N. Closner Blvd., Edinburg, TX 78539;

J. Defendant, DISTRICT ATTORNEY RENE GUERRA, in his official position and individually, and may be served at his office 100 N Closner Blvd, Edinburg, TX 78539.

K. Defendant, COUNTY JUDGE RODOLFO GONZALEZ in his official position and individually, and may be served at his office at 100 N Closner Blvd, Edinburg, TX 78539;

L. Defendant, HIDALOG COUNTY SHERIFF GUADALUPE "LUPE" TREVIÑO, in his official position and personally, and may be served with process at his office at 711 E. El Cibolo Road, Edinburg, Texas 78542;

M. Defendant HIDALGO COUNTY, TEXAS, a local governmental entity, may be served with process by serving County Judge Ramon Garcia of said a local governmental entity, at 302 West University, Edinburg, TX 78539;

N. Defendant, BBVA USA, INC., Waterway Plaza II 10001 Woodloch Forest The Woodlands, Texas, 77380, whose registered agent is Peter W. Paulsen Waterway Plaza II, 10001 Woodloch Forest Drive Ste 610, The Woodlands, Texas, 77380; known herein as Compass Bank.

O. Defendant, MCALLEN POLICE CHIEF VICTOR RODRIGUEZ, in his official position, and may be served with process at his office at 1601 N. Bicentennia Blvd., McAllen, TX 78501;

P. Defendant, CITY OF MCALLEN, TEXAS, a municipal corporation, may be served with process by serving its mayor of said organization, JIM DARLING, at 1300 Houston Avenue, McAllen, TX 78501;

Q. Defendant JAMES MAPLES divorced and may be served with process at 605 Wisteria, McAllen, Texas 78504; phone 956-827-5502.

R. Defendant, COMPASS BANK, 15 South 20th Street, Birmingham, Alabama, 35233, whose registered agent is C T Corporation System, 350 N St. Paul Street, Dallas, Texas, 75201;

S. Defendant, FARMERS INSURANCE, and may be served through FIRE INSURANCE EXCHANGE, P.O. Box 51196, Los Angeles, Ca. 90051-5496;

T. Defendant, STATE BAR OF TEXAS, a public corporation and an administrative agency of the judicial department, may be served with process by serving Christine E. McKeeman, Executive Director & General Counsel, 1414 Colorado Street, Austin, Texas 78701.

### III. JURISDICTION

3. This Court has concurrent jurisdiction over 42 USC § 1983, Civil Action for Deprivation of Rights, and 18 U.S.C. 1964, Racketeer Influenced Corrupt Organization, pursuant to Article VI, Clause 2 of the United States Constitution. See Tafflin v. Levitt, 493 U.S. 455 (1990). This Court also has concurrent jurisdiction over eminent domain suits per Tx. Prop. Code § 21.001.

### IV. FACTS

4. Johnny Partain, Plaintiff herein, is a judgment creditor in Cause CL-29,530-[A] in Hidalgo County Court No. 1 pursuant to a *Final Judgment* dated July 24, 2002, for approximately $453,000 (App. 1, Final Judgment; App. 2. Abstract of Judgment) which was later modified to a *Third Amended Judgment* (*App. 4, Third Amended Judgment*) on February 23, 2003, through Judge Rudolfo Gonzalez : Judge Gonzalez allegedly reestablished the Court's plenary power after a writ of execution had been issued in CL-29,530-[A] on a TRCP 306 motion that the judgment Debtors did not have notice of the Final Judgment (*see App. 3,*

*Attached Letter of Debtor's attorney describing fraudulent conveyance plan and acknowledging that the judge would make a determination by July 22, 2002).*

5.  The Debtors attempted to avoid their debt by encumbering or conveying all their assets to a corporation (*App. 5, Special Warranty Deed*) per their attorney's written instruction with the assistance of Compass Bank (aka Texas State Bank) and their neighbor Paul Moxley, President of Texas State Bank. Global Limo, Inc. (aka Atlas Transportation, Inc.) was originally a scam, a racketeering enterprise, designed by Debtors to control and to "fraudulently convey" assets away from satisfaction of judgment in case no. CL-29,530-A. It was implemented after Judge Gonzalez unlawfully seized back the plenary power his Court lost after Final Judgment was rendered against the judgment Debtors for approximately $453,000 on excuse that the Debtors knew nothing of the final order, although a document (*see App. 3, Attached Letter of Debtor's attorney describing fraudulent conveyance*) which appeared two years later demonstrates that everyone was given notice of the signing of the *Final Judgment* by Judge Gonzalez himself. Judge Gonzalez used his illegally extended plenary power to destroy Plaintiff's jury awards, causes of action, and jury findings to protect the judgment Debtors, which he expressed to Plaintiff, [sic] "should be accepted as a business loss." Debtors created Global Limo, Inc. to hide all their non-exempt assets and Compass Bank cross-collaterized assets as planned through their close relationship. Compass Bank refused to abide by court orders and specific requests from Plaintiff as the bank liquidated and transferred monies from existing business accounts to new accounts for the Debtors on basis of another illegal order issued in Judge Gonzalez' court which had been entered with the "forged" signature of the judge on or around February 2, 2005: Judge Gonzalez refused to void the illegal order, but did reverse it after the damage was done. One of these accounts established under Kathleen Maples was used to transfer FEMA funds earned by Global Limo, Inc. during hurricane Rita, for approximately $240,000, away from the corporation without report to the Debtors' bankruptcy or its owner, the Plaintiff. Compass Bank also made new written agreements with the Debtors to control Global Limo, Inc. after they receive orders from County Court no. 1 and a demand from the Plaintiff that the Debtors had no interests in the corporation.

6.  Concurrently, Plaintiff was able to obtain a turnover order on January 27, 2005, for all interests in the corporation, Global Limo, Inc. in an attempt to salvage any asset value and to

offset damages through the corporation's operation. *App. 6, Order (Original Turnover Order), Case no. CL-29,530-A, dated 1/27/2005*. Plaintiff purchased a condo from the corporation on Jan. 27, 2005, and filed a Special Warranty Deed with the Hidalgo County Clerk approximately one week prior to Compass Bank filing a Deed of Trust on the same property. *App. 7. Special Warranty Deed, dated 1/27/2005*. The judgment Debtors then filed a Title 11 bankruptcy on or about February 17, 2005, In Re: James H. Maples and Virginia Kathleen Maples, case no. 05-bk-70128. They also filed a bankruptcy adversary case no. 05-bk-07009, Maples v. Partain, under the main bankruptcy wherefrom it was ordered that [sic] "Partain's Third Amended Judgment issued by the Hidalgo County Court at Law No. 1 in case CL 29,530-A is excepted from any discharge that may be granted in favor of James H. Maples in his bankruptcy case". The bankruptcy judge "avoided" the County Court's Order (Original Turnover Order) and the condo's purchase by the Plaintiff (which under bankruptcy law would have reverted title back to Global Limo, Inc. and reimburse Mr. Partain his payment). *App. 8, Judgment, Maples v. Partain, Case no. 05-bk-07009, dated 4/27/2006*: Note that the Texas corporation Global Limo, Inc. was never in bankruptcy, although it was treated like an asset instead of a legal entity in the adversary case by the bankruptcy court to evade the corporation's legal rights for the benefit of Compass Bank.

7.      After the bankruptcy avoidance proceeding, Compass Bank returned to the main bankruptcy case and motioned the bankruptcy court to allow it to foreclose against Global Limo, Inc. and the condo since the Debtors actually had no interests in either (an avoidance under bankruptcy requires an interest by bankruptcees that will add value to the estate). *App. 10, Texas State Bank's Motion For Relief From The Automatic Stay, Bankruptcy Case no. 05-bk-70128, dated 05/16/2006*. Bankruptcy Judge Schmidt allowed Texas State Bank to foreclose against the condo but didn't have jurisdiction to allow them to foreclose against Global Limo, Inc since it was not a party in bankruptcy. *App. 9, Order Granting Texas State Bank's Motion For Relief from The Automatic Stay, Bankruptcy Case no. 05-bk-70128, dated 08/24/2007*.

8.      The Debtors' bankruptcy estate was dissolved on August 22, 2007 on approval of their plan to pay creditors, but the Debtors later refused to pay any creditors, except Compass Bank. *App. 15, Creditor, Plaintiff's, Third Amended Complaint Of Debtors' Default Of Plan Payment, case no. 05-70128, date 3/14/2008; App. 16, Final Docket Report, case no. 05-*

*70128*. Bankruptcy court also refused to enforce the Debtors bankruptcy plan although Plaintiff made multiple and constant complaints, and accordingly, Plaintiff was directed by the bankruptcy court's to return to county courts to enforce his *Third Amended Judgment* since it was non-dischargeable and since he is a "super-creditor."

9.    On August 18, 2008, Hidalgo County No. 1 trial court entered *Turnover No. 5 (App. 11, Turnover Order No. 5, Case No. CL-29,530-A, dated 8/18/2008)* to assist Plaintiff recover his assets (a condominium identified in App. 7, Special Warranty Deed, January 27, 2005, and identified hereafter as the "real property") and the corporation, Global Limo, Inc. that had been seized by the bankruptcy courts from the Plaintiff and controlled by the judgment Debtors and bankruptcy courts during the Debtors' Title 11 bankruptcy. The judgment Debtors challenged *Turnover Order No. 5* in the 13th Court of Appeal through case number 13-08-00524-CV and in the Texas Supreme Court through case number 08-0882, and were denied. *Turnover Order No. 5* became a final order.

10.    On February 9, 2010, the Debtors removed Hidalgo County case no. CL-29,530-A to the federal courts, but the federal courts declined to hear the case and returned it on April 28, 2010.

11.    On May 19, 2010, Plaintiff continued to enforce his judgment through contempt proceedings in case no. CL-29,530-A. The trial court entered *Turnover No. 6. Appendix 18, Turnover Order No. 6, Case no. CL-29,530-A, dated 05/19/2010*. However, the court has also refused to enforce *Turnover Order No. 6*.

12.    On or about September 22, 2010, Debtors through their attorney, Kelly McKinnis, advised Judge Gonzalez that his clients could help pay off their judgment debt in case no. CL-29,530-A to Plaintiff if the Court would "lean" on Compass Bank to release a lien against Plaintiff's house. He proposed that the Court could use that credit to the Debtors' advantage. The Debtors represented that Compass Bank was afraid of Plaintiff's RICO (Racketeer Influenced Corrupt Organization) complaints against the bank and the Debtors, and that the bank would do "anything" to get away from his claim. *App. 67, Affidavit*. Judge Gonzalez asked Plaintiff if he approved and Plaintiff advised Judge Gonzalez that litigants do not come to court asking for equity with "dirty hands", admitting a crime, and then expecting the Court to involve itself with the offense to pay off their debt with the creditor's assets. The lien that the Debtors were referring was the illegal and unenforceable lien taken against Plaintiff's

house to generate a debt whose partial value was laundered through Plaintiff's company, Global Limo, Inc. without Plaintiff's permission, to an escrow account under a trust in north Texas for the cash benefit of the Debtors just 2 weeks prior to the Debtors filing for bankruptcy. *App. 81, Disbursement Authorization and Promissory Note (regardless of the documents' alleged dates, note that the documents were not file with the Hidalgo County Clerk's Office until much later, after Plaintiff had already instructed the bank to put a hold on his corporate accounts and a week after Plaintiff had already filed a deed with the Hidalgo County Clerk's Office for the same property).* Judge Gonzalez called Vicky Skaggs with the Atlas & Hall LLP law firm who represented Compass Bank, and Compass Bank then released the $47,000 lien against Plaintiff's house on October 4, 2010. *App. 19, Release Of Lien, dated October 4, 2010.*

13.     On January 5, 2011, Relator filed his third request for execution which was stayed by Judge Rudy Gonzalez. *App. 20, Request For Writ Of Execution, CL-29,530-A, 1/25/2011.* On February 2, 2011, Judge Gonzalez entered a void Order allegedly modifying the *Third Amended Judgment* and crediting $75,000 to the judgment Debtors for the Plaintiff's recovery of his real property while at the same time making the Plaintiff a judgment debtor for $14,120.26 plus any other costs. *App. 21, Order, Case no. CL-29,530-A, February 2, 2011.* Relator filed a petition for mandamus in the 13th Court of Appeals, case no. 13-11-00276-CV, complaining that Judge Gonzalez engaged in bank fraud or extortion, and was illegally attacking the orders of the court instead of enforcing them as required by law. Judge Gonzalez immediately recused himself and evaded the complaint. Relator also appealed the Order to the 13th Court of Appeals through case no. 13-11-00289-CV on May 3, 2011.

14.     Concurrently on or about May 13, 2011, and approximately three month after being credited $75,000 a judgment Debtor (deceased James Maples) and another newly acquired attorney, William McCarthy, perjured themselves by filing a petition to evict Plaintiff's tenant Joe Guerrero from the Plaintiff's real property arguing that the Debtors were landlords of the Plaintiff's condo and that they had not been paid in approximately 3 years (since *Turnover Order No. 5*). *App. 22, Plaintiff's Petition, Case no. JP2011-197, dated May 13, 2011, Plaintiff's Petition, case no. JP2011-197.* However, Joe Guerrero and Plaintiff had a court enforced rental agreement through Hidalgo County Court No. 1, case no. CL-08-3320-A. *App. 23, Judgment, CL-08-3320-A, dated 2/03/2009, Order, case no. CL-08-3320-A.*

Strangely, the Plaintiff was not allowed to contest the Debtors' forcible detainer petition because Justice of the Peace Homer Jasso claimed that the Hidalgo County District Attorney's Office through District Attorney Rene Guerra advised him that the Plaintiff was not sued and that the Plaintiff was not allowed to participate in the detainer proceedings per the law since he was not sued. District Attorney Rene Guerra supported JP Jasso's default order and advised JP Jasso that there was no option available except for Plaintiff to petition for a TRO since this was a civil matter only. Judge Jasso entered *Default Judgment* for possession of the Plaintiff's real property to the Debtors, although Plaintiff was not named in the judgment. *App. 24, Default Judgment, Case no. JP2011-197, dated 6/03/2011; App. 25, Civil Docket, JP2011-197.* Plaintiff attempted to file a criminal complaint against the Debtors at the District Attorney's Office, but Plaintiff was refused and he was directed to file a complaint with McAllen Police or the Sheriff's Office. McAllen Police also refused to document a complaint on excuse that Hidalgo County corruption was outside their jurisdiction. Hidalgo County Sheriff's Office declined to act on Plaintiff's complaint stating that they lacked jurisdiction. *App. 26, Signed Certified Mail Receipts to District Attorney Rene Guerra, McAllen Chief of Police Victor Rodriguez, McAllen Mayor Richard Cortez, and Letter Complaining of Fraud, dated 6/15/2011; App. 27, Letter to Hidalgo County Sheriff's Office, dated 5/25/2011; App. 78, Hidalgo County Sheriff's Office Incident Report.*

15. Concurrently, Plaintiff's case no. CL-29,530-A became a cause without a judge, unable to enforce it's orders, so on June 6, 2011, Administrative Judge Orlando Olvera assigned retired District Judge Alex Gabert to county court case no. CL-29,530-A, and ordered Judge Gabert authority [sic] "until the plenary power has expired." However, the plenary power of the case had already expired in 2002 and in 2004, and Plaintiff challenged Judge Gabert's assignment for lack of jurisdiction (particularly over a contempt proceedings against the Debtors), requesting Administrative Judge J. Rolando Olvera to reassign Judge Gabert and requesting Judge Gabert to seek reassignment with the necessary authority to enforce the decrees of the court. Judge Olvera ignored the Plaintiff. Then on November 1, 2011, recused Judge Rudy Gonzalez transferred case no. CL-29,530-A to Hidalgo County Court no. 7 without any authority and the county clerk's changed the case no. to CL-29,530-[G] - while the case was purportedly under the assignment of Judge Gabert. *App. 28, CL-29,530-[H] Docket Report.* Judge Alex Gabert continued to administer the case in County

Court No. 7, although he refused to acknowledge the case's final *Third Amended Judgment*. The 13th Court of Appeals abated and dismissed appeals case no. 13-11-00289-CV since it was unclear if Judge Gonzalez's Order (*App. 21*) was a final order and because Plaintiff and Debtors made a Rule 11 agreement to allow the Court to enforce the existing final judgment of the Court. Instead, Judge Gabert broke the agreement and entered another Final Judgment, dated Mar. 16, 2012, making the Plaintiff a debtor for almost $180,000 and apparently giving the Plaintiff's real property to the judgment Debtors although the Plaintiff had not been sued. *App. 29, Final Judgment, Case no. CL-29,530-A, dated 3/16/2012*. William McCarthy then requested a writ of possession and the judgment Debtors were awarded an order for possession. *Appendix 25, Civil Docket, JP2011-197*.

16.     On or about April 5, 2012, Plaintiff filed a petition for a temporary restraining order and injunctive relief in Hidalgo County District Court case no. C-0929-12-F on complaints of Abuse of Process and Interference With An Existing Contract (*App. 69*) which he supported through a rich showing of certified evidence (*see App. 11, 43*) documenting his authority and rights to his house and Congressional Campaign Headquarters (*App. 76*) at a preliminary injunction hearing held in the 332nd District Court on April 16, 2012. Plaintiff demonstrated a pattern of fraud, mortal intimidation, and damages by Debtors. Plaintiff demonstrated a lack of jurisdiction by JP Homer Jasso Sr., and Sheriff/Constable J.E. "Eddie" Guerra so strong that the issue was not further argued or defended. *App. 11, Turnover Order No. 5; App. 69, Reporter's Record, 332nd District Court, April 16, 2012*. Plaintiff sought an injunction and a declaratory judgment regarding the justice court's lack of jurisdiction in case no. JP2011-197, but Plaintiff was denied since the judgment Debtors claimed they finally owned Plaintiff's property through Judge Gabert's *Final Judgment* dated March 16, 2012. *App 29, Final Judgment (Void)*. The District Court put very heavy weight on Judge Gabert's Final Judgment and accused Plaintiff of collaterally attacking it. *App. 30, Temporary Injunction Hearing (Transcript), C-0929-12-F, dated 4/16/2012*. District Judge Mario Ramirez dissolved the temporary restraining order and refused Plaintiff any relief or protection. *App. 31, Order Denying Injunctive Relief And Dissolving The Temporary Restraining Order, C-0929-12-F, dated 05/02/2012*.

17.     JP Homer Jasso Sr. and Sheriff/Constable J.E. "Eddie" Guerra, used the opportunity this District Court offered when it refused to maintain the "status quo" by staging an armed

assault, with a SWAT team, against the Plaintiff's at his house and congressional campaign headquarters, at approximately the same time as the Plaintiff's scheduled televised campaign forum against the incumbent US Congressman, Ruben Hinojosa. On May 7, 2012, Plaintiff was scheduled to participate in the only televised forum to include all congressional candidates for the United States House of Representatives. That same day Sheriff/Constable Guerra and Deputy Constable Carlos Gonzalez assaulted Plaintiff's home and Congressional Campaign Headquarters, breaking locks off outside panels and turning off power and water. Plaintiff was able to convince the power company to send out a technician nearly 6 hours later to instruct the police that they were breaking the law by turning off power and water, and the power and water was restored about 2 hours later. Deputy Constable Carlos Gonzalez lied to McAllen Police that he had an order from this District Court ordering Plaintiff to vacate his home - since that order does not exist. *App. 79, Police Report, May 7, 2012.* Deputy Constable Gonzalez also lied to McAllen Police that Plaintiff threatened him with a pistol resulting in the dispatch of SWAT with rifles and body armor around Plaintiff's house and Congressional Campaign Headquarters and the partial closing of Nolana Street in McAllen, Texas, although Plaintiff never made a mention of or displayed any specific kind of weapons he might have had in his home. Hidalgo County Constables represented to the news reporters that Plaintiff was under house arrest, and thereafter surrounded and threatened Plaintiff with arrest and criminal charges for three [3] days. On Wednesday, May 9, 2012, a reporter for KGBT news called the Sheriff's office on behalf of Plaintiff to confirm there was no arrest warrant for his person and verified with the Constable that there were no actual impending criminal charges against Plaintiff. The Constables finally withdrew on Wednesday given that they did not have a legal means to enter the premises. On Friday, May 11, 2012, Constable Guerra with several deputies and McAllen Police broke Plaintiff's front and rear entry doors down, breaking windows and absconding away with Plaintiff's business assets and records, vehicle titles, furnishings, campaign materials and records, sign making equipment, and other miscellaneous items. They seized Plaintiff's home and Congressional Campaign Headquarters and still have possession of his assets as of the date of the writing of this complaint. Constable Deputies and McAllen Police directly threatened Plaintiff that if he attempted to take repossession of his property that he would be arrested for criminal trespassing, regardless of his perceived rights or duties under the law. McAllen Public

Utilities further canceled Plaintiff's water account against his protests. Plaintiff believes that Hidalgo County officials, and others, took advantage of fraud, other tortious acts, and criminal acts against him to intimidate him by violating his civil rights and causing him injury to interfere with his United States Congressional campaign against corruption.

18.    Plaintiff's original petition in case no. C-0929-12-F was effectively mooted and the status quo was changed by the District Court. Plaintiff was forced to continue his litigation in the 13th Court of Appeals by filing an appeal, case no. 13-12-00267-CV, on April 27, 2012, to complain of the *Final Judgment* and to reestablish his rights to his house. On May 9, 2013, the 13th Court of Appeals issued its Opinion in case no. 13-12-00267-CV declaring Judge Gabert's Final Judgment to be void in Hidalgo County Court case no. CL-29,530-G. *App. 32. Opinion, Appeals Case no. 13-12-00267-CV, dated 5/9/2013.* Immediately on May 14, 2012, Judge Ramirez ordered a hearing for dismissal of Plaintiff's complaints under TRCP 165a and on his authority as a judge. *App. 33, Notice of Hearing For Dismissal For Want Of Prosecution, Case No. C-0929-12-F, Dated May 14, 2013.*

19.    A dismissal hearing pursuant to TRCP 165a did not occur and Plaintiff filed, on June 3, 2013, his 190 page Plaintiff's First Amended Petition For Injunctive Relief Consolidating §1983 Civil Rights Violations and Rico Complaints; And Request For Disclosure; With Objection, and causing service on all additional defendants therefrom. *App. 34, Dismissal For Want Of Prosecution Hearing Transcript, dated 6/3/2013*; Plaintiff also filed his Plaintiff's Motion For Summary Judgment Against James Maples on or about June 11, 2013. *App. 35, Plaintiff's Motion For Summary Judgment Against James Maples, Case no. C-0929-12-F, dated 6/11/2013.* The District Court ignored the Plaintiff's motion and on July 3, 2013, the Court unexpectedly entered its Order Dismissing For Want Of Prosecution, Denying Plaintiff's Motion To Retain, and allegedly at the same time adjudicating the issues with prejudice. *App. 36, Order Dismissing For Want Of Prosecution And Denying Plaintiff's Motion to Retain. Case no. C-0929-12-F, dated 7/3/2013.* Plaintiff immediately filed his Plaintiff's Certified Motion To Reinstate Case DWOP which the Court again ignored. On July 8, 2013, Plaintiff filed an appeal in the 13th Court of Appeals, case no. 13-13-00341-CV, on argument he is constitutionally entitled to an open court and due process. The 13th Court of Appeal sat on the case for two years until the Plaintiff filed for mandamus orders in the Texas Supreme Court, case no. 15-0343, and an outside judge was appointed by the Chief

Justice of the Supreme Court to the case. Thereafter, the appeals court reversed and remanded Judge Ramirez' order of dismissal. *App. 68, Memorandum Opinion, 13th Court of Appeals, case no. 13-13-00341-CV, dated 7/2/2015.*

20.   Concurrently on May 24, 2013, the Plaintiff returned to Hidalgo County Court No. 7 to enforce Turnover Order No. 5, Turnover Order No. 6, and the *Third Amended Judgment.* Inexplicably, Judge Sergio Valdez sat in on the case although Judge Alex Gabert was assigned by the 5th Administrative District, and Judge Valdez refused to enforce the *Third Amended Judgment.* Instead Judge Valdez directed Plaintiff and William McCarthy to provide briefs. On October 10, 2013, Judge Valdez under the color of law again allegedly modified the prior final orders of the Court in violation of the 13th Court of Appeals mandate from case no. 13-12-00267-CV by entering Order Of The Court allegedly replacing the Third Amended Judgment again and ignoring all turnover orders. *App. 37, Order Of The Court, Case no. CL-29,530-G, dated 10/10/2013; App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated May 9, 2013; App. 39, Corrected Mandate, Appeals Case no. 13-12-00267-CV, dated 8/16/2013.* Judge Valdez absolutely refused to enforce the orders of the court or to return Plaintiff's illegally seized property. Plaintiff made his Judgment Creditor's Motion To Strike, Case no. CL-29,530-G, dated 11/12/2013, and at hearing on January 22, 2014, Judge Valdez duplicated Judge Gabert's illegal acts and violated the 13th Court of Appeals mandate again by hearing evidence and refusing to enforce turnover orders since Judge Valdez represented that he had overturned the *Third Amended Judgment* to which said turnover orders applied - and inviting Plaintiff to appeal again. *App. 38, Judgment Creditor's Motion To Strike, Case no. CL-29,530-A, dated 11/12/2013; App. 42, Hearing On Motions (To enforce orders of the court) CL-29,530-G, dated 1/22/2014 (Tr. p.12-25).*

21.   Judgment Debtor, James Maples, died on or about March 28, 2014 of age related illness. Judge Valdez refused to add the new parties-in-interest (heirs) pursuant to TRCP 155, or to enforce any orders on a remaining Debtor. Having no reasonable remedy in law, Petitioner repossessed his own real property, made repairs again, and rented it: Relator's deed, Turnover Order No. 5, Hidalgo County Clerk's record, and tax entity information (*App. 43, Hidalgo County Tax Statements, El Cazador #2 E 18.41' of W 60.82' Of Lot 37 – Unit 2, Certified Owner: Plaintiff*) showed that Plaintiff owned the property and police would not remove him, although attorney William McCarthy claimed he now owned the Plaintiff's

property through deed prior to the death of his client (McCarthy could produce no documents). *See also App. 42, Hearing On Motions (To enforce orders of the court) CL-29,530-G, dated 1/22/2014 (Tr. p.15, pp.16-18 "The condominium. The condominium was given to me [McCarthy]. So if he wants to sue me that's fine.).*

22. On July 15, 2014, William McCarthy, misrepresenting himself as the executor and administrator of "The Estate of James Maples", filed a forcible detainer action against Plaintiff's tenant, Dora Martinez - but not against the Plaintiff - again through Justice of the Peace Homer Jasso, case no. JP2014-458, in violation of *Turnover Order No. 5* and now claiming that "The Estate Of James Maples" was the owner and landlord of the property. *App. 44, Original Petition For Forcible Detainer, Case no. JP2014-458, dated 7/15/2014.* Plaintiff filed a motion to intervene in the case and answered, objecting to the justice court's lack of jurisdiction and to William McCarthy's lack of standing. App. 45, Answer, Case no. JP2014-458, dated 7/28/2014. Plaintiff motioned for Justice of the Peace Homer Jasso to recuse himself, since Judge Jasso claimed to have superior knowledge of title, appeared hostile, and because he is a defendant and a witness in this instant district case no. C-0929-12-F and appeals case no. 13-13-00341-CV involving similar circumstances against the Plaintiff. *App. 46, Johnny Partain's First Motion To Recuse, Case no. JP2014-458, dated 8/4/2014.*

23. JP Homer Jasso refused to acknowledge or honor Plaintiff's *Turnover Order No. 5* or his objections, claiming he had superior knowledge of title and claiming that Assistant District Attorney Michael Garza advised him that Plaintiff was not allowed to speak at any hearing since he was not sued and had no standing. William McCarthy argued to have the Plaintiff be held in contempt, although there were no orders aimed at the Plaintiff. JP Jasso stated that the District Attorney's Office was already looking into a way the Plaintiff could be held in contempt. On Sept. 29, 2014, JP Jasso ordered a *Default Judgment* for the "Estate of James H. Maples" claiming that his hand were ministerially tied since Plaintiff couldn't participate in hearing per the Hidalgo District Attorney's Office and wasn't a party under the law. *App. 47, Default Judgment, Case no. JP2014-458, dated 9/29/2014.*

24. Consequently, Plaintiff filed his own "ministerial" forcible detainer suit in Justice Court, Pct. 4, Pl. 2, case no. JP2014-531 on August 29, 2014, since his tenant failed to pay rent after being harassed by William McCarthy and since JP Jasso alleged his actions to

exclude the Plaintiff and issue a Default Judgment were ministerial and required by the law. *App 48, Petition For Forcible Detainer, Case no. JP2014-531, Johnny Partain v. Dora Martinez dated 8/29/2014.* JP Jasso then requested the Plaintiff to document his ownership for Assistant District Attorney Michael Garza in case no. JP2014-531. Plaintiff delivered the documentation directly to Michael Garza on September 12, 2014. *App. 49, Johnny Partain's Demonstration Of Title As Requested By Judge Jasso Per Micheal Garza Of The District Attorney's Office, JP2014-531, dated 9/12/2014.* Judge Jasso declined to rule on Plaintiff's forcible detainer suit, claiming the advice of the DA's office. Clearly, Judge Jasso's prior acts harassed the Plaintiff and his campaign against corruption while at the same time protected Hidalgo County and other public officials under the supervision of the DA's office.

25.    Plaintiff filed his Intervenor's Notice of Appeal and Appeal Bond on September 3, 2014, and the Justice Court's transcript and original files were received from the Justice Court by the Hidalgo County Clerk on Sept. 9, 2014. *App. 50, Letter of Receipt of Appeals Documents by County Clerk, CL-14-3542-E, dated 9/10/2014.* Then JP Jasso illegally entered a Writ of Possession order on September 11, 2014, against Plaintiff's property, in apparent conflict with Texas Property Code § 24.0054 (3). *App. 51, Writ of Possession, Case no. JP2014-458, dated 9/11/2014.*

26.    Plaintiff rushed to file his Appellant's Emergency Motion For TRO to protect his property during the appeal of the Justice Court's Default Judgment in Hidalgo County Court No. 5, case no. CL-14-3542-E. *App. 52, Appellant's Emergency Motion For TRO, Case no. CL-29,530-G, dated 10/08/2014.* A hearing on the motion was had on September 29, 2014 and on Oct 3, 2014, case no. CL-14-3542-E was mysteriously dismissed without warning, leading to an appeal in the 13th Court of Appeals, case no. 13-14-00584-CV on October 7, 2014. App. 53, Order (Dismissal of action), Case no. CL-14-3542-E, dated 10/3/2014. A subsequent Finding Of Fact And Conclusion Of Law documents many serious and dubious misrepresentations by Judge Arnoldo Cantu, Jr. not supported by the Court's record, but demonstrating the finality of the "dismissal order" and intent of ending any complaints. *App 54, Finding of Facts and Conclusions of Law, Case no. CL-14-3542-E, dated 10/17/2014.*

27.    Plaintiff appealed County Court No. 5 Order to the 13th Court of Appeals and again made an Emergency Motion For Temporary Restraining Order To Protect The Status Quo, but the 13th Court of Appeals did not timely respond and Hidalgo County Constables with

McAllen Police moved attorney William McCarthy into Plaintiff's house: William McCarthy presently lives in Plaintiff's house. When the 13th Court of Appeals finally responded the Court's insinuated that the appeals from case CL-14-3542-E was interlocutory and that Plaintiff was somehow a debtor responsive to TEX. R. APP. P. 29.3. *App. 55, Order (Denying relief), Appeals Case no. 13-14-00584-CV, dated 11/19/2014*. Plaintiff has been unable to find relief and said case is still under review.

28.      While Plaintiff was waiting on the 13th Court of Appeals to respond to his Emergency Motion For Temporary Restraining Order To Protect The Status Quo, he made his *(App. 56)* Creditor's Emergency Motion For TRO, Case no. CL-29,530-G, dated 10/08/2014, requesting an emergency hearing, preliminary injunction, and a show cause hearing to enforce the orders of the court from collateral attacks. Judge Valdez ordered that Plaintiff was collaterally attacking the default judgment of the justice court and the order of County Court No. 5. *App. 57, Order(Denying relief or protecting Turnover Order No. 5),Case no. CL-29,530-G, dated 10/9/2014.*

29.      On October 9, 2014, Hidalgo County Constables broke into and seized Plaintiff's house again, with the assistance of the McAllen City Police.

30.      Judge Valdez then ordered the alleged transfer of case no. CL-29530-G to Judge Rolando Cantu of Hidalgo County Court No. 8 on November 21, 2014. *App 58, Order Of Transfer, Case no. CL-29,530-G, dated 11/21/2014*. Judge Omar Maldonado then replaced Judge Rolando Cantu in the same court on or about Jan. 2, 2015. On Jan. 14, 2015, Judge Maldonado also refused to enforce the orders of the court claiming that he had already recused himself, although the case docket does not currently reflect this assertion. *App. 28, Civil Docket Report, CL-29,530-H*. Regardless, on January 20, 2015, Administrative Judge J. Rolando Olvera filed his Order Of Assignment (App. 59) assigning retired District Judge Robert Blackmon to Hidalgo County case no. CL-29,530-H. Plaintiff objected to the assignment of Judge Blackmon because the Order Of Assignment again limited assignment by stating, [sic] "from this date until plenary jurisdiction has expired", which prior Judge Alex Gabert argued meant that the case was without a final judgment. *App. 60, Objection To Assignment, Case no. CL-29,530-H, dated 01/02/2015*. However, Judge Olvera's clerk called Plaintiff and requested he withdraw his objection since Judge Blackmon was the only judge available and that his assignment were made on forms provided by the Texas Supreme

Court. Plaintiff conditionally withdrew his objection if Judge Blackmon were given the jurisdiction to enforce Relator's *Third Amended Judgment* and turnover orders. *App. 61, Withdrawal of Objection To Assignment, Case No. CL-29,530-H, dated 2/03/2015.*

31. Judge Robert Blackmon held a show cause hearing on Feb. 26, 2015, on Plaintiff's Motion for Contempt against William McCarthy. Judge Blackmon argued that the actual number on the case was CL-29,530-H instead of the original case number, CL-29,530-A, making the case a separate and brand new case without any orders to enforce. Judge Blackmon argued that *Turnover Order No. 5* wouldn't apply anyways since the turnover order was directed at the judgment Debtors and did not limit actions taken by their attorney. Judge Blackmon then chastised the Plaintiff for suing the Debtors' attorney, William McCarthy, in a new case and for trying to enforce *Turnover Order No. 5* which couldn't be valid since it was entered after a final judgment in case no. CL-29,530-A. Judge Blackmon threatened the Plaintiff on and off the record that he may sanction him with fines for not "playing nice" and if the Plaintiff didn't conform to his future orders he could end up in jail. *App. 67, Affidavit.* Judge Blackmon finally stated that he was only assigned for the one hearing and that he hadn't made up his mind if he would continue the case; that the case was actually under County Judge Omar Maldonado. Judge Blackmon issued an order, changing the Plaintiff's original case no. CL-29,530-H and styling it under Justice Court, Pct. 4 Place 2 and with new parties to wit – Johnny Ray Partain v. Estate of James H. Maples, Decedent et al. *App. 62, Order Denying Motion For Contempt, Case no. CL-29,530-G, dated 3/02/2015.*

32. William McCarthy also filed another exparte motion and affidavit for "The Estate Of James H. Maples" on July 30, 2014, pursuant to TEX GV. CODE ANN. § 51.902, FRAUDULENT LIENS, in District Court case no. C-6549-14-G to attack Relator's deed on his condo on in violation of Turnover Order No. 5. *App. 63, Motion For Judicial Review Of A Document Purporting To Create A Judgment Lien, Case no. C-6549-14-G, dated 7/30/2014.* Plaintiff learned of the action and filed a petition for intervention and an Answer objecting to William McCarthy's motion as a violation of *Turnover Order No. 5*, his standing as insufficient to invoke the jurisdiction of the court, and his failure to conform to the statute. *App. 64, Original Answer, Case no. C-6549-14-G, dated 9/30/2014.* District Judge Noe Gonzalez conferred with District Judge Robert Flores regarding transferring William McCarthy's motion from 370th Court to the 139th Court, both recused themselves, and then

Judge J. Rolando Olvera assigned Judge J. Manuel Banales. *App. 66, Civil Docket Report C-6549-14-G*. Judge Banales ruled, without his jurisdiction being invoked, that Plaintiff's "deed" on his house "does not refer to a legally constituted court ... and there is no valid deed", and then ordered the Hidalgo County Clerk to deed the Plaintiff's condo to the deceased James H. Maples. *App. 65, Judicial Findings Of Fact And Conclusions Of Law Regarding A Documentation Or Instrument Purporting To Create A Deed, Case no. C-6549-14-G, dated 2/13/2015.*

33.     Plaintiff has still not been compensated on his *Third Amended Judgment* from 2003 nor have any of his final turnover orders been enforced. Plaintiff has not been compensated the loss of his property or for the destruction of his business. Plaintiff has maintained a constant effort to collect judgment since his final judgment in 2002, but Hidalgo County courts have destroyed his property through meaningless litigation meant to protect and enrich the county and its officials. Plaintiff has been further injured by the judgment Debtors, their attorneys, and a racketeering enterprise involving the many public officials in Hidalgo County operating under the color of law directing their efforts and offices against the Plaintiff to deprive him of his property rights. Attorney William McCarthy is currently living in the Plaintiff's house and is still attempting to become the executor and administrator over the "Estate of James H. Maples" which now holds a real estate title over the Plaintiff's property through Judge Banales' void order to the clerk to change his property title, and yet Plaintiff, a large judgment creditor has still never been sued for his property – as was recognized in Opinion by the 13th Court of Appeals. *App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated 5/9/2013.*

## V.  CAUSES OF ACTION

COUNT 1

34.     FOURTEENTH ADMENDMENT TO THE CONSTITUTION OF THE UNITED STATES and 42 USC §1983 - This is an action at law to redress the deprivations under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to Plaintiff by the Fourteenth Amendment to the Constitution of the United States and actionable through 42 USC §1983, and arising under the law and statutes of the United States and State of Texas. At all relevant times herein JP Homer

Jasso Sr., Judge Rodolfo Gonzalez, Judge Alex W. Gabert, Judge Jose Manuel Banales, Judge Robert Max Blackmon, Constable J.E. "Eddie" Guerra, Deputy Constable Carlos Gonzalez, District Attorney Rene Guerra, and Sheriff Guadalupe Trevino were duly elected officials or assigned their positions with access to Hidalgo County resources through established process to represent Hidalgo County, a political subdivision of the State of Texas, under the color of their offices. At all relevant times herein McAllen Police Chief Victor Rodriguez was employed by the City of McAllen, a municipal corporation of Texas. The aforementioned defendants have the authority and had the opportunity to invoke government process through their office, positions, and through subordinates to intervene in or arrest illegal acts perpetrated through Hidalgo County and the City of McAllen that violated Plaintiff's United States Constitution and Texas Constitution protections and several federal statutes, including but not exclusive to, illegal seizure of actual or prospective property without due process; false imprisonment; divestment of liberty, property, privileges, due course of law, and redress of grievances; interference with a political campaign; false imprisonment; equal protection of the law; and RICO as provided through the FACTs herein which created a special relationship through the use of armed police force. Each of the Defendants, separately and in concert, acted outside the scope of their jurisdiction and without authorization of law through Hidalgo County and City of McAllen resources, processes, and through other people unknown to the Plaintiff, under the color of state law and contrary to their oaths of office deprived Plaintiff his constitutional rights, his prospective property, and his actual property. With respect to the extent of damages available, the Supreme Court has noted that the basic purpose of a section 1983 damages award is to compensate the victims of official misconduct, and therefore held that there is no limit on actual damages if they can be proven. *See also Damages below.*

COUNT 2

35.     UNITED STATES CONSTITUTION AMENDMENT 5, AND TEXAS CONSTITUTION, ARTICLE 1, SECTION 17. TAKING, DAMAGING, OR DESTROYING PROPERTY FOR PUBLIC USE; SPECIAL PRIVILEGES AND IMMUNITIES; CONTROL OF PRIVILEGES AND FRANCHISES – The STATE OF

TEXAS, HIDALGO COUNTY, and CITY OF MCALLEN deprived Plaintiff any standing or substantive due process, and did take, damage, and destroy the Plaintiff's *Third Amended Judgment, Turnover Order No. 5, Turnover Order No. 6, and assets* by refusing to enforce or even to observe the final decrees of Texas courts, diminishing Plaintiff's property of all its value, and illegally seizing his assets through assault by police. No consideration was given to Plaintiff's private interests as public officials who sought to hide incompetence, systemic local corruption, and criminality to maintain the appearance of propriety in their offices retaliated against and destroyed Plaintiff's interests and seized his assets. District Attorney Rene Guerra (removed from office in 2014) and his office, Justice Homer Jasso, Hidalgo County Sheriff/Constable Eddie Guerra, Deputy Constable Carlos Gonzalez, District Judge Alex Gabert, District Judge Robert Blackmon, District Judge Jose Banales, County Judge Sergio Valdez, County Judge Rodolfo Gonzalez, County Judge Arnoldo Cantu, Hidalgo County Sheriff Lupe Trevino (convicted), and Judge Mario Ramirez all ignored, diminished, and destroyed Plaintiff's property rights. Even 13th Court of Appeals Justice Nora Longoria manufactured and misrepresented facts to destroy Plaintiff's interest in his property and to protect Hidalgo County from liability to Plaintiff, while at the same time paying down political capital she owed to the Hidalgo County District Attorney's office for refusing to prosecute her DUI arrest in 2014.

36. Plaintiff's final orders required the return of his equipment, records, and accounts for his business in 2008 (a business making approximately $2.5 million dollars a year), but the courts refused to enforce their final decrees depriving Plaintiff his property. Plaintiff's final orders removed and enjoined judgment Debtors from his property, but the courts later refused to acknowledge their final decrees and instead attacked Plaintiff with police and SWAT through exparte and void orders to seize his property. Plaintiff's final orders required Debtor to make monthly payments to him, but again courts refused to enforce their final decrees. Finally, public officers herein manipulated due process procedures to destroy Plaintiff's legal recourse to recover lawful damages for the destruction of his interests or for illegal incarceration pursuant to the criminal activities of a racketeering enterprise. Plaintiff did not give consent to the taking of his property or

waive his rights. Tx. Const. Art 1. Sec 17 is a waiver of sovereign immunity requiring adequate compensation to the Plaintiff. *See also Damages below.*

## RACKETEER INFLUENCED CORRUPT ORGANIZATION, 18 U.S.C. § 1961-1968[1]
## COUNT 3

37.    18 U.S.C. § 1962 (d). Defendants Sheriff/Constable J.E."Eddie" Guerra, Deputy Constable Carlos Gonzalez, Judge Homer Jasso, Judge Alex Gabert, Judge Jose Manuel Banales, Judge Robert Blackmon, Judge Sergio Valdez, District Attorney Rene Guerra, Judge Rodolfo Gonzalez, Sheriff Guadalupe Trevino, Compass Bank, James Maples, Police Chief Victor Rodriguez, Farmers Insurance, and State Bar of Texas were well informed of the FACTS above, but are part of a racketeering enterprise and adopted its goal to deprive Plaintiff of his property, interests, and rights conspiring to violate the provisions of 18 U.S.C. § 1962. Plaintiff was injured. *See damages below.*

## COUNT 4

38.    18 U.S.C 1344 (2); 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b), (c), (d); 18 U.S. Code § 1956; 18 U.S. Code § 1957; THEFT – The Debtors (Mapleses) created a counterfeit order, *Order On Defendant Motion To Stay,* in cause no.CL-29,530-A, on or about February 1, 2005, to knowingly enable the Debtors and Compass Bank to transfer monies out of bank accounts owned by Global Limo, Inc. without notice to Plaintiff. Plaintiff gave Compass Bank a certified *Turnover Order* giving Plaintiff all rights and interest in Global Limo, Inc. and also gave Compass Bank a demand to freeze said accounts and to place Plaintiff on those specified business accounts as the sole authority. Compass Bank did not comply and instead on or about February 18, 2005, silently transferred monies out of those account controlled by Plaintiff to new accounts for Debtors while at the same time communicating to Plaintiff over the telephone that they were unable to give him the specific account transaction information he requested

---

[1] Congress defined a racketeering activities under 18 U.S.C. § 1961 to help snare those who make careers of crime. Participation in the affairs of an enterprise through the commission of two or more predicate crimes is now an offense separate and distinct from those predicate crimes. So too is conspiracy to commit this new offense a crime separate and distinct from conspiracy to commit the predicate crimes.

and representing that they were working to get him the information and would give him a call back: Compass Bank never called Plaintiff back. Compass Bank later represented through electronic communication that the County Court's counterfeit order authorized them to move assets away from Plaintiff. This scheme was executed with intent to obtain monies or credit frozen under Global Limo, Inc. accounts for Debtors' control of the RICO entity, Global Limo, Inc., and for Compass Bank to influence and determine the conduct of the RICO entity when the Debtors filed for bankruptcy. Plaintiff complained of the illegal *Order On Defendant Motion To Stay* to the County Court whereas it was revealed that the counterfeit order was not actually signed by a judge nor was it within the knowledge of the Judge Gonzalez. However, Judge Gonzalez refused to void the counterfeit order, and eventually reversed it after the damage was accomplished. Plaintiff made criminal complaints to District Attorney Rene Guerra, but no criminal charges were ever pursued. Plaintiff was damaged through the loss of property and the values therein and through the interference with Plaintiff's ability to operate an interstate motorcoach business resulting in loss of profits, loss of compensations, and loss of opportunities. *See also Damages below.*

COUNT 5

39.     18 U.S.C 1344 (2); 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S. Code § 1513: 18 U.S. Code § 1513; 18 U.S.C. § 1962 (b) and (c) – On or about February 16, 2005, James Maples, Kathleen Maples, and d/b/a Global Tours and Charters electronically filed bankruptcy in case no. 05-70128. Shortly thereafter, on or about February 28, 2005, and without notice to Plaintiff, Debtors signed an agreement with Compass Bank that Global Limo, Inc. would pay it's debts (Global Limo, Inc. was not in bankruptcy). On or about March 7, 2005, Paul Moxley, President of Compass Bank, threatened over the telephone to call the police to prevent Plaintiff from operating his company and then sent two Special Asset Division Vice Presidents to the offices of Global Limo, Inc. to stop Plaintiff from operating or removing motorcoaches wherefrom the bank claimed full interests through liens with the Debtors. Thereafter, on or about March 7, 2005, Debtors and Compass Bank attempted to have Plaintiff held in contempt of bankruptcy court's automatic stay in case no. 05-70128 for not allowing Debtors to operate Global Limo,

Inc. and for moving buses away without approval of Compass Bank and notice to the insurance company whom Compass Bank claimed was aggrieved that Plaintiff hadn't spoken to them. Debtors and Compass Bank knowingly executed a bankruptcy scheme to control motorcoaches, credit, and monies purportedly owned by or deposited in Compass Bank but operated by Global Limo, Inc. on intentional fraudulent representations to the bankruptcy court, cause no. 05-07009, that Global Limo, Inc. or it's assets were included under Debtors' bankruptcy. Plaintiff was damaged through the loss of property and the values therein; interference with his ability to operate an interstate motorcoach business; loss of profits; loss of compensations; and loss of opportunities. *See also Damages below.*

COUNT 6

40.     18 U.S.C 1344 (2); 18 U.S. Code § 1956; 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c) FRAUDULENT TRANSFER - Compass Bank and James Maples knowingly executed a business loan for approximately $47,000 to Global Limo, Inc. on a purported transfer of interest of real property owned by Plaintiff and Teresa Partain, from Global Limo, Inc. to Compass bank: James Maples was not an officer of Global Limo, Inc. and did not have authority to sign for the company. The real property is describe as "[T]he East 18.41 feet of the West 60.82 feet of Lot 37, El Cazador Subdivision, Unit No. 2, an Addition to the City of McAllen, Hidalgo County, Texas according to map thereof recorded in volume 19, page 58 of the Map Records of Hidalgo County." Global Limo, Inc.'s loan monies were then sent directly by Compass Bank to an escrow account under a trust in north Texas for Debtors which the Debtors immediately used to purchase a new ranch home in or around Mt. Vernon, Texas, approximately 2 weeks prior to Debtors filing chapter 11 bankruptcy. The fraudulent loan was an intentional attempt to fraudulently transfer and encumber assets of Global and acquire an interest in and to exercise control over Global Limo, Inc. Plaintiff was damaged through the illegal lien on his property, and through the deprivation and loss of his property or the values therein. *See also Damages below.*

COUNT 7

41. 18 USC §1951 INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE; EXTORTION; THEFT; 18 U.S.C. § 1962 (c) (d) – On or about January 31, 2005, James Maples broke the locks of Global Limo, Inc. at 1408 N. Jackson and entered the office removing assets, including but not exclusive to interstate motorcoaches operated under Global Limo, Inc., after being warned on three occasions the weekend before by the Pharr police that he was trespassing and not to enter the premises. Debtors stationed a security guard at the office doors to prevent Plaintiff's entry into the office. This extortion continued until approximately February 16, 2008, wherefrom Plaintiff was unable to operate Global Limo, Inc. to engage in interstate commerce, pay debts, or make profit. During this same period, Compass Bank claimed it was unable to provide Plaintiff with his account information furthering enabling Debtors' extortion and control of Global Limo, Inc. *See also Damages below.*

COUNT 8

42. 18 U.S.C 1344 (2); 18 U.S. Code § 1956; 18 U.S. Code § 1957; 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c); THEFT - On or about March 29, 2005, Debtors electronically petitioned for an injunction in adversary case no. 05-07009, Maples et. ux. v. Partain, pursuant to Mapleses' chapter 11 bankruptcy case no. 05-70128, to acquire full control of Global Limo, Inc. The Debtors and Compass Bank prosecuted the petition on basis of James Maples' perjurious affidavit of ownership and rights in Global Limo, Inc., on basis of the aforementioned violation in the Hobbs Act (extortion in Count 7), and on basis of the counterfeit order produced in Count 4 above, although Debtors had already been denied any interests in the Bankruptcy Court and in the County Court. Debtors and Compass Bank were aware that their representations of ownership and employment were false and that they relied on or presented fraudulent or misleading documents and extortion to support their arguments, but Debtors and Compass Bank made such representations with the intent that the Court would act on them to provide Debtors and Compass Bank access to Global Limo, Inc. affairs:

43. Bankruptcy Judge Marvin Isgur did use their representations to seize Global Limo, Inc.'s assets and operation to provide Debtors and Compass Bank interest and control of the racketeering entity. Judge Isgur encumbered Plaintiff's and Teresa Partain's house

with a lis pendens in connection with the RICO entity to provide Debtors and Compass Bank interest therein. Said illegal seizure greatly injured Plaintiff's property and business interests since the company was raped of all its value and operated with dangerous vehicles resulting in 23 deaths through a motorcoach fire and large liabilities against Global Limo, Inc.

44.     The additional lis pendens prevented Mr. Partain's free use of his house and was later used in February of 2007 on the wild and confused whim of Judge Isgur to incarcerate Plaintiff purportedly for collecting rent on his house pursuant to the orders for the lis pendens.[2] Plaintiff was damaged through deprivation of freedom, assets, and the loss of his property and the values therein. The damage was further aggravated by interference with Plaintiff's ability to operate an interstate motorcoach business; pay his debts and liabilities; loss of license to operate a motor carrier; loss of profits; loss of compensations; and loss of opportunities. See related injuries in Hidalgo County MDL case no. 05-1073, In re Hurricane Rita. *See also Damages below.*

COUNT 9

45.     18 U.S.C 1344 (2); 18 U.S. Code § 1956; 18 U.S. Code § 1957; 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c); THEFT; FRAUDULENT TRANSFER – On or about May 16, 2005, Debtors and Compass Bank prosecuted against Plaintiff for control of Global Limo, Inc. at a preliminary injunction hearing, in adversary cause no. 05-07009 (SDTX). Debtors had devised a scheme to fraudulently transfer assets and/or to encumber assets before bankruptcy with intent to prevent the collection of *Judgment* in Hidalgo County case no. CL-29,530-A to restitute Plaintiff. Global Limo, Inc. was an element of this scheme as outlined by Debtors' attorney Keith Livesay in July of 2002 through a written letter. Compass Bank assisted Debtors by cross- collateralizing the assets, as outlined by Debtorss' attorney Keith Livesay. Accordingly, all assets were retitled under Global Limo, Inc. and encumbered by Compass Bank wherefrom Plaintiff could not collect his judgment for fraud against Mapleses and et al. Debtors did not

---

[2] This action followed complaints to the 5th Circuit that there was fraud and racketeering occurring in case no. 05-07009 and related cases under Judge Isgur and under Judge Crane. Plaintiff sued out a habeas corpus after 72 days of incarceration on grounds that Bankruptcy Judge Marvin Isgur lied and lacked jurisdiction.

maintain the legal authority or legal obligations of Global Limo, Inc. after the scheme was implemented.

46. On or about January 27, 2005, a turnover motion was adjudication in case no. CL-29,530-A transferring all rights and interests in Global Limo, Inc. to Plaintiff wherefrom Plaintiff cured the company's legal obligations and operation. Debtors quickly filed chapter 11 bankruptcy as individuals, however, said bankruptcy did not include Global Limo, Inc. and the company was never in bankruptcy. Debtors and Compass Bank claimed Global Limo, Inc. did not exist and that all assets that had belonged to Global Limo, Inc. had now flowed magically into Debtors' ownership which were protected by bankruptcy. Debtors and Compass Bank made their representations with the intent that the Judge would act on them. Judge Isgur accepted Debtors' and Compass Bank's presentations and it was determined at the aforementioned hearing that in disregard of Texas law, Texas court orders and the Rooker-Feldman doctrine, that Plaintiff had almost no identifiable interests in Global Limo, Inc.[3] due to Mapleses bankruptcy and Compass Bank's interests in Global Limo, Inc. which had to be protected from Plaintiff.

47. Plaintiff's business and property interests were nearly destroyed by Judge Isgur's injunction order that allowed Debtors and Compass Bank nearly unfettered control over Global Limo, Inc. resulting in the rape of business' value and assets and operation of dangerous interstate vehicles which resulted in 23 deaths and large liabilities against Plaintiff's interests.[4] Plaintiff was severely damaged through deprivation and loss of his property and the values therein; through interference with his ability to operate an interstate motorcoach business; loss of profits; loss of compensations; and loss of opportunities. *See also Damages below.*

COUNT 10

---

[3] This order was reversed approximately 9 months later (after 23 deaths and destruction of Global Limo, Inc.) by Judge Isgur who found that Plaintiff was actually the owner of Global Limo, Inc. which empowered the Judge to avoid Plaintiff's interest in the corporation through bankruptcy proceedings and to remove Plaintiff's standing to sue Compass Bank and Debtors by placing all interests under Mapleses' bankruptcy estate. *Memorandum Opinion On Summary Judgment,* Case no. 05-07009 (SDTX).

[4] Bankruptcy Judge Marvin Isgur was never prosecuted for the illegal seizure and resulting deaths that occurred since Judge Ricardo Hinojosa claimed Judge Isgur was immune to prosecution. No one was ever prosecuted for those deaths.

48. 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c); THEFT; FRAUD – On or about May 12, 2006, Compass Bank electronically motioned for relief from bankruptcy's automatic stay in chapter 11 bankruptcy case no. 05-70128 (SDTX) through *Texas State Bank's Motion For Relief From The Automatic* Stay to execute against Global Limo, Inc.'s assets and house seized from Plaintiff by Bankruptcy Judge Marvin Isgur in adversary case no. 05-07009 through *Judgment* (bankruptcy avoidance) on or about April 27, 2006 (approximately 2 weeks earlier).

49. Compass Bank made representations to the bankruptcy Court that [sic] "the Debtor has little or no equity in the Buses, Condo, and/or Rents and (c) the Buses, Condo, and Rents are not necessary to the Debtor's effective reorganization." Judge Schmidt responded with *Order Granting Texas State Bank's Motion For Relief From Automatic Stay*. However, Compass Bank had previous and consistently represented throughout Debtors' bankruptcy cases that it was necessary to seize Global Limo, Inc. and Plaintiff's house through bankruptcy avoidance for the benefit of Mapleses' bankruptcy estate and for the good of "all" creditors thereof: Property may only be avoided through bankruptcy if the property would have been in the bankruptcy estate and therefore available to Debtor's general creditors; essentially, voidable preferences must have depleted the estate and may not have been fully encumbered prior to avoidance. Accordingly, a judge can only avoid a preferential transfer for the benefit of the bankruptcy estate and not for the benefit of Compass Bank.

50. Compass Bank intended and knowingly made conflicting, material, and false representations to different bankruptcy courts in venue of Debtors' Chapter 11 bankruptcy to use specific bankruptcy processes to execute a scheme to gain or legitimize interests in Global Limo, Inc. and Plaintiff's house that they did not have due to their fraud and Texas law prior to Debtors' Bankruptcy. The bankruptcy court's used their representations to effectively launder Plaintiff's assets and Global Limo, Inc. and it's assets through Debtors' bankruptcy estate to aid and enrich Compass Bank. Plaintiff was injured through deprivation and loss of his properties and the values therein; interference with Plaintiff's ability to operate an interstate motorcoach business; acquired debts and liabilities; loss of profits; loss of compensations; loss of opportunities; and illegal incarceration. *See also Damages below.*

## COUNT 11

51.     ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; 18 U.S.C. § 1962 (c) and (d); – On or about January 10, 2007, Global Limo, Inc. was sentenced for Conspiracy To Make False Statements To A Government Agency, 18 U.S.C § 371 and Violation Of Federal Motor Carrier Safety Administrations Regulations 49 U.S.C. § 521 (b) (6) and 18 U.S.C. § 2 (while operated by the Mapleses) and James Maples was sentenced for Violation Of Federal Motor Carrier Safety Administrations Regulations 49 U.S.C. § 521 (b) (6) and 18 U.S.C. § 2 in a Federal Court in the Southern District of Texas, Criminal case no. M-06-076-S. Global Limo, Inc. was originally a racketeering enterprise created by Debtors to fraudulently transfer assets. Debtors were operating Global Limo, Inc. solely due to false oral representations that company was included under their Chapter 11 Bankruptcy. The US Trustee's Office out of Washington D.C. supports Plaintiff that the corporation was never in bankruptcy. Plaintiff was injured through deprivation and loss of his properties and the values therein; severe violations to his US Constitutional rights, Federal Statutes, and Bankruptcy Code; interference with his ability to operate an interstate motorcoach business; acquired debts and liabilities; loss of profits; loss of compensations; and loss of opportunities. *See also Damages below.*

## COUNT 12

52.     ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; THEFT; 18 U.S. Code § 1341; 18 U.S.C. § 1962 (c) and (d); - James Maples filed a false sworn *Plaintiff's Complaint For Eviction And Suit For Rent* in the Justice Court of Precinct 4, Place 2, in Hidalgo County, case no. Cause no. JP2011-197 on or about May 13, 2011. Debtor did not invoke the jurisdiction of the court and did not sue Plaintiff. At about that same time Debtor re-enter an old order from his Bankruptcy case no. 05-07009 into the County Clerks Record allegedly giving control (although not ownership) of Plaintiff's house to Debtors dissolved bankruptcy estate in April 2006: Plaintiff actually superseded and regained control over his property in August of 2008 through *Turnover Order No. 5.* Debtor relied on racketeering activities in his Chapter 11 bankruptcy through a RICO enterprise consisting of James Maples, Kathy Maples,

Compass Bank, Global Limo, Inc., Justice of the Peace Homer Jasso, DA Rene Guerra, and Sheriff Lupe Trevino to make a fraudulent claims to control Plaintiff's home through an illegal *Writ of Possession*. (See App. 26, Certified Mail Receipts to District Attorney). JP Homer Jasso ordered a Default Judgment and an order for possession against Plaintiff's home while at the same time not allowing Plaintiff to defend his property since he was not a party to the suit. Plaintiff was injured. See damages below.

53.     Plaintiff was attacked by Sheriff/Constable J.E."Eddie" Guerra, Deputy Constable Carlos Gonzalez, and a SWAT team at his house which evolved into a 3 day armed standoff. Chief Victor Rodriguez and Sheriff Guadalupe Trevino refused to stop the racketeering activities until Channel 4 news requested JP Jasso to explain how the state could take someone's property without a lawsuit: All police withdrew. On or about May 11, 2012, Sheriff/Constable J.E."Eddie" Guerra, with the assistance of McAllen Police, broke into Plaintiff's house - creating a special relationship -, removed his campaign material and other assets, and threatened Plaintiff with criminal trespass arrest if he returned. Officer Hernandez of the McAllen Police Department also threatened Plaintiff with criminal trespass arrest if he returned. Plaintiff suffered threats to his life, property loss, loss of rent, loss of time, and loss of investment. *See also Damages below*.

COUNT 13

54.     18 U.S.C § 1344 - BANK FRAUD; 18 U.S.C § 1956 - LAUNDERING OF MONETARY INSTRUMENTS; 18 U.S.C § 1957 - ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY; 18 U.S.C § 1961 (1) (D) ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; and 18 U.S.C § 1962(b), (c), (d) - County Judge Sergio Valdez, Hidalgo County Court No. 7, having never been transferred case no. CL-20,530-A by assigned Judge Alex Gabert, worked without authority to continue Judge Gonzalez' racketeering activities and assaults on Plaintiff's *Third Amended Judgment* and associated turnover orders, under the color of law to frustrate all of Plaintiff's attempts to enforce any of the final decrees of the court in case no. CL-29,530-[A] even after a mandate issued from the 13th Court of Appeals to enforce the Plaintiff's final judgment. *App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated*

*5/9/2013; App. 39, Corrected Mandate, Appeals Case no. 13-12-00267-CV, dated 8/16/2013.* When the 13th Court of Appeals found Judge Gabert's *Final Judgment* void, since Plaintiff had never been sued and was a judgment creditor, Plaintiff again attempted to cause the court to enforce it's decrees and to return his illegally seized property by filing his *Judgment Creditor's Motion For a Show Cause Hearing Hearing Enforcing Turnover Orders No. 5 and No. 6 And To Recover Stolen Monies. App. 28, Civil Docket Report, CL-29,530-H.*

55.     Judge Sergio Valdez mysteriously stepped in, avoiding Plaintiff's motion to regain his illegally seized property, and Judge Valdez again attempted to modify Mr. Partain's final decrees by filing an "interlocutory order" offsetting the *Third Amended Judgment* on excuse that the Mapleses' Title 11 bankruptcy was a suit against Plaintiff that modified the *Third Amended Judgment. App. 37, Order Of The Court, Case no. CL-29,530-G, dated 10/10/2013.* However, Judge Valdez was made aware that Bankruptcy courts cannot affect or review the merits of a state judgment, and certainly cannot alter a state judgment in an effort to recoup, offset, or recover, especially for criminal sanction wherefrom bankruptcy court's lack all jurisdiction. Stern v. Marshall, 564 U.S. 2 (2011), (held that a bankruptcy court lacked constitutional authority under Article III of the United States Constitution to enter a final judgment); In re Sweeney, 276 B.R. 186 (B.A.P. 6th Cir. 2002) (Under the Rooker-Feldman doctrine, a bankruptcy court may not review and re-determine the merits of a debt or set aside the default judgment reflecting it, but it may within its exclusive jurisdiction determine whether that debt is dischargeable or not. (Id. At 195)); also see Terrebonne Fuel and Lube, Inc., 108 F.3d 609, 613 (5th Cir.1997) ("bankruptcy courts lack the power to hold persons in criminal contempt.").

56.     Judge Valdez, without jurisdiction, using the color of law in a case where the county court had already lost its plenary power, entered *Order Of The Court*, dated October 10, 2013, allegedly modifying the Plaintiff's *Third Amended Judgment*, ignoring *Turnover Order No. 5* and *Turnovever Order No. 6*, and inviting Plaintiff to appeal again, adopting and continuing a pattern of racketeering activities of the racketeering enterprise. Plaintiff was deprived of his rights and property. Plaintiff was injured. See damages below.

## COUNT 14

57.        18 USC § 1344 – BANK FRAUD; EXTORTION; or alternately 18 USC § 201 –
BRIBERY OF PUBLIC OFFICIALS AND WITNESS; 18 USC § 666; 18 U.S.C § 1341;
and VIOLATION OF AMENDMENT 14 OF THE UNITED STATE CONSTITUTION
– The Debtors' other attorney, Kelly Mckinnis, advised Judge Gonzalez that his clients
could pay part of their judgment debt in case no. CL-29,530-A to Plaintiff if the Court
would "lean" on Compass Bank to release a lien against Plaintiff's house then the Court
could use that to credit the Debtors.  Debtors represented that Compass Bank was afraid
of Plaintiff's RICO (Racketeer Influenced Corrupt Organization) complaints against the
bank and Debtors, and that the bank would do "anything" to get away from his claim.
Plaintiff protested that the Court shouldn't involve itself in a crime to pay him with his
own asset by removing illegal liens.  Judge Gonzalez called the bank's attorney, Vicky
Skaggs, and Compass Bank release a $47,000 lien against Plaintiff's house, through his
company Global Limo, Inc., on or about October 4, 2010 to influence Judge Gonzalez to
destroy Plaintiff's final judgment.  Judge Gonzalez was expecting to be influenced by the
bank.  Consequently, Judge Gonzalez put out an order attacking all the Court's previous
orders and denying Plaintiff any judgment award or relief.  Plaintiff was injured through
the racketeering activity because Judge Gonzalez used it to allegedly and illegally defeat
all the previous orders of the court, leaving Plaintiff with no award or judgment after an
original *Final Judgment* for approximately $452,000 years and approximately 18 years of
litigation and torment.  Judge Gonzales recused himself and later, without any authority
under the law, ordered the case CL-29,530-A away from Judge Gabert to Judge Valdez to
impair Plaintiff's recourse. Plaintiff was injured. *See also Damages below.*

## COUNT 15

58.        18 U.S. Code § 1961 (1) (D) ANY OFFENSE INVOLVING FRAUD
CONNECTED WITH A CASE UNDER TITLE 11; 18 U.S.C. § 1956; 18 U.S. Code §
1951; 18 U.S.C. § 1957; 18 U.S.C § 1341; 18 U.S. Code § 1513; THEFT; FRAUD; 18
U.S.C. § 1962 (c)(d) - District Judge Alex W. Gabert, assigned judge to Hidalgo County
Court no. [1] for case no. CL-29530-A operated under the color of law to participate in
racketeering activities with attorney William McCarthy and Judge Rudolfo Gonzalez,

including theft, fraud, and fraud connected to a Title 11 bankruptcy case, to attack the Plaintiff's *Third Amended Judgment* by replacing it with another Final Judgment, dated March 16, 2012, to supplement Judge Gonzalez' Order (App. 21), dated 2/2/2011, based on William McCarthy's claim of an offset from a Title 11 bankruptcy and interests in assets from an interstate motorcoach company named Global Limo, Inc. App. 29, Final Judgment, Case no. CL-29,530-A, dated 3/16/2012.

59.    As a direct result of Judge Gabert's void *Final Judgment*, Plaintiff was attacked by Hidalgo County Constables and a SWAT team at his real property which he was using as his Congressional Campaign Headquarters on the same day and time he was scheduled for the only televised congressional candidates forum with Congressman Ruben Hinojosa (Plaintiff was also after being given a friendly warning by a Hidalgo County Sheriff's Commander to "watch his back since he was pissing off the powers that be"). *App. 30, Temporary Injunction Hearing (Transcript), C-0929-12-F, dated 4/16/2012.* Power and water were cutoff and a 3 day armed standoff ensued. The Constable service finally withdrew after the 3rd day (the SWAT team withdrew within 6 hours after they discovered the Relator wasn't listed in the orders to take possession of the condo and appeared to own the condo per county records), but Constables returned on the 5th day breaking into the condo and removing the Plaintiff's campaign materials, campaign records, business tools, and business inventory.

60.    Judge Gabert's void Final Judgment in case CL-29,530-[A] was used as an argument by William McCarthy to vindicate Judge Homer Jasso's illegal writ of possession in Justice Court case no. JP2011-197 to defeat a preliminary injunction in district case no. C-0929-12-F and violate Plaintiff's constitutional rights to be secure in his property and possessions. Tx. Const. Art. 1 sec. 19 - Deprivation of Life, Liberty, Etc.; Due Course of Law; USCA 14, Sec. 1. The 13th Court of Appeals opinioned in case no. 13-12-00267-CV that Final Judgment was Void, never having the effect of law. *App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated 5/9/2013.*

61.    Plaintiff's property was never returned, his motions and efforts to recover his property were ignored or attacked by the every judge rotating through his case. Attorney William McCarthy, Judge Homer Jasso, and assistant District Attorney Michael L. Garza

continue to use the resulting physical seizure of Plaintiff's property on May 11, 2012, to challenge Relator's property ownership. Plaintiff was injured. *See also Damages below.*

COUNT 16

62.     ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; THEFT; 18 U.S. Code § 1341; 18 U.S. Code § 1961 (1)(A),(B),(D); 18 U.S. Code § 1513; 18 U.S.C. § 1962 (c) and (d); CRIMINAL MISCHIEF; EXTORTION; THEFT – William John McCarthy filed a false sworn *Original Petition For Forcible Detainer*, Case no. JP2014-458, in the Justice Court of Precinct 4, Place 2, in Hidalgo County, on or about July 15, 2014 for real property owned by Plaintiff and leased to Plaintiff's tenant, Dora Martinez. William McCarthy did not invoke the jurisdiction of the court and did not sue Plaintiff: The Debtors, attorney William McCarthy, and "The Estate Of James H. Maples" lacked standing to invoke the jurisdiction of the justice court to sue for forcible detainer against Plaintiff's tenants since the Debtors were not landlords or owners pursuant to Texas Property Code § 24 and Turnover Order No. 5, making JP Jasso's Default Judgment[s] and Writ[s] of Possession void for lack of jurisdiction. William McCarthy irrelevantly claimed to be executor and administrator over The Estate Of James Maples, although he was not and a probate case had not even been filed. William McCarthy represented that the Plaintiff's real property was awarded to the Debtors' Estate through the bankruptcy court, but he did not fully represent that the bankruptcy court's order had been superseded by Mr. Partain's *Turnover Order No. 5* two years later in 2008. William McCarthy also claimed to McAllen police and to a county court judge that he actually owned the real property individually, but he could produce no documents.

63.     Justice of the Peace Homer Jasso, Sr., operating under the color of law through Justice Court, Pct. 4, Pl. 2, Hidalgo County, case no. JP2011-197 and case no. JP2014-458, engaged in a continuing pattern of racketeering activities with William McCarthy, and the Hidalgo County District Attorney's Office including theft, fraud, fraud connected with a case under title 11, and conspiracy to deprive Plaintiff his real property by force using Hidalgo County resources including Hidalgo County Constables, a SWAT team, Default Judgments, and Writ of Possessions against Plaintiff and his tenants, and by

collaterally attacking the Relator's *Turnover Order No. 5. App. 11, Turnover Order No. 5, Case No. CL-29,530-A, dated 8/18/2008; App. 24, Default Judgment, Case no. JP2011-197, dated 6/03/2011; App. 47, Default Judgment, Case no. JP2014-458, dated 9/29/2014; Writ of Possession, Case no. JP2014-458, dated 9/11/2014.* Plaintiff's rent and assets went to Hidalgo County, Debtors, and attorney William McCarthy. *18 U.S. Code § 1957 - Engaging in monetary transactions in property derived from specified unlawful activity.* Judge Jasso further violated Texas Property Code § 24.0054(3) and injured Plaintiff by ordering a writ of possession after the appeals record was sent to the Hidalgo County Clerk. *App. 50, Letter of Receipt of Appeals Documents by County Clerk, CL-14-3542-E, dated 9/10/2014.* Plaintiff suffered real property loss (>$20,000), loss of rent, loss of time, and loss of his investment. *See also Damages below.*

COUNT 17

64.     ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 1118 U.S.C. § 1341; 18 U.S.C. § 1343; CRIMINAL MISCHIEF; THEFT18 U.S.C. § 1962 (c) and (d)  – William John McCarthy filed a false sworn exparte *Motion For Judicial Review Of A Document Purporting To Create A Judgement Lien*, case no. C-6549-14-G, in 370th District Court of Hidalgo County, on or about July 30, 2014 claiming that Plaintiff placed an illegal lien against property owned by "The Estate Of James Maples", but he did not provide a copy of the alleged document or identify it as required by statute. William McCarthy claimed to be executor and administrator over "The Estate Of James Maples," although he was not. Two district judges recused themselves: District Judge Jose Banales was later assigned to the case. William McCarthy did not identify which document Plaintiff had filed as statutorily required by TEX GV. CODE ANN. § 51.902 (c) and William McCarthy misrepresented ownership of the real property in violation of *Turnover Order No. 5* through an improper affidavit. William McCarthy did not invoke the jurisdiction of the court. Judge Jose Banales was made aware of these facts and that Plaintiff was owner of the property, but he ordered the clerk through wired communication to retitle Plaintiff's property to the deceased, James Maples. Judge Banales used the color of law to vandalize Plaintiff's deed on his property using improper ministerial action through TEX GV. CODE ANN. § 51.902 to enrich a

non-legal entity and to protect a racketeering enterprise which included Hidalgo County. Plaintiff's title to his property was destroyed, and *Turnover Order No. 5* was ignored. Plaintiff suffered real property loss (>$20,000), loss of rent, loss of time, loss of his investment and prejudice against his rights. Plaintiff was injured. See Damages below.

COUNT 18

65.     18 U.S. CODE § 1961(1)(A),(B),(D). 18 U.S. CODE § 1961(1)(A),(D); 18 U.S. CODE § 1951 - INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE; 18 U.S. CODE § 1513 - RETALIATING AGAINST A WITNESS, VICTIM, OR AN INFORMANT; 18 U.S. CODE § 1962(c),(d) - District Judge Robert Max Blackmon was purportedly assigned to Hidalgo County case no. CL-29,530-[H] through Administrative Judge Jose Rolando Olvera's *Order of Assignment*. Plaintiff objected to the assignment of Judge Blackmon, but conditionally withdrew the objection if the assignment fully authorized Judge Blackmon to enforce the Third Amended Judgement and all associated orders of the court. *App. 60, 61; TEX GV. CODE ANN. § 74.053 (b).* Judge Olvera did not amend his orders or assign another judge so Plaintiff's objection laid and Judge Blackmon was legally disqualified. However, Judge Robert Blackmon ordered and held a show cause hearing under the color of law on Feb. 26, 2015, on Plaintiff's *Motion for Contempt* against William McCarthy. Judge Blackmon tried to circumvent his disqualification by claiming he was only assigned for one hearing since Judge Omar Maldonado of County Court No. 8 was actually sitting over the case. *App. 59, Order Of Assignment, dated 1/20/2015.* However, Judge Omar Maldonado was not assigned over the case by the 5th Administrative District as required by law, and is not sitting over the case.

66.     Judge Blackmon refused to acknowledge the 13th Court of Appeals *Opinion* and mandate, from related appeals case no. 13-12-00267-CV, and instead protected William McCarthy's fraud and multiple violation of the court's final orders by claiming the court's orders do not apply to counsel. *See App. 21, 24, 30, 44, 51, 53, 54, 57, 63, 65.* Judge Blackmon adopted William McCarthy's new sworn testimony, allegedly speaking for "The Estate of James H. Maples" (a non-legal entity), detailing his deceased client's interests in the Plaintiff's interstate commerce business and how much the Plaintiff owed

the "The Estate of James H. Maples," although the 13th Court of Appeals wrote that it was beyond the jurisdiction of the court to hear new testimony after it lost its plenary power. *App. 32, Opinion; Henson v. Estate of Crow, 734 S.W.2d 648, 649 (Tex. 1987) (The dispositive question before us is the holding of the trial court that the Estate of Bruce L. Crow was not a legal entity and cannot be sued as such.).*

67.     Judge Blackmon fervently cast fraudulent arguments and legal misrepresentations at the Plaintiff, and issued an order under the color of law denying contempt against William McCarthy to protect the racketeering enterprise and its racketeering activities. 18 U.S. Code § 1961(1)(A),(D); 18 U.S. Code § 1962(c)(d). Specifically, Judge Blackmon made arguments that the actual number on the instant case was "CL-29,530-H" instead of "CL-29,530-A" because of Judge Rudolfo Gonzalez' acts to transfer the case outside his jurisdiction, making the case a brand new case without any orders to enforce – and contradicting TEX GV. CODE ANN. § 74.121(c).

68.     Judge Blackmon retaliated and further argued that Plaintiff started a new case, CL-29,530-H, to harass the Debtors' attorney and that he was considering sanctions to punish Plaintiff unless he played nice and submitted. 18 U.S. Code § 1961(1)(A),(B),(D). Judge Blackmon threatened the Plaintiff on, but mostly off the record that he may sanction him with fines for not "playing nice", and that if the Plaintiff failed to conform to any of the judge's possible orders that he could end up in jail. 18 U.S. Code § 1951 - Interference with commerce by threats or violence; 18 U.S. Code § 1513 - Retaliating against a witness, victim, or an informant. Judge Blackmon even manufactured his own styled case as Johnny Ray Partain v. Estate of James H. Maples, Decedent et al. in the Justice Court, Pct. 4, Pl. 2. to continue his deception and to protect racketeering activities through his alleged new case and threats. *App. 62, Order Denying Motion For Contempt, Case no. CL-29,530-H, dated 3/02/2015;* 18 U.S. Code § 1962(c)(d); 18 U.S. Code § 1961(1)(D). Plaintiff Plaintiff was injured. Also see Damages below.

COUNT 19

69.     18 U.S. CODE § 1001; 18 U.S. CODE § 1018; 18 U.S. CODE § 1961 (D); 18 U.S. CODE § 1962 (D) - Plaintiff made two criminal complaints to the State Bar of Texas, well informing it of attorney William McCarthy's criminal acts, his mortal threats, and

the racketeering activities herein. The Texas State Bar responded first by shortening the period originally offered to Plaintiff to provide evidence, and then by joining the RICO enterprise and converting Mr. Partain's complaints and 500 plus pages of certified documents witnessing serious crimes, as an "inquiry" concealing the racketeering enterprise, connected with a title 11 bankruptcy case, and conspiring to advance its goals in violation of 18 U.S. Code § 1962 (D): William McCarthy referenced the Texas State Bars response to Mr. Partain as condoning his (criminal) actions. The Texas State Bar adopted the goal of the racketeering enterprise claiming in written notice that the serious crimes documented and provided to them do not violate the Integrity of the Profession (See Attorney Displinary Rules of Professional Conduct, Rule 8.04. Misconduct) - although they do. The Texas State Bar of Texas conspired with the RICO enterprise and concealed the racketeering activity to adversely affect Plaintiff's recourse and to cause him injury. Plaintiff was injured. *Also see Damages below.*

COUNT 20

70.      18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962(d) – Plaintiff purchased property loss insurance for his house located at 3820 N 7th Court, McAllen, Texas, with Farmers Insurance (an insurance company operating interstate), in 2008, on representations by Farmers Insurance's agents that Farmers Insurance, or its associates, would compensate Plaintiff for property lost to the perils that Farmers Insurance listed. However, Farmers Insurance did not intend to fully provide coverage for the perils it listed, and in fact, was almost nonresponsive to Plaintiff's claims of property loss until Plaintiff communicated that he would add Farmers Insurance to a lawsuit for failure to respond. Thereafter, Farmers Insurance refused to fulfill its promise to compensate Plaintiff his property loss by joining the RICO enterprise and adopting its goal to destroy Plaintiff's property rights. Farmers Insurance used electronic communication and United States mail to execute its scheme.

71.      Plaintiff made two loss claims under his Farmers insurance policy regarding the illegal taking and the destruction of title to his property under claim numbers 8000753367-1-1 (5/11/2012) and 3003661120-1-1 (10/09/2014) pursuant to the civil commotion, vandalism, and malicious mischief perils under his insurance. Farmers Insurance verified Plaintiff's title to his house on or about December of 2012, but failed

to deny or accept his claim within statutory time limits. Said claim languished unanswered until 2015 wherefrom Farmers Insurance claimed protection under the statute of limitations. Plaintiff made a second claim on or around October of 2014 which Farmers Insurance also ignored until Plaintiff suggested that he may make a complaint to the Texas Department of Insurance and add the company as a party to litigation. Farmers Insurance finally responded and formally investigated Plaintiff's claims. Farmers Insurance was made well aware of the RICO enterprise and its racketeering activities, and then Farmers Insurance joined the RICO enterprise and adopted its goal to avoid paying Plaintiff's loss of his property in violation of 18 U.S.C. § 1962(d). On or about October 6, 2015, Farmers Insurance denied Plaintiff any recovery of his property loss by claiming his policy excluded "government action." Plaintiff was injured. *Also see Damages below.*

## DAMAGES

72.     The acts and omissions of the Defendants are the proximate cause of the damages to Plaintiff, and Plaintiff seeks monetary relief over $1,000,000 and a demand for judgment for all the other relief to which the Plaintiff deems himself entitled. Plaintiff seeks special damages for loss of business, loss of freedom, mental anguish, loss of wages in the past, loss of future earning capacity, and exemplary damage for intentional abuse of "legal process", retaliation, and malice. Further, it is unlawful for any person to conspire to violate any of the provisions of subsections 18 U.S.C. § 1962 (a), (b), or (c), and each co-conspirator is liable for mandatory treble damages for the acts of all other co-conspirators undertaken in furtherance of the conspiracy, both prior to and subsequent to the co-conspirator's joining the conspiracy, even if the conspirator did not participate in, or was unaware of, such acts. Salinas v. United States, 522 U.S. 52, 63-64 (1997); see also CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d 1076, 1088 (10th Cir. 2014).

73.     Plaintiff also seeks adequate compensation for the taking, damaging, or destruction of his property by the State of Texas, Hidalgo County, and City Of McAllen.

## CONDITIONS PRECEDENT

74.     All conditions precedent have been performed or have occurred.

## INCORPORATION OF EXHIBITS

75. Exhibits attached to this petition are incorporated herein as evidence and arguments supporting this *Plaintiff's Second Amended Petition Consolidating Sec. 1983 Civil Rights Violations, Rico Complaints, and "Taking Clause"*

## JURY DEMAND

76. Plaintiff demands a jury trial as required in any findings of fact.

## REQUEST FOR DISCLOSURE

77. Pursuant to Rule 194, you are requested to disclose, within 50 days of the service of this request, the information or material described in Rule 194.2(a)-(i).

## VI. PRAYER

78. WHEREFORE, PREMISES CONSIDERED, Plaintiff Johnny Partain prays this Court cause Defendants to be served with process herein, that the Defendant be ordered to appear and answer, that the Court exercises the authority granted it under 18 USC § 1961-1968 and under Tex. Civ. Prac. Rem. Ch. 37 and 65, and that upon final hearing, the Plaintiff have judgment of the Court for his damages and costs, including actual damages, exemplary damages, pre-judgment interest at 10% APR, post judgment interest at 10% APR, appeal attorney fees, all costs incurred herefrom, for his time, and for any other and further relief, either at law or in equity, to which the Plaintiff may be entitled.

Respectfully submitted

PLAINTIFF
7020 N. 16th Street
McAllen, Texas 78504
956-240-1821
partain@atlastechnologies.biz

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered a true and correct copy of *Plaintiff's Second Amended Petition Consolidating Sec. 1983 Civil Rights Violations, Rico Complaints, and "Taking Clause"* on this Nov. 2, 2015 pursuant to the Texas Rules of Civil Procedure to:

Charles C. Murray
Compass Bank
818 W. Pecan Blvd.
McAllen, Texas 78501-2418
via ccmurray@atlashall.com;

Michael Lee Garza
Assistant District Attorney
100 N. Closner Room 303
via michael.garza@da.co.hidalgo.tx.us

Benjamin Dower
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
via benjamin.dower@texasattorneygeneral.gov

Josephine Ramirez
100 N. Closner, Room 303
Edinburg, Texas 78539
via josephine.ramirez@da.co.hidalgo.tx.us;

William McCarthy
Oxford & Gonzalez
124 S. 12th Street
Edinburg, Texas 78539-4502
via mccarthy.625@gmail.com

# M A N D A T E

TO THE 332ND DISTRICT COURT of HIDALGO COUNTY, GREETINGS:

Before our Court of Appeals for the Thirteenth District of Texas, on the 2nd day of July, 2015, the cause upon appeal to revise or reverse your judgment between

JOHNNY PARTAIN,

                                                                    Appellant,

                                    v.

CONTABLE J. E. 'EDDIE' GUERRA,
HIDALGO COUNTY PRECINCT 4 IN
HIS OFFICIAL CAPACITY AND
JAMES H. MAPLES, ET AL.
                                                                    Appellees.
CAUSE NO. 13-13-00341-CV
                                                    (Tr.Ct.No. C-0929-12-F)

was determined; and therein our said Court made its order in these words:

THIRTEENTH COURT OF APPEALS, having considered this cause on appeal, concludes the judgment of the trial court should be REVERSED and the cause REMANDED to the trial court. The Court orders the judgment of the trial court REVERSED and REMANDED for further proceedings consistent with its opinion. Costs of the appeal are adjudged against appellee.

We further order this decision certified below for observance.

★ ★ ★ ★ ★ ★

WHEREFORE, WE COMMAND YOU to observe the order of our said Court of Appeals for the Thirteenth District of Texas, in this behalf, and in all things have it duly recognized, obeyed and executed.

WITNESS, the Hon. Rogelio Valdez, Chief Justice of our Court of Appeals, with the seal thereof affixed, at the City of Edinburg, Texas this 18th day of September, 2015.



Dorian E. Ramirez, CLERK



# NUMBER 13-13-00341-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOHNNY PARTAIN,**                                       **Appellant,**

**v.**

**CONSTABLE J. E. 'EDDIE' GUERRA,
HIDALGO COUNTY PRECINCT 4 IN HIS
OFFICIAL CAPACITY AND JAMES H.
MAPLES, ET AL.,**                             **Appellees.**

---

### On appeal from the 332nd District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Wittig
### Memorandum Opinion by Justice Wittig[1]

This is an appeal by Johnny Partain, pro se appellant, challenging the district trial court's dismissal of his case for want of prosecution and its failure to hear his motion to reinstate.[2]  We will reverse and remand.

---

[1] Retired Fourteenth Court of Appeals Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code.  *See* TEX. GOV'T CODE ANN. § 74.003 (West, Westlaw through 2013 3d C.S.).

[2] The appellees in this cause include Constable J. E. "Eddie" Guerra of Hidalgo County, Precinct 4 in his official capacity, James H. Maples, Compass Bank, BBVA USA, Inc., Kathleen Maples, Carlos

# I. BACKGROUND

On April 5, 2012, Partain filed suit seeking injunctive and other relief against James Maples and Constable J. E. "Eddie" Guerra, appellees. The trial court originally granted Partain's temporary restraining order but later denied his request for a temporary injunction and dissolved the restraining order. Thereafter, twelve additional defendants were added, most of whom are also appellees herein. According to Partain, his requested temporary injunction was denied specifically because the trial court relied upon a void final judgment issued on March 16, 2012 by a county court in Hidalgo County. The record indeed reflects that on May 9, 2013, this court ruled that the judgment in question from the County Court at Law No. 7 of Hidalgo County was not valid and the county trial court was without jurisdiction. *Partain v. Maples*, 438 S.W.3d. 69, 73–74 (Tex. App.—Corpus Christi, 2013, no pet.). In our earlier opinion, we noted the history going back to January 1998 when Partain sued Maples, obtained a jury verdict, and a sizeable judgment was entered on February 24, 2002. *Id.* at 70. This judgment was amended and was followed by numerous turnover orders and show cause hearings.

Then, on February 2, 2011, the county court entered an order discharging and releasing Maples and requiring Partain to file an accounting detailing assets collected so that the trial court could consider ordering a refund. *Id.* at 73. This order was appealed, and we abated for a trial court clarification regarding the order. On March 16, 2012, the trial court entered a third amended "judgment," purportedly addressing an overpayment by Maples. *See id.* In the void March 16, 2012 judgment, the county court purported to

---

Gonzalez, District Judge (Retired), Alex W. Gabert, McAllen Police Department, Justice of the Peace, Homer Jasso, Sr., District Attorney Rene Guerra, County Judge Rodolfo Gonzalez, Hidalgo County Sheriff Guadalupe "Lupe" Trevino, Hidalgo County, Texas, and the City of McAllen.

allow Maples to "recover his condo with a rescission of the turnover order." *Id.* at 74. As noted, we held the county court lacked jurisdiction to enter this judgment. *Id.*

The gravamen of Partain's claims in the present action is that he seeks to prevent an alleged fraud on the court by allowing Maples to take possession of Partain's condo located at 3820 N. 7th Street in McAllen, Texas. He also sought to restrain any constable or sheriff from executing any writs to dispossess Partain of his property.

According to the petition and the record, Maples sold the condo on September 3, 2002 to Partain's company, which in turn deeded the property to Partain. Partain, quoting the district judge in this appeal at the temporary injunction hearing held on April 16, 2013, stated that, notwithstanding, the void judgment from the County Court-at-Law No. 7 "gave the condo to Mr. Maples. That's exactly what he did in this judgment." The trial court went on to observe that, after subtracting the value of the condo and rescinding the turnover order, Maples would be entitled to a judgment. The trial court opined concerning the county court's "judgment:" "It's the judgment of the Court that James Maples recover his condo with a rescission of the turnover order."[3] Partain informed the trial court that he still had time (45 days) to appeal the "judgment." The trial court stated: "And – and if you are going to appeal it, I suggest that you do that."

Partain suggested that the county court lacked jurisdiction, to which the trial court responded: "Then – then the place to attack his jurisdiction is also the Court of Appeals." Partain followed the explicit instructions or suggestions of the district court. The result of that related appeal, as already noted, was our holding the county court judgment was null and void.

---

[3] This is a quotation from the same April 16, 2013 hearing.

3

## II. STANDARD OF REVIEW

We review a trial court's decision to dismiss a case for want of prosecution under a clear abuse of discretion standard. *MacGregor v. Rich*, 941 S.W.2d 74, 75 (Tex. 1997); *State v. Rotello*, 671 S.W.2d 507, 508–09 (Tex. 1984); *Fox v. Wardy*, 234 S.W.3d 30, 32 (Tex. App.—El Paso 2007, pet. dism'd w.o.j.); *Dick Poe Motors, Inc., v. DaimlerChrysler Corp.*, 169 S.W.3d 478, 484 (Tex. App.—El Paso 2005, no pet.); *Garcia v. Barreiro*, 115 S.W.3d 271, 275 (Tex. App.—Corpus Christi, 2003, no pet.). We likewise review a trial court's denial of a motion to reinstate for abuse of discretion. *Aguilar v. 21st Century Res., Inc.*, 349 S.W.3d 32, 35 (Tex. App.—El Paso, 2010, no pet.) (citing *Polk v. Sw. Crossing Homeowners Ass'n*, 165 S.W.3d 89, 96 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)). A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner, or when it acts without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

## III. DISCUSSION

A trial court's authority to dismiss for want of prosecution stems from the following two sources: (1) Rule 165a of the Texas Rules of Civil Procedure; and (2) the court's inherent power. *Villarreal v. San Antonio Truck & Equip.*, 994 S.W.2d 628, 630 (Tex. 1999); *see Veterans' Land Bd. v. Williams*, 543 S.W.2d 89, 90 (Tex. 1976); *see also Bevil v. Johnson*, 307 S.W.2d 85, 87 (Tex. 1957). Under Rule 165a, a trial court may dismiss a case on "failure of any party seeking affirmative relief to appear for any hearing or trial of which the party had notice," TEX. R. CIV. P. 165a(1), or when a case is "not disposed of within the time standards promulgated by the Supreme Court." *Id.* R. 165a(2). In addition, the common law vests the trial court with the inherent power to dismiss independently of the rules of procedure when a plaintiff fails to prosecute a case with due diligence. *Villarreal*, 994 S.W.2d at 630. However, a party must be provided with notice and an

4

opportunity to be heard before a court may dismiss a case for want of prosecution under either Rule 165a or the court's inherent authority. *Villarrea*l, 994 S.W.2d at 630; *see also* TEX. R. CIV. P. 165a(1). The failure to provide adequate notice of the trial court's intent to dismiss for want of prosecution requires reversal. *Villarreal,* 994 S.W.2d at 630.

First, we note that Partain did appear at the dismissal docket. Accordingly, the first prong of Rule 165a was satisfied and could not be a valid basis for dismissal. At the truncated and summary dismissal hearing, attended only by Partain, the trial court asked, "What have you got?" Partain responded that he filed a motion to retain and that the court of appeals "put out an order voiding the order that this Court was relying on . . . ." After the trial court responded that he had not seen the order, the trial court told Partain to give the order to the coordinator and that he would "take this motion under advisement." The judge then dismissed Partain without hearing any argument or ascertaining whether he had anything further to offer.

A party must be provided with notice and an opportunity to be heard before a trial court may dismiss a case for want of prosecution under either its inherent power or Rule 165a. *See* TEX. R. CIV. P. 165a(1); *Villarreal*, 994 S.W.2d at 630.

The trial court's notice of hearing for dismissal for want of prosecution cites both its inherent power and Rule 165a. Notably, the notice also states: "The court intends to dismiss this case on its dismissal docket set for hearing in open court on the 3rd day of June, 2013, at 9:00 A.M." It further states that failure to appear at the oral hearing will result in dismissal. In his motion to retain, Partain notes that the trial court's notice to dismiss was signed just four days after we issued our opinion on the related void judgment. While the dismissal is technically at the one year guideline, the placement on the dismissal docket is permissive, and subject to retention on the docket for good cause. *See* TEX. R. CIV. P. 165a(1),(2).

5

The factors that a trial court may consider in dismissing a case under its inherent power include the length of time the case was on file, the extent of activity in the case, whether a trial setting was requested, and the existence of reasonable excuses for delay. *Texas Mut. Ins. Co. v. Olivas*, 323 S.W.3d 266, 274 (Tex. App.—El Paso, 2010, no pet.); *Maida v. Fire Ins. Exchange,* 990 S.W.2d 836, 842 (Tex. App.—Fort Worth 1999, no pet.); *King v. Holland,* 884 S.W.2d 231, 237 (Tex.App—Corpus Christi 1994, writ denied). We must look to the record in its entirety. *Bilnoski v. Pizza Inn, Inc.,* 858 S.W.2d 55, 58 (Tex. App.—Houston [14th Dist.] 1993, no writ). The central issue is whether the plaintiff exercised reasonable diligence. *Williams*, 543 S.W.2d at 90.

In his motion to retain, Partain pointed out to the trial court that our opinion in *Partain v. Maples* strongly vindicated his arguments to the court that the defendants' whole defense was based upon a void judgment from County Court-at-Law No. 7. Partain also claimed that the other order from the Justice of the Peace awarding possession of Partain's property to Maples was illegal.[4] Partain further urged that his case be retained on the docket because the district court, in its earlier hearing, "put heavy weight on the Defendants' order from the County Court requiring Johnny Partain to challenge the VOID order in the aforementioned appeals case instead." (Emphasis in the original). Indeed, as we noted, the district court on at least two occasions pointed to the court of appeals as the proper course of relief for Partain. Our opinion was issued on May 8, 2013, just days before the dismissal hearing. In addition to multiple filings by Partain in the district court, the issuance of a temporary restraining order, and a full hearing on the temporary

---

[4] Maples attempted to forcible evict Partain's tenant and obtained a default judgment against the tenant then obtained a writ of possession even though Partain was not even a party to this proceeding. Subsequently, various law enforcement, including an alleged SWAT team, came to Partain's residence seeking his removal, notwithstanding his legal title to the residence.

injunction, we note that the public record shows some sixty "events" in the companion appellate case.

## IV. Conclusion

Considering the entire history of this litigation, the complexity, the brief one-year pendency in the district court, and the prosecution of the underlying and related appeal, we conclude that the record demonstrates extensive activity, reasonable diligence, and viable excuses for delay both as a matter of fact and a matter of law. *See Williams*, 543 S.W.2d at 90; *MacGregor,* 941 S.W.3d 279–30. We sustain Partain's first issue. Because of our disposition, we need not address Partain's second issue. TEX. R. APP. P. 47.1. We reverse and remand.

/s/ DON WITTIG
Assigned Justice

Delivered and filed the
2nd day of July, 2015.

7

EXHIBIT 3

7020 N 16th Street
McAllen, Texas 78504


IXCHEL PARR
Assistant Attorney General
Environmental Protection Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
(512) 475-4013 | Fax: (512) 320-0911
Ixchel.Parr@oag.texas.gov

February 16, 2024

Re: Demand to cease and desist misrepresentations and attempts to divert PSF funds from GLO

Ms. Parr;

      I received your demand letter of January 31, 2024, regarding the General Land Office's (GLO) complaint of my properties and lessees.  You either failed your due diligence before contacting me, or you are misrepresenting the illicit acts of the State of Texas – I am attaching to this letter some relevant communications with the Attorney General and Governor.  It is the General Land Office that has confiscated or misappropriated some of my royalty payments, without proper legal authority over my property, by making misrepresentations to my lessees.[1]  This is going to cause problems for my lessees whom will eventually be unable to produce on my property – or pay the State's taxes.  But its going to be a much bigger problem for the State of Texas if it continues to use these illicit tactics to evade paying its debt to me.

      The State of Texas, including all the instrumentalities of the state, its legislative, executive, and judicial authorities, has precious little authority over the matter of my collecting its debt to me, as imposed by Art. 1 Sec. 17 of the Texas Constitution and the 5th Amendment of the United States Constitution.  Texas' continuing rogue evasions and gamesmanship of its obligations to pay its debt are barred by Art. 1, Sec. 29.  It has been established through multiple United States and Texas Supreme Court Opinions that these debts must be paid.[2]  In fact, Texas Solicitor General Aaron Neilson recently represented to the United States Supreme Court, in Devillier v. Texas, cause no. 22-913, a relevant case here, that the State of Texas always pays its constitutionally imposed debts:  Mr. Neilson was responding to characterizations that Texas' actions in Devillier were rogue, resembling gamesmanship or even bait and switch.  Did he lie?  Well, Texas' debt in my instance has matured much further than even Devillier, following the State's established path of gamesmanship to the instant situation.

---

[1] The State has no power to commit acts contrary to the guarantees found in the Bill of Rights.  Boullion, 896 S.W.2d 147-49 (Tex. 1995).

[2] "[I]f a state takes a person's property and doesn't give compensation, that state is violating the Constitution every day — it's an ongoing violation," said United States Supreme Court Justice Elena Kagan, In re: Devillier v. Texas.

Texas avoided and evaded paying its constitutionally imposed debt to me. Your Attorney Generals Office unlawfully claimed judicial immunity to the processes that I attempted in good faith, which consequently neutered the State's power to resolve it debt to me, judicially and statutorily. All this done to sacrifice me and my family and protect incompetence and corruption from the lowest to the highest political offices of Texas. Ironically, I now have legal immunity to civil litigation and criminal prosecution since they are not only barred by res judicata, but by Art 1. Sec. 29[3][4], beyond government power and inviolate. Raising further legal arguments is irrelevant and will not lie, even if the processes now implemented to collect against the State's debt are alleged imperfect. Your best response now would be to negotiate honestly with me.

As of February 16, 2024 the State of Texas is indebted to me for approximately $337 million, minus the estimated over $100 million in assets I possess through execution against the State. That's comes out to about $237 million. Plus we'll have to add for costs and the recent additional seizures of my property. I've developed a lot of tools and I will collect the full amount of the State's debt. However, I am fully willing to release Texas from my lien once it pays it debt to me as required by law. Please make certain that the GLO returns my royalties back to me.

In the meantime, you've express interest in some of my property which you claim is under the PSF. Do you have the authority to trade, or to pay the State's debt? Or, do you want to set a precedent?

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

Cc:

Governor Greg Abbott, Office of the Governor, P.O. Box 12428, Austin, Texas 78711-2428, Cert. Mail #9407111206210996187334;

Attorney General Ken Paxton, Office of the Attorney General, PO Box 12548, Austin, TX 78711-2548, Cert. Mail #9407111206210996439693.

---

[3] The United States Supreme Court has consistently described the Just Compensation Clause as "self-executing," meaning that no additional acquiescence or authorization is necessary to enforce the compensation requirement. This means that no further action by the government is a necessary predicate to enforcing the right, nor is a waiver of sovereign immunity, nor an enabling statute. Thus, an owner whose property has been taken is entitled to seek compensation without invoking any particular statute or state court procedures. See, e.g., Knick, 139 S.Ct. at 2171; Clarke, 445 U.S. at 257. When government takes property, it is obligated to provide compensation. If it does not, property owners are entitled to seek compensation themselves without additional government permission.
[4] "Just compensation is provided for by the Constitution and the right to it cannot be taken away by statute." Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304 (1923).



KEN PAXTON
ATTORNEY GENERAL OF TEXAS

January 31, 2024

Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz
956-240-1821

  Re: Demand to cease and desist misrepresentations and attempts to divert PSF funds from GLO

Dear Mr. Partain:

  This office has received a request from the General Land Office ("GLO") to address the letters you have sent to operators of numerous oil and gas leases in Texas.

  In these letters, you allege that certain Permanent School Fund ("PSF") minerals have been transferred to you. You further allege that "[t]he debtor, State of Texas, has defaulted in connection with an obligation secured by collateral specified in the attached UCC Finance Statement." The UCC Finance Statement claims as collateral "[a]ll assets, interest, and taxes belonging to Texas, Texas Treasury Safekeeping Trust Company, Hidalgo County and City of McAllen." The letters direct the operator to make all payments owed to the State of Texas pursuant to State oil and gas leases to you.

  As you must be aware, the representations you have made are wholly inaccurate and entirely without authority. You have presented no recorded deeds or judgments against GLO or any other entity to support your representations. The funds you are attempting to divert away from the Permanent School Fund support public schools across Texas, and the Office of the Attorney General takes any attempt to illegally appropriate these funds very seriously.

The Office of the Attorney General, on behalf of the GLO, demands that you**:**

1. **Immediately cease and desist contacting operators claiming any interest in state property;**
2. **Immediately inform the operators you have previously contacted of your misrepresentations and return any royalty payments you inappropriately received;**

3. **Within 20 days of the date of this letter, file the attached UCC-3 termination statement for all properties on which you filed a UCC-1 statement pursuant to TEX. BUS. & COM. CODE § 9.513(c); and**

4. **Within 30 days of the date of this letter, send copies of your correspondence with the operators previously contacted and file stamped copies of the UCC-3 termination statements.**

This letter is an attempt to resolve this matter without the need, or cost, of litigation. Your prompt attention to this matter will save time and expense for you and the people of Texas. **Failure to respond may result in further action by the Attorney General.** Any and all future calls, correspondence, and other communications should be directed to my attention.

Thank you for your prompt attention to this matter.

Sincerely,

*/s/ Ixchel Parr*
IXCHEL PARR
Assistant Attorney General
Environmental Protection Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
(512) 475-4013 | Fax: (512) 320-0911
Ixchel.Parr@oag.texas.gov

Johnny Partain
7020 N 16th Street
McAllen, Texas 78504

US Attorney General Merrick Garland
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

May 18, 2023

<u>CRIMINAL COMPLAINT AGAINST TEXAS GOVERNOR GREG ABBOTT AND ATTORNEY GENERAL KEN PAXTON, AS WELL AS NOTICE OF COMINGLING OF PUBLIC AND PRIVATE PROPERTY POTENTIALLY AFFECTING FEDERAL PUBLIC MONIES</u>

My name is Johnny Partain, and I am filing a criminal complaint (18 USC 242, 241) against Texas Governor Greg Abbott and Texas Attorney General Ken Paxton for violating my civil rights. I am also informing your office that I have solutions to cure my injuries and enforce my civil rights that may jeopardize the interests of the United States government, so I am requesting and providing information before proceeding.

Governor Greg Abbott and Attorney General Ken Paxton knowingly violated my rights to receive hundreds of millions of dollars in compensation for property that was taken, damaged, and destroyed by the State of Texas pursuant to Texas Constitution Article 1, Section 17.  To be clear, the Texas Judiciary buried its inept and unlawful acts against me, my property, and other people's lives by denying me access to the courts under the pretext of confusion and immunity, which ultimately destroyed my property rights. However, it was the Attorney General, acting under color of law asserting immunity in Hidalgo County District Case No. C-0929-12-F, who absolved the helpless courts of their obligations under the Texas constitution, and as required by mandate of a higher court.  Then, Texas Governor Gregg Abbott and Texas Attorney General Ken Paxton took affirmative action, objecting to and blocking the Texas Comptroller Glenn Hagar through its attorney, Murl E. Miller, from paying my application for just compensation as required by the constitution, claiming under color of law that I was required a court order to exercise my right to just compensation under Texas Constitution Article 1, Section 17, from which they had just been illegally granted immunity.  Attorney General Paxton could have brought my request for compensation before a jury if he wanted a second opinion on its value rather than claiming immunity from the constitution to evade the required compensation. Governor Gregg Abbott does not require a court order to comply with the constitution or to allow the Texas Comptroller to pay me. See the attached notices.

To put context on this issue, the compensation due to me arises from the racketeering activities of Texas State Bank to interfere through its political connections in the South Texas judiciary with my final judgment for $451,000 against a well-known fraud.  The fraud was a personal friend and neighbor to the president of the bank.  The bank then interfered with the operations of my interstate bus company through theft of its assets and racketeering (RICO) to control the company and its profits. Banks have no superior rights under the Texas Constitution.  Twenty-three (23) people died as a result of the bank

strong arming me through their law firm to seize control of my company.  I was served with over a billion dollars in legal claims, and then I was judicially enjoined and threatened with incarceration to be silent to protect the appearance of propriety by the judiciary in the ensuing multi-district litigation.  My company was destroyed and the families who lost lives were compensated almost nothing:  They never realized that the courts and the bank were running the seized corporation.  When I complained to higher authorities, I was threatened for complaining, my complaints were dismissed, and I was consequently imprisoned for civil contempt for 72 days by the judge I was complaining about, before suing out a habeas corpus in Federal court.  The offending judge never had jurisdiction over me. Despite the fact that I had no charges against me and that I had never faced prosecution, I was fined $94,500 by a second judge for using habeas corpus to evade the first judge's order to jail me.  Thereafter, four judges signed orders on each other's courts to protect the offending judge from criminal prosecution.  President Obama's administration ordered a criminal investigation of two of the judges through the FBI, but the FBI failed to perform.  I know this because I was never interviewed, but my house was searched by FBI and US Marshals.

Later, my property and my temporary congressional campaign headquarters were assaulted by a SWAT team through actions by the Hidalgo County District Attorney and a Justice of the Peace to seize my property while I campaigned for a US congressional seat against public corruption.  This resulted in a three day armed standoff, wherefrom police withdrew, but my campaign headquarters, a property I owned, was taken a few days later while I was away.  Because I had never been sued, orders to take my property were eventually found to be unlawful by a higher court. A few years later, the same government agents once again illegally seized my property in the exact same way as I ran for Congress again.  A Justice of the Peace then threatened me that the District Attorney was looking for a way to prosecute me.  A month later I was indicted and fully prosecuted for a felony manufactured by local government.  I was eventually exonerated on the grounds that there was no crime.  However, after my acquittal, the courts withheld almost $25,000 from me and refused to restore it as required by law.  Before the prosecutions were dropped, I lost my ability (security clearance) to work for my clients, which almost cost me my second company. The courts then instructed the court's clerk to title my property to a dead man using Texas lien laws to describe my title on my property as a lien not assigned by a court recognized in the State of Texas or the United States.

There are a lot more civil right violations, and I have filed numerous competent complaints, but because everyone involved has always been granted unexplained immunity from the law, my complaints have never been subjected to judicial review. Even though my rights have been serially violated, I cannot appeal since the clerks have also been weaponized, altering records and making unlawful demands, to prevent my appeals.  According to a district attorney's investigator, I should not expect protection from criminal assaults against me or my property because I am a contentious political issue that will not be brought before a jury.  I've made it quite clear that the Texas legal system will never permit me to stand trial, but maybe I can force it to prosecute me?

This brings me to one of the many extrajudicial options I have. According to Texas Constitution, Art. 1, Sec. 17, the government must provide payment before using, taking, or destroying a citizen's property. It is not necessary to file a lawsuit, because according to the constitution, payment is required prior to using, taking, or destroying property. Since Texas is not permitted to become indebted to me instead, my hundreds of millions of dollars are comingled with those of the State of Texas.  Art. 1, Sec. 17 of the Constitution is a self-executing constitutional right, and I cannot be legally prosecuted for

receiving my compensation. Any prosecution would lead directly to legal error according to opinions of the Texas Supreme Court for the past 60 years.  However, even if I were to be prosecuted, I doubt that the State of Texas or even the Federal government would be willing to have me appear before a jury and have a team of lawyers examine what I have experienced over the past 20 years. I will collect my compensation from Texas. I am nonetheless aware that federal funds, grants, and programs also contribute to Texas's economy. Finding and avoiding any potential federal funds or pledges that Texas may hold is a nearly intractable challenge. As a result, I'm notifying you, the Department of Justice, that I want to refrain from seizing federal property and that I will seek my rightful restitution from the State of Texas.

I'm respectfully requesting that you identify to me all federal property that the State of Texas is holding so that I can avoid taking it, whether or not the Department of Justice decides to pursue the charges I've made against Gov. Gregg Abbott and AG Ken Paxton. Alternately, I'm asking that any federal property that the State of Texas owns or controls be taken away until I receive my pay from Texas. This could include withdrawing FDIC protection for deposits in Texas State Depositories. As a final option, I am requesting that the United States government reimburse me for my just compensation using funds designated for the State of Texas. As of May 18, 2023, this compensation is $327,143,334, compounded at 10% annually as provided by law. If you are able to organize any relief, if you have any concerns or objections, or if you intend to leave me on my own, please let me know as soon as possible.


Respectfully,


Johnny Partain
956-240-1821


Cc:

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

Attorney General Ken Paxton
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548



December 7, 2022

Mr. Johnny R. Partain
7020 North 16th Street
McAllen, Texas 78504

RE: Miscellaneous Claims Application

Dear Mr. Partain,

    I greatly appreciated the opportunity to talk with you about the $250,000,000.00 Miscellaneous Claims Application that you filed with our agency. For the reasons we discussed, your Application must be denied as a matter of law.

    Your lawsuit was dismissed because the trial court did not have jurisdiction to hear your causes of action due to sovereign immunity. Sovereign immunity entails two separate forms of immunity for the State of Texas, its agencies, and its officials (collectively, the "State").

(1) **Immunity from Suit:** Immunity from suit bars a lawsuit against the State unless the State expressly gives its consent to the suit. In other words, although the claim asserted may be one on which the State acknowledges liability, this rule precludes a remedy until the Legislature consents to suit.

(2) **Immunity from Liability:** Immunity from liability protects the State from judgments even if the Legislature has expressly given consent to the suit. In other words, even if the Legislature authorizes suit against the State the question remains whether the claim is one for which the State acknowledges liability. The State neither admits liability by granting permission to be sued.

    Thus, when the trial court made its judgment, it denied your claim as the State is immune from the suit and the liability. The appellate court also did not overturn the immunity judgment. As a result, it is inaccurate to state that the Courts have not determined your real property claim. The judiciary have specifically found that your claims are barred under the doctrine of sovereign immunity.

    Even if you disagree and continue to believe that you do have a valid right to payment that is "unopposed," you are still required to obtain an Order from a Texas court with competent jurisdiction over the matter to agree to enforce your right to the payment. Absent a bona fide judicial order from such a Court, our Agency has no statutory authority to pay any claim that you may present concerning this matter.

Respectfully yours,

Murl E. Miller
Chief Counsel for General Litigation

 Comptroller of Public Accounts FORM 74-209 (Rev.10-17/8)

# Miscellaneous Claim Application

Use this form to file a claim against the state of Texas for the following reasons:
- Warrant that is void due to expiration date.
- Unpaid bill that cannot be paid by receiving state agency due to expiration of appropriation.
- Other claim justified by state contract or state law.

*Instructions on second page*

**Type of Claim** *(Please check one)*

☐ Void Warrant      ☐ Unpaid Bill      ☑ Other   **Claim under Tex. Const. Art. 1, Sec. 17**

*Please type or print*

Claimant's name *(Legal name of individual or business)*
**Johnny Ray Partain**

Mailing address (P.O. Box, street, city, state and ZIP + 4 code)
**7020 N 16th Street**

Claimant's Social Security number (SSN)* or Texas taxpayer number or Federal Employer Identification Number (FEIN)
**\*\*\*-\*\*-\*\*\*\***

| Claimant's telephone *(Area code and number)* | Amount of claim |
|---|---|
| **956-240-1821** | **$250,000,000.00** |

Specific reason for claim *(For void warrant(s), list specific identification of goods, services, refund or other items for which the warrant(s) were originally issued.)*

**This is my sum certain claim for just compensation specifically required by Texas Constitution, Art 1., Sec. 17, for my property taken, damage, or destroyed by state actors, and particularly state judges, protected under claims of immunity to suit by the Texas judiciary: I have not been sued. The Texas Judiciary waived its right to review my claim on excuse of immunity to suit in Texas courts. Attached is the Third Amended Petition describing the original complaint. Governor Abbott and Attorney General Paxton refuse to meet to negotiate. My request for $250 million compensation through warrant is unopposed. My constitutional claim is due pursuant to Art. 1, Sec. 17, and is superior to any impeding process or statute, being constitutionally derived.**

Supporting documentation *(Please list)*

1. **Third Amended Petition**
2. **Letters to Governor and Attorney Gen.**
3. _____
4. _____

\* **Federal Privacy Act Statement:** *Disclosure of your Social Security number is required and authorized under law for the purpose of tax administration and identification of any individual affected by applicable law, 42 U.S.C. § 405(c)(2)(C)(i) and Tex. Gov't Code §§ 403.011, 403.015, 403.055, 403.056 and 403.078. The Public Information Act, Tex. Gov't Code Ch. 522, and applicable federal law shall govern release of information on this form in response to a public information request.*

## Certification

I certify that the information I have furnished on this form is true and correct. I certify that the amount of this claim is still outstanding and is due and payable.

| Type or print name | Title |
|---|---|
| **Johnny Ray Partain** | **Citizen of Texas** |

sign here ▶ Claimant's signature *[signature: Johnny Ray Partain]*    Date **8/26/2022**

Complete application and mail to: Comptroller of Public Accounts
Fiscal Management Division
P.O. Box 13528
Austin, TX 78711-3528
**ATTN: Miscellaneous Claims Analyst**

Or FAX to: 512-463-2138

For questions, call 1-800-531-5441, ext. 5-0966.
The local number in Austin is 512-475-0966.

*Under Ch. 559, Texas Government Code, you are entitled to review, request and correct information we have on file about you, with limited exceptions in accordance with Ch. 552, Government Code. To request information for review or to request error correction, contact us at the address or phone number listed on this form.*



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

Attorney General Ken Paxton
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

August 11, 2022

## NOTICE OF DEBT COLLECTION

The State of Texas has to this date evaded paying to me and my family its constitutional debt under Texas Constitution, Article 1, Section 17. I have tried to resolve this through the Texas Supreme Court which now claims immunity from petition, constitution, and the laws of our state. I have tried to resolve this debt with both the Governor's and Attorney General's office which refuse to enforce the laws of this state or pay its debts, but have argued that the debt needs to be paid.

The creation of the State of Texas begins in Texas Constitution, Article 1, and includes our Bill of Rights which are excepted from the powers of government and inviolate, in verbatim, per our Texas Constitution. Specific rights under the constitution are self-executing according to the Texas Supreme Court and can be enforced without any other actions required.

WHEREAS, Johnny Partain residing at 7020 N 16th Street, McAllen, Texas 78504 has made several claims regarding the taking, use, and destruction of his property by the government amounting to $250 million, sum certain, pursuant to Texas Constitution, Article 1, Section 17;

WHEREAS, Johnny Partain has attempted to compel the State of Texas and its political subdivisions to conform to the Texas Constitution to pay its debts, ad nauseam, and he has no other legal recourse;

WHEREAS, The State of Texas has refused Johnny Partain any due process or a jury trial as mandated by order of a higher court and the law.

WHEREAS, The State of Texas has no immunity to its obligations under the Texas Constitution and a constitutional debt exists;

WHEREAS, the State of Texas, Hidalgo County, and City of McAllen have engaged in serial patterns of harassment, intimidation, oppression, and corruption, protected by the State of Texas all the way up to its Governor, Attorney General, and Chief Justice of the Texas Supreme Court;

WHEREAS, Johnny Partain is entitled to full payment and to the costs of collections, including the costs of defending his restitution as necessary;

WHEREAS, debt collections routinely cost 50% of the debt owed and is traditionally added to debts collected;

WHEREAS, the Department of Public Safety alone has an agency wide biennial budget of $2.3 billion in state and federal funds;

ACCORDINGLY, Johnny Partain is now forced to engage all forms of debt collections against the State of Texas, and its culpable political subdivisions, of assets to restitute, preserve, and defend his rights under the United States Constitution and Texas Constitution;

ACCORDINGLY, restitution will be adjusted to reflect the original value of Johnny Partain's injuries, and any additional injuries;

ACCORDINGLY, costs will be adjusted to compensate for enforcement and defense of the collection of debt for restitution.

The State of Texas may pay its debt to Johnny Partain within 20 days of this letter without incurring additional costs, but note that no action is necessary from your office. If you protest and wish to justify your position, protest immediately and be very specific regarding the terms of your protest: Remember that the Texas judiciary has already waived and exhausted its jurisdiction to review this debt, punting any reasonable and civil resolution to your offices, if possible. Prior letters to the Governor's Office are attached to this notice.

Justly,

Johnny Partain
956-240-1821



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

Attorney General Ken Paxton
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

December 21, 2021

Re: Johnny Partain – Property Compensation Pursuant To Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5.

Governor Greg Abbott and Attorney General Ken Paxton;

The State of Texas owes me $250 million for condemnation and destruction of my property through its efforts to protect official incompetence and public corruption[1] in South Texas.  I sent you a certified letter on August 6, 2020, requesting payment since I had been locked out of the courts for over 4 years and couldn't even get a response to a simple motion.  I never got a response from your office and your office failed to return my calls for a meeting or a calendar.  In fact, I have never been interviewed even after making criminal and judicial complaints against public officials for two decades.  Taking notes from your December 18, 2021, press conference[2] regarding the State's right to take 'Unprecedented' action on the border wall "when the Biden Administration has failed to do its job as required by

---

[1] The United State Supreme Court relevantly explains in Nashville, C. & St. L. R. Co. v. Browning, 310 U.S. 362, 369, "It would be a narrow conception of jurisprudence to confine the notion of "laws" to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law…Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text." See also Poe v. Ullman, 367 U.S. 497 (1961). I.E. Corruption is the law of South Texas all the way up to the Texas Supreme Court.

[2] https://www.youtube.com/watch?v=7rQHlft5jFw&t=153

the constitution … to enforce the law", I am also taking this unprecedented action to protect my property rights under the Texas Constitution Art. 1 Sec. 17 to collect monies owed to me for property seized and destroyed. Your office and the Texas Supreme Court have facilitated "third-world country" banana republic practices which you campaigned against in 2014. You have both allowed public corruption to flourish and to cause me great injury. If you ignore me, I will be forced to take the $250 million, plus whatever costs to collect it, to make myself whole - to embarrass everyone involved and to destroy the status quo so I might finally live peacefully in Texas. Recall that it didn't take much to shut down the whole judicial network for two months when I last contacted you.

The amount is no longer at issue since the judiciary has waived its right to review, claiming it is immune to being sued in it's own courts. Being attorneys you also realize that this hasn't been a credible defense in the courts since the 1960's and the Texas Constitution (Art.1, Sec. 17) requires payment, even if the Texas Supreme Court determines that public incompetence, corruption, and the status quo must be protected at all costs when it embarrasses the courts or impugns the state.[3] Fortunately, Texas Constitutional rights are allegedly self-executing and don't require judicial review. I presume you and the State will treat me as deplorable wherefrom the law doesn't apply as usual, and maybe unresponsive since I am only a citizen of Texas. I've already endured two decades of poor treatment and political prosecution. Please don't be inconsiderate.

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

---

[3] [T]he Constitution itself is . . . a waiver of governmental immunity for the taking, damaging or destruction of property." Steele v. City of Houston, 603 S.W.2d 786, 791 (Tex. 1980).



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

August 3, 2020

Re: Johnny Partain – Request For Property Compensation Pursuant To Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5.

Governor Greg Abbott;

I am currently in the Texas Supreme Court, In Re Johnny Partain, case no. 20-0362, regarding an inverse condemnation complaint against public officials and the State of Texas with additional complaints of public officials engaging in and protecting institutionalized incompetence and public corruption – the status quo. I'm certain that you, Governor Abbott, know of what I speak since you raised the issue of public corruption in South Texas by comparing it to "third-world country practices" in your campaign near the Fort Bliss Army base in February of 2014 as you campaigned for governor. Unfortunately, the corruption hasn't changed since your inauguration and the Texas judiciary has, in a most obvious and spectacular way, placed itself in the embarrassing situation of engaging in and then protecting this well documented public corruption in South Texas with sovereign immunity. *See Hidalgo District Court case no. C-0929-12-F.* Case no. C-0929-12-F is a case I petitioned in 2012 to protect my property and my final judgment in Hidalgo County case no. CL-29,530-A from retaliatory seizure and destruction. The litigation didn't work, the rule of law did not prevail, because too many large extrajudicial interests connected to the Hidalgo County courthouse with stake in sustaining local government corruption and protecting the county interfered with the judicial process placing the judiciary into its instant embarrassment. *See In Re Johnny Partain, case no. 20-0362, Petition For Writs of Mandamus.*

You can relax. I am not mixing current judicial process with my request to you for reimbursement of my seized and destroyed property, as required under Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5. Due process as

explained by the United State Supreme Court[1] is not necessarily judicial:  It only requires some kind of meaningful and timely process.  You will find that while case no. C-0929-12-F was reinstated by a 14th Appeals Court judge assigned by Texas Supreme Court Justice Nathan L. Hecht in 2015 after it was illegally dismissed only "on the authority" of a district judge, that same district judge has since then refused to answer any of my motions or to take me to trial as mandated by the 14th Appeals Court justice.  Many judges I've encountered over the past 22 years routinely demonstrate contempt for their own judiciary and the rule of law.  I am denied justice under any common judicial practice and there is nothing you could add or subtract from the process.  Even the Texas Supreme Court appears to abuse its own discretion[2] by refusing to enforce the appeal court's mandate or the constitution when it obviously has the authority to do so, apparently to protect the appearance of propriety in the system.  The courts, not the issue, were closed to me exactly four years ago without any adjudication except to bless nearly all parties with immunity for invading, seizing, and destroying my property.

Regardless of what little scant processes are available that can be used to enforce a person's civil rights under the constitution, the required lawful reimbursement for my property losses by the state always leads to your office to negotiate an order for repayment from the Secretary of State. I think that after 22 years of litigating the same issues over and over without resolution or enforcement in the judiciary only to be finally excluded from all court processes, that its reasonable for any man or the public to conclude the Texas Judiciary is an impotency relying on its court concocted immunity to escape public accountability while at the same time collecting paychecks and consuming public resources.  The judiciary is failed and is probably irrelevant anyways to those who know its workings.  Bringing me to a bigger point.

The courts go further to bless nearly all other public offices with immunity from accountability - and the status quo embraces it.  I'm not certain how the Executive or Legislative branches will respond to my efforts in this upcoming 87th Legislature to pierce this immunity to accountability, but it appears the political environment is ripe to raise the issue.  There is a poignant point to be made by recent protests and

---

[1] Mathews v. Eldridge, 424 U.S. 319 (1976) - This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. Wolff v. McDonnell, 418 U. S. 539, 418 U. S. 557-558 (1974). See, e.g., Phillips v. Commissioner, 283 U. S. 589, 283 U. S. 596-597 (1931). See also Dent v. West Virginia, 129 U. S. 114, 129 U. S. 124-125 (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Joint Anti-Fascist Comm. v. McGrath, 341 U. S. 123, 341 U. S. 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U. S. 545, 380 U. S. 552 (1965). See Grannis v. Ordean, 234 U. S. 385, 234 U. S. 394 (1914).  Nelson v. Colorado, 137 S. Ct. 1249, 197 L. Ed. 2d 611 (2017) To comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions.

[2] A judge abuses his discretion if he acts in an arbitrary or unreasonable manner or if he acts without reference to any guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

riots that injustice is rooted in institutionalized bias and corruption, that there is a serious problem with our government, and that there is no rule of law. Public corruption, immunities, and injustice are the root of anger[3], inciting Black Lives Matter, Antifa, and even the Democratic Party to protest and to riot. Its not even a new issue being that the piercing of government immunity was an issue that was voted through the Sixty-first Legislature in 1969 under House Bill 117 (vetoed by the governor). That was over 50 years ago when protests and race riots were just about as they are now. 50 years ago and so little progress has been made regarding the accountability of our government to corruption and injustice.

Article 1 of the Texas Constitution is our bill of rights which describes a compact defining the relationship of our Texas republic and our citizens. It includes the rights to be secured in our persons, houses, papers and possessions and to enjoy life, liberty, property, privileges, and certain immunities. Our Bill of Rights is declared in the constitution to be inviolate and excepted to modification to "guard against transgressions of the high powers herein delegated … [wherein] all laws contrary thereto … shall be void." But the fact is that our bill of rights is already violated, that my rights have been serially violated, and that our civil rights are mostly unactionable, unenforceable, and not self-executing, pursuant to public corruption protected by the courts implementation of its own "common law" which modify the effect of our constitutional compact - to protect the State of Texas from its own citizens. These immunities displace the "rule of law" and cultivate injustices by undermining official accountability and by protecting public corruption and malfeasance under the veil of state propriety.

You see, I am in the middle of a political crisis because I cannot prosecute or punish state corruption. I cannot force the Judiciary to perform or to dispense justice, especially when it will discredit itself. I can only request reimbursement for my significant losses as required by the Texas Constitution which will always end up in your office under current Texas law for consideration of payment. Your consideration is certainly political - even if the judiciary had timely performed its job, had my due process been respected.

My property losses include, my hard won civil judgment ($2,720,126) in Hidalgo County Court No. 1 case no. CL-29,530-A which was finally destroyed through dismissal for want of prosecution (16 years after the judgment became final and 3 executions had been attempted); my real property ($116,000) which was invaded and first seized after an assault by a SWAT team as directed by the Hidalgo County District Attorney to interfere with my US Congressional campaign against public corruption; about eight years of rents ($96,000) after the seizure of my house; my transportation business and assets ($19 million) which were never return per court order (the court's refused to enforce their decrees and instead threatened me with contempt and incarceration for insisting that the courts enforce their decrees); my established and prospective business interests in one of my electrical service companies ($55 million) which was partially destroyed after a failed attempt to "felonize" me following a threat by a Justice of the Peace that the

---

[3] Racial injustice is a subset of the bigger problem.

District Attorney looking for a way to prosecute me (my company[ies] requires security clearance); and treble damages for the aforementioned losses that I am denied because the courts are closed to me.[4]  I can currently prove to a jury or the public that my property losses are approximately $236,796,378 and rising, and I've won a plethora of court opinions and orders supporting my claims - a stinging and constitutional rebuke against established south Texas corruption that you have already identified, and that has now landed in your office.  Its an opportunity for you to address corruption in South Texas and right some wrongs.  Should the corruption continue to be protected at the highest office in Texas?  Should I be denied my constitutional rights to my property or its value?  What will you do?

I am requesting a timely scheduled meeting with you to negotiate reasonable compensation for my property losses so that I might finally resume my life, liberty, property, privileges, and immunities with my family as promised under our Texas Constitution.  I would also like to bend your ear regarding accountability in our Texas government by considering new legislation in the 87th Legislature to modify common law government immunities imposed by the courts which are intrinsically unjust. Thank you in advance for your time and efforts.

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

---

[4] "All courts shall be open, and every person for injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, §13

No. 22-913

# In the Supreme Court of the United States

RICHARD DEVILLIER, ET AL., PETITIONERS

*v.*

STATE OF TEXAS

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

## BRIEF FOR RESPONDENT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney
  General


OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Aaron.Nielson@oag.texas.gov
(512) 936-1700

AARON L. NIELSON
Solicitor General
  *Counsel of Record*

LANORA C. PETTIT
Principal Deputy Solicitor
  General

NATALIE D. THOMPSON
KATELAND R. JACKSON
SARA B. BAUMGARDNER
Assistant Solicitors
  General

J. ANDREW MACKENZIE
Assistant Attorney General

**INTRODUCTION**

The State of Texas takes property rights extremely seriously. Indeed, the Texas Constitution goes beyond the U.S. Constitution by providing that "[n]o person's property shall be taken, *damaged, or destroyed* for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, §17 (emphasis added). Texas courts also decide takings claims and award full compensation under both the U.S. Constitution and the more protective Texas Constitution.

This case therefore is not about property rights. Instead, it is about the separation of powers. To date, Congress has not seen fit to create a cause of action to enforce the Fourteenth Amendment—and by extension the Takings Clause of the Fifth Amendment—against the States. That is presumably because the States are appropriately resolving takings disputes. Tellingly, Petitioners do not identify any State that refuses to provide just compensation for a taking. Tellingly, Petitioners have not identified any State that refuses to provide just compensation for a taking.

Nonetheless, although they were free to (and did) sue Texas under a state cause of action, Petitioners ask the Court to hold that the U.S. Constitution itself creates a federal cause of action. Their argument does not withstand scrutiny. No one disputes that the Fifth Amendment "did not expressly create a right of action when it mandated just compensation for Government takings of private property for public use." *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1328 n.12 (2020) (cleaned up); *see* Pet.Br.17. Nor does anyone dispute that for nearly a century after the founding, "takings claims against the federal government were

(1)

resolved directly by Congress." Pet.Br.27. It thus defies constitutional text and history to litigate a federal takings claim without a federal takings statute. Indeed, Justice Scalia lampooned the concept as one that "[n]o one would suggest." *Webster v. Doe*, 486 U.S. 592, 613 (1988) (Scalia, J., dissenting). Similar analysis applies to the Fourteenth Amendment, which creates no cause of action and was ratified during the same era in which takings claims were resolved by Congress rather than courts. Nothing in its text, structure, or history suggests that the Fourteenth Amendment deprives States of the same authority possessed by Congress regarding how to satisfy their just-compensation duty. To borrow Petitioners' phrase (at 8), these points alone should "begin and end" the Court's analysis.

Yet Petitioners urge "one last drink," *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), from the "heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring). "[I]mplying constitutional causes of action," however, "is 'a disfavored judicial activity.'" Supp.Pet.App.51a (quoting *Egbert v. Boule*, 596 U.S. 482, 491 (2022)). And the Court should be especially reluctant to create a new cause of action here. It is one thing for a federal court to recognize a new federal cause of action against the federal government. That, at least, represents a single sovereign governing its own affairs. It is something else entirely for a federal court to create a federal cause of action against the States, which are separate sovereigns.

Enforcing the Constitution as written would not leave aggrieved property owners without recourse. Because

the Takings Clause is self-executing, as soon as a taking occurs, a State is obligated to provide just compensation. And, in Texas, property owners can bring state causes of action. Since 1887, the federal government has largely satisfied its duty through the Court of Federal Claims. The key point, however, is that the Constitution empowers legislatures—both state and federal—to choose how to provide just compensation, whether through statutory causes of action, special bills, executive tribunals, or legislative courts. And because state courts are courts of general jurisdiction, they often also can resolve takings claims by enjoining uncompensated takings or under common-law causes of action. Petitioners could have pursued—and, in fact, *did* pursue—such an alternative avenue to relief.

Applying those principles here, Petitioners are correct (at 8) that the "question is easy": Unless and until Congress creates a federal cause of action for takings claims against the States, no such federal cause of action exists. Petitioners may prefer such a cause of action, but the Constitution does not entitle them to one.

## STATEMENT

## I. Petitioners' Consolidated Suits and the District Court's Ruling

This case concerns four state-court lawsuits, involving more than 70 plaintiffs, filed in two Texas counties along an interstate highway. Because "[t]he gist of all these lawsuits was the same," they were "removed to and consolidated in federal district court." Pet.Br.1-2. Removal allowed the cases to proceed in the same forum (something that could not happen in state court) with a single, consolidated complaint. JA.1-48. Petitioners did not object to removal.

EXHIBIT 5

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - - -

RICHARD DEVILLIER, ET AL.,            )

              Petitioners,            )

              v.                      ) No. 22-913

TEXAS,                                )

              Respondent.             )

- - - - - - - - - - - - - - - - - - - -

Pages:  1 through 90

Place:  Washington, D.C.

Date:   January 16, 2024

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.   20005
(202) 628-4888
www.hrccourtreporters.com

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - -

RICHARD DEVILLIER, ET AL.,           )

               Petitioners,           )

                v.                          ) No. 22-913

TEXAS,                               )

               Respondent.           )

- - - - - - - - - - - - - - - - - - -

Washington, D.C.

Tuesday, January 16, 2024

The above-entitled matter came on for oral argument before the Supreme Court of the United States at 11:10 a.m.

APPEARANCES:

ROBERT J. McNAMARA, ESQUIRE, Arlington, Virginia; on behalf of the Petitioners.

AARON L. NIELSON, Solicitor General, Austin, Texas; on behalf of the Respondent.

EDWIN S. KNEEDLER, Deputy Solicitor General, Department of Justice, Washington, D.C.; for the United States, as amicus curiae, supporting the Respondent.

C O N T E N T S

ORAL ARGUMENT OF:                                    PAGE:

ROBERT J. McNAMARA, ESQ.

    On behalf of the Petitioners              3

ORAL ARGUMENT OF:

AARON L. NIELSON, ESQ.

    On behalf of the Respondent              38

ORAL ARGUMENT OF:

EDWIN S. KNEEDLER, ESQ.

    For the United States, as amicus

    curiae, supporting the Respondent        68

REBUTTAL ARGUMENT OF:

ROBERT J. McNAMARA, ESQ.

    On behalf of the Petitioners             87

P R O C E E D I N G S

(11:10 a.m.)

CHIEF JUSTICE ROBERTS: We'll hear argument next in Case 22-913, Devillier versus Texas.

Mr. McNamara.

ORAL ARGUMENT OF ROBERT J. McNAMARA ON BEHALF OF THE PETITIONERS

MR. McNAMARA: Mr. Chief Justice, and may it please the Court:

The Question Presented in this case is resolved by the text of the Fifth Amendment, which, unlike any other provision of the Constitution, imposes on the government a -- an explicit duty to pay money.

It's also answered by this Court's decision in First English, which holds that the just compensation remedy is mandatory and that the Fifth Amendment itself furnishes a basis on which a court can award just compensation in an inverse condemnation case.

And this right of property owners to sue in inverse condemnation to obtain just compensation for an alleged taking is at the heart of modern American takings law. It's at

the heart of inverse condemnation claims filed against state and local governments nationwide. And it's also at the heart of every takings claim filed against the federal government under the Tucker Act.

The Tucker Act provides no cause of action, no substantive entitlement to a remedy. The cause of action, the substantive entitlement to a remedy, in every Tucker Act takings case is the self-executing Fifth Amendment, the same cause of action recognized in First English, the same cause of action pled here.

To reject that cause of action now is to upend the way lower courts, both state and federal, understand the Takings Clause to work and also to abandon this Court's consistent explanations of that clause not just in First English but in more recent cases like Knick v. Township of Scott.

And there's no reason to make that kind of drastic change. This Court has already recognized that money-mandating legal obligations logically come along with the right to file a lawsuit to enforce those obligations.

That's true as to statutes, which is

what this Court held in Maine Community Health Options. It should be at least as true as to the Constitution, and this Court's precedents consistently teach that it is.

I welcome the Court's questions.

JUSTICE THOMAS: In your reply brief, you say that the 19th century federal courts were faced with a bedrock property right and no way to enforce it directly.

Doesn't that seem to be at odds -- the fact that the courts there had to resort to extra-constitutional causes of action, isn't that at odds with your argument now?

MR. McNAMARA: I don't think so, Your Honor, because the primary problem facing federal courts in the early part of the 19th century was a lack of jurisdiction. And I think the question of jurisdiction is just conceptually distinct from the question of whether there's a cause of action, whether there's a right to a remedy.

Congress could tomorrow amend Section 1331 to reimpose an amount-in-controversy limit, and if it did that, that would prevent a number of people from

bringing Ex parte Young actions in federal court. Those claims wouldn't cease to exist. Congress would just have eliminated the jurisdiction over them.

And so I think there's a difference between jurisdictional limits which limited takings claims and even pleading requirements like the limits to the forms of action, which also limited plaintiffs' abilities to bring certain kinds of claims, and the core Question Presented here, which is just whether there is an entitlement to relief.

There -- there's only one modern form of action, which just takes the shape of saying, I'm entitled to this remedy for that reason. The remedy is just compensation. The reason is the Fifth Amendment as applied through the Fourteenth. And once the jurisdictional problems and the pleading problems are removed, as they have been in this case, the only question remains whether the Fifth Amendment mandates compensation, whether it mandates that remedy, which this Court has already answered. First English says that the just compensation remedy is mandatory.

And I think contrasting the -- the arguments of the other side with the rule adopted by the California Supreme Court in Agins is actually a useful illustration here. The California Supreme Court's decision in Agins said, we as a common law court don't want to recognize a claim for just compensation in a regulatory takings case. We think that intrudes on the legislature's prerogative. We don't recognize that cause of action.

And First English says that doesn't matter. The cause of action, the entitlement to relief, flows directly from the Fifth Amendment. So too here. The complaint here pleads a cause of action directly under the Fifth Amendment --

JUSTICE BARRETT: Counsel --

MR. McNAMARA: -- that says our property was taken and the Fifth Amendment -- yes, Your Honor?

JUSTICE BARRETT: Counsel, I agree that jurisdiction and a cause of action are distinct, but it's a little bit hard to see how in 1791 -- I mean, I think your argument is, when the Fifth Amendment was ratified, those who ratified it had to see the Fifth Amendment as

itself supplying the cause of action because this was the crucial way to vitiate the takings right, the right to just compensation.

But Congress didn't provide for federal question jurisdiction until 1875, so that kind of languished on the vine for a pretty long time if you're right that the founding generation or the -- you know, the ratifying generation in 1791 viewed it that way.

Moreover, you know, the historical evidence of private bills runs contrary to your argument because, yes, there was a right to just compensation, but we have all of this time, throughout the 19th century, of Congress enacting private bills to give just compensation.

And I think you have to contend with that because, I mean, I get that this is against Texas, against the state, but if the Fourteenth Amendment incorporated the Fifth Amendment as it was, there's kind of a mountain of historical evidence, you know, that you've got to contend with.

MR. McNAMARA: So I -- I don't think that mountain does quite the work that Texas

needs it to, Your Honor. And I think one problem here is the difficulty in mapping the modern conception of cause of action onto 1791 visions of the court. I think, if you asked a lawyer in 1791 whether the Fifth Amendment contained a cause of action, they probably wouldn't understand the question.

But, if you asked them can a property owner sue to enforce just compensation, the answer absolutely would have been yes. It would have been a suit in trespass. It would perhaps have been a suit in ejectment. But there was an understanding at the framing that this was an enforceable right, and if you --

JUSTICE GORSUCH: Well, that -- that establishes at most, it seems to me, that the Fifth Amendment envisioned some remedial mechanism would be available. And the common law trespass, as you point out, might have been it, or conversion might have been it. It -- it doesn't necessarily mean that there is itself an independent cause of action under the Fifth Amendment.

MR. McNAMARA: I -- I think it does, Your Honor, once the forms --

JUSTICE GORSUCH: Why? You've just conceded that the cause of action that -- that the Framers would have understood would have been in trespass.

MR. McNAMARA: Well, Your Honor, I think, in -- in modern terms, what the Court means when it says "cause of action" --

JUSTICE GORSUCH: Well, no. But what we're talking about the original meaning, and you're asking us to appeal to the original meaning and say they would have understood there would have been a cause of action. Perhaps, but what would that cause of action look like?

MR. McNAMARA: I -- I think they would have understood that there was an entitlement to a remedy.

JUSTICE GORSUCH: Some remedy?

MR. McNAMARA: An entitlement to just compensation as a remedy.

JUSTICE GORSUCH: Some -- some way to get that?

MR. McNAMARA: Yes, and I think --

JUSTICE GORSUCH: Fair enough. That doesn't necessarily mean there's a federal cause of action. It could mean it happens under state

common law, right?

MR. McNAMARA: Well, Your Honor, two -- two --

JUSTICE GORSUCH: I mean, you -- you would admit that a state common law cause of action did and could fully vindicate the Fifth Amendment?

MR. McNAMARA: Yes, Your Honor, I think there could be a state common law action that vindicated the First Amendment, but I also think --

JUSTICE GORSUCH: Fifth. Fair enough.

MR. McNAMARA: Yes, Your Honor, or -- or the First.

JUSTICE GORSUCH: And that that would -- that would be enough. No -- nothing more would be required.

MR. McNAMARA: Well --

JUSTICE GORSUCH: And, in fact, that's how it operated for a long time.

MR. McNAMARA: Well, certainly, Your Honor, if compensation is provided through any mechanism, there's no longer a Fifth Amendment injury to be remedied.

JUSTICE GORSUCH: Ah. Okay. I

understand that argument. That's not the argument you're -- you're pressing, though.

MR. McNAMARA: That's because, here, compensation hasn't been paid. The plaintiffs in this case continue to suffer the ongoing Fifth Amendment injury.

JUSTICE GORSUCH: Well, maybe that's because you -- you -- you -- you allowed this case to be removed, which I -- and -- and -- and, you know, I'm -- I'm surprised you didn't oppose removal on that ground and said there's no federal question that we need to resolve here because it's really a state common law cause of action we're pursuing. That would have been one option.

Or maybe in federal court you might have said we want a declaratory judgment, which everyone concedes you can get under the Fifth Amendment, and take pendent jurisdiction over our state common law cause of action, which would adequately vindicate our Fifth Amendment rights.

You didn't pursue either of those courses here.

MR. McNAMARA: So two responses, Your

Honor. One, I don't think there was a good-faith grounds to oppose Texas's removal because what the complaint says on its face is we are entitled to just compensation under the Fifth Amendment.

JUSTICE GORSUCH: Well, but it -- it then pleads state causes of action to do so.

MR. McNAMARA: No, Your Honor. It -- it pleads a claim directly under the Fifth Amendment.

JUSTICE GORSUCH: Well, maybe that's another problem you face is it -- you -- if you had an adequate common law -- do you dispute that Texas has an adequate common law remedy to -- for -- for your problem?

MR. McNAMARA: I do, Your Honor. And this is actually an important point. That --

JUSTICE GORSUCH: Is that argument in your brief, that -- that the -- that the -- the common law of Texas or state law has no mechanism to enforce the Fifth Amendment?

MR. McNAMARA: Well, Your Honor, Texas asserts --

JUSTICE GORSUCH: If -- if it did, I'd -- that one would I -- I'd take seriously,

but I didn't see it.

MR. McNAMARA: So Texas asserts, Your Honor, that there is a Texas common law mechanism to vindicate the Fifth Amendment, but there is no Texas decision saying we sitting as a common law court invoke our common law powers to create a cause of action.

JUSTICE GORSUCH: No trespass, no conversion?

MR. McNAMARA: Texas hears inverse condemnation claims arising under the Fifth Amendment. That's what the Texas Supreme Court said most recently in City of Baytown v. Schrock, and it cites the Fifth Amendment. It doesn't invoke its common law powers.

JUSTICE GORSUCH: Fair enough. I get all of that now. All right. Now that's clarifying. But you -- you -- the -- the nature of the argument before us isn't that Texas lacks a common law cause of action. It's whether or not Texas has such a thing, we're entitled to another remedy under federal law.

MR. McNAMARA: I -- I don't think that's right, Your Honor. What the Fifth Circuit said is that the complaint that alleges

an entitlement to just compensation flowing from the Fifth Amendment doesn't state a claim, that that claim is dead. If --

JUSTICE GORSUCH: Let -- let -- let -- let's suppose you -- we -- it did create a cause of action. Would -- would it also waive sovereign immunity? And what would the statute of limitations be?

MR. McNAMARA: I -- it -- it wouldn't necessarily waive sovereign immunity, Your Honor. I think that's a distinct question. And the statute of limitations would be the statute of limitations that is applied by lower courts when people actually bring these claims.

There's a -- a robust Court of Federal Claims jurisprudence, federal district courts hear claims arising under the Fifth Amendment, sometimes looking to state law to set the statute of limitations.

JUSTICE GORSUCH: Ah, they look to state law, don't they, yeah?

MR. McNAMARA: But the claim itself, Your Honor, comes from the Fifth Amendment not just in Texas but in states nationwide. And I think this is an important point.

Take Oregon, for example. Oregon signed on to the state's amicus brief in support of Texas, but the reason that Oregon pays just compensation for takings under the Fifth Amendment is the Oregon courts, citing First English, have said it must pay just compensation. And so answering the Question Presented --

JUSTICE BARRETT: If we don't read First English the way you do -- I mean, I think that footnote's pretty difficult to decipher -- do you lose?

MR. McNAMARA: No, Your Honor. I would -- I don't think it's just the footnote in First English. I think it's the broader holding that the remedy is required.

But I think there's no dispute here that there is an entitlement to relief. And, certainly, by the time of the ratification of the Fourteenth Amendment, courts across the country had converged on how that kind of entitlement would be enforced.

And it's enforced by a lawsuit directly against the entity that took the property that takes the form of saying, you have

this duty to provide just compensation, you have not fulfilled it, and I'd like the court to order you to fulfill it.

JUSTICE SOTOMAYOR: Can I have a -- just a small point of information? Your case was dismissed in federal court. Did you ask for a remand on your claims under the Texas Constitution?

MR. McNAMARA: No, Your Honor. The district court is keeping pendent jurisdiction over the claims under the Texas cause.

JUSTICE SOTOMAYOR: So you -- you have a pending suit on the state law claim?

MR. McNAMARA: Yes, Your Honor, but there is a dispute about the scope of the takings law that governs that question. Texas has taken the position in the lower courts that the Texas Constitution has a narrower definition of what counts as a taking than the federal courts.

JUSTICE SOTOMAYOR: Well, then First English comes in too because First English was about a state court claim and when it started, whether a temporary claim was a taking or not, and we said yes, it's a taking, and so the state

court had to pay for that taking.

How is it different than First English in that respect?

MR. McNAMARA: I -- I don't think it's different from First English, Your Honor, except that, here, it was removed into federal court and then the Fifth Amendment aspect of the case was dismissed on the merits.

JUSTICE SOTOMAYOR: Oh, I -- I -- I -- I don't disagree with you, but First English is about what the substantive law of Texas is and what Texas has to pay.

And so that issue should be resolved even in the district court, correct?

MR. McNAMARA: I -- I don't think so, Your Honor, because the backstop in First English is the Fifth Amendment that -- that says that the met -- the just compensation --

JUSTICE SOTOMAYOR: No, the backstop in the Fifth -- yes, it's the Fifth Amendment that provides the substantive law, but not necessarily -- we didn't address whether it provides a cause of action.

MR. McNAMARA: I -- I think the Court did, Your Honor. The United States' amicus

brief --

JUSTICE SOTOMAYOR: All right. We're -- we're going to -- we're going to go into --

JUSTICE JACKSON: Can I just ask -- I -- I mean, this is similar to what -- what Justice Sotomayor was just getting into. Are -- are you saying that we don't have three separate concepts, right, remedy, and cause of action? I thought those were three different things, and perhaps First English only covered two of them?

MR. McNAMARA: I -- I'm not sure they're distinct concepts, Your Honor. I think the simplest way to understand cause of action is an entitlement to a particular remedy, which is why it's coherent to say someone might have a cause of action for an injunction.

JUSTICE JACKSON: I thought it had to do with the forum, that you have a cause of action that is recognized in the judicial forum as opposed to, say, going to the legislature through -- through private bills.

MR. McNAMARA: Well, Your Honor, I -- I think, to the extent that's the definition of "cause of action," we would have a cause of action under the clear import of the history

that the --

JUSTICE JACKSON: Not -- not the history. I guess I'm just trying to understand, is there -- does it make sense to think about the Fifth Amendment as providing the right and the remedy but not speaking to where you're going to get that remedy from or what is the enforcement mechanism?

That's how I sort of am conceptualizing this, and -- and I think we differ about that, so I'd like to hear your opinion on it.

MR. McNAMARA: I -- I'm not sure that's a correct reading of the Fifth Amendment, Your Honor, in part because I think that reading -- everyone agrees there are some judicial remedies for the Fifth Amendment.

As I understand my friend's argument, we'd be entitled to sue for injunctive relief or for ejectment in the absence of a -- a path to a Fifth Amendment compensation remedy.

So everyone agrees there's some judicial remedy, and I think the form of that judicial remedy depends on the scope of the government's obligation.

There are two visions of the Fifth Amendment. One is that the Fifth Amendment just provides a precondition. The government is required to pay and it can be enjoined from taking the property if it doesn't pay.

The other vision that's adopted in First English that's reiterated in Knick is that the Fifth Amendment creates an obligation to pay just compensation. And if that's the ongoing obligation, the government has taken property, it owes just compensation today, will owe just compensation tomorrow, courts are empowered to cure that ongoing obligation.

It's not a question of damages for a past violation. It's a question of the government's obligation as it stands in court today.

JUSTICE BARRETT: Mr. McNamara, can I go back to Justice Sotomayor's question and just ask for a point of clarification? I understood Texas law to provide a cause of action for vitiating the federal Fifth Amendment right.

I took your answer to Justice Sotomayor to be saying that Texas courts say -- you were talking about how Texas courts define a

taking for purposes of the Texas Constitution.

So am I wrong in thinking that Texas allows you to bring a state cause of action for the federal Fifth Amendment claim?

MR. McNAMARA: I -- I'm not sure whether that's right to be honest, Your Honor. And I think two things flow from this. One, if it's true that there is a Texas common law cause of action under which we could have -- we can vindicate our Fifth Amendment rights, then the Fifth Circuit still has to be reversed because it held that that substantive claim should be dismissed on the merits.

JUSTICE BARRETT: Okay. Well, let me just -- just -- just -- it's important for me to be able to understand this procedural point. Does Texas have -- provide a state cause of action to vitiate the state takings right from the Texas Constitution?

MR. McNAMARA: Yes, Your Honor.

JUSTICE BARRETT: Okay. It seems to me then it can't discriminate against the federal claim anyway.

MR. McNAMARA: I -- I think that's true, Your Honor, but Texas doesn't -- Texas

isn't trying to discriminate against the -- this federal claim. What Texas says, like other state courts, is it's not doing -- it doesn't say we're doing common law analysis and creating a cause of action.

What Texas seems to be doing is constitutional analysis, just like the other state courts that specifically cite First English and say, ah, there is a cause of cause of action here. I'm not familiar with any state case saying we are using our powers as a common law court to create a cause of action to vindicate the Fifth Amendment.

What they say is we're looking at the Fifth Amendment. We see it creates the obligation. Frequently they cite First English directly and they say that's what gives rise to the cause of action.

And that, I think, is what's dangerous about the Question Presented here. As -- as I understand Texas's argument, the complaint we filed in state court was perfectly valid and could be adjudicated, and the Fifth Amendment could have been adjudicated in state court. Once it was removed, Texas moved to dismiss and

sought an interlocutory appeal and has successfully extinguished that.

But my concern is that adopting Texas's arguments here tells all of these state courts that have pointed to First English and said this is the source of -- the Fifth Amendment is the source of the cause of action would look to a decision in this case adopting Texas's arguments and say: Okay. We were wrong. The Constitution does not, in fact, require a remedy. There is no federal constitutional cause of action. And that would eliminate the federal takings remedy in state courts across the nation.

JUSTICE ALITO: Mr. McDowell, the language of the Takings Clause is quite similar to the language of the Due Process Clause in the Fifth Amendment, which immediately precedes it. "No person shall be [...] deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

So why should they be read differently with respect to the creation of a cause of action?

MR. McNAMARA: I -- I don't think they have to be read differently, Your Honor. I think, if there's an ongoing due process violation, a plaintiff could bring an Ex parte Young action. Ex parte Young was not a 1983 action. It was --

JUSTICE ALITO: No, not an Ex parte Young, but a claim for damages?

MR. McNAMARA: Well, and I think that's the difference here, that we're not seeking damages; we're seeking just compensation. We're not saying there was a past completed violation of the Constitution and we want something to offset that. We're saying the government has taken property, which gives rise to a present duty to pay just compensation, and we want the present obligation enforced, not a backwards-looking damages remedy concocted or created. And I think that entitlement to just compensation is how the Framers would have understood the Fifth Amendment.

The alternative view, the idea that all you get are injunctions, I don't think squares with either the text or how contemporary commentators talked about the clause.

St. George Tucker and John Jay wrote about the Takings Clause in the context of the Army seizing horses and military supplies. But, if the Army is seizing horses, the Army's going to get the horses. The understanding would not have been that you could stop the Army in the moment from seizing your horses.

What St. George Tucker is writing about is the ongoing duty to provide compensation for the horses, which is also how contemporary courts wrote about the just compensation requirement, even constrained as they were by the forms of action.

I -- I think a great example of this is the Massachusetts Supreme Court's decision in -- excuse me -- the Massachusetts Supreme Court's decision in evaluating an -- an action brought as a -- a writ of debt in Gedney v. Inhabitants of Tewksbury, where the justices -- the judges of the Massachusetts Supreme Court there said: This isn't the right forum. This isn't an action in debt. You can't state it using that forum. You have to go to a different forum to get your just compensation. But, if that other forum denies you compensation, you

can return here, in the statement of one of the judges, and ask for that remedy again, which will not probably be refused if --

JUSTICE ALITO: If the Fifth Amendment confers a right to sue for just compensation in and of itself, is that right unqualified? And if it is not unqualified, what qualifications do you recognize?

MR. McNAMARA: Oh, I -- I certainly don't think it's unqualified, Your Honor. It --

JUSTICE ALITO: What qualifications do you recognize?

MR. McNAMARA: It -- it requires a court of competent jurisdiction, and so, certainly, Congress is free to channel jurisdiction however it likes. Texas is similarly free to create courts of jurisdiction as it pleases.

But the underlying -- all we're saying is that there is an underlying entitlement to receive just compensation and that when that entitlement is denied, a court of competent jurisdiction can order that that just compensation be paid.

JUSTICE ALITO: Well, does it make

sense to view the Fifth Amendment as providing a right to sue for compensation, but your ability to vindicate that right is totally dependent on Congress's discretionary choice to create lower federal courts and to give them jurisdiction to entertain such claims? That sounds like a very weak right if that's -- if it's subject to limitation in that way.

MR. McNAMARA: I think the same could be said of the entire Bill of Rights, though, Your Honor. The -- the entire stratum of federal constitutional rights depends on Congress to create lower federal courts, courts where these rights can be vindicated.

Once Congress does create those courts, and when a state defendant deliberately chooses to avail itself of those courts, the only question is whether that court can enforce the ongoing obligation to require the payment of just compensation.

And I think that's ultimately what distinguishes this case from the Court's Bivens cases, where Bivens cases are about the policy question of whether to create a remedy. They don't engage in constitutional text, history,

and tradition analysis, which is why Justice Rehnquist could dissent in cases like Carlson v. Green and Davis v. Passman and then, less than a decade later, Chief Justice Rehnquist could write First English, because we're not talking about a damages remedy; we're talking about the power of the federal courts to, when their jurisdiction is competently invoked and when the state has waived its sovereign immunity, require the state to comply with its ongoing constitutional duty.

I think that matches both with the history, it matches with the tradition, and it matches particularly with the Fourteenth Amendment context itself. It's worth remembering that when this Court incorporated the Fifth Amendment against the states in Chicago, Burlington & Quincy Railroad, it specifically incorporated the right to compensation, not the right not to have the property taken but the right to receive money, that the due process of law necessarily included as a matter of first principles -- Chicago, Burlington actually doesn't cite the Fifth Amendment -- but, as a matter of first

principles, it includes the right to receive compensation for the property taken.

These state -- these cases rarely appear in federal court, in part because, before Knick, no takings case could be filed ab initio, but also because, as the magistrate judge's opinion in this case points out, it's relatively rare for a state to choose to remove this federal claim -- this federal right into a federal forum. But, once it does so, once Texas has decided it wants the scope of our rights under the Fifth Amendment to be litigated in federal court, that can't change the scope of the claim we make.

What the Fifth Circuit opinion below says is that we cannot state a claim invoking our rights under the Fifth Amendment, full stop. If Texas is right that, in fact, we have that right as a matter of Texas common law, then the Fifth Circuit was wrong to say that we only have that right under Section 1983. That counsels in favor of reversal.

But this Court has also squarely held and again repeated in Knick that the Fifth Amendment does furnish a basis on which a court

can award just compensation. In the mine run of cases, that's going to be a state court awarding just compensation. But, when the state wishes to be in federal court, I don't think there's a good-faith basis for the plaintiff to say, I'm invoking my rights under the Fifth Amendment, I want the full scope of compensation -- that I'm entitled to under the Fifth Amendment, but I refuse to allow this claim that arises under my rights under the Fifth Amendment to be in federal court.

It is the defendant's choice to have this federal claim that turns on federal law heard in federal court. That's the choice that Texas made, and that choice can't, on the merits, extinguish our Fifth Amendment remedy.

What Texas has effectively accomplished here by making the unusual decision to remove is that it's eliminated the Fifth Amendment question from this case and given itself what it believes -- I'm not conceding that they're right about Texas law -- but what it believes is a more favorable rule of Texas law.

But, if First English is right and the

just compensation remedy is mandatory, then the just compensation remedy is mandatory, and Texas can't extinguish it through procedural maneuvers like removing this case to federal court. The claim -- a claim for just compensation simply takes the form of saying the government has taken a property interest and I as the former owner am entitled to the fair market value of that property interest.

JUSTICE JACKSON: Can I just be clear, are you arguing that through Texas's maneuvering that claim is no longer available to you?

MR. McNAMARA: Yes, Your Honor. I think that's what Judge Oldham points out in his dissent below.

JUSTICE JACKSON: I -- I understand not in federal court, but are you claiming that Texas has prevented you from making this claim in state court?

MR. McNAMARA: Yes, Your Honor. There -- there will be no remand in this case. This case is staying in federal district court. And as Judge Oldham correctly pointed out, the upshot of the panel opinion below is that this case will proceed without any federal takings

claim in it because --

JUSTICE JACKSON: If you had sought remand and it went back to Texas court, are you saying that there wouldn't be the opportunity to make this claim in state court? I'm just trying to understand if the claim is totally gone as -- as a general matter here.

MR. McNAMARA: I -- so I -- I think -- I -- I see my light is on.

CHIEF JUSTICE ROBERTS: No, go ahead.

MR. McNAMARA: Thank you, Your Honor. I -- so I think, Your Honor, first, I don't know that we would have had grounds to fight remand because the claim does invoke our entitlement under federal law. But, if the case were remanded, I think the question in Texas state court would be exactly the Question Presented here: Are we entitled, without the 1983 vehicle, to invoke our rights under the Fifth Amendment?

Texas courts have said yes, we are entitled to invoke our rights under the Fifth Amendment. But, again, they just cite the Fifth Amendment. They're not invoking some special cause of action that they have created. They,

like other courts, look to the Constitution, to this Court's analysis of the Constitution, and say the Constitution provides the entitlement to just compensation, not, as far as I'm aware, an independent common law cause of action.

CHIEF JUSTICE ROBERTS: Thank you, counsel.

Let's suppose you bring a -- a -- the state takes some action, you claim that is a taking, you bring that claim for just compensation. In the state court, they decide yes, it was a taking, and so the government owes you $3 million. And the government says: Wow, we didn't think it was worth that much. Here, take it back.

And can they do that?

MR. McNAMARA: To -- to a point, Your Honor. I think saying here take it back runs afoul of what Justice Brennan identified in his San Diego Gas & Electric dissent that ending the taking just creates an uncompensated temporary taking. And that is why, as this Court noted in Knick, Justice Brennan's dissent became the law in First English, that just stopping the taking creates an uncompensated temporary taking.

Certainly, the -- the state is within its rights to cease a taking if it wants to cease a taking, and it may be that evidence at trial shows Texas has chosen to cease the taking here, but the question is and always based on the full factual record what property interest has Texas actually taken or has the defendant actually taken --

CHIEF JUSTICE ROBERTS: So they can claim what we've taken is a temporary, you know, right, so we owe you rent, that -- and that's just compensation?

MR. McNAMARA: Exactly, Your Honor. The -- the defendant is always free to say this is -- this is just a temporary easement or maybe this is a temporary partial easement.

CHIEF JUSTICE ROBERTS: And they can say that after the fact?

MR. McNAMARA: I -- I think --

CHIEF JUSTICE ROBERTS: We took the whole thing, we found out we were taking more than we could -- we're biting off more than we could chew, and so we're going to give it back to you?

MR. McNAMARA: I -- I think that would

be a valid ground for going back to the district court and saying that the facts have changed. The way --

CHIEF JUSTICE ROBERTS: Okay. Thank you.

MR. McNAMARA: Thank you, Your Honor.

CHIEF JUSTICE ROBERTS: Justice Thomas?

Justice Alito?

JUSTICE ALITO: Well, suppose that going forward they find a way to divert the water so that it doesn't cause flooding in the future. Then what claim would you have?

MR. McNAMARA: I -- I think that would just be a -- a claim for a temporary easement, Your Honor. Ultimately, the property interest in this case would be some kind of flooding easement. The trial court would have to decide whether it's a permanent easement, a partial easement, a temporary easement, and this is the kind of determination courts make in takings cases every day.

JUSTICE ALITO: Yeah, and if it's -- so, if it's completely eliminated going forward, your -- your property is not going to be flooded

going forward, what would the remedy be?

MR. McNAMARA: The -- the remedy -- so, to the extent the Court found on the facts that Texas had taken a temporary easement, it would be the fair market value of that temporary easement.

JUSTICE ALITO: Would that be different from damages?

MR. McNAMARA: Yes, Your Honor, and --

JUSTICE ALITO: In what way would it be different from damages?

MR. McNAMARA: So damages are an attempt to rectify a wrongful act. And so a plaintiff seeking damages can seek consequential damages. I would have had -- if you had paid me on time, I would have had this business opportunity that I had to forego.

JUSTICE ALITO: Yeah, I understand that. So how would you put a value on the temporary taking?

MR. McNAMARA: It would be -- generally speaking, there is testimony from dueling appraisers who talk about at fair market value what rent someone would pay for -- for that kind of easement, what a -- a willing

seller would have sold that kind of easement for, but it's limited to the fair market value. It's limited to what the government took as distinct from what the property owner may have lost.

JUSTICE ALITO: Okay. Thank you.

CHIEF JUSTICE ROBERTS: Justice Sotomayor?

Justice Kagan?

Justice Barrett?

Justice Jackson?

Okay. Thank you, counsel.

MR. McNAMARA: Thank you, Your Honor.

CHIEF JUSTICE ROBERTS: Mr. Nielson.

ORAL ARGUMENT OF AARON L. NIELSON

ON BEHALF OF THE RESPONDENT

MR. NIELSON: Mr. Chief Justice, and may it please the Court:

The Court will be hard-pressed to find any government more committed to property than Texas. The Texas Constitution is more protective than the federal Constitution, and Texas courts under a Texas cause of action adjudicate takings claims under both constitutions.

This appeal thus isn't about substantive rights. All Petitioners had to do was use Texas's cause of action. Instead, Petitioners insist they can bring a cause of action directly under the federal Takings Clause itself. This argument is wrong for many reasons.

For one, it ignores what the Constitution says. Governments must provide just compensation, but the Takings Clause says nothing about how they must do it, whether through commissions, private bills, or litigation.

For another, this Court held in Williams that Congress may constitutionally -- and I'm going to quote here -- "retain for itself, the power to hear and determine controversies respecting claims against the United States." It follows that, again, a quote, "there is no constitutional right to a judicial remedy."

As Petitioners concede, Congress did just that for nearly a century. We don't see how this Court could hold for Petitioners without overruling Williams.

And as this Court explained in Knick, states didn't start recognizing state causes of action until after the Fourteenth Amendment's ratification.

Petitioners argue none of this matters because of First English, but the Court went out of its way in First English to emphasize that its decision was about substance, not procedure.

And if first Williams somehow did include a procedural holding, Texas satisfies it. We have a cause of action for federal takings claims. Petitioners simply refuse to use it.

We welcome the Court's questions.

JUSTICE THOMAS: How would that cause of action look -- what would it look like?

MR. NIELSON: So I would point the Court to the Texas Supreme Court's decision in City of Baytown --

JUSTICE THOMAS: Yeah.

MR. NIELSON: -- and they say, we hear claims under both the Texas Constitution and under the federal Constitution, and then they resolve the claim under Penn Central, which, of course, is a decision of this Court.

JUSTICE THOMAS: Let's say we affirm here. Can Petitioners' constitutional right be vindicated now in -- in Texas courts?

MR. NIELSON: Well, in federal court. The problem is they haven't pleaded the claim. So, at this point, you'd have to have leave from the district court to amend their complaint if they wanted to bring a claim under the Texas cause of action.

There's still live claims here. There's still a claim under the Texas Constitution itself and they have federal due process claims. This is an interlocutory appeal.

So they would have to get leave from the district court to amend their complaint to bring a claim under Texas common law. They've just never done it because they say they don't have to.

JUSTICE SOTOMAYOR: I'm --

CHIEF JUSTICE ROBERTS: Counsel, in -- just a couple of quotes from cases. In Cedar Point, we said that the Court in First English "concluded categorically that the government must pay just compensation for physical

invasion."

In Knick, it said First English rejects "the view that the Constitution does not of its own force furnish a basis for a court to award money damages against the government."

Now we've -- we've said those in many cases. Those are just two recent ones --

MR. NIELSON: Correct, Your Honor.

CHIEF JUSTICE ROBERTS: -- where I wrote the opinions. So --

(Laughter.)

MR. NIELSON: Correctly wrote the opinions.

CHIEF JUSTICE ROBERTS: -- so do you have any dispute with those -- those holdings?

MR. NIELSON: We do not, Your Honor. That's a question of the substantive right, which Texas does not dispute, and you could pursue that claim under the Texas cause of action in a Texas court or here --

CHIEF JUSTICE ROBERTS: The -- the -- the -- the -- it -- it's --

MR. NIELSON: -- in federal court -- yes, Your Honor.

CHIEF JUSTICE ROBERTS: -- it's --

it's the statement of the -- the right, and that's a federal right, right?

MR. NIELSON: Yes, Your Honor.

CHIEF JUSTICE ROBERTS: So you can require that a federal assertion of rights like that be brought in state court and not in federal court?

MR. NIELSON: Well, it's brought under a -- a state cause of action. So, I mean, you can remove -- there's diversity jurisdiction or something like that, like any other sort of cause of action, but the cause of action itself is created by -- by Texas.

And that's how it's been -- as this Court explained in Knick, that's how state courts have always done it. Since 1870s, this Court said and onwards --

CHIEF JUSTICE ROBERTS: Well, it said -- what we said in --

MR. NIELSON: -- that's how we've done it.

CHIEF JUSTICE ROBERTS: -- what we said in Knick is that the Constitution of its own force furnishes the basis for a court to award money damages. And you think what we had

in mind is a -- a basis to -- to -- in state court but not federal court?

MR. NIELSON: When the claim is against a state, in Knick, the Court said 19 times by our count 1983. Every time the Court states the holding in Knick, they tie it to Section 1983 because there's a difference between the substantive right and the cause of action.

In Knick, the cause of action was Section 1983 because Congress said, if you're going to sue municipalities or cities, there you go, there's the cause of action.

CHIEF JUSTICE ROBERTS: Well, you removed to federal court, where you couldn't bring an action under 1983, right?

MR. NIELSON: Correct, Your Honor. We did remove to federal -- federal court. Two reasons for that. One, this is not just one case. These are four separate cases, all putative class actions. They say there's more than a hundred plaintiffs here.

Texas -- these are filed in different counties. Texas has no way to put all of them in a single Texas court. So, if the cases were

going to be in a single court, it had to be through removal and put them in -- in that court.

The second reason for that was Texas courts don't have a lot of experience with implied rights of action, alleged -- implied rights of action under federal law. This is the bread and butter of this Court's -- you guys' Court resolves factual -- those types of issues all of the time. So we thought let's just get it there, we'll get everybody in one case, and we can take out this, you know, putative federal cause of action, which we think is flatly irreconcilable to begin with.

CHIEF JUSTICE ROBERTS: So what -- under what basis would they proceed against the state under -- under 1983?

MR. NIELSON: They -- they couldn't, Your Honor. There is no such claim. Congress has said that you can bring claims against cities and municipalities. You cannot sue the states under Section 1983.

They say they can. So, under Bell v. Hood, they've claimed that there is a federal cause of action. When someone asserts that a

federal cause of action exists, the federal courts have jurisdiction to decide whether that is true, and then they can decide on the merits whether the cause of action exists.

CHIEF JUSTICE ROBERTS: Well, isn't that a -- a Catch-22 or -- I mean, you say you -- they have to proceed in -- in state court. They can't proceed in federal court. And as soon as they do, you remove it to federal court under 1983, where you say they can't proceed?

MR. NIELSON: Well, we would make the same argument in state or federal court that there is no federal cause of action directly under the Fifth Amendment. That is not --

CHIEF JUSTICE ROBERTS: Well, but that's what was rejected in the -- in the two cases that I read to you, Cedar Point and Knick.

MR. NIELSON: With your respect, Your Honor, I don't read either of those cases as saying there is a federal cause of action. There's certainly a federal substantive right to relief, but as this Court said in all of the Bivens line of cases or all the implied right of action cases, the right to, you know, a -- a substantive right does not therefore mean that

there is a cause of action.

JUSTICE KAGAN: But, General, do you agree with Mr. McNamara that if a state takes a person's property and doesn't give compensation, that state is violating the Constitution every day? It's an ongoing violation. Do you agree with that?

MR. NIELSON: That's not how the Court has -- I -- I -- I believe -- I certainly agree that's a violation of the Constitution. I don't think this Court's cases have ever --

JUSTICE KAGAN: But that's what I want to know. It's an --

MR. NIELSON: Sure.

JUSTICE KAGAN: -- ongoing violation of the Constitution, right? I've taken Mr. McNamara's property. I haven't paid him. Every day, I'm violating the Constitution, correct?

MR. NIELSON: Yes, Your Honor.

JUSTICE KAGAN: Okay. So aren't courts supposed to do something about that?

MR. NIELSON: Yes, Your Honor. And what this Court said in Knick is, when there's not a cause of action, which remember there wasn't a cause of action, there were -- you have

-- there's no remedies.

JUSTICE KAGAN: Yeah.

MR. NIELSON: What -- what is injunctive relief --

JUSTICE KAGAN: But this is -- this is very different.

MR. NIELSON: Sure.

JUSTICE KAGAN: You know, in the usual case, we have a constitutional -- let's take a Fourth Amendment case. You know, it's you've searched somebody's home illegally.

MR. NIELSON: Mm-hmm.

JUSTICE KAGAN: It's happened, and then it's over, and then the question is what remedy are you going to be giving for that violation.

But this is a different kind of violation. It's not a -- it's not even clear that the word "remedy" is appropriate here. It's a right to compensation. And the state, by taking the land and not compensating, is violating that right every day. It's not that the state --

MR. NIELSON: Mm-hmm.

JUSTICE KAGAN: -- is failing to

provide a remedy. The state is violating the right to be paid.

MR. NIELSON: Sure, Your Honor. And I -- I just -- and the answer would be, if there's not a cause of action, that's why I went back to Knick.

JUSTICE KAGAN: Well, if it's not a cause of action, I mean, in the --

MR. NIELSON: Sure.

JUSTICE KAGAN: -- usual case, suppose that a state violates Mr. McNamara's First Amendment rights.

MR. NIELSON: Yep.

JUSTICE KAGAN: Could he bring a suit about that?

MR. NIELSON: Yes, Your Honor, for injunctive relief.

JUSTICE KAGAN: Yes. And what Mr. McNamara, I believe, is saying is that -- that the usual distinction that we draw, you can bring a right for injunctive relief, but you can't -- you can bring a suit for injunctive relief, but you can't bring a suit for damages, that's the usual distinction.

But it sort of falls apart in this

case because the right is a right to be paid.

MR. NIELSON: Yes, Your Honor. And so I -- I -- I come at this from maybe the other direction. Let's imagine that some government said, you know what, we're not going to pay. We're telling everybody now. Now you are on notice we are not paying.

Well, then what happens? Before they could do anything, you would rush to court and you would say: Injunction. They can't do it. They've promised they're not going to pay. They're not going to provide that. And the Constitution says, if they don't, they're out of -- they're -- they're violating their rights. That's Eastern Enterprises v. Apfel, where if there's -- clear that there's not going to be a right to judicial -- to payment, there are no -- no monies coming, not -- not judicial, but no payments coming, you can get that injunction right away.

JUSTICE KAGAN: I mean, General, let me make the point another way.

MR. NIELSON: Sure.

JUSTICE KAGAN: I mean, it's sort of backwards to say that Mr. McNamara's client can

sue for an injunction, meaning like, you know, give me back my property. Actually, the state has a right to take his property or a prerogative to take --

MR. NIELSON: Yeah.

JUSTICE KAGAN: -- his property. If the state wants to use his property for a railroad, it doesn't really matter that the -- a person doesn't want to sell. The state has the ability to take -- the only thing that the state does not have the prerogative to do and the thing that the landowner has a right to have is payment.

MR. NIELSON: Yes, Your Honor.

JUSTICE KAGAN: So to say, well, look, you can sue for an injunction but you can't sue for payment just doesn't understand the nature of this right.

MR. NIELSON: Well, so our first-line argument is, you know, the way the United States did it for a hundred years is -- is correct. But, if the Court disagrees with that, if the Court says, you know what, actually --

JUSTICE KAGAN: So, General, I kind of agree with that. Your best argument is like

what happened between the time of the Constitution and, you know, someplace in the late 19th Century.

But suppose that I'm not such an originalist and I don't really care about that.

(Laughter.)

MR. NIELSON: Sure. All right. So the -- that -- that's the answer I'm going to say. So, if we -- if the Court says, we read First English and it requires not just a substantive relief, it requires some sort of judicial proceeding, which we don't think is consistent with the history, but let's assume, Texas does it. Texas provides the cause of action for which they can bring a federal takings claim.

So even if that is true, which we don't believe as our first-line argument is correct, Texas still wins. They --

JUSTICE BARRETT: What if Texas didn't do it, though?

MR. NIELSON: So -- so that's where we get interesting.

JUSTICE BARRETT: But I'm not -- but -- I -- I -- and I just want to be clear I'm not

talking about the hypothetical you gave where Texas announces in advance --

MR. NIELSON: Yeah.

JUSTICE BARRETT: -- we're going to take and we're not going to pay. Let's say that Texas takes and just this one property owner can't get the money, the -- Texas is being intransigent about it.

MR. NIELSON: Mm-hmm.

JUSTICE BARRETT: And Texas says: And, by the way, our state cause of action -- we have no state cause of action for you to use in our courts to get the money, no private bills. We don't do that. There's no state --

MR. NIELSON: Sure.

JUSTICE BARRETT: -- law remedy. What then?

MR. NIELSON: All right. So, you know, if a state goes rogue, that's how we're thinking about it, because we know from Knick all the states don't do that, but let's assume some state says, we're just not going to do that. Well, you have injunctive relief. I realize that might not be a perfect relief --

JUSTICE BARRETT: Doesn't work in this

hypothetical.

MR. NIELSON: It doesn't work because of that. Then the answer is exactly what the Constitution says. Congress -- Section 5 of the Fourteenth Amendment says, if a state is violating the Constitution, which would be happening in this scenario, that's precisely what Section 5 is for.

Congress has never done that --

JUSTICE BARRETT: So they have to wait for Congress to enforce it through legislation? Would there be some sort of due process violation or an argument that the state has to provide some sort of forum?

MR. NIELSON: Well, that's what I'm trying to say. If you read First English that way to say that not only is it there's a substantive obligation, but there has to be a -- some sort of judicial forum for -- for, you know, vindication of that --

JUSTICE BARRETT: I -- not, I mean, a judicial forum. It could be --

MR. NIELSON: Sure.

JUSTICE BARRETT: -- an administrative forum. I mean, I -- I'm taking --

MR. NIELSON: Okay. Sure. Sure.

JUSTICE BARRETT: -- your argument about that.

MR. NIELSON: Okay.

JUSTICE BARRETT: You're -- you're really saying that the state could shut down and give no administrative forum, no legislative forum, no judicial forum, and because the Fifth Amendment doesn't create an implied cause of action, then the property owner would have to say, Congress, can you please use your Section 5 power?

MR. NIELSON: The answer would be first try to get an injunction. That doesn't always work for the reasons that you say. In that scenario, yeah, that's what the Constitution says.

CHIEF JUSTICE ROBERTS: Well, but we're talk --

JUSTICE GORSUCH: Why -- why -- why -- I'm -- I'm sorry, Chief.

CHIEF JUSTICE ROBERTS: I'm sorry. We're talk -- those are two governments. I mean, we're talking about the ability of the government to take property without paying for

it. The -- the states and Congress may have common cause on that. And the idea that, well, you look to a different government --

MR. NIELSON: Mm-hmm.

CHIEF JUSTICE ROBERTS: -- to tell this government that that's not something governments can do, that's not much of a remedy.

MR. NIELSON: Well, this Court has cases that says we trust that Congress takes itself seriously. We trust that the states take their oath seriously. That's one of the premises of Alden v. Maine, that they're going to do that. But --

JUSTICE GORSUCH: Well, we also -- we also assume people act in their self-interest.

MR. NIELSON: Sure.

JUSTICE GORSUCH: And the -- our whole system of separated powers is premised on that idea. And self-interest here that would be created isn't a rogue state but an incentive for governments not -- not -- to -- to withdraw their -- their existing causes of action. I think that's the thrust --

MR. NIELSON: Yeah.

JUSTICE GORSUCH: -- of Justice

Barrett and the Chief's questions.

MR. NIELSON: What we --

JUSTICE GORSUCH: And I guess I'm wondering --

MR. NIELSON: Sorry.

JUSTICE GORSUCH: -- why wouldn't the injunction order the state to pay?

MR. NIELSON: So that's a question that has not been litigated, whether you could have injunctive relief to pay.

JUSTICE GORSUCH: Say you have to provide --

MR. NIELSON: Correct.

JUSTICE GORSUCH: -- just compensation. We're not telling you how.

MR. NIELSON: Yep.

JUSTICE GORSUCH: We're not telling you in what forum.

MR. NIELSON: And -- and -- and --

JUSTICE GORSUCH: But -- but the Constitution commands it.

MR. NIELSON: Sure. As I said, that's -- if you want to read First English that way, Texas has no quarrel with that because we provide it. And we don't just provide through a

commission, though I think we have the constitutional right to do so. We do it in court. We --

JUSTICE BARRETT: But you have to answer -- I'm sorry. You have to answer the hypothetical.

MR. NIELSON: Yeah.

JUSTICE BARRETT: I think Justice Gorsuch's premise is that Texas isn't doing this.

MR. NIELSON: Okay. So, if we say that a Texas doesn't or -- or some state doesn't have a -- a court proceeding and you don't have any sort -- other sort of commission, you still can get an injunction, and if you know the state doesn't have any of those things, you can get that injunction very, very, very early.

JUSTICE GORSUCH: And wouldn't the injunction say, Texas, you have an obligation --

MR. NIELSON: Mm-hmm.

JUSTICE GORSUCH: -- to pay?

MR. NIELSON: And this is where I -- I'm not quarreling because Texas --

JUSTICE GORSUCH: Okay.

MR. NIELSON: -- as a matter of --

JUSTICE KAVANAUGH: You don't want to concede that?

MR. NIELSON: -- first principles -- as a matter of first principles, I don't know how you get there. But I'm saying that Texas has no quarrel with it --

JUSTICE GORSUCH: Okay. And -- and --

MR. NIELSON: -- because Texas does -- what you're saying --

JUSTICE KAVANAUGH: What do you mean --

JUSTICE GORSUCH: I've got -- I -- I've got it. I've got it. I just want to -- I just want to clear -- clear up two other things.

MR. NIELSON: Sure.

JUSTICE GORSUCH: What is the common law cause of action and what is the state constitutional cause of action that does exist that you say could have but wasn't brought?

MR. NIELSON: That's right. So the -- the easiest place to see it because it's the most recent and I think the most clear is the Texas Supreme Court's City of Baytown --

JUSTICE GORSUCH: Right. That just says, though, as I understand it from your

colleague --

MR. NIELSON: Yeah.

JUSTICE GORSUCH: -- go look at the federal Constitution. So how does that help you?

MR. NIELSON: Well, they look at both. They say, we resolve takings claims under our constitutions, plural, and then they cite both. And then they --

JUSTICE GORSUCH: So Texas has represented to this Court that there is a state constitutional cause of action?

MR. NIELSON: Yes, Your Honor.

JUSTICE GORSUCH: Okay. And is there a common law cause of action --

MR. NIELSON: Well, that --

JUSTICE GORSUCH: -- that would achieve the same thing?

MR. NIELSON: -- that's what I'm -- that's what I'm -- I must have -- I must have misunderstood --

JUSTICE GORSUCH: Beyond --

MR. NIELSON: -- what you were saying. That is the -- the cause of action.

JUSTICE GORSUCH: That is the cause of

action?

MR. NIELSON: Yeah.

JUSTICE GORSUCH: Okay. And it wasn't pled here, is what you're --

MR. NIELSON: No, Your Honor. They --

JUSTICE GORSUCH: What does --

MR. NIELSON: -- vigorously resisted --

JUSTICE GORSUCH: Fine. Fine.

MR. NIELSON: -- the idea that they have to --

JUSTICE GORSUCH: Oh, okay. I got it. And what -- what cause of action remains pendent as you understand it?

MR. NIELSON: So they still have claims for federal due process, and they still have claims for the Texas Constitution.

JUSTICE GORSUCH: Would you oppose leave to amend to add a Texas constitutional claim on -- on an email?

MR. NIELSON: On behalf of the State of Texas, we would not oppose that in the district court.

JUSTICE GORSUCH: Okay. Thank you.

JUSTICE KAVANAUGH: Justice Gorsuch --

JUSTICE SOTOMAYOR: Sorry. But I -- I -- I -- I'm sorry.

JUSTICE KAVANAUGH: Go ahead.

JUSTICE SOTOMAYOR: Point of clarification.

MR. NIELSON: Sure.

JUSTICE SOTOMAYOR: Tell me how they plead this. Let's assume we affirm the court below. There's no freestanding right to come into federal court and sue Texas under the Fifth Amendment.

How would they go to the Texas court and make their Fifth Amendment claim?

MR. NIELSON: So --

JUSTICE SOTOMAYOR: What would they say in the Texas court?

MR. NIELSON: So -- yes. So what they would say here, and, candidly, the pleadings have never been as pellucid as I think anyone would have liked, but what I think that they -- they would say is, we are bringing our claim under state law, see City -- see, e.g., City of Baytown. I think that would be sufficient to get us there.

JUSTICE SOTOMAYOR: That -- that's --

my gosh. I've never heard of pleadings in any state where you had to mention the law at issue.

MR. NIELSON: Well, that's the --

JUSTICE SOTOMAYOR: Usually you mention the facts --

MR. NIELSON: Well --

JUSTICE SOTOMAYOR: -- or you state the facts and then you --

MR. NIELSON: Well --

JUSTICE SOTOMAYOR: But putting that aside, here, they say violation of Article I, Section 17 of the Texas Constitution for the taking, damaging, or the destruction of their property. That's Count 1.

MR. NIELSON: Yes, Your Honor.

JUSTICE SOTOMAYOR: And Count 2 says violation of the Fifth Amendment of the U.S. Constitution.

MR. NIELSON: Yes, Your Honor.

JUSTICE SOTOMAYOR: Summarizing basically. I don't know what else they would have had to do in Texas court if I cite that case.

MR. NIELSON: It --

JUSTICE SOTOMAYOR: They said, I'm

suing you in Texas court. You're the one who removed to federal court.

MR. NIELSON: Yes, Your Honor.

JUSTICE SOTOMAYOR: This seems to me like a totally made-up case because they did exactly what they had to do under Texas law. It's you who are telling me -- it's almost a bait and switch -- that you wanted to get to federal court to basically have a class action and you couldn't do it in state court, so -- but you had to fight something, which -- I don't know what you're fighting because you're telling me that Texas lets them have a cause of action under the Fifth Amendment.

MR. NIELSON: Yes, Your Honor. There's no bait and switch here, I want to be clear on that, no bait and switch.

JUSTICE SOTOMAYOR: Well, you're the one who removed.

MR. NIELSON: We removed, and they didn't come back and say, oh, no, you misunderstand what we're saying. Instead, every step along the way, they have doubled down all the way going to cert, you know, seek certiorari review from this Court.

So, if we misunderstood what they were saying --

JUSTICE SOTOMAYOR: So, if -- if they go back down and say to the district court, this has been remanded to the district court, all we want is just compensation under the Texas Constitution and the Fifth Amendment under that case that you're mentioning, that's okay and you're not going to resist that?

MR. NIELSON: We -- we -- we would not resist that, Your Honor.

JUSTICE SOTOMAYOR: Okay.

JUSTICE KAVANAUGH: On Justice Gorsuch's injunction-to-pay hypothetical, I just want to make sure I'm clear on that.

MR. NIELSON: Yeah.

JUSTICE KAVANAUGH: I thought you were saying we don't need to answer that question in this case because Texas provides forums for compensation.

MR. NIELSON: Yes, Your Honor. Conceptually, I don't know how you get an injunction to pay money.

JUSTICE KAVANAUGH: But -- but --

MR. NIELSON: I'm not familiar with

that, but that's blowing apart --

JUSTICE KAVANAUGH: I -- I understand that, but even in the --

MR. NIELSON: Yeah.

JUSTICE KAVANAUGH: -- the theoretical possibility of it is just not present here, right?

MR. NIELSON: Correct, Your Honor. And, as I said, it's hard for me to quarrel with it because Texas does pay money. But, conceptually, I don't know how you get there.

JUSTICE KAVANAUGH: Yeah.

MR. NIELSON: If I may --

JUSTICE JACKSON: What about a declaration? What about a declaration? Is that something different?

MR. NIELSON: A declaration? I --

JUSTICE JACKSON: Could you sue for -- for --

MR. NIELSON: Sure.

JUSTICE JACKSON: -- declaratory judgment that Texas or whatever state is not paying you?

MR. NIELSON: So my understanding of a declaratory judgment action is it sounds in

equity, not in damages. So I think it would fall within the -- the universe of Ex parte Young type remedies. So we wouldn't have any objection to that either, though, again, I -- I -- I'm a little bit shooting from the hip, so I apologize it wasn't briefed on that one, so I'm -- I'm a bit nervous on that.

JUSTICE JACKSON: Yes.

MR. NIELSON: Though, I mean, I -- if I -- if I may, I would like just to make a couple of affirmative points.

CHIEF JUSTICE ROBERTS: Well, no, you can do that later.

MR. NIELSON: Oh, I apologize, Your Honor.

CHIEF JUSTICE ROBERTS: Yeah.

Justice Thomas?

Justice Alito?

JUSTICE ALITO: Well, why don't you quickly make an affirmative point.

(Laughter.)

MR. NIELSON: Well, I would just like to say that as far as I am aware, Texas is the only party here that has offered evidence on the original public meaning of the actual language

of the text, not the ideas, the actual language of the Constitution. And when courts looked at that language, they read it precisely the same way that Texas does now.

CHIEF JUSTICE ROBERTS: Anything further?

JUSTICE ALITO: Thank you.

CHIEF JUSTICE ROBERTS: Justice Sotomayor?

Justice Gorsuch?

Justice Jackson?

Thank you, counsel.

MR. NIELSON: Thank you, Your Honor.

CHIEF JUSTICE ROBERTS: Mr. Kneedler.

ORAL ARGUMENT OF EDWIN S. KNEEDLER

FOR THE UNITED STATES, AS AMICUS CURIAE,

SUPPORTING THE RESPONDENT

MR. KNEEDLER: Mr. Chief Justice, and may it please the Court:

The Fifth Amendment to the United States Constitution does not of its own force create a cause of action against the government under the Fifth Amendment against the United States Government for damages.

Numerous provisions of the

Constitution make that clear, including the text of the just compensation clause itself. It says property shall not be taken, no person -- property shall not be taken for public use without just compensation.

The right is not to have the property taken without compensation. It's not a right to compensation. And this -- it's prohibitory. It has a condition for the -- governmental action to be lawful. That condition is the payment of compensation. If there's not compensation, then the action is unlawful, and what lies is an injunction to cease the taking of the property.

This Court in -- in a number of recent -- relatively recent cases has made that point. In Ruckelshaus versus Monsanto, in Dames & Moore, in the railroad reorganization cases, the question really was, should there be an injunction preventing this statute from going into effect, or is there compensation available under the Tucker Act such that an injunction would not be appropriate?

In all of those cases, that's what the Court held, that there was compensation available. But that -- the the very question

presupposed that there might be situations in which compensation was not available. That's the violation.

And the -- the same thing, if you look at the overall context of the Fifth Amendment, that is also true. It -- the preceding clause, as Justice Alito pointed out, says that no person shall be deprived of property without due process. The prohibition is the -- deprivation, the condition -- without -- without the condition of due process.

If a court finds a violation, it doesn't order due process. It orders -- it enjoins the conduct that was undertaken without due process. The government can always go back and do it over again with due process.

And -- and, finally, there's another clause in the Fifth Amendment that is written in exactly the same way, the indictment clause. It says a person shall not be held for a capital or otherwise infamous crime unless on a presentment of an indictment. An indictment is the condition precedent to having a lawful holding of somebody for a crime, and one --

CHIEF JUSTICE ROBERTS: Mr. Kneedler,

in the --

MR. KNEEDLER: Yeah.

CHIEF JUSTICE ROBERTS: -- brief that you -- you filed in First English 38 years ago, you argued that the Constitution does not of its own force furnish a basis for a court to award money damages against the government.

Now, in the decision in First English, Justice Rehnquist rejected the idea that "the Constitution does not, of its own force, furnish a basis for the court to award money damages against the government."

Now it seems to me that the question is -- turns on basis. And what you seem to be saying is it created a general theory of what the government had to do. But that doesn't mean that anybody could take that and recover compensation. They have to go get an injunction or they -- they can't proceed at all because there's no cause of action?

MR. KNEEDLER: Yes, Your --

CHIEF JUSTICE ROBERTS: I mean, are you just rearguing the point that the Court rejected?

MR. KNEEDLER: Not at all. Not at

all. But our point -- our point, that portion of our brief was really going to the cause of action question and -- and for the reasons that we said in that brief and this brief, and -- and I don't think the Court rejected this.

For all the reasons we said, not just the text of the clause, but -- but the Appropriations Clause, the Fifth Amendment only applied to the United States, the Appropriations Clause would have prohibited any court from awarding a money judgment or an injunction to pay money because only Congress can authorize the payment of money from the Treasury.

CHIEF JUSTICE ROBERTS: Well, but it's --

MR. KNEEDLER: OPM versus Richmond makes that clear.

CHIEF JUSTICE ROBERTS: Well, the Constitution can do it too, which is what the rest of that footnote rejecting the arguments that the government made in First English said. It says that the "cases made clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking."

So I -- I'm not sure how you get around the fact that the Constitution speaks in terms of just compensation and not an injunction.

MR. KNEEDLER: Well, as I said, it speaks in terms of compensation in terms of defining the right, which is not to have property taken without just -- just compensation. But that footnote, I think it's important to understand the context of that footnote.

In fact, all of First English was about the Agins rule in the -- in the -- in California, which said there was not even a taking. Sometimes they said you -- no compensation, but there was no taking until a court first determined that there was a taking.

And that was the rule, that was the controversy at the time, the so-called temporary taking. Does -- does the taking arise in a regulatory context at the time the regulation is effective or later? That was the issue that the Court rejected, and in that respect, it said no, compensation is owed from the moment of -- of the Constitution. And what --

CHIEF JUSTICE ROBERTS: Thank you, counsel.

JUSTICE ALITO: Mr. Kneedler, I have a little trouble understanding your argument about the Tucker Act. In your view, neither the Tucker Act nor the Takings Clause provides a cause of action, but then you say the combination of the two somehow provides a cause of action.

And the Petitioner says that what you're saying is that nothing plus nothing equals something. So this -- you must be relying on some kind of higher math that I can't understand. Where -- what is the cause of action --

MR. KNEEDLER: No, I -- I --

JUSTICE ALITO: -- in a Tucker Act suit?

MR. KNEEDLER: I -- as I said, I think it's the combination of the two. It's not zero plus zero; it's one-half plus one-half. The -- the -- as we say, the -- the -- the Constitution, the Fifth Amendment itself, does not create a -- a -- a cause of action. It would have -- would -- would have been

extraordinary. We went for 200 years, as pointed out, with that not being the case.

But what the Tucker Act does is, as the Court said two terms ago, three terms ago, I guess, it provides the framework under which it's -- it can be determined whether Congress has provided the ability to -- to sue under the Tucker Act.

The Tucker Act standard is whether the particular substantive provision that is being relied upon creates a -- can reasonably be read to mandate compensation if there is a violation. By definition -- and the Court made this point in Bormes -- the Tucker Act is there for something where there is an obligation but no elements of a cause of action. So the -- the -- for example, the Fifth Amendment or the statute that may be involved, particular statute that may be involved, by definition does not create a cause of action.

Congress provided in the Tucker Act that you can recover compensation if -- if the other provision of law can reasonably be construed. That's a -- that's a Tucker Act standard for when --

JUSTICE ALITO: All right. Suppose there -- suppose that the Takings Clause was not in the Constitution, but Congress enacted a statute that said the federal government shall not take private property for public use without just compensation.

Would that be a money-mandating statute that creates a cause of action?

MR. KNEEDLER: I don't think so. I -- because it's a -- it's a -- it's a prohibition, I think it's the same -- the same as the Fifth Amendment itself. It -- it is a directive to Congress not to -- or executive not to take property without affording compensation.

Now it may be that the particular statute would be understood or could be interpreted that way, but, here, we're talking about the Constitution, and no other provision of the Constitution provides of its own force a remedy, particularly a remedy for damages.

And that would have been extraordinary at the time the Constitution was adopted because of the Appropriations Clause, sovereign immunity, and the Debt Clause. If -- if compensation is not paid, that is a debt of the

United States, and it's clear --

JUSTICE ALITO: I -- I find it hard to understand how that would not be a statute that mandates the payment of money. It says you -- you can't take property for a public use without just compensation. It's talking about paying money. If that's not a money-mandating provision, then --

MR. KNEEDLER: It might -- it might be -- it might be money -- money-mandating under the Tucker Act. I -- I think I understood you to say it -- this wasn't the Tucker Act.

JUSTICE ALITO: No.

MR. KNEEDLER: But that's because the Tucker Act has been under --

JUSTICE ALITO: It's another -- it's another statute, and we would interpret it like we interpreted the statute in Maine Community Health. Does it -- does it mandate the payment of money? I would think the answer to that would be yes. And if that's the case with the statute, why isn't it the same with the --

MR. KNEEDLER: Because the --

JUSTICE ALITO: -- with the Fifth Amendment?

MR. KNEEDLER: -- the money mandating is not -- is not something under the Tucker Act. It is -- it is a provision in the Tucker Act that --

JUSTICE ALITO: All right.

MR. KNEEDLER: It -- it's not -- it's not the other statute. It's a provision in the Tucker Act. And that is a Tucker Act-specific standard for when Congress --

JUSTICE ALITO: Thank -- thank -- thank you.

JUSTICE JACKSON: Mr. --

JUSTICE ALITO: Thank you, Mr. Kneedler.

JUSTICE JACKSON: -- Mr. Kneedler, I thought your answer to Justice Alito was going to be going back to what you said at the beginning, which is the compensation is conditional in the same way as the Due Process Clause is conditional.

I thought that was very interesting, and maybe you want to repeat it.

MR. KNEEDLER: Yeah. No, no, that is -- that -- I -- I think that's a fundamental point about the text, not -- of the just

compensation clause itself, but the entire Fifth Amendment is pro -- is prohibitory. I mentioned the indictment clause, but the self-incrimination clause is the same way. The Double Jeopardy Clause is -- is the same.

JUSTICE JACKSON: And so, to the extent that we see a condition there, it -- you -- you're not interpreting that as mandating that condition necessarily. It's about the prohibition?

MR. KNEEDLER: Right. Exactly. If I could -- I'm -- I'm sorry.

CHIEF JUSTICE ROBERTS: No.

MR. KNEEDLER: If I could go back to the Chief Justice's question about First English, the language in that footnote is directed to, it says -- remedial. But what it is referring to is the -- computation of just compensation as a remedial matter.

If you have a cause of action, how do you calculate the remedy? All of the cases, it says, as the cases in the text make clear, it -- it -- it -- it's a remedy, and it does provide a basis for compensation, but in a cause of action where there already is one.

CHIEF JUSTICE ROBERTS: Thank you.

MR. KNEEDLER: Every one of the cases the Court cited --

CHIEF JUSTICE ROBERTS: Thank -- thank you, counsel.

MR. KNEEDLER: I'm sorry.

CHIEF JUSTICE ROBERTS: Justice Thomas?

JUSTICE THOMAS: No.

CHIEF JUSTICE ROBERTS: Anything further?

JUSTICE SOTOMAYOR: Is your position -- is there any daylight between Texas's position and the government's position here?

MR. KNEEDLER: Well, some --

JUSTICE SOTOMAYOR: Your -- you representing the government?

MR. KNEEDLER: Yeah. To the extent there was a suggestion that there could be an injunction to pay money, we would disagree with that because of the Appropriations Clause, I think. The Fifth Amendment cannot be read --

JUSTICE SOTOMAYOR: So would it be --

MR. KNEEDLER: -- to allow that.

JUSTICE SOTOMAYOR: -- a matter of

semantics, you can't take this property? You have to stop flooding it? You have to do --

MR. KNEEDLER: You have to -- you have to stop whatever it is that would constitute a taking. And -- and -- and --

JUSTICE SOTOMAYOR: All right. And just to clarify your answer to Justice Alito in my head, you're saying it's the Tucker Act plus the statute --

MR. KNEEDLER: Yes.

JUSTICE SOTOMAYOR: -- mandating payment that gets you into court?

MR. KNEEDLER: That is -- that's -- that's correct, and it's certainly not the -- it's certainly not the other provision itself, the just -- the just compensation clause or the other statute, which by definition --

JUSTICE SOTOMAYOR: So that's your half-point/half-point --

MR. KNEEDLER: Yes.

JUSTICE SOTOMAYOR: -- equals one?

MR. KNEEDLER: Yes.

JUSTICE SOTOMAYOR: Okay.

MR. KNEEDLER: Sorry.

CHIEF JUSTICE ROBERTS: Justice Kagan?

Justice Gorsuch?

JUSTICE GORSUCH: Two questions. First, the rogue state example, why shouldn't we worry about that? It -- why shouldn't we worry about the incentive structure we create that would allow states to withdraw compensation schemes, and maybe the federal government too, to exploit this loophole?

MR. KNEEDLER: With respect, it's not a loophole. It's a -- it's a fundamental aspect of the Constitution that the Constitution does not -- does not require this.

And the rogue state is answered by it's a prohibition, and if -- if Congress does not provide the condition necessary to render it lawful, you have an injunction -- injunctive action. And as the Court said in Knick, that was the way --

JUSTICE GORSUCH: Okay.

MR. KNEEDLER: -- that just compensation issues were raised before.

JUSTICE GORSUCH: Okay. And then, second, this may be a question better directed to Mr. McNamara when he speaks on rebuttal, but Justice Sotomayor pointed out an interesting

feature of the procedural history of this case.
The complaint has two counts about takings. One
is under the state constitution, and the other
is under the federal Constitution.

How do we read what the Fifth Circuit
did here? Did it only dismiss the second, the
federal claim, and is the first claim under,
what is it, City of Bayview and the -- and the
Texas Constitution, still live? Do they even
need to amend their complaint to add it? Is it
already there?

MR. KNEEDLER: There's a footnote in
the court of appeals' opinion that says that the
Texas Constitution or Texas provides a cause of
action. And that is not further elaborated
upon, but it -- it's --

JUSTICE GORSUCH: No. Exactly.

MR. KNEEDLER: -- it's remanded for
further proceedings, so --

JUSTICE GORSUCH: So do you take it
that that first count under the state
constitution is still alive and available to the
plaintiffs?

MR. KNEEDLER: I -- it is still alive
and available. If it required an amendment to

the complaint, I -- I took --

JUSTICE GORSUCH: Do you think it requires amendment --

MR. KNEEDLER: I --

JUSTICE GORSUCH: -- to the complaint, or because it was remanded for further proceedings and the court only expressly addressed the federal Constitution, that that first count is still alive?

MR. KNEEDLER: I think it would depend on whether that first count, in -- in relying on the state constitution, was just relying on a state substantive right to compensation or whether it was also relying --

JUSTICE GORSUCH: Well, Texas --

MR. KNEEDLER: -- on a cause of action.

JUSTICE GORSUCH: -- has represented to us that it provides a cause of action --

MR. KNEEDLER: Right. And -- and --

JUSTICE GORSUCH: -- right? So --

MR. KNEEDLER: -- so -- so, if -- if the -- if the complaint is read to be invoking the state cause of action for the federal taking, then, yes, I think that would be open on

remand.

JUSTICE GORSUCH: Thank you.

CHIEF JUSTICE ROBERTS: Justice Kavanaugh?

Justice Barrett?

JUSTICE BARRETT: Mr. Kneedler, just want to clarify something. So your position in response to, say, the rogue state hypothetical, when you said an injunction is the solution, it's not an injunction to pay money because you said the United States thinks that can't happen.

So is it your position that if, say, a state or the United States takes property, refuses to get -- give just compensation for it, that the property owner could get an injunction essentially saying, give me my property back if you're not going to pay, and perhaps get that injunction but not get reimbursed for the temporary taking that happened in between the seizure and the award of the injunction?

MR. KNEEDLER: That -- that is -- that is correct. And it -- the same thing would be true, you -- there could be a temporary deprivation of due process, and if you get an injunction preventing the government from doing

whatever it did without due process, there is an in -- interim period, but a person could go to court, get a TRO, get a preliminary injunction to -- to prevent that from going on a long -- a long time. That's just the nature of litigation and an injunction, but it doesn't lead to the question of damages.

And this Court's cases, First English and others, had to do with the calculation whether interest should be paid, and that's what the Court meant about the Fifth Amendment being a basis for the award of compensation, not that there was a cause of action.

CHIEF JUSTICE ROBERTS: Justice Jackson?

JUSTICE JACKSON: And just to clarify from what Justice Barrett just said, the government's position would be that you might be able to have a cause of action, say, under state law or whatnot for that temporary taking. It's not that you would be out the compensation entirely, right?

MR. KNEEDLER: Right. It -- that -- that would depend on -- on state law and the availability of a state cause of action on that.

But we're -- I'm only talking about the federal causes of action, which that -- there's no basis for an award of money out of the Treasury and overcoming sovereign immunity and all that in federal court for a compensation even for that interim period.

But the interim period is endemic to -- to litigation, due process violation being held on -- on an indictment, but that is the proper remedy and that's the -- the remedy that existed until the Tucker Act was passed. It was the remedy that this Court said in Knick was the way to vindicate Fifth Amendment rights -- until the Tucker Act or state constitutions came along and provided a monetary remedy.

JUSTICE JACKSON: Thank you.

CHIEF JUSTICE ROBERTS: Thank you, counsel.

Rebuttal, Mr. McNamara.

REBUTTAL ARGUMENT OF ROBERT J. McNAMARA
ON BEHALF OF THE PETITIONERS

MR. McNAMARA: Thank you, Your Honor.

To begin with Justice Gorsuch's question, I think it's important to remember the procedural posture here. I understood my friend

from Texas to say that the City of Baytown decision means that Texas courts hear claims "under the federal Constitution."

The complaint pleads a claim under the federal Constitution, and to the extent Texas's only complaint with that was that it failed to cite directly to a Texas Supreme Court decision, it's not clear why Texas moved to dismiss it, sought an interlocutory appeal of that decision as a dispositive issue and then extinguished it on the merits in the Fifth Circuit.

To the extent that claim exists, that claim has been extinguished and that warrants reversal.

To the original meaning, and I think, Your Honor, the -- the rogue state example is not a hypothetical. It's a real example because state after state has looked to federal law and to First English as the thing that prevents the state from denying compensation.

That's true in Oregon, as I mentioned, but also New Mexico, South Carolina, Nebraska, the list goes on of states that provide compensation under the Fifth Amendment because they understand the Fifth Amendment to require

compensation.

And they're correct to understand that, Your Honor. The original understanding, as evidenced by writings from James Madison to St. George Tucker, is that the Fifth Amendment creates an obligation to pay, which is why you can sue under the Tucker Act because the Fifth Amendment creates an obligation to pay.

Only in the absence of a court of competent jurisdiction to enforce that obligation does -- do the federal courts resort to cases like Meigs v. McClung's Lessee, where the Court ejected the United States military from its own base because it didn't have clean title. That -- that is the last resort in the absence of a court that has the jurisdiction to enforce that obligation.

That's why, in Maine Community Health, this Court specifically pointed to the Takings Clause as the analogy for what sort of money-mandating inquiry it means to create the obligation to pay.

But, more broadly, Your Honor, I -- I think Texas's understanding of the Fifth Amendment would relegate property rights to the

status of the poor relation of the Bill of Rights.

It would be the only acknowledged ongoing obligation in the Constitution that is entitled to no enforcement, that is left entirely to the discretion of the government entities that are supposedly obligated to pay. But, surely, as evidenced by the writings and by the adoption of the Fifth Amendment itself, the Framers meant for property rights to mean more than that.

If the Court has no further questions, we'll rest on our briefs.

CHIEF JUSTICE ROBERTS: Thank you, counsel.

The case is submitted.

(Whereupon, at 12:23 p.m., the case was submitted.)

## $

**$3** [1] **34**:13

## 1

**1** [1] **63**:14
**11:10** [2] **1**:15 **3**:2
**12:23** [1] **90**:17
**1331** [1] **5**:23
**16** [1] **1**:11
**17** [1] **63**:12
**1791** [4] **7**:23 **8**:9 **9**:3,5
**1870s** [1] **43**:16
**1875** [1] **8**:5
**19** [1] **44**:4
**1983** [10] **25**:5 **30**:21 **33**:18 **44**:5,7,11,16 **45**:17,22 **46**:10
**19th** [4] **5**:7,16 **8**:14 **52**:3

## 2

**2** [1] **63**:16
**200** [1] **75**:1
**2024** [1] **1**:11
**22-913** [1] **3**:4

## 3

**3** [1] **2**:4
**38** [2] **2**:7 **71**:4

## 5

**5** [3] **54**:4,8 **55**:11

## 6

**68** [1] **2**:11

## 8

**87** [1] **2**:14

## A

**a.m** [2] **1**:15 **3**:2
**AARON** [3] **1**:20 **2**:6 **38**:15
**ab** [1] **30**:5
**abandon** [1] **4**:16
**abilities** [1] **6**:9
**ability** [4] **28**:2 **51**:10 **55**:24 **75**:7
**able** [2] **22**:16 **86**:19
**above-entitled** [1] **1**:13
**absence** [3] **20**:20 **89**:9,16
**absolutely** [1] **9**:10
**accomplished** [1] **31**:18
**achieve** [1] **60**:18
**acknowledged** [1] **90**:3
**across** [2] **16**:20 **24**:14
**Act** [25] **4**:5,6,9 **37**:13 **56**:15 **69**:21 **74**:5,6,17 **75**:3,8,9, 14,21,24 **77**:11,12,15 **78**:2, 3,8 **81**:8 **87**:11,14 **89**:7
**Act-specific** [1] **78**:8
**action** [123] **4**:7,8,11,12,13 **5**:12,20 **6**:8,14 **7**:10,12,15, 21 **8**:1 **9**:3,6,22 **10**:2,7,12, 13,25 **11**:6,9 **12**:14,20 **13**:7 **14**:7,20 **15**:6 **18**:23 **19**:8, 13,16,19,24,25 **21**:21 **22**:3,

9,18 **23**:5,10,12,18 **24**:7,12, 25 **25**:5,6 **26**:13,17,22 **33**:25 **34**:5,9 **38**:23 **39**:3,5 **40**:3,11,16 **41**:9 **42**:20 **43**:9,12, 12 **44**:9,10,13,16 **45**:6,7,13, 25 **46**:1,4,13,20,24 **47**:1,24, 25 **49**:5,8 **52**:15 **53**:11,12 **55**:10 **56**:22 **59**:17,18 **60**:12,15,24 **61**:1,13 **64**:9,13 **66**:25 **68**:22 **69**:9,12 **71**:20 **72**:3 **74**:7,9,15,24 **75**:16,20 **76**:8 **79**:20,24 **82**:17 **83**:15 **84**:17,19,24 **86**:13,19,25 **87**:2
**actions** [2] **6**:1 **44**:21
**actual** [2] **67**:25 **68**:1
**actually** [8] **7**:4 **13**:17 **15**:14 **29**:24 **35**:7,8 **51**:2,23
**add** [2] **61**:19 **83**:10
**address** [1] **18**:22
**addressed** [1] **84**:8
**adequate** [2] **13**:13,14
**adequately** [1] **12**:21
**adjudicate** [1] **38**:24
**adjudicated** [2] **23**:23,24
**administrative** [2] **54**:24 **55**:7
**admit** [1] **11**:5
**adopted** [3] **7**:3 **21**:6 **76**:22
**adopting** [2] **24**:3,8
**adoption** [1] **90**:9
**advance** [1] **53**:2
**affirm** [2] **41**:1 **62**:8
**affirmative** [2] **67**:11,20
**affording** [1] **76**:14
**afoul** [1] **34**:19
**Agins** [3] **7**:3,5 **73**:13
**ago** [3] **71**:4 **75**:4,4
**agree** [5] **7**:20 **47**:3,6,9 **51**:25
**agrees** [2] **20**:16,22
**Ah** [3] **11**:25 **15**:20 **23**:9
**ahead** [2] **33**:10 **62**:3
**AL** [1] **1**:3
**Alden** [1] **56**:12
**ALITO** [28] **24**:15 **25**:7 **27**:4, 11,25 **36**:9,10,23 **37**:7,10, 18 **38**:6 **67**:18,19 **68**:7 **70**:7 **74**:3,17 **76**:1 **77**:2,13,16, 24 **78**:5,10,13,16 **81**:7
**alive** [3] **83**:22,24 **84**:9
**alleged** [2] **3**:24 **45**:6
**alleges** [1] **14**:25
**allow** [3] **31**:9 **80**:24 **82**:6
**allowed** [1] **12**:8
**allows** [1] **22**:3
**almost** [1] **64**:7
**already** [4] **4**:21 **6**:23 **79**:25 **83**:11
**alternative** [1] **25**:22
**amend** [5] **5**:22 **41**:7,16 **61**:19 **83**:10
**Amendment** [98] **3**:12,19 **4**:10 **6**:17,21 **7**:13,15,18,24,

25 **8**:20,20 **9**:5,17,23 **11**:7, 10,23 **12**:6,19,21 **13**:5,10, 21 **14**:4,12,14 **15**:2,17,23 **16**:5,20 **18**:7,17,20 **20**:5,14, 17,21 **21**:2,2,8,22 **22**:4,10 **23**:13,15,23 **24**:7,18 **25**:21 **27**:4 **28**:1 **29**:15,17,25 **30**:12,17,25 **31**:6,8,10,16,20 **33**:20,23,24 **46**:14 **48**:10 **49**:12 **54**:5 **55**:9 **62**:11,13 **63**:17 **64**:14 **65**:7 **68**:20,23 **70**:5,18 **72**:8 **74**:23 **75**:17 **76**:12 **77**:25 **79**:2 **80**:22 **83**:25 **84**:3 **86**:11 **87**:13 **88**:24, 25 **89**:5,8,25 **90**:9
**Amendment's** [1] **40**:3
**American** [1] **3**:25
**amicus** [5] **1**:24 **2**:10 **16**:2 **18**:25 **68**:16
**amount-in-controversy** [1] **5**:24
**amounting** [1] **72**:24
**analogy** [1] **89**:20
**analysis** [4] **23**:4,7 **29**:1 **34**:2
**announces** [1] **53**:2
**another** [7] **13**:12 **14**:22 **39**:14 **50**:22 **70**:17 **77**:16,17
**answer** [12] **9**:10 **21**:23 **49**:4 **52**:8 **54**:3 **55**:13 **58**:5,5 **65**:18 **77**:20 **78**:16 **81**:7
**answered** [3] **3**:16 **6**:23 **82**:13
**answering** [1] **16**:7
**anybody** [1] **71**:17
**anyway** [1] **22**:23
**apart** [2] **49**:25 **66**:1
**Apfel** [1] **50**:15
**apologize** [2] **67**:6,14
**appeal** [5] **10**:10 **24**:1 **39**:1 **41**:14 **88**:9
**appeals'** [1] **83**:13
**appear** [1] **30**:4
**APPEARANCES** [1] **1**:17
**applied** [3] **6**:17 **15**:13 **72**:9
**appraisers** [1] **37**:23
**appropriate** [2] **48**:19 **69**:22
**Appropriations** [4] **72**:8,9 **76**:23 **80**:21
**aren't** [1] **47**:20
**argue** [1] **40**:5
**argued** [1] **71**:5
**arguing** [1] **32**:11
**argument** [27] **1**:14 **2**:2,5,8, 12 **3**:4,7 **5**:13 **7**:23 **8**:12 **12**:1,2 **13**:18 **14**:19 **20**:18 **23**:21 **38**:15 **39**:6 **46**:12 **51**:20, 25 **52**:18 **54**:13 **55**:2 **68**:15 **74**:4 **87**:20
**arguments** [4] **7**:2 **24**:4,9 **72**:20
**arise** [1] **73**:20
**arises** [1] **31**:9

**arising** [2] **14**:11 **15**:17
**Arlington** [1] **1**:18
**Army** [3] **26**:3,4,6
**Army's** [1] **26**:4
**around** [1] **73**:2
**Article** [1] **63**:11
**aside** [1] **63**:11
**aspect** [2] **18**:7 **82**:10
**assertion** [1] **43**:5
**asserts** [3] **13**:23 **14**:2 **45**:25
**assume** [4] **52**:13 **53**:21 **56**:15 **62**:8
**attempt** [1] **37**:13
**Austin** [1] **1**:20
**authorize** [1] **72**:12
**avail** [1] **28**:17
**availability** [1] **86**:25
**available** [7] **9**:18 **32**:12 **69**:20,25 **70**:2 **83**:22,25
**award** [9] **3**:20 **31**:1 **42**:5 **43**:25 **71**:6,11 **85**:20 **86**:12 **87**:3
**awarding** [2] **31**:2 **72**:11
**aware** [2] **34**:4 **67**:23
**away** [1] **50**:20

## B

**back** [14] **21**:19 **33**:3 **34**:15, 18 **35**:23 **36**:1 **49**:5 **51**:2 **64**:21 **65**:4 **70**:15 **78**:17 **79**:14 **85**:16
**backstop** [2] **18**:16,19
**backwards** [1] **50**:25
**backwards-looking** [1] **25**:18
**bait** [3] **64**:8,16,17
**BARRETT** [24] **7**:16,20 **16**:9 **21**:18 **22**:14,21 **38**:10 **52**:20,24 **53**:4,10,16,25 **54**:10, 21,24 **55**:2,5 **57**:1 **58**:4,8 **85**:5,6 **86**:17
**base** [1] **89**:14
**based** [1] **35**:5
**basically** [2] **63**:21 **64**:9
**basis** [13] **3**:19 **30**:25 **31**:5 **42**:4 **43**:24 **44**:1 **45**:16 **71**:6,11,14 **79**:24 **86**:12 **87**:2
**Baytown** [5] **14**:13 **40**:19 **59**:23 **62**:23 **88**:1
**Bayview** [1] **83**:8
**became** [2] **34**:23
**bedrock** [1] **5**:8
**begin** [2] **45**:14 **87**:23
**beginning** [1] **78**:18
**behalf** [9] **1**:19,21 **2**:4,7,14 **3**:8 **38**:16 **61**:21 **87**:21
**believe** [3] **47**:9 **49**:19 **52**:18
**believes** [2] **31**:21,23
**Bell** [1] **45**:23
**below** [4] **30**:15 **32**:15,24 **62**:9
**best** [1] **51**:25

**better** [1] **82**:23
**between** [5] **6**:6 **44**:8 **52**:1 **80**:13 **85**:19
**Beyond** [1] **60**:22
**Bill** [2] **28**:10 **90**:1
**bills** [5] **8**:11,15 **19**:21 **39**:12 **53**:13
**bit** [3] **7**:22 **67**:5,7
**biting** [1] **35**:22
**Bivens** [3] **28**:22,23 **46**:23
**blowing** [1] **66**:1
**Bormes** [1] **75**:14
**both** [6] **4**:14 **29**:12 **38**:24 **40**:22 **60**:6,8
**bread** [1] **45**:8
**Brennan** [1] **34**:19
**Brennan's** [1] **34**:23
**brief** [8] **5**:6 **13**:19 **16**:2 **19**:1 **71**:3 **72**:2,4,4
**briefed** [1] **67**:6
**briefs** [1] **90**:13
**bring** [16] **6**:9 **15**:14 **22**:3 **25**:4 **34**:8,10 **39**:4 **41**:8,17 **44**:16 **45**:20 **49**:14,21,22, 23 **52**:15
**bringing** [2] **6**:1 **62**:21
**broader** [1] **16**:15
**broadly** [1] **89**:23
**brought** [4] **26**:18 **43**:6,8 **59**:19
**Burlington** [2] **29**:18,24
**business** [1] **37**:16
**butter** [1] **45**:8

## C

**calculate** [1] **79**:21
**calculation** [1] **86**:9
**California** [3] **7**:3,5 **73**:14
**came** [2] **1**:13 **87**:14
**candidly** [1] **62**:18
**cannot** [3] **30**:16 **45**:21 **80**:22
**capital** [1] **70**:20
**care** [1] **52**:5
**Carlson** [1] **29**:2
**Carolina** [1] **88**:22
**Case** [37] **3**:4,11,21 **4**:9 **6**:20 **7**:8 **12**:5,9 **17**:5 **18**:7 **23**:11 **24**:8 **28**:22 **30**:5,7 **31**:20 **32**:4,21,22,25 **33**:15 **36**:17 **44**:20 **45**:11 **48**:9,10 **49**:10 **50**:1 **63**:23 **64**:5 **65**:8, 19 **75**:2 **77**:21 **83**:1 **90**:16, 17
**cases** [26] **4**:18 **28**:23,23 **29**:2 **30**:3 **31**:2 **36**:22 **41**:22 **42**:7 **44**:20,25 **46**:17,19, 23,24 **47**:11 **56**:9 **69**:15,17, 23 **72**:22 **79**:21,22 **80**:2 **86**:8 **89**:12
**Catch-22** [1] **46**:6
**categorically** [1] **41**:24
**cause** [104] **4**:6,8,11,12,13 **5**:20 **7**:10,12,14,21 **8**:1 **9**:3,

6,22 **10**:2,7,12,13,24 **11**:5 **12**:13,20 **14**:7,20 **15**:5 **17**: 11 **18**:23 **19**:8,13,16,18,24, 24 **21**:21 **22**:3,8,17 **23**:5,9, 9,12,18 **24**:7,12,24 **33**:25 **34**:5 **36**:12 **38**:23 **39**:3,4 **40**:11,15 **41**:9 **42**:19 **43**:9, 12,12 **44**:8,10,13 **45**:13,25 **46**:1,4,13,20 **47**:1,24,25 **49**: 5,8 **52**:14 **53**:11,12 **55**:9 **56**:2 **59**:17,18 **60**:12,15,24, 25 **61**:13 **64**:13 **68**:22 **71**: 20 **72**:2 **74**:7,8,14,24 **75**:16, 20 **76**:8 **79**:20,24 **83**:14 **84**: 16,19,24 **86**:13,19,25

**causes** [5] **5**:12 **13**:7 **40**:2 **56**:22 **87**:2

**cease** [5] **6**:2 **35**:2,3,4 **69**: 13

**Cedar** [2] **41**:22 **46**:17
**Central** [1] **40**:24
**century** [5] **5**:7,17 **8**:14 **39**: 23 **52**:3
**cert** [1] **64**:24
**certain** [1] **6**:10
**certainly** [9] **11**:21 **16**:19 **27**:9,15 **35**:1 **46**:21 **47**:9 **81**:14,15
**certiorari** [1] **64**:24
**change** [2] **4**:21 **30**:13
**changed** [1] **36**:2
**channel** [1] **27**:15
**chew** [1] **35**:23
**Chicago** [2] **29**:18,23
**CHIEF** [52] **3**:3,9 **29**:4 **33**: 10 **34**:6 **35**:9,17,20 **36**:4,7 **38**:7,14,17 **41**:21 **42**:9,14, 21,25 **43**:4,18,22 **44**:14 **45**: 15 **46**:5,15 **55**:18,21,22 **56**: 5 **67**:12,16 **68**:5,8,14,18 **70**: 25 **71**:3,22 **72**:14,18 **74**:1 **79**:13,15 **80**:1,4,7,10 **81**:25 **85**:3 **86**:14 **87**:17 **90**:14
**Chief's** [1] **57**:1
**choice** [4] **28**:4 **31**:12,14, 15
**choose** [1] **30**:8
**chooses** [1] **28**:17
**chosen** [1] **35**:4
**Circuit** [6] **14**:25 **22**:11 **30**: 15,20 **83**:5 **88**:11
**cite** [7] **23**:8,16 **29**:24 **33**:23 **60**:8 **63**:22 **88**:7
**cited** [1] **80**:3
**cites** [1] **14**:14
**cities** [2] **44**:12 **45**:21
**citing** [1] **16**:5
**City** [7] **14**:13 **40**:19 **59**:23 **62**:22,22 **83**:8 **88**:1
**claim** [49] **4**:4 **7**:7 **13**:9 **15**:2, 3,22 **17**:13,23,24 **22**:4,12, 23 **23**:2 **25**:8 **30**:9,14,16 **31**:9,13 **32**:5,5,12,18 **33**:1, 5,6,14 **34**:9,10 **35**:10 **36**:13,

15 **40**:24 **41**:5,8,11,17 **42**: 19 **44**:3 **45**:19 **52**:16 **61**:20 **62**:13,21 **83**:7,7 **88**:4,12,13
**claimed** [1] **45**:24
**claiming** [1] **32**:17
**claims** [22] **4**:1 **6**:2,7,10 **14**: 11 **15**:14,16,17 **17**:7,11 **28**: 6 **38**:24 **39**:18 **40**:12,22 **41**: 10,13 **45**:20 **60**:7 **61**:16,17 **88**:2
**clarification** [2] **21**:20 **62**: 5
**clarify** [3] **81**:7 **85**:7 **86**:16
**clarifying** [1] **14**:18
**class** [2] **44**:21 **64**:9
**Clause** [27] **4**:15,17 **24**:16, 17 **25**:25 **26**:2 **39**:5,10 **69**: 2 **70**:6,18,19 **72**:7,8,10 **74**: 6 **76**:2,23,24 **78**:20 **79**:1,3, 4,5 **80**:21 **81**:16 **89**:20
**clean** [1] **89**:14
**clear** [16] **19**:25 **32**:10 **48**: 18 **50**:16 **52**:25 **59**:14,14, 22 **64**:17 **65**:15 **69**:1 **72**:17, 22 **77**:1 **79**:22 **88**:8
**client** [1] **50**:25
**coherent** [1] **19**:15
**colleague** [1] **60**:1
**combination** [2] **74**:8,20
**come** [4] **4**:23 **50**:3 **62**:9 **64**: 21
**comes** [2] **15**:23 **17**:22
**coming** [2] **50**:18,19
**commands** [1] **57**:21
**commentators** [1] **25**:25
**commission** [2] **58**:1,14
**commissions** [1] **39**:12
**committed** [1] **38**:20
**common** [24] **7**:6 **9**:18 **11**:1, 5,9 **12**:13,20 **13**:13,14,20 **14**:3,6,6,15,20 **22**:8 **23**:4, 11 **30**:19 **34**:5 **41**:17 **56**:2 **59**:16 **60**:15
**Community** [3] **5**:1 **77**:18 **89**:18
**compensating** [1] **48**:21
**compensation** [91] **3**:18, 20,24 **6**:16,22,24 **7**:7 **8**:3, 13,16 **9**:9 **10**:19 **11**:22 **12**: 4 **13**:4 **15**:1 **16**:4,7 **17**:1 **18**: 18 **20**:21 **21**:9,11,12 **24**:22 **25**:12,16,20 **26**:10,12,24, 25 **27**:5,21,24 **28**:2,20 **29**: 20 **30**:2 **31**:1,3,7 **32**:1,2,5 **34**:4,11 **35**:12 **39**:10 **41**:25 **47**:4 **48**:20 **57**:15 **65**:6,20 **69**:2,5,7,8,11,11,20,24 **70**: 2 **71**:18 **73**:3,6,9,16,24 **75**: 12,22 **76**:6,14,25 **77**:6 **78**: 18 **79**:1,19,24 **81**:16 **82**:6, 21 **84**:13 **85**:14 **86**:12,21 **87**:5 **88**:20,24 **89**:1
**competent** [3] **27**:14,22 **89**: 10

**competently** [1] **29**:8
**complaint** [13] **7**:14 **13**:3 **14**:25 **23**:21 **41**:7,16 **83**:2, 10 **84**:1,5,23 **88**:4,6
**completed** [1] **25**:13
**completely** [1] **36**:24
**comply** [1] **29**:10
**computation** [1] **79**:18
**concede** [2] **39**:22 **59**:2
**conceded** [1] **10**:2
**concedes** [1] **12**:18
**conceding** [1] **31**:21
**conception** [1] **9**:3
**concepts** [2] **19**:8,12
**conceptualizing** [1] **20**:10
**conceptually** [3] **5**:19 **65**: 22 **66**:11
**concern** [1] **24**:3
**concluded** [1] **41**:24
**condemnation** [4] **3**:21,23 **4**:1 **14**:11
**condition** [8] **69**:9,10 **70**: 10,11,23 **79**:7,9 **82**:15
**conditional** [2] **78**:19,20
**conduct** [1] **70**:14
**confers** [1] **27**:5
**Congress** [24] **5**:22 **6**:3 **8**:4, 14 **27**:15 **28**:13,15 **39**:15, 22 **44**:11 **45**:19 **54**:4,9,11 **55**:11 **56**:1,9 **72**:12 **75**:6, 21 **76**:3,13 **78**:9 **82**:14
**Congress's** [1] **28**:4
**consequential** [1] **37**:14
**consistent** [2] **4**:16 **52**:13
**consistently** [1] **5**:4
**constitute** [1] **81**:4
**Constitution** [60] **3**:14 **5**:3 **17**:8,18 **22**:1,19 **24**:10 **25**: 13 **34**:1,2,3 **38**:21,22 **39**:9 **40**:22,23 **41**:12 **42**:3 **43**:23 **47**:5,10,16,18 **50**:13 **52**:2 **54**:4,6 **55**:17 **57**:21 **60**:4 **61**:17 **63**:12,18 **65**:7 **68**:2, 21 **69**:1 **71**:5,10 **72**:19,23 **73**:2,25 **74**:23 **76**:3,18,19, 22 **82**:11,11 **83**:3,4,9,14,22 **84**:8,12 **88**:3,5 **90**:4
**constitutional** [12] **23**:7 **24**:12 **28**:12,25 **29**:11 **39**: 20 **41**:2 **48**:9 **58**:2 **59**:18 **60**:12 **61**:19
**constitutionally** [1] **39**:15
**constitutions** [3] **38**:25 **60**: 8 **87**:14
**constrained** [1] **26**:12
**construed** [1] **75**:24
**contained** [1] **9**:6
**contemporary** [2] **25**:24 **26**:11
**contend** [2] **8**:17,22
**context** [5] **26**:2 **29**:15 **70**:5 **73**:10,21
**continue** [1] **12**:5

**contrary** [1] **8**:11
**contrasting** [1] **7**:1
**controversies** [1] **39**:18
**controversy** [1] **73**:19
**converged** [1] **16**:21
**conversion** [2] **9**:20 **14**:9
**core** [1] **6**:10
**correct** [12] **18**:14 **20**:14 **42**: 8 **44**:17 **47**:18 **51**:21 **52**:19 **57**:13 **66**:8 **81**:14 **85**:22 **89**: 2
**correctly** [2] **32**:23 **42**:12
**couldn't** [3] **44**:15 **45**:18 **64**:10
**Counsel** [10] **7**:16,20 **34**:7 **38**:12 **41**:21 **68**:12 **74**:2 **80**: 5 **87**:18 **90**:15
**counsels** [1] **30**:21
**count** [6] **44**:5 **63**:14,16 **83**: 21 **84**:9,11
**counties** [1] **44**:24
**country** [1] **16**:21
**counts** [2] **17**:19 **83**:2
**couple** [2] **41**:22 **67**:11
**course** [1] **40**:25
**courses** [1] **12**:24
**COURT** [139] **1**:1,14 **3**:10, 20 **4**:21 **5**:1 **6**:2,23 **7**:3,6 **9**: 4 **10**:6 **12**:16 **14**:6,12 **15**: 15 **17**:2,6,10,23 **18**:1,6,14, 24 **21**:16 **23**:12,22,24 **26**: 20 **27**:14,22 **28**:18 **29**:16 **30**:4,13,23,25 **31**:2,4,11,14 **32**:4,17,19,22 **33**:3,5,17 **34**: 11,22 **36**:2,18 **37**:3 **38**:18, 19 **39**:14,24 **40**:1,6,18,25 **41**:4,7,16,23 **42**:4,20,23 **43**: 6,7,15,17,24 **44**:2,2,4,5,15, 18,25 **45**:1,3,9 **46**:7,8,9,12, 22 **47**:8,23 **50**:9 **51**:22,23 **52**:9 **56**:8 **58**:3,13 **60**:11 **61**:23 **62**:8,10,12,16 **63**:22 **64**:1,2,9,10,25 **65**:4,5 **68**: 19 **69**:14,24 **70**:12 **71**:6,11, 23 **72**:5,10 **73**:17,23 **75**:4, 13 **80**:3 **81**:12 **82**:17 **83**:13 **84**:7 **86**:3,11 **87**:5,12 **88**:7 **89**:9,13,16,19 **90**:12
**Court's** [15] **3**:16 **4**:16 **5**:3, 5 **7**:5 **26**:15,17 **28**:22 **34**:2 **40**:14,18 **45**:8 **47**:11 **59**:23 **86**:8
**courts** [38] **4**:14 **5**:7,11,16 **15**:13,16 **16**:5,20 **17**:17,20 **21**:12,24,25 **23**:3,8 **24**:5,14 **26**:11 **27**:17 **28**:5,13,13,16, 17 **29**:7 **33**:21 **34**:1 **36**:21 **38**:23 **41**:3 **43**:16 **45**:5 **46**: 2 **47**:21 **53**:13 **68**:2 **88**:2 **89**:11
**covered** [1] **19**:10
**create** [14] **14**:7 **15**:5 **23**:12 **27**:17 **28**:4,13,15,24 **55**:9 **68**:22 **74**:24 **75**:19 **82**:5 **89**:

21

**created** [5] **25**:19 **33**:25 **43**: 13 **56**:20 **71**:15
**creates** [8] **21**:8 **23**:15 **34**: 21,25 **75**:11 **76**:8 **89**:6,8
**creating** [1] **23**:4
**creation** [1] **24**:24
**crime** [2] **70**:21,24
**crucial** [1] **8**:2
**cure** [1] **21**:13
**curiae** [3] **1**:24 **2**:11 **68**:16

## D

**D.C** [2] **1**:10,23
**damages** [19] **21**:14 **25**:8, 11,18 **29**:6 **37**:8,11,12,14, 15 **42**:5 **43**:25 **49**:23 **67**:1 **68**:24 **71**:7,11 **76**:20 **86**:7
**damaging** [1] **63**:13
**Dames** [1] **69**:16
**dangerous** [1] **23**:19
**Davis** [1] **29**:3
**day** [4] **36**:22 **47**:6,18 **48**:22
**daylight** [1] **80**:13
**dead** [1] **15**:3
**debt** [4] **26**:18,22 **76**:24,25
**decade** [1] **29**:4
**decide** [4] **34**:11 **36**:18 **46**: 2,3
**decided** [1] **30**:11
**decipher** [1] **16**:11
**decision** [14] **3**:17 **7**:5 **14**:5 **24**:8 **26**:15,17 **31**:18 **40**:8, 18,25 **71**:8 **88**:2,7,9
**declaration** [3] **66**:15,15, 17
**declaratory** [3] **12**:17 **66**: 21,25
**defendant** [3] **28**:16 **35**:7, 14
**defendant's** [1] **31**:12
**define** [1] **21**:25
**defining** [1] **73**:7
**definition** [5] **17**:18 **19**:23 **75**:13,19 **81**:17
**deliberately** [1] **28**:16
**denied** [1] **27**:22
**denies** [1] **26**:25
**denying** [1] **88**:20
**Department** [1] **1**:23
**depend** [2] **84**:10 **86**:24
**dependent** [1] **28**:3
**depends** [2] **20**:24 **28**:12
**deprivation** [2] **70**:9 **85**:24
**deprived** [1] **70**:8
**Deputy** [1] **1**:22
**destruction** [1] **63**:13
**determination** [1] **36**:21
**determine** [1] **39**:17
**determined** [2] **73**:17 **75**:6
**DEVILLIER** [2] **1**:3 **3**:4
**dictates** [1] **72**:23
**Diego** [1] **34**:20
**differ** [1] **20**:11

**difference** [3] 6:5 25:10 44:7

**different** [11] 18:2,5 19:9 26:23 37:8,11 44:23 48:6,17 56:3 66:16

**differently** [2] 24:23 25:2

**difficult** [1] 16:11

**difficulty** [1] 9:2

**directed** [2] 79:17 82:23

**direction** [1] 50:4

**directive** [1] 76:12

**directly** [9] 5:9 7:13,15 13:9 16:24 23:17 39:5 46:13 88:7

**disagree** [2] 18:10 80:20

**disagrees** [1] 51:22

**discretion** [1] 90:6

**discretionary** [1] 28:4

**discriminate** [2] 22:22 23:1

**dismiss** [3] 23:25 83:6 88:8

**dismissed** [3] 17:6 18:8 22:13

**dispositive** [1] 88:10

**dispute** [5] 13:13 16:17 17:15 42:15,18

**dissent** [4] 29:2 32:15 34:20,23

**distinct** [5] 5:19 7:22 15:11 19:12 38:4

**distinction** [2] 49:20,24

**distinguishes** [1] 28:22

**district** [10] 15:16 17:10 18:14 32:22 36:1 41:7,16 61:23 65:4,5

**diversity** [1] 43:10

**divert** [1] 36:11

**doing** [5] 23:3,4,6 58:9 85:25

**done** [4] 41:18 43:16,20 54:9

**Double** [1] 79:5

**doubled** [1] 64:23

**down** [3] 55:6 64:23 65:4

**drastic** [1] 4:21

**draw** [1] 49:20

**Due** [16] 24:17,20 25:3 29:22 41:12 54:12 61:16 70:8,11,13,15,16 78:19 85:24 86:1 87:8

**dueling** [1] 37:23

**duty** [5] 3:15 17:1 25:16 26:9 29:11

### E

**e.g** [1] 62:22

**early** [2] 5:16 58:17

**easement** [11] 35:15,16 36:15,18,19,20,20 37:4,6,25 38:1

**easiest** [1] 59:21

**Eastern** [1] 50:15

**EDWIN** [3] 1:22 2:9 68:15

**effect** [1] 69:20

**effective** [1] 73:22

**effectively** [1] 31:17

**either** [4] 12:23 25:24 46:19 67:4

**ejected** [1] 89:13

**ejectment** [2] 9:12 20:20

**elaborated** [1] 83:15

**Electric** [1] 34:20

**elements** [1] 75:16

**eliminate** [1] 24:13

**eliminated** [3] 6:3 31:19 36:24

**email** [1] 61:20

**emphasize** [1] 40:7

**empowered** [1] 21:12

**enacted** [1] 76:3

**enacting** [1] 8:15

**endemic** [1] 87:7

**ending** [1] 34:20

**enforce** [8] 4:24 5:9 9:9 13:21 28:18 54:11 89:10,17

**enforceable** [1] 9:14

**enforced** [3] 16:22,23 25:17

**enforcement** [2] 20:8 90:5

**engage** [1] 28:25

**English** [36] 3:17 4:11,18 6:24 7:11 16:6,10,15 17:22,22 18:2,5,10,17 19:10 21:7 23:9,16 24:5 29:5 31:25 34:24 40:6,7 41:23 42:2 52:10 54:16 57:23 71:4,8 72:21 73:12 79:16 86:8 88:19

**enjoined** [1] 21:4

**enjoins** [1] 70:14

**enough** [4] 10:23 11:12,16 14:16

**Enterprises** [1] 50:15

**entertain** [1] 28:6

**entire** [3] 28:10,11 79:1

**entirely** [2] 86:22 90:6

**entities** [1] 90:7

**entitled** [9] 6:15 13:4 14:21 20:19 31:8 32:8 33:18,22 90:5

**entitlement** [15] 4:7,8 6:12 7:12 10:15,18 15:1 16:18,22 19:14 25:19 27:20,22 33:14 34:3

**entity** [1] 16:24

**envisioned** [1] 9:17

**equals** [2] 74:12 81:21

**equity** [1] 67:1

**ESQ** [4] 2:3,6,9,13

**ESQUIRE** [1] 1:18

**essentially** [1] 85:16

**establishes** [1] 9:16

**ET** [1] 1:3

**evaluating** [1] 26:17

**even** [9] 6:7 18:14 26:12 48:18 52:17 66:3 73:14 83:9 87:5

**everybody** [2] 45:11 50:6

**everyone** [3] 12:18 20:16,22

**evidence** [4] 8:11,22 35:3 67:24

**evidenced** [2] 89:4 90:8

**Ex** [5] 6:1 25:4,5,7 67:2

**exactly** [7] 33:17 35:13 54:3 64:6 70:19 79:11 83:17

**example** [6] 16:1 26:14 75:17 82:3 88:16,17

**except** [1] 18:5

**excuse** [1] 26:16

**executive** [1] 76:13

**exist** [2] 6:2 59:18

**existed** [1] 87:11

**existing** [1] 56:22

**exists** [3] 46:1,4 88:12

**experience** [1] 45:5

**explained** [2] 40:1 43:15

**explanations** [1] 4:17

**explicit** [1] 3:15

**exploit** [1] 82:8

**expressly** [1] 84:7

**extent** [6] 19:23 37:3 79:7 80:18 88:5,12

**extinguish** [2] 31:16 32:3

**extinguished** [3] 24:2 88:10,13

**extra-constitutional** [1] 5:12

**extraordinary** [2] 75:1 76:21

### F

**face** [2] 13:3,12

**faced** [1] 5:8

**facing** [1] 5:15

**fact** [7] 5:11 11:19 24:10 30:18 35:18 73:2,12

**facts** [4] 36:2 37:3 63:5,8

**factual** [2] 35:6 45:9

**failed** [1] 88:6

**failing** [1] 48:25

**Fair** [7] 10:23 11:12 14:16 32:8 37:5,23 38:2

**fall** [1] 67:2

**falls** [1] 49:25

**familiar** [2] 23:10 65:25

**far** [2] 34:4 67:23

**favor** [1] 30:22

**favorable** [1] 31:23

**feature** [1] 83:1

**federal** [83] 4:4,15 5:7,16 6:1 8:5 10:24 12:12,16 14:22 15:15,16 17:6,19 18:6 21:22 22:4,23 23:2 24:11,13 28:5,12,13 29:7 30:4,9,9,10,13 31:4,11,13,13,14 32:4,17,22,25 33:15 38:22 39:5 40:11,23 41:4,12 42:23 43:2,5,7 44:2,15,18 45:7,12,24 46:1,1,8,9,12,13,20,21 52:15 60:4 61:16

**Fifth** [97] 3:12,19 4:10 6:17,21 7:13,15,18,24,25 8:20 9:5,17,22 11:6,12,23 12:6,18,21 13:5,9,21 14:4,11,14,24 15:2,17,23 16:4 18:7,17,20,20 20:5,14,17,21 21:1,2,8,22 22:4,10,11 23:13,15,23 24:6,18 25:21 27:4 28:1 29:17,24 30:12,15,17,20,24 31:6,8,10,16,19 33:19,22,23 46:14 55:8 62:10,13 63:17 64:14 65:7 68:20,23 70:5,18 72:8 74:23 75:17 76:11 77:24 79:1 80:22 83:5 86:11 87:13 88:11,24,25 89:5,7,24 90:9

**fight** [2] 33:13 64:11

**fighting** [1] 64:12

**file** [1] 4:24

**filed** [6] 4:1,4 23:22 30:5 44:23 71:4

**finally** [1] 70:17

**find** [3] 36:11 38:19 77:2

**finds** [1] 70:12

**Fine** [2] 61:9,9

**First** [52] 3:17 4:11,17 6:24 7:11 11:10,14 16:5,10,15 17:21,22 18:2,5,10,16 19:10 21:7 23:8,16 24:5 29:5,23,25 31:25 33:12 34:24 40:6,7,9 41:23 42:2 49:11 52:10 54:16 55:14 57:23 59:3,4 71:4,8 72:21 73:12,17 79:15 82:3 83:7,21 84:9,11 86:8 88:19

**first-line** [2] 51:19 52:18

**flatly** [1] 45:13

**flooded** [1] 36:25

**flooding** [3] 36:12,17 81:2

**flow** [1] 22:7

**flowing** [1] 15:1

**flows** [1] 7:13

**follows** [1] 39:19

**footnote** [6] 16:14 72:20 73:9,11 79:16 83:12

**footnote's** [1] 16:11

**force** [6] 42:4 43:24 68:21 71:6,10 76:19

**forego** [1] 37:17

**form** [4] 6:13 16:25 20:23 32:6

**former** [1] 32:7

**forms** [3] 6:8 9:25 26:13

**forum** [15] 19:18,19 26:21,23,24,25 30:10 54:14,19,22,25 55:7,8,8 57:18

**forums** [1] 65:19

**forward** [3] 36:11,24 37:1

**found** [2] 35:21 37:3

**founding** [1] 8:7

**four** [1] 44:20

62:10 64:2,9 76:4 82:7 83:4,7 84:8,24 87:1,5 88:3,5,18 89:11

**Fifth** [97] 3:12,19 4:10 6:17,21 7:13,15,18,24,25 8:20 9:5,17,22 11:6,12,23 12:6,18,21 13:5,9,21 14:4,11,14,24 15:2,17,23 16:4 18:7,17,20,20 20:5,14,17,21 21:1,2,8,22 22:4,10,11 23:13,15,23 24:6,18 25:21 27:4 28:1 29:17,24 30:12,15,17,20,24 31:6,8,10,16,19 33:19,22,23 46:14 55:8 62:10,13 63:17 64:14 65:7 68:20,23 70:5,18 72:8 74:23 75:17 76:11 77:24 79:1 80:22 83:5 86:11 87:13 88:11,24,25 89:5,7,24 90:9

**Fourteenth** [6] 6:18 8:19 16:20 29:14 40:3 54:5

**Fourth** [1] 48:10

**Framers** [3] 10:3 25:20 90:10

**framework** [1] 75:5

**framing** [1] 9:13

**free** [3] 27:15,17 35:14

**freestanding** [1] 62:9

**Frequently** [1] 23:16

**friend** [1] 87:25

**friend's** [1] 20:18

**fulfill** [1] 17:3

**fulfilled** [1] 17:2

**full** [3] 30:17 31:7 35:6

**fully** [1] 11:6

**fundamental** [2] 78:24 82:10

**furnish** [4] 30:25 42:4 71:6,10

**furnishes** [2] 3:19 43:24

**further** [6] 68:6 80:11 83:15,19 84:6 90:12

**future** [1] 36:13

### G

**Gas** [1] 34:20

**gave** [1] 53:1

**Gedney** [1] 26:18

**General** [7] 1:20,22 33:7 47:2 50:21 51:24 71:15

**generally** [1] 37:22

**generation** [2] 8:8,9

**George** [3] 26:1,8 89:5

**gets** [1] 81:12

**getting** [1] 19:6

**give** [8] 8:15 28:5 35:23 47:4 51:2 55:7 85:14,16

**given** [1] 31:20

**gives** [2] 23:17 25:15

**giving** [1] 48:15

**good-faith** [2] 13:2 31:5

**GORSUCH** [63] 9:15 10:1,8,17,20,23 11:4,12,15,19,25 12:7 13:6,11,18,24 14:8,16 15:4,20 55:20 56:14,17,25 57:3,6,11,14,17,20 58:18,21,24 59:7,12,16,24 60:3,10,14,17,22,25 61:3,6,9,12,18,24,25 68:10 82:1,2,19,22 83:17,20 84:2,5,15,18,21 85:2

**Gorsuch's** [3] 58:9 65:14 87:23

**gosh** [1] 63:1

**got** [5] 8:22 59:12,13,13 61:12

**government** [28] 3:14 4:4 21:3,10 25:15 32:6 34:12,13 38:3,20 41:24 42:5 50:4 55:25 56:3,6 68:22,24 70:15 71:7,12,16 72:21 76:4 80:17 82:7 85:25 90:6

**government's** [4] 20:25

**21**:16 **80**:14 **86**:18
**governmental** [1] **69**:9
**governments** [5] **4**:2 **39**:9 **55**:23 **56**:7,21
**governs** [1] **17**:16
**great** [1] **26**:14
**Green** [1] **29**:3
**ground** [2] **12**:11 **36**:1
**grounds** [2] **13**:2 **33**:13
**guess** [3] **20**:3 **57**:3 **75**:5
**guys'** [1] **45**:8

**H**

**half-point/half-point** [1] **81**:19
**happen** [1] **85**:11
**happened** [3] **48**:13 **52**:1 **85**:19
**happening** [1] **54**:7
**happens** [2] **10**:25 **50**:8
**hard** [3] **7**:22 **66**:9 **77**:2
**hard-pressed** [1] **38**:19
**head** [1] **81**:8
**Health** [3] **5**:1 **77**:19 **89**:18
**hear** [6] **3**:3 **15**:17 **20**:11 **39**: 17 **40**:21 **88**:2
**heard** [2] **31**:14 **63**:1
**hears** [1] **14**:10
**heart** [3] **3**:25 **4**:1,3
**held** [7] **5**:1 **22**:12 **30**:23 **39**: 14 **69**:24 **70**:20 **87**:9
**help** [1] **60**:4
**higher** [1] **74**:13
**hip** [1] **67**:5
**historical** [2] **8**:10,21
**history** [6] **19**:25 **20**:3 **28**: 25 **29**:13 **52**:13 **83**:1
**hold** [1] **39**:24
**holding** [4] **16**:16 **40**:10 **44**: 6 **70**:23
**holdings** [1] **42**:15
**holds** [1] **3**:17
**home** [1] **48**:11
**honest** [1] **22**:6
**Honor** [70] **5**:15 **7**:19 **9**:1,25 **10**:5 **11**:2,8,13,22 **13**:1,8, 16,22 **14**:3,24 **15**:11,23 **16**: 13 **17**:9,14 **18**:5,16,25 **19**: 12,22 **20**:15 **22**:6,20,25 **25**: 2 **27**:10 **28**:11 **32**:13,20 **33**: 11,12 **34**:18 **35**:13 **36**:6,16 **37**:9 **38**:13 **42**:8,16,24 **43**: 3 **44**:17 **45**:19 **46**:19 **47**:19, 22 **49**:3,16 **50**:2 **51**:14 **60**: 13 **61**:5 **63**:15,19 **64**:3,15 **65**:11,21 **66**:8 **67**:15 **68**:13 **87**:22 **88**:16 **89**:3,23
**Hood** [1] **45**:24
**horses** [5] **26**:3,4,5,7,10
**however** [1] **27**:16
**hundred** [2] **44**:22 **51**:21
**hypothetical** [6] **53**:1 **54**:1 **58**:6 **65**:14 **85**:8 **88**:17

**I**

**idea** [5] **25**:22 **56**:2,19 **61**: 10 **71**:9
**ideas** [1] **68**:1
**identified** [1] **34**:19
**ignores** [1] **39**:8
**illegally** [1] **48**:11
**illustration** [1] **7**:4
**imagine** [1] **50**:4
**immediately** [1] **24**:18
**immunity** [5] **15**:7,10 **29**:9 **76**:24 **87**:4
**implied** [4] **45**:6,6 **46**:23 **55**: 9
**import** [1] **19**:25
**important** [5] **13**:17 **15**:25 **22**:15 **73**:10 **87**:24
**imposes** [1] **3**:14
**incentive** [2] **56**:20 **82**:5
**include** [1] **40**:10
**included** [1] **29**:22
**includes** [1] **30**:1
**including** [1] **69**:1
**incorporated** [3] **8**:20 **29**: 16,19
**independent** [2] **9**:22 **34**:5
**indictment** [5] **70**:19,22,22 **79**:3 **87**:9
**infamous** [1] **70**:21
**information** [1] **17**:5
**Inhabitants** [1] **26**:19
**initio** [1] **30**:5
**injunction** [27] **19**:16 **50**: 10,19 **51**:1,16 **55**:14 **57**:7 **58**:15,17,19 **65**:23 **69**:13, 19,21 **71**:18 **72**:11 **73**:4 **80**: 20 **82**:16 **85**:9,10,15,18,20, 25 **86**:3,6
**injunction-to-pay** [1] **65**: 14
**injunctions** [1] **25**:23
**injunctive** [8] **20**:19 **48**:4 **49**:17,21,22 **53**:23 **57**:10 **82**:16
**injury** [2] **11**:24 **12**:6
**inquiry** [1] **89**:21
**insist** [1] **39**:4
**Instead** [2] **39**:3 **64**:22
**interest** [5] **32**:7,9 **35**:6 **36**: 16 **86**:10
**interesting** [3] **52**:23 **78**: 21 **82**:25
**interference** [1] **72**:24
**interim** [3] **86**:2 **87**:6,7
**interlocutory** [3] **24**:1 **41**: 13 **88**:9
**interpret** [1] **77**:17
**interpreted** [2] **76**:17 **77**: 18
**interpreting** [1] **79**:8
**intransigent** [1] **53**:8
**intrudes** [1] **7**:8
**invasion** [1] **42**:1

**inverse** [4] **3**:21,23 **4**:1 **14**: 10
**invoke** [5] **14**:6,15 **33**:14, 19,22
**invoked** [1] **29**:8
**invoking** [4] **30**:16 **31**:6 **33**: 24 **84**:23
**involved** [2] **75**:18,19
**irreconcilable** [1] **45**:14
**isn't** [10] **5**:12 **14**:19 **23**:1 **26**:21,22 **39**:1 **46**:5 **56**:20 **58**:9 **77**:22
**issue** [4] **18**:13 **63**:2 **73**:22 **88**:10
**issues** [2] **45**:9 **82**:21
**itself** [19] **3**:19 **8**:1 **9**:21 **15**: 22 **27**:6 **28**:17 **29**:15 **31**:21 **39**:6,17 **41**:12 **43**:12 **56**:10 **69**:2 **74**:23 **76**:12 **79**:1 **81**: 15 **90**:9

**J**

**JACKSON** [18] **19**:4,17 **20**: 2 **32**:10,16 **33**:2 **38**:11 **66**: 14,18,21 **67**:8 **68**:11 **78**:12, 15 **79**:6 **86**:15,16 **87**:16
**James** [1] **89**:4
**January** [1] **1**:11
**Jay** [1] **26**:1
**Jeopardy** [1] **79**:5
**John** [1] **26**:1
**Judge** [2] **32**:14,23
**judge's** [1] **30**:6
**judges** [2] **26**:20 **27**:2
**judgment** [4] **12**:17 **66**:22, 25 **72**:11
**judicial** [11] **19**:19 **20**:16,23, 24 **39**:21 **50**:17,18 **52**:12 **54**:19,22 **55**:8
**jurisdiction** [17] **5**:17,18 **6**: 4 **7**:21 **8**:5 **12**:19 **17**:10 **27**: 14,16,17,23 **28**:5 **29**:8 **43**: 10 **46**:2 **89**:10,16
**jurisdictional** [2] **6**:6,18
**jurisprudence** [1] **15**:16
**Justice** [267] **1**:23 **3**:3,9 **5**:6 **7**:16,20 **9**:15 **10**:1,8,17,20, 23 **11**:4,12,15,19,25 **12**:7 **13**:6,11,18,24 **14**:8,16 **15**:4, 20 **16**:9 **17**:4,12,21 **18**:9,19, 23 **22**:14,21 **24**:15 **25**:7 **27**: 4,11,25 **29**:1,4 **32**:10,16 **33**: 2,10 **34**:6,19,23 **35**:9,17,20 **36**:4,7,7,9,10,23 **37**:7,10, 18 **38**:6,7,7,9,10,11,14,17 **40**:15,20 **41**:1,20,21 **42**:9, 14,21,25 **43**:4,18,22 **44**:14 **45**:15 **46**:5,15 **47**:2,12,15, 20 **48**:2,5,8,13,25 **49**:7,10, 14,18 **50**:21,24 **51**:6,15,24 **52**:20,24 **53**:4,10,16,25 **54**: 10,21,24 **55**:2,5,18,20,22 **56**:5,14,17,25,25 **57**:3,6,11,

14,17,20 **58**:4,8,8,18,21,24 **59**:1,7,10,12,16,24 **60**:3,10, 14,17,22,25 **61**:3,6,9,12,18, 24,25,25 **62**:1,3,4,7,15,25 **63**:4,7,10,16,20,25 **64**:4,18 **65**:3,12,13,13,17,24 **66**:2,5, 12,14,18,21 **67**:8,12,16,17, 18,19 **68**:5,7,8,8,10,11,14, 18 **70**:7,25 **71**:3,9,22 **72**:14, 18 **74**:1,3,17 **76**:1 **77**:2,13, 16,24 **78**:5,10,12,13,15,16 **79**:6,13 **80**:1,4,7,7,9,10,12, 16,23,25 **81**:6,7,11,18,21, 23,25,25 **82**:1,2,19,22,25 **83**:17,20 **84**:2,5,15,18,21 **85**:2,3,3,5,6 **86**:14,14,16, 17 **87**:16,17,23 **90**:14
**Justice's** [1] **79**:15
**justices** [1] **26**:19

**K**

**Kagan** [20] **38**:9 **47**:2,12,15, 20 **48**:2,5,8,13,25 **49**:7,10, 14,18 **50**:21,24 **51**:6,15,24 **81**:25
**KAVANAUGH** [11] **59**:1,10 **61**:25 **62**:3 **65**:13,17,24 **66**: 2,5,12 **85**:4
**keeping** [1] **17**:10
**kind** [11] **4**:21 **8**:6,21 **16**:21 **36**:17,21 **37**:25 **38**:1 **48**:17 **51**:24 **74**:13
**kinds** [1] **6**:10
**KNEEDLER** [49] **1**:22 **2**:9 **68**:14,15,18 **70**:25 **71**:2,21, 25 **72**:16 **73**:5 **74**:3,16,19 **76**:9 **77**:9,14,23 **78**:1,6,14, 15,23 **79**:11,14 **80**:2,6,15, 18,24 **81**:3,10,13,20,22,24 **82**:9,20 **83**:12,18,24 **84**:4, 10,16,20,22 **85**:6,21 **86**:23
**Knick** [18] **4**:18 **21**:7 **30**:5, 24 **34**:23 **40**:1 **42**:2 **43**:15, 23 **44**:4,6,10 **46**:17 **47**:23 **49**:6 **53**:20 **82**:17 **87**:12

**L**

**lack** [1] **5**:17
**lacks** [1] **14**:19
**land** [1] **48**:21
**landowner** [1] **51**:12
**language** [6] **24**:16,17 **67**: 25 **68**:1,3 **79**:16
**languished** [1] **8**:6
**last** [1] **89**:15
**late** [1] **52**:3
**later** [3] **29**:4 **67**:13 **73**:22
**Laughter** [3] **42**:11 **52**:6 **67**: 21
**law** [49] **3**:25 **7**:6 **9**:19 **11**:1, 5,9 **12**:13,20 **13**:13,14,20, 20 **14**:3,6,6,15,20,22 **15**:18, 21 **17**:13,16 **18**:11,21 **21**: 21 **22**:8 **23**:4,12 **24**:21 **29**:

22 **30**:19 **31**:13,22,24 **33**: 15 **34**:5,23 **41**:17 **45**:7 **53**: 16 **59**:17 **60**:15 **62**:22 **63**:2 **64**:6 **75**:23 **86**:20,24 **88**:18
**lawful** [3] **69**:10 **70**:23 **82**: 16
**lawsuit** [2] **4**:24 **16**:23
**lawyer** [1] **9**:5
**lead** [1] **86**:6
**least** [1] **5**:2
**leave** [3] **41**:6,15 **61**:19
**left** [1] **90**:5
**legal** [1] **4**:22
**legislation** [1] **54**:11
**legislative** [1] **55**:7
**legislature** [1] **19**:20
**legislature's** [1] **7**:9
**less** [1] **29**:3
**Lessee** [1] **89**:12
**liberty** [1] **24**:20
**lies** [1] **69**:12
**light** [1] **33**:9
**likes** [1] **27**:16
**limit** [1] **5**:24
**limitation** [1] **28**:8
**limitations** [4] **15**:8,12,13, 19
**limited** [4] **6**:6,9 **38**:2,3
**limits** [2] **6**:6,8
**line** [1] **46**:23
**list** [1] **88**:23
**litigated** [2] **30**:12 **57**:9
**litigation** [3] **39**:13 **86**:5 **87**: 8
**little** [3] **7**:22 **67**:5 **74**:4
**live** [2] **41**:10 **83**:9
**local** [1] **4**:2
**logically** [1] **4**:23
**long** [4] **8**:7 **11**:20 **86**:4,5
**longer** [2] **11**:23 **32**:12
**look** [11] **10**:13 **15**:20 **24**:8 **34**:1 **40**:16,16 **51**:15 **56**:3 **60**:3,6 **70**:4
**looked** [2] **68**:2 **88**:18
**looking** [2] **15**:18 **23**:14
**loophole** [2] **82**:8,10
**lose** [1] **16**:12
**lost** [1] **38**:5
**lot** [1] **45**:5
**lower** [5] **4**:14 **15**:13 **17**:17 **28**:4,13

**M**

**made** [5] **31**:15 **69**:15 **72**: 21,22 **75**:13
**made-up** [1] **64**:5
**Madison** [1] **89**:4
**magistrate** [1] **30**:6
**Maine** [4] **5**:1 **56**:12 **77**:18 **89**:18
**mandate** [2] **75**:12 **77**:19
**mandates** [3] **6**:22,22 **77**:4
**mandating** [3] **78**:1 **79**:8 **81**:11

**mandatory** [4] **3**:18 **6**:25 **32**:1,2
**maneuvering** [1] **32**:11
**maneuvers** [1] **32**:3
**many** [2] **39**:6 **42**:6
**mapping** [1] **9**:2
**market** [4] **32**:8 **37**:5,23 **38**:2
**Massachusetts** [3] **26**:15, 16,20
**matches** [3] **29**:12,13,14
**math** [1] **74**:13
**matter** [11] **1**:13 **7**:12 **29**:23, 25 **30**:19 **33**:7 **51**:8 **58**:25 **59**:4 **79**:19 **80**:25
**matters** [1] **40**:5
**McClung's** [1] **89**:12
**McDowell** [1] **24**:15
**McNAMARA** [68] **1**:18 **2**:3, 13 **3**:6,7,9 **5**:14 **7**:17 **8**:24 **9**:24 **10**:5,14,18,22 **11**:2,8, 13,18,21 **12**:3,25 **13**:8,16, 22 **14**:2,10,23 **15**:9,22 **16**: 13 **17**:9,14 **18**:4,15,24 **19**: 11,22 **20**:13 **21**:18 **22**:5,20, 24 **25**:1,9 **27**:9,13 **28**:9 **32**: 13,20 **33**:8,11 **34**:17 **35**:13, 19,25 **36**:6,14 **37**:2,9,12,21 **38**:13 **47**:3 **49**:19 **82**:24 **87**: 19,20,22
**McNamara's** [3] **47**:17 **49**: 11 **50**:25
**mean** [22] **7**:23 **8**:18 **9**:21 **10**:24,25 **11**:4 **16**:10 **19**:5 **43**:9 **46**:6,25 **49**:8 **50**:21, 24 **54**:21,25 **55**:24 **59**:10 **67**:9 **71**:16,22 **90**:10
**meaning** [5] **10**:9,11 **51**:1 **67**:25 **88**:15
**means** [3] **10**:7 **88**:2 **89**:21
**meant** [2] **86**:11 **90**:10
**mechanism** [5] **9**:18 **11**:23 **13**:21 **14**:4 **20**:8
**Meigs** [1] **89**:12
**mention** [2] **63**:2,5
**mentioned** [2] **79**:2 **88**:21
**mentioning** [1] **65**:8
**merits** [5] **18**:8 **22**:13 **31**:16 **46**:3 **88**:11
**met** [1] **18**:18
**Mexico** [1] **88**:22
**might** [10] **9**:19,20 **12**:16 **19**:15 **53**:24 **70**:1 **77**:9,9, 10 **86**:18
**military** [2] **26**:3 **89**:13
**million** [1] **34**:13
**mind** [1] **44**:1
**mine** [1] **31**:1
**misunderstand** [1] **64**:22
**misunderstood** [2] **60**:21 **65**:1
**Mm-hmm** [5] **48**:12,24 **53**: 9 **56**:4 **58**:20
**modern** [4] **3**:25 **6**:13 **9**:3

**10**:6
**moment** [2] **26**:7 **73**:24
**monetary** [1] **87**:15
**money** [21] **3**:15 **29**:21 **42**:5 **43**:25 **53**:7,13 **65**:23 **66**:10 **71**:7,11 **72**:11,12,13 **77**:4,7, 10,20 **78**:1 **80**:20 **85**:10 **87**: 3
**money-mandating** [5] **4**: 22 **76**:7 **77**:7,10 **89**:21
**monies** [1] **50**:18
**Monsanto** [1] **69**:16
**Moore** [1] **69**:17
**Moreover** [1] **8**:10
**most** [4] **9**:16 **14**:13 **59**:22, 22
**mountain** [2] **8**:21,25
**moved** [2] **23**:25 **88**:8
**much** [2] **34**:14 **56**:7
**municipalities** [2] **44**:12 **45**:21
**must** [7] **16**:6 **39**:9,11 **41**: 25 **60**:20,20 **74**:12

## N

**narrower** [1] **17**:18
**nation** [1] **24**:14
**nationwide** [2] **4**:2 **15**:24
**nature** [3] **14**:18 **51**:17 **86**:5
**nearly** [1] **39**:23
**Nebraska** [1] **88**:22
**necessarily** [6] **9**:21 **10**:24 **15**:10 **18**:22 **29**:22 **79**:9
**necessary** [1] **82**:15
**need** [3] **12**:12 **65**:18 **83**:10
**needs** [1] **9**:1
**neither** [1] **74**:5
**nervous** [1] **67**:7
**never** [4] **41**:18 **54**:9 **62**:19 **63**:1
**New** [1] **88**:22
**next** [1] **3**:4
**NIELSON** [107] **1**:20 **2**:6 **38**: 14,15,17 **40**:17,21 **41**:4 **42**: 8,12,16,23 **43**:3,8,20 **44**:3, 17 **45**:18 **46**:11,18 **47**:8,14, 19,22 **48**:3,7,12,24 **49**:3,9, 13,16 **50**:2,23 **51**:5,14,19 **52**:7,22 **53**:3,9,15,18 **54**:2, 15,23 **55**:1,4,13 **56**:4,8,16, 24 **57**:2,5,8,13,16,19,22 **58**: 7,11,20,22,25 **59**:3,8,15,20 **60**:2,6,13,16,19,23 **61**:2,5, 7,10,15,21 **62**:6,14,17 **63**:3, 6,9,15,19,24 **64**:3,15,20 **65**: 10,16,21,25 **66**:4,8,13,17, 20,24 **67**:9,14,22 **68**:13
**none** [1] **40**:5
**nor** [2] **24**:21 **74**:6
**noted** [1] **34**:22
**nothing** [4] **11**:16 **39**:11 **74**: 11,11
**notice** [1] **50**:7
**number** [2] **5**:25 **69**:14

**Numerous** [1] **68**:25

## O

**oath** [1] **56**:11
**objection** [1] **67**:4
**obligated** [1] **90**:7
**obligation** [17] **20**:25 **21**:8, 10,13,16 **23**:16 **25**:17 **28**: 19 **54**:18 **58**:19 **75**:15 **89**:6, 8,11,17,22 **90**:4
**obligations** [2] **4**:23,24
**obtain** [1] **3**:23
**odds** [2] **5**:10,13
**offered** [1] **67**:24
**offset** [1] **25**:14
**Okay** [22] **11**:25 **22**:14,21 **24**:9 **36**:4 **38**:6,12 **47**:20 **55**:1,4 **58**:11,24 **59**:7 **60**: 14 **61**:3,12,24 **65**:8,12 **81**: 23 **82**:19,22
**Oldham** [2] **32**:14,23
**once** [6] **6**:18 **9**:25 **23**:25 **28**:15 **30**:10,10
**one** [22] **6**:13 **9**:1 **12**:14 **13**: 1,25 **21**:2 **22**:7 **27**:1 **39**:8 **44**:19,19 **45**:11 **53**:6 **56**:11 **64**:1,19 **67**:6 **70**:24 **79**:25 **80**:2 **81**:21 **83**:2
**one-half** [2] **74**:21,21
**ones** [1] **42**:7
**ongoing** [10] **12**:5 **21**:9,13 **25**:3 **26**:9 **28**:19 **29**:10 **47**: 6,15 **90**:4
**only** [16] **6**:13,20 **19**:10 **28**: 18 **30**:20 **51**:10 **54**:17 **67**: 24 **72**:8,12 **83**:6 **84**:7 **87**:1 **88**:6 **89**:9 **90**:3
**onwards** [1] **43**:17
**open** [1] **84**:25
**operated** [1] **11**:20
**opinion** [5] **20**:12 **30**:7,15 **32**:24 **83**:13
**opinions** [2] **42**:10,13
**OPM** [1] **72**:16
**opportunity** [2] **33**:4 **37**:17
**oppose** [4] **12**:11 **13**:2 **61**: 18,22
**opposed** [1] **19**:20
**option** [1] **12**:15
**Options** [1] **5**:2
**oral** [7] **1**:13 **2**:2,5,8 **3**:7 **38**: 15 **68**:15
**order** [4] **17**:3 **27**:23 **57**:7 **70**:13
**orders** [1] **70**:13
**Oregon** [5] **16**:1,1,3,5 **88**: 21
**original** [5] **10**:9,10 **67**:25 **88**:15 **89**:3
**originalist** [1] **52**:5
**other** [17] **3**:13 **7**:2 **21**:6 **23**: 2,7 **26**:25 **34**:1 **43**:11 **50**:3 **58**:14 **59**:14 **75**:23 **76**:18 **78**:7 **81**:15,17 **83**:3

**others** [1] **86**:9
**otherwise** [1] **70**:21
**out** [13] **9**:19 **30**:7 **32**:14,23 **35**:21 **40**:6 **45**:12 **50**:13 **70**: 7 **75**:2 **82**:25 **86**:21 **87**:3
**over** [5] **6**:4 **12**:19 **17**:11 **48**: 14 **70**:16
**overall** [1] **70**:5
**overcoming** [1] **87**:4
**overruling** [1] **39**:25
**owe** [2] **21**:11 **35**:11
**owed** [1] **73**:24
**owes** [2] **21**:11 **34**:12
**own** [7] **42**:4 **43**:24 **68**:21 **71**:6,10 **76**:19 **89**:14
**owner** [6] **9**:9 **32**:8 **38**:4 **53**: 6 **55**:10 **85**:15
**owners** [1] **3**:22

## P

**p.m** [1] **90**:17
**PAGE** [1] **2**:2
**paid** [8] **12**:4 **27**:24 **37**:15 **47**:17 **49**:2 **50**:1 **76**:25 **86**: 10
**panel** [1] **32**:24
**part** [3] **5**:16 **20**:15 **30**:4
**parte** [5] **6**:1 **25**:4,5,7 **67**:2
**partial** [2] **35**:16 **36**:19
**particular** [4] **19**:14 **75**:10, 18 **76**:15
**particularly** [2] **29**:14 **76**: 20
**party** [1] **67**:24
**passed** [1] **87**:11
**Passman** [1] **29**:3
**past** [2] **21**:15 **25**:12
**path** [1] **20**:20
**pay** [26] **3**:15 **16**:6 **18**:1,12 **21**:4,5,8 **25**:16 **37**:24 **41**: 25 **50**:5,11 **53**:5 **57**:7,10 **58**:21 **65**:23 **66**:10 **72**:12 **80**:20 **85**:10,17 **89**:6,8,22 **90**:7
**paying** [4] **50**:7 **55**:25 **66**: 23 **77**:6
**payment** [9] **28**:19 **50**:17 **51**:13,17 **69**:10 **72**:13 **77**:4, 19 **81**:12
**payments** [1] **50**:19
**pays** [1] **16**:3
**pellucid** [1] **62**:19
**pendent** [3] **12**:19 **17**:10 **61**:13
**pending** [1] **17**:13
**Penn** [1] **40**:24
**people** [3] **5**:25 **15**:14 **56**: 15
**perfect** [1] **53**:24
**perfectly** [1] **23**:22
**perhaps** [4] **9**:11 **10**:12 **19**: 10 **85**:17
**period** [3] **86**:2 **87**:6,7
**permanent** [1] **36**:19

**person** [6] **24**:19 **51**:9 **69**:3 **70**:8,20 **86**:2
**person's** [1] **47**:4
**Petitioner** [1] **74**:10
**Petitioners** [12] **1**:4,19 **2**:4, 14 **3**:8 **39**:2,4,22,24 **40**:5, 12 **87**:21
**Petitioners'** [1] **41**:2
**physical** [1] **41**:25
**place** [1] **59**:21
**plaintiff** [3] **25**:4 **31**:5 **37**: 14
**plaintiffs** [3] **12**:4 **44**:22 **83**: 23
**plaintiffs'** [1] **6**:9
**plead** [1] **62**:8
**pleaded** [1] **41**:5
**pleading** [2] **6**:7,19
**pleadings** [2] **62**:18 **63**:1
**pleads** [4] **7**:14 **13**:7,9 **88**:4
**please** [4] **3**:10 **38**:18 **55**: 11 **68**:19
**pleases** [1] **27**:18
**pled** [2] **4**:12 **61**:4
**plural** [1] **60**:8
**plus** [4] **74**:11,21,21 **81**:8
**point** [20] **9**:19 **13**:17 **15**:25 **17**:5 **21**:20 **22**:16 **34**:17 **40**: 17 **41**:6,23 **46**:17 **50**:22 **62**: 4 **67**:20 **69**:16 **71**:23 **72**:1, 1 **75**:13 **78**:25
**pointed** [6] **24**:5 **32**:23 **70**: 7 **75**:2 **82**:25 **89**:19
**points** [3] **30**:7 **32**:14 **67**:11
**policy** [1] **28**:23
**poor** [1] **90**:1
**portion** [1] **72**:1
**position** [7] **17**:17 **80**:12, 14,14 **85**:7,12 **86**:18
**possibility** [1] **66**:6
**posture** [1] **87**:25
**power** [3] **29**:7 **39**:17 **55**:12
**powers** [4] **14**:6,15 **23**:11 **56**:18
**precedent** [1] **70**:23
**precedents** [1] **5**:3
**precedes** [1] **24**:18
**preceding** [1] **70**:6
**precisely** [2] **54**:7 **68**:3
**precondition** [1] **21**:3
**preliminary** [1] **86**:3
**premise** [1] **58**:9
**premised** [1] **56**:18
**premises** [1] **56**:12
**prerogative** [3] **7**:9 **51**:4, 11
**present** [3] **25**:16,17 **66**:6
**Presented** [5] **3**:11 **6**:11 **16**:8 **23**:20 **33**:17
**presentment** [1] **70**:21
**pressing** [1] **12**:2
**presupposed** [1] **70**:1
**pretty** [2] **8**:6 **16**:11
**prevent** [2] **5**:25 **86**:4

**prevented** [1] 32:18
**preventing** [2] 69:19 85:25
**prevents** [1] 88:19
**primary** [1] 5:15
**principles** [4] 29:23 30:1 59:3,4
**private** [7] 8:11,15 19:21 24:21 39:12 53:13 76:5
**pro** [1] 79:2
**probably** [2] 9:6 27:3
**problem** [5] 5:15 9:2 13:12, 15 41:5
**problems** [2] 6:19,19
**procedural** [5] 22:16 32:3 40:10 83:1 87:25
**procedure** [1] 40:8
**proceed** [6] 32:25 45:16 46:7,8,10 71:19
**proceeding** [2] 52:12 58: 13
**proceedings** [2] 83:19 84: 7
**Process** [16] 24:17,20 25:3 29:22 41:13 54:12 61:16 70:9,11,13,15,16 78:19 85: 24 86:1 87:8
**prohibited** [1] 72:10
**prohibition** [4] 70:9 76:10 79:10 82:14
**prohibitory** [2] 69:8 79:2
**promised** [1] 50:11
**proper** [1] 87:10
**property** [45] 3:22 5:8 7:18 9:8 16:25 21:5,10 24:20, 21 25:15 29:21 30:2 32:7, 9 35:6 36:16,25 38:4,20 47:4,17 51:2,3,6,7 53:6 55: 10,25 63:14 69:3,4,6,13 70: 8 72:24 73:8 76:5,14 77:5 81:1 85:13,15,16 89:25 90: 10
**protective** [1] 38:22
**provide** [15] 8:4 17:1 21:21 22:17 26:9 39:9 49:1 50: 12 54:14 57:12,25,25 79: 23 82:15 88:23
**provided** [4] 11:22 75:7,21 87:15
**provides** [13] 4:6 18:21,23 21:3 34:3 52:14 65:19 74: 6,8 75:5 76:19 83:14 84: 19
**providing** [2] 20:5 28:1
**provision** [8] 3:13 75:10, 23 76:18 77:8 78:3,7 81: 15
**provisions** [1] 68:25
**public** [5] 24:22 67:25 69:4 76:5 77:5
**purposes** [1] 22:1
**pursue** [2] 12:23 42:19
**pursuing** [1] 12:14
**put** [3] 37:19 44:24 45:2
**putative** [2] 44:21 45:12

**putting** [1] 63:10

## Q

**qualifications** [2] 27:7,11
**quarrel** [3] 57:24 59:6 66:9
**quarreling** [1] 58:23
**Question** [33] 3:11 5:18,19 6:10,21 8:5 9:7 12:12 15: 11 16:7 17:16 21:14,15,19 23:20 28:18,24 31:20 33: 16,17 35:5 42:17 48:14 57: 8 65:18 69:18,25 71:13 72: 3 79:15 82:23 86:7 87:24
**questions** [5] 5:5 40:14 57: 1 82:2 90:12
**quickly** [1] 67:20
**Quincy** [1] 29:18
**quite** [2] 8:25 24:16
**quote** [2] 39:16,20
**quotes** [1] 41:22

## R

**Railroad** [3] 29:18 51:8 69: 17
**raised** [1] 82:21
**rare** [1] 30:8
**rarely** [1] 30:3
**ratification** [2] 16:19 40:4
**ratified** [2] 7:24,25
**ratifying** [1] 8:8
**read** [13] 16:9 24:23 25:2 46:17,19 52:9 54:16 57:23 68:3 75:11 80:22 83:5 84: 23
**reading** [2] 20:14,15
**real** [1] 88:17
**realize** [1] 53:24
**really** [6] 12:13 51:8 52:5 55:6 69:18 72:2
**rearguing** [1] 71:23
**reason** [5] 4:20 6:15,16 16: 3 45:4
**reasonably** [2] 75:11,23
**reasons** [5] 39:7 44:19 55: 15 72:3,6
**REBUTTAL** [4] 2:12 82:24 87:19,20
**receive** [3] 27:21 29:21 30: 1
**recent** [5] 4:18 42:7 59:22 69:15,15
**recently** [1] 14:13
**recognize** [4] 7:7,10 27:8, 12
**recognized** [3] 4:11,22 19: 19
**recognizing** [1] 40:2
**record** [1] 35:6
**recover** [2] 71:17 75:22
**rectify** [1] 37:13
**referring** [1] 79:18
**refuse** [2] 31:9 40:12
**refused** [1] 27:3
**refuses** [1] 85:14

**regulation** [1] 73:21
**regulatory** [2] 7:8 73:21
**Rehnquist** [3] 29:2,4 71:9
**reimbursed** [1] 85:18
**reimpose** [1] 5:23
**reiterated** [1] 21:7
**reject** [1] 4:13
**rejected** [5] 46:16 71:9,24 72:5 73:23
**rejecting** [1] 72:20
**rejects** [1] 42:3
**relation** [1] 90:1
**relatively** [2] 30:7 69:15
**relegate** [1] 89:25
**relied** [1] 75:11
**relief** [13] 6:12 7:13 16:18 20:19 46:22 48:4 49:17,21, 23 52:11 53:23,24 57:10
**relying** [4] 74:13 84:11,12, 14
**remains** [2] 6:21 61:13
**remand** [5] 17:7 32:21 33: 3,13 85:1
**remanded** [4] 33:16 65:5 83:18 84:6
**remedial** [3] 9:17 79:17,19
**remedied** [1] 11:24
**remedies** [3] 20:17 48:1 67:3
**remedy** [47] 3:18 4:7,9 5: 21 6:15,16,23,25 10:16,17, 19 13:14 14:22 16:16 19:8, 14 20:6,7,21,23,24 24:11, 13 25:18 27:2 28:24 29:6 31:16 32:1,2 37:1,2 39:21 48:15,19 49:1 53:16 56:7 72:23 76:20,20 79:21,23 87:10,10,12,15
**remember** [2] 47:24 87:24
**remembering** [1] 29:16
**removal** [3] 12:11 13:2 45: 2
**remove** [5] 30:8 31:19 43: 10 44:18 46:9
**removed** [8] 6:19 12:9 18: 6 23:25 44:15 64:2,19,20
**removing** [1] 32:4
**render** [1] 82:15
**rent** [2] 35:11 37:24
**reorganization** [1] 69:17
**repeat** [1] 78:22
**repeated** [1] 30:24
**reply** [1] 5:6
**represented** [2] 60:11 84: 18
**representing** [1] 80:17
**require** [6] 24:11 28:19 29: 9 43:5 82:12 88:25
**required** [4] 11:17 16:16 21:4 83:25
**requirement** [1] 26:12
**requirements** [1] 6:7
**requires** [4] 27:13 52:10, 11 84:3

**resist** [2] 65:9,11
**resisted** [1] 61:7
**resolve** [3] 12:12 40:24 60: 7
**resolved** [2] 3:12 18:13
**resolves** [1] 45:9
**resort** [3] 5:11 89:11,15
**respect** [5] 18:3 24:24 46: 18 73:23 82:9
**respecting** [1] 39:18
**Respondent** [7] 1:7,21,25 2:7,11 38:16 68:17
**response** [1] 85:8
**responses** [1] 12:25
**rest** [2] 72:20 90:13
**retain** [1] 39:16
**return** [1] 27:1
**reversal** [2] 30:22 88:14
**reversed** [1] 22:11
**review** [1] 64:25
**RICHARD** [1] 1:3
**Richmond** [1] 72:16
**rights** [23] 12:22 22:10 28: 10,12,14 30:11,17 31:6,10 33:19,22 35:2 39:2 43:5 45:6,7 49:12 50:14 72:24 87:13 89:25 90:2,10
**rise** [2] 23:17 25:15
**ROBERT** [5] 1:18 2:3,13 3: 7 87:20
**ROBERTS** [46] 3:3 33:10 34:6 35:9,17,20 36:4,7 38: 7,14 41:21 42:9,14,21,25 43:4,18,22 44:14 45:15 46: 5,15 55:18,22 56:5 67:12, 16 68:5,8,14 70:25 71:3,22 72:14,18 74:1 79:13 80:1, 4,7,10 81:25 85:3 86:14 87:17 90:14
**robust** [1] 15:15
**rogue** [6] 53:19 56:20 82:3, 13 85:8 88:16
**Ruckelshaus** [1] 69:16
**rule** [4] 7:2 31:23 73:13,18
**run** [1] 31:1
**runs** [2] 8:11 34:18
**rush** [1] 50:9

## S

**same** [15] 4:10,12 28:9 46: 12 60:18 68:3 70:4,19 76: 11,11 77:22 78:19 79:4,5 85:22
**San** [1] 34:20
**satisfies** [1] 40:10
**saying** [26] 6:14 14:5 16:25 19:7 21:24 23:11 25:12,14 27:19 32:6 33:4 34:18 36: 2 46:20 49:19 55:6 59:5,9 60:23 64:22 65:2,18 71:15 74:11 81:8 85:16
**says** [33] 6:24 7:11,17 10:7 13:3 18:17 23:2 30:16 34: 13 39:9,10 50:13 51:23 52:

9 53:10,22 54:4,5 55:17 56:9 59:25 63:16 69:2 70: 7,20 72:22 74:10 77:4 79: 17,22 83:13
**scenario** [2] 54:7 55:16
**schemes** [1] 82:7
**Schrock** [1] 14:14
**scope** [5] 17:15 20:24 30: 11,13 31:7
**Scott** [1] 4:19
**searched** [1] 48:11
**second** [3] 45:4 82:23 83:6
**Section** [9] 5:23 30:21 44: 7,11 45:22 54:4,8 55:11 63:12
**see** [10] 7:22,25 14:1 23:15 33:9 39:23 59:21 62:22,22 79:7
**seek** [2] 37:14 64:24
**seeking** [3] 25:11,11 37:14
**seem** [2] 5:10 71:14
**seems** [5] 9:16 22:21 23:6 64:4 71:13
**seizing** [3] 26:3,4,7
**seizure** [1] 85:20
**self-executing** [1] 4:10
**self-incrimination** [1] 79: 4
**self-interest** [2] 56:15,19
**sell** [1] 51:9
**seller** [1] 38:1
**semantics** [1] 81:1
**sense** [2] 20:4 28:1
**separate** [2] 19:7 44:20
**separated** [1] 56:18
**seriously** [3] 13:25 56:10, 11
**set** [1] 15:18
**shall** [7] 24:19,21 69:3,4 70: 8,20 76:4
**shape** [1] 6:14
**shooting** [1] 67:5
**shouldn't** [2] 82:3,4
**shows** [1] 35:4
**shut** [1] 55:6
**side** [1] 7:2
**signed** [1] 16:2
**similar** [2] 19:5 24:16
**similarly** [1] 27:17
**simplest** [1] 19:13
**simply** [2] 32:5 40:12
**Since** [1] 43:16
**single** [2] 44:25 45:1
**sitting** [1] 14:5
**situations** [1] 70:1
**small** [1] 17:5
**so-called** [1] 73:19
**sold** [1] 38:1
**Solicitor** [2] 1:20,22
**solution** [1] 85:9
**somebody** [1] 70:24
**somebody's** [1] 48:11
**somehow** [2] 40:9 74:8
**someone** [3] 19:15 37:24

45:25

**someplace** [1] **52**:2

**sometimes** [2] **15**:18 **73**: 15

**soon** [1] **46**:9

**sorry** [9] **55**:21,22 **57**:5 **58**: 5 **62**:1,2 **79**:12 **80**:6 **81**:24

**sort** [11] **20**:9 **43**:11 **49**:25 **50**:24 **52**:11 **54**:12,14,19 **58**:14,14 **89**:20

**SOTOMAYOR** [36] **17**:4,12, 21 **18**:9,19 **19**:2,6 **21**:24 **38**:8 **41**:20 **62**:1,4,7,15,25 **63**:4,7,10,16,20,25 **64**:4,18 **65**:3,12 **68**:9 **80**:12,16,23, 25 **81**:6,11,18,21,23 **82**:25

**Sotomayor's** [1] **21**:19

**sought** [3] **24**:1 **33**:2 **88**:9

**sounds** [2] **28**:6 **66**:25

**source** [2] **24**:6,7

**South** [1] **88**:22

**sovereign** [5] **15**:7,10 **29**:9 **76**:23 **87**:4

**speaking** [2] **20**:6 **37**:22

**speaks** [3] **73**:2,6 **82**:24

**special** [1] **33**:24

**specifically** [3] **23**:8 **29**:19 **89**:19

**squarely** [1] **30**:23

**squares** [1] **25**:24

**St** [3] **26**:1,8 **89**:5

**standard** [3] **75**:9,25 **78**:9

**stands** [1] **21**:16

**start** [1] **40**:2

**started** [1] **17**:23

**state** [97] **4**:2,14 **8**:19 **10**:25 **11**:5,9 **12**:13,20 **13**:7,20 **15**:2,18,21 **17**:13,23,25 **22**: 3,17,18 **23**:3,8,10,22,24 **24**: 4,13 **26**:22 **28**:16 **29**:9,10 **30**:3,8,16 **31**:2,3 **32**:19 **33**: 5,16 **34**:9,11 **35**:1 **40**:2 **43**: 6,9,15 **44**:1,4 **45**:17 **46**:7, 12 **47**:3,5 **48**:20,23 **49**:1,11 **51**:2,7,9,10 **53**:11,12,14,19, 22 **54**:5,13 **55**:6 **56**:20 **57**: 7 **58**:12,15 **59**:17 **60**:11 **61**: 21 **62**:22 **63**:2,7 **64**:10 **66**: 22 **82**:3,13 **83**:3,21 **84**:12, 13,24 **85**:8,13 **86**:19,24,25 **87**:14 **88**:16,18,18,20

**state's** [1] **16**:2

**statement** [2] **27**:1 **43**:1

**STATES** [24] **1**:1,15,24 **2**: 10 **15**:24 **29**:17 **39**:19 **40**:2 **44**:6 **45**:22 **51**:20 **53**:21 **56**: 1,10 **68**:16,21,24 **72**:9 **77**:1 **82**:6 **85**:11,13 **88**:23 **89**:13

**States'** [1] **18**:25

**status** [1] **90**:1

**statute** [17] **15**:7,12,12,19 **69**:19 **75**:17,18 **76**:4,8,16 **77**:3,17,18,22 **78**:7 **81**:9,17

**statutes** [1] **4**:25

**staying** [1] **32**:22

**step** [1] **64**:23

**still** [11] **22**:11 **41**:10,11 **52**: 19 **58**:14 **61**:15,16 **83**:9,22, 24 **84**:9

**stop** [4] **26**:6 **30**:17 **81**:2,4

**stopping** [1] **34**:24

**stratum** [1] **28**:11

**structure** [1] **82**:5

**subject** [1] **28**:7

**submitted** [2] **90**:16,18

**substance** [1] **40**:8

**substantive** [14] **4**:7,8 **18**: 11,21 **22**:12 **39**:2 **42**:17 **44**: 8 **46**:21,25 **52**:11 **54**:18 **75**: 10 **84**:13

**successfully** [1] **24**:2

**sue** [14] **3**:23 **9**:9 **20**:19 **27**: 5 **28**:2 **44**:12 **45**:21 **51**:1, 16,16 **62**:10 **66**:18 **75**:7 **89**: 7

**suffer** [1] **12**:5

**sufficient** [1] **62**:23

**suggestion** [1] **80**:19

**suing** [1] **64**:1

**suit** [7] **9**:11,12 **17**:13 **49**:14, 22,23 **74**:18

**Summarizing** [1] **63**:20

**supplies** [1] **26**:3

**supplying** [1] **8**:1

**support** [1] **16**:2

**supporting** [3] **1**:24 **2**:11 **68**:17

**suppose** [7] **15**:5 **34**:8 **36**: 10 **49**:10 **52**:4 **76**:1,2

**supposed** [1] **47**:21

**supposedly** [1] **90**:7

**SUPREME** [11] **1**:1,14 **7**:3, 5 **14**:12 **26**:15,16,20 **40**:18 **59**:23 **88**:7

**surely** [1] **90**:8

**surprised** [1] **12**:10

**switch** [3] **64**:8,16,17

**system** [1] **56**:18

## T

**takings** [26] **3**:25 **4**:3,9,15 **6**:7 **7**:8 **8**:2 **16**:4 **17**:16 **22**: 18 **24**:13,16 **26**:2 **30**:5 **32**: 25 **36**:21 **38**:24 **39**:5,10 **40**: 12 **52**:16 **60**:7 **74**:6 **76**:2 **83**:2 **89**:19

**talked** [1] **25**:25

**teach** [1] **5**:4

**tells** [1] **24**:4

**temporary** [15] **17**:24 **34**: 21,25 **35**:10,15,16 **36**:15, 20 **37**:4,5,20 **73**:19 **85**:19, 23 **86**:20

**terms** [6] **10**:6 **73**:3,6,6 **75**: 4,4

**testimony** [1] **37**:22

**Tewksbury** [1] **26**:19

**TEXAS** [113] **1**:6,20 **3**:5 **8**:

16

**Tucker** [27] **4**:5,6,9 **26**:1,8 **69**:21 **74**:5,6,17 **75**:3,8,9, 14,21,24 **77**:11,12,15 **78**:2, 3,8,8 **81**:8 **87**:11,14 **89**:5,7

**Tuesday** [1] **1**:11

**turns** [2] **31**:13 **71**:14

**two** [16] **11**:2,3 **12**:25 **19**:10 **21**:1 **22**:7 **42**:7 **44**:18 **46**: 16 **55**:23 **59**:14 **74**:8,20 **75**: 4 **82**:2 **83**:2

**type** [1] **67**:3

**types** [1] **45**:9

## U

**U.S** [1] **63**:17

**ultimately** [2] **28**:21 **36**:16

**uncompensated** [2] **34**: 21,25

**under** [68] **4**:4 **7**:15 **9**:22 **10**: 25 **12**:18 **13**:4,9 **14**:11,22 **15**:17 **16**:4 **17**:7,11 **19**:25 **22**:9 **30**:12,17,21 **31**:6,8,9, 10 **33**:15,19,22 **38**:23,24 **39**:5 **40**:22,23,24 **41**:8,11, 17 **42**:19 **43**:8 **44**:16 **45**:7, 16,17,17,22,23 **46**:10,14 **60**:7 **62**:10,22 **64**:6,14 **65**: 6,7 **68**:23 **69**:21 **75**:5,7 **77**: 10,15 **78**:2 **83**:3,4,7,21 **86**: 19 **88**:3,4,24 **89**:7

**underlying** [2] **27**:19,20

**understand** [20] **4**:15 **9**:7 **12**:1 **19**:13 **20**:3,18 **22**:16 **23**:21 **32**:16 **33**:6 **37**:18 **51**: 17 **59**:25 **61**:14 **66**:2 **73**:10 **74**:14 **77**:3 **88**:25 **89**:2

**understanding** [6] **9**:13 **26**:5 **66**:24 **74**:4 **89**:3,24

**understood** [8] **10**:3,11,15 **21**:20 **25**:21 **76**:16 **77**:11 **87**:25

**undertaken** [1] **70**:14

**UNITED** [15] **1**:1,14,24 **2**:10 **18**:25 **39**:19 **51**:20 **68**:16, 20,23 **72**:9 **77**:1 **85**:11,13 **89**:13

**universe** [1] **67**:2

**unlawful** [1] **69**:12

**unless** [1] **70**:21

**unlike** [1] **3**:13

**unqualified** [3] **27**:6,7,10

**until** [5] **8**:5 **40**:3 **73**:16 **87**: 11,13

**unusual** [1] **31**:18

**up** [1] **59**:14

**upend** [1] **4**:14

**upshot** [1] **32**:24

**useful** [1] **7**:4

**using** [2] **23**:11 **26**:23

**usual** [4] **48**:8 **49**:10,20,24

## V

**valid** [2] **23**:22 **36**:1

**value** [5] **32**:8 **37**:5,19,24 **38**:2

**vehicle** [1] **33**:19

**versus** [3] **3**:4 **69**:16 **72**:16

**view** [4] **25**:22 **28**:1 **42**:3 **74**: 5

**viewed** [1] **8**:9

**vigorously** [1] **61**:7

**vindicate** [7] **11**:6 **12**:21 **14**:4 **22**:10 **23**:13 **28**:3 **87**: 13

**vindicated** [3] **11**:10 **28**:14 **41**:3

**vindication** [1] **54**:20

**vine** [1] **8**:6

**violates** [1] **49**:11

**violating** [6] **47**:5,18 **48**:22 **49**:1 **50**:14 **54**:6

**violation** [15] **21**:15 **25**:4, 13 **47**:6,10,15 **48**:16,18 **54**: 13 **63**:11,17 **70**:3,12 **75**:12 **87**:8

**Virginia** [1] **1**:18

**vision** [1] **21**:6

**visions** [2] **9**:4 **21**:1

**vitiate** [2] **8**:2 **22**:18

**vitiating** [1] **21**:22

## W

**wait** [1] **54**:10

**waive** [2] **15**:6,10

**waived** [1] **29**:9

**wanted** [2] **41**:8 **64**:8

**wants** [3] **30**:11 **35**:2 **51**:7

**warrants** [1] **88**:13

**Washington** [2] **1**:10,23

**water** [1] **36**:12

**way** [27] **4**:14 **5**:9 **8**:2,9 **10**: 20 **16**:10 **19**:13 **28**:8 **36**:3, 11 **37**:10 **40**:7 **44**:24 **50**:22 **51**:20 **53**:11 **54**:17 **57**:23 **64**:23,24 **68**:4 **70**:19 **76**:17 **78**:19 **79**:4 **82**:18 **87**:13

**weak** [1] **28**:7

**welcome** [2] **5**:5 **40**:14

**whatever** [3] **66**:22 **81**:4 **86**:1

**whatnot** [1] **86**:20

**Whereupon** [1] **90**:17

**whether** [22] **5**:20,20 **6**:11, 21,22 **9**:5 **14**:20 **17**:24 **18**: 22 **22**:6 **28**:18,24 **36**:19 **39**: 11 **46**:2,4 **57**:9 **75**:6,9 **84**: 11,14 **86**:10

**whole** [2] **35**:21 **56**:17

**will** [5] **21**:11 **27**:3 **32**:21,25 **38**:19

**Williams** [3] **39**:15,25 **40**:9

**willing** [1] **37**:25

**wins** [1] **52**:19

**wishes** [1] **31**:3

**withdraw** [2] **56**:21 **82**:6

**within** [2] **35**:1 **67**:2

**without** [17] **24**:20,22 **32**:

19,25 **13**:14,20,22 **14**:2,3,5, 10,12,19,21 **15**:24 **16**:3 **17**: 7,11,16,18 **18**:11,12 **21**:21, 24,25 **22**:1,2,8,17,19,25,25 **23**:2,6,25 **27**:16 **30**:10,18, 19 **31**:15,17,22,23 **32**:2,18 **33**:3,16,21 **35**:4,7 **37**:4 **38**: 21,21,23,23 **40**:10,18,22 **41**:3,8,11,17 **42**:18,19,20 **43**:13 **44**:23,24,25 **45**:4 **52**: 14,14,19,20 **53**:2,6,7,10 **57**: 24 **58**:9,12,19,23 **59**:5,8,23 **60**:10 **61**:17,19,22 **62**:10, 12,16 **63**:12,22 **64**:1,6,13 **65**:6,19 **66**:10,22 **67**:23 **68**: 4 **83**:9,14,14 **84**:15 **88**:1,2, 7,8

**Texas's** [9] **13**:2 **23**:21 **24**: 4,9 **32**:11 **39**:3 **80**:13 **88**:5 **89**:24

**text** [8] **3**:12 **25**:24 **28**:25 **68**: 1 **69**:1 **72**:7 **78**:25 **79**:22

**theoretical** [1] **66**:5

**theory** [1] **71**:15

**there's** [35] **4**:20 **5**:20,21 **6**: 5,13 **8**:21 **10**:24 **11**:23 **12**: 11 **15**:15 **16**:17 **20**:22 **25**:3 **31**:4 **41**:10,11 **43**:10 **44**:7, 13,21 **46**:21 **47**:23 **48**:1 **49**: 4 **50**:16,16 **53**:14 **54**:17 **62**: 9 **64**:16 **69**:11 **70**:17 **71**:20 **83**:12 **87**:2

**therefore** [1] **46**:25

**They've** [3] **41**:17 **45**:24 **50**: 11

**thinking** [2] **22**:2 **53**:20

**thinks** [1] **85**:11

**THOMAS** [8] **5**:6 **36**:8 **40**: 15,20 **41**:1 **67**:17 **80**:8,9

**though** [7] **12**:2 **28**:10 **52**: 21 **58**:1 **59**:25 **67**:4,9

**three** [3] **19**:7,9 **75**:4

**throughout** [1] **8**:14

**thrust** [1] **56**:23

**tie** [1] **44**:6

**title** [1] **89**:15

**today** [2] **21**:11,17

**tomorrow** [2] **5**:22 **21**:12

**took** [5] **16**:24 **21**:23 **35**:20 **38**:3 **84**:1

**totally** [3] **28**:3 **33**:6 **64**:5

**Township** [1] **4**:19

**tradition** [2] **29**:1,13

**Treasury** [2] **72**:13 **87**:3

**trespass** [4] **9**:11,19 **10**:4 **14**:8

**trial** [2] **35**:4 **36**:18

**TRO** [1] **86**:3

**trouble** [1] **74**:4

**true** [9] **4**:25 **5**:2 **22**:8,25 **46**: 3 **52**:17 **70**:6 **85**:23 **88**:21

**trust** [2] **56**:9,10

**try** [1] **55**:14

**trying** [4] **20**:3 **23**:1 **33**:5 **54**:

25 **33**:18 **39**:25 **55**:25 **69**:5, 7 **70**:8,10,10,14 **73**:8 **76**:5, 14 **77**:5 **86**:1

**wondering** [1] **57**:4
**word** [1] **48**:19
**work** [5] **4**:15 **8**:25 **53**:25 **54**:2 **55**:15
**worry** [2] **82**:4,4
**worth** [2] **29**:15 **34**:14
**Wow** [1] **34**:13
**writ** [1] **26**:18
**write** [1] **29**:5
**writing** [1] **26**:8
**writings** [2] **89**:4 **90**:8
**written** [1] **70**:18
**wrongful** [1] **37**:13
**wrote** [4] **26**:1,11 **42**:10,12

## Y

**years** [3] **51**:21 **71**:4 **75**:1
**Yep** [2] **49**:13 **57**:16
**Young** [5] **6**:1 **25**:5,5,8 **67**:3

## Z

**zero** [2] **74**:20,21

Heritage Reporting Corporation

**without - zero**

Official

REPORTER'S CERTIFICATE

The Contractor hereby certifies that the attached pages represent an accurate transcription of electronic sound recording of the oral argument before the Supreme Court of the United States in the matter of Richard Devillier v. Texas, Docket No. 22-913, and that these pages constitute the original transcript of the proceedings for the records of the Court.


BY _____

Karen Brynteseon, Court Reporter

2. Third Amended Petition, case no. C-0929-12-F

CAUSE NO. <u>C-0929-12-F</u>

| | | |
|---|---|---|
| JOHNNY PARTAIN | § | IN THE 332 DISTRICT COURT |
| Plaintiff | § | |
| | § | OF HIDALGO COUNTY, TEXAS |
| VS. | § | |
| | § | |
| STATE OF TEXAS, and et al. | § | |
| Defendants | § | |

<u>THIRD AMENDED PETITION</u>

1.　　COMES NOW JOHNNY PARTAIN, Plaintiff in the above filed and numbered cause and files his *Third Amended Petition* and respectfully shows unto the Court as follows.

DISCOVERY

2.　　Plaintiff intends that discovery be conducted under Level 3.

PARTIES

A. Plaintiff, JOHNNY RAY PARTAIN, 7020 N 16th Street, McAllen, Texas 78504; partain@atlastechnologies.biz; 956-240-1821;

B. Defendant, STATE OF TEXAS, represented by Scot Graydon, Texas Office of Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711; scot.graydon@oag.texas.gov; 512-463-2120;

C. Defendant, HIDALGO COUNTY, TEXAS, represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539; josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

D. Defendant, CAMERON COUNTY, TEXAS, a local governmental entity, may be served with process by serving the present County Judge, or County Judge Eddie Trevino Jr. of said local governmental entity, at 1100 E. Monroe Street, Suite 218, Brownsville, Texas 78520;

E. Defendant, MCALLEN POLICE CHIEF VICTOR RODRIGUEZ, represented by Ysmael D. Fonseca, Guerra & Sabo, PLLC, 10213 N 10th St, McAllen, TX 78504; yfonseca@guerraleeds.com; (956) 383-4300;

F.  Defendant, CITY OF MCALLEN, TEXAS, a municipal corporation, represented by Ysmael D. Fonseca, Guerra & Sabo, PLLC, 10213 N 10th St, McAllen, TX 78504; yfonseca@guerraleeds.com; (956) 383-4300;

G.  Defendant, FARMERS INSURANCE, dba FIRE INSURANCE EXCHANGE, represented by Donean Surratt, Orgain Bell & Tucker, LLP, 470 Orleans Street, P.O. Box 1750, Beaumont, Texas 78704; djf@obt.com; 409-838-6412;

H.  Defendant, HIDALGO COUNTY SHERIFF/CONSTABLE JOSE EDUARDO GUERRA, HIDALGO COUNTY PRECINCT 4, represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539; josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

I.  Defendant, DEPUTY CONSTABLE CARLOS GONZALEZ, HIDALGO COUNTY PRECINCT 4, represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539; josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

J.  Defendant, JUSTICE OF THE PEACE HOMER JASSO SR., represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539; josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

K.  Defendant, DISTRICT JUDGE ALEX W. GABERT, represented by Benjamin L. Dower, P.O. Box 12548, Capitol Station, Austin, Texas 78711; Benjamin.Dower@texasattorneygeneral.gov; 512-465-4058;

L.  Defendant, DISTRICT JUDGE JOSE MANUEL BANALES, represented by Kelli Caitlin Fuqua, Texas Office of Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711; Kelli.fuqua@texasattorneygeneral.gov; 512-463-2120;

M.  Defendant, DISTRICT JUDGE ROBERT MAX BLACKMON, represented by Kelli Caitlin Fuqua, Texas Office of Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711; Kelli.fuqua@texasattorneygeneral.gov; 512-463-2120;

N.  Defendant, COUNTY JUDGE SERGIO VALDEZ, represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539; josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

O.  Defendant, DISTRICT ATTORNEY RENE GUERRA replaced by DISTRICT ATTORNEY RICARDO RODRIGUEZ, represented by Josephine Ramirez Solis, 100 E. Cano, First Floor,

Hidalgo County Courthouse Annex III, Edinburg, Texas 78539;

josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

P.  Defendant, COUNTY JUDGE RODOLFO GONZALEZ represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539;

Q.  Defendant, HIDALOG COUNTY SHERIFF GUADALUPE "LUPE" TREVIÑO, officially and personally, represented by Josephine Ramirez Solis, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539; josephine.ramirez@da.co.hidalgo.tx.us; 956-292-7609;

R.  Defendant, BBVA USA, INC., Waterway Plaza II 10001 Woodloch Forest The Woodlands, Texas, 77380; represented by Charles C. Murray, 818 W. Pecan Blvd., McAllen, Texas 78501; ccmurray@atlashall.com; 956-682-5501

S.  Defendant, COMPASS BANK aka BBVA, 15 South 20th Street, Birmingham, Alabama, 35233; represented by Charles C. Murray, 818 W. Pecan Blvd., McAllen, Texas 78501; ccmurray@atlashall.com; 956-682-5501.

## III. JURISDICTION

3.      This Court has general jurisdictional authority under Article V, § 8 of the Texas Constitution and Tex. Gov't Code § 24.011 is properly invoked by the filing of a Tex.Civ.Prac. & Rem.Code §§ 37.004(a), 37.006 for declaratory judgment.  This Court has concurrent jurisdiction over 42 USC § 1983, Civil Action for Deprivation of Rights, and 18 U.S.C. 1964, Racketeer Influenced Corrupt Organization, pursuant to Article VI, Clause 2 of the United States Constitution.  *See Tafflin v. Levitt, 493 U.S. 455 (1990).*  This Court also has jurisdiction over inverse condemnation claims through a waiver of sovereign immunity per Texas Constitution Art. 1 Sec 17.

## IV. FACTS[1]

---

[1] Appendix references refer to <u>151016 Second Amended Petition Optimized Vol 2</u> file on 11/03/2015 in the above numbered and styled case.

4.     Johnny Partain, Plaintiff herein, was a large judgment creditor in Cause CL-29,530-[A] in Hidalgo County Court No. 1 pursuant to a *Final Judgment* dated July 24, 2002, for approximately $453,000 (App. 1, Final Judgment; App. 2. Abstract of Judgment). The final judgment was later modified to a *Third Amended Judgment* (*App. 4, Third Amended Judgment*) on February 23, 2003, through Judge Rodolfo Gonzalez: Judge Gonzalez allegedly reestablished the Court's plenary power after a writ of execution had been issued in CL-29,530-[A] on a TRCP 306 motion that the judgment debtors did not have notice of the Final Judgment (*see App. 3, Attached Letter of Debtor's attorney describing fraudulent conveyance plan and acknowledging that the judge would make a determination by July 22, 2002*) although the judge gave warning at hearing that he was signing the judgment and the judgement itself shows that it was sent to the defendants. Compass Bank originally expressed to the judge that they wanted to protect the defendants and Judge Gonzalez initially amended Partain's judgment three time, taking awards and claims from the original judgment. Judge Gonzalez expressed to Partain that it, [sic] "should be accepted as a business loss." Partain made a complaint and petitioned for mandamus from the 13th Court of Appeals to restrain the judge. The 13th Court of Appeals using its "legal discretion" refused to restrain the judge. Judge Gonzalez again allegedly amended the final judgment, to make Partain a judgment debtor, approximately 8 years later when Compass Bank offered to release a lien in exchange for protection from Partain's RICO lawsuits.

5.     Compass Bank also assisted the judgment debtors to avoid their debt by encumbering or conveying all their assets to a corporation (*App. 5, Special Warranty Deed*) per debtor attorney's written instruction and debtor's neighbor Paul Moxley, President of Compass Bank, who approved all their paperwork. Global Limo, Inc. (aka Atlas Transportation, Inc.) was originally a scam designed by debtors to control and to "fraudulently convey" assets away from satisfaction of judgment in case no. CL-29,530-A. The debtors hid all their non-exempt assets in the corporation and Compass Bank cross-collaterized its assets as planned through their close relationship. Compass Bank refused to abide by court orders and specific requests from Partain as the bank liquidated and transferred monies from existing business accounts to new accounts for the debtors on basis of another illegal order issued in Judge Gonzalez' court which had been entered with the "forged" signature of the judge on or around February 2, 2005: Judge Gonzalez refused to void the illegal order, but did reverse it

after allowing the damage to be done. Partain was deprived his property interests and due process. One of these accounts established under Kathleen Maples was used to transfer FEMA funds earned by Global Limo, Inc. during hurricane Rita, for approximately $240,000, away from the corporation without report to the debtors' bankruptcy or its owner, Johnny Partain.  Compass Bank also fabricated new written agreements with the debtors to control Global Limo, Inc. after they received certified turnover orders from County Court no. 1 and notice from Partain that the debtors had no interests in his corporation.

6.      Partain was able to obtain a turnover order on January 27, 2005, for all interests in the corporation, Global Limo, Inc. in an attempt to salvage any asset value and to offset damages through the corporation's operation.  *App. 6, Order (Original Turnover Order), Case no. CL-29,530-A, dated 1/27/2005*.  Partain purchased a condo from the corporation on Jan. 27, 2005, and filed a Special Warranty Deed with the Hidalgo County Clerk approximately one week prior to Compass Bank filing a Deed of Trust on the same property.  *App. 7. Special Warranty Deed, dated 1/27/2005*.  The judgment debtors then filed a Title 11 bankruptcy (immediately after purchasing a ranch house) on or about February 17, 2005, styled In Re: James H. Maples and Virginia Kathleen Maples, case no. 05-bk-70128. They also filed a bankruptcy adversary, case no. 05-bk-07009, Maples v. Partain, with the assistance of Compass Bank's lawyers under the main bankruptcy case to seize control of Global Limo, Inc.  During the pendency of the bankruptcy court's seizure of the corporation, 23 people were killed in a bus fire pursuant to Compass Bank and the debtors exploitations of the corporation.  Thereafter, Partain received nearly a billion dollars in claims for wrongful death by the families of their victims.  Partain was enjoined from complaining or defending his corporation from its illegal operation through the efforts of Compass Bank and he was even threatened with contempt for raising the issue that the company wasn't even in bankruptcy and shouldn't be under the control of the court.

7.      The adversary case judge whom had seized Partain's corporation on Compass Bank's efforts and arguments did his best to intimidate Partain from raising any issues regarding the operation of the company.  The bankruptcy judge "avoided" the County Court's original Turnover Order and the condo's purchase by the Partain (which under bankruptcy law would have reverted title back to Global Limo, Inc. and reimbursed Mr. Partain his payment) placing the corporation and condo into the estate of the debtors so they could pay for their

bankruptcy and reimburse Compass Bank. *App. 8, Judgment, Maples v. Partain, Case no. 05-bk-07009, dated 4/27/2006*:  Note that the Texas corporation Global Limo, Inc. was never in bankruptcy, although it was treated like an asset instead of a legal entity in the adversary case by the bankruptcy court to evade the corporation's legal rights for the benefit of Compass Bank, on Compass Bank's arguments to the bankruptcy court that the company was of interest to all creditors.  Partain's standing was removed and he was not allowed to sue Compass Bank in a counter-claim, however it was ordered that [sic] "Partain's Third Amended Judgment issued by the Hidalgo County Court at Law No. 1 in case CL 29,530-A was excepted from any discharge.

8.      After the bankruptcy avoidance proceeding, Compass Bank returned to the main bankruptcy case and motioned the bankruptcy court to allow it to foreclose against Global Limo, Inc. and the condo since the debtors <u>actually had no interests in either</u> (an avoidance under bankruptcy requires an interest by bankruptcees that will add value to the estate). *App. 10, Texas State Bank's Motion For Relief From The Automatic Stay, Bankruptcy Case no. 05-bk-70128, dated 05/16/2006*.  Compass Bank obviously lied to the courts to achieve control over the interstate transportation company and its assets by claiming it had value that had to be shared by the bankruptcy creditors, and then after the bank had control Compass Bank represented that the company had no value to other creditors. Bankruptcy Judge Schmidt then allowed Compass Bank to foreclose against the condo but he didn't have jurisdiction to allow them to foreclose against Global Limo, Inc since it was not a party in bankruptcy.  *App. 9, Order Granting Texas State Bank's Motion For Relief from  The Automatic Stay, Bankruptcy Case no. 05-bk-70128, dated 08/24/2007*.

9.      The debtors' bankruptcy estate was dissolved on August 22, 2007 on approval of their plan to pay creditors, but the debtors later refused to pay any creditors, except Compass Bank. *App. 15, Creditor, Plaintiff's, Third Amended Complaint Of Debtors' Default Of Plan Payment, case no. 05-70128, date 3/14/2008; App. 16, Final Docket Report, case no. 05-70128*.  Bankruptcy court also refused to enforce the debtors' bankruptcy plan although Partain made multiple and constant complaints, and accordingly, Partain was directed by the bankruptcy court's to return to county courts to enforce his judgment since it was non-dischargeable and because he was a "super-creditor."

10.     On August 18, 2008, Hidalgo County No. 1 trial court entered *Turnover No. 5 (App. 11, Turnover Order No. 5, Case No. CL-29,530-A, dated 8/18/2008)* to assist Partain to collect his judgment. Partain used the turnover to recover his assets (a condominium identified in App. 7, Special Warranty Deed, January 27, 2005, and identified hereafter as the "real property") and the corporation, Global Limo, Inc. Partain then added Compass Bank as a party to a RICO complaint in federal case no. M-07-016 on January 23, 2009, but the case was dismissed for judicial immunity just prior to the amended petition being filed. Partain's complaint containing Compass Bank was also struck for not obtaining permission to amend his petition pursuant to a new FRCP rule that took effect after the filing of his amended petition. The dismissal and the striking of Partain's amended petition was pursued through the 5th Circuit which affirmed the original dismissal on basis immunity on July 28, 2010.

11.     On or about September 22, 2010, attorney Kelly McKinnis advised Judge Gonzalez that his clients could help pay off their judgment debt in case no. CL-29,530-A to Partain if the Court would "lean" on Compass Bank to release a lien against Partain's house. He proposed that the Court could use that credit to the debtors' advantage. Mr. McKinnis represented that Compass Bank was afraid of Partain's RICO (Racketeer Influenced Corrupt Organization) complaints against the bank, and that the bank would do "anything" to get away from his claim. *App. 67, Affidavit*. Judge Gonzalez asked Partain if he approved. Partain advised Judge Gonzalez that litigants do not come to a court asking for equity with "dirty hands", admitting to a crime, and then expecting the Court to continue the crime to pay off their debt with the creditor's assets. The lien that Mr. McKinnis spoke was an unenforceable lien taken against Partain's house to generate a debt whose partial value was laundered through Partain's company, Global Limo, Inc. without Partain's authorization, to an escrow account under a trust in north Texas for the cash benefit of the judgment debtors just 2 weeks before filing for bankruptcy to buy a ranch house (the ranch house was given to a debtor's lawyer to pay for criminal defense – debtor was convicted). *App. 81, Disbursement Authorization and Promissory Note (regardless of the documents' alleged dates, note that the documents were not file with the Hidalgo County Clerk's Office until much later, after Partain had already instructed the bank to put a hold on his corporate accounts and a week after Partain had already filed a deed with the Hidalgo County Clerk's Office for the same property).* Judge Gonzalez called Vicky Skaggs with the Atlas & Hall

LLP law firm who represented Compass Bank, and Compass Bank then released the $47,000 lien against Partain's real property on October 4, 2010, although Compass Bank was not a party to the suit. *App. 19, Release Of Lien, dated October 4, 2010.* Partain also spoke to Vicky Skaggs who confirmed that the judge had contacted her personally, before she talked to the bank.

12.    Partain continued to use legal process and self-help to recover the assets and records for his company. Many company assets were abandoned throughout the Gulf Coast from Texas to Louisiana, and unrecoverable since their locations and information was hidden. On January 5, 2011, Partain filed his third request for execution which was stayed by Judge Rudy Gonzalez. *App. 20, Request For Writ Of Execution, CL-29,530-A, 1/25/2011.* On February 2, 2011, Judge Gonzalez entered a void Order allegedly modifying the *Third Amended Judgment* and crediting $75,000 to the judgment Debtors for the Partain's recovery of his real property while at the same time making the Partain a judgment debtor for $14,120.26 plus any other costs. *App. 21, Order, Case no. CL-29,530-A, February 2, 2011.* Partain filed a petition for mandamus in the 13th Court of Appeals, case no. 13-11-00276-CV, complaining that Judge Gonzalez engaged in bank fraud, and was illegally attacking the orders of the court instead of enforcing them as required by law. Partain was deprived his property interests and due process. The 13th Court of Appeals again using their "legal discretion" refused to act and dismissed Partain's petition. Partain also appealed to the 13th Court of Appeals through case no. 13-11-00289-CV on May 3, 2011.

13.    Concurrently on or about May 13, 2011, and approximately three month after being credited $75,000 for Partain's real condo, a judgment debtor (deceased James Maples) and his family attorney, William McCarthy, perjured themselves by filing a petition to evict Partain's tenant Joe Guerrero from the Partain's real property arguing that they were landlords or owners[2] of the Partain's real property and that they had not been paid in approximately 3 years (since Partain had exercised *Turnover Order No. 5*). *App. 22,*

---

[2] James Maples sold the real property to Global Limo, Inc. in 2004, and Johnny Partain bought the real property from Global Limo, Inc. in 2005. The bankruptcy court avoided Partain's purchase from Global Limo, Inc., but never returned his considerations. The real property allegedly reverted back to the original owner, Global Limo, Inc., although Global Limo, Inc. was never in bankruptcy. Regardless, it was never disclosed by the 13th Court of Appeals, District Attorneys Office, Compass Bank, County Court no. 1, or the Justice of the Peace Homer Jasso how James Maples or his attorney came to be entitled or owners of the real property after having sold it in 2004.

*Plaintiff's Petition, Case no. JP2011-197, dated May 13, 2011, Plaintiff's Petition, case no. JP2011-197.* Joe Guerrero and Partain had a court enforced rental agreement through Hidalgo County Court No. 1, case no. CL-08-3320-A. *App. 23, Judgment, CL-08-3320-A, dated 2/03/2009, Order, case no. CL-08-3320-A.* Strangely, Partain was not allowed to contest the forcible detainer petition because Justice of the Peace Homer Jasso claimed that the Hidalgo County District Attorney's Office through District Attorney Rene Guerra advised him that Partain was not sued and that Partain was not allowed to participate in the detainer proceedings per the law since he was not sued. By this time a commander for the Hidalgo County Sheriffs Office warned Partain that his complaints of local corruption in his Congressional Campaign for US Congress, District 15, had "pissed off the power that be" and that they were going to retaliate. He advised Partain that he had become a hot topic subject at the Sheriffs Office. District Attorney Rene Guerra supported JP Jasso's default order and advised JP Jasso that there was no option available except for Partain to petition for a TRO since this was a civil matter only. Judge Jasso entered *Default Judgment* to take possession of the Partain's condo, although Partain was not named in the judgment: The Hidalgo County Tax Appraiser listed Partain as the certified owner. *App. 24, Default Judgment, Case no. JP2011-197, dated 6/03/2011; App. 25, Civil Docket, JP2011-197.* Partain attempted to file a criminal complaint at the District Attorney's Office, but Partain was refused. Instead, he was directed to file a complaint with McAllen Police or the Sheriff's Office. McAllen Police refused to document a complaint on excuse that Hidalgo County corruption was outside their jurisdiction. The Hidalgo County Sheriff's Office declined to act on Partain's complaint stating that they lacked jurisdiction. *App. 26, Signed Certified Mail Receipts to District Attorney Rene Guerra, McAllen Chief of Police Victor Rodriguez, McAllen Mayor Richard Cortez, and Letter Complaining of Fraud, dated 6/15/2011; App. 27, Letter to Hidalgo County Sheriff's Office, dated 5/25/2011; App. 78, Hidalgo County Sheriff's Office Incident Report.* The City of McAllen through Police Chief Victor Rodriguez and District Attorney Rene Guerra used their "legal discretion" to assist the seizure of Partain's real property and to threaten Partain with charges for criminal trespassing. Partain filed a complaint against JP Homer Jasso with the State Commission on Judicial Conduct, which went nowhere.

14.     Concurrently, Partain's case no. CL-29,530-A became a cause without a judge (when Judge Rudy Gonzalez recused himself sua sponte), unable to enforce it's orders, so on June 6, 2011, Administrative Judge Orlando Olvera assigned retired District Judge Alex Gabert to county court case no. CL-29,530-A, and ordered Judge Gabert authority [sic] "until the plenary power has expired."   However, the plenary power of the case had already expired in 2002, and Partain challenged Judge Gabert's assignment for lack of jurisdiction (particularly over a contempt proceedings against the debtors), requesting Administrative Judge J. Rolando Olvera to reassign Judge Gabert and requesting Judge Gabert to seek reassignment with the necessary authority to enforce the decrees of the court.  Partain made complaints to the 5th Administrative Judicial Region whom ignored Partain.  Then on November 1, 2011, recused Judge Rudy Gonzalez transferred case no. CL-29,530-A to Hidalgo County Court no. 7 without any apparent authority and the county clerk's changed the case no. to CL-29,530-[G] - while the case was purportedly under the assignment of Judge Gabert.  *App. 28, CL-29,530-[H] Docket Report*.  Judge Alex Gabert continued to administer the case in County Court No. 7, although he refused to acknowledge the case's final *Third Amended Judgment*.  The 13th Court of Appeals abated and dismissed appeals case no. 13-11-00289-CV since it was unclear if Judge Gonzalez's Order (*App. 21*) was a final order and because Partain and debtors made a Rule 11 agreement to allow the Court to enforce the existing final judgment of the Court.  Instead, Judge Gabert immediately broke the agreement and allegedly entered another Final Judgment, dated Mar. 16, 2012, making Partain a debtor for almost $180,000 and taking Partain's real property and giving it to the judgment debtors although the Partain had not been sued.  *App. 29, Final Judgment, Case no. CL-29,530-A, dated 3/16/2012*.  William McCarthy then requested a writ of possession and the judgment debtors were awarded an order for possession.  *Appendix 25, Civil Docket, JP2011-197*.  Partain was deprived his property rights and due process.

15.     As advised by DA Rene Guerra, Partain filed a petition for a temporary restraining order and injunctive relief in Hidalgo County District Court case no. C-0929-12-F, on or about April 5, 2012, complaining of abuse of process and interference with an existing contract (*App. 69*) which he supported through a rich showing of certified evidence (*see App. 11, 43*) documenting his authority and rights to his real property (being used as a Congressional Campaign Headquarters at the time since his renters had been personally

harassed) (*App. 76*) at a preliminary injunction hearing held in the 332nd District Court on April 16, 2012. Partain demonstrated a pattern of fraud, mortal intimidation, and injuries by debtors. Partain demonstrated a lack of jurisdiction by JP Homer Jasso Sr., and Sheriff/Constable Jose Eduardo Guerra so strong that the issue was not further argued or defended. *App. 11, Turnover Order No. 5; App. 69, Reporter's Record, 332nd District Court, April 16, 2012*. Partain sought an injunction and a declaratory judgment regarding the justice court's lack of jurisdiction in case no. JP2011-197, but Partain was denied relief since the judgment debtors claimed they finally owned Partain's real property through Judge Gabert's *Final Judgment* dated March 16, 2012. *App 29, Final Judgment (Void)*. The District Court put very heavy weight on Judge Gabert's Final Judgment and accused Partain of collaterally attacking it. *App. 30, Temporary Injunction Hearing (Transcript), C-0929-12-F, dated 4/16/2012*. District Judge Mario Ramirez dissolved the temporary restraining order and refused Partain any relief or protection. *App. 31, Order Denying Injunctive Relief And Dissolving The Temporary Restraining Order, C-0929-12-F, dated 05/02/2012*. Partain was deprived his property interests by District Judge Mario Ramirez and District Judge Alex Gabert.

16. Sheriff/Constable Guerra claims he spoke to the District Court which authorized him to stage an armed assault, with a SWAT team, against Partain at his house (his congressional campaign headquarters) - at almost exactly the same time as the Partain's scheduled televised campaign forum against the incumbent US Congressman, Ruben Hinojosa. On May 7, 2012, Partain was scheduled to participate in the only televised forum to include all congressional candidates for the United States House of Representatives, but Sheriff/Constable Guerra and Deputy Constable Carlos Gonzalez assaulted Partain's property, breaking locks off outside electrical panels and turning off the power and water. Partain was able to convince the power company to send out a technician nearly 6 hours later to instruct the police that they were breaking the law by turning off power and water, and Partain's power and water was restored about 2 hours after that. Deputy Constable Carlos Gonzalez represented to McAllen Police that he had an order from this District Court ordering Partain to vacate his home - but that order does not exist. *App. 79, Police Report, May 7, 2012*. Deputy Constable Gonzalez also lied to McAllen Police using a standard law enforcement cliche that Partain threatened him with a pistol. The City of McAllen dispatched additional SWAT police with rifles and body

armor around Partain's real property, partial closing Nolana Street in McAllen, Texas, although Partain never made a mention of or even displayed any specific kind of weapons he might have had on his property. Hidalgo County Constables represented to the news reporters that Partain was under house arrest, and thereafter surrounded and threatened Partain with arrest and criminal charges for three [3] days. On Wednesday, May 9, 2012, a reporter for KGBT news called the Sheriff's office on behalf of Partain to confirm that there was no arrest warrant for his person and verified with the Constable that there were no actual impending criminal charges against Partain: The Constables finally withdrew on Wednesday quoting to the reporter that they did not have a legal means to enter the premises since Partain owned it. On Friday, May 11, 2012, Sheriff/Constable Guerra with several deputies and McAllen Police broke Partain's front and rear entry doors down, breaking windows and absconding away with Partain's business assets and records, vehicle titles, furnishings, campaign materials and records, sign making equipment, and other miscellaneous items while Partain was working. They seized Partain's home and still have possession of his assets as of the date of the writing of this Third Amended Petition. Constable Deputies and McAllen Police directly threatened Partain that if he attempted to take repossession of his property that he would be arrested for criminal trespassing, regardless of his perceived rights or duties under the law. McAllen Public Utilities further canceled Partain's water account and re-established it for actual trespassers against Partain's protest, claiming it was a city policy to provide water to anyone who requested it at any address.

17.     At the same time, Hidalgo County, Hidalgo County Drainage District #1 and McAllen Independent School District filed a tax suit in case no. T-1394-12, for approximately $700 in unpaid ad valorem tax accrued before Partain acquired possession of his property – mainly due to a justice court refusing to enforce its own orders for writs of possession in 2008 and 2009 requiring Partain to file an appeal in a county court in 2009. Partain paid all the property taxes on the property while he had possession of it, but no taxes have been paid since 2012 when Hidalgo County and the City of McAllen seized the property and destroyed its ability to generate income. The property has not been returned to Partain, nor has Partain been compensated his rents or injuries.

18.     Upon seizing of the property, Partain's original petition in case no. C-0929-12-F was effectively mooted and the status quo was changed by the District Court. Partain was forced

to continue his litigation in the 13th Court of Appeals by filing an appeal, case no. 13-12-00267-CV, on April 27, 2012, to complain of the "new" *Final Judgment* and to reestablish his rights to his real property.  The appeals case was lost for approximately one year.  Partain went to the Texas Legislature and lobbied for relief before speaking to the General Counsel for the Texas Supreme Court, who went to the 13th Court of Appeals and had Partain's case found and back on the docket within a half hour.  On May 9, 2013, the 13th Court of Appeals issued its Opinion in case no. 13-12-00267-CV declaring Judge Gabert's Final Judgment to be void in Hidalgo County Court case no. CL-29,530-G, having no jurisidiction.  *App. 32. Opinion, Appeals Case no. 13-12-00267-CV, dated 5/9/2013*. Immediately on May 14, 2012, Judge Ramirez ordered a hearing for dismissal of Partain's complaints under TRCP 165a and on his authority as a judge.  *App. 33, Notice of Hearing For Dismissal For Want Of Prosecution, Case No. C-0929-12-F, Dated May 14, 2013*.

19.     A dismissal hearing pursuant to TRCP 165a did not occur so Partain filed his 190 page Plaintiff's First Amended Petition For Injunctive Relief Consolidating §1983 Civil Rights Violations and Rico Complaints; And Request For Disclosure; With Objection, on June 3, 2013, causing service on additional defendants.  *App. 34, Dismissal For Want Of Prosecution Hearing Transcript, dated 6/3/2013*; Partain also filed his Plaintiff's Motion For Summary Judgment Against James Maples on or about June 11, 2013.  *App. 35, Plaintiff's Motion For Summary Judgment Against James Maples, Case no. C-0929-12-F, dated 6/11/2013*.  The District Court ignored the Partain's motion and on July 3, 2013, the Court unexpectedly entered its Order Dismissing For Want Of Prosecution, Denying Partain's Motion To Retain, and allegedly at the same time adjudicating the issues with prejudice.  *App. 36, Order Dismissing For Want Of Prosecution And Denying Plaintiff's Motion to Retain. Case no. C-0929-12-F, dated 7/3/2013*.  Partain immediately filed his Plaintiff's Certified Motion To Reinstate Case DWOP which Judge Ramirez again ignored.  On July 8, 2013, Partain filed an appeal in the 13th Court of Appeals, case no. 13-13-00341-CV, on argument that he is constitutionally entitled to an open court and due process.  The 13th Court of Appeals lost the case for approximately two years this time until Partain filed for mandamus orders in the Texas Supreme Court, case no. 15-0343, against nine judges engaged in criminal activities. A judge from the 14th Court of Appeals was appointed by the Chief Justice of the Supreme Court to the case who agreed with Partain's appeal.  However, the Supreme Court, and every

other agency of Texas, failed to respond to Partain's criminal complaints against the judges, allowing their abuse to continue against Partain and his property. Thereafter, the appeals court reversed and remanded Judge Ramirez' order of dismissal. *App. 68, Memorandum Opinion, 13th Court of Appeals, case no. 13-13-00341-CV, dated 7/2/2015*. However, the 13th Court of Appeals refused to enforce its mandate on Judge Ramirez. Apparently it has the "legal discretion" to do so.

20.       Concurrently on May 24, 2013, Partain went to Hidalgo County Court No. 7 to enforce *Turnover Order No. 5*, *Turnover Order No. 6*, and the *Third Amended Judgment* since his case mysterious ended up being sent there. Inexplicably, Judge Sergio Valdez sat in on the case although Judge Alex Gabert was assigned by the 5th Administrative District. Judge Valdez refused to enforce the *Third Amended Judgment*. Instead Judge Valdez directed Partain and William McCarthy to provide briefs. On October 10, 2013, Judge Valdez under the color of law again allegedly modified the prior final orders of the Court in violation of the 13th Court of Appeals Opinion of case no. 13-12-00267-CV by entering Order Of The Court, allegedly replacing the Third Amended Judgment again and ignoring all turnover orders. *App. 37, Order Of The Court, Case no. CL-29,530-G, dated 10/10/2013; App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated  May 9, 2013; App. 39, Corrected Mandate, Appeals Case no. 13-12-00267-CV, dated 8/16/2013*. Judge Valdez absolutely refused to enforce Partain's final judgment from years earlier, or to return Partain's illegally seized property. Partain made his Judgment Creditor's Motion To Strike, Case no. CL-29,530-G, dated 11/12/2013, and at hearing on January 22, 2014, Judge Valdez duplicated Judge Gabert's acts and violated the 13th Court of Appeals Opinion again by hearing evidence and refusing to enforce turnover orders since Judge Valdez represented that he had overturned the *Third Amended Judgment* to which said turnover orders applied - and invited Partain to appeal again. *App. 38, Judgment Creditor's Motion To Strike, Case no. CL-29,530-A, dated 11/12/2013; App. 42, Hearing On Motions (To enforce orders of the court)  CL-29,530-G, dated 1/22/2014 (Tr. p.12-25)*. Partain thought it a pointless exercise to appeal if the courts refused to conform to the orders or mandate of the higher court, and the higher court refused to enforce its mandate. Seemed like just a bunch of paper pushing with no substantive due process. Partain had no reasonable remedy at law to address his accruing injuries. Partain was deprived his property interests and due process.

21.     A judgment debtor died on or about March 28, 2014.  Judge Valdez refused to add the new parties-in-interest (heirs) pursuant to TRCP 155, or to enforce any orders on a remaining debtor.   Having no reasonable remedy in law, Partain repossessed his own real property, made repairs again, and rented it:  Partain's deed, Turnover Order No. 5, Hidalgo County Clerk's record, and tax entity information (*App. 43, Hidalgo County Tax Statements, El Cazador #2 E 18.41' of W 60.82' Of Lot 37 – Unit 2, Certified Owner: Plaintiff*) showed that Partain still owned his property.  Up to this time Partain had spent $39,000 repairing his property twice – this doesn't include the taxes he paid.  However, attorney William McCarthy now claimed he owned the Partain's property through deed prior to the death of his client although McCarthy could produce no documents. *See also App. 42, Hearing On Motions (To enforce orders of the court)  CL-29,530-G, dated 1/22/2014 (Tr. p.15, pp.16-18 "The condominium. The condominium was given to me [McCarthy].  So if he wants to sue me that's fine.).*

22.     On July 15, 2014, William McCarthy, changed his argument again, misrepresenting himself as the executor and administrator of "The Estate of James Maples", harassed and then filed a forcible detainer action against Partain's tenant, Dora Martinez - but not against the Partain  - again through Justice of the Peace Homer Jasso, case no. JP2014-458, in violation of *Turnover Order No. 5* and the 13th Court of Appeal Opinion, now claiming that "The Estate Of James Maples" was the owner and landlord of the real property. *App. 44, Original Petition For Forcible Detainer, Case no. JP2014-458, dated 7/15/2014*. He lied in his sworn statement because a probate case hadn't even been filed yet, and he had no proof of ownership.  Partain filed a motion to intervene in the case and answered, objecting to the justice court's lack of jurisdiction and to William McCarthy's lack of standing. App. 45, Answer, Case no.  JP2014-458, dated 7/28/2014.  Partain motioned for Justice of the Peace Homer Jasso to recuse himself, since Judge Jasso claimed to have superior knowledge of title, appeared hostile, and because he is a defendant and a witness in this instant district case no. C-0929-12-F and appeals case no. 13-13-00341-CV involving similar circumstances against Partain. *App. 46, Johnny Partain's First Motion To Recuse, Case no. JP2014-458, dated 8/4/2014*.

23.      JP Homer Jasso refused to acknowledge or honor Partain's *Turnover Order No. 5* or his objections, claiming he had superior knowledge of title because the District Attorneys

Office claimed James Maples was the owner of the Partain's real property, and claiming that Assistant District Attorney Michael Garza advised him that Partain was not allowed to speak at any hearing since he was not sued and had no standing. William McCarthy motioned to have the Partain be held in contempt. Partain pointed out to JP Jasso that if he thought that Partain was not a litigant and had no orders directed at him, then it was impossible to find him in contempt. JP Jasso then stated that the District Attorney's Office was already looking for a way prosecuted Partain - failure to violate the criminal code first is not an impediment to criminal prosecution. JP Jasso ignored the Opinion of the 13th Court of Appeals that Partain had to be sued first if he wanted to take his property. On Sept. 29, 2014, JP Jasso ordered a *Default Judgment* for the "Estate of James H. Maples" claiming that his hands were ministerially tied since Partain couldn't participate in hearing per the Hidalgo District Attorney's Office and wasn't a party under the law. *App. 47, Default Judgment, Case no. JP2014-458, dated 9/29/2014*. JP Jasso claims it's a loophole in Texas law that anybody's property can be taken if you sue someone else and they don't answer. Partain filed a criminal complaint against William McCarthy directly with the Hidalgo District Attorneys Office who told him that they would not prosecute because Partain's issues were a hot political potato. Apparently, the Hidalgo District Attorneys Office who represents the State of Texas in criminal prosecutions has "legal discretion" to ignore crimes and the injuries they cause. Partain also filed a complaint with the Texas State Bar who immediately rejected his complaint without investigation. Apparently, the Texas State Bar, a department under the Texas Supreme Court, has "legal discretion" to ignore crimes and the injuries they cause. Partain was deprived his property interests and due process.

24.     Partain filed his own "ministerial" forcible detainer suit in Justice Court, Pct. 4, Pl. 2, case no. JP2014-531 on August 29, 2014, since his tenant failed to pay rent after being harassed by William McCarthy and since JP Jasso alleged his actions to exclude the Partain and issue a default judgment were ministerial and required by the law. *App 48, Petition For Forcible Detainer, Case no. JP2014-531, Johnny Partain v. Dora Martinez dated 8/29/2014*. But JP Jasso refused to ministerially act for Partain and requested he document his ownership for Assistant District Attorney Michael Garza in case no. JP2014-531. Partain filed his proof ownership and delivered a copy of the documentation directly to Michael Garza on September 12, 2014, to memorialize their request. *App. 49, Johnny Partain's Demonstration*

*Of Title As Requested By Judge Jasso Per Micheal Garza Of The District Attorney's Office, JP2014-531, dated 9/12/2014.* Judge Jasso declined to exercise his alleged ministerial duty to rule on Partain's forcible detainer suit, claiming he was following the advice of the DA's office. Partain was again deprived his property interests and due process.

25.    Partain filed an Intervenor's Notice of Appeal and Appeal Bond on September 3, 2014, and the Justice Court's transcript and original files were received from the Justice Court by the Hidalgo County Clerk on Sept. 9, 2014. *App. 50, Letter of Receipt of Appeals Documents by County Clerk, CL-14-3542-E, dated 9/10/2014.* Then JP Jasso entered a <u>Writ of Possession</u> order on September 11, 2014, against Partain's property, in direct conflict with Texas Property Code § 24.0054 (3). *App. 51, Writ of Possession, Case no. JP2014-458, dated 9/11/2014.*

26.    Partain rushed to file his Appellant's Emergency Motion For TRO to protect his property during the appeal of the Justice Court's Default Judgment in Hidalgo County Court No. 5, case no. CL-14-3542-E. *App. 52, Appellant's Emergency Motion For TRO, Case no. CL-29,530-G, dated 10/08/2014.* A hearing on the motion was had on September 29, 2014, and on Oct 3, 2014, case no. CL-14-3542-E was mysteriously dismissed without warning, leading to an appeal in the 13th Court of Appeals, case no. 13-14-00584-CV on October 7, 2014. App. 53, Order (Dismissal of action), Case no. CL-14-3542-E, dated 10/3/2014. A subsequent Finding Of Fact And Conclusion Of Law documents many serious and dubious misrepresentations by Judge Arnoldo Cantu, Jr. not supported by the Court's record, but demonstrating the finality of the "dismissal order" and intent of ending any complaints. *App 54, Finding of Facts and Conclusions of Law, Case no. CL-14-3542-E, dated 10/17/2014.* The <u>Finding of Facts and Conclusions of Law</u> were written by William McCarthy without any argument being allowed from Partain since it was concluded he had no standing to appeal.

27.    Plaintiff appealed County Court No. 5 Order to the 13th Court of Appeals and again made an Emergency Motion For Temporary Restraining Order To Protect The Status Quo, but the 13th Court of Appeals did not timely respond. On October 9, 2014, Hidalgo County Constables broke into and seized Partain's house again, with the assistance of the McAllen City Police. Hidalgo County Constables with McAllen Police moved attorney William McCarthy into Partain's house. Partain was again threatened by McAllen Police with arrest

for criminal trespass if he returned to his property. When the 13th Court of Appeals finally responded the Court's insinuated that the appeals from case CL-14-3542-E was interlocutory and that Partain was somehow a debtor. *App. 55, Order (Denying relief), Appeals Case no. 13-14-00584-CV, dated 11/19/2014.* 13th Court of Appeals Justice Nora Longoria then fabricated a tale based on William McCarthy's fraud and her ignorance of bankruptcy law to further deprive Partain his property. Partain complained to the 13th Court of Appeal, en banc, challenging the court to review her fabrications for any truth, but the court on their "legal discretion" refused to act and allowed Justice Longoria's fraud to continue. Partain made a criminal complaint of official oppression against Justice Longoria, but the Hidalgo District Attorney on his "legal discretion" let it pass. Partain appealed to the Texas Supreme Court, case no. 15-0720, claiming violations to Texas Constitution Art. 1, Sec. 9, 13, and 19. The Texas Supreme Court with their "legal discretion" denied Partain any relief claiming that he had no standing to complain because he wasn't sued. Partain was deprived his property interests and due process.

28.     While Partain was waiting for the 13th Court of Appeals to respond to his Emergency Motion For Temporary Restraining Order To Protect The Status Quo, he made his (*App. 56*) Creditor's Emergency Motion For TRO, Case no. CL-29,530-G, dated 10/08/2014, requesting an emergency hearing, preliminary injunction, and a show cause hearing to enforce the orders of the court from collateral attacks. Judge Valdez ordered that Partain was collaterally attacking the default judgment of the justice court and the order of County Court No. 5. *App. 57, Order(Denying relief or protecting Turnover Order No. 5),Case no. CL-29,530-G, dated 10/9/2014.* Judge Valdez eventually approved that William McCarthy could claim ownership and that he moved into Partain's condo.

29.     On November 4, 2014, (election day) Partain was called and told that he needed to turn himself in to be arrested for felony charges for a business transaction through his electrical company. Partain surrendered on November 5, 2014, on threat of an arrest warrant. Consequently, Partain lost his security clearance for the majority of work he provided to the Federal, Texas, and city governments and his businesses suffered severely. Partain being the main principle of a licensed electrical company was indicted and fully prosecuted on a fraudulent arrest affidavit made primarily on opinions (very little fact) of a detective who had been ordered to find a way to prosecute Partain. The Cameron County District Attorney

Office was very familiar with Partain's complaints in Hidalgo County and used their knowledge of the abuses in Hidalgo County to argue to a jury in his criminal prosecution that the State of Texas was averse to Mr. Partain. The District Attorney made absolutely no attempts at all to find justice as required by the law. The district attorney has broad "legal discretion" protected by immunity from complaint. Cameron County, representing the State of Texas in its cause styled The State of Texas v. Johnny Ray Partain also seized approximately $23,000 from Partain on the orders of Judge Elia Cornejo Lopez, through his company, on continuing threats of further arrest and incarceration. However, Partain was eventually acquitted after firing his lawyer, and proceeding pro se, since there was no crime. The case was expunged and Partain was able to return to some of his business years later. Cameron County through Judge Elia Cornejo Lopez refused to return the monies taken from Partain. Partain made a complaint to the State Commission on Judicial Conduct regarding Judge Elia Cornejo Lopez' refusal to return his monies, but there has been no response.

30. Judge Valdez ordered the alleged transfer of case no. CL-29530-G to Judge Rolando Cantu of Hidalgo County Court No. 8 on November 21, 2014. *App 58, Order Of Transfer, Case no. CL-29,530-G, dated 11/21/2014*. Judge Omar Maldonado then somehow replaced Judge Rolando Cantu in the same court on or about Jan. 2, 2015. On Jan. 14, 2015, Judge Maldonado also refused to enforce the orders of the court claiming that he had already recused himself, although the case docket did not reflect this assertion. *App. 28, Civil Docket Report, CL-29,530-H*. Regardless, on January 20, 2015, Administrative Judge J. Rolando Olvera filed his Order Of Assignment (App. 59) assigning retired District Judge Robert Blackmon to Hidalgo County case no. CL-29,530-H. Partain objected to the assignment of Judge Blackmon because the Order Of Assignment again limited assignment by stating, [sic] "from this date until plenary jurisdiction has expired", which prior Judge Alex Gabert argued meant that the case was without a final judgment. *App. 60, Objection To Assignment, Case no. CL-29,530-H, dated 01/02/2015*. However, Judge Olvera's clerk called Partain and requested he withdraw his objection since Judge Blackmon was the only judge available and that his assignment were made on forms provided by the Texas Supreme Court. Partain conditionally withdrew his objection if Judge Blackmon were given the jurisdiction to enforce Relator's *Third Amended Judgment* and turnover orders. *App. 61, Withdrawal of*

*Objection To Assignment, Case No. CL-29,530-H, dated 2/03/2015.* He wasn't given proper jurisdiction so Partain continued his objection.

31.     Judge Robert Blackmon held a show cause hearing on Feb. 26, 2015, on Partain's Motion for Contempt against William McCarthy. Judge Blackmon argued that the actual number on the case was CL-29,530-H instead of the original case number, CL-29,530-A, making the case a separate and brand new case without any orders to enforce. Partain was deprived his property interests and due process. Judge Blackmon argued that *Turnover Order No. 5* wouldn't apply anyways since the turnover order was directed at judgment debtors and did not limit actions taken by their attorney. Judge Blackmon then chastised Partain for suing William McCarthy in Blackmon's new case and for trying to enforce *Turnover Order No. 5* which couldn't be valid since it was entered after a final judgment in case no. CL-29,530-A. Judge Blackmon threatened Partain on and off the record that he may sanction him with fines for not "playing nice" and if the Partain didn't conform to his future orders he could end up in jail. *App. 67, Affidavit.* Judge Blackmon finally stated that he was only assigned for the one hearing and that he hadn't made up his mind if he would continue the case - that he was actually filling in under County Judge Omar Maldonado. Judge Blackmon issued an order, changing Partain's original case no. CL-29,530-H and re-styling it under Justice Court, Pct. 4 Place 2 and with new parties to wit – Johnny Ray Partain v. Estate of James H. Maples, Decedent et al. *App. 62, Order Denying Motion For Contempt, Case no. CL-29,530-G, dated 3/02/2015.*

32.     William McCarthy also filed another ex parte motion and affidavit for "The Estate Of James H. Maples" on July 30, 2014, pursuant to TEX GV. CODE ANN. § 51.902, FRAUDULENT LIENS, in District Court case no. C-6549-14-G to attack Partain's deed on his real property. *App. 63, Motion For Judicial Review Of A Document Purporting To Create A Judgment Lien, Case no. C-6549-14-G, dated 7/30/2014.* Partain learned of the action after a call from the clerk's office and he filed a petition for intervention and an <u>Answer</u> objecting to William McCarthy's motion. Partain claim McCarthy had no standing to invoke the jurisdiction of the court, to sign an affidavit for a dead man, and failed to conform to the statute. *App. 64, Original Answer, Case no. C-6549-14-G, dated 9/30/2014.* District Judge Noe Gonzalez conferred with District Judge Robert Flores regarding transferring William McCarthy's motion from 370th Court to the 139th Court, both recused

themselves, and then Judge J. Rolando Olvera assigned Judge J. Manuel Banales. *App. 66, Civil Docket Report C-6549-14-G.* Judge Banales ruled, without his jurisdiction being invoked per the statute on liens, that Partain's "deed" on his house "does not refer to a legally constituted court … and there is no valid deed", and then ordered the Clerk to deed the Partain's condo to the deceased James H. Maples. *App. 65, Judicial Findings Of Fact And Conclusions Of Law Regarding A Documentation Or Instrument Purporting To Create A Deed, Case no. C-6549-14-G, dated 2/13/2015.* Banales vandalized Partain's title on his property, depriving Partain of his property interests and due process. Partain complained to the Texas Supreme Court, case no. 15-0343, for a mandamus. Relief was denied. Partain complained to the State Commission on Judicial Conduct which has been unresponsive.

33.     A probate case was started on July 30, 2014, case no. P-36,416, styled Estate of James Maples, deceased. Partain sued the heirs for theft on basis that Judge Banales had attached Partain's real property to the deceased estate. After approximately two years of litigating, Attorney Howard Reiner, hired by Compass Bank and executor for the estate, informed Partain that Compass Bank had spent over $30,000 on a third party law firm to look over all the cases involving Partain to determine if he could make a legal claim to his real property. That law firm concluded that Partain was the actual owner. Consequently, Mr. Reiner offered to return the real property to Partain or to give him a better property that was in the bankruptcy courts if he would stop suing the defendants. Partain agreed that he wanted his property only, if the probate judge would quiet the title. A judgment quieting title on Partain's real property was signed on December 19, 2016. *App. 84, Judgment on Creditor Claims Of Johnny Partain And Quieting Of Title[3].* However, the property is unusable, needs repairs again, and is now being sued for over $18,000 in ad valorem taxes and fines since nobody paid taxes after Hidalgo County and the City of McAllen seized the property in 2012. Partain is still deprived his property interests.

34.     After the 13th Court of Appeals, under 14th Court of Appeals Justice Wiggins, reversed Judge Ramirez' order of dismissal and remanded Partain's complaints back to the district court on July 2, 2015, to conform to the appellate court's mandate, Judge Ramirez started dismissing defendants and told Partain he may go to trial, but he wouldn't have anyone to go

---

[3] App. 84, Judgment On Creditor Claims Of Johnny Partain And Quieting Of Title is filed with this Third Amended Petition.

to trial against. Partain motioned for a summary judgment against the State Of Texas which went unopposed, but was never adjudicated. Partain motioned for compensation of his costs of court pursuant to Judge Ramirez' mandate to pay Partain, buy Ramirez ignored him. Thereafter, Judge Ramirez closed his court to all the parties for over four years until Partain petitioned the Texas Supreme Court for a mandamus to enforce the 13th Court of Appeals mandate on Judge Ramirez. Partain also complained of either serious corruption in the South Texas Judiciary or widespread coincidental incompetence. The Texas Supreme Court again denied him relief, but it is unclear if the court even read his petition since the court's network was brought down by ransomware at approximately the same time Partain petitioned and State of Texas' judicial network was still inoperative 30 days later making Partain's complaints unviewable to at least the General Counsel for the Supreme Court and the State Commission on Judicial Conduct. Another coincidence? Partain filed a cordial demand letter to Texas Governor Abbott to be compensated his losses under the Texas Constitution, but the Governor kept silent. Partain also filed a petition to the 87th Texas Legislature for relief and was informed by his senator that he could receive no more than $50,000 because of the budget shortfall due to Covid 19. Partain declined because his losses and his efforts to be made whole were magnitudes higher and said offer was grossly unreasonable. Judge Ramirez mysteriously re-opened his court in August of 2020, and then dismissed all the defendants depriving Partain his property interests and due process. Partain appealed to an appellate court again, requesting a direct appeal to the Texas Supreme Court. Partain then rendered this Third Amended Petition.

## V. CAUSES OF ACTION

### COUNT 1

35. FOURTEENTH ADMENDMENT TO THE CONSTITUTION OF THE UNITED STATES and 42 USC §1983 - This is an action at law to redress the deprivations under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to Partain by the Fourteenth Amendment to the Constitution of the United States, actionable through 42 USC §1983, and arising under the law and statutes of the United States and State of Texas. At all relevant times herein JP Homer Jasso Sr., Judge Rodolfo Gonzalez, Judge Alex W. Gabert, Judge Jose Manuel Banales,

Judge Robert Max Blackmon, Sherriff/Constable Jose Guerra, Deputy Constable Carlos Gonzalez, District Attorney Rene Guerra (Ricardo Rodriguez), and Sheriff Guadalupe Trevino were duly elected officials or assigned their positions with access to Hidalgo County resources through established process to represent Hidalgo County, a political subdivision of the State of Texas, under the color of their offices.  At all relevant times herein McAllen Police Chief Victor Rodriguez, a policy maker, was employed by the City of McAllen, a municipal corporation of Texas.  The aforementioned defendants have the authority and had the opportunity and were personally involved in or at least casually connected to the illegal acts perpetrated through Hidalgo County and the City of McAllen that violated Partain's United States and Texas Constitutional protections and several federal statutes, including but not exclusive to, illegal seizure of actual or prospective property without due process; false imprisonment; divestment of liberty, property, privileges, due course of law, and redress of grievances; interference with a political campaign; false imprisonment; equal protection of the law; and RICO as demonstrated in the above FACTS which created a special relationship through the use of armed police force.  Each of the defendants, separately and in concert, acted outside the scope of their jurisdiction and under the color of state law through Hidalgo County and City of McAllen, to deprive Partain his constitutional rights and his property. Hidalgo County and the City of McAllen with deliberate indifference to the consequences, established and maintained a policy, practice, or custom enforcing orders with police force, in this instance void judgments and orders issued without jurisdiction, which directly caused the violations perpetrated against Partain.  The City of McAllen doesn't even have a statutory duty to enforce a valid order.  Hidalgo County and City of McAllen did this twice. Also, City of McAllen with deliberate indifference to the consequences, established and maintained a policy, practice, or custom of turning on and off utilities at a property regardless of property owner's demand or contract to divest the owner his interest in his property, to enable criminal trespassing, which directly caused the violations perpetrated on Partain. City of McAllen also did this twice.  With respect to the extent of damages available, the Supreme Court has noted that the basic purpose of a section 1983 damages award is to

compensate the victims of official misconduct, and therefore held that there is no limit on actual damages if they can be proven. *See also Damages below*.

COUNT 2

36. UNITED STATES CONSTITUTION AMENDMENT 5, TEXAS CONSTITUTION, ARTICLE 1, SECTION 17, TEXAS CONSTITUTION, ARTICLE 1, SECTION 9, TEXAS CONSTITUTION, ARTICLE 1, SECTION 17, TEXAS CONSTITUTION, ARTICLE 1, SECTION 19 – The State of Texas, Hidalgo County, and City of McAllen deprived Partain any standing or substantive due process, and did take, damage, and destroy his property without suing him and without warrant against him by seizing a condo owned by Partain on two different occasions and depriving him his rents. They used a SWAT team, McAllen police, and court orders - even after the 13th Court of Appeals opined that Partain had to be sued before his property could be taken. No consideration was given to Partain, not even for his petition for injunction in the instant case to District Judge Mario Ramirez to stop their unconstitutional actions. Instead, Partain was accused of collaterally attacking (void) orders, while public officials who sought to hide incompetency, systemic local corruption, and criminality to maintain the public appearance of propriety in their offices retaliated against and destroyed his property. District Attorney Rene Guerra (removed from office in 2014) and his office, Justice Homer Jasso, Hidalgo County Sheriff/Constable Jose Guerra, Deputy Constable Carlos Gonzalez, District Judge Alex Gabert, District Judge Robert Blackmon, District Judge Jose Banales, County Judge Sergio Valdez, County Judge Rodolfo Gonzalez, County Judge Arnoldo Cantu, Hidalgo County Sheriff Lupe Trevino (convicted), Chief Victor Rodriguez, and Judge Mario Ramirez all worked together to diminish, destroy, and seize Partain's property

37. The aforementioned district judges, county judges, and district attorney consistently conspired to deprive Partain the fruits of his final judgment (case no. CL-29,530-[A]), his condo, his interstate transportation company, Atlas Transportation, Inc., and his damages pursuant to his litigation for relief in the courts directly after Compass Bank bribed Hidalgo County Judge Rodolfo Gonzalez, on or about October 4, 2010, to avoid a lawsuit for racketeering under the RICO statute. The aforementioned state and

county judges refused to enforce, or even acknowledge, Partain's final judgment and turnover orders, and spent much effort trying to make Partain a judgment debtor although he had not been sued, which protected Compass Bank against RICO complaints. Even Justice Nora Longoria of the 13th Court of Appeals manufactured facts in a fraudulent opinion (without a scintilla of resistance being raised from the rest of the 13th Court of Appeals, despite the fraud being illuminated and identified fake) and demonstrated serial ignorance or contempt of bankruptcy law, case no. 13-14-00584-CV, to protect Hidalgo County from liability to Partain and to destroy Partain's property interests while at the same time paying down the political capital she owed to the Hidalgo County District Attorney for refusing to prosecute her DUI arrest in 2014 (simultaneous events). Partain was adjudged from a justice court to the Supreme Court not to have standing to complain that his property was seized - his complaints were completely ignored. Protection of civil rights under the Texas or United States constitutions did not self-execute or void the constitutional violations against Partain. Additionally, Hidalgo County and City of McAllen immediately sued Partain's real property (not Partain) for ad valorem taxes accrued during the time they seized and/or exercised control over his property, further inhibiting Partain's ability to recover, use, or sale his property.[4] Partain made criminal complaints to the Hidalgo County District Attorneys Office, McAllen Police, Hidalgo County Sheriffs Office, Texas State Bar, State Commission on Judicial Conduct, and Texas Supreme Court - and nothing happened. The crimes and malfeasance were tolerated since these are the deeply rooted traditions of our state's policy. [5]

38.     Partain's final orders required the return of his equipment, records, and accounts for his interstate transportation company in 2008 (a business making approximately $2.5 million dollars a year), but the courts (district and county judges) refused to enforce Partain's final decrees depriving him of his property. Partain has an large interest in the causes of action claimed against Compass Bank and Farmer Insurance/Fire Insurance

---

[4] This petition is a counter-suit against Hidalgo County and City of McAllen for their tax and fines claims
[5] Nashville, C. & St. L. R. Co. v. Browning, 310 U.S. 362, 369, "It would be a narrow conception of jurisprudence to confine the notion of "laws" to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law…Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text." See also Poe v. Ullman, 367 U.S. 497 (1961).

Exchange for the damages they perpetrated on him through racketeering, yet the State of Texas through its District Judge Mario Ramirez has continually abused his discretion in this instant lawsuit through the enforcement of an unconstitutional order (found void by a higher court), unconstitutional dismissal of Partain's lawsuit (reversed), and general summary judgment and dismissal to protect these large corporations from their own actions, their liability to Partain. Partain has not been compensated, nor has he been allowed substantive due process years after Compass Bank seized control of his interstate company and then bribed a county judge. Plaintiff did not give consent to the taking of his property or waive his rights. Tx. Const. Art 1. Sec 17 is a waiver of sovereign immunity requiring adequate compensation to the Plaintiff. *See Damages below.*

COUNT 3

39. UNITED STATES CONSTITUTION AMENDMENT 5, TEXAS CONSTITUTION, ART. 1, SEC. 17 - The State of Texas, Hidalgo County, and Cameron County seized and destroyed Partain's property and damage his reputation as part of their legal strategy to defeat his political campaign complaints against corruption in South Texas government and to justify their initial seizures and destruction of Partain's property to protect Compass Bank from RICO complaints and a racketeering enterprise. On Sept. 29, 2014, JP Jasso stated that the District Attorney's Office was looking for a way prosecuted Partain. One month later on November 5, 2014, Partain was arrested for a criminal felony charge evolving from a contract dispute regarding his interstate electrical company, Atlas Technologies, Inc. Partain was arrested and indicted on the basis of a fraudulent affidavit for arrest which contained mostly opinions and very little facts, through the approval and advice of the Cameron County District Attorney, allegedly to protect public interests. Partain was fully prosecuted and eventually acquitted, pro se, on or about November 16, 2017, because there was no crime. During the trial of Partain, the Cameron County prosecutor boasted about her knowledge of Hidalgo County's seizure of Partain's property to a jury and claimed the State of Texas was averse to Mr. Partain, although Partain never raised an issue. Cameron County seized $22,802.00 in cash from Partain and deprived Partain the value of his associated business contract through its court orders (voided) and on threats of incarceration: Partain did not approve. Cameron

County's indictment and prosecution against Partain, for what was clearly well-established by law as not a crime, destroyed Partain's ability to work with his government customers and destroyed his significant vested interests in his company. Thereafter, Partain subpoenaed documents regarding the communications between Hidalgo County District Attorneys Office and the Cameron County Attorneys Office in the prosecution, but the Hidalgo County District Attorneys Office successfully defended against any discovery through a federal court on the argument of privileged legal strategy in the instant case. Partain made requests for compensation from Cameron County and he was denied. Cameron County claimed sovereign immunity, but its immunity was waived under Tx. Const. Art. 1 Sec 17. Partain's property was seized and destroyed without compensation: See *Damages* below.

COUNT 4

40. TEXAS CONSTITUTION, ART. 1, SEC. 13, 17, and 19 - The State of Texas, Hidalgo County, District Attorney Rene Guerra (Ricardo Rodriguez), City of McAllen, and Justice of the Peace Homer Jasso Sr. violated Partain's civil rights under Texas Constitution Art. 1, Sec. 13, 17, and 19, through the unconstitutional application of Texas Property Code, Title 4. Actions and Remedies, Chapter 24. Forcible Entry And Detainer. Defendants damaged Partain and violated his civil rights by taking his condo, destroying its value, and depriving Partain of his rents without suing Partain (no due process) and without providing him an opportunity to an open court. Justice Homer Jasso claims that Chapter 24 is a loop-hole in the law that allows that anybody may sue anybody for any property, and if there is no answer, any property may be taken. Chapter 24 doesn't provide any protection for a person's constitutional rights, other than a sworn statement, which in the instant case has proven to be little more than pushing paper since a sworn statement doesn't necessarily create an adversary or protect the rights of all, in any, persons at interest in a particular property. Partain appealed the unconstitutional seizure of his property all the way to the Texas Supreme Court and was denied standing (all the way) to complain. Partain even filed for an injunction in the instant case to prevent the illegal taking wherefrom his complaints were dismissed on the authority of Judge Mario Ramirez, then reinstated, then the court

closed to Partain, and then finally - over 9 years later - all defendants excused on immunity. Criminal complaints and administrative complaints to the Texas State Bar, Texas State Commission on Judicial Conduct, District Attorneys office, and Attorney Generals office have also been pointless and ineffectual. Partain has continued to be deprived due process, an open court, and his property pursuant to the application of TPC §24. Sovereign immunity is waived under Tex.Civ.Prac. & Rem.Code §§ 37.004(a), 37.006. This count is interrelated with 42 U.S.C. § 1983 claims herein.

COUNT 5

41. TEXAS CONSTITUTION, ART. 1, SEC. 13, 17, and 19 - The State of Texas, Hidalgo County, and Judge Jose Banales violated Partain's civil rights under Texas Constitution Art. 1, Sec. 13, 17, and 19, through the unconstitutional application of Tex. Gov. Code § 51.902, Fraudulent Liens. Defendants damaged Partain and violated his civil rights by vandalizing the title on his house, adjudicating it as an unlawful lien under §51.902 without suing Partain. §51.902 does not protect constitutional considerations such as creating an adversary, due process, jury determination of the facts, or even appealability, yet it can be used to determine property rights. Recourse has been unobtainable since criminal complaints and administrative complaints to the Texas State Bar, Texas State Commission on Judicial Conduct, District Attorneys office, and Attorney Generals office have also been pointless and ineffectual. Sovereign immunity is waived under Tex.Civ.Prac. & Rem.Code §§ 37.004(a), 37.006. This count is interrelated with 42 U.S.C. § 1983 claims herein.

**RACKETEER INFLUENCED CORRUPT ORGANIZATION, 18 U.S.C. § 1961-1968[6]**

COUNT 6

---

[6] Congress defined racketeering activities under 18 U.S.C. § 1961 to help snare those who make careers of crime. Participation in the affairs of an enterprise through the commission of two or more predicate crimes is now an offense separate and distinct from those predicate crimes. So too is conspiracy to commit this new offense a crime separate and distinct from conspiracy to commit the predicate crimes.

42. 18 U.S.C. § 1962 (d).  Defendants Sheriff/Constable Jose Guerra, Deputy Constable Carlos Gonzalez, Judge Mario Ramirez, Judge Homer Jasso, Judge Alex Gabert, Judge Jose Manuel Banales, Judge Robert Blackmon, Judge Sergio Valdez, District Attorney Rene Guerra (Ricardo Rodriguez), Judge Rodolfo Gonzalez, Sheriff Guadalupe Trevino, Justice Nora Longoria, Compass Bank, Police Chief Victor Rodriguez, Farmers Insurance, and State Bar of Texas were well informed of the FACTS above, but are part of a racketeering enterprise and adopted its goal to deprive Partain his property, interests, and rights, to protect themselves, by conspiring to violate the provisions of 18 U.S.C. § 1962.  Partain is still being injured by the continuing deprival of his rights and damages by defendants reflecting an open pattern of RICO.  *See Damages below*.

## COUNT  7

43. 18 U.S.C 1344 (2); 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b), (c), (d); 18 U.S. Code § 1956; 18 U.S. Code § 1957; THEFT – The debtors (Mapleses) created a counterfeit order, *Order On Defendant Motion To Stay,* in cause no.CL-29,530-A, on or about February 1, 2005, to knowingly enable the Compass Bank to transfer monies out of bank accounts owned by Global Limo, Inc. without notice to its owner Partain:  Partain gave Compass Bank a certified *Turnover Order* disclosing Partain's rights and interest in Global Limo, Inc. and also gave Compass Bank a demand to freeze said accounts and to place Partain on those specified business accounts as the sole authority.  Compass Bank did not comply and instead on or about February 18, 2005, silently transferred monies out of those account to new hidden accounts while at the same time communicating to Partain over the telephone that they were unable to give him the specific account transaction information he requested and representing that they were working to get him the information and would give him a call back: Compass Bank never called Partain back.  Compass Bank later represented through electronic communication that the County Court's counterfeit order authorized them to move assets away from Partain.  This scheme was executed with intent to obtain monies or credit frozen under Global Limo, Inc. accounts for control of Global Limo, Inc., and for Compass Bank to influence and determine the conduct of the corporation when the debtors filed for bankruptcy protection.  Partain complained of the illegal *Order On Defendant Motion To Stay* to the

County Court whereas it was revealed that the counterfeit order was not actually signed by a judge nor was it within the knowledge of Judge Gonzalez. However, Judge Gonzalez refused to void the counterfeit order, and eventually reversed it after allowing Compass Bank to accomplish its theft. Partain made criminal complaints to District Attorney Rene Guerra, but no criminal charges were ever brought. Partain was damaged through the loss of property and the values therein and through the interference with his ability to operate an interstate motorcoach business resulting in loss of profits, loss of compensations, and loss of opportunities. *See also Damages below*.

COUNT 8

44. 18 U.S.C 1344 (2); 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S. Code § 1513: 18 U.S. Code § 1513; 18 U.S.C. § 1962 (b) and (c) – On or about February 16, 2005, debtors electronically filed bankruptcy in case no. 05-70128. Shortly thereafter, on or about February 28, 2005, and without notice to Partain, debtors made a written agreement with Compass Bank that Partain's company would pay it's debts (for fraudulently conveyed assets). On or about March 7, 2005, Paul Moxley, President of Compass Bank, threatened Partain over the telephone to call the police to prevent Partain from operating his company. He sent two Special Asset Division Vice Presidents to the offices of Global Limo, Inc. to stop Partain from operating or removing motorcoaches wherefrom the bank claimed full interests through liens with the debtors. Thereafter, on or about March 7, 2005, Compass Bank attempted to have Partain held in contempt of bankruptcy court's automatic stay in case no. 05-70128 for not allowing debtors to operate Global Limo, Inc. (Partain had fired debtors) and for moving buses away without approval of Compass Bank. Compass Bank knowingly executed a bankruptcy scheme to control motorcoaches, credit, and monies purportedly owned by or deposited in Compass Bank but operated by Global Limo, Inc. through intentionally fraudulent representations to the bankruptcy court in cause no. 05-07009 that Global Limo, Inc. or it's assets were included under debtors' bankruptcy of a sole proprietor business named Global Tours. Partain was damaged through the loss of property and the values therein; interference with his ability to operate his interstate motorcoach business; loss of profits; loss of compensations; and loss of opportunities. *See also Damages below*.

COUNT 9

45. 18 U.S.C 1344 (2); 18 U.S. Code § 1956;  18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c)  FRAUDULENT TRANSFER - Compass Bank knowingly executed a business loan for approximately $47,000 against Global Limo, Inc. on a purported transfer of interest of real property owned by Partain to Compass bank.  Partain did not authorize a business loan.  The real property is describe as "[T]he East 18.41 feet of the West 60.82 feet of Lot 37, El Cazador Subdivision, Unit No. 2, an Addition to the City of McAllen, Hidalgo County, Texas according to map thereof recorded in volume 19, page 58 of the Map Records of Hidalgo County."  Compass Bank then sent the alleged loan monies to an escrow account under a trust in north Texas for debtors to further encumber through the purchase of a new ranch home in or around Mt. Vernon, Texas, approximately 2 weeks prior to filing a chapter 11 bankruptcy.  The loan was an act of theft to fraudulently transfer and to acquire an interest in Global Limo, Inc. to exercise control over the corporation.   Plaintiff was damaged through the illegal lien on his property, and through the deprivation and loss of his property or the values therein. *See also Damages below.*

COUNT 10

46. 18 USC §1951 INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE; EXTORTION; THEFT; 18 U.S.C. § 1962 (c) (d)   – On or about January 31, 2005, debtors broke the locks of Global Limo, Inc. at 1408 N. Jackson and entered Partain's office removing assets, including but not exclusive to interstate motorcoaches operated under Global Limo, Inc., after being warned on three occasions the weekend before by the Pharr police that they were trespassing and not to enter the premises.  Debtors stationed a security guard at the office doors to challenge Partain's entry into the office and created counterfeit court order to keep police away from the building.   This extortion continued until approximately February 16, 2008, wherefrom Plaintiff was unable to operate Global Limo, Inc. to engage in interstate commerce, pay debts, or make profit.  During this same period, Compass Bank claimed it was unable to provide Partain with his account information furthering enabling debtors' extortion and control of Global Limo, Inc. *See also Damages below*.

COUNT 11

47. 18 U.S.C 1344 (2); 18 U.S. Code § 1956; 18 U.S. Code § 1957; 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c); THEFT - On or about March 29, 2005, debtors as bankruptcees electronically petitioned for an injunction in adversary case no. 05-07009, Maples et. ux. v. Partain, pursuant to their chapter 11 bankruptcy case no. 05-70128, to acquire control of Global Limo, Inc.  Compass Bank prosecuted the petition on basis of a debtor's perjurious affidavit of ownership and rights in Global Limo, Inc., on basis of the aforementioned violation in the Hobbs Act (extortion in Count 10), and on basis of the counterfeit order produced in Count 7 above, although debtors had already been denied any interests in the bankruptcy court and in the county court.  Compass Bank was aware that their representations of ownership and employment were false, but Compass Bank argued such representations with the intent that the court would act on them to provide Compass Bank access to Global Limo, Inc. affairs:  Bankruptcy Judge Marvin Isgur did use their representations to seize Global Limo, Inc.'s assets and operation to provide Compass Bank interest and control of the corporation (the corporation was not in bankruptcy).  Judge Isgur encumbered Partain's house with a lis pendens to provide Compass Bank interest therein.  Said illegal seizure greatly injured Partain's property and business interests since Compass Bank raped his company of all its value and which caused it to operate dangerous vehicles needing repairs, resulting in 23 deaths through a motorcoach fire and large liabilities against Global Limo, Inc.  The additional lis pendens prevented Mr. Partain's free use of his house and was later used in February of 2007 on the wild and confused whim of Judge Isgur to incarcerate Plaintiff purportedly for collecting rent on his house pursuant to the orders for the lis pendens.[7] Partain was damaged through deprivation of freedom, assets, and the loss of his property and the values therein.  The damage was further aggravated by interference with Partain's ability to operate his interstate motorcoach business; pay his debts and liabilities; loss of license to operate a motor carrier; loss of profits; loss of compensations; and loss of

---

[7] This action followed complaints to the 5th Circuit that there was fraud and racketeering occurring in case no. 05-07009 and related cases under Judge Isgur and under Judge Crane.  Partain sued out a habeas corpus after 72 days of incarceration on grounds that Bankruptcy Judge Marvin Isgur lied and lacked jurisdiction.  The Federal District court was unable to find where Judge Isgur had ever acquired jurisdiction over Partain's property.

opportunities. See related injuries in Hidalgo County MDL case no. 05-1073, In re Hurricane Rita. *See also Damages below*.

COUNT 12

48. 18 U.S.C 1344 (2); 18 U.S. Code § 1956; 18 U.S. Code § 1957; 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c); THEFT; FRAUDULENT TRANSFER – On or about May 16, 2005, Compass Bank, with debtors, argued against Partain for control of Global Limo, Inc. at a preliminary injunction hearing, in adversary cause no. 05-07009 (SDTX). Debtors devised a scheme requiring Compass Bank's assistance to fraudulently transfer assets and/or to encumber assets before bankruptcy with intent to prevent collection of *Judgment* in Hidalgo County case no. CL-29,530-A. Global Limo, Inc. was an element in this scheme as outlined by debtor's new attorney Keith Livesay in July of 2002, through a written letter. Compass Bank cross- collateralized Global Limo, Inc.'s assets, as instructed by the attorney. Once all assets were retitled under Global Limo, Inc., Compass Bank encumbered them to prevent their collection on a judgment of fraud against debtors. On or about January 27, 2005, a turnover motion was adjudication in case no. CL-29,530-A transferring all rights and interests in Global Limo, Inc. to Partain. Debtors quickly filed chapter 11 bankruptcy as individuals, however, said bankruptcy did not include Global Limo, Inc. Compass Bank then claimed Global Limo, Inc. did not exist and that all its assets now flowed magically into debtors' bankruptcy. Compass Bank made its representations with the intent that the Judge would act on them. Judge Isgur accepted Compass Bank's misrepresentations and it was determined at the aforementioned hearing that regardless of Texas law, Texas court orders and the Rooker-Feldman doctrine, that Partain had almost no identifiable interests in Global Limo, Inc.[8] due to Compass Bank's interests in Global Limo, Inc. Judge Isgur gave Compass Bank nearly unfettered control over Global Limo, Inc. resulting in the rape of business' value and assets and operation of dangerous interstate vehicles which resulted in 23 deaths and

---

[8] This order was reversed approximately 9 months later (after 23 deaths and destruction of Global Limo, Inc.) by Judge Isgur who found that Plaintiff was actually the owner of Global Limo, Inc. which empowered the judge to avoid Partain's interest in the corporation through bankruptcy proceedings and to remove Plaintiff's standing to sue Compass Bank and Debtors by placing all interests under Mapleses' bankruptcy estate. *Memorandum Opinion On Summary Judgment*, Case no. 05-07009 (SDTX).

large liabilities against Partain's property interests.[9]  Plaintiff was severely damaged through deprivation and loss of his property and the values therein; through interference with his ability to operate an interstate motorcoach business; loss of profits; loss of compensations; and loss of opportunities. *See also Damages below*.

COUNT 13

49. 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962 (b) and (c); THEFT; FRAUD – On or about May 12, 2006, Compass Bank electronically motioned for relief from bankruptcy's automatic stay in chapter 11 bankruptcy case no. 05-70128 (SDTX) through *Texas State Bank's Motion For Relief From The Automatic* Stay to execute against Global Limo, Inc.'s assets and house seized from Partain by the bankruptcy judge in adversary case no. 05-07009 through *Judgment* (bankruptcy avoidance) on or about April 27, 2006 (approximately 2 weeks earlier).

50.      Compass Bank made representations to the bankruptcy Court that [sic] "the Debtor has little or no equity in the Buses, Condo, and/or Rents and (c) the Buses, Condo, and Rents are not necessary to the Debtor's effective reorganization."  Judge Schmidt responded with *Order Granting Texas State Bank's Motion For Relief From Automatic Stay*.  However, Compass Bank had previous and consistently represented throughout the bankruptcy cases that it was necessary to seize Global Limo, Inc. and Partain's house through bankruptcy avoidance for the benefit of the bankruptcy estate and for the good of "all" creditors therein:  Property may only be avoided through bankruptcy if the property would have been in the bankruptcy estate and therefore available to a debtor's general creditors; essentially, voidable preferences must have depleted the estate and may not have been fully encumbered prior to avoidance.   Accordingly, a judge can only avoid a preferential transfer for the benefit of the bankruptcy estate and not for the benefit of Compass Bank.

51.      Compass Bank intended and knowingly made conflicting, material, and false representations to different bankruptcy courts in venue of debtors' Chapter 11 bankruptcy

---

[9] Bankruptcy Judge Marvin Isgur was never prosecuted for the illegal seizure and resulting deaths that occurred since Judge Ricardo Hinojosa claimed Judge Isgur was immune to prosecution.  No one was ever prosecuted for those deaths.

to use specific bankruptcy processes to execute a scheme to gain or legitimize interests in Global Limo, Inc. and Partain's house that they did not have prior to debtors' Bankruptcy. The bankruptcy court's used their representations to effectively launder Partain's assets and his corporation through a bankruptcy estate to aid and enrich Compass Bank. Partain was injured through deprivation and loss of his properties and the values therein; interference with Partain's ability to operate an interstate motorcoach business; acquired debts and liabilities; loss of profits; loss of compensations; loss of opportunities; and illegal incarceration. *See also Damages below*.

## COUNT 14

52. ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; 18 U.S.C. § 1962 (c) and (d); – On or about January 10, 2007, Global Limo, Inc. was sentenced for Conspiracy To Make False Statements To A Government Agency, 18 U.S.C § 371 and Violation Of Federal Motor Carrier Safety Administrations Regulations 49 U.S.C. § 521 (b) (6) and 18 U.S.C. § 2 while under seizure by the bankruptcy courts, although not in bankruptcy. Debtor, James Maples, was sentenced for Violation Of Federal Motor Carrier Safety Administrations Regulations 49 U.S.C. § 521 (b) (6) and 18 U.S.C. § 2 in a Federal Court in the Southern District of Texas, Criminal case no. M-06-076-S. Debtors were able to operate Global Limo, Inc. under their Chapter 11 Bankruptcy on Compass Bank's efforts to launder the corporation through the bankruptcy courts on fraudulent representations. The US Trustee's Office out of Washington D.C. supports Partain that the corporation was never in bankruptcy. Partain was injured through deprivation and loss of his properties and the values therein; severe violations to his US Constitutional rights, Federal Statutes, and Bankruptcy Code; interference with his ability to operate an interstate motorcoach business; acquired debts and liabilities; loss of profits; loss of compensations; and loss of opportunities. *See also Damages below*.

## COUNT 15

53. ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; THEFT; 18 U.S. Code § 1341; 18 U.S.C. § 1962 (c) and (d) - On or about October 4, 2010, Compass Bank bribed County Judge Rodolfo Gonzalez with a release of lien to

avoid RICO complaints, on the premise of some unknown ownership interests of judgment debtor, James Maples, in Partain's house. The debtor had actually sold the house to Partain's company in 2004 and had acquired no legal title to it thereafter. The debtor used the Judge Gonzalez' actions to lien on a bank for credit on Partain's house to claim an interest in Partain's property. He filed a fraudulent sworn *Plaintiff's Complaint For Eviction And Suit For Rent* in the Justice Court of Precinct 4, Place 2, in Hidalgo County, case no. Cause no. JP2011-197 on or about May 13, 2011, with the assistance the District Attorney Rene Guerra. The debtor did not sue Partain. The debtor did rely on the racketeering predicate acts in his Chapter 11 bankruptcy through a RICO enterprise consisting of James Maples, Kathy Maples, Compass Bank, Global Limo, Inc., Justice of the Peace Homer Jasso, DA Rene Guerra, and Sheriff Lupe Trevino to make a fraudulent claim to seize Partain's home through an ex parte default judgment and *Writ of Possession*. (See App. 26, Certified Mail Receipts to District Attorney). JP Homer Jasso ordered a Default Judgment and an order for possession against Partain's home while at the same time not allowing Partain to participate in the litigation or to defend his property. Partain was injured. See damages below.

54.     Consequently, Partain was attacked by Sheriff/Constable J.E."Eddie" Guerra, Deputy Constable Carlos Gonzalez, and a SWAT team at his house which evolved into a 3 day armed standoff. Chief Victor Rodriguez and Sheriff Guadalupe Trevino refused to stop the racketeering activities until Channel 4 news requested JP Jasso to explain how the state could take someone's property without a lawsuit: All police withdrew. On or about May 11, 2012, Sheriff/Constable Jose Guerra, with the assistance of McAllen police, broke into Partain's house - creating a special relationship -, removed his campaign material and other assets, and threatened Partain with criminal trespass arrest if he returned. Officer Hernandez of the McAllen Police Department also threatened Partain with criminal trespass arrest if he returned. Plaintiff suffered threats to his life, property loss, loss of rent, loss of time, and loss of investment. *See also Damages below*.

COUNT 16

55. 18 U.S.C § 1344 - BANK FRAUD; 18 U.S.C § 1956 - LAUNDERING OF MONETARY INSTRUMENTS; 18 U.S.C § 1957 - ENGAGING IN MONETARY

TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY; 18 U.S.C § 1961 (1) (D) ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; and 18 U.S.C § 1962(b), (c), (d) - County Judge Sergio Valdez, Hidalgo County Court No. 7, having never been transferred case no. CL-20,530-A by assigned Judge Alex Gabert, worked without authority to continue Judge Gonzalez' racketeering activities and assaults on Partain's *Final Judgment* under the color of law to frustrate all of Partain's attempts to enforce any of the final decrees of the court in case no. CL-29,530-[A] even after a mandate issued from the 13th Court of Appeals to enforce the Partain's final judgment. *App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated 5/9/2013; App. 39, Corrected Mandate, Appeals Case no. 13-12-00267-CV, dated 8/16/2013.* When the 13th Court of Appeals found Judge Gabert's *Final Judgment* void, since Partain had never been sued and was a judgment creditor, Partain again attempted to cause the court to enforce it's decrees and to return his illegally seized property by filing his *Judgment Creditor's Motion For a Show Cause Hearing Hearing Enforcing Turnover Orders No. 5 and No. 6 And To Recover Stolen Monies*. *App. 28, Civil Docket Report, CL-29,530-H*.

56.    Judge Sergio Valdez mysteriously stepped in, avoiding Partain's motion to regain his illegally seized property, and Judge Valdez again attempted to modify Partain's final decrees by filing an "interlocutory order" offsetting the *Third Amended Judgment* on excuse that the Mapleses' Title 11 bankruptcy was a suit against Partain that modified the *Third Amended Judgment*. *App. 37, Order Of The Court, Case no. CL-29,530-G, dated 10/10/2013*. However, Judge Valdez was made aware that bankruptcy courts cannot affect or review the merits of a state judgment, and certainly cannot alter a state judgment in an effort to recoup, offset, or recover, especially for criminal sanction wherefrom bankruptcy court's lack all jurisdiction. Stern v. Marshall, 564 U.S. 2 (2011), (held that a bankruptcy court lacked constitutional authority under Article III of the United States Constitution to enter a final judgment); In re Sweeney, 276 B.R. 186 (B.A.P. 6th Cir. 2002) (Under the Rooker-Feldman doctrine, a bankruptcy court may not review and re-determine the merits of a debt or set aside the default judgment reflecting it, but it may within its exclusive jurisdiction determine whether that debt is dischargeable or not. (Id.

At 195)); also see Terrebonne Fuel and Lube, Inc., 108 F.3d 609, 613 (5th Cir.1997) ("bankruptcy courts lack the power to hold persons in criminal contempt.").

57.     Judge Valdez, without jurisdiction, using the color of law in a case where the county court had already lost its plenary power, entered *Order Of The Court*, dated October 10, 2013, allegedly modifying the Partain's *Third Amended Judgment*, ignoring *Turnover Order No. 5* and *Turnovever Order No. 6,* and inviting Partain to appeal again, adopting and continuing a pattern of racketeering activities of the racketeering enterprise. Partain was deprived of his rights and property. Partain was injured. See damages below.

COUNT 17

58. 18 USC § 1344 – BANK FRAUD; EXTORTION; or alternately 18 USC § 201 – BRIBERY OF PUBLIC OFFICIALS AND WITNESS; 18 USC § 666; 18 U.S.C § 1341; and VIOLATION OF AMENDMENT 14 OF THE UNITED STATE CONSTITUTION – The debtors' other attorney, Kelly Mckinnis, advised Judge Gonzalez that his clients could pay part of their judgment debt in case no. CL-29,530-A to Partain if the Court would "lean" on Compass Bank to release a lien against Partain's house then the Court could use that to credit the debtors. Debtors represented that Compass Bank was afraid of Partain's RICO (Racketeer Influenced Corrupt Organization) complaints against the bank, and that the bank would do "anything" to get away from his claim. Partain protested that the court shouldn't involve itself in a crime to pay him with his own assets by removing illegal liens. Judge Gonzalez called the bank's attorney, Vicky Skaggs, and Compass Bank release a $47,000 lien against Partain's house, through his company Global Limo, Inc., on or about October 4, 2010 to influence Judge Gonzalez to destroy Partain's final judgment to protect the bank. Judge Gonzalez was expecting to be influenced by the bank. Consequently, Judge Gonzalez put out an order attacking all the court's previous orders and denying Partain any judgment award or relief. Partain was injured through the racketeering activity because Judge Gonzalez used it to allegedly and illegally defeat all the previous orders of the court, leaving Partain with no award or judgment after an original *Final Judgment* for approximately $452,000 years and approximately 18 years of litigation and torment. Judge Gonzales recused himself and

later, without any authority under the law, ordered the case CL-29,530-A away from Judge Gabert to Judge Valdez to impair Partain's recourse. Partain was injured. *See also Damages below.*

COUNT 18

59. 18 U.S. Code § 1961 (1) (D) ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; 18 U.S.C. § 1956; 18 U.S. Code § 1951; 18 U.S.C. § 1957; 18 U.S.C § 1341; 18 U.S. Code § 1513; THEFT; FRAUD; 18 U.S.C. § 1962 (c)(d) - District Judge Alex W. Gabert, assigned judge to Hidalgo County Court no. [1] for case no. CL-29530-A operated under the color of law to participate in racketeering activities with attorney William McCarthy and Judge Rodolfo Gonzalez, including theft, fraud, and fraud connected to a Title 11 bankruptcy case, to attack the Partain's *Third Amended Judgment* by replacing it with another Final Judgment, dated March 16, 2012, to supplement Judge Gonzalez' Order (*App. 21*), dated 2/2/2011, based on William McCarthy's claim of an offset from a Title 11 bankruptcy and interests in assets from an interstate motorcoach company named Global Limo, Inc.  App. 29, Final Judgment, Case no. CL-29,530-A, dated 3/16/2012.

60. As a direct result of Judge Gabert's void *Final Judgment*, Partain was attacked by Hidalgo County Constables and a SWAT team at his condo which he was using as his Congressional Campaign Headquarters, on the same day and time he was scheduled for the only televised congressional candidates forum with Congressman Ruben Hinojosa (Plaintiff was also after being given a friendly warning by a Hidalgo County Sheriff's Commander to "watch his back since he was pissing off the powers that be"). *App. 30, Temporary Injunction Hearing (Transcript), C-0929-12-F, dated 4/16/2012.*  Power and water were cutoff and a 3 day armed standoff ensued.  The Constable service finally withdrew after the 3rd day (the SWAT team withdrew within 6 hours after they discovered the Partain wasn't listed in the orders to take possession of the condo and appeared to own the condo per county records), but Constables returned on the 5th day with McAllen police breaking into the condo and removing the Partain's campaign materials, campaign records, business tools, and business inventory.  Judge Gabert's void Final Judgment in case CL-29.530-[A] was used as an argument by William McCarthy to

vindicate Judge Homer Jasso's illegal writ of possession in Justice Court case no. JP2011-197 to defeat a preliminary injunction in district case no. C-0929-12-F and violate Partain's constitutional rights to be secure in his property and possessions. Tx. Const. Art. 1 sec. 19 - Deprivation of Life, Liberty, Etc.; Due Course of Law; USCA 14, Sec. 1. The 13th Court of Appeals opinioned in case no. 13-12-00267-CV that Final Judgment was Void, never having the effect of law. *App. 32, Opinion, Appeals Case no. 13-12-00267-CV, dated 5/9/2013.*

61. Partain's property was never returned, his motions and efforts to recover his property were ignored or attacked by every judge rotating through his case. Attorney William McCarthy, Judge Homer Jasso, and assistant District Attorney Michael L. Garza continued to use the resulting physical seizure of Plaintiff's property on May 11, 2012, to challenge Partain's property ownership. Plaintiff was injured. *See also Damages below*.

## COUNT 19

62. ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 11; THEFT; 18 U.S. Code § 1341; 18 U.S. Code § 1961 (1)(A),(B),(D); 18 U.S. Code § 1513; 18 U.S.C. § 1962 (c) and (d); CRIMINAL MISCHIEF; EXTORTION; THEFT – William John McCarthy filed a false sworn *Original Petition For Forcible Detainer*, Case no. JP2014-458, in the Justice Court of Precinct 4, Place 2, in Hidalgo County, on or about July 15, 2014 for real property owned by Partain and leased to Partain's tenant, Dora Martinez. William McCarthy did not sue Partain: Attorney William McCarthy, and "The Estate Of James H. Maples" lacked standing to invoke the jurisdiction of the justice court to sue for forcible detainer against Partain's tenants since the debtors were not landlords or owners pursuant to Texas Property Code § 24 and Turnover Order No. 5, making JP Jasso's Default Judgment[s] and Writ[s] of Possession void for lack of jurisdiction. William McCarthy irrelevantly claimed to be executor and administrator over The Estate Of James Maples, although he was not and a probate case had not even been filed. William McCarthy represented that the Partain's property was awarded to the debtors' Estate through the bankruptcy court, but he did not fully represent that the bankruptcy court's order had been superseded by Mr. Partain's *Turnover Order No. 5*

approximately 6 years earlier in 2008.  William McCarthy also claimed to McAllen police and to a county court judge that he actually owned the real property individually, but he could produce no documents.

63.    Justice of the Peace Homer Jasso, Sr., operating under the color of law through Justice Court, Pct. 4, Pl. 2, Hidalgo County, case no. JP2011-197 and case no. JP2014-458, engaged in a continuing pattern of racketeering activities with William McCarthy, and the Hidalgo County District Attorney's Office including theft, fraud, fraud connected with a case under title 11, and conspiracy to deprive Partain his real property by force using Hidalgo County resources including Hidalgo County Constables, a SWAT team, Default Judgments, and Writ of Possessions against Partain and his tenants, and by collaterally attacking the Partain's *Turnover Order No. 5. App. 11, Turnover Order No. 5, Case No. CL-29,530-A, dated 8/18/2008;  App. 24, Default Judgment, Case no. JP2011-197, dated 6/03/2011; App. 47, Default Judgment, Case no. JP2014-458, dated 9/29/2014; Writ of Possession, Case no. JP2014-458, dated 9/11/2014*.  Partain's rent and assets went to Hidalgo County and attorney William McCarthy. *18 U.S. Code § 1957 - Engaging in monetary transactions in property derived from specified unlawful activity.* Judge Jasso further violated Texas Property Code § 24.0054(3) and injured Partain by ordering a writ of possession after the appeals record was sent to the Hidalgo County Clerk. *App. 50, Letter of Receipt of Appeals Documents by County Clerk, CL-14-3542-E, dated 9/10/2014*.  Partain suffered real property loss, loss of rent, loss of time, and loss of his investment. *See also Damages below.*

COUNT 20

64. ANY OFFENSE INVOLVING FRAUD CONNECTED WITH A CASE UNDER TITLE 1118 U.S.C. § 1341; 18 U.S.C. § 1343; CRIMINAL MISCHIEF; THEFT18 U.S.C. § 1962 (c) and (d)  – William John McCarthy filed a fraudulent sworn exparte *Motion For Judicial Review Of A Document Purporting To Create A Judgement Lien*, case no. C-6549-14-G,  in 370th District Court of Hidalgo County, on or about July 30, 2014 claiming that Partain placed an illegal lien against property owned by "The Estate Of James Maples", but he did not provide a copy of the alleged document or identify it as required by statute.  William McCarthy claimed to be executor and administrator over

"The Estate Of James Maples," although he was not. Two district judges recused themselves: District Judge Jose Banales was later assigned to the case. William McCarthy did not identify which document Partain had filed as statutorily required by TEX GV. CODE ANN. § 51.902 (c) and William McCarthy misrepresented ownership of the real property in violation of *Turnover Order No. 5* through an improper affidavit for a deceased debtor. William McCarthy did not invoke the jurisdiction of the court. Judge Jose Banales was made aware of these facts and that Partain was owner of the property, but he ordered the clerk through wired communication to retitle Partain's property to a deadman. Judge Banales used the color of law to vandalize Partain's deed on his property using improper ministerial action through TEX GV. CODE ANN. § 51.902 to enrich a non-legal entity and to protect a racketeering enterprise which included Hidalgo County. Partain's title to his property was destroyed. Partain suffered real property loss, loss of rent, loss of time, loss of his investment and prejudice against his rights. Partain was injured. See Damages below.

COUNT 21

65. 18 U.S. CODE § 1961(1)(A),(B),(D). 18 U.S. CODE § 1961(1)(A),(D); 18 U.S. CODE § 1951 - INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE; 18 U.S. CODE § 1513 - RETALIATING AGAINST A WITNESS, VICTIM, OR AN INFORMANT; 18 U.S. CODE § 1962(c),(d) - District Judge Robert Max Blackmon was purportedly assigned to Hidalgo County case no. CL-29,530-[H] through Administrative Judge Jose Rolando Olvera's *Order of Assignment*. Partain objected to the assignment of Judge Blackmon, but conditionally withdrew the objection if the assignment fully authorized Judge Blackmon to enforce the Third Amended Judgement and all associated orders of the court. *App. 60, 61; TEX GV. CODE ANN. § 74.053 (b).* Judge Olvera did not amend his orders or assign another judge so Partain's objection laid and Judge Blackmon was legally disqualified. However, Judge Robert Blackmon ordered and held a show cause hearing under the color of law on Feb. 26, 2015, on Partain's *Motion for Contempt* against William McCarthy. Judge Blackmon tried to circumvent his disqualification by claiming he was only assigned for one hearing since Judge Omar Maldonado of County Court No. 8 was actually sitting over the case. *App. 59, Order Of*

*Assignment, dated 1/20/2015.* However, Judge Omar Maldonado was not assigned over the case by the 5th Administrative District as required by law, and is not sitting over the case.

66.    Judge Blackmon refused to acknowledge the 13th Court of Appeals *Opinion* and mandate, from related appeals case no. 13-12-00267-CV, and instead protected William McCarthy's fraud and multiple violation of the court's final orders by claiming the court's orders do not apply to counsel. *See App. 21, 24, 30, 44, 51, 53, 54, 57, 63, 65.* Judge Blackmon adopted William McCarthy's new sworn testimony, allegedly speaking for "The Estate of James H. Maples" (a non-legal entity), detailing his deceased client's interests in the Partain's interstate commerce business and how much the Partain owed the "The Estate of James H. Maples," although the 13th Court of Appeals wrote that it was beyond the jurisdiction of the court to hear new testimony after it lost its plenary power. *App. 32, Opinion; Henson v. Estate of Crow, 734 S.W.2d 648, 649 (Tex. 1987) (The dispositive question before us is the holding of the trial court that the Estate of Bruce L. Crow was not a legal entity and cannot be sued as such.).*

67.    Judge Blackmon fervently cast fraudulent arguments and legal misrepresentations at the Partain, and issued an order under the color of law denying contempt against William McCarthy to protect the racketeering enterprise and its racketeering activities. 18 U.S. Code § 1961(1)(A),(D); 18 U.S. Code § 1962(c)(d). Specifically, Judge Blackmon made arguments that the actual number on the instant case was "CL-29,530-H" instead of "CL-29,530-A" because of Judge Rodolfo Gonzalez' acts to transfer the case outside his jurisdiction, making the case a brand new case without any orders to enforce – and contradicting TEX GV. CODE ANN. § 74.121(c).

68.    Judge Blackmon retaliated and further argued that Partain started a new case, CL-29,530-H, to harass the attorney McCarthy and that he was considering sanctions to punish Partain unless he played nice and submitted. 18 U.S. Code § 1961(1)(A),(B),(D). Judge Blackmon threatened the Partain on, but mostly off the record that he may sanction him with fines for not "playing nice", and that if the Partain failed to conform to any of the judge's possible orders that he could end up in jail. 18 U.S. Code § 1951 - Interference with commerce by threats or violence; 18 U.S. Code § 1513 - Retaliating against a witness, victim, or an informant. Judge Blackmon even

manufactured his own styled case as Johnny Ray Partain v. Estate of James H. Maples, Decedent et al. in the Justice Court, Pct. 4, Pl. 2. to continue his deception and to protect racketeering activities through his alleged new case and threats. *App. 62, Order Denying Motion For Contempt, Case no. CL-29,530-H, dated 3/02/2015*; 18 U.S. Code § 1962(c)(d); 18 U.S. Code § 1961(1)(D). The association-in-fact continued when Judge Robert Blackmon illegally filed an order in Hidalgo County case no. CL-29,530-[H] in 2016 to dismiss the finalized case for want of prosecution (DWOP) to overrule all orders and the final judgment, which was over 14 years, to take the Partain's property and business to protect the racketeering enterprise. Partain was injured. Also see Damages below.

COUNT 22

69. 18 U.S. CODE § 1001; 18 U.S. CODE § 1018; 18 U.S. CODE § 1961 (D); 18 U.S. CODE § 1962 (D) - Partain made two criminal complaints to the Texas State Bar informing it well of attorney William McCarthy's criminal acts, his mortal threats, and the racketeering activities herein. The Texas State Bar responded first by shortening the period originally offered to Partain to provide evidence, and then by joining the RICO enterprise and converting Mr. Partain's complaints and 500 plus pages of certified documents witnessing serious crimes, as an "inquiry" concealing the racketeering enterprise, connected with a title 11 bankruptcy case, and conspiring to advance its goals in violation of 18 U.S. Code § 1962 (D): William McCarthy referenced the Texas State Bar's response to Partain as condoning his (criminal) actions. The Texas State Bar adopted the goal of the racketeering enterprise claiming in written notice that the serious crimes documented and provided to them do not violate the Integrity of the Profession (See Attorney Displinary Rules of Professional Conduct, Rule 8.04. Misconduct) - although they technically do. The Texas State Bar[10] of Texas conspired with the RICO enterprise and concealed the racketeering activity to deprive Partain recourse and to cause him injury. Partain was injured. *Also see Damages below*.

---

[10] Partain is not suing the Texas State Bar, but is documenting the extent of the racketeering enterprise for which co-conspiring defendants are liable.

COUNT 23

70. 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1962(d) – Farmers Insurance engaged in wire fraud, mail fraud, and RICO conspiracy. Partain purchased property loss insurance for his condo located at 3820 N 7th Court, McAllen, Texas, with Farmers Insurance, in 2008, on representations by Farmers Insurance's agents that Farmers Insurance, or its associates, would compensate Partain for property lost to the perils that Farmers Insurance listed. However, Farmers Insurance did not intend to fully provide coverage for the perils it listed, and in fact, was almost nonresponsive to Partain's claims of property loss. Instead, Farmers joined a RICO enterprise and adopted its goal to destroy Partain's property rights. Farmers Insurance used electronic communication and United States mail to execute its scheme.

71. Specifically, Partain made two loss claims under his Farmers insurance policy regarding the illegal taking and the destruction of title to his property under claim numbers 8000753367-1-1 (5/11/2012) and 3003661120-1-1 (10/09/2014) pursuant to the civil commotion, vandalism, and malicious mischief perils under his insurance. Farmers Insurance verified Partain's title to his house on or about December of 2012, but failed to deny or accept his claim within statutory time limits. Instead Farmers having learned of the RICO enterprise started a scheme to defraud Partain of insurance money by evading Partain's insurance claim 8000753367-1-1 (5/11/2012) through representations in emails and mailings that they were conducting an investigation on his claim when in fact they had already closed the claim. Then on October 5, 2015, after the statute of limitations had run to enforce an insurance claim through lawsuit, Farmers mailed a denial of coverage misrepresenting legally established precedent to profit off of Partain through the conduct of the racketeering enterprise. Partain was injured. *Also see Damages below*.

COUNT 24

72. 18 U.S.C. § 1962(d) – Judge Mario Ramirez[11] is associated-in-fact with the racketeering enterprise and continues to conspire to engage in a course of conduct to deprive Partain

_____

[11] The enterprise element of a RICO allegation may be proven with evidence of an "association-in-fact" enterprise. Boyle v. United States, 129 S. Ct. 2237 (2009); United States v. Warner, 498 F.3d 666 (7th Cir. 2007) (A state may be an enterprise). Former Governor George Ryan's conviction was affirmed). Naming a judge as part of an association-in-fact enterprise does not require that the judge becomes a defendant in the complaint of racketeering,

his property, his rights, and the operation of his interstate company, Atlas Transportation, Inc. (aka Global Limo, Inc.) while protecting Compass Bank and other racketeers. The association-in-fact enterprise continued when Judge Mario Ramirez dismissed the defendants of this lawsuit on his authority as a judge to protect the racketeering enterprise. When the case was reopened and remanded to conform to the law, Judge Ramirez closed his court to the Partain for over 4 years, refusing to respond to motions, and preventing Partain from exercising his constitutional rights and recovering compensation for his businesses and property, and protecting Hidalgo County corruption. After Partain complained to the Texas Supreme Court and Governor Greg Abbott, Judge Ramirez was contemptuous of Partain's rights and Ramirez' mandate so Judge Ramirez bless all the defendants of the racketeering enterprise with immunity and dismissal to continue the open pattern of racketeering described herein. To be part of a conspiracy to violate RICO under § 1962(d), the conspirator need not himself have committed or agreed to commit the two or more predicate acts, only to further the conduct of the racketeering enterprise. He who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c), and vice versa, even if the defendants do not personally agree to do, or to conspire with respect to, any particular element. Partain is injured. *Also see Damages below.*

## DAMAGES

73.     The acts and omissions of the Defendants are the proximate cause of the damages to Partain, and Partain seeks monetary relief over $1,000,000 and a demand for judgment for all the other relief to which the Partain deems himself entitled. Partain seeks compensation for the loss and damage of his property and his vested interests in his businesses, and general damages for the loss of freedom, mental anguish, loss of wages in the past, loss of future earning capacity, and exemplary damage for intentional abuse of "legal process", retaliation, and malice. Further, it is unlawful for any person to conspire to violate any of the provisions of subsections 18 U.S.C. § 1962 (a), (b), or (c), and each co-conspirator is liable for mandatory treble damages for the acts of all other co-conspirators undertaken in furtherance

---

nor that a judge be a part of a lawsuit, but he is still an associate of the racketeering enterprise nonetheless which demonstrates a continuation or an open pattern of racketeering in the instant case.

of the conspiracy, both prior to and subsequent to the co-conspirator's joining the conspiracy, even if the conspirator did not participate in, or was unaware of, such acts. Salinas v. United States, 522 U.S. 52, 63-64 (1997); see also CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d 1076, 1088 (10th Cir. 2014).

74.    As of August 3, 2020, Partain's property losses include, a hard won civil judgment ($2,720,126) in Hidalgo County Court No. 1 case no. CL-29,530-A which was finally destroyed through dismissal for want of prosecution (16 years after the judgment became final and 3 executions had been attempted); real property ($116,000) which was invaded and first seized after an assault by a SWAT team as directed by the Hidalgo County District Attorney to interfere with Partain's US Congressional campaign against public corruption; eight years of rents ($96,000) after the seizure of Partain's condo; Partain's transportation business and assets ($19 million) which was never return per court order (the court's refused to enforce their decrees and instead threatened Partain with contempt and incarceration for insisting that the courts enforce their decrees); Partain's established and vested business interests in his electrical service companies ($55 million) which was partially destroyed after a failed attempt to "felonize" Partain in Cameron County following a threat by a Justice of the Peace that the District Attorney looking for a way to prosecute him; $22,802 in additional monies seized by Cameron County, plus simple interest at 10% before judgment and compound interest after judgment; plus treble damages against RICO defendants. Said damages are minimally sum certain at $236,819,180, and do not include any jury findings for loss of freedom, mental anguish, intentional abuse of "legal process", retaliation, and malice.

## CONDITIONS PRECEDENT

75.    All conditions precedent have been performed or have occurred.

## JURY DEMAND

76.    Plaintiff demands a jury trial as required in any findings of fact.

## REQUEST FOR DISCLOSURE

77.    Pursuant to Rule 194, you are requested to disclose, within 50 days of the service of this request, the information or material described in Rule 194.2(a)-(i).

## VI. PRAYER

78.     WHEREFORE, PREMISES CONSIDERED, Plaintiff, Johnny Partain prays the Court causes Defendants to be served with process herein, that the Defendants be ordered to appear and answer, that the Court exercises the authority granted it under 18 USC § 1961-1968 and under Tex. Civ. Prac. Rem. Ch. 37 and 65, and the Texas Constitution, and that upon final hearing, Partain have judgment of the Court for his damages and costs, including actual damages, general damages, exemplary damages, pre-judgment interest at 10% APR, post judgment compound interest at 10% APR, all costs incurred therefrom, for his time, and for any other and further relief, either at law or in equity, to which Partain may be entitled. Partain seeks adequate compensation for the taking, damaging, or destruction of his property by the State of Texas, Hidalgo County, Cameron County, and City Of McAllen, and seeks declaratory judgment on the as-applied-to-the-facts-of-this-case constitutionality of Tex. Gov. Code § 51.902, and Fraudulent Liens and Texas Property Code, Title 4. Actions and Remedies, Chapter 24. Forcible Entry And Detainer.

Respectfully submitted

PLAINTIFF
7020 N. 16th Street
McAllen, Texas 78504
956-240-1821
partain@atlastechnologies.biz

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered a true and correct copy of *Third Amended Petition* on this May 18, 2021 pursuant to the Texas Rules of Civil Procedure to:

1. STATE OF TEXAS; TEXAS ATTORNEY GENERAL KEN PAXTON; DISTRICT JUDGE ALEX W. GABERT; DISTRICT JUDGE ROBERT MAX BLACKMON; DISTRICT JUDGE MANUEL BANALES - Benjamin.Dower@texasattorneygeneral.gov, Demetri.Anastasiadis@texasattorneygeneral.gov, kelli.fuqua@texasattorneygeneral.gov, scot.graydon@oag.texas.gov;

2. HIDALGO COUNTY, TEXAS; HIDALGO COUNTY SHERIFF/CONSTABLE J.E."EDDIE" GUERRA, HIDALGO COUNTY PRECINCT 4; DEPUTY CONSTABLE CARLOS GONZALEZ, HIDALGO COUNTY PRECINCT 4; JUSTICE OF THE PEACE HOMER JASSO SR.; DISTRICT JUDGE JOSE MANUEL BANALES; COUNTY JUDGE SERGIO VALDEZ; COUNTY JUDGE RODOLFO GONZALEZ; HIDALOG COUNTY SHERIFF GUADALUPE "LUPE" TREVIÑO, officially and personally; - josephine.ramirez@da.co.hidalgo.tx.us;

3. MCALLEN POLICE CHIEF VICTOR RODRIGUEZ and CITY OF MCALLEN – rdguerra@guerrasabo.com, hscott@guerrasabo.com;

4. FARMERS INSURANCE, INSURANCE EXCHANGE- sds@obt.com;

5. DISTRICT ATTORNEY RENE GUERRA replaced by DISTRICT ATTORNEY RICARDO RODRIGUEZ - michael.garza@da.co.hidalgo.tx.us;

6. BBVA USA, INC.; COMPASS BANK - ccmurray@atlashall.com;

3. Letters To Governor and Attorney General

EXHIBIT 3

7020 N 16th Street
McAllen, Texas 78504

IXCHEL PARR
Assistant Attorney General
Environmental Protection Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
(512) 475-4013 | Fax: (512) 320-0911
Ixchel.Parr@oag.texas.gov

February 16, 2024

Re: Demand to cease and desist misrepresentations and attempts to divert PSF funds from GLO

Ms. Parr;

I received your demand letter of January 31, 2024, regarding the General Land Office's (GLO) complaint of my properties and lessees. You either failed your due diligence before contacting me, or you are misrepresenting the illicit acts of the State of Texas – I am attaching to this letter some relevant communications with the Attorney General and Governor. It is the General Land Office that has confiscated or misappropriated some of my royalty payments, without proper legal authority over my property, by making misrepresentations to my lessees.[1] This is going to cause problems for my lessees whom will eventually be unable to produce on my property – or pay the State's taxes. But its going to be a much bigger problem for the State of Texas if it continues to use these illicit tactics to evade paying its debt to me.

The State of Texas, including all the instrumentalities of the state, its legislative, executive, and judicial authorities, has precious little authority over the matter of my collecting its debt to me, as imposed by Art. 1 Sec. 17 of the Texas Constitution and the 5th Amendment of the United States Constitution. Texas' continuing rogue evasions and gamesmanship of its obligations to pay its debt are barred by Art. 1, Sec. 29. It has been established through multiple United States and Texas Supreme Court Opinions that these debts must be paid.[2] In fact, Texas Solicitor General Aaron Neilson recently represented to the United States Supreme Court, in Devillier v. Texas, cause no. 22-913, a relevant case here, that the State of Texas always pays its constitutionally imposed debts: Mr. Neilson was responding to characterizations that Texas' actions in Devillier were rogue, resembling gamesmanship or even bait and switch. Did he lie? Well, Texas' debt in my instance has matured much further than even Devillier, following the State's established path of gamesmanship to the instant situation.

---

[1] The State has no power to commit acts contrary to the guarantees found in the Bill of Rights. Boullion, 896 S.W.2d 147-49 (Tex. 1995).

[2] "[I]f a state takes a person's property and doesn't give compensation, that state is violating the Constitution every day — it's an ongoing violation," said United States Supreme Court Justice Elena Kagan, In re: Devillier v. Texas.

Texas avoided and evaded paying its constitutionally imposed debt to me. Your Attorney Generals Office unlawfully claimed judicial immunity to the processes that I attempted in good faith, which consequently neutered the State's power to resolve it debt to me, judicially and statutorily. All this done to sacrifice me and my family and protect incompetence and corruption from the lowest to the highest political offices of Texas. Ironically, I now have legal immunity to civil litigation and criminal prosecution since they are not only barred by res judicata, but by Art 1. Sec. 29[3][4], beyond government power and inviolate. Raising further legal arguments is irrelevant and will not lie, even if the processes now implemented to collect against the State's debt are alleged imperfect. Your best response now would be to negotiate honestly with me.

As of February 16, 2024 the State of Texas is indebted to me for approximately $337 million, minus the estimated over $100 million in assets I possess through execution against the State. That's comes out to about $237 million. Plus we'll have to add for costs and the recent additional seizures of my property. I've developed a lot of tools and I will collect the full amount of the State's debt. However, I am fully willing to release Texas from my lien once it pays it debt to me as required by law. Please make certain that the GLO returns my royalties back to me.

In the meantime, you've express interest in some of my property which you claim is under the PSF. Do you have the authority to trade, or to pay the State's debt? Or, do you want to set a precedent?

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

Cc:

Governor Greg Abbott, Office of the Governor, P.O. Box 12428, Austin, Texas 78711-2428, Cert. Mail #9407111206210996187334;

Attorney General Ken Paxton, Office of the Attorney General, PO Box 12548, Austin, TX 78711-2548, Cert. Mail #9407111206210996439693.

---

[3] The United States Supreme Court has consistently described the Just Compensation Clause as "self-executing," meaning that no additional acquiescence or authorization is necessary to enforce the compensation requirement. This means that no further action by the government is a necessary predicate to enforcing the right, nor is a waiver of sovereign immunity, nor an enabling statute. Thus, an owner whose property has been taken is entitled to seek compensation without invoking any particular statute or state court procedures. See, e.g., Knick, 139 S.Ct. at 2171; Clarke, 445 U.S. at 257. When government takes property, it is obligated to provide compensation. If it does not, property owners are entitled to seek compensation themselves without additional government permission.
[4] "Just compensation is provided for by the Constitution and the right to it cannot be taken away by statute." Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304 (1923).



KEN PAXTON
ATTORNEY GENERAL OF TEXAS

January 31, 2024

Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz
956-240-1821

Re:  Demand to cease and desist misrepresentations and attempts to
     divert PSF funds from GLO

Dear Mr. Partain:

This office has received a request from the General Land Office ("GLO") to address the letters you have sent to operators of numerous oil and gas leases in Texas.

In these letters, you allege that certain Permanent School Fund ("PSF") minerals have been transferred to you. You further allege that "[t]he debtor, State of Texas, has defaulted in connection with an obligation secured by collateral specified in the attached UCC Finance Statement." The UCC Finance Statement claims as collateral "[a]ll assets, interest, and taxes belonging to Texas, Texas Treasury Safekeeping Trust Company, Hidalgo County and City of McAllen." The letters direct the operator to make all payments owed to the State of Texas pursuant to State oil and gas leases to you.

As you must be aware, the representations you have made are wholly inaccurate and entirely without authority. You have presented no recorded deeds or judgments against GLO or any other entity to support your representations. The funds you are attempting to divert away from the Permanent School Fund support public schools across Texas, and the Office of the Attorney General takes any attempt to illegally appropriate these funds very seriously.

The Office of the Attorney General, on behalf of the GLO, demands that you**:**

1. **Immediately cease and desist contacting operators claiming any interest in state property;**
2. **Immediately inform the operators you have previously contacted of your misrepresentations and return any royalty payments you inappropriately received;**

3. **Within 20 days of the date of this letter, file the attached UCC-3 termination statement for all properties on which you filed a UCC-1 statement pursuant to TEX. BUS. & COM. CODE § 9.513(c); and**

4. **Within 30 days of the date of this letter, send copies of your correspondence with the operators previously contacted and file stamped copies of the UCC-3 termination statements.**

This letter is an attempt to resolve this matter without the need, or cost, of litigation. Your prompt attention to this matter will save time and expense for you and the people of Texas. **Failure to respond may result in further action by the Attorney General.** Any and all future calls, correspondence, and other communications should be directed to my attention.

Thank you for your prompt attention to this matter.

Sincerely,

*/s/ Ixchel Parr*
IXCHEL PARR
Assistant Attorney General
Environmental Protection Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
(512) 475-4013 | Fax: (512) 320-0911
Ixchel.Parr@oag.texas.gov

Johnny Partain
7020 N 16th Street
McAllen, Texas 78504

US Attorney General Merrick Garland
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

May 18, 2023

<u>CRIMINAL COMPLAINT AGAINST TEXAS GOVERNOR GREG ABBOTT AND ATTORNEY GENERAL KEN PAXTON, AS WELL AS NOTICE OF COMINGLING OF PUBLIC AND PRIVATE PROPERTY POTENTIALLY AFFECTING FEDERAL PUBLIC MONIES</u>

My name is Johnny Partain, and I am filing a criminal complaint (18 USC 242, 241) against Texas Governor Greg Abbott and Texas Attorney General Ken Paxton for violating my civil rights. I am also informing your office that I have solutions to cure my injuries and enforce my civil rights that may jeopardize the interests of the United States government, so I am requesting and providing information before proceeding.

Governor Greg Abbott and Attorney General Ken Paxton knowingly violated my rights to receive hundreds of millions of dollars in compensation for property that was taken, damaged, and destroyed by the State of Texas pursuant to Texas Constitution Article 1, Section 17.  To be clear, the Texas Judiciary buried its inept and unlawful acts against me, my property, and other people's lives by denying me access to the courts under the pretext of confusion and immunity, which ultimately destroyed my property rights. However, it was the Attorney General, acting under color of law asserting immunity in Hidalgo County District Case No. C-0929-12-F, who absolved the helpless courts of their obligations under the Texas constitution, and as required by mandate of a higher court.  Then, Texas Governor Gregg Abbott and Texas Attorney General Ken Paxton took affirmative action, objecting to and blocking the Texas Comptroller Glenn Hagar through its attorney, Murl E. Miller, from paying my application for just compensation as required by the constitution, claiming under color of law that I was required a court order to exercise my right to just compensation under Texas Constitution Article 1, Section 17, from which they had just been illegally granted immunity.  Attorney General Paxton could have brought my request for compensation before a jury if he wanted a second opinion on its value rather than claiming immunity from the constitution to evade the required compensation. Governor Gregg Abbott does not require a court order to comply with the constitution or to allow the Texas Comptroller to pay me. See the attached notices.

To put context on this issue, the compensation due to me arises from the racketeering activities of Texas State Bank to interfere through its political connections in the South Texas judiciary with my final judgment for $451,000 against a well-known fraud.  The fraud was a personal friend and neighbor to the president of the bank.  The bank then interfered with the operations of my interstate bus company through theft of its assets and racketeering (RICO) to control the company and its profits. Banks have no superior rights under the Texas Constitution.  Twenty-three (23) people died as a result of the bank

strong arming me through their law firm to seize control of my company.  I was served with over a billion dollars in legal claims, and then I was judicially enjoined and threatened with incarceration to be silent to protect the appearance of propriety by the judiciary in the ensuing multi-district litigation.  My company was destroyed and the families who lost lives were compensated almost nothing:  They never realized that the courts and the bank were running the seized corporation.  When I complained to higher authorities, I was threatened for complaining, my complaints were dismissed, and I was consequently imprisoned for civil contempt for 72 days by the judge I was complaining about, before suing out a habeas corpus in Federal court.  The offending judge never had jurisdiction over me. Despite the fact that I had no charges against me and that I had never faced prosecution, I was fined $94,500 by a second judge for using habeas corpus to evade the first judge's order to jail me.  Thereafter, four judges signed orders on each other's courts to protect the offending judge from criminal prosecution.  President Obama's administration ordered a criminal investigation of two of the judges through the FBI, but the FBI failed to perform.  I know this because I was never interviewed, but my house was searched by FBI and US Marshals.

Later, my property and my temporary congressional campaign headquarters were assaulted by a SWAT team through actions by the Hidalgo County District Attorney and a Justice of the Peace to seize my property while I campaigned for a US congressional seat against public corruption.  This resulted in a three day armed standoff, wherefrom police withdrew, but my campaign headquarters, a property I owned, was taken a few days later while I was away.  Because I had never been sued, orders to take my property were eventually found to be unlawful by a higher court. A few years later, the same government agents once again illegally seized my property in the exact same way as I ran for Congress again.  A Justice of the Peace then threatened me that the District Attorney was looking for a way to prosecute me.  A month later I was indicted and fully prosecuted for a felony manufactured by local government.  I was eventually exonerated on the grounds that there was no crime.  However, after my acquittal, the courts withheld almost $25,000 from me and refused to restore it as required by law.  Before the prosecutions were dropped, I lost my ability (security clearance) to work for my clients, which almost cost me my second company. The courts then instructed the court's clerk to title my property to a dead man using Texas lien laws to describe my title on my property as a lien not assigned by a court recognized in the State of Texas or the United States.

There are a lot more civil right violations, and I have filed numerous competent complaints, but because everyone involved has always been granted unexplained immunity from the law, my complaints have never been subjected to judicial review. Even though my rights have been serially violated, I cannot appeal since the clerks have also been weaponized, altering records and making unlawful demands, to prevent my appeals.  According to a district attorney's investigator, I should not expect protection from criminal assaults against me or my property because I am a contentious political issue that will not be brought before a jury.  I've made it quite clear that the Texas legal system will never permit me to stand trial, but maybe I can force it to prosecute me?

This brings me to one of the many extrajudicial options I have. According to Texas Constitution, Art. 1, Sec. 17, the government must provide payment before using, taking, or destroying a citizen's property. It is not necessary to file a lawsuit, because according to the constitution, payment is required prior to using, taking, or destroying property. Since Texas is not permitted to become indebted to me instead, my hundreds of millions of dollars are comingled with those of the State of Texas.  Art. 1, Sec. 17 of the Constitution is a self-executing constitutional right, and I cannot be legally prosecuted for

receiving my compensation. Any prosecution would lead directly to legal error according to opinions of the Texas Supreme Court for the past 60 years.  However, even if I were to be prosecuted, I doubt that the State of Texas or even the Federal government would be willing to have me appear before a jury and have a team of lawyers examine what I have experienced over the past 20 years. I will collect my compensation from Texas. I am nonetheless aware that federal funds, grants, and programs also contribute to Texas's economy. Finding and avoiding any potential federal funds or pledges that Texas may hold is a nearly intractable challenge. As a result, I'm notifying you, the Department of Justice, that I want to refrain from seizing federal property and that I will seek my rightful restitution from the State of Texas.

I'm respectfully requesting that you identify to me all federal property that the State of Texas is holding so that I can avoid taking it, whether or not the Department of Justice decides to pursue the charges I've made against Gov. Gregg Abbott and AG Ken Paxton. Alternately, I'm asking that any federal property that the State of Texas owns or controls be taken away until I receive my pay from Texas. This could include withdrawing FDIC protection for deposits in Texas State Depositories. As a final option, I am requesting that the United States government reimburse me for my just compensation using funds designated for the State of Texas. As of May 18, 2023, this compensation is $327,143,334, compounded at 10% annually as provided by law. If you are able to organize any relief, if you have any concerns or objections, or if you intend to leave me on my own, please let me know as soon as possible.


Respectfully,

Johnny Partain
956-240-1821

Cc:

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

Attorney General Ken Paxton
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548



P.O. Box 13528  •  Austin, TX 78711-3528

December 7, 2022

Mr. Johnny R. Partain
7020 North 16ᵗʰ Street
McAllen, Texas 78504

RE: Miscellaneous Claims Application

Dear Mr. Partain,

I greatly appreciated the opportunity to talk with you about the $250,000,000.00 Miscellaneous Claims Application that you filed with our agency. For the reasons we discussed, your Application must be denied as a matter of law.

Your lawsuit was dismissed because the trial court did not have jurisdiction to hear your causes of action due to sovereign immunity. Sovereign immunity entails two separate forms of immunity for the State of Texas, its agencies, and its officials (collectively, the "State").

(1) **Immunity from Suit:** Immunity from suit bars a lawsuit against the State unless the State expressly gives its consent to the suit. In other words, although the claim asserted may be one on which the State acknowledges liability, this rule precludes a remedy until the Legislature consents to suit.

(2) **Immunity from Liability:** Immunity from liability protects the State from judgments even if the Legislature has expressly given consent to the suit. In other words, even if the Legislature authorizes suit against the State the question remains whether the claim is one for which the State acknowledges liability. The State neither admits liability by granting permission to be sued.

Thus, when the trial court made its judgment, it denied your claim as the State is immune from the suit and the liability. The appellate court also did not overturn the immunity judgment. As a result, it is inaccurate to state that the Courts have not determined your real property claim. The judiciary have specifically found that your claims are barred under the doctrine of sovereign immunity.

Even if you disagree and continue to believe that you do have a valid right to payment that is "unopposed," you are still required to obtain an Order from a Texas court with competent jurisdiction over the matter to agree to enforce your right to the payment. Absent a bona fide judicial order from such a Court, our Agency has no statutory authority to pay any claim that you may present concerning this matter.

Respectfully yours,

Murl E. Miller
Chief Counsel for General Litigation



74-209
(Rev.10-17/8)

# Miscellaneous Claim Application

Use this form to file a claim against the state of Texas for the following reasons:
- Warrant that is void due to expiration date.
- Unpaid bill that cannot be paid by receiving state agency due to expiration of appropriation.
- Other claim justified by state contract or state law.

*Instructions on second page*

**Type of Claim** *(Please check one)*

☐ Void Warrant      ☐ Unpaid Bill      ☑ Other   **Claim under Tex. Const. Art. 1, Sec. 17**

*Please type or print*

Claimant's name *(Legal name of individual or business)*
**Johnny Ray Partain**

Mailing address (P.O. Box, street, city, state and ZIP + 4 code)
**7020 N 16th Street**

Claimant's Social Security number (SSN)* or Texas taxpayer number or Federal Employer Identification Number (FEIN)
**\*\*\*-\*\*-\*\*\*\***

| Claimant's telephone *(Area code and number)* | Amount of claim |
|---|---|
| **956-240-1821** | **$250,000,000.00** |

Specific reason for claim *(For void warrant(s), list specific identification of goods, services, refund or other items for which the warrant(s) were originally issued.)*

This is my sum certain claim for just compensation specifically required by Texas Constitution, Art 1., Sec. 17, for my property taken, damage, or destroyed by state actors, and particularly state judges, protected under claims of immunity to suit by the Texas judiciary: I have not been sued. The Texas Judiciary waived its right to review my claim on excuse of immunity to suit in Texas courts. Attached is the Third Amended Petition describing the original complaint. Governor Abbott and Attorney General Paxton refuse to meet to negotiate. My request for $250 million compensation through warrant is unopposed. My constitutional claim is due pursuant to Art. 1, Sec. 17, and is superior to any impeding process or statute, being constitutionally derived.

Supporting documentation *(Please list)*

1. **Third Amended Petition**          3. _____

2. **Letters to Governor and Attorney Gen.**   4. _____

\* **Federal Privacy Act Statement:** *Disclosure of your Social Security number is required and authorized under law for the purpose of tax administration and identification of any individual affected by applicable law, 42 U.S.C. § 405(c)(2)(C)(i) and Tex. Gov't Code §§ 403.011, 403.015, 403.055, 403.056 and 403.078. The Public Information Act, Tex. Gov't Code Ch. 522, and applicable federal law shall govern release of information on this form in response to a public information request.*

## Certification

I certify that the information I have furnished on this form is true and correct. I certify that the amount of this claim is still outstanding and is due and payable.

| Type or print name | Title |
|---|---|
| **Johnny Ray Partain** | **Citizen of Texas** |

sign here ▶  Claimant's signature

Date
**8/26/2022**

Complete application and mail to:   Comptroller of Public Accounts
Fiscal Management Division
P.O. Box 13528
Austin, TX  78711-3528
**ATTN: Miscellaneous Claims Analyst**

Or FAX to:   512-463-2138

For questions, call 1-800-531-5441, ext. 5-0966.
The local number in Austin is 512-475-0966.

*Under Ch. 559, Texas Government Code, you are entitled to review, request and correct information we have on file about you, with limited exceptions in accordance with Ch. 552, Government Code. To request information for review or to request error correction, contact us at the address or phone number listed on this form.*



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

Attorney General Ken Paxton
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

August 11, 2022

## NOTICE OF DEBT COLLECTION

The State of Texas has to this date evaded paying to me and my family its constitutional debt under Texas Constitution, Article 1, Section 17. I have tried to resolve this through the Texas Supreme Court which now claims immunity from petition, constitution, and the laws of our state. I have tried to resolve this debt with both the Governor's and Attorney General's office which refuse to enforce the laws of this state or pay its debts, but have argued that the debt needs to be paid.

The creation of the State of Texas begins in Texas Constitution, Article 1, and includes our Bill of Rights which are excepted from the powers of government and inviolate, in verbatim, per our Texas Constitution. Specific rights under the constitution are self-executing according to the Texas Supreme Court and can be enforced without any other actions required.

WHEREAS, Johnny Partain residing at 7020 N 16th Street, McAllen, Texas 78504 has made several claims regarding the taking, use, and destruction of his property by the government amounting to $250 million, sum certain, pursuant to Texas Constitution, Article 1, Section 17;

WHEREAS, Johnny Partain has attempted to compel the State of Texas and its political subdivisions to conform to the Texas Constitution to pay its debts, ad nauseam, and he has no other legal recourse;

WHEREAS, The State of Texas has refused Johnny Partain any due process or a jury trial as mandated by order of a higher court and the law.

WHEREAS, The State of Texas has no immunity to its obligations under the Texas Constitution and a constitutional debt exists;

WHEREAS, the State of Texas, Hidalgo County, and City of McAllen have engaged in serial patterns of harassment, intimidation, oppression, and corruption, protected by the State of Texas all the way up to its Governor, Attorney General, and Chief Justice of the Texas Supreme Court;

WHEREAS, Johnny Partain is entitled to full payment and to the costs of collections, including the costs of defending his restitution as necessary;

WHEREAS, debt collections routinely cost 50% of the debt owed and is traditionally added to debts collected;

WHEREAS, the Department of Public Safety alone has an agency wide biennial budget of $2.3 billion in state and federal funds;

ACCORDINGLY, Johnny Partain is now forced to engage all forms of debt collections against the State of Texas, and its culpable political subdivisions, of assets to restitute, preserve, and defend his rights under the United States Constitution and Texas Constitution;

ACCORDINGLY, restitution will be adjusted to reflect the original value of Johnny Partain's injuries, and any additional injuries;

ACCORDINGLY, costs will be adjusted to compensate for enforcement and defense of the collection of debt for restitution.

The State of Texas may pay its debt to Johnny Partain within 20 days of this letter without incurring additional costs, but note that no action is necessary from your office. If you protest and wish to justify your position, protest immediately and be very specific regarding the terms of your protest: Remember that the Texas judiciary has already waived and exhausted its jurisdiction to review this debt, punting any reasonable and civil resolution to your offices, if possible. Prior letters to the Governor's Office are attached to this notice.

Justly,

Johnny Partain
956-240-1821



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

Attorney General Ken Paxton
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

December 21, 2021

Re: Johnny Partain – Property Compensation Pursuant To Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5.

Governor Greg Abbott and Attorney General Ken Paxton;

The State of Texas owes me $250 million for condemnation and destruction of my property through its efforts to protect official incompetence and public corruption[1] in South Texas.  I sent you a certified letter on August 6, 2020, requesting payment since I had been locked out of the courts for over 4 years and couldn't even get a response to a simple motion.  I never got a response from your office and your office failed to return my calls for a meeting or a calendar.  In fact, I have never been interviewed even after making criminal and judicial complaints against public officials for two decades.  Taking notes from your December 18, 2021, press conference[2] regarding the State's right to take 'Unprecedented' action on the border wall "when the Biden Administration has failed to do its job as required by

---

[1] The United State Supreme Court relevantly explains in Nashville, C. & St. L. R. Co. v. Browning, 310 U.S. 362, 369, "It would be a narrow conception of jurisprudence to confine the notion of "laws" to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law…Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text." See also Poe v. Ullman, 367 U.S. 497 (1961). I.E. Corruption is the law of South Texas all the way up to the Texas Supreme Court.

[2] https://www.youtube.com/watch?v=7rQHlft5jFw&t=153

the constitution … to enforce the law", I am also taking this unprecedented action to protect my property rights under the Texas Constitution Art. 1 Sec. 17 to collect monies owed to me for property seized and destroyed. Your office and the Texas Supreme Court have facilitated "third-world country" banana republic practices which you campaigned against in 2014. You have both allowed public corruption to flourish and to cause me great injury. If you ignore me, I will be forced to take the $250 million, plus whatever costs to collect it, to make myself whole - to embarrass everyone involved and to destroy the status quo so I might finally live peacefully in Texas. Recall that it didn't take much to shut down the whole judicial network for two months when I last contacted you.

The amount is no longer at issue since the judiciary has waived its right to review, claiming it is immune to being sued in it's own courts. Being attorneys you also realize that this hasn't been a credible defense in the courts since the 1960's and the Texas Constitution (Art.1, Sec. 17) requires payment, even if the Texas Supreme Court determines that public incompetence, corruption, and the status quo must be protected at all costs when it embarrasses the courts or impugns the state.[3] Fortunately, Texas Constitutional rights are allegedly self-executing and don't require judicial review. I presume you and the State will treat me as deplorable wherefrom the law doesn't apply as usual, and maybe unresponsive since I am only a citizen of Texas. I've already endured two decades of poor treatment and political prosecution. Please don't be inconsiderate.

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

---

[3] [T]he Constitution itself is . . . a waiver of governmental immunity for the taking, damaging or destruction of property." Steele v. City of Houston, 603 S.W.2d 786, 791 (Tex. 1980).



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

August 3, 2020

Re: Johnny Partain – Request For Property Compensation Pursuant To Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5.

Governor Greg Abbott;

    I am currently in the Texas Supreme Court, <u>In Re Johnny Partain</u>, case no. 20-0362, regarding an inverse condemnation complaint against public officials and the State of Texas with additional complaints of public officials engaging in and protecting institutionalized incompetence and public corruption – the status quo. I'm certain that you, Governor Abbott, know of what I speak since you raised the issue of public corruption in South Texas by comparing it to "third-world country practices" in your campaign near the Fort Bliss Army base in February of 2014 as you campaigned for governor. Unfortunately, the corruption hasn't changed since your inauguration and the Texas judiciary has, in a most obvious and spectacular way, placed itself in the embarrassing situation of engaging in and then protecting this well documented public corruption in South Texas with sovereign immunity. *See Hidalgo District Court case no. C-0929-12-F.* Case no. C-0929-12-F is a case I petitioned in 2012 to protect my property and my final judgment in Hidalgo County case no. CL-29,530-A from retaliatory seizure and destruction. The litigation didn't work, the rule of law did not prevail, because too many large extrajudicial interests connected to the Hidalgo County courthouse with stake in sustaining local government corruption and protecting the county interfered with the judicial process placing the judiciary into its instant embarrassment. *See In Re Johnny Partain, case no. 20-0362, Petition For Writs of Mandamus.*

    You can relax. I am not mixing current judicial process with my request to you for reimbursement of my seized and destroyed property, as required under Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5. Due process as

explained by the United State Supreme Court[1] is not necessarily judicial:  It only requires some kind of meaningful and timely process.  You will find that while case no. C-0929-12-F was reinstated by a 14th Appeals Court judge assigned by Texas Supreme Court Justice Nathan L. Hecht in 2015 after it was illegally dismissed only "on the authority" of a district judge, that same district judge has since then refused to answer any of my motions or to take me to trial as mandated by the 14th Appeals Court justice.  Many judges I've encountered over the past 22 years routinely demonstrate contempt for their own judiciary and the rule of law.  I am denied justice under any common judicial practice and there is nothing you could add or subtract from the process.  Even the Texas Supreme Court appears to abuse its own discretion[2] by refusing to enforce the appeal court's mandate or the constitution when it obviously has the authority to do so, apparently to protect the appearance of propriety in the system.  The courts, not the issue, were closed to me exactly four years ago without any adjudication except to bless nearly all parties with immunity for invading, seizing, and destroying my property.

Regardless of what little scant processes are available that can be used to enforce a person's civil rights under the constitution, the required lawful reimbursement for my property losses by the state always leads to your office to negotiate an order for repayment from the Secretary of State. I think that after 22 years of litigating the same issues over and over without resolution or enforcement in the judiciary only to be finally excluded from all court processes, that its reasonable for any man or the public to conclude the Texas Judiciary is an impotency relying on its court concocted immunity to escape public accountability while at the same time collecting paychecks and consuming public resources.  The judiciary is failed and is probably irrelevant anyways to those who know its workings.  Bringing me to a bigger point.

The courts go further to bless nearly all other public offices with immunity from accountability - and the status quo embraces it.  I'm not certain how the Executive or Legislative branches will respond to my efforts in this upcoming 87th Legislature to pierce this immunity to accountability, but it appears the political environment is ripe to raise the issue.  There is a poignant point to be made by recent protests and

---

[1] Mathews v. Eldridge, 424 U.S. 319 (1976) - This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. Wolff v. McDonnell, 418 U. S. 539, 418 U. S. 557-558 (1974). See, e.g., Phillips v. Commissioner, 283 U. S. 589, 283 U. S. 596-597 (1931). See also Dent v. West Virginia, 129 U. S. 114, 129 U. S. 124-125 (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Joint Anti-Fascist Comm. v. McGrath, 341 U. S. 123, 341 U. S. 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U. S. 545, 380 U. S. 552 (1965). See Grannis v. Ordean, 234 U. S. 385, 234 U. S. 394 (1914).  Nelson v. Colorado, 137 S. Ct. 1249, 197 L. Ed. 2d 611 (2017) To comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions.

[2] A judge abuses his discretion if he acts in an arbitrary or unreasonable manner or if he acts without reference to any guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

2

riots that injustice is rooted in institutionalized bias and corruption, that there is a serious problem with our government, and that there is no rule of law. Public corruption, immunities, and injustice are the root of anger[3], inciting Black Lives Matter, Antifa, and even the Democratic Party to protest and to riot. Its not even a new issue being that the piercing of government immunity was an issue that was voted through the Sixty-first Legislature in 1969 under House Bill 117 (vetoed by the governor). That was over 50 years ago when protests and race riots were just about as they are now. 50 years ago and so little progress has been made regarding the accountability of our government to corruption and injustice.

Article 1 of the Texas Constitution is our bill of rights which describes a compact defining the relationship of our Texas republic and our citizens. It includes the rights to be secured in our persons, houses, papers and possessions and to enjoy life, liberty, property, privileges, and certain immunities. Our Bill of Rights is declared in the constitution to be inviolate and excepted to modification to "guard against transgressions of the high powers herein delegated … [wherein] all laws contrary thereto … shall be void." But the fact is that our bill of rights is already violated, that my rights have been serially violated, and that our civil rights are mostly unactionable, unenforceable, and not self-executing, pursuant to public corruption protected by the courts implementation of its own "common law" which modify the effect of our constitutional compact - to protect the State of Texas from its own citizens. These immunities displace the "rule of law" and cultivate injustices by undermining official accountability and by protecting public corruption and malfeasance under the veil of state propriety.

You see, I am in the middle of a political crisis because I cannot prosecute or punish state corruption. I cannot force the Judiciary to perform or to dispense justice, especially when it will discredit itself. I can only request reimbursement for my significant losses as required by the Texas Constitution which will always end up in your office under current Texas law for consideration of payment. Your consideration is certainly political - even if the judiciary had timely performed its job, had my due process been respected.

My property losses include, my hard won civil judgment ($2,720,126) in Hidalgo County Court No. 1 case no. CL-29,530-A which was finally destroyed through dismissal for want of prosecution (16 years after the judgment became final and 3 executions had been attempted); my real property ($116,000) which was invaded and first seized after an assault by a SWAT team as directed by the Hidalgo County District Attorney to interfere with my US Congressional campaign against public corruption; about eight years of rents ($96,000) after the seizure of my house; my transportation business and assets ($19 million) which were never return per court order (the court's refused to enforce their decrees and instead threatened me with contempt and incarceration for insisting that the courts enforce their decrees); my established and prospective business interests in one of my electrical service companies ($55 million) which was partially destroyed after a failed attempt to "felonize" me following a threat by a Justice of the Peace that the

---

[3] Racial injustice is a subset of the bigger problem.

District Attorney looking for a way to prosecute me (my company[ies] requires security clearance); and treble damages for the aforementioned losses that I am denied because the courts are closed to me.[4]  I can currently prove to a jury or the public that my property losses are approximately $236,796,378 and rising, and I've won a plethora of court opinions and orders supporting my claims - a stinging and constitutional rebuke against established south Texas corruption that you have already identified, and that has now landed in your office.  Its an opportunity for you to address corruption in South Texas and right some wrongs.  Should the corruption continue to be protected at the highest office in Texas?  Should I be denied my constitutional rights to my property or its value?  What will you do?

I am requesting a timely scheduled meeting with you to negotiate reasonable compensation for my property losses so that I might finally resume my life, liberty, property, privileges, and immunities with my family as promised under our Texas Constitution.  I would also like to bend your ear regarding accountability in our Texas government by considering new legislation in the 87th Legislature to modify common law government immunities imposed by the courts which are intrinsically unjust. Thank you in advance for your time and efforts.

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

---

[4] "All courts shall be open, and every person for injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, §13

4. Transfer Statement



**Hidalgo County**
**Arturo Guajardo Jr.**
**County Clerk**
**Edinburg, Texas 78540**

---

**Document No: 3547620**

**Recorded On: May 10, 2024 04:59 PM**

**Billable Pages:** 5

**Number of Pages:** 6

---

NOTICE

---

*****Examined and Charged as Follows*****

Total Recording: $ 51.00

---

*****THIS PAGE IS PART OF THE DOCUMENT*****

Any provision herein which restricts the Sale, Rental, or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**

| | |
|---|---|
| Document No: | 3547620 |
| Receipt No: | 20240510000390 |
| Recorded On: | May 10, 2024 04:59 PM |
| Deputy Clerk: | Olga Garcia |
| Station: | CH-1-CC-K21 |

**Record and Return To:**

Johnny Ray Partain

7020 N 16th Street

PCI - original returned to customer

MCALLEN TX 78504

---



STATE OF TEXAS
COUNTY OF HIDALGO

I hereby certify that this Instrument was FILED in the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Hidalgo County, Texas.

Arturo Guajardo Jr.
County Clerk
Hidalgo County, Texas

# TRANSFER STATEMENT

Date: May 10, 2024

Debtor:                     State of Texas
                            Texas Secretary of State
                            P.O. Box 12079
                            Austin, Texas 78711

                            Hidalgo County
                            100 E. Cano, Second Floor
                            Edinburg, Texas 78539

                            City of McAllen
                            1300 Houston Avenue
                            McAllen, Texas 78501

Secured Party
and Transferee:             Johnny Ray Partain
                            7020 N 16th Street
                            McAllen, Texas 78504
                            partain@atlastechnologies.biz

The debtor[s], State of Texas, County of Hidalgo, and City of McAllen, have defaulted in connection with an obligation secured by collateral specified in the attached UCC Finance Statement.

The secured party, Johnny Ray Partain, exercises his post-default remedies with respect to the collateral.

By reason of the remedies exercised, Johnny Ray Partain has acquired all the rights and interests of the State of Texas, County of Hidalgo, and City of McAllen, in the following collateral:

- The East 18.41 feet of the West 60.82 feet of Lot 37, El Cazador Subdivision, Unit 2, an addition to the City of McAllen, Hidalgo County, Texas, according to the map or plat thereof, recorded in Volume 19, Page 58, and in Volume 2, Page 75, Map Records of Hidalgo County, Texas.

STATE OF TEXAS      §
                              §
COUNTY OF HIDALGO    §

       This transfer statement was authenticated pursuant to TX Bus & Com Code § 9.619 by Johnny Ray Partain on this May 10, 2024.

JOHNNY RAY PARTAIN

NOTARY PUBLIC

VIVIAN LEE RINCON
Notary Public, State of Texas
Comm. Expires 07-28-2026
Notary ID 133881138

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS

| |
|---|
| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)<br>Partain Johnny 956-240-1821 |
| B. E-MAIL CONTACT AT SUBMITTER (optional) |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)<br>Partain Johnny<br>7020 N 16th Street<br>Mcallen, TX 78504-3132<br>USA |
| SEE BELOW FOR SECURED PARTY CONTACT INFORMATION |

**FILING NUMBER: 23-0043292984**
**FILING DATE:** 10/06/2023    10:56 AM
**DOCUMENT NUMBER:** 1292224560002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **Texas** | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS **Secretary of State, P.O. Box 12079** | CITY **Austin** | STATE **TX** | POSTAL CODE 78711 | COUNTRY **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME **Hidalgo County** | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS **100 E. Cano, Second Floor** | CITY **Edinburg** | STATE **TX** | POSTAL CODE 78539 | COUNTRY **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME **Partain** | FIRST PERSONAL NAME **Johnny** | ADDITIONAL NAME(S)/INITIAL(S) **Ray** | | SUFFIX |
| 3c. MAILING ADDRESS **7020 N 16th Street** | CITY **McAllen** | STATE **TX** | POSTAL CODE 78504 | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
Collateral includes all assets, interests, and taxes, prospective and real, belonging to Texas, The Texas Treasury Safekeeping Trust Company, Hidalgo County, and City of McAllen, which may be comingled with Johnny Ray Partain's assets and interests, the sum certain total including $250,000,000, plus 10% compounded interest per year accruing on the $250,000,000 since January 4, 2021, plus all costs to collect the accruing total, payable to Johnny Ray Partain, upon debtor's failure to fulfill their obligations. Payment and record is authorized and required by the Debtor's herein pursuant to Tex. Const. Art. 1, Sec. 17, and protected without exception under Sec. 29.

This financing statement is to be filed in the Real Estate Records, to include all real estate and as-extracted collateral held by and for the benefit of the Debtors.

5. Check only if applicable and check only one box: Collateral is ☑ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9: NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | 9a. ORGANIZATION'S NAME |
|---|---|
| OR | Texas |
| | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)                     SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | 10a. ORGANIZATION'S NAME |
|---|---|
| OR | City of McAllen |
| | 10b. INDIVIDUAL'S SURNAME |
| | INDIVIDUAL'S FIRST PERSONAL NAME |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1300 Houston Avenue | McAllen | TX | 78501 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | 11a. ORGANIZATION'S NAME |
|---|---|
| OR | |

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

page 3

UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9: NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

OR

9a. ORGANIZATION'S NAME
Texas

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                    SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (10a or 10b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

OR

10a. ORGANIZATION'S NAME
The Texas Treasury Safekeeping Trust Company

| 10b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 208 E 10th Street | Austin | TX | 78701 | USA |

FILING OFFICE COPY

5.  Certified Transcript in Devillier v. Texas, 601 U.S. 285 (2024)

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - - -

RICHARD DEVILLIER, ET AL.,      )

        Petitioners,     )

          v.          ) No. 22-913

TEXAS,                 )

        Respondent.      )

- - - - - - - - - - - - - - - - - - - -

Pages:  1 through 90

Place:  Washington, D.C.

Date:  January 16, 2024

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.   20005
(202) 628-4888
www.hrccourtreporters.com

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - -

RICHARD DEVILLIER, ET AL.,            )

                Petitioners,          )

            v.                        ) No. 22-913

TEXAS,                                )

                Respondent.           )

- - - - - - - - - - - - - - - - - - -

Washington, D.C.

Tuesday, January 16, 2024

The above-entitled matter came on for oral argument before the Supreme Court of the United States at 11:10 a.m.

APPEARANCES:

ROBERT J. McNAMARA, ESQUIRE, Arlington, Virginia; on behalf of the Petitioners.

AARON L. NIELSON, Solicitor General, Austin, Texas; on behalf of the Respondent.

EDWIN S. KNEEDLER, Deputy Solicitor General, Department of Justice, Washington, D.C.; for the United States, as amicus curiae, supporting the Respondent.

C O N T E N T S

ORAL ARGUMENT OF:                                    PAGE:

ROBERT J. McNAMARA, ESQ.

     On behalf of the Petitioners              3

ORAL ARGUMENT OF:

AARON L. NIELSON, ESQ.

     On behalf of the Respondent               38

ORAL ARGUMENT OF:

EDWIN S. KNEEDLER, ESQ.

     For the United States, as amicus

     curiae, supporting the Respondent         68

REBUTTAL ARGUMENT OF:

ROBERT J. McNAMARA, ESQ.

     On behalf of the Petitioners              87

P R O C E E D I N G S

(11:10 a.m.)

CHIEF JUSTICE ROBERTS: We'll hear argument next in Case 22-913, Devillier versus Texas.

Mr. McNamara.

ORAL ARGUMENT OF ROBERT J. McNAMARA

ON BEHALF OF THE PETITIONERS

MR. McNAMARA: Mr. Chief Justice, and may it please the Court:

The Question Presented in this case is resolved by the text of the Fifth Amendment, which, unlike any other provision of the Constitution, imposes on the government a -- an explicit duty to pay money.

It's also answered by this Court's decision in First English, which holds that the just compensation remedy is mandatory and that the Fifth Amendment itself furnishes a basis on which a court can award just compensation in an inverse condemnation case.

And this right of property owners to sue in inverse condemnation to obtain just compensation for an alleged taking is at the heart of modern American takings law. It's at

the heart of inverse condemnation claims filed against state and local governments nationwide. And it's also at the heart of every takings claim filed against the federal government under the Tucker Act.

The Tucker Act provides no cause of action, no substantive entitlement to a remedy. The cause of action, the substantive entitlement to a remedy, in every Tucker Act takings case is the self-executing Fifth Amendment, the same cause of action recognized in First English, the same cause of action pled here.

To reject that cause of action now is to upend the way lower courts, both state and federal, understand the Takings Clause to work and also to abandon this Court's consistent explanations of that clause not just in First English but in more recent cases like Knick v. Township of Scott.

And there's no reason to make that kind of drastic change. This Court has already recognized that money-mandating legal obligations logically come along with the right to file a lawsuit to enforce those obligations.

That's true as to statutes, which is

what this Court held in Maine Community Health Options. It should be at least as true as to the Constitution, and this Court's precedents consistently teach that it is.

I welcome the Court's questions.

JUSTICE THOMAS: In your reply brief, you say that the 19th century federal courts were faced with a bedrock property right and no way to enforce it directly.

Doesn't that seem to be at odds -- the fact that the courts there had to resort to extra-constitutional causes of action, isn't that at odds with your argument now?

MR. McNAMARA: I don't think so, Your Honor, because the primary problem facing federal courts in the early part of the 19th century was a lack of jurisdiction. And I think the question of jurisdiction is just conceptually distinct from the question of whether there's a cause of action, whether there's a right to a remedy.

Congress could tomorrow amend Section 1331 to reimpose an amount-in-controversy limit, and if it did that, that would prevent a number of people from

bringing Ex parte Young actions in federal court. Those claims wouldn't cease to exist. Congress would just have eliminated the jurisdiction over them.

And so I think there's a difference between jurisdictional limits which limited takings claims and even pleading requirements like the limits to the forms of action, which also limited plaintiffs' abilities to bring certain kinds of claims, and the core Question Presented here, which is just whether there is an entitlement to relief.

There -- there's only one modern form of action, which just takes the shape of saying, I'm entitled to this remedy for that reason. The remedy is just compensation. The reason is the Fifth Amendment as applied through the Fourteenth. And once the jurisdictional problems and the pleading problems are removed, as they have been in this case, the only question remains whether the Fifth Amendment mandates compensation, whether it mandates that remedy, which this Court has already answered. First English says that the just compensation remedy is mandatory.

And I think contrasting the -- the arguments of the other side with the rule adopted by the California Supreme Court in Agins is actually a useful illustration here. The California Supreme Court's decision in Agins said, we as a common law court don't want to recognize a claim for just compensation in a regulatory takings case. We think that intrudes on the legislature's prerogative. We don't recognize that cause of action.

And First English says that doesn't matter. The cause of action, the entitlement to relief, flows directly from the Fifth Amendment. So too here. The complaint here pleads a cause of action directly under the Fifth Amendment --

JUSTICE BARRETT: Counsel --

MR. McNAMARA: -- that says our property was taken and the Fifth Amendment -- yes, Your Honor?

JUSTICE BARRETT: Counsel, I agree that jurisdiction and a cause of action are distinct, but it's a little bit hard to see how in 1791 -- I mean, I think your argument is, when the Fifth Amendment was ratified, those who ratified it had to see the Fifth Amendment as

itself supplying the cause of action because this was the crucial way to vitiate the takings right, the right to just compensation.

But Congress didn't provide for federal question jurisdiction until 1875, so that kind of languished on the vine for a pretty long time if you're right that the founding generation or the -- you know, the ratifying generation in 1791 viewed it that way.

Moreover, you know, the historical evidence of private bills runs contrary to your argument because, yes, there was a right to just compensation, but we have all of this time, throughout the 19th century, of Congress enacting private bills to give just compensation.

And I think you have to contend with that because, I mean, I get that this is against Texas, against the state, but if the Fourteenth Amendment incorporated the Fifth Amendment as it was, there's kind of a mountain of historical evidence, you know, that you've got to contend with.

MR. McNAMARA: So I -- I don't think that mountain does quite the work that Texas

needs it to, Your Honor. And I think one problem here is the difficulty in mapping the modern conception of cause of action onto 1791 visions of the court. I think, if you asked a lawyer in 1791 whether the Fifth Amendment contained a cause of action, they probably wouldn't understand the question.

But, if you asked them can a property owner sue to enforce just compensation, the answer absolutely would have been yes. It would have been a suit in trespass. It would perhaps have been a suit in ejectment. But there was an understanding at the framing that this was an enforceable right, and if you --

JUSTICE GORSUCH: Well, that -- that establishes at most, it seems to me, that the Fifth Amendment envisioned some remedial mechanism would be available. And the common law trespass, as you point out, might have been it, or conversion might have been it. It -- it doesn't necessarily mean that there is itself an independent cause of action under the Fifth Amendment.

MR. McNAMARA: I -- I think it does, Your Honor, once the forms --

JUSTICE GORSUCH: Why? You've just conceded that the cause of action that -- that the Framers would have understood would have been in trespass.

MR. McNAMARA: Well, Your Honor, I think, in -- in modern terms, what the Court means when it says "cause of action" --

JUSTICE GORSUCH: Well, no. But what we're talking about the original meaning, and you're asking us to appeal to the original meaning and say they would have understood there would have been a cause of action. Perhaps, but what would that cause of action look like?

MR. McNAMARA: I -- I think they would have understood that there was an entitlement to a remedy.

JUSTICE GORSUCH: Some remedy?

MR. McNAMARA: An entitlement to just compensation as a remedy.

JUSTICE GORSUCH: Some -- some way to get that?

MR. McNAMARA: Yes, and I think --

JUSTICE GORSUCH: Fair enough. That doesn't necessarily mean there's a federal cause of action. It could mean it happens under state

common law, right?

MR. McNAMARA: Well, Your Honor, two -- two --

JUSTICE GORSUCH: I mean, you -- you would admit that a state common law cause of action did and could fully vindicate the Fifth Amendment?

MR. McNAMARA: Yes, Your Honor, I think there could be a state common law action that vindicated the First Amendment, but I also think --

JUSTICE GORSUCH: Fifth. Fair enough.

MR. McNAMARA: Yes, Your Honor, or -- or the First.

JUSTICE GORSUCH: And that that would -- that would be enough. No -- nothing more would be required.

MR. McNAMARA: Well --

JUSTICE GORSUCH: And, in fact, that's how it operated for a long time.

MR. McNAMARA: Well, certainly, Your Honor, if compensation is provided through any mechanism, there's no longer a Fifth Amendment injury to be remedied.

JUSTICE GORSUCH: Ah. Okay. I

understand that argument. That's not the argument you're -- you're pressing, though.

MR. McNAMARA: That's because, here, compensation hasn't been paid. The plaintiffs in this case continue to suffer the ongoing Fifth Amendment injury.

JUSTICE GORSUCH: Well, maybe that's because you -- you -- you -- you allowed this case to be removed, which I -- and -- and -- and, you know, I'm -- I'm surprised you didn't oppose removal on that ground and said there's no federal question that we need to resolve here because it's really a state common law cause of action we're pursuing. That would have been one option.

Or maybe in federal court you might have said we want a declaratory judgment, which everyone concedes you can get under the Fifth Amendment, and take pendent jurisdiction over our state common law cause of action, which would adequately vindicate our Fifth Amendment rights.

You didn't pursue either of those courses here.

MR. McNAMARA: So two responses, Your

Honor. One, I don't think there was a good-faith grounds to oppose Texas's removal because what the complaint says on its face is we are entitled to just compensation under the Fifth Amendment.

JUSTICE GORSUCH: Well, but it -- it then pleads state causes of action to do so.

MR. McNAMARA: No, Your Honor. It -- it pleads a claim directly under the Fifth Amendment.

JUSTICE GORSUCH: Well, maybe that's another problem you face is it -- you -- if you had an adequate common law -- do you dispute that Texas has an adequate common law remedy to -- for -- for your problem?

MR. McNAMARA: I do, Your Honor. And this is actually an important point. That --

JUSTICE GORSUCH: Is that argument in your brief, that -- that the -- that the -- the common law of Texas or state law has no mechanism to enforce the Fifth Amendment?

MR. McNAMARA: Well, Your Honor, Texas asserts --

JUSTICE GORSUCH: If -- if it did, I'd -- that one would I -- I'd take seriously,

but I didn't see it.

MR. McNAMARA: So Texas asserts, Your Honor, that there is a Texas common law mechanism to vindicate the Fifth Amendment, but there is no Texas decision saying we sitting as a common law court invoke our common law powers to create a cause of action.

JUSTICE GORSUCH: No trespass, no conversion?

MR. McNAMARA: Texas hears inverse condemnation claims arising under the Fifth Amendment. That's what the Texas Supreme Court said most recently in City of Baytown v. Schrock, and it cites the Fifth Amendment. It doesn't invoke its common law powers.

JUSTICE GORSUCH: Fair enough. I get all of that now. All right. Now that's clarifying. But you -- you -- the -- the nature of the argument before us isn't that Texas lacks a common law cause of action. It's whether or not Texas has such a thing, we're entitled to another remedy under federal law.

MR. McNAMARA: I -- I don't think that's right, Your Honor. What the Fifth Circuit said is that the complaint that alleges

an entitlement to just compensation flowing from the Fifth Amendment doesn't state a claim, that that claim is dead. If --

JUSTICE GORSUCH: Let -- let -- let -- let's suppose you -- we -- it did create a cause of action. Would -- would it also waive sovereign immunity? And what would the statute of limitations be?

MR. McNAMARA: I -- it -- it wouldn't necessarily waive sovereign immunity, Your Honor. I think that's a distinct question. And the statute of limitations would be the statute of limitations that is applied by lower courts when people actually bring these claims.

There's a -- a robust Court of Federal Claims jurisprudence, federal district courts hear claims arising under the Fifth Amendment, sometimes looking to state law to set the statute of limitations.

JUSTICE GORSUCH: Ah, they look to state law, don't they, yeah?

MR. McNAMARA: But the claim itself, Your Honor, comes from the Fifth Amendment not just in Texas but in states nationwide. And I think this is an important point.

Take Oregon, for example. Oregon signed on to the state's amicus brief in support of Texas, but the reason that Oregon pays just compensation for takings under the Fifth Amendment is the Oregon courts, citing First English, have said it must pay just compensation. And so answering the Question Presented --

JUSTICE BARRETT: If we don't read First English the way you do -- I mean, I think that footnote's pretty difficult to decipher -- do you lose?

MR. McNAMARA: No, Your Honor. I would -- I don't think it's just the footnote in First English. I think it's the broader holding that the remedy is required.

But I think there's no dispute here that there is an entitlement to relief. And, certainly, by the time of the ratification of the Fourteenth Amendment, courts across the country had converged on how that kind of entitlement would be enforced.

And it's enforced by a lawsuit directly against the entity that took the property that takes the form of saying, you have

this duty to provide just compensation, you have not fulfilled it, and I'd like the court to order you to fulfill it.

JUSTICE SOTOMAYOR: Can I have a -- just a small point of information? Your case was dismissed in federal court. Did you ask for a remand on your claims under the Texas Constitution?

MR. McNAMARA: No, Your Honor. The district court is keeping pendent jurisdiction over the claims under the Texas cause.

JUSTICE SOTOMAYOR: So you -- you have a pending suit on the state law claim?

MR. McNAMARA: Yes, Your Honor, but there is a dispute about the scope of the takings law that governs that question. Texas has taken the position in the lower courts that the Texas Constitution has a narrower definition of what counts as a taking than the federal courts.

JUSTICE SOTOMAYOR: Well, then First English comes in too because First English was about a state court claim and when it started, whether a temporary claim was a taking or not, and we said yes, it's a taking, and so the state

court had to pay for that taking.

How is it different than First English in that respect?

MR. McNAMARA: I -- I don't think it's different from First English, Your Honor, except that, here, it was removed into federal court and then the Fifth Amendment aspect of the case was dismissed on the merits.

JUSTICE SOTOMAYOR: Oh, I -- I -- I -- I don't disagree with you, but First English is about what the substantive law of Texas is and what Texas has to pay.

And so that issue should be resolved even in the district court, correct?

MR. McNAMARA: I -- I don't think so, Your Honor, because the backstop in First English is the Fifth Amendment that -- that says that the met -- the just compensation --

JUSTICE SOTOMAYOR: No, the backstop in the Fifth -- yes, it's the Fifth Amendment that provides the substantive law, but not necessarily -- we didn't address whether it provides a cause of action.

MR. McNAMARA: I -- I think the Court did, Your Honor. The United States' amicus

brief --

JUSTICE SOTOMAYOR: All right. We're -- we're going to -- we're going to go into --

JUSTICE JACKSON: Can I just ask -- I -- I mean, this is similar to what -- what Justice Sotomayor was just getting into. Are -- are you saying that we don't have three separate concepts, right, remedy, and cause of action? I thought those were three different things, and perhaps First English only covered two of them?

MR. McNAMARA: I -- I'm not sure they're distinct concepts, Your Honor. I think the simplest way to understand cause of action is an entitlement to a particular remedy, which is why it's coherent to say someone might have a cause of action for an injunction.

JUSTICE JACKSON: I thought it had to do with the forum, that you have a cause of action that is recognized in the judicial forum as opposed to, say, going to the legislature through -- through private bills.

MR. McNAMARA: Well, Your Honor, I -- I think, to the extent that's the definition of "cause of action," we would have a cause of action under the clear import of the history

that the --

JUSTICE JACKSON: Not -- not the history. I guess I'm just trying to understand, is there -- does it make sense to think about the Fifth Amendment as providing the right and the remedy but not speaking to where you're going to get that remedy from or what is the enforcement mechanism?

That's how I sort of am conceptualizing this, and -- and I think we differ about that, so I'd like to hear your opinion on it.

MR. McNAMARA: I -- I'm not sure that's a correct reading of the Fifth Amendment, Your Honor, in part because I think that reading -- everyone agrees there are some judicial remedies for the Fifth Amendment.

As I understand my friend's argument, we'd be entitled to sue for injunctive relief or for ejectment in the absence of a -- a path to a Fifth Amendment compensation remedy.

So everyone agrees there's some judicial remedy, and I think the form of that judicial remedy depends on the scope of the government's obligation.

There are two visions of the Fifth Amendment. One is that the Fifth Amendment just provides a precondition. The government is required to pay and it can be enjoined from taking the property if it doesn't pay.

The other vision that's adopted in First English that's reiterated in Knick is that the Fifth Amendment creates an obligation to pay just compensation. And if that's the ongoing obligation, the government has taken property, it owes just compensation today, will owe just compensation tomorrow, courts are empowered to cure that ongoing obligation.

It's not a question of damages for a past violation. It's a question of the government's obligation as it stands in court today.

JUSTICE BARRETT: Mr. McNamara, can I go back to Justice Sotomayor's question and just ask for a point of clarification? I understood Texas law to provide a cause of action for vitiating the federal Fifth Amendment right.

I took your answer to Justice Sotomayor to be saying that Texas courts say -- you were talking about how Texas courts define a

taking for purposes of the Texas Constitution.

So am I wrong in thinking that Texas allows you to bring a state cause of action for the federal Fifth Amendment claim?

MR. McNAMARA: I -- I'm not sure whether that's right to be honest, Your Honor. And I think two things flow from this. One, if it's true that there is a Texas common law cause of action under which we could have -- we can vindicate our Fifth Amendment rights, then the Fifth Circuit still has to be reversed because it held that that substantive claim should be dismissed on the merits.

JUSTICE BARRETT: Okay. Well, let me just -- just -- just -- it's important for me to be able to understand this procedural point. Does Texas have -- provide a state cause of action to vitiate the state takings right from the Texas Constitution?

MR. McNAMARA: Yes, Your Honor.

JUSTICE BARRETT: Okay. It seems to me then it can't discriminate against the federal claim anyway.

MR. McNAMARA: I -- I think that's true, Your Honor, but Texas doesn't -- Texas

isn't trying to discriminate against the -- this federal claim. What Texas says, like other state courts, is it's not doing -- it doesn't say we're doing common law analysis and creating a cause of action.

What Texas seems to be doing is constitutional analysis, just like the other state courts that specifically cite First English and say, ah, there is a cause of cause of action here. I'm not familiar with any state case saying we are using our powers as a common law court to create a cause of action to vindicate the Fifth Amendment.

What they say is we're looking at the Fifth Amendment. We see it creates the obligation. Frequently they cite First English directly and they say that's what gives rise to the cause of action.

And that, I think, is what's dangerous about the Question Presented here. As -- as I understand Texas's argument, the complaint we filed in state court was perfectly valid and could be adjudicated, and the Fifth Amendment could have been adjudicated in state court. Once it was removed, Texas moved to dismiss and

sought an interlocutory appeal and has successfully extinguished that.

But my concern is that adopting Texas's arguments here tells all of these state courts that have pointed to First English and said this is the source of -- the Fifth Amendment is the source of the cause of action would look to a decision in this case adopting Texas's arguments and say: Okay. We were wrong. The Constitution does not, in fact, require a remedy. There is no federal constitutional cause of action. And that would eliminate the federal takings remedy in state courts across the nation.

JUSTICE ALITO: Mr. McDowell, the language of the Takings Clause is quite similar to the language of the Due Process Clause in the Fifth Amendment, which immediately precedes it. "No person shall be [...] deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

So why should they be read differently with respect to the creation of a cause of action?

MR. McNAMARA: I -- I don't think they have to be read differently, Your Honor. I think, if there's an ongoing due process violation, a plaintiff could bring an Ex parte Young action. Ex parte Young was not a 1983 action. It was --

JUSTICE ALITO: No, not an Ex parte Young, but a claim for damages?

MR. McNAMARA: Well, and I think that's the difference here, that we're not seeking damages; we're seeking just compensation. We're not saying there was a past completed violation of the Constitution and we want something to offset that. We're saying the government has taken property, which gives rise to a present duty to pay just compensation, and we want the present obligation enforced, not a backwards-looking damages remedy concocted or created. And I think that entitlement to just compensation is how the Framers would have understood the Fifth Amendment.

The alternative view, the idea that all you get are injunctions, I don't think squares with either the text or how contemporary commentators talked about the clause.

St. George Tucker and John Jay wrote about the Takings Clause in the context of the Army seizing horses and military supplies. But, if the Army is seizing horses, the Army's going to get the horses. The understanding would not have been that you could stop the Army in the moment from seizing your horses.

What St. George Tucker is writing about is the ongoing duty to provide compensation for the horses, which is also how contemporary courts wrote about the just compensation requirement, even constrained as they were by the forms of action.

I -- I think a great example of this is the Massachusetts Supreme Court's decision in -- excuse me -- the Massachusetts Supreme Court's decision in evaluating an -- an action brought as a -- a writ of debt in Gedney v. Inhabitants of Tewksbury, where the justices -- the judges of the Massachusetts Supreme Court there said: This isn't the right forum. This isn't an action in debt. You can't state it using that forum. You have to go to a different forum to get your just compensation. But, if that other forum denies you compensation, you

can return here, in the statement of one of the judges, and ask for that remedy again, which will not probably be refused if --

JUSTICE ALITO: If the Fifth Amendment confers a right to sue for just compensation in and of itself, is that right unqualified? And if it is not unqualified, what qualifications do you recognize?

MR. McNAMARA: Oh, I -- I certainly don't think it's unqualified, Your Honor. It --

JUSTICE ALITO: What qualifications do you recognize?

MR. McNAMARA: It -- it requires a court of competent jurisdiction, and so, certainly, Congress is free to channel jurisdiction however it likes. Texas is similarly free to create courts of jurisdiction as it pleases.

But the underlying -- all we're saying is that there is an underlying entitlement to receive just compensation and that when that entitlement is denied, a court of competent jurisdiction can order that that just compensation be paid.

JUSTICE ALITO: Well, does it make

sense to view the Fifth Amendment as providing a right to sue for compensation, but your ability to vindicate that right is totally dependent on Congress's discretionary choice to create lower federal courts and to give them jurisdiction to entertain such claims? That sounds like a very weak right if that's -- if it's subject to limitation in that way.

MR. McNAMARA: I think the same could be said of the entire Bill of Rights, though, Your Honor. The -- the entire stratum of federal constitutional rights depends on Congress to create lower federal courts, courts where these rights can be vindicated.

Once Congress does create those courts, and when a state defendant deliberately chooses to avail itself of those courts, the only question is whether that court can enforce the ongoing obligation to require the payment of just compensation.

And I think that's ultimately what distinguishes this case from the Court's Bivens cases, where Bivens cases are about the policy question of whether to create a remedy. They don't engage in constitutional text, history,

and tradition analysis, which is why Justice Rehnquist could dissent in cases like Carlson v. Green and Davis v. Passman and then, less than a decade later, Chief Justice Rehnquist could write First English, because we're not talking about a damages remedy; we're talking about the power of the federal courts to, when their jurisdiction is competently invoked and when the state has waived its sovereign immunity, require the state to comply with its ongoing constitutional duty.

I think that matches both with the history, it matches with the tradition, and it matches particularly with the Fourteenth Amendment context itself. It's worth remembering that when this Court incorporated the Fifth Amendment against the states in Chicago, Burlington & Quincy Railroad, it specifically incorporated the right to compensation, not the right not to have the property taken but the right to receive money, that the due process of law necessarily included as a matter of first principles -- Chicago, Burlington actually doesn't cite the Fifth Amendment -- but, as a matter of first

principles, it includes the right to receive compensation for the property taken.

These state -- these cases rarely appear in federal court, in part because, before Knick, no takings case could be filed ab initio, but also because, as the magistrate judge's opinion in this case points out, it's relatively rare for a state to choose to remove this federal claim -- this federal right into a federal forum. But, once it does so, once Texas has decided it wants the scope of our rights under the Fifth Amendment to be litigated in federal court, that can't change the scope of the claim we make.

What the Fifth Circuit opinion below says is that we cannot state a claim invoking our rights under the Fifth Amendment, full stop. If Texas is right that, in fact, we have that right as a matter of Texas common law, then the Fifth Circuit was wrong to say that we only have that right under Section 1983. That counsels in favor of reversal.

But this Court has also squarely held and again repeated in Knick that the Fifth Amendment does furnish a basis on which a court

can award just compensation. In the mine run of cases, that's going to be a state court awarding just compensation. But, when the state wishes to be in federal court, I don't think there's a good-faith basis for the plaintiff to say, I'm invoking my rights under the Fifth Amendment, I want the full scope of compensation -- that I'm entitled to under the Fifth Amendment, but I refuse to allow this claim that arises under my rights under the Fifth Amendment to be in federal court.

It is the defendant's choice to have this federal claim that turns on federal law heard in federal court. That's the choice that Texas made, and that choice can't, on the merits, extinguish our Fifth Amendment remedy.

What Texas has effectively accomplished here by making the unusual decision to remove is that it's eliminated the Fifth Amendment question from this case and given itself what it believes -- I'm not conceding that they're right about Texas law -- but what it believes is a more favorable rule of Texas law.

But, if First English is right and the

just compensation remedy is mandatory, then the just compensation remedy is mandatory, and Texas can't extinguish it through procedural maneuvers like removing this case to federal court. The claim -- a claim for just compensation simply takes the form of saying the government has taken a property interest and I as the former owner am entitled to the fair market value of that property interest.

JUSTICE JACKSON: Can I just be clear, are you arguing that through Texas's maneuvering that claim is no longer available to you?

MR. McNAMARA: Yes, Your Honor. I think that's what Judge Oldham points out in his dissent below.

JUSTICE JACKSON: I -- I understand not in federal court, but are you claiming that Texas has prevented you from making this claim in state court?

MR. McNAMARA: Yes, Your Honor. There -- there will be no remand in this case. This case is staying in federal district court. And as Judge Oldham correctly pointed out, the upshot of the panel opinion below is that this case will proceed without any federal takings

claim in it because --

JUSTICE JACKSON: If you had sought remand and it went back to Texas court, are you saying that there wouldn't be the opportunity to make this claim in state court? I'm just trying to understand if the claim is totally gone as -- as a general matter here.

MR. McNAMARA: I -- so I -- I think -- I -- I see my light is on.

CHIEF JUSTICE ROBERTS: No, go ahead.

MR. McNAMARA: Thank you, Your Honor. I -- so I think, Your Honor, first, I don't know that we would have had grounds to fight remand because the claim does invoke our entitlement under federal law. But, if the case were remanded, I think the question in Texas state court would be exactly the Question Presented here: Are we entitled, without the 1983 vehicle, to invoke our rights under the Fifth Amendment?

Texas courts have said yes, we are entitled to invoke our rights under the Fifth Amendment. But, again, they just cite the Fifth Amendment. They're not invoking some special cause of action that they have created. They,

like other courts, look to the Constitution, to this Court's analysis of the Constitution, and say the Constitution provides the entitlement to just compensation, not, as far as I'm aware, an independent common law cause of action.

CHIEF JUSTICE ROBERTS: Thank you, counsel.

Let's suppose you bring a -- a -- the state takes some action, you claim that is a taking, you bring that claim for just compensation. In the state court, they decide yes, it was a taking, and so the government owes you $3 million. And the government says: Wow, we didn't think it was worth that much. Here, take it back.

And can they do that?

MR. McNAMARA: To -- to a point, Your Honor. I think saying here take it back runs afoul of what Justice Brennan identified in his San Diego Gas & Electric dissent that ending the taking just creates an uncompensated temporary taking. And that is why, as this Court noted in Knick, Justice Brennan's dissent became the law in First English, that just stopping the taking creates an uncompensated temporary taking.

Certainly, the -- the state is within its rights to cease a taking if it wants to cease a taking, and it may be that evidence at trial shows Texas has chosen to cease the taking here, but the question is and always based on the full factual record what property interest has Texas actually taken or has the defendant actually taken --

CHIEF JUSTICE ROBERTS: So they can claim what we've taken is a temporary, you know, right, so we owe you rent, that -- and that's just compensation?

MR. McNAMARA: Exactly, Your Honor. The -- the defendant is always free to say this is -- this is just a temporary easement or maybe this is a temporary partial easement.

CHIEF JUSTICE ROBERTS: And they can say that after the fact?

MR. McNAMARA: I -- I think --

CHIEF JUSTICE ROBERTS: We took the whole thing, we found out we were taking more than we could -- we're biting off more than we could chew, and so we're going to give it back to you?

MR. McNAMARA: I -- I think that would

be a valid ground for going back to the district court and saying that the facts have changed. The way --

CHIEF JUSTICE ROBERTS: Okay. Thank you.

MR. McNAMARA: Thank you, Your Honor.

CHIEF JUSTICE ROBERTS: Justice Thomas?

Justice Alito?

JUSTICE ALITO: Well, suppose that going forward they find a way to divert the water so that it doesn't cause flooding in the future. Then what claim would you have?

MR. McNAMARA: I -- I think that would just be a -- a claim for a temporary easement, Your Honor. Ultimately, the property interest in this case would be some kind of flooding easement. The trial court would have to decide whether it's a permanent easement, a partial easement, a temporary easement, and this is the kind of determination courts make in takings cases every day.

JUSTICE ALITO: Yeah, and if it's -- so, if it's completely eliminated going forward, your -- your property is not going to be flooded

going forward, what would the remedy be?

MR. McNAMARA: The -- the remedy --
so, to the extent the Court found on the facts
that Texas had taken a temporary easement, it
would be the fair market value of that temporary
easement.

JUSTICE ALITO: Would that be
different from damages?

MR. McNAMARA: Yes, Your Honor, and --

JUSTICE ALITO: In what way would it
be different from damages?

MR. McNAMARA: So damages are an
attempt to rectify a wrongful act. And so a
plaintiff seeking damages can seek consequential
damages. I would have had -- if you had paid me
on time, I would have had this business
opportunity that I had to forego.

JUSTICE ALITO: Yeah, I understand
that. So how would you put a value on the
temporary taking?

MR. McNAMARA: It would be --
generally speaking, there is testimony from
dueling appraisers who talk about at fair market
value what rent someone would pay for -- for
that kind of easement, what a -- a willing

seller would have sold that kind of easement for, but it's limited to the fair market value. It's limited to what the government took as distinct from what the property owner may have lost.

JUSTICE ALITO: Okay. Thank you.

CHIEF JUSTICE ROBERTS: Justice Sotomayor?

Justice Kagan?

Justice Barrett?

Justice Jackson?

Okay. Thank you, counsel.

MR. McNAMARA: Thank you, Your Honor.

CHIEF JUSTICE ROBERTS: Mr. Nielson.

ORAL ARGUMENT OF AARON L. NIELSON

ON BEHALF OF THE RESPONDENT

MR. NIELSON: Mr. Chief Justice, and may it please the Court:

The Court will be hard-pressed to find any government more committed to property than Texas. The Texas Constitution is more protective than the federal Constitution, and Texas courts under a Texas cause of action adjudicate takings claims under both constitutions.

This appeal thus isn't about substantive rights. All Petitioners had to do was use Texas's cause of action. Instead, Petitioners insist they can bring a cause of action directly under the federal Takings Clause itself. This argument is wrong for many reasons.

For one, it ignores what the Constitution says. Governments must provide just compensation, but the Takings Clause says nothing about how they must do it, whether through commissions, private bills, or litigation.

For another, this Court held in Williams that Congress may constitutionally -- and I'm going to quote here -- "retain for itself, the power to hear and determine controversies respecting claims against the United States." It follows that, again, a quote, "there is no constitutional right to a judicial remedy."

As Petitioners concede, Congress did just that for nearly a century. We don't see how this Court could hold for Petitioners without overruling Williams.

And as this Court explained in Knick, states didn't start recognizing state causes of action until after the Fourteenth Amendment's ratification.

Petitioners argue none of this matters because of First English, but the Court went out of its way in First English to emphasize that its decision was about substance, not procedure.

And if first Williams somehow did include a procedural holding, Texas satisfies it. We have a cause of action for federal takings claims. Petitioners simply refuse to use it.

We welcome the Court's questions.

JUSTICE THOMAS: How would that cause of action look -- what would it look like?

MR. NIELSON: So I would point the Court to the Texas Supreme Court's decision in City of Baytown --

JUSTICE THOMAS: Yeah.

MR. NIELSON: -- and they say, we hear claims under both the Texas Constitution and under the federal Constitution, and then they resolve the claim under Penn Central, which, of course, is a decision of this Court.

JUSTICE THOMAS: Let's say we affirm here. Can Petitioners' constitutional right be vindicated now in -- in Texas courts?

MR. NIELSON: Well, in federal court. The problem is they haven't pleaded the claim. So, at this point, you'd have to have leave from the district court to amend their complaint if they wanted to bring a claim under the Texas cause of action.

There's still live claims here. There's still a claim under the Texas Constitution itself and they have federal due process claims. This is an interlocutory appeal.

So they would have to get leave from the district court to amend their complaint to bring a claim under Texas common law. They've just never done it because they say they don't have to.

JUSTICE SOTOMAYOR: I'm --

CHIEF JUSTICE ROBERTS: Counsel, in -- just a couple of quotes from cases. In Cedar Point, we said that the Court in First English "concluded categorically that the government must pay just compensation for physical

invasion."

In Knick, it said First English rejects "the view that the Constitution does not of its own force furnish a basis for a court to award money damages against the government."

Now we've -- we've said those in many cases. Those are just two recent ones --

MR. NIELSON: Correct, Your Honor.

CHIEF JUSTICE ROBERTS: -- where I wrote the opinions. So --

(Laughter.)

MR. NIELSON: Correctly wrote the opinions.

CHIEF JUSTICE ROBERTS: -- so do you have any dispute with those -- those holdings?

MR. NIELSON: We do not, Your Honor. That's a question of the substantive right, which Texas does not dispute, and you could pursue that claim under the Texas cause of action in a Texas court or here --

CHIEF JUSTICE ROBERTS: The -- the -- the -- the -- it -- it's --

MR. NIELSON: -- in federal court -- yes, Your Honor.

CHIEF JUSTICE ROBERTS: -- it's --

it's the statement of the -- the right, and that's a federal right, right?

MR. NIELSON: Yes, Your Honor.

CHIEF JUSTICE ROBERTS: So you can require that a federal assertion of rights like that be brought in state court and not in federal court?

MR. NIELSON: Well, it's brought under a -- a state cause of action. So, I mean, you can remove -- there's diversity jurisdiction or something like that, like any other sort of cause of action, but the cause of action itself is created by -- by Texas.

And that's how it's been -- as this Court explained in Knick, that's how state courts have always done it. Since 1870s, this Court said and onwards --

CHIEF JUSTICE ROBERTS: Well, it said -- what we said in --

MR. NIELSON: -- that's how we've done it.

CHIEF JUSTICE ROBERTS: -- what we said in Knick is that the Constitution of its own force furnishes the basis for a court to award money damages. And you think what we had

in mind is a -- a basis to -- to -- in state court but not federal court?

MR. NIELSON: When the claim is against a state, in Knick, the Court said 19 times by our count 1983. Every time the Court states the holding in Knick, they tie it to Section 1983 because there's a difference between the substantive right and the cause of action.

In Knick, the cause of action was Section 1983 because Congress said, if you're going to sue municipalities or cities, there you go, there's the cause of action.

CHIEF JUSTICE ROBERTS: Well, you removed to federal court, where you couldn't bring an action under 1983, right?

MR. NIELSON: Correct, Your Honor. We did remove to federal -- federal court. Two reasons for that. One, this is not just one case. These are four separate cases, all putative class actions. They say there's more than a hundred plaintiffs here.

Texas -- these are filed in different counties. Texas has no way to put all of them in a single Texas court. So, if the cases were

going to be in a single court, it had to be through removal and put them in -- in that court.

The second reason for that was Texas courts don't have a lot of experience with implied rights of action, alleged -- implied rights of action under federal law. This is the bread and butter of this Court's -- you guys' Court resolves factual -- those types of issues all of the time. So we thought let's just get it there, we'll get everybody in one case, and we can take out this, you know, putative federal cause of action, which we think is flatly irreconcilable to begin with.

CHIEF JUSTICE ROBERTS: So what -- under what basis would they proceed against the state under -- under 1983?

MR. NIELSON: They -- they couldn't, Your Honor. There is no such claim. Congress has said that you can bring claims against cities and municipalities. You cannot sue the states under Section 1983.

They say they can. So, under Bell v. Hood, they've claimed that there is a federal cause of action. When someone asserts that a

federal cause of action exists, the federal courts have jurisdiction to decide whether that is true, and then they can decide on the merits whether the cause of action exists.

CHIEF JUSTICE ROBERTS: Well, isn't that a -- a Catch-22 or -- I mean, you say you -- they have to proceed in -- in state court. They can't proceed in federal court. And as soon as they do, you remove it to federal court under 1983, where you say they can't proceed?

MR. NIELSON: Well, we would make the same argument in state or federal court that there is no federal cause of action directly under the Fifth Amendment. That is not --

CHIEF JUSTICE ROBERTS: Well, but that's what was rejected in the -- in the two cases that I read to you, Cedar Point and Knick.

MR. NIELSON: With your respect, Your Honor, I don't read either of those cases as saying there is a federal cause of action. There's certainly a federal substantive right to relief, but as this Court said in all of the Bivens line of cases or all the implied right of action cases, the right to, you know, a -- a substantive right does not therefore mean that

there is a cause of action.

JUSTICE KAGAN: But, General, do you agree with Mr. McNamara that if a state takes a person's property and doesn't give compensation, that state is violating the Constitution every day? It's an ongoing violation. Do you agree with that?

MR. NIELSON: That's not how the Court has -- I -- I -- I believe -- I certainly agree that's a violation of the Constitution. I don't think this Court's cases have ever --

JUSTICE KAGAN: But that's what I want to know. It's an --

MR. NIELSON: Sure.

JUSTICE KAGAN: -- ongoing violation of the Constitution, right? I've taken Mr. McNamara's property. I haven't paid him. Every day, I'm violating the Constitution, correct?

MR. NIELSON: Yes, Your Honor.

JUSTICE KAGAN: Okay. So aren't courts supposed to do something about that?

MR. NIELSON: Yes, Your Honor. And what this Court said in Knick is, when there's not a cause of action, which remember there wasn't a cause of action, there were -- you have

-- there's no remedies.

JUSTICE KAGAN: Yeah.

MR. NIELSON: What -- what is injunctive relief --

JUSTICE KAGAN: But this is -- this is very different.

MR. NIELSON: Sure.

JUSTICE KAGAN: You know, in the usual case, we have a constitutional -- let's take a Fourth Amendment case. You know, it's you've searched somebody's home illegally.

MR. NIELSON: Mm-hmm.

JUSTICE KAGAN: It's happened, and then it's over, and then the question is what remedy are you going to be giving for that violation.

But this is a different kind of violation. It's not a -- it's not even clear that the word "remedy" is appropriate here. It's a right to compensation. And the state, by taking the land and not compensating, is violating that right every day. It's not that the state --

MR. NIELSON: Mm-hmm.

JUSTICE KAGAN: -- is failing to

provide a remedy. The state is violating the right to be paid.

MR. NIELSON: Sure, Your Honor. And I -- I just -- and the answer would be, if there's not a cause of action, that's why I went back to Knick.

JUSTICE KAGAN: Well, if it's not a cause of action, I mean, in the --

MR. NIELSON: Sure.

JUSTICE KAGAN: -- usual case, suppose that a state violates Mr. McNamara's First Amendment rights.

MR. NIELSON: Yep.

JUSTICE KAGAN: Could he bring a suit about that?

MR. NIELSON: Yes, Your Honor, for injunctive relief.

JUSTICE KAGAN: Yes. And what Mr. McNamara, I believe, is saying is that -- that the usual distinction that we draw, you can bring a right for injunctive relief, but you can't -- you can bring a suit for injunctive relief, but you can't bring a suit for damages, that's the usual distinction.

But it sort of falls apart in this

case because the right is a right to be paid.

MR. NIELSON: Yes, Your Honor. And so I -- I -- I come at this from maybe the other direction. Let's imagine that some government said, you know what, we're not going to pay. We're telling everybody now. Now you are on notice we are not paying.

Well, then what happens? Before they could do anything, you would rush to court and you would say: Injunction. They can't do it. They've promised they're not going to pay. They're not going to provide that. And the Constitution says, if they don't, they're out of -- they're -- they're violating their rights. That's Eastern Enterprises v. Apfel, where if there's -- clear that there's not going to be a right to judicial -- to payment, there are no -- no monies coming, not -- not judicial, but no payments coming, you can get that injunction right away.

JUSTICE KAGAN: I mean, General, let me make the point another way.

MR. NIELSON: Sure.

JUSTICE KAGAN: I mean, it's sort of backwards to say that Mr. McNamara's client can

sue for an injunction, meaning like, you know, give me back my property. Actually, the state has a right to take his property or a prerogative to take --

MR. NIELSON: Yeah.

JUSTICE KAGAN: -- his property. If the state wants to use his property for a railroad, it doesn't really matter that the -- a person doesn't want to sell. The state has the ability to take -- the only thing that the state does not have the prerogative to do and the thing that the landowner has a right to have is payment.

MR. NIELSON: Yes, Your Honor.

JUSTICE KAGAN: So to say, well, look, you can sue for an injunction but you can't sue for payment just doesn't understand the nature of this right.

MR. NIELSON: Well, so our first-line argument is, you know, the way the United States did it for a hundred years is -- is correct. But, if the Court disagrees with that, if the Court says, you know what, actually --

JUSTICE KAGAN: So, General, I kind of agree with that. Your best argument is like

what happened between the time of the Constitution and, you know, someplace in the late 19th Century.

But suppose that I'm not such an originalist and I don't really care about that.

(Laughter.)

MR. NIELSON: Sure. All right. So the -- that -- that's the answer I'm going to say. So, if we -- if the Court says, we read First English and it requires not just a substantive relief, it requires some sort of judicial proceeding, which we don't think is consistent with the history, but let's assume, Texas does it. Texas provides the cause of action for which they can bring a federal takings claim.

So even if that is true, which we don't believe as our first-line argument is correct, Texas still wins. They --

JUSTICE BARRETT: What if Texas didn't do it, though?

MR. NIELSON: So -- so that's where we get interesting.

JUSTICE BARRETT: But I'm not -- but -- I -- I -- and I just want to be clear I'm not

talking about the hypothetical you gave where Texas announces in advance --

MR. NIELSON: Yeah.

JUSTICE BARRETT: -- we're going to take and we're not going to pay. Let's say that Texas takes and just this one property owner can't get the money, the -- Texas is being intransigent about it.

MR. NIELSON: Mm-hmm.

JUSTICE BARRETT: And Texas says: And, by the way, our state cause of action -- we have no state cause of action for you to use in our courts to get the money, no private bills. We don't do that. There's no state --

MR. NIELSON: Sure.

JUSTICE BARRETT: -- law remedy. What then?

MR. NIELSON: All right. So, you know, if a state goes rogue, that's how we're thinking about it, because we know from Knick all the states don't do that, but let's assume some state says, we're just not going to do that. Well, you have injunctive relief. I realize that might not be a perfect relief --

JUSTICE BARRETT: Doesn't work in this

hypothetical.

MR. NIELSON: It doesn't work because of that. Then the answer is exactly what the Constitution says. Congress -- Section 5 of the Fourteenth Amendment says, if a state is violating the Constitution, which would be happening in this scenario, that's precisely what Section 5 is for.

Congress has never done that --

JUSTICE BARRETT: So they have to wait for Congress to enforce it through legislation? Would there be some sort of due process violation or an argument that the state has to provide some sort of forum?

MR. NIELSON: Well, that's what I'm trying to say. If you read First English that way to say that not only is it there's a substantive obligation, but there has to be a -- some sort of judicial forum for -- for, you know, vindication of that --

JUSTICE BARRETT: I -- not, I mean, a judicial forum. It could be --

MR. NIELSON: Sure.

JUSTICE BARRETT: -- an administrative forum. I mean, I -- I'm taking --

MR. NIELSON: Okay. Sure. Sure.

JUSTICE BARRETT: -- your argument about that.

MR. NIELSON: Okay.

JUSTICE BARRETT: You're -- you're really saying that the state could shut down and give no administrative forum, no legislative forum, no judicial forum, and because the Fifth Amendment doesn't create an implied cause of action, then the property owner would have to say, Congress, can you please use your Section 5 power?

MR. NIELSON: The answer would be first try to get an injunction. That doesn't always work for the reasons that you say. In that scenario, yeah, that's what the Constitution says.

CHIEF JUSTICE ROBERTS: Well, but we're talk --

JUSTICE GORSUCH: Why -- why -- why -- I'm -- I'm sorry, Chief.

CHIEF JUSTICE ROBERTS: I'm sorry. We're talk -- those are two governments. I mean, we're talking about the ability of the government to take property without paying for

it. The -- the states and Congress may have common cause on that. And the idea that, well, you look to a different government --

MR. NIELSON: Mm-hmm.

CHIEF JUSTICE ROBERTS: -- to tell this government that that's not something governments can do, that's not much of a remedy.

MR. NIELSON: Well, this Court has cases that says we trust that Congress takes itself seriously. We trust that the states take their oath seriously. That's one of the premises of Alden v. Maine, that they're going to do that. But --

JUSTICE GORSUCH: Well, we also -- we also assume people act in their self-interest.

MR. NIELSON: Sure.

JUSTICE GORSUCH: And the -- our whole system of separated powers is premised on that idea. And self-interest here that would be created isn't a rogue state but an incentive for governments not -- not -- to -- to withdraw their -- their existing causes of action. I think that's the thrust --

MR. NIELSON: Yeah.

JUSTICE GORSUCH: -- of Justice

Barrett and the Chief's questions.

MR. NIELSON: What we --

JUSTICE GORSUCH: And I guess I'm wondering --

MR. NIELSON: Sorry.

JUSTICE GORSUCH: -- why wouldn't the injunction order the state to pay?

MR. NIELSON: So that's a question that has not been litigated, whether you could have injunctive relief to pay.

JUSTICE GORSUCH: Say you have to provide --

MR. NIELSON: Correct.

JUSTICE GORSUCH: -- just compensation. We're not telling you how.

MR. NIELSON: Yep.

JUSTICE GORSUCH: We're not telling you in what forum.

MR. NIELSON: And -- and -- and --

JUSTICE GORSUCH: But -- but the Constitution commands it.

MR. NIELSON: Sure. As I said, that's -- if you want to read First English that way, Texas has no quarrel with that because we provide it. And we don't just provide through a

commission, though I think we have the constitutional right to do so. We do it in court. We --

JUSTICE BARRETT: But you have to answer -- I'm sorry. You have to answer the hypothetical.

MR. NIELSON: Yeah.

JUSTICE BARRETT: I think Justice Gorsuch's premise is that Texas isn't doing this.

MR. NIELSON: Okay. So, if we say that a Texas doesn't or -- or some state doesn't have a -- a court proceeding and you don't have any sort -- other sort of commission, you still can get an injunction, and if you know the state doesn't have any of those things, you can get that injunction very, very, very early.

JUSTICE GORSUCH: And wouldn't the injunction say, Texas, you have an obligation --

MR. NIELSON: Mm-hmm.

JUSTICE GORSUCH: -- to pay?

MR. NIELSON: And this is where I -- I'm not quarreling because Texas --

JUSTICE GORSUCH: Okay.

MR. NIELSON: -- as a matter of --

JUSTICE KAVANAUGH: You don't want to concede that?

MR. NIELSON: -- first principles -- as a matter of first principles, I don't know how you get there. But I'm saying that Texas has no quarrel with it --

JUSTICE GORSUCH: Okay. And -- and --

MR. NIELSON: -- because Texas does -- what you're saying --

JUSTICE KAVANAUGH: What do you mean --

JUSTICE GORSUCH: I've got -- I -- I've got it. I've got it. I just want to -- I just want to clear -- clear up two other things.

MR. NIELSON: Sure.

JUSTICE GORSUCH: What is the common law cause of action and what is the state constitutional cause of action that does exist that you say could have but wasn't brought?

MR. NIELSON: That's right. So the -- the easiest place to see it because it's the most recent and I think the most clear is the Texas Supreme Court's City of Baytown --

JUSTICE GORSUCH: Right. That just says, though, as I understand it from your

colleague --

MR. NIELSON: Yeah.

JUSTICE GORSUCH: -- go look at the federal Constitution. So how does that help you?

MR. NIELSON: Well, they look at both. They say, we resolve takings claims under our constitutions, plural, and then they cite both. And then they --

JUSTICE GORSUCH: So Texas has represented to this Court that there is a state constitutional cause of action?

MR. NIELSON: Yes, Your Honor.

JUSTICE GORSUCH: Okay. And is there a common law cause of action --

MR. NIELSON: Well, that --

JUSTICE GORSUCH: -- that would achieve the same thing?

MR. NIELSON: -- that's what I'm -- that's what I'm -- I must have -- I must have misunderstood --

JUSTICE GORSUCH: Beyond --

MR. NIELSON: -- what you were saying. That is the -- the cause of action.

JUSTICE GORSUCH: That is the cause of

action?

MR. NIELSON: Yeah.

JUSTICE GORSUCH: Okay. And it wasn't pled here, is what you're --

MR. NIELSON: No, Your Honor. They --

JUSTICE GORSUCH: What does --

MR. NIELSON: -- vigorously resisted --

JUSTICE GORSUCH: Fine. Fine.

MR. NIELSON: -- the idea that they have to --

JUSTICE GORSUCH: Oh, okay. I got it. And what -- what cause of action remains pendent as you understand it?

MR. NIELSON: So they still have claims for federal due process, and they still have claims for the Texas Constitution.

JUSTICE GORSUCH: Would you oppose leave to amend to add a Texas constitutional claim on -- on an email?

MR. NIELSON: On behalf of the State of Texas, we would not oppose that in the district court.

JUSTICE GORSUCH: Okay. Thank you.

JUSTICE KAVANAUGH: Justice Gorsuch --

JUSTICE SOTOMAYOR: Sorry. But I -- I -- I -- I'm sorry.

JUSTICE KAVANAUGH: Go ahead.

JUSTICE SOTOMAYOR: Point of clarification.

MR. NIELSON: Sure.

JUSTICE SOTOMAYOR: Tell me how they plead this. Let's assume we affirm the court below. There's no freestanding right to come into federal court and sue Texas under the Fifth Amendment.

How would they go to the Texas court and make their Fifth Amendment claim?

MR. NIELSON: So --

JUSTICE SOTOMAYOR: What would they say in the Texas court?

MR. NIELSON: So -- yes. So what they would say here, and, candidly, the pleadings have never been as pellucid as I think anyone would have liked, but what I think that they -- they would say is, we are bringing our claim under state law, see City -- see, e.g., City of Baytown. I think that would be sufficient to get us there.

JUSTICE SOTOMAYOR: That -- that's --

my gosh. I've never heard of pleadings in any state where you had to mention the law at issue.

MR. NIELSON: Well, that's the --

JUSTICE SOTOMAYOR: Usually you mention the facts --

MR. NIELSON: Well --

JUSTICE SOTOMAYOR: -- or you state the facts and then you --

MR. NIELSON: Well --

JUSTICE SOTOMAYOR: But putting that aside, here, they say violation of Article I, Section 17 of the Texas Constitution for the taking, damaging, or the destruction of their property. That's Count 1.

MR. NIELSON: Yes, Your Honor.

JUSTICE SOTOMAYOR: And Count 2 says violation of the Fifth Amendment of the U.S. Constitution.

MR. NIELSON: Yes, Your Honor.

JUSTICE SOTOMAYOR: Summarizing basically. I don't know what else they would have had to do in Texas court if I cite that case.

MR. NIELSON: It --

JUSTICE SOTOMAYOR: They said, I'm

suing you in Texas court. You're the one who removed to federal court.

MR. NIELSON: Yes, Your Honor.

JUSTICE SOTOMAYOR: This seems to me like a totally made-up case because they did exactly what they had to do under Texas law. It's you who are telling me -- it's almost a bait and switch -- that you wanted to get to federal court to basically have a class action and you couldn't do it in state court, so -- but you had to fight something, which -- I don't know what you're fighting because you're telling me that Texas lets them have a cause of action under the Fifth Amendment.

MR. NIELSON: Yes, Your Honor. There's no bait and switch here, I want to be clear on that, no bait and switch.

JUSTICE SOTOMAYOR: Well, you're the one who removed.

MR. NIELSON: We removed, and they didn't come back and say, oh, no, you misunderstand what we're saying. Instead, every step along the way, they have doubled down all the way going to cert, you know, seek certiorari review from this Court.

So, if we misunderstood what they were saying --

JUSTICE SOTOMAYOR: So, if -- if they go back down and say to the district court, this has been remanded to the district court, all we want is just compensation under the Texas Constitution and the Fifth Amendment under that case that you're mentioning, that's okay and you're not going to resist that?

MR. NIELSON: We -- we -- we would not resist that, Your Honor.

JUSTICE SOTOMAYOR: Okay.

JUSTICE KAVANAUGH: On Justice Gorsuch's injunction-to-pay hypothetical, I just want to make sure I'm clear on that.

MR. NIELSON: Yeah.

JUSTICE KAVANAUGH: I thought you were saying we don't need to answer that question in this case because Texas provides forums for compensation.

MR. NIELSON: Yes, Your Honor. Conceptually, I don't know how you get an injunction to pay money.

JUSTICE KAVANAUGH: But -- but --

MR. NIELSON: I'm not familiar with

that, but that's blowing apart --

JUSTICE KAVANAUGH: I -- I understand that, but even in the --

MR. NIELSON: Yeah.

JUSTICE KAVANAUGH: -- the theoretical possibility of it is just not present here, right?

MR. NIELSON: Correct, Your Honor. And, as I said, it's hard for me to quarrel with it because Texas does pay money. But, conceptually, I don't know how you get there.

JUSTICE KAVANAUGH: Yeah.

MR. NIELSON: If I may --

JUSTICE JACKSON: What about a declaration? What about a declaration? Is that something different?

MR. NIELSON: A declaration? I --

JUSTICE JACKSON: Could you sue for -- for --

MR. NIELSON: Sure.

JUSTICE JACKSON: -- declaratory judgment that Texas or whatever state is not paying you?

MR. NIELSON: So my understanding of a declaratory judgment action is it sounds in

equity, not in damages. So I think it would fall within the -- the universe of Ex parte Young type remedies. So we wouldn't have any objection to that either, though, again, I -- I -- I'm a little bit shooting from the hip, so I apologize it wasn't briefed on that one, so I'm -- I'm a bit nervous on that.

JUSTICE JACKSON: Yes.

MR. NIELSON: Though, I mean, I -- if I -- if I may, I would like just to make a couple of affirmative points.

CHIEF JUSTICE ROBERTS: Well, no, you can do that later.

MR. NIELSON: Oh, I apologize, Your Honor.

CHIEF JUSTICE ROBERTS: Yeah.

Justice Thomas?

Justice Alito?

JUSTICE ALITO: Well, why don't you quickly make an affirmative point.

(Laughter.)

MR. NIELSON: Well, I would just like to say that as far as I am aware, Texas is the only party here that has offered evidence on the original public meaning of the actual language

of the text, not the ideas, the actual language of the Constitution. And when courts looked at that language, they read it precisely the same way that Texas does now.

CHIEF JUSTICE ROBERTS: Anything further?

JUSTICE ALITO: Thank you.

CHIEF JUSTICE ROBERTS: Justice Sotomayor?

Justice Gorsuch?

Justice Jackson?

Thank you, counsel.

MR. NIELSON: Thank you, Your Honor.

CHIEF JUSTICE ROBERTS: Mr. Kneedler.

ORAL ARGUMENT OF EDWIN S. KNEEDLER

FOR THE UNITED STATES, AS AMICUS CURIAE,

SUPPORTING THE RESPONDENT

MR. KNEEDLER: Mr. Chief Justice, and may it please the Court:

The Fifth Amendment to the United States Constitution does not of its own force create a cause of action against the government under the Fifth Amendment against the United States Government for damages.

Numerous provisions of the

Constitution make that clear, including the text of the just compensation clause itself. It says property shall not be taken, no person -- property shall not be taken for public use without just compensation.

The right is not to have the property taken without compensation. It's not a right to compensation. And this -- it's prohibitory. It has a condition for the -- governmental action to be lawful. That condition is the payment of compensation. If there's not compensation, then the action is unlawful, and what lies is an injunction to cease the taking of the property.

This Court in -- in a number of recent -- relatively recent cases has made that point. In Ruckelshaus versus Monsanto, in Dames & Moore, in the railroad reorganization cases, the question really was, should there be an injunction preventing this statute from going into effect, or is there compensation available under the Tucker Act such that an injunction would not be appropriate?

In all of those cases, that's what the Court held, that there was compensation available. But that -- the the very question

presupposed that there might be situations in which compensation was not available. That's the violation.

And the -- the same thing, if you look at the overall context of the Fifth Amendment, that is also true. It -- the preceding clause, as Justice Alito pointed out, says that no person shall be deprived of property without due process. The prohibition is the -- deprivation, the condition -- without -- without the condition of due process.

If a court finds a violation, it doesn't order due process. It orders -- it enjoins the conduct that was undertaken without due process. The government can always go back and do it over again with due process.

And -- and, finally, there's another clause in the Fifth Amendment that is written in exactly the same way, the indictment clause. It says a person shall not be held for a capital or otherwise infamous crime unless on a presentment of an indictment. An indictment is the condition precedent to having a lawful holding of somebody for a crime, and one --

CHIEF JUSTICE ROBERTS: Mr. Kneedler,

in the --

MR. KNEEDLER: Yeah.

CHIEF JUSTICE ROBERTS: -- brief that you -- you filed in First English 38 years ago, you argued that the Constitution does not of its own force furnish a basis for a court to award money damages against the government.

Now, in the decision in First English, Justice Rehnquist rejected the idea that "the Constitution does not, of its own force, furnish a basis for the court to award money damages against the government."

Now it seems to me that the question is -- turns on basis. And what you seem to be saying is it created a general theory of what the government had to do. But that doesn't mean that anybody could take that and recover compensation. They have to go get an injunction or they -- they can't proceed at all because there's no cause of action?

MR. KNEEDLER: Yes, Your --

CHIEF JUSTICE ROBERTS: I mean, are you just rearguing the point that the Court rejected?

MR. KNEEDLER: Not at all. Not at

all. But our point -- our point, that portion of our brief was really going to the cause of action question and -- and for the reasons that we said in that brief and this brief, and -- and I don't think the Court rejected this.

For all the reasons we said, not just the text of the clause, but -- but the Appropriations Clause, the Fifth Amendment only applied to the United States, the Appropriations Clause would have prohibited any court from awarding a money judgment or an injunction to pay money because only Congress can authorize the payment of money from the Treasury.

CHIEF JUSTICE ROBERTS: Well, but it's --

MR. KNEEDLER: OPM versus Richmond makes that clear.

CHIEF JUSTICE ROBERTS: Well, the Constitution can do it too, which is what the rest of that footnote rejecting the arguments that the government made in First English said. It says that the "cases made clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking."

So I -- I'm not sure how you get around the fact that the Constitution speaks in terms of just compensation and not an injunction.

MR. KNEEDLER: Well, as I said, it speaks in terms of compensation in terms of defining the right, which is not to have property taken without just -- just compensation. But that footnote, I think it's important to understand the context of that footnote.

In fact, all of First English was about the Agins rule in the -- in the -- in California, which said there was not even a taking. Sometimes they said you -- no compensation, but there was no taking until a court first determined that there was a taking.

And that was the rule, that was the controversy at the time, the so-called temporary taking. Does -- does the taking arise in a regulatory context at the time the regulation is effective or later? That was the issue that the Court rejected, and in that respect, it said no, compensation is owed from the moment of -- of the Constitution. And what --

CHIEF JUSTICE ROBERTS: Thank you, counsel.

JUSTICE ALITO: Mr. Kneedler, I have a little trouble understanding your argument about the Tucker Act. In your view, neither the Tucker Act nor the Takings Clause provides a cause of action, but then you say the combination of the two somehow provides a cause of action.

And the Petitioner says that what you're saying is that nothing plus nothing equals something. So this -- you must be relying on some kind of higher math that I can't understand. Where -- what is the cause of action --

MR. KNEEDLER: No, I -- I --

JUSTICE ALITO: -- in a Tucker Act suit?

MR. KNEEDLER: I -- as I said, I think it's the combination of the two. It's not zero plus zero; it's one-half plus one-half. The -- the -- as we say, the -- the -- the Constitution, the Fifth Amendment itself, does not create a -- a -- a cause of action. It would have -- would -- would have been

extraordinary. We went for 200 years, as pointed out, with that not being the case.

But what the Tucker Act does is, as the Court said two terms ago, three terms ago, I guess, it provides the framework under which it's -- it can be determined whether Congress has provided the ability to -- to sue under the Tucker Act.

The Tucker Act standard is whether the particular substantive provision that is being relied upon creates a -- can reasonably be read to mandate compensation if there is a violation. By definition -- and the Court made this point in Bormes -- the Tucker Act is there for something where there is an obligation but no elements of a cause of action. So the -- the -- for example, the Fifth Amendment or the statute that may be involved, particular statute that may be involved, by definition does not create a cause of action.

Congress provided in the Tucker Act that you can recover compensation if -- if the other provision of law can reasonably be construed. That's a -- that's a Tucker Act standard for when --

JUSTICE ALITO: All right. Suppose there -- suppose that the Takings Clause was not in the Constitution, but Congress enacted a statute that said the federal government shall not take private property for public use without just compensation.

Would that be a money-mandating statute that creates a cause of action?

MR. KNEEDLER: I don't think so. I -- because it's a -- it's a -- it's a prohibition, I think it's the same -- the same as the Fifth Amendment itself. It -- it is a directive to Congress not to -- or executive not to take property without affording compensation.

Now it may be that the particular statute would be understood or could be interpreted that way, but, here, we're talking about the Constitution, and no other provision of the Constitution provides of its own force a remedy, particularly a remedy for damages.

And that would have been extraordinary at the time the Constitution was adopted because of the Appropriations Clause, sovereign immunity, and the Debt Clause. If -- if compensation is not paid, that is a debt of the

United States, and it's clear --

JUSTICE ALITO: I -- I find it hard to understand how that would not be a statute that mandates the payment of money. It says you -- you can't take property for a public use without just compensation. It's talking about paying money. If that's not a money-mandating provision, then --

MR. KNEEDLER: It might -- it might be -- it might be money -- money-mandating under the Tucker Act. I -- I think I understood you to say it -- this wasn't the Tucker Act.

JUSTICE ALITO: No.

MR. KNEEDLER: But that's because the Tucker Act has been under --

JUSTICE ALITO: It's another -- it's another statute, and we would interpret it like we interpreted the statute in Maine Community Health. Does it -- does it mandate the payment of money? I would think the answer to that would be yes. And if that's the case with the statute, why isn't it the same with the --

MR. KNEEDLER: Because the --

JUSTICE ALITO: -- with the Fifth Amendment?

MR. KNEEDLER: -- the money mandating is not -- is not something under the Tucker Act. It is -- it is a provision in the Tucker Act that --

JUSTICE ALITO: All right.

MR. KNEEDLER: It -- it's not -- it's not the other statute. It's a provision in the Tucker Act. And that is a Tucker Act-specific standard for when Congress --

JUSTICE ALITO: Thank -- thank -- thank you.

JUSTICE JACKSON: Mr. --

JUSTICE ALITO: Thank you, Mr. Kneedler.

JUSTICE JACKSON: -- Mr. Kneedler, I thought your answer to Justice Alito was going to be going back to what you said at the beginning, which is the compensation is conditional in the same way as the Due Process Clause is conditional.

I thought that was very interesting, and maybe you want to repeat it.

MR. KNEEDLER: Yeah. No, no, that is -- that -- I -- I think that's a fundamental point about the text, not -- of the just

compensation clause itself, but the entire Fifth Amendment is pro -- is prohibitory. I mentioned the indictment clause, but the self-incrimination clause is the same way. The Double Jeopardy Clause is -- is the same.

JUSTICE JACKSON: And so, to the extent that we see a condition there, it -- you -- you're not interpreting that as mandating that condition necessarily. It's about the prohibition?

MR. KNEEDLER: Right. Exactly. If I could -- I'm -- I'm sorry.

CHIEF JUSTICE ROBERTS: No.

MR. KNEEDLER: If I could go back to the Chief Justice's question about First English, the language in that footnote is directed to, it says -- remedial. But what it is referring to is the -- computation of just compensation as a remedial matter.

If you have a cause of action, how do you calculate the remedy? All of the cases, it says, as the cases in the text make clear, it -- it -- it -- it's a remedy, and it does provide a basis for compensation, but in a cause of action where there already is one.

CHIEF JUSTICE ROBERTS: Thank you.

MR. KNEEDLER: Every one of the cases the Court cited --

CHIEF JUSTICE ROBERTS: Thank -- thank you, counsel.

MR. KNEEDLER: I'm sorry.

CHIEF JUSTICE ROBERTS: Justice Thomas?

JUSTICE THOMAS: No.

CHIEF JUSTICE ROBERTS: Anything further?

JUSTICE SOTOMAYOR: Is your position -- is there any daylight between Texas's position and the government's position here?

MR. KNEEDLER: Well, some --

JUSTICE SOTOMAYOR: Your -- you representing the government?

MR. KNEEDLER: Yeah. To the extent there was a suggestion that there could be an injunction to pay money, we would disagree with that because of the Appropriations Clause, I think. The Fifth Amendment cannot be read --

JUSTICE SOTOMAYOR: So would it be --

MR. KNEEDLER: -- to allow that.

JUSTICE SOTOMAYOR: -- a matter of

semantics, you can't take this property? You have to stop flooding it? You have to do --

MR. KNEEDLER: You have to -- you have to stop whatever it is that would constitute a taking. And -- and -- and --

JUSTICE SOTOMAYOR: All right. And just to clarify your answer to Justice Alito in my head, you're saying it's the Tucker Act plus the statute --

MR. KNEEDLER: Yes.

JUSTICE SOTOMAYOR: -- mandating payment that gets you into court?

MR. KNEEDLER: That is -- that's -- that's correct, and it's certainly not the -- it's certainly not the other provision itself, the just -- the just compensation clause or the other statute, which by definition --

JUSTICE SOTOMAYOR: So that's your half-point/half-point --

MR. KNEEDLER: Yes.

JUSTICE SOTOMAYOR: -- equals one?

MR. KNEEDLER: Yes.

JUSTICE SOTOMAYOR: Okay.

MR. KNEEDLER: Sorry.

CHIEF JUSTICE ROBERTS: Justice Kagan?

Justice Gorsuch?

JUSTICE GORSUCH: Two questions. First, the rogue state example, why shouldn't we worry about that? It -- why shouldn't we worry about the incentive structure we create that would allow states to withdraw compensation schemes, and maybe the federal government too, to exploit this loophole?

MR. KNEEDLER: With respect, it's not a loophole. It's a -- it's a fundamental aspect of the Constitution that the Constitution does not -- does not require this.

And the rogue state is answered by it's a prohibition, and if -- if Congress does not provide the condition necessary to render it lawful, you have an injunction -- injunctive action. And as the Court said in Knick, that was the way --

JUSTICE GORSUCH: Okay.

MR. KNEEDLER: -- that just compensation issues were raised before.

JUSTICE GORSUCH: Okay. And then, second, this may be a question better directed to Mr. McNamara when he speaks on rebuttal, but Justice Sotomayor pointed out an interesting

feature of the procedural history of this case. The complaint has two counts about takings. One is under the state constitution, and the other is under the federal Constitution.

How do we read what the Fifth Circuit did here? Did it only dismiss the second, the federal claim, and is the first claim under, what is it, City of Bayview and the -- and the Texas Constitution, still live? Do they even need to amend their complaint to add it? Is it already there?

MR. KNEEDLER: There's a footnote in the court of appeals' opinion that says that the Texas Constitution or Texas provides a cause of action. And that is not further elaborated upon, but it -- it's --

JUSTICE GORSUCH: No. Exactly.

MR. KNEEDLER: -- it's remanded for further proceedings, so --

JUSTICE GORSUCH: So do you take it that that first count under the state constitution is still alive and available to the plaintiffs?

MR. KNEEDLER: I -- it is still alive and available. If it required an amendment to

the complaint, I -- I took --

JUSTICE GORSUCH: Do you think it requires amendment --

MR. KNEEDLER: I --

JUSTICE GORSUCH: -- to the complaint, or because it was remanded for further proceedings and the court only expressly addressed the federal Constitution, that that first count is still alive?

MR. KNEEDLER: I think it would depend on whether that first count, in -- in relying on the state constitution, was just relying on a state substantive right to compensation or whether it was also relying --

JUSTICE GORSUCH: Well, Texas --

MR. KNEEDLER: -- on a cause of action.

JUSTICE GORSUCH: -- has represented to us that it provides a cause of action --

MR. KNEEDLER: Right. And -- and --

JUSTICE GORSUCH: -- right? So --

MR. KNEEDLER: -- so -- so, if -- if the -- if the complaint is read to be invoking the state cause of action for the federal taking, then, yes, I think that would be open on

remand.

JUSTICE GORSUCH: Thank you.

CHIEF JUSTICE ROBERTS: Justice Kavanaugh?

Justice Barrett?

JUSTICE BARRETT: Mr. Kneedler, just want to clarify something. So your position in response to, say, the rogue state hypothetical, when you said an injunction is the solution, it's not an injunction to pay money because you said the United States thinks that can't happen.

So is it your position that if, say, a state or the United States takes property, refuses to get -- give just compensation for it, that the property owner could get an injunction essentially saying, give me my property back if you're not going to pay, and perhaps get that injunction but not get reimbursed for the temporary taking that happened in between the seizure and the award of the injunction?

MR. KNEEDLER: That -- that is -- that is correct. And it -- the same thing would be true, you -- there could be a temporary deprivation of due process, and if you get an injunction preventing the government from doing

whatever it did without due process, there is an in -- interim period, but a person could go to court, get a TRO, get a preliminary injunction to -- to prevent that from going on a long -- a long time. That's just the nature of litigation and an injunction, but it doesn't lead to the question of damages.

And this Court's cases, First English and others, had to do with the calculation whether interest should be paid, and that's what the Court meant about the Fifth Amendment being a basis for the award of compensation, not that there was a cause of action.

CHIEF JUSTICE ROBERTS: Justice Jackson?

JUSTICE JACKSON: And just to clarify from what Justice Barrett just said, the government's position would be that you might be able to have a cause of action, say, under state law or whatnot for that temporary taking. It's not that you would be out the compensation entirely, right?

MR. KNEEDLER: Right. It -- that -- that would depend on -- on state law and the availability of a state cause of action on that.

But we're -- I'm only talking about the federal causes of action, which that -- there's no basis for an award of money out of the Treasury and overcoming sovereign immunity and all that in federal court for a compensation even for that interim period.

But the interim period is endemic to -- to litigation, due process violation being held on -- on an indictment, but that is the proper remedy and that's the -- the remedy that existed until the Tucker Act was passed. It was the remedy that this Court said in Knick was the way to vindicate Fifth Amendment rights -- until the Tucker Act or state constitutions came along and provided a monetary remedy.

JUSTICE JACKSON: Thank you.

CHIEF JUSTICE ROBERTS: Thank you, counsel.

Rebuttal, Mr. McNamara.

REBUTTAL ARGUMENT OF ROBERT J. McNAMARA

ON BEHALF OF THE PETITIONERS

MR. McNAMARA: Thank you, Your Honor.

To begin with Justice Gorsuch's question, I think it's important to remember the procedural posture here. I understood my friend

from Texas to say that the City of Baytown decision means that Texas courts hear claims "under the federal Constitution."

The complaint pleads a claim under the federal Constitution, and to the extent Texas's only complaint with that was that it failed to cite directly to a Texas Supreme Court decision, it's not clear why Texas moved to dismiss it, sought an interlocutory appeal of that decision as a dispositive issue and then extinguished it on the merits in the Fifth Circuit.

To the extent that claim exists, that claim has been extinguished and that warrants reversal.

To the original meaning, and I think, Your Honor, the -- the rogue state example is not a hypothetical. It's a real example because state after state has looked to federal law and to First English as the thing that prevents the state from denying compensation.

That's true in Oregon, as I mentioned, but also New Mexico, South Carolina, Nebraska, the list goes on of states that provide compensation under the Fifth Amendment because they understand the Fifth Amendment to require

compensation.

And they're correct to understand that, Your Honor. The original understanding, as evidenced by writings from James Madison to St. George Tucker, is that the Fifth Amendment creates an obligation to pay, which is why you can sue under the Tucker Act because the Fifth Amendment creates an obligation to pay.

Only in the absence of a court of competent jurisdiction to enforce that obligation does -- do the federal courts resort to cases like Meigs v. McClung's Lessee, where the Court ejected the United States military from its own base because it didn't have clean title. That -- that is the last resort in the absence of a court that has the jurisdiction to enforce that obligation.

That's why, in Maine Community Health, this Court specifically pointed to the Takings Clause as the analogy for what sort of money-mandating inquiry it means to create the obligation to pay.

But, more broadly, Your Honor, I -- I think Texas's understanding of the Fifth Amendment would relegate property rights to the

status of the poor relation of the Bill of Rights.

It would be the only acknowledged ongoing obligation in the Constitution that is entitled to no enforcement, that is left entirely to the discretion of the government entities that are supposedly obligated to pay. But, surely, as evidenced by the writings and by the adoption of the Fifth Amendment itself, the Framers meant for property rights to mean more than that.

If the Court has no further questions, we'll rest on our briefs.

CHIEF JUSTICE ROBERTS:  Thank you, counsel.

The case is submitted.

(Whereupon, at 12:23 p.m., the case was submitted.)

## $

**$3** [1] **34**:13

## 1

**1** [1] **63**:14
**11:10** [2] **1**:15 **3**:2
**12:23** [1] **90**:17
**1331** [1] **5**:23
**16** [1] **1**:11
**17** [1] **63**:12
**1791** [4] **7**:23 **8**:9 **9**:3,5
**1870s** [1] **43**:16
**1875** [1] **8**:5
**19** [1] **44**:4
**1983** [10] **25**:5 **30**:21 **33**:18
 **44**:5,7,11,16 **45**:17,22 **46**:
 10
**19th** [4] **5**:7,16 **8**:14 **52**:3

## 2

**2** [1] **63**:16
**200** [1] **75**:1
**2024** [1] **1**:11
**22-913** [1] **3**:4

## 3

**3** [1] **2**:4
**38** [2] **2**:7 **71**:4

## 5

**5** [3] **54**:4,8 **55**:11

## 6

**68** [1] **2**:11

## 8

**87** [1] **2**:14

## A

**a.m** [2] **1**:15 **3**:2
**AARON** [3] **1**:20 **2**:6 **38**:15
**ab** [1] **30**:5
**abandon** [1] **4**:16
**abilities** [1] **6**:9
**ability** [4] **28**:2 **51**:10 **55**:24
 **75**:7
**able** [2] **22**:16 **86**:19
**above-entitled** [1] **1**:13
**absence** [3] **20**:20 **89**:9,16
**absolutely** [1] **9**:10
**accomplished** [1] **31**:18
**achieve** [1] **60**:18
**acknowledged** [1] **90**:3
**across** [2] **16**:20 **24**:14
**Act** [25] **4**:5,6,9 **37**:13 **56**:15
 **69**:21 **74**:5,6,17 **75**:3,8,9,
 14,21,24 **77**:11,12,15 **78**:2,
 3,8 **81**:8 **87**:11,14 **89**:7
**Act-specific** [1] **78**:8
**action** [123] **4**:7,8,11,12,13
 **5**:12,20 **6**:8,14 **7**:10,12,15,
 21 **8**:1 **9**:3,6,22 **10**:2,7,12,
 13,25 **11**:6,9 **12**:14,20 **13**:7
 **14**:7,20 **15**:6 **18**:23 **19**:8,
 13,16,19,24,25 **21**:21 **22**:3,

9,18 **23**:5,10,12,18 **24**:7,12,
25 **25**:5,6 **26**:13,17,22 **33**:
25 **34**:5,9 **38**:23 **39**:3,5 **40**:
3,11,16 **41**:9 **42**:20 **43**:9,12,
12 **44**:9,10,13,16 **45**:6,7,13,
25 **46**:1,4,13,20,24 **47**:1,24,
25 **49**:5,8 **52**:15 **53**:11,12
**55**:10 **56**:22 **59**:17,18 **60**:
12,15,24 **61**:1,13 **64**:9,13
**66**:25 **68**:22 **69**:9,12 **71**:20
**72**:3 **74**:7,9,15,24 **75**:16,20
**76**:8 **79**:20,24 **82**:17 **83**:15
**84**:17,19,24 **86**:13,19,25
**87**:2
**actions** [2] **6**:1 **44**:21
**actual** [2] **67**:25 **68**:1
**actually** [8] **7**:4 **13**:17 **15**:
 14 **29**:24 **35**:7,8 **51**:2,23
**add** [2] **61**:19 **83**:10
**address** [1] **18**:22
**addressed** [1] **84**:8
**adequate** [2] **13**:13,14
**adequately** [1] **12**:21
**adjudicate** [1] **38**:24
**adjudicated** [2] **23**:23,24
**administrative** [2] **54**:24
 **55**:7
**admit** [1] **11**:5
**adopted** [3] **7**:3 **21**:6 **76**:22
**adopting** [2] **24**:3,8
**adoption** [1] **90**:9
**advance** [1] **53**:2
**affirm** [2] **41**:1 **62**:8
**affirmative** [2] **67**:11,20
**affording** [1] **76**:14
**afoul** [1] **34**:19
**Agins** [3] **7**:3,5 **73**:13
**ago** [3] **71**:4 **75**:4,4
**agree** [5] **7**:20 **47**:3,6,9 **51**:
 25
**agrees** [2] **20**:16,22
**Ah** [3] **11**:25 **15**:20 **23**:9
**ahead** [2] **33**:10 **62**:3
**AL** [1] **1**:3
**Alden** [1] **56**:12
**ALITO** [28] **24**:15 **25**:7 **27**:4,
 11,25 **36**:9,10,23 **37**:7,10,
 18 **38**:6 **67**:18,19 **68**:7 **70**:
 7 **74**:3,17 **76**:1 **77**:2,13,16,
 24 **78**:5,10,13,16 **81**:7
**alive** [3] **83**:22,24 **84**:9
**alleged** [2] **3**:24 **45**:6
**alleges** [1] **14**:25
**allow** [3] **31**:9 **80**:24 **82**:6
**allowed** [1] **12**:8
**allows** [1] **22**:3
**almost** [1] **64**:7
**already** [4] **4**:21 **6**:23 **79**:25
 **83**:11
**alternative** [1] **25**:22
**amend** [5] **5**:22 **41**:7,16 **61**:
 19 **83**:10
**Amendment** [98] **3**:12,19
 **4**:10 **6**:17,21 **7**:13,15,18,24,

25 **8**:20,20 **9**:5,17,23 **11**:7,
10,23 **12**:6,19,21 **13**:5,10,
21 **14**:4,12,14 **15**:2,17,23
**16**:5,20 **18**:7,17,20 **20**:5,14,
17,21 **21**:2,2,8,22 **22**:4,10
**23**:13,15,23 **24**:7,18 **25**:21
**27**:4 **28**:1 **29**:15,17,25 **30**:
12,17,25 **31**:6,8,10,16,20
**33**:20,23,24 **46**:14 **48**:10
**49**:12 **54**:5 **55**:9 **62**:11,13
**63**:17 **64**:14 **65**:7 **68**:20,23
**70**:5,18 **72**:8 **74**:23 **75**:17
**76**:12 **77**:25 **79**:2 **80**:22 **83**:
25 **84**:3 **86**:11 **87**:13 **88**:24,
25 **89**:5,8,25 **90**:9
**Amendment's** [1] **40**:3
**American** [1] **3**:25
**amicus** [5] **1**:24 **2**:10 **16**:2
 **18**:25 **68**:16
**amount-in-controversy**
[1] **5**:24
**amounting** [1] **72**:24
**analogy** [1] **89**:20
**analysis** [4] **23**:4,7 **29**:1 **34**:
 2
**announces** [1] **53**:2
**another** [7] **13**:12 **14**:22 **39**:
 14 **50**:22 **70**:17 **77**:16,17
**answer** [12] **9**:10 **21**:23 **49**:
 4 **52**:8 **54**:3 **55**:13 **58**:5,5
 **65**:18 **77**:20 **78**:16 **81**:7
**answered** [3] **3**:16 **6**:23 **82**:
 13
**answering** [1] **16**:7
**anybody** [1] **71**:17
**anyway** [1] **22**:23
**apart** [2] **49**:25 **66**:1
**Apfel** [1] **50**:15
**apologize** [2] **67**:6,14
**appeal** [5] **10**:10 **24**:1 **39**:1
 **41**:14 **88**:9
**appeals'** [1] **83**:13
**appear** [1] **30**:4
**APPEARANCES** [1] **1**:17
**applied** [3] **6**:17 **15**:13 **72**:9
**appraisers** [1] **37**:23
**appropriate** [2] **48**:19 **69**:
 22
**Appropriations** [4] **72**:8,9
 **76**:23 **80**:21
**aren't** [1] **47**:20
**argue** [1] **40**:5
**argued** [1] **71**:5
**arguing** [1] **32**:11
**argument** [27] **1**:14 **2**:2,5,8,
 12 **3**:4,7 **5**:13 **7**:23 **8**:12 **12**:
 1,2 **13**:18 **14**:19 **20**:18 **23**:
 21 **38**:15 **39**:6 **46**:12 **51**:20,
 25 **52**:18 **54**:13 **55**:2 **68**:15
 **74**:4 **87**:20
**arguments** [4] **7**:2 **24**:4,9
 **72**:20
**arise** [1] **73**:20
**arises** [1] **31**:9

**arising** [2] **14**:11 **15**:17
**Arlington** [1] **1**:18
**Army** [3] **26**:3,4,6
**Army's** [1] **26**:4
**around** [1] **73**:2
**Article** [1] **63**:11
**aside** [1] **63**:11
**aspect** [2] **18**:7 **82**:10
**assertion** [1] **43**:5
**asserts** [3] **13**:23 **14**:2 **45**:
 25
**assume** [4] **52**:13 **53**:21 **56**:
 15 **62**:8
**attempt** [1] **37**:13
**Austin** [1] **1**:20
**authorize** [1] **72**:12
**avail** [1] **28**:17
**availability** [1] **86**:25
**available** [7] **9**:18 **32**:12 **69**:
 20,25 **70**:2 **83**:22,25
**award** [9] **3**:20 **31**:1 **42**:5
 **43**:25 **71**:6,11 **85**:20 **86**:12
 **87**:3
**awarding** [2] **31**:2 **72**:11
**aware** [2] **34**:4 **67**:23
**away** [1] **50**:20

## B

**back** [14] **21**:19 **33**:3 **34**:15,
 18 **35**:23 **36**:1 **49**:5 **51**:2
 **64**:21 **65**:4 **70**:15 **78**:17 **79**:
 14 **85**:16
**backstop** [2] **18**:16,19
**backwards** [1] **50**:25
**backwards-looking** [1]
 **25**:18
**bait** [3] **64**:8,16,17
**BARRETT** [24] **7**:16,20 **16**:
 9 **21**:18 **22**:14,21 **38**:10 **52**:
 20,24 **53**:4,10,16,25 **54**:10,
 21,24 **55**:2,5 **57**:1 **58**:4,8
 **85**:5,6 **86**:17
**base** [1] **89**:14
**based** [1] **35**:5
**basically** [2] **63**:21 **64**:9
**basis** [13] **3**:19 **30**:25 **31**:5
 **42**:4 **43**:24 **44**:1 **45**:16 **71**:
 6,11,14 **79**:24 **86**:12 **87**:2
**Baytown** [5] **14**:13 **40**:19
 **59**:23 **62**:23 **88**:1
**Bayview** [1] **83**:8
**became** [2] **34**:23
**bedrock** [1] **5**:8
**begin** [2] **45**:14 **87**:23
**beginning** [1] **78**:18
**behalf** [9] **1**:19,21 **2**:4,7,14
 **3**:8 **38**:16 **61**:21 **87**:21
**believe** [3] **47**:9 **49**:19 **52**:
 18
**believes** [2] **31**:21,23
**Bell** [1] **45**:23
**below** [4] **30**:15 **32**:15,24
 **62**:9
**best** [1] **51**:25

**better** [1] **82**:23
**between** [5] **6**:6 **44**:8 **52**:1
 **80**:13 **85**:19
**Beyond** [1] **60**:22
**Bill** [2] **28**:10 **90**:1
**bills** [5] **8**:11,15 **19**:21 **39**:
 12 **53**:13
**bit** [3] **7**:22 **67**:5,7
**biting** [1] **35**:22
**Bivens** [3] **28**:22,23 **46**:23
**blowing** [1] **66**:1
**Bormes** [1] **75**:14
**both** [6] **4**:14 **29**:12 **38**:24
 **40**:22 **60**:6,8
**bread** [1] **45**:8
**Brennan** [1] **34**:19
**Brennan's** [1] **34**:23
**brief** [8] **5**:6 **13**:19 **16**:2 **19**:
 1 **71**:3 **72**:2,4,4
**briefed** [1] **67**:6
**briefs** [1] **90**:13
**bring** [16] **6**:9 **15**:14 **22**:3
 **25**:4 **34**:8,10 **39**:4 **41**:8,17
 **44**:16 **45**:20 **49**:14,21,22,
 23 **52**:15
**bringing** [2] **6**:1 **62**:21
**broader** [1] **16**:15
**broadly** [1] **89**:23
**brought** [4] **26**:18 **43**:6,8
 **59**:19
**Burlington** [2] **29**:18,24
**business** [1] **37**:16
**butter** [1] **45**:8

## C

**calculate** [1] **79**:21
**calculation** [1] **86**:9
**California** [3] **7**:3,5 **73**:14
**came** [2] **1**:13 **87**:14
**candidly** [1] **62**:18
**cannot** [3] **30**:16 **45**:21 **80**:
 22
**capital** [1] **70**:20
**care** [1] **52**:5
**Carlson** [1] **29**:2
**Carolina** [1] **88**:22
**Case** [37] **3**:4,11,21 **4**:9 **6**:
 20 **7**:8 **12**:5,9 **17**:5 **18**:7 **23**:
 11 **24**:8 **28**:22 **30**:5,7 **31**:
 20 **32**:4,21,22,25 **33**:15 **36**:
 17 **44**:20 **45**:11 **48**:9,10 **49**:
 10 **50**:1 **63**:23 **64**:5 **65**:8,
 19 **75**:2 **77**:21 **83**:1 **90**:16,
 17
**cases** [26] **4**:18 **28**:23,23
 **29**:2 **30**:3 **31**:2 **36**:22 **41**:
 22 **42**:7 **44**:20,25 **46**:17,19,
 23,24 **47**:11 **56**:9 **69**:15,17,
 23 **72**:22 **79**:21,22 **80**:2 **86**:
 8 **89**:12
**Catch-22** [1] **46**:6
**categorically** [1] **41**:24
**cause** [104] **4**:6,8,11,12,13
 **5**:20 **7**:10,12,14,21 **8**:1 **9**:3,

6,22 **10**:2,7,12,13,24 **11**:5 **12**:13,20 **14**:7,20 **15**:5 **17**:11 **18**:23 **19**:8,13,16,18,24, 24 **21**:21 **22**:3,8,17 **23**:5,9, 9,12,18 **24**:7,12,24 **33**:25 **34**:5 **36**:12 **38**:23 **39**:3,4 **40**:11,15 **41**:9 **42**:19 **43**:9, 12,12 **44**:8,10,13 **45**:13,25 **46**:1,4,13,20 **47**:1,24,25 **49**:5,8 **52**:14 **53**:11,12 **55**:9 **56**:2 **59**:17,18 **60**:12,15,24, 25 **61**:13 **64**:13 **68**:22 **71**:20 **72**:2 **74**:7,8,14,24 **75**:16, 20 **76**:8 **79**:20,24 **83**:14 **84**:16,19,24 **86**:13,19,25

**causes** [5] **5**:12 **13**:7 **40**:2 **56**:22 **87**:2

**cease** [5] **6**:2 **35**:2,3,4 **69**:13

**Cedar** [2] **41**:22 **46**:17

**Central** [1] **40**:24

**century** [5] **5**:7,17 **8**:14 **39**:23 **52**:3

**cert** [1] **64**:24

**certain** [1] **6**:10

**certainly** [9] **11**:21 **16**:19 **27**:9,15 **35**:1 **46**:21 **47**:9 **81**:14,15

**certiorari** [1] **64**:24

**change** [2] **4**:21 **30**:13

**changed** [1] **36**:2

**channel** [1] **27**:15

**chew** [1] **35**:23

**Chicago** [2] **29**:18,23

**CHIEF** [52] **3**:3,9 **29**:4 **33**:10 **34**:6 **35**:9,17,20 **36**:4,7 **38**:7,14,17 **41**:21 **42**:9,14, 21,25 **43**:4,18,22 **44**:14 **45**:15 **46**:5,15 **55**:18,21,22 **56**:5 **67**:12,16 **68**:5,8,14,18 **70**:25 **71**:3,22 **72**:14,18 **74**:1 **79**:13,15 **80**:1,4,7,10 **81**:25 **85**:3 **86**:14 **87**:17 **90**:14

**Chief's** [1] **57**:1

**choice** [4] **28**:4 **31**:12,14, 15

**choose** [1] **30**:8

**chooses** [1] **28**:17

**chosen** [1] **35**:4

**Circuit** [6] **14**:25 **22**:11 **30**:15,20 **83**:5 **88**:11

**cite** [7] **23**:8,16 **29**:24 **33**:23 **60**:8 **63**:22 **88**:7

**cited** [1] **80**:3

**cites** [1] **14**:14

**cities** [2] **44**:12 **45**:21

**citing** [1] **16**:5

**City** [7] **14**:13 **40**:19 **59**:23 **62**:22,22 **83**:8 **88**:1

**claim** [49] **4**:4 **7**:7 **13**:9 **15**:2, 3,22 **17**:13,23,24 **22**:4,12, 23 **23**:2 **25**:8 **30**:9,14,16 **31**:9,13 **32**:5,5,12,18 **33**:1, 5,6,14 **34**:9,10 **35**:10 **36**:13,

15 **40**:24 **41**:5,8,11,17 **42**:19 **44**:3 **45**:19 **52**:16 **61**:20 **62**:13,21 **83**:7,7 **88**:4,12,13

**claimed** [1] **45**:24

**claiming** [1] **32**:17

**claims** [22] **4**:1 **6**:2,7,10 **14**:11 **15**:14,16,17 **17**:7,11 **28**:6 **38**:24 **39**:18 **40**:12,22 **41**:10,13 **45**:20 **60**:7 **61**:16,17 **88**:2

**clarification** [2] **21**:20 **62**:5

**clarify** [3] **81**:7 **85**:7 **86**:16

**clarifying** [1] **14**:18

**class** [2] **44**:21 **64**:9

**Clause** [27] **4**:15,17 **24**:16, 17 **25**:25 **26**:2 **39**:5,10 **69**:2 **70**:6,18,19 **72**:7,8,10 **74**:6 **76**:2,23,24 **78**:20 **79**:1,3, 4,5 **80**:21 **81**:16 **89**:20

**clean** [1] **89**:14

**clear** [16] **19**:25 **32**:10 **48**:18 **50**:16 **52**:25 **59**:14,14, 22 **64**:17 **65**:15 **69**:1 **72**:17, 22 **77**:1 **79**:22 **88**:8

**client** [1] **50**:25

**coherent** [1] **19**:15

**colleague** [1] **60**:1

**combination** [2] **74**:8,20

**come** [4] **4**:23 **50**:3 **62**:9 **64**:21

**comes** [2] **15**:23 **17**:22

**coming** [2] **50**:18,19

**commands** [1] **57**:21

**commentators** [1] **25**:25

**commission** [2] **58**:1,14

**commissions** [1] **39**:12

**committed** [1] **38**:20

**common** [24] **7**:6 **9**:18 **11**:1, 5,9 **12**:13,20 **13**:13,14,20 **14**:3,6,6,15,20 **22**:8 **23**:4, 11 **30**:19 **34**:5 **41**:17 **56**:2 **59**:16 **60**:15

**Community** [3] **5**:1 **77**:18 **89**:18

**compensating** [1] **48**:21

**compensation** [91] **3**:18, 20,24 **6**:16,22,24 **7**:7 **8**:3, 13,16 **9**:9 **10**:19 **11**:22 **12**:4 **13**:4 **15**:1 **16**:4,7 **17**:1 **18**:18 **20**:21 **21**:9,11,12 **24**:22 **25**:12,16,20 **26**:10,12,24, 25 **27**:5,21,24 **28**:2,20 **29**:20 **30**:2 **31**:1,3,7 **32**:1,2,5 **34**:4,11 **35**:12 **39**:10 **41**:25 **47**:4 **48**:20 **57**:15 **65**:6,20 **69**:2,5,7,8,11,11,20,24 **70**:2 **71**:18 **73**:3,6,9,16,24 **75**:12,22 **76**:6,14,25 **77**:6 **78**:18 **79**:1,19,24 **81**:16 **82**:6, 21 **84**:13 **85**:14 **86**:12,21 **87**:5 **88**:20,24 **89**:1

**competent** [3] **27**:14,22 **89**:10

**competently** [1] **29**:8

**complaint** [13] **7**:14 **13**:3 **14**:25 **23**:21 **41**:7,16 **83**:2, 10 **84**:1,5,23 **88**:4,6

**completed** [1] **25**:13

**completely** [1] **36**:24

**comply** [1] **29**:10

**computation** [1] **79**:18

**concede** [2] **39**:22 **59**:2

**conceded** [1] **10**:2

**concedes** [1] **12**:18

**conceding** [1] **31**:21

**conception** [1] **9**:3

**concepts** [2] **19**:8,12

**conceptualizing** [1] **20**:10

**conceptually** [3] **5**:19 **65**:22 **66**:11

**concern** [1] **24**:3

**concluded** [1] **41**:24

**concocted** [1] **25**:18

**condemnation** [4] **3**:21,23 **4**:1 **14**:11

**condition** [8] **69**:9,10 **70**:10,11,23 **79**:7,9 **82**:15

**conditional** [2] **78**:19,20

**conduct** [1] **70**:14

**confers** [1] **27**:5

**Congress** [24] **5**:22 **6**:3 **8**:4, 14 **27**:15 **28**:13,15 **39**:15, 22 **44**:11 **45**:19 **54**:4,9,11 **55**:11 **56**:1,9 **72**:12 **75**:6, 21 **76**:3,13 **78**:9 **82**:14

**Congress's** [1] **28**:4

**consequential** [1] **37**:14

**consistent** [2] **4**:16 **52**:13

**consistently** [1] **5**:4

**constitute** [1] **81**:4

**Constitution** [60] **3**:14 **5**:3 **17**:8,18 **22**:1,19 **24**:10 **25**:13 **34**:1,2,3 **38**:21,22 **39**:9 **40**:22,23 **41**:12 **42**:3 **43**:23 **47**:5,10,16,18 **50**:13 **52**:2 **54**:4,6 **55**:17 **57**:21 **60**:4 **61**:17 **63**:12,18 **65**:7 **68**:2, 21 **69**:1 **71**:5,10 **72**:19,23 **73**:2,25 **74**:23 **76**:3,18,19, 22 **82**:11,11 **83**:3,4,9,14,22 **84**:8,12 **88**:3,5 **90**:4

**constitutional** [12] **23**:7 **24**:12 **28**:12,25 **29**:11 **39**:20 **41**:2 **48**:9 **58**:2 **59**:18 **60**:12 **61**:19

**constitutionally** [1] **39**:15

**constitutions** [3] **38**:25 **60**:8 **87**:14

**constrained** [1] **26**:12

**construed** [1] **75**:24

**contained** [1] **9**:6

**contemporary** [2] **25**:24 **26**:11

**contend** [2] **8**:17,22

**context** [5] **26**:2 **29**:15 **70**:5 **73**:10,21

**continue** [1] **12**:5

**contrary** [1] **8**:11

**contrasting** [1] **7**:1

**controversies** [1] **39**:18

**controversy** [1] **73**:19

**converged** [1] **16**:21

**conversion** [2] **9**:20 **14**:9

**core** [1] **6**:10

**correct** [12] **18**:14 **20**:14 **42**:8 **44**:17 **47**:18 **51**:21 **52**:19 **57**:13 **66**:8 **81**:14 **85**:22 **89**:2

**correctly** [2] **32**:23 **42**:12

**couldn't** [3] **44**:15 **45**:18 **64**:10

**Counsel** [10] **7**:16,20 **34**:7 **38**:12 **41**:21 **68**:12 **74**:2 **80**:5 **87**:18 **90**:15

**counsels** [1] **30**:21

**count** [6] **44**:5 **63**:14,16 **83**:21 **84**:9,11

**counties** [1] **44**:24

**country** [1] **16**:21

**counts** [2] **17**:19 **83**:2

**couple** [2] **41**:22 **67**:11

**course** [1] **40**:25

**courses** [1] **12**:24

**COURT** [139] **1**:1,14 **3**:10, 20 **4**:21 **5**:1 **6**:2,23 **7**:3,6 **9**:4 **10**:6 **12**:16 **14**:6,12 **15**:15 **17**:2,6,10,23 **18**:1,6,14, 24 **21**:16 **23**:12,22,24 **26**:20 **27**:14,22 **28**:18 **29**:16 **30**:4,13,23,25 **31**:2,4,11,14 **32**:4,17,19,22 **33**:3,5,17 **34**:11,22 **36**:2,18 **37**:3 **38**:18, 19 **39**:14,24 **40**:1,6,18,25 **41**:4,7,16,23 **42**:4,20,23 **43**:6,7,15,17,24 **44**:2,2,4,5,15, 18,25 **45**:1,3,9 **46**:7,8,9,12, 22 **47**:8,23 **50**:9 **51**:22,23 **52**:9 **56**:8 **58**:3,13 **60**:11 **61**:23 **62**:8,10,12,16 **63**:22 **64**:1,2,9,10,25 **65**:4,5 **68**:19 **69**:14,24 **70**:12 **71**:6,11, 23 **72**:5,10 **73**:17,23 **75**:4, 13 **80**:3 **81**:12 **82**:17 **83**:13 **84**:7 **86**:3,11 **87**:5,12 **88**:7 **89**:9,13,16,19 **90**:12

**Court's** [15] **3**:16 **4**:16 **5**:3, 5 **7**:5 **26**:15,17 **28**:22 **34**:2 **40**:14,18 **45**:8 **47**:11 **59**:23 **86**:8

**courts** [38] **4**:14 **5**:7,11,16 **15**:13,16 **16**:5,20 **17**:17,20 **21**:12,24,25 **23**:3,8 **24**:5,14 **26**:11 **27**:17 **28**:5,13,13,16, 17 **29**:7 **33**:21 **34**:1 **36**:21 **38**:23 **41**:3 **43**:16 **45**:5 **46**:2 **47**:21 **53**:13 **68**:2 **88**:2 **89**:11

**covered** [1] **19**:10

**create** [14] **14**:7 **15**:5 **23**:12 **27**:17 **28**:4,13,15,24 **55**:9 **68**:22 **74**:24 **75**:19 **82**:5 **89**:

21

**created** [5] **25**:19 **33**:25 **43**:13 **56**:20 **71**:15

**creates** [8] **21**:8 **23**:15 **34**:21,25 **75**:11 **76**:8 **89**:6,8

**creating** [1] **23**:4

**creation** [1] **24**:24

**crime** [2] **70**:21,24

**crucial** [1] **8**:2

**cure** [1] **21**:13

**curiae** [3] **1**:24 **2**:11 **68**:16

## D

**D.C** [2] **1**:10,23

**damages** [19] **21**:14 **25**:8, 11,18 **29**:6 **37**:8,11,12,14, 15 **42**:5 **43**:25 **49**:23 **67**:1 **68**:24 **71**:7,11 **76**:20 **86**:7

**damaging** [1] **63**:13

**Dames** [1] **69**:16

**dangerous** [1] **23**:19

**Davis** [1] **29**:3

**day** [4] **36**:22 **47**:6,18 **48**:22

**daylight** [1] **80**:13

**dead** [1] **15**:3

**debt** [4] **26**:18,22 **76**:24,25

**decade** [1] **29**:4

**decide** [4] **34**:11 **36**:18 **46**:2,3

**decided** [1] **30**:11

**decipher** [1] **16**:11

**decision** [14] **3**:17 **7**:5 **14**:5 **24**:8 **26**:15,17 **31**:18 **40**:8, 18,25 **71**:8 **88**:2,7,9

**declaration** [3] **66**:15,15, 17

**declaratory** [3] **12**:17 **66**:21,25

**defendant** [3] **28**:16 **35**:7, 14

**defendant's** [1] **31**:12

**define** [1] **21**:25

**defining** [1] **73**:7

**definition** [5] **17**:18 **19**:23 **75**:13,19 **81**:17

**deliberately** [1] **28**:16

**denied** [1] **27**:22

**denies** [1] **26**:25

**denying** [1] **88**:20

**Department** [1] **1**:23

**depend** [2] **84**:10 **86**:24

**dependent** [1] **28**:3

**depends** [2] **20**:24 **28**:12

**deprivation** [2] **70**:9 **85**:24

**deprived** [1] **70**:8

**Deputy** [1] **1**:22

**destruction** [1] **63**:13

**determination** [1] **36**:21

**determine** [1] **39**:17

**determined** [2] **73**:17 **75**:6

**DEVILLIER** [2] **1**:3 **3**:4

**dictates** [1] **72**:23

**Diego** [1] **34**:20

**differ** [1] **20**:11

difference [3] 6:5 25:10 44:7

different [11] 18:2,5 19:9 26:23 37:8,11 44:23 48:6,17 56:3 66:16

differently [2] 24:23 25:2

difficult [1] 16:11

difficulty [1] 9:2

directed [2] 79:17 82:23

direction [1] 50:4

directive [1] 76:12

directly [9] 5:9 7:13,15 13:9 16:24 23:17 39:5 46:13 88:7

disagree [2] 18:10 80:20

disagrees [1] 51:22

discretion [1] 90:6

discretionary [1] 28:4

discriminate [2] 22:22 23:1

dismiss [3] 23:25 83:6 88:8

dismissed [3] 17:6 18:8 22:13

dispositive [1] 88:10

dispute [5] 13:13 16:17 17:15 42:15,18

dissent [4] 29:2 32:15 34:20,23

distinct [5] 5:19 7:22 15:11 19:12 38:4

distinction [2] 49:20,24

distinguishes [1] 28:22

district [10] 15:16 17:10 18:14 32:22 36:1 41:7,16 61:23 65:4,5

diversity [1] 43:10

divert [1] 36:11

doing [5] 23:3,4,6 58:9 85:25

done [4] 41:18 43:16,20 54:9

Double [1] 79:5

doubled [1] 64:23

down [3] 55:6 64:23 65:4

drastic [1] 4:21

draw [1] 49:20

Due [16] 24:17,20 25:3 29:22 41:12 54:12 61:16 70:8,11,13,15,16 78:19 85:24 86:1 87:8

dueling [1] 37:23

duty [5] 3:15 17:1 25:16 26:9 29:11

### E

e.g [1] 62:22

early [2] 5:16 58:17

easement [11] 35:15,16 36:15,18,19,20,20 37:4,6,25 38:1

easiest [1] 59:21

Eastern [1] 50:15

EDWIN [3] 1:22 2:9 68:15

effect [1] 69:20

effective [1] 73:22

effectively [1] 31:17

either [4] 12:23 25:24 46:19 67:4

ejected [1] 89:13

ejectment [2] 9:12 20:20

elaborated [1] 83:15

Electric [1] 34:20

elements [1] 75:16

eliminate [1] 24:13

eliminated [3] 6:3 31:19 36:24

email [1] 61:20

emphasize [1] 40:7

empowered [1] 21:12

enacted [1] 76:3

enacting [1] 8:15

endemic [1] 87:7

ending [1] 34:20

enforce [8] 4:24 5:9 9:9 13:21 28:18 54:11 89:10,17

enforceable [1] 9:14

enforced [3] 16:22,23 25:17

enforcement [2] 20:8 90:5

engage [1] 28:25

English [36] 3:17 4:11,18 6:24 7:11 16:6,10,15 17:22,22 18:2,5,10,17 19:10 21:7 23:9,16 24:5 29:5 31:25 34:24 40:6,7 41:23 42:2 52:10 54:16 57:23 71:4,8 72:21 73:12 79:16 86:8 88:19

enjoined [1] 21:4

enjoins [1] 70:14

enough [4] 10:23 11:12,16 14:16

Enterprises [1] 50:15

entertain [1] 28:6

entire [3] 28:10,11 79:1

entirely [2] 86:22 90:6

entities [1] 90:7

entitled [9] 6:15 13:4 14:21 20:19 31:8 32:8 33:18,22 90:5

entitlement [15] 4:7,8 6:12 7:12 10:15,18 15:1 16:18,22 19:14 25:19 27:20,22 33:14 34:3

entity [1] 16:24

envisioned [1] 9:17

equals [2] 74:12 81:21

equity [1] 67:1

ESQ [4] 2:3,6,9,13

ESQUIRE [1] 1:18

essentially [1] 85:16

establishes [1] 9:16

ET [1] 1:3

evaluating [1] 26:17

even [9] 6:7 18:14 26:12 48:18 52:17 66:3 73:14 83:9 87:5

everybody [2] 45:11 50:6

everyone [3] 12:18 20:16,22

evidence [4] 8:11,22 35:3 67:24

evidenced [2] 89:4 90:8

Ex [5] 6:1 25:4,5,7 67:2

exactly [7] 33:17 35:13 54:3 64:6 70:19 79:11 83:17

example [6] 16:1 26:14 75:17 82:3 88:16,17

except [1] 18:5

excuse [1] 26:16

executive [1] 76:13

exist [2] 6:2 59:18

existed [1] 87:11

existing [1] 56:22

exists [3] 46:1,4 88:12

experience [1] 45:5

explained [2] 40:1 43:15

explanations [1] 4:17

explicit [1] 3:15

exploit [1] 82:8

expressly [1] 84:7

extent [6] 19:23 37:3 79:7 80:18 88:5,12

extinguish [2] 31:16 32:3

extinguished [3] 24:2 88:10,13

extra-constitutional [1] 5:12

extraordinary [2] 75:1 76:21

### F

face [2] 13:3,12

faced [1] 5:8

facing [1] 5:15

fact [7] 5:11 11:19 24:10 30:18 35:18 73:2,12

facts [4] 36:2 37:3 63:5,8

factual [2] 35:6 45:9

failed [1] 88:6

failing [1] 48:25

Fair [7] 10:23 11:12 14:16 32:8 37:5,23 38:2

fall [1] 67:2

falls [1] 49:25

familiar [2] 23:10 65:25

far [2] 34:4 67:23

favor [1] 30:22

favorable [1] 31:23

feature [1] 83:1

federal [83] 4:4,15 5:7,16 6:1 8:5 10:24 12:12,16 14:22 15:15,16 17:6,19 18:6 21:22 22:4,23 23:2 24:11,13 28:5,12,13 29:7 30:4,9,9,10,13 31:4,11,13,13,14 32:4,17,22,25 33:15 38:22 39:5 40:11,23 41:4,12 42:23 43:2,5,7 44:2,15,18 45:7,12,24 46:1,1,8,9,12,13,20,21 52:15 60:4 61:16

62:10 64:2,9 76:4 82:7 83:4,7 84:8,24 87:1,5 88:3,5,18 89:11

Fifth [97] 3:12,19 4:10 6:17,21 7:13,15,18,24,25 8:20 9:5,17,22 11:6,12,23 12:6,18,21 13:5,9,21 14:4,11,14,24 15:2,17,23 16:4 18:7,17,20,20 20:5,14,17,21 21:1,2,8,22 22:4,10,11 23:13,15,23 24:6,18 25:21 27:4 28:1 29:17,24 30:12,15,17,20,24 31:6,8,10,16,19 33:19,22,23 46:14 55:8 62:10,13 63:17 64:14 65:7 68:20,23 70:5,18 72:8 74:23 75:17 76:11 77:24 79:1 80:22 83:5 86:11 87:13 88:11,24,25 89:5,7,24 90:9

fight [2] 33:13 64:11

fighting [1] 64:12

file [1] 4:24

filed [6] 4:1,4 23:22 30:5 44:23 71:4

finally [1] 70:17

find [3] 36:11 38:19 77:2

finds [1] 70:12

Fine [2] 61:9,9

First [52] 3:17 4:11,17 6:24 7:11 11:10,14 16:5,10,15 17:21,22 18:2,5,10,16 19:10 21:7 23:8,16 24:5 29:5,23,25 31:25 33:12 34:24 40:6,7,9 41:23 42:2 49:11 52:10 54:16 55:14 57:23 59:3,4 71:4,8 72:21 73:12,17 79:15 82:3 83:7,21 84:9,11 86:8 88:19

first-line [2] 51:19 52:18

flatly [1] 45:13

flooded [1] 36:25

flooding [3] 36:12,17 81:2

flow [1] 22:7

flowing [1] 15:1

flows [1] 7:13

follows [1] 39:19

footnote [6] 16:14 72:20 73:9,11 79:16 83:12

footnote's [1] 16:11

force [6] 42:4 43:24 68:21 71:6,10 76:19

forego [1] 37:17

form [4] 6:13 16:25 20:23 32:6

former [1] 32:7

forms [3] 6:8 9:25 26:13

forum [15] 19:18,19 26:21,23,24,25 30:10 54:14,19,22,25 55:7,8,8 57:18

forums [1] 65:19

forward [3] 36:11,24 37:1

found [2] 35:21 37:3

founding [1] 8:7

four [1] 44:20

Fourteenth [6] 6:18 8:19 16:20 29:14 40:3 54:5

Fourth [1] 48:10

Framers [3] 10:3 25:20 90:10

framework [1] 75:5

framing [1] 9:13

free [3] 27:15,17 35:14

freestanding [1] 62:9

Frequently [1] 23:16

friend [1] 87:25

friend's [1] 20:18

fulfill [1] 17:3

fulfilled [1] 17:2

full [3] 30:17 31:7 35:6

fully [1] 11:6

fundamental [2] 78:24 82:10

furnish [4] 30:25 42:4 71:6,10

furnishes [2] 3:19 43:24

further [6] 68:6 80:11 83:15,19 84:6 90:12

future [1] 36:13

### G

Gas [1] 34:20

gave [1] 53:1

Gedney [1] 26:18

General [7] 1:20,22 33:7 47:2 50:21 51:24 71:15

generally [1] 37:22

generation [2] 8:8,9

George [3] 26:1,8 89:5

gets [1] 81:12

getting [1] 19:6

give [8] 8:15 28:5 35:23 47:4 51:2 55:7 85:14,16

given [1] 31:20

gives [2] 23:17 25:15

giving [1] 48:15

good-faith [2] 13:2 31:5

GORSUCH [63] 9:15 10:1,8,17,20,23 11:4,12,15,19,25 12:7 13:6,11,18,24 14:8,16 15:4,20 55:20 56:14,17,25 57:3,6,11,14,17,20 58:18,21,24 59:7,12,16,24 60:3,10,14,17,22,25 61:3,6,9,12,18,24,25 68:10 82:1,2,19,22 83:17,20 84:2,5,15,18,21 85:2

Gorsuch's [3] 58:9 65:14 87:23

gosh [1] 63:1

got [5] 8:22 59:12,13,13 61:12

government [28] 3:14 4:4 21:3,10 25:15 32:6 34:12,13 38:3,20 41:24 42:5 50:4 55:25 56:3,6 68:22,24 70:15 71:7,12,16 72:21 76:4 80:17 82:7 85:25 90:6

government's [4] 20:25

21:16 80:14 86:18
**governmental** [1] **69:**9
**governments** [5] **4:**2 **39:**9 **55:**23 **56:**7,21
**governs** [1] **17:**16
**great** [1] **26:**14
**Green** [1] **29:**3
**ground** [2] **12:**11 **36:**1
**grounds** [2] **13:**2 **33:**13
**guess** [3] **20:**3 **57:**3 **75:**5
**guys'** [1] **45:**8

**H**

**half-point/half-point** [1] **81:**19
**happen** [1] **85:**11
**happened** [3] **48:**13 **52:**1 **85:**19
**happening** [1] **54:**7
**happens** [2] **10:**25 **50:**8
**hard** [3] **7:**22 **66:**9 **77:**2
**hard-pressed** [1] **38:**19
**head** [1] **81:**8
**Health** [3] **5:**1 **77:**19 **89:**18
**hear** [6] **3:**3 **15:**17 **20:**11 **39:**17 **40:**21 **88:**2
**heard** [2] **31:**14 **63:**1
**hears** [1] **14:**10
**heart** [3] **3:**25 **4:**1,3
**held** [7] **5:**1 **22:**12 **30:**23 **39:**14 **69:**24 **70:**20 **87:**9
**help** [1] **60:**4
**higher** [1] **74:**13
**hip** [1] **67:**5
**historical** [2] **8:**10,21
**history** [6] **19:**25 **20:**3 **28:**25 **29:**13 **52:**13 **83:**1
**hold** [1] **39:**24
**holding** [4] **16:**16 **40:**10 **44:**6 **70:**23
**holdings** [1] **42:**15
**holds** [1] **3:**17
**home** [1] **48:**11
**honest** [1] **22:**6
**Honor** [70] **5:**15 **7:**19 **9:**1,25 **10:**5 **11:**2,8,13,22 **13:**1,8,16,22 **14:**3,24 **15:**11,23 **16:**13 **17:**9,14 **18:**5,16,25 **19:**12,22 **20:**15 **22:**6,20,25 **25:**2 **27:**10 **28:**11 **32:**13,20 **33:**11,12 **34:**18 **35:**13 **36:**6,16 **37:**9 **38:**13 **42:**8,16,24 **43:**3 **44:**17 **45:**19 **46:**19 **47:**19,22 **49:**3,16 **50:**2 **51:**14 **60:**13 **61:**5 **63:**15,19 **64:**3,15 **65:**11,21 **66:**8 **67:**15 **68:**13 **87:**22 **88:**16 **89:**3,23
**Hood** [1] **45:**24
**horses** [5] **26:**3,4,5,7,10
**however** [1] **27:**16
**hundred** [2] **44:**22 **51:**21
**hypothetical** [6] **53:**1 **54:**1 **58:**6 **65:**14 **85:**8 **88:**17

**I**

**idea** [5] **25:**22 **56:**2,19 **61:**10 **71:**9
**ideas** [1] **68:**1
**identified** [1] **34:**19
**ignores** [1] **39:**8
**illegally** [1] **48:**11
**illustration** [1] **7:**4
**imagine** [1] **50:**4
**immediately** [1] **24:**18
**immunity** [5] **15:**7,10 **29:**9 **76:**24 **87:**4
**implied** [4] **45:**6,6 **46:**23 **55:**9
**import** [1] **19:**25
**important** [5] **13:**17 **15:**25 **22:**15 **73:**10 **87:**24
**imposes** [1] **3:**14
**incentive** [2] **56:**20 **82:**5
**include** [1] **40:**10
**included** [1] **29:**22
**includes** [1] **30:**1
**including** [1] **69:**1
**incorporated** [3] **8:**20 **29:**16,19
**independent** [2] **9:**22 **34:**5
**indictment** [5] **70:**19,22,22 **79:**3 **87:**9
**infamous** [1] **70:**21
**information** [1] **17:**5
**Inhabitants** [1] **26:**19
**initio** [1] **30:**5
**injunction** [27] **19:**16 **50:**10,19 **51:**1,16 **55:**14 **57:**7 **58:**15,17,19 **65:**23 **69:**13,19,21 **71:**18 **72:**11 **73:**4 **80:**20 **82:**16 **85:**9,10,15,18,20,25 **86:**3,6
**injunction-to-pay** [1] **65:**14
**injunctions** [1] **25:**23
**injunctive** [8] **20:**19 **48:**4 **49:**17,21,22 **53:**23 **57:**10 **82:**16
**injury** [2] **11:**24 **12:**6
**inquiry** [1] **89:**21
**insist** [1] **39:**4
**Instead** [2] **39:**3 **64:**22
**interest** [5] **32:**7,9 **35:**6 **36:**16 **86:**10
**interesting** [3] **52:**23 **78:**21 **82:**25
**interference** [1] **72:**24
**interim** [3] **86:**2 **87:**6,7
**interlocutory** [3] **24:**1 **41:**13 **88:**9
**interpret** [1] **77:**17
**interpreted** [2] **76:**17 **77:**18
**interpreting** [1] **79:**8
**intransigent** [1] **53:**8
**intrudes** [1] **7:**8
**invasion** [1] **42:**1
**inverse** [4] **3:**21,23 **4:**1 **14:**10
**invoke** [5] **14:**6,15 **33:**14,19,22
**invoked** [1] **29:**8
**invoking** [4] **30:**16 **31:**6 **33:**24 **84:**23
**involved** [2] **75:**18,19
**irreconcilable** [1] **45:**14
**isn't** [10] **5:**12 **14:**19 **23:**1 **26:**21,22 **39:**1 **46:**5 **56:**20 **58:**9 **77:**22
**issue** [4] **18:**13 **63:**2 **73:**22 **88:**10
**issues** [2] **45:**9 **82:**21
**itself** [19] **3:**19 **8:**1 **9:**21 **15:**22 **27:**6 **28:**17 **29:**15 **31:**21 **39:**6,17 **41:**12 **43:**12 **56:**10 **69:**2 **74:**23 **76:**12 **79:**1 **81:**15 **90:**9

**J**

**JACKSON** [18] **19:**4,17 **20:**2 **32:**10,16 **33:**2 **38:**11 **66:**14,18,21 **67:**8 **68:**11 **78:**12,15 **79:**6 **86:**15,16 **87:**16
**James** [1] **89:**4
**January** [1] **1:**11
**Jay** [1] **26:**1
**Jeopardy** [1] **79:**5
**John** [1] **26:**1
**Judge** [2] **32:**14,23
**judge's** [1] **30:**6
**judges** [2] **26:**20 **27:**2
**judgment** [4] **12:**17 **66:**22,25 **72:**11
**judicial** [11] **19:**19 **20:**16,23,24 **39:**21 **50:**17,18 **52:**12 **54:**19,22 **55:**8
**jurisdiction** [17] **5:**17,18 **6:**4 **7:**21 **8:**5 **12:**19 **17:**10 **27:**14,16,17,23 **28:**5 **29:**8 **43:**10 **46:**2 **89:**10,16
**jurisdictional** [2] **6:**6,18
**jurisprudence** [1] **15:**16
**Justice** [267] **1:**23 **3:**3,9 **5:**6 **7:**16,20 **9:**15 **10:**1,8,17,20,23 **11:**4,12,15,19,25 **12:**7 **13:**6,11,18,24 **14:**8,16 **15:**4,20 **16:**9 **17:**4,12,21 **18:**9,19,23 **22:**14,21 **24:**15 **25:**7 **27:**4,11,25 **29:**1,4 **32:**10,16 **33:**2,10 **34:**6,19,23 **35:**9,17,20 **36:**4,7,7,9,10,23 **37:**7,10,18 **38:**6,7,7,9,10,11,14,17 **40:**15,20 **41:**1,20,21 **42:**9,14,21,25 **43:**4,18,22 **44:**14 **45:**15 **46:**5,15 **47:**2,12,15,20 **48:**2,5,8,13,25 **49:**7,10,14,18 **50:**21,24 **51:**6,15,24 **52:**20,24 **53:**4,10,16,25 **54:**10,21,24 **55:**2,5,18,20,22 **56:**5,14,17,25,25 **57:**3,6,11,

14,17,20 **58:**4,8,8,18,21,24 **59:**1,7,10,12,16,24 **60:**3,10,14,17,22,25 **61:**3,6,9,12,18,24,25,25 **62:**1,3,4,7,15,25 **63:**4,7,10,16,20,25 **64:**4,18 **65:**3,12,13,13,17,24 **66:**2,5,12,14,18,21 **67:**8,12,16,17,18,19 **68:**5,7,8,8,10,11,14,18 **70:**7,25 **71:**3,9,22 **72:**14,18 **74:**1,3,17 **76:**1 **77:**2,13,16,24 **78:**5,10,12,13,15,16 **79:**6,13 **80:**1,4,7,7,9,10,12,16,23,25 **81:**6,7,11,18,21,23,25,25 **82:**1,2,19,22,25 **83:**17,20 **84:**2,5,15,18,21 **85:**2,3,3,5,6 **86:**14,14,16,17 **87:**16,17,23 **90:**14
**Justice's** [1] **79:**15
**justices** [1] **26:**19

**K**

**Kagan** [20] **38:**9 **47:**2,12,15,20 **48:**2,5,8,13,25 **49:**7,10,14,18 **50:**21,24 **51:**6,15,24 **81:**25
**KAVANAUGH** [11] **59:**1,10 **61:**25 **62:**3 **65:**13,17,24 **66:**2,5,12 **85:**4
**keeping** [1] **17:**10
**kind** [11] **4:**21 **8:**6,21 **16:**21 **36:**17,21 **37:**25 **38:**1 **48:**17 **51:**24 **74:**13
**kinds** [1] **6:**10
**KNEEDLER** [49] **1:**22 **2:**9 **68:**14,15,18 **70:**25 **71:**2,21,25 **72:**16 **73:**5 **74:**3,16,19 **76:**9 **77:**9,14,23 **78:**1,6,14,15,23 **79:**11,14 **80:**2,6,15,18,24 **81:**3,10,13,20,22,24 **82:**9,20 **83:**12,18,24 **84:**4,10,16,20,22 **85:**6,21 **86:**23
**Knick** [18] **4:**18 **21:**7 **30:**5,24 **34:**23 **40:**1 **42:**2 **43:**15,23 **44:**4,6,10 **46:**17 **47:**23 **49:**6 **53:**20 **82:**17 **87:**12

**L**

**lack** [1] **5:**17
**lacks** [1] **14:**19
**land** [1] **48:**21
**landowner** [1] **51:**12
**language** [6] **24:**16,17 **67:**25 **68:**1,3 **79:**16
**languished** [1] **8:**6
**last** [1] **89:**15
**late** [1] **52:**3
**later** [3] **29:**4 **67:**13 **73:**22
**Laughter** [3] **42:**11 **52:**6 **67:**21
**law** [49] **3:**25 **7:**6 **9:**19 **11:**1,5,9 **12:**13,20 **13:**13,14,20,20 **14:**3,6,6,15,20,22 **15:**18,21 **17:**13,16 **18:**11,21 **21:**21 **22:**8 **23:**4,12 **24:**21 **29:**

22 **30:**19 **31:**13,22,24 **33:**15 **34:**5,23 **41:**17 **45:**7 **53:**16 **59:**17 **60:**15 **62:**22 **63:**2 **64:**6 **75:**23 **86:**20,24 **88:**18
**lawful** [3] **69:**10 **70:**23 **82:**16
**lawsuit** [2] **4:**24 **16:**23
**lawyer** [1] **9:**5
**lead** [1] **86:**6
**least** [1] **5:**2
**leave** [3] **41:**6,15 **61:**19
**left** [1] **90:**5
**legal** [1] **4:**22
**legislation** [1] **54:**11
**legislative** [1] **55:**7
**legislature** [1] **19:**20
**legislature's** [1] **7:**9
**less** [1] **29:**3
**Lessee** [1] **89:**12
**liberty** [1] **24:**20
**lies** [1] **69:**12
**light** [1] **33:**9
**likes** [1] **27:**16
**limit** [1] **5:**24
**limitation** [1] **28:**8
**limitations** [4] **15:**8,12,13,19
**limited** [4] **6:**6,9 **38:**2,3
**limits** [2] **6:**6,8
**line** [1] **46:**23
**list** [1] **88:**23
**litigated** [2] **30:**12 **57:**9
**litigation** [3] **39:**13 **86:**5 **87:**8
**little** [3] **7:**22 **67:**5 **74:**4
**live** [2] **41:**10 **83:**9
**local** [1] **4:**2
**logically** [1] **4:**23
**long** [4] **8:**7 **11:**20 **86:**4,5
**longer** [2] **11:**23 **32:**12
**look** [11] **10:**13 **15:**20 **24:**8 **34:**1 **40:**16,16 **51:**15 **56:**3 **60:**3,6 **70:**4
**looked** [2] **68:**2 **88:**18
**looking** [2] **15:**18 **23:**14
**loophole** [2] **82:**8,10
**lose** [1] **16:**12
**lost** [1] **38:**5
**lot** [1] **45:**5
**lower** [5] **4:**14 **15:**13 **17:**17 **28:**4,13

**M**

**made** [5] **31:**15 **69:**15 **72:**21,22 **75:**13
**made-up** [1] **64:**5
**Madison** [1] **89:**4
**magistrate** [1] **30:**6
**Maine** [4] **5:**1 **56:**12 **77:**18 **89:**18
**mandate** [2] **75:**12 **77:**19
**mandates** [3] **6:**22,22 **77:**4
**mandating** [3] **78:**1 **79:**8 **81:**11

**mandatory** [4] **3**:18 **6**:25 **32**:1,2
**maneuvering** [1] **32**:11
**maneuvers** [1] **32**:3
**many** [2] **39**:6 **42**:6
**mapping** [1] **9**:2
**market** [4] **32**:8 **37**:5,23 **38**:2
**Massachusetts** [3] **26**:15, 16,20
**matches** [3] **29**:12,13,14
**math** [1] **74**:13
**matter** [11] **1**:13 **7**:12 **29**:23, 25 **30**:19 **33**:7 **51**:8 **58**:25 **59**:4 **79**:19 **80**:25
**matters** [1] **40**:5
**McClung's** [1] **89**:12
**McDowell** [1] **24**:15
**McNAMARA** [68] **1**:18 **2**:3, 13 **3**:6,7,9 **5**:14 **7**:17 **8**:24 **9**:24 **10**:5,14,18,22 **11**:2,8, 13,18,21 **12**:3,25 **13**:8,16, 22 **14**:2,10,23 **15**:9,22 **16**: 13 **17**:9,14 **18**:4,15,24 **19**: 11,22 **20**:13 **21**:18 **22**:5,20, 24 **25**:1,9 **27**:9,13 **28**:9 **32**: 13,20 **33**:8,11 **34**:17 **35**:13, 19,25 **36**:6,14 **37**:2,9,12,21 **38**:13 **47**:3 **49**:19 **82**:24 **87**: 19,20,22
**McNamara's** [3] **47**:17 **49**: 11 **50**:25
**mean** [22] **7**:23 **8**:18 **9**:21 **10**:24,25 **11**:4 **16**:10 **19**:5 **43**:9 **46**:6,25 **49**:8 **50**:21, 24 **54**:21,25 **55**:24 **59**:10 **67**:9 **71**:16,22 **90**:10
**meaning** [5] **10**:9,11 **51**:1 **67**:25 **88**:15
**means** [3] **10**:7 **88**:2 **89**:21
**meant** [2] **86**:11 **90**:10
**mechanism** [5] **9**:18 **11**:23 **13**:21 **14**:4 **20**:8
**Meigs** [1] **89**:12
**mention** [2] **63**:2,5
**mentioned** [2] **79**:2 **88**:21
**mentioning** [1] **65**:8
**merits** [5] **18**:8 **22**:13 **31**:16 **46**:3 **88**:11
**met** [1] **18**:18
**Mexico** [1] **88**:22
**might** [10] **9**:19,20 **12**:16 **19**:15 **53**:24 **70**:1 **77**:9,9, 10 **86**:18
**military** [2] **26**:3 **89**:13
**million** [1] **34**:13
**mind** [1] **44**:1
**mine** [1] **31**:1
**misunderstand** [1] **64**:22
**misunderstood** [2] **60**:21 **65**:1
**Mm-hmm** [5] **48**:12,24 **53**: 9 **56**:4 **58**:20
**modern** [4] **3**:25 **6**:13 **9**:3

**10**:6
**moment** [2] **26**:7 **73**:24
**monetary** [1] **87**:15
**money** [21] **3**:15 **29**:21 **42**:5 **43**:25 **53**:7,13 **65**:23 **66**:10 **71**:7,11 **72**:11,12,13 **77**:4,7, 10,20 **78**:1 **80**:20 **85**:10 **87**: 3
**money-mandating** [5] **4**: 22 **76**:7 **77**:7,10 **89**:21
**monies** [1] **50**:18
**Monsanto** [1] **69**:16
**Moore** [1] **69**:17
**Moreover** [1] **8**:10
**most** [4] **9**:16 **14**:13 **59**:22, 22
**mountain** [2] **8**:21,25
**moved** [2] **23**:25 **88**:8
**much** [2] **34**:14 **56**:7
**municipalities** [2] **44**:12 **45**:21
**must** [7] **16**:6 **39**:9,11 **41**: 25 **60**:20,20 **74**:12

## N

**narrower** [1] **17**:18
**nation** [1] **24**:14
**nationwide** [2] **4**:2 **15**:24
**nature** [3] **14**:18 **51**:17 **86**:5
**nearly** [1] **39**:23
**Nebraska** [1] **88**:22
**necessarily** [6] **9**:21 **10**:24 **15**:10 **18**:22 **29**:22 **79**:9
**necessary** [1] **82**:15
**need** [3] **12**:12 **65**:18 **83**:10
**needs** [1] **9**:1
**neither** [1] **74**:5
**nervous** [1] **67**:7
**never** [4] **41**:18 **54**:9 **62**:19 **63**:1
**New** [1] **88**:22
**next** [1] **3**:4
**NIELSON** [107] **1**:20 **2**:6 **38**: 14,15,17 **40**:17,21 **41**:4 **42**: 8,12,16,23 **43**:3,8,20 **44**:3, 17 **45**:18 **46**:11,18 **47**:8,14, 19,22 **48**:3,7,12,24 **49**:3,9, 13,16 **50**:2,23 **51**:5,14,19 **52**:7,22 **53**:3,9,15,18 **54**:2, 15,23 **55**:1,4,13 **56**:4,8,16, 24 **57**:2,5,8,13,16,19,22 **58**: 7,11,20,22,25 **59**:3,8,15,20 **60**:2,6,13,16,19,23 **61**:2,5, 7,10,15,21 **62**:6,14,17 **63**:3, 6,9,15,19,24 **64**:3,15,20 **65**: 10,16,21,25 **66**:4,8,13,17, 20,24 **67**:9,14,22 **68**:13
**none** [1] **40**:5
**nor** [2] **24**:21 **74**:6
**noted** [1] **34**:22
**nothing** [4] **11**:16 **39**:11 **74**: 11,11
**notice** [1] **50**:7
**number** [2] **5**:25 **69**:14

**Numerous** [1] **68**:25

## O

**oath** [1] **56**:11
**objection** [1] **67**:4
**obligated** [1] **90**:7
**obligation** [17] **20**:25 **21**:8, 10,13,16 **23**:16 **25**:17 **28**: 19 **54**:18 **58**:19 **75**:15 **89**:6, 8,11,17,22 **90**:4
**obligations** [2] **4**:23,24
**obtain** [1] **3**:23
**odds** [2] **5**:10,13
**offered** [1] **67**:24
**offset** [1] **25**:14
**Okay** [22] **11**:25 **22**:14,21 **24**:9 **36**:4 **38**:6,12 **47**:20 **55**:1,4 **58**:11,24 **59**:7 **60**: 14 **61**:3,12,24 **65**:8,12 **81**: 23 **82**:19,22
**Oldham** [2] **32**:14,23
**once** [6] **6**:18 **9**:25 **23**:25 **28**:15 **30**:10,10
**one** [22] **6**:13 **9**:1 **12**:14 **13**: 1,25 **21**:2 **22**:7 **27**:1 **39**:8 **44**:19,19 **45**:11 **53**:6 **56**:11 **64**:1,19 **67**:6 **70**:24 **79**:25 **80**:2 **81**:21 **83**:2
**one-half** [2] **74**:21,21
**ones** [1] **42**:7
**ongoing** [10] **12**:5 **21**:9,13 **25**:3 **26**:9 **28**:19 **29**:10 **47**: 6,15 **90**:4
**only** [16] **6**:13,20 **19**:10 **28**: 18 **30**:20 **51**:10 **54**:17 **67**: 24 **72**:8,12 **83**:6 **84**:7 **87**:1 **88**:6 **89**:9 **90**:3
**onwards** [1] **43**:17
**open** [1] **84**:25
**operated** [1] **11**:20
**opinion** [5] **20**:12 **30**:7,15 **32**:24 **83**:13
**opinions** [2] **42**:10,13
**OPM** [1] **72**:16
**opportunity** [2] **33**:4 **37**:17
**oppose** [4] **12**:11 **13**:2 **61**: 18,22
**opposed** [1] **19**:20
**option** [1] **12**:15
**Options** [1] **5**:2
**oral** [7] **1**:13 **2**:2,5,8 **3**:7 **38**: 15 **68**:15
**order** [4] **17**:3 **27**:23 **57**:7 **70**:13
**orders** [1] **70**:13
**Oregon** [5] **16**:1,1,3,5 **88**: 21
**original** [5] **10**:9,10 **67**:25 **88**:15 **89**:3
**originalist** [1] **52**:5
**other** [17] **3**:13 **7**:2 **21**:6 **23**: 2,7 **26**:25 **34**:1 **43**:11 **50**:3 **58**:14 **59**:14 **75**:23 **76**:18 **78**:7 **81**:15,17 **83**:3

**others** [1] **86**:9
**otherwise** [1] **70**:21
**out** [13] **9**:19 **30**:7 **32**:14,23 **35**:21 **40**:6 **45**:12 **50**:13 **70**: 7 **75**:2 **82**:25 **86**:21 **87**:3
**over** [5] **6**:4 **12**:19 **17**:11 **48**: 14 **70**:16
**overall** [1] **70**:5
**overcoming** [1] **87**:4
**overruling** [1] **39**:25
**owe** [2] **21**:11 **35**:11
**owed** [1] **73**:24
**owes** [2] **21**:11 **34**:12
**own** [7] **42**:4 **43**:24 **68**:21 **71**:6,10 **76**:19 **89**:14
**owner** [6] **9**:9 **32**:8 **38**:4 **53**: 6 **55**:10 **85**:15
**owners** [1] **3**:22

## P

**p.m** [1] **90**:17
**PAGE** [1] **2**:2
**paid** [8] **12**:4 **27**:24 **37**:15 **47**:17 **49**:2 **50**:1 **76**:25 **86**: 10
**panel** [1] **32**:24
**part** [3] **5**:16 **20**:15 **30**:4
**parte** [5] **6**:1 **25**:4,5,7 **67**:2
**partial** [2] **35**:16 **36**:19
**particular** [4] **19**:14 **75**:10, 18 **76**:15
**particularly** [2] **29**:14 **76**: 20
**party** [1] **67**:24
**passed** [1] **87**:11
**Passman** [1] **29**:3
**past** [2] **21**:15 **25**:12
**path** [1] **20**:20
**pay** [26] **3**:15 **16**:6 **18**:1,12 **21**:4,5,8 **25**:16 **37**:24 **41**: 25 **50**:5,11 **53**:5 **57**:7,10 **58**:21 **65**:23 **66**:10 **72**:12 **80**:20 **85**:10,17 **89**:6,8,22 **90**:7
**paying** [4] **50**:7 **55**:25 **66**: 23 **77**:6
**payment** [9] **28**:19 **50**:17 **51**:13,17 **69**:10 **72**:13 **77**:4, 19 **81**:12
**payments** [1] **50**:19
**pays** [1] **16**:3
**pellucid** [1] **62**:19
**pendent** [3] **12**:19 **17**:10 **61**:13
**pending** [1] **17**:13
**Penn** [1] **40**:24
**people** [3] **5**:25 **15**:14 **56**: 15
**perfect** [1] **53**:24
**perfectly** [1] **23**:22
**perhaps** [4] **9**:11 **10**:12 **19**: 10 **85**:17
**period** [3] **86**:2 **87**:6,7
**permanent** [1] **36**:19

**person** [6] **24**:19 **51**:9 **69**:3 **70**:8,20 **86**:2
**person's** [1] **47**:4
**Petitioner** [1] **74**:10
**Petitioners** [12] **1**:4,19 **2**:4, 14 **3**:8 **39**:2,4,22,24 **40**:5, 12 **87**:21
**Petitioners'** [1] **41**:2
**physical** [1] **41**:25
**place** [1] **59**:21
**plaintiff** [3] **25**:4 **31**:5 **37**: 14
**plaintiffs** [3] **12**:4 **44**:22 **83**: 23
**plaintiffs'** [1] **6**:9
**plead** [1] **62**:8
**pleaded** [1] **41**:5
**pleading** [2] **6**:7,19
**pleadings** [2] **62**:18 **63**:1
**pleads** [4] **7**:14 **13**:7,9 **88**:4
**please** [4] **3**:10 **38**:18 **55**: 11 **68**:19
**pleases** [1] **27**:18
**pled** [2] **4**:12 **61**:4
**plural** [1] **60**:8
**plus** [4] **74**:11,21,21 **81**:8
**point** [20] **9**:19 **13**:17 **15**:25 **17**:5 **21**:20 **22**:16 **34**:17 **40**: 17 **41**:6,23 **46**:17 **50**:22 **62**: 4 **67**:20 **69**:16 **71**:23 **72**:1, 1 **75**:13 **78**:25
**pointed** [6] **24**:5 **32**:23 **70**: 7 **75**:2 **82**:25 **89**:19
**points** [3] **30**:7 **32**:14 **67**:11
**policy** [1] **28**:23
**poor** [1] **90**:1
**portion** [1] **72**:1
**position** [7] **17**:17 **80**:12, 14,14 **85**:7,12 **86**:18
**possibility** [1] **66**:6
**posture** [1] **87**:25
**power** [3] **29**:7 **39**:17 **55**:12
**powers** [4] **14**:6,15 **23**:11 **56**:18
**precedent** [1] **70**:23
**precedents** [1] **5**:3
**precedes** [1] **24**:18
**preceding** [1] **70**:6
**precisely** [2] **54**:7 **68**:3
**precondition** [1] **21**:3
**preliminary** [1] **86**:3
**premise** [1] **58**:9
**premised** [1] **56**:18
**premises** [1] **56**:12
**prerogative** [3] **7**:9 **51**:4, 11
**present** [3] **25**:16,17 **66**:6
**Presented** [5] **3**:11 **6**:11 **16**:8 **23**:20 **33**:17
**presentment** [1] **70**:21
**pressing** [1] **12**:2
**presupposed** [1] **70**:1
**pretty** [2] **8**:6 **16**:11
**prevent** [2] **5**:25 **86**:4

**prevented** [1] 32:18
**preventing** [2] 69:19 85:25
**prevents** [1] 88:19
**primary** [1] 5:15
**principles** [4] 29:23 30:1 59:3,4
**private** [7] 8:11,15 19:21 24:21 39:12 53:13 76:5
**pro** [1] 79:2
**probably** [2] 9:6 27:3
**problem** [5] 5:15 9:2 13:12, 15 41:5
**problems** [2] 6:19,19
**procedural** [5] 22:16 32:3 40:10 83:1 87:25
**procedure** [1] 40:8
**proceed** [6] 32:25 45:16 46:7,8,10 71:19
**proceeding** [2] 52:12 58: 13
**proceedings** [2] 83:19 84: 7
**Process** [16] 24:17,20 25:3 29:22 41:13 54:12 61:16 70:9,11,13,15,16 78:19 85: 24 86:1 87:8
**prohibited** [1] 72:10
**prohibition** [4] 70:9 76:10 79:10 82:14
**prohibitory** [2] 69:8 79:2
**promised** [1] 50:11
**proper** [1] 87:10
**property** [45] 3:22 5:8 7:18 9:8 16:25 21:5,10 24:20, 21 25:15 29:21 30:2 32:7, 9 35:6 36:16,25 38:4,20 47:4,17 51:2,3,6,7 53:6 55: 10,25 63:14 69:3,4,6,13 70: 8 72:24 73:8 76:5,14 77:5 81:1 85:13,15,16 89:25 90: 10
**protective** [1] 38:22
**provide** [15] 8:4 17:1 21:21 22:17 26:9 39:9 49:1 50: 12 54:14 57:12,25,25 79: 23 82:15 88:23
**provided** [4] 11:22 75:7,21 87:15
**provides** [13] 4:6 18:21,23 21:3 34:3 52:14 65:19 74: 6,8 75:5 76:19 83:14 84: 19
**providing** [2] 20:5 28:1
**provision** [8] 3:13 75:10, 23 76:18 77:8 78:3,7 81: 15
**provisions** [1] 68:25
**public** [5] 24:22 67:25 69:4 76:5 77:5
**purposes** [1] 22:1
**pursue** [2] 12:23 42:19
**pursuing** [1] 12:14
**put** [3] 37:19 44:24 45:2
**putative** [2] 44:21 45:12

**putting** [1] 63:10

## Q

**qualifications** [2] 27:7,11
**quarrel** [3] 57:24 59:6 66:9
**quarreling** [1] 58:23
**Question** [33] 3:11 5:18,19 6:10,21 8:5 9:7 12:12 15: 11 16:7 17:16 21:14,15,19 23:20 28:18,24 31:20 33: 16,17 35:5 42:17 48:14 57: 8 65:18 69:18,25 71:13 72: 3 79:15 82:23 86:7 87:24
**questions** [5] 5:5 40:14 57: 1 82:2 90:12
**quickly** [1] 67:20
**Quincy** [1] 29:18
**quite** [2] 8:25 24:16
**quote** [2] 39:16,20
**quotes** [1] 41:22

## R

**Railroad** [3] 29:18 51:8 69: 17
**raised** [1] 82:21
**rare** [1] 30:8
**rarely** [1] 30:3
**ratification** [2] 16:19 40:4
**ratified** [2] 7:24,25
**ratifying** [1] 8:8
**read** [13] 16:9 24:23 25:2 46:17,19 52:9 54:16 57:23 68:3 75:11 80:22 83:5 84: 23
**reading** [2] 20:14,15
**real** [1] 88:17
**realize** [1] 53:24
**really** [6] 12:13 51:8 52:5 55:6 69:18 72:2
**rearguing** [1] 71:23
**reason** [5] 4:20 6:15,16 16: 3 45:4
**reasonably** [2] 75:11,23
**reasons** [5] 39:7 44:19 55: 15 72:3,6
**REBUTTAL** [4] 2:12 82:24 87:19,20
**receive** [3] 27:21 29:21 30: 1
**recent** [5] 4:18 42:7 59:22 69:15,15
**recently** [1] 14:13
**recognize** [4] 7:7,10 27:8, 12
**recognized** [3] 4:11,22 19: 19
**recognizing** [1] 40:2
**record** [1] 35:6
**recover** [2] 71:17 75:22
**rectify** [1] 37:13
**referring** [1] 79:18
**refuse** [2] 31:9 40:12
**refused** [1] 27:3
**refuses** [1] 85:14

**regulation** [1] 73:21
**regulatory** [2] 7:8 73:21
**Rehnquist** [3] 29:2,4 71:9
**reimbursed** [1] 85:18
**reimpose** [1] 5:23
**reiterated** [1] 21:7
**reject** [1] 4:13
**rejected** [5] 46:16 71:9,24 72:5 73:23
**rejecting** [1] 72:20
**rejects** [1] 42:3
**relation** [1] 90:1
**relatively** [2] 30:7 69:15
**relegate** [1] 89:25
**relied** [1] 75:11
**relief** [13] 6:12 7:13 16:18 20:19 46:22 48:4 49:17,21, 23 52:11 53:23,24 57:10
**relying** [4] 74:13 84:11,12, 14
**remains** [2] 6:21 61:13
**remand** [5] 17:7 32:21 33: 3,13 85:1
**remanded** [4] 33:16 65:5 83:18 84:6
**remedial** [3] 9:17 79:17,19
**remedied** [1] 11:24
**remedies** [3] 20:17 48:1 67:3
**remedy** [47] 3:18 4:7,9 5: 21 6:15,16,23,25 10:16,17, 19 13:14 14:22 16:16 19:8, 14 20:6,7,21,23,24 24:11, 13 25:18 27:2 28:24 29:6 31:16 32:1,2 37:1,2 39:21 48:15,19 49:1 53:16 56:7 72:23 76:20,20 79:21,23 87:10,10,12,15
**remember** [2] 47:24 87:24
**remembering** [1] 29:16
**removal** [3] 12:11 13:2 45: 2
**remove** [5] 30:8 31:19 43: 10 44:18 46:9
**removed** [8] 6:19 12:9 18: 6 23:25 44:15 64:2,19,20
**removing** [1] 32:4
**render** [1] 82:15
**rent** [2] 35:11 37:24
**reorganization** [1] 69:17
**repeat** [1] 78:22
**repeated** [1] 30:24
**reply** [1] 5:6
**represented** [2] 60:11 84: 18
**representing** [1] 80:17
**require** [6] 24:11 28:19 29: 9 43:5 82:12 88:25
**required** [4] 11:17 16:16 21:4 83:25
**requirement** [1] 26:12
**requirements** [1] 6:7
**requires** [4] 27:13 52:10, 11 84:3

**resist** [2] 65:9,11
**resisted** [1] 61:7
**resolve** [3] 12:12 40:24 60: 7
**resolved** [2] 3:12 18:13
**resolves** [1] 45:9
**resort** [3] 5:11 89:11,15
**respect** [5] 18:3 24:24 46: 18 73:23 82:9
**respecting** [1] 39:18
**Respondent** [7] 1:7,21,25 2:7,11 38:16 68:17
**response** [1] 85:8
**responses** [1] 12:25
**rest** [2] 72:20 90:13
**retain** [1] 39:16
**return** [1] 27:1
**reversal** [2] 30:22 88:14
**reversed** [1] 22:11
**review** [1] 64:25
**RICHARD** [1] 1:3
**Richmond** [1] 72:16
**rights** [23] 12:22 22:10 28: 10,12,14 30:11,17 31:6,10 33:19,22 35:2 39:2 43:5 45:6,7 49:12 50:14 72:24 87:13 89:25 90:2,10
**rise** [2] 23:17 25:15
**ROBERT** [5] 1:18 2:3,13 3: 7 87:20
**ROBERTS** [46] 3:3 33:10 34:6 35:9,17,20 36:4,7 38: 7,14 41:21 42:9,14,21,25 43:4,18,22 44:14 45:15 46: 5,15 55:18,22 56:5 67:12, 16 68:5,8,14 70:25 71:3,22 72:14,18 74:1 79:13 80:1, 4,7,10 81:25 85:3 86:14 87:17 90:14
**robust** [1] 15:15
**rogue** [6] 53:19 56:20 82:3, 13 85:8 88:16
**Ruckelshaus** [1] 69:16
**rule** [4] 7:2 31:23 73:13,18
**run** [1] 31:1
**runs** [2] 8:11 34:18
**rush** [1] 50:9

## S

**same** [15] 4:10,12 28:9 46: 12 60:18 68:3 70:4,19 76: 11,11 77:22 78:19 79:4,5 85:22
**San** [1] 34:20
**satisfies** [1] 40:10
**saying** [26] 6:14 14:5 16:25 19:7 21:24 23:11 25:12,14 27:19 32:6 33:4 34:18 36: 2 46:20 49:19 55:6 59:5,9 60:23 64:22 65:2,18 71:15 74:11 81:8 85:16
**says** [33] 6:24 7:11,17 10:7 13:3 18:17 23:2 30:16 34: 13 39:9,10 50:13 51:23 52:

9 53:10,22 54:4,5 55:17 56:9 59:25 63:16 69:2 70: 7,20 72:22 74:10 77:4 79: 17,22 83:13
**scenario** [2] 54:7 55:16
**schemes** [1] 82:7
**Schrock** [1] 14:14
**scope** [5] 17:15 20:24 30: 11,13 31:7
**Scott** [1] 4:19
**searched** [1] 48:11
**second** [3] 45:4 82:23 83:6
**Section** [9] 5:23 30:21 44: 7,11 45:22 54:4,8 55:11 63:12
**see** [10] 7:22,25 14:1 23:15 33:9 39:23 59:21 62:22,22 79:7
**seek** [2] 37:14 64:24
**seeking** [3] 25:11,11 37:14
**seem** [2] 5:10 71:14
**seems** [5] 9:16 22:21 23:6 64:4 71:13
**seizing** [3] 26:3,4,7
**seizure** [1] 85:20
**self-executing** [1] 4:10
**self-incrimination** [1] 79: 4
**self-interest** [2] 56:15,19
**sell** [1] 51:9
**seller** [1] 38:1
**semantics** [1] 81:1
**sense** [2] 20:4 28:1
**separate** [2] 19:7 44:20
**separated** [1] 56:18
**seriously** [3] 13:25 56:10, 11
**set** [1] 15:18
**shall** [7] 24:19,21 69:3,4 70: 8,20 76:4
**shape** [1] 6:14
**shooting** [1] 67:5
**shouldn't** [2] 82:3,4
**shows** [1] 35:4
**shut** [1] 55:6
**side** [1] 7:2
**signed** [1] 16:2
**similar** [2] 19:5 24:16
**similarly** [1] 27:17
**simplest** [1] 19:13
**simply** [2] 32:5 40:12
**Since** [1] 43:16
**single** [2] 44:25 45:1
**sitting** [1] 14:5
**situations** [1] 70:1
**small** [1] 17:5
**so-called** [1] 73:19
**sold** [1] 38:1
**Solicitor** [2] 1:20,22
**solution** [1] 85:9
**somebody** [1] 70:24
**somebody's** [1] 48:11
**somehow** [2] 40:9 74:8
**someone** [3] 19:15 37:24

45:25

**someplace** [1] **52**:2

**sometimes** [2] **15**:18 **73**: 15

**soon** [1] **46**:9

**sorry** [9] **55**:21,22 **57**:5 **58**: 5 **62**:1,2 **79**:12 **80**:6 **81**:24

**sort** [11] **20**:9 **43**:11 **49**:25 **50**:24 **52**:11 **54**:12,14,19 **58**:14,14 **89**:20

**SOTOMAYOR** [36] **17**:4,12, 21 **18**:9,19 **19**:2,6 **21**:24 **38**:8 **41**:20 **62**:1,4,7,15,25 **63**:4,7,10,16,20,25 **64**:4,18 **65**:3,12 **68**:9 **80**:12,16,23, 25 **81**:6,11,18,21,23 **82**:25

**Sotomayor's** [1] **21**:19

**sought** [3] **24**:1 **33**:2 **88**:9

**sounds** [2] **28**:6 **66**:25

**source** [2] **24**:6,7

**South** [1] **88**:22

**sovereign** [5] **15**:7,10 **29**:9 **76**:23 **87**:4

**speaking** [2] **20**:6 **37**:22

**speaks** [3] **73**:2,6 **82**:24

**special** [1] **33**:24

**specifically** [3] **23**:8 **29**:19 **89**:19

**squarely** [1] **30**:23

**squares** [1] **25**:24

**St** [3] **26**:1,8 **89**:5

**standard** [3] **75**:9,25 **78**:9

**stands** [1] **21**:16

**start** [1] **40**:2

**started** [1] **17**:23

**state** [97] **4**:2,14 **8**:19 **10**:25 **11**:5,9 **12**:13,20 **13**:7,20 **15**:2,18,21 **17**:13,23,25 **22**: 3,17,18 **23**:3,8,10,22,24 **24**: 4,13 **26**:22 **28**:16 **29**:9,10 **30**:3,8,16 **31**:2,3 **32**:19 **33**: 5,16 **34**:9,11 **35**:1 **40**:2 **43**: 6,9,15 **44**:1,4 **45**:17 **46**:7, 12 **47**:3,5 **48**:20,23 **49**:1,11 **51**:2,7,9,10 **53**:11,12,14,19, 22 **54**:5,13 **55**:6 **56**:20 **57**: 7 **58**:12,15 **59**:17 **60**:11 **61**: 21 **62**:22 **63**:2,7 **64**:10 **66**: 22 **82**:3,13 **83**:3,21 **84**:12, 13,24 **85**:8,13 **86**:19,24,25 **87**:14 **88**:16,18,18,20

**state's** [1] **16**:2

**statement** [2] **27**:1 **43**:1

**STATES** [24] **1**:1,15,24 **2**: 10 **15**:24 **29**:17 **39**:19 **40**:2 **44**:6 **45**:22 **51**:20 **53**:21 **56**: 1,10 **68**:16,21,24 **72**:9 **77**:1 **82**:6 **85**:11,13 **88**:23 **89**:13

**States'** [1] **18**:25

**status** [1] **90**:1

**statute** [17] **15**:7,12,12,19 **69**:19 **75**:17,18 **76**:4,8,16 **77**:3,17,18,22 **78**:7 **81**:9,17

**statutes** [1] **4**:25

**staying** [1] **32**:22

**step** [1] **64**:23

**still** [11] **22**:11 **41**:10,11 **52**: 19 **58**:14 **61**:15,16 **83**:9,22, 24 **84**:9

**stop** [4] **26**:6 **30**:17 **81**:2,4

**stopping** [1] **34**:24

**stratum** [1] **28**:11

**structure** [1] **82**:5

**subject** [1] **28**:7

**submitted** [2] **90**:16,18

**substance** [1] **40**:8

**substantive** [14] **4**:7,8 **18**: 11,21 **22**:12 **39**:2 **42**:17 **44**: 8 **46**:21,25 **52**:11 **54**:18 **75**: 10 **84**:13

**successfully** [1] **24**:2

**sue** [14] **3**:23 **9**:9 **20**:19 **27**: 5 **28**:2 **44**:12 **45**:21 **51**:1, 16,16 **62**:10 **66**:18 **75**:7 **89**: 7

**suffer** [1] **12**:5

**sufficient** [1] **62**:23

**suggestion** [1] **80**:19

**suing** [1] **64**:1

**suit** [7] **9**:11,12 **17**:13 **49**:14, 22,23 **74**:18

**Summarizing** [1] **63**:20

**supplies** [1] **26**:3

**supplying** [1] **8**:1

**support** [1] **16**:2

**supporting** [3] **1**:24 **2**:11 **68**:17

**suppose** [7] **15**:5 **34**:8 **36**: 10 **49**:10 **52**:4 **76**:1,2

**supposed** [1] **47**:21

**supposedly** [1] **90**:7

**SUPREME** [11] **1**:1,14 **7**:3, 5 **14**:12 **26**:15,16,20 **40**:18 **59**:23 **88**:7

**surely** [1] **90**:8

**surprised** [1] **12**:10

**switch** [3] **64**:8,16,17

**system** [1] **56**:18

---

**T**

**takings** [26] **3**:25 **4**:3,9,15 **6**:7 **7**:8 **8**:2 **16**:4 **17**:16 **22**: 18 **24**:13,16 **26**:2 **30**:5 **32**: 25 **36**:21 **38**:24 **39**:5,10 **40**: 12 **52**:16 **60**:7 **74**:6 **76**:2 **83**:2 **89**:19

**talked** [1] **25**:25

**teach** [1] **5**:4

**tells** [1] **24**:4

**temporary** [15] **17**:24 **34**: 21,25 **35**:10,15,16 **36**:15, 20 **37**:4,5,20 **73**:19 **85**:19, 23 **86**:20

**terms** [6] **10**:6 **73**:3,6,6 **75**: 4,4

**testimony** [1] **37**:22

**Tewksbury** [1] **26**:19

**TEXAS** [113] **1**:6,20 **3**:5 **8**:

19,25 **13**:14,20,22 **14**:2,3,5, 10,12,19,21 **15**:24 **16**:3 **17**: 7,11,16,18 **18**:11,12 **21**:21, 24,25 **22**:1,2,8,17,19,25,25 **23**:2,6,25 **27**:16 **30**:10,18, 19 **31**:15,17,22,23 **32**:2,18 **33**:3,16,21 **35**:4,7 **37**:4 **38**: 21,21,23,23 **40**:10,18,22 **41**:3,8,11,17 **42**:18,19,20 **43**:13 **44**:23,24,25 **45**:4 **52**: 14,14,19,20 **53**:2,6,7,10 **57**: 24 **58**:9,12,19,23 **59**:5,8,23 **60**:10 **61**:17,19,22 **62**:10, 12,16 **63**:12,22 **64**:1,6,13 **65**:6,19 **66**:10,22 **67**:23 **68**: 4 **83**:9,14,14 **84**:15 **88**:1,2, 7,8

**Texas's** [9] **13**:2 **23**:21 **24**: 4,9 **32**:11 **39**:3 **80**:13 **88**:5 **89**:24

**text** [8] **3**:12 **25**:24 **28**:25 **68**: 1 **69**:1 **72**:7 **78**:25 **79**:22

**theoretical** [1] **66**:5

**theory** [1] **71**:15

**there's** [35] **4**:20 **5**:20,21 **6**: 5,13 **8**:21 **10**:24 **11**:23 **12**: 11 **15**:15 **16**:17 **20**:22 **25**:3 **31**:4 **41**:10,11 **43**:10 **44**:7, 13,21 **46**:21 **47**:23 **48**:1 **49**: 4 **50**:16,16 **53**:14 **54**:17 **62**: 9 **64**:16 **69**:11 **70**:17 **71**:20 **83**:12 **87**:2

**therefore** [1] **46**:25

**They've** [3] **41**:17 **45**:24 **50**: 11

**thinking** [2] **22**:2 **53**:20

**thinks** [1] **85**:11

**THOMAS** [8] **5**:6 **36**:8 **40**: 15,20 **41**:1 **67**:17 **80**:8,9

**though** [7] **12**:2 **28**:10 **52**: 21 **58**:1 **59**:25 **67**:4,9

**three** [3] **19**:7,9 **75**:4

**throughout** [1] **8**:14

**thrust** [1] **56**:23

**tie** [1] **44**:6

**title** [1] **89**:15

**today** [2] **21**:11,17

**tomorrow** [2] **5**:22 **21**:12

**took** [5] **16**:24 **21**:23 **35**:20 **38**:3 **84**:1

**totally** [3] **28**:3 **33**:6 **64**:5

**Township** [1] **4**:19

**tradition** [2] **29**:1,13

**Treasury** [2] **72**:13 **87**:3

**trespass** [4] **9**:11,19 **10**:4 **14**:8

**trial** [2] **35**:4 **36**:18

**TRO** [1] **86**:3

**trouble** [1] **74**:4

**true** [9] **4**:25 **5**:2 **22**:8,25 **46**: 3 **52**:17 **70**:6 **85**:23 **88**:21

**trust** [2] **56**:9,10

**try** [1] **55**:14

**trying** [4] **20**:3 **23**:1 **33**:5 **54**:

16

**Tucker** [27] **4**:5,6,9 **26**:1,8 **69**:21 **74**:5,6,17 **75**:3,8,9, 14,21,24 **77**:11,12,15 **78**:2, 3,8,8 **81**:8 **87**:11,14 **89**:5,7

**Tuesday** [1] **1**:11

**turns** [2] **31**:13 **71**:14

**two** [16] **11**:2,3 **12**:25 **19**:10 **21**:1 **22**:7 **42**:7 **44**:18 **46**: 16 **55**:23 **59**:14 **74**:8,20 **75**: 4 **82**:2 **83**:2

**type** [1] **67**:3

**types** [1] **45**:9

---

**U**

**U.S** [1] **63**:17

**ultimately** [2] **28**:21 **36**:16

**uncompensated** [2] **34**: 21,25

**under** [68] **4**:4 **7**:15 **9**:22 **10**: 25 **12**:18 **13**:4,9 **14**:11,22 **15**:17 **16**:4 **17**:7,11 **19**:25 **22**:9 **30**:12,17,21 **31**:6,8,9, 10 **33**:15,19,22 **38**:23,24 **39**:5 **40**:22,23,24 **41**:8,11, 17 **42**:19 **43**:8 **44**:16 **45**:7, 16,17,17,22,23 **46**:10,14 **60**:7 **62**:10,22 **64**:6,14 **65**: 6,7 **68**:23 **69**:21 **75**:5,7 **77**: 10,15 **78**:2 **83**:3,4,7,21 **86**: 19 **88**:3,4,24 **89**:7

**underlying** [2] **27**:19,20

**understand** [20] **4**:15 **9**:7 **12**:1 **19**:13 **20**:3,18 **22**:16 **23**:21 **32**:16 **33**:6 **37**:18 **51**: 17 **59**:25 **61**:14 **66**:2 **73**:10 **74**:14 **77**:3 **88**:25 **89**:2

**understanding** [6] **9**:13 **26**:5 **66**:24 **74**:4 **89**:3,24

**understood** [8] **10**:3,11,15 **21**:20 **25**:21 **76**:16 **77**:11 **87**:25

**undertaken** [1] **70**:14

**UNITED** [15] **1**:1,14,24 **2**:10 **18**:25 **39**:19 **51**:20 **68**:16, 20,23 **72**:9 **77**:1 **85**:11,13 **89**:13

**universe** [1] **67**:2

**unlawful** [1] **69**:12

**unless** [1] **70**:21

**unlike** [1] **3**:13

**unqualified** [3] **27**:6,7,10

**until** [5] **8**:5 **40**:3 **73**:16 **87**: 11,13

**unusual** [1] **31**:18

**up** [1] **59**:14

**upend** [1] **4**:14

**upshot** [1] **32**:24

**useful** [1] **7**:4

**using** [2] **23**:11 **26**:23

**usual** [4] **48**:8 **49**:10,20,24

---

**V**

**valid** [2] **23**:22 **36**:1

**value** [5] **32**:8 **37**:5,19,24 **38**:2

**vehicle** [1] **33**:19

**versus** [3] **3**:4 **69**:16 **72**:16

**view** [4] **25**:22 **28**:1 **42**:3 **74**: 5

**viewed** [1] **8**:9

**vigorously** [1] **61**:7

**vindicate** [7] **11**:6 **12**:21 **14**:4 **22**:10 **23**:13 **28**:3 **87**: 13

**vindicated** [3] **11**:10 **28**:14 **41**:3

**vindication** [1] **54**:20

**vine** [1] **8**:6

**violates** [1] **49**:11

**violating** [6] **47**:5,18 **48**:22 **49**:1 **50**:14 **54**:6

**violation** [15] **21**:15 **25**:4, 13 **47**:6,10,15 **48**:16,18 **54**: 13 **63**:11,17 **70**:3,12 **75**:12 **87**:8

**Virginia** [1] **1**:18

**vision** [1] **21**:6

**visions** [2] **9**:4 **21**:1

**vitiate** [2] **8**:2 **22**:18

**vitiating** [1] **21**:22

---

**W**

**wait** [1] **54**:10

**waive** [2] **15**:6,10

**waived** [1] **29**:9

**wanted** [2] **41**:8 **64**:8

**wants** [3] **30**:11 **35**:2 **51**:7

**warrants** [1] **88**:13

**Washington** [2] **1**:10,23

**water** [1] **36**:12

**way** [27] **4**:14 **5**:9 **8**:2,9 **10**: 20 **16**:10 **19**:13 **28**:8 **36**:3, 11 **37**:10 **40**:7 **44**:24 **50**:22 **51**:20 **53**:11 **54**:17 **57**:23 **64**:23,24 **68**:4 **70**:19 **76**:17 **78**:19 **79**:4 **82**:18 **87**:13

**weak** [1] **28**:7

**welcome** [2] **5**:5 **40**:14

**whatever** [3] **66**:22 **81**:4 **86**:1

**whatnot** [1] **86**:20

**Whereupon** [1] **90**:17

**whether** [22] **5**:20,20 **6**:11, 21,22 **9**:5 **14**:20 **17**:24 **18**: 22 **22**:6 **28**:18,24 **36**:19 **39**: 11 **46**:2,4 **57**:9 **75**:6,9 **84**: 11,14 **86**:10

**whole** [2] **35**:21 **56**:17

**will** [5] **21**:11 **27**:3 **32**:21,25 **38**:19

**Williams** [3] **39**:15,25 **40**:9

**willing** [1] **37**:25

**wins** [1] **52**:19

**wishes** [1] **31**:3

**withdraw** [2] **56**:21 **82**:6

**within** [2] **35**:1 **67**:2

**without** [17] **24**:20,22 **32**:

25 **33**:18 **39**:25 **55**:25 **69**:5,
7 **70**:8,10,10,14 **73**:8 **76**:5,
14 **77**:5 **86**:1
**wondering** [1] **57**:4
**word** [1] **48**:19
**work** [5] **4**:15 **8**:25 **53**:25
 **54**:2 **55**:15
**worry** [2] **82**:4,4
**worth** [2] **29**:15 **34**:14
**Wow** [1] **34**:13
**writ** [1] **26**:18
**write** [1] **29**:5
**writing** [1] **26**:8
**writings** [2] **89**:4 **90**:8
**written** [1] **70**:18
**wrongful** [1] **37**:13
**wrote** [4] **26**:1,11 **42**:10,12

## Y

**years** [3] **51**:21 **71**:4 **75**:1
**Yep** [2] **49**:13 **57**:16
**Young** [5] **6**:1 **25**:5,5,8 **67**:
3

## Z

**zero** [2] **74**:20,21

Official

REPORTER'S CERTIFICATE

The Contractor hereby certifies that the attached pages represent an accurate transcription of electronic sound recording of the oral argument before the Supreme Court of the United States in the matter of Richard Devillier v. Texas, Docket No. 22-913, and that these pages constitute the original transcript of the proceedings for the records of the Court.


BY     _Karen Brynteson_
Karen Brynteseon, Court Reporter

6.  Miscellaneous Claim Application With Response

 
# Miscellaneous Claim Application

Use this form to file a claim against the state of Texas for the following reasons:
- Warrant that is void due to expiration date.
- Unpaid bill that cannot be paid by receiving state agency due to expiration of appropriation.
- Other claim justified by state contract or state law.

*Instructions on second page*

Type of Claim *(Please check one)*

☐ Void Warrant    ☐ Unpaid Bill    ☑ Other    **Claim under Tex. Const. Art. 1, Sec. 17**

*Please type or print*

Claimant's name *(Legal name of individual or business)*

**Johnny Ray Partain**

Mailing address (P.O. Box, street, city, state and ZIP + 4 code)

**7020 N 16th Street**

Claimant's Social Security number (SSN)* or Texas taxpayer number or Federal Employer Identification Number (FEIN)

**454455062**

| Claimant's telephone *(Area code and number)* | Amount of claim |
|---|---|
| **956-240-1821** | **$250,000,000.00** |

Specific reason for claim *(For void warrant(s), list specific identification of goods, services, refund or other items for which the warrant(s) were originally issued.)*

**This is my sum certain claim for just compensation specifically required by Texas Constitution, Art 1., Sec. 17, for my property taken, damage, or destroyed by state actors, and particularly state judges, protected under claims of immunity to suit by the Texas judiciary: I have not been sued. The Texas Judiciary waived its right to review my claim on excuse of immunity to suit in Texas courts. Attached is the Third Amended Petition describing the original complaint. Governor Abbott and Attorney General Paxton refuse to meet to negotiate. My request for $250 million compensation through warrant is unopposed. My constitutional claim is due pursuant to Art. 1, Sec. 17, and is superior to any impeding process or statute, being constitutionally derived.**

Supporting documentation *(Please list)*

1. **Third Amended Petition**     3. _____
2. **Letters to Governor and Attorney Gen.**     4. _____

*\* Federal Privacy Act Statement: Disclosure of your Social Security number is required and authorized under law for the purpose of tax administration and identification of any individual affected by applicable law, 42 U.S.C. § 405(c)(2)(C)(i) and Tex. Gov't Code §§ 403.011, 403.015, 403.055, 403.056 and 403.078. The Public Information Act, Tex. Gov't Code Ch. 522, and applicable federal law shall govern release of information on this form in response to a public information request.*

## Certification

I certify that the information I have furnished on this form is true and correct. I certify that the amount of this claim is still outstanding and is due and payable.

| Type or print name | Title |
|---|---|
| **Johnny Ray Partain** | **Citizen of Texas** |

Claimant's signature | Date
**sign here ▸** | **8/26/2022**

Complete application and mail to:    Comptroller of Public Accounts
Fiscal Management Division
P.O. Box 13528
Austin, TX 78711-3528
**ATTN: Miscellaneous Claims Analyst**

Or FAX to:  512-463-2138

For questions, call 1-800-531-5441, ext. 5-0966.
The local number in Austin is 512-475-0966.

*Under Ch. 559, Texas Government Code, you are entitled to review, request and correct information we have on file about you, with limited exceptions in accordance with Ch. 552, Government Code. To request information for review or to request error correction, contact us at the address or phone number listed on this form.*

**Eligibility:**
Claims that are over eight years old, as determined from the day after payment was due on the original claim, are generally not eligible for payment by the Comptroller's office through the provisions of the Miscellaneous Claims Act. For void warrants, the expiration date is eight years from the date the warrant was originally issued. For unpaid bills, the expiration date is eight years from the day after payment was due on the original invoice of delivery of goods or services. If lacking an invoice, eight years from the day after the last day of the contract billing period.

---

# Instructions for Completing the Miscellaneous Claim Application

Type of Claim
Check the box indicating the type of claim you are filing.

Claimant Name
Enter the name of the person or business in whose behalf this claim is being submitted.

Mailing Address
Enter the mailing address where correspondence concerning this claim should be sent. **Please include your ZIP + 4 code.**

Claimant's SSN, Texas taxpayer number or FEIN
If claimant is an individual, enter the Social Security number. If claimant is a business, enter the Texas taxpayer number or Federal Employer Identification Number.

Amount of Claim
If the claim is for a void warrant, enter the amount of warrant. If the claim is for an unpaid bill, enter the amount due. If the claim is for any other type of liability, enter amount due.

Specific Reason for Filing Claim
Fully describe the reason for filing the claim. It must include the following information:

- Void Warrant:  Description of the goods, services, refund or other item for which the original warrant was issued. Attach original warrant or warrant information. **File should contain specific identification of goods, services, refund or other items for which the warrant was originally issued.**

- Unpaid Bill:  Description of goods or services or other item which is unpaid. You must also attach an invoice or other acceptable documentation of the unpaid amount which lists the original date the goods or services were delivered or performed.

- Other:  Fully describe the reason for the claim. Include all appropriate documentation.

Supporting Documentation
Application MUST contain supporting documentation (such as void warrants, itemized bills, invoices, contracts, etc.) that will fully substantiate the claim. If not included, a statement must be provided explaining why these items are not available.

Certification
The claimant or authorized agent (representative of business) signature is required.

Submit the completed and signed applciation to the mailing address of FAX number indicated.



December 7, 2022

Mr. Johnny R. Partain
7020 North 16th Street
McAllen, Texas 78504

RE: Miscellaneous Claims Application

Dear Mr. Partain,

I greatly appreciated the opportunity to talk with you about the $250,000,000.00 Miscellaneous Claims Application that you filed with our agency. For the reasons we discussed, your Application must be denied as a matter of law.

Your lawsuit was dismissed because the trial court did not have jurisdiction to hear your causes of action due to sovereign immunity. Sovereign immunity entails two separate forms of immunity for the State of Texas, its agencies, and its officials (collectively, the "State").

(1) **Immunity from Suit:** Immunity from suit bars a lawsuit against the State unless the State expressly gives its consent to the suit. In other words, although the claim asserted may be one on which the State acknowledges liability, this rule precludes a remedy until the Legislature consents to suit.

(2) **Immunity from Liability:** Immunity from liability protects the State from judgments even if the Legislature has expressly given consent to the suit. In other words, even if the Legislature authorizes suit against the State the question remains whether the claim is one for which the State acknowledges liability. The State neither admits liability by granting permission to be sued.

Thus, when the trial court made its judgment, it denied your claim as the State is immune from the suit and the liability. The appellate court also did not overturn the immunity judgment. As a result, it is inaccurate to state that the Courts have not determined your real property claim. The judiciary have specifically found that your claims are barred under the doctrine of sovereign immunity.

Even if you disagree and continue to believe that you do have a valid right to payment that is "unopposed," you are still required to obtain an Order from a Texas court with competent jurisdiction over the matter to agree to enforce your right to the payment. Absent a bona fide judicial order from such a Court, our Agency has no statutory authority to pay any claim that you may present concerning this matter.

Respectfully yours,

Murl E. Miller
Chief Counsel for General Litigation

7.  Hidalgo County Court case no. CL-29,530-H, Summary (Certified)

| | | | |
|---|---|---|---|
| JOHNNY PARTAIN AND TERESA C. PARTAIN vs.<br>JAMES H. MAPLES, INDIVIDUALLY AND D/B/A<br>GLOBAL TOURS & CHARTERS AND KATHY<br>MAPLES, INDIVIDUALLY AND D/B/A KBM BUS<br>LEASING, INC. AND KBM BUS LEASING, INC. | §<br>§<br>§<br>§<br>§ | Location:<br>Judicial Officer:<br>Filed on:<br>Ableterm Track Number: | **County Court at Law #8**<br>**Cantu, Rolando**<br>**01/26/1998**<br>**10015** |

---

### CASE INFORMATION

**Statistical Closures**
06/30/2016    All Other Dispositions (OCA)

Case Type: **Contract -<br>Consumer/Commercial/Debt**

Case Flags: **Case on Appeal**

---

| DATE | CASE ASSIGNMENT |
|---|---|

**Current Case Assignment**

| | |
|---|---|
| Case Number | CL-29,530-H |
| Court | County Court at Law #8 |
| Date Assigned | 01/26/1998 |
| Judicial Officer | Cantu, Rolando |

---

### PARTY INFORMATION

*Lead Attorneys*

| Defendant | **GLOBAL TOURS & CHARTERS** | |
|---|---|---|
| | **KBM BUS LEASING INC** | |
| | **MAPLES, JAMES H** | |
| | | Pro Se |
| | **MAPLES, KATHY** | |
| Plaintiff | **PARTAIN, JOHNNY** | Pro Se<br>9562401821(H) |
| | **PARTAIN, TERESA C** | |
| | | Pro Se |

Date: **JAN 16 2025**

I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office
By: _____
Deputy Clerk

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 06/30/2016 | **Case Called**<br>*Judge J. Bonner Dorsey called case for DWOP hearing; no appearances were made by any of the parties. CASE DISMISSED. Order signed.* | |
| 06/30/2016 | **Dismissal Want of Prosecution (8:30 AM)**<br>*Judge Dorsey to preside over said hearing.* | |
| 06/30/2016 | DWOP Order, Signed<br>*E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H ORDER SIGNED June 30, 2016 12:38 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; CL-29530-H.pdf (547.7 KB)* | |
| 05/26/2016 | DWOP Hearing<br>*E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H DWOP HEARING June 1, 2016 12:43 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; CL-29,530-H.pdf (57.3 KB)* | |

05/24/2016    DWOP Notice Sent

*E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H DWOP NOTICE May 24, 2016 3:25 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; CL-29,530-H.pdf (245.4 KB)*

04/22/2016    Case Called

*Parties did not appear; Judge Dorsey made some announcements on the record*

04/21/2016    **Status Conference Hearing** (2:30 PM)

*Heard by Judge J. Bonner Dorsey*

04/18/2016    Letter Received

*Letter To Justice Dorsey*

04/11/2016    Order Setting Hearing, Signed

*STATUS HRG SET FOR 04/21/2016 @ 2:30 P.M. E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H ORDER SIGNED April 11, 2016 4:14 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; CL-29,530-H.pdf (143.3 KB)*

04/07/2016    Order Signed

*AMENDED ORDER OF ASSIGNMENT E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H 2 AMENDED ORDERS OF ASSIGNMENT April 11, 2016 2:25 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; AMENDED ORDER OF ASSIGNMENT 1.pdf (849.2 KB) AMENDED ORDER OF ASSIGNMENT.pdf (769.5 KB)*

04/05/2016    Order Signed

*AMENDED ORDER OF ASSIGNMENT E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H 2 AMENDED ORDERS OF ASSIGNMENT April 11, 2016 2:25 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; AMENDED ORDER OF ASSIGNMENT 1.pdf (849.2 KB) AMENDED ORDER OF ASSIGNMENT.pdf (769.5 KB)*

03/23/2016    Order Signed

*ORDER OF VOLUNTARY RECUSAL E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN FAXED COPY TO JUDGE ROBERT M. BLACKMON CL-29,530-H ORDER SIGNED March 29, 2016 8:49 AM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; ORDER OF VOLUNTARY RECUSAL.pdf (1.9 MB)*

03/21/2016    Order Signed

*ORDER OF ASSIGNMENT E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29-530-H ORDER OF ASSIGNMENT SIGNED March 23, 2016 12:04 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; CL-29-530-H ORD... ASSIGNMENT.pdf (923.2 KB)///recv'd @ wrhs 3.24.26*



08/24/2015    Notice of Filing, Filed
*Motion For Additional Mandamus Relief From The Texas Supreme Court*

06/01/2015    Other
*Minimized Amended Petition For Writs Of Mandamuses And Criminal Complaint*

05/08/2015    Notice of Filing, Filed
*Petition For Writs Of Mandamus*

04/02/2015    Other
*correspondece from Judge Blackmon*

03/02/2015    Order Signed
*ORDER DENYING MTN FOR CONTEMPT E-MAILED COPY TO ATTY'S WILLIAM MCCARTHY & MR. JOHNNY PARTAIN CL-29,530-H (ORDER SIGNED) March 11, 2015 10:52 AM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain "partain" <partain@atlastechnologies.biz>; thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; ORDER_DENYING_M...-29530-H[1].pdf (667.2 KB)*

02/26/2015    **Motion to Dismiss (2:00 PM)**
*Heard by Visiting Judge Hon. Robert Blackmon*

02/26/2015    **Plea to the Jurisdiction (2:00 PM)**
*Heard by Visiting Judge Hon. Robert Blackmon*

02/26/2015    **Motion (2:00 PM)**
***Motion for Contempt** Heard by Visiting Judge Hon. Robert Blackmon*

02/25/2015    **Plea to the Jurisdiction (11:00 AM)**
*visiting Judge Blackman (RS 2-26-15)*

02/25/2015    **Motion to Compel (11:00 AM)**
*Visiting Judge Blackman--plea to the jurisdiction (RS 2-26-15)*

02/12/2015    Order Setting Hearing, Signed
*ON MTN FOR CONTEMPT AND MOTN TO DISMISS FOR LACK OF JURISDICTION; ALTERNATIVELY A RESPONSE HEARING SET ON 2.25.15 @ 11:00 A.M. E-MAILED COPY TO WILLIAM MCCARTHY & JOHNNY PARTAIN CL-29,530-H (ORDER SIGNED) February 12, 2015 4:40 PM From: Jacquelyn Perez "Jacquelyn Perez" <jacquelyn.perez@co.hidalgo.tx.us>; To: thefirm "thefirm" <thefirm@oxfordandgonzalez.com>; partain "partain" <partain@atlastechnologies.biz>; CL-29530-H[1].pdf (608.4 KB)*

02/03/2015    Other
*WITHDRAWAL OF OBJECTION TO ASSIGNMENT*

02/02/2015    Objection
*TO ASSIGNMENT*

01/14/2015    Order Filed
*Order*

01/14/2015    Motion
*Motion to Dismiss for Want of Jurisdiction*



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office.

Date: JAN 16 2025

By: _____ Deputy Clerk

01/14/2015    Order Filed
*SHOW CAUSE HEARING ORDER*

01/14/2015    Order Filed
*SHOW CAUSE HEARING ORDER*

01/14/2015    Motion for Contempt

01/13/2015    **Status Conference Hearing** (8:30 AM)

12/16/2014    Order Setting Hearing, Signed
*ORDER FOR STATUS HEARING SET ON 1.13.15 @ 8:30 A.M. E-MAILED COPY TO JOHNNY PARTAIN & ATTY WILLIAM J. MCCARTHY CL-29,530-H (ORDER SIGNED) December 16, 2014 8:34 AM From: Jacquelyn Garcia "Jacquelyn Garcia" <jacquelyn.perez@co.hidalgo.tx.us>; To: partain@atlastechnologies.biz partain@atlastechnologies.biz; mccarthy 625 "mccarthy 625" <mccarthy.625@gmail.com>; CL-29,530-H[1].pdf (470 KB)*

12/08/2014    Returned Mail
*DORA MARTINEZ ( ORDER OF TRANSFER)*

12/01/2014    Other
*JUDGMENT CREDITOR'S EMERGENCY MOTION FOR STATUS HEARING, ORDER ATTACHED*

11/21/2014    Order of Transfer, Signed
*COPY MAILED OUT TO PARTIES*

10/09/2014    Order, Signed
*Order faxed to Atty. McCarthy and via hand delivery to Johnny Partain*

10/08/2014    **Hearing** (1:00 PM)
*CC8 COURT REPORTER;*

10/08/2014    Order Filed

10/08/2014    Emergency Hearing
*FOR TRO*

06/09/2014    Brief
*Exclusive Jurisdiction of the Probate Court*

06/06/2014    **Tickler** (8:30 AM)
*RULING TO BE MADE*

06/06/2014    Judgment Filed
*CREDITOR JOHNNY PARTAIN'S TRCP 155 BRIEF*

06/02/2014    **Status Conference Hearing** (8:30 AM)
*ALL PARTIES PRESENT; PARTIES TO PROVIDE BRIEFS W/ CASE LAW; RULING TO BE MADE ON JUNE 6, 2014*
*Held*



I, Arturo Guerrero, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office.

Date: JAN 1 6 2025

By: _____ Deputy Clerk

05/28/2014    Order, Signed
*Order Denying Rule 155 Motion*

05/28/2014    Response
*Response to Plaintiff's Motion for A TRCP 155 Hearing*

05/22/2014    **Status Conference Hearing** (8:30 AM)
*PARTIES PRESENT; MR. MCARTHY UNAVAILABLE; STATUS HEARING SET FOR JUNE 2, 2014 @8.00AM*
*Held*

05/20/2014    Motion
*TO PROCEED UNDER UNDER TRCP 155/recv'd at wrhs on 5-22-14*

05/19/2014    **Status Conference Hearing** (8:30 AM)
*ALL PARTIES PRESENT; SUGGESTION OF DEATH FILED; STATUS HEARING SET FOR MAY 22, 2014 @8.30AM*
*Held*

05/19/2014    Motion to Reset Hearing
*MOTION TO RE-SET A TRCP 155*

05/13/2014    Suggestion of Death, Filed
*Suggestion of Death*

05/12/2014    **Status Conference Hearing** (8:30 AM)
*ALL PARTIES PRESENT; SUGGESTION OF DEATH NOT FILED; STATUS HEARING SET FOR MAY 19, 2014 @8.30AM*
*Held*

04/07/2014    **Motion** (8:30 AM)
*ALL PARTIES PRESENT; JAMES MAPLES IS NOW DECEASED; STATUS HEARING SET FOR MAY 12, 2014 @8.30AM; MOTION FOR TURNOVER RELIEF OF APPELLANT COST TO DEFEAT THIS COURT'S FINAL JUDGMENT WHICH WAS ADJUDGED VOID BY THE 13TH COURT OF APPEALS*
*Held*

04/02/2014    Order Filed
*FOR TURNOVER HEARING*

04/01/2014    Motion

04/01/2014    Objection
*TO AN APRIL 1,2014 REQUEST FOR TURNOVER AND THE COURTS REFUSAL TO PROVIDE AID*

04/01/2014    Motion

04/01/2014    Court Entries
*Can not ser for Hearing. Lacking OSH. Upon receipt of OSH will be set for Hearing; as per Judge Sergio Valdez*

04/01/2014    Motion
*FOR TUROVER RELIEF OF APPELLANT COST TO DEFEAT THIS COURT'S FINAL JUDGMENT WHICH WAS ADJUDGED VOID THE 13TH COURT OF APPEALS*



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office.
By: _____ Deputy Clerk
JAN 16 2025

| | |
|---|---|
| 01/22/2014 | **Motion** (8:30 AM)<br>*ALL PARTIES PRESENT; CREDITOR'S MOTION TO STRIKE; DENIED;*<br>*Held* |
| 01/21/2014 | **Motion** (8:30 AM)<br>*JUDGMENT CREDITOR'S MOTION TO STRIKE AND JUDGMENTS CREDITORS*<br>*MOTION FOR SHOW CAUSE AND ENFORING TURNOVER ORDERS NO. 5 AND NO. 6*<br>*AND TO RECOVER STOLEN MONIES*<br>*Reset* |
| 11/25/2013 | File Checked In |
| 11/25/2013 | Order Setting Hearing, Signed<br>*JUDGMENT CREDITORS MOTION TO STRIKE AND JUDGMENT CREDITORS MOTION*<br>*FOR SHOW CAUSE AND ENFORCING TURNOVER ORDERS NO. 5 AND NO. 6 AND TO*<br>*RECOVER STOLEN MONIES; JAN. 21, 2014 @8.30AM* |
| 11/20/2013 | Clerk's Entry<br>*Vol 2 is up at court for an order and Vol 1 with accordian is in file room.* |
| 11/15/2013 | File Checked Out |
| 11/12/2013 | Judgment Filed<br>*CREDITOR'S MOTION TO STRIKE WITH ORDER TO VACATE ORDER ATTAHCED* |
| 10/10/2013 | **Status Conference Hearing** (8:30 AM)<br>*@8:00a.m.* |
| 10/10/2013 | File Checked In |
| 10/10/2013 | File Sent to County Clerk |
| 10/10/2013 | Order of the Court, Signed |
| 10/03/2013 | File Checked Out |
| 10/01/2013 | Other<br>*JUDGMENT CREDDITOR JOHNNY PARTAIN'S COLLECTION BREIF WITH EXHIBITS*<br>*ATTACHED WITH CD ATTACHED* |
| 10/01/2013 | Letter Received<br>*WITH EXHIBITS ATTACHED RECV'D AT WRHS 10.2.13* |
| 09/18/2013 | File Checked In |
| 09/17/2013 | **Hearing** (8:30 AM)<br>*case called parties were present; parties need to submitt documents by 10.1.13* |
| 08/21/2013 | File Checked Out |
| 08/19/2013 | Other<br>*COURT OF APPEALS/recv'd @ wrhs on 8-28-13* |
| 08/16/2013 | Motion<br>*TO ENFORCE THE COUT'S FINAL JUDGMENT AND ITS FINAL TURNOVER ORDERS*<br>*WITH ORDER ATTACHED* |



| | |
|---|---|
| 07/26/2013 | Notice<br>*FROM COURT OF APPEAL* |
| 07/15/2013 | **Status Conference Hearing** (8:30 AM)<br>*notice sent to parties on 6.13.13* |
| 07/15/2013 | Court Entries<br>*CASE CALLED; ALL PARTIES PRESENT; D/L TO FILE PLEADINGS 8.16.13; DEADLINE FOR PARTIES TO FILE RESPONSE 8.23.13; HEARING SET FOR 9.17.13 ON ALL MOTIONS @10.00AM* |
| 07/15/2013 | File Checked In |
| 07/12/2013 | File Checked Out |
| 06/14/2013 | File Checked In |
| 06/14/2013 | File Sent to County Clerk |
| 06/13/2013 | Order, Signed<br>*Order for Appearance and Scheduling of a Show Cause HEaring on Turnover Order No. 5* |
| 06/03/2013 | File Checked Out |
| 05/24/2013 | Other<br>*JUDGMENT CREDITOR'S MOTION FOR A SHOW CAUSE HEARING ENFORCING TURNOVER ORDERS NO. 5 AND NO.6 AND TO RECOVER STOLEN MONIES* |
| 05/17/2013 | File Checked In |
| 05/16/2013 | File Checked Out |
| 05/15/2013 | File Checked Out |
| 05/14/2013 | Other<br>*OPINION 13TH COURT OF APPEALS/ JUDGMENT* |
| 07/26/2012 | Bill of Cost<br>*$50.00* |
| 07/26/2012 | Supplemental<br>*OF CLERK'S RECORD/recvd at wrhs on 7-31-12* |
| 07/26/2012 | Bill of Cost<br>*$47.00* |
| 07/25/2012 | Supplemental<br>*OF CLERK'S RECORD/recvd at wrhs on 7-31-12* |
| 07/20/2012 | Clerk's Entry<br>*ORDER MAILED TO 13TH COURT OF APPEALS 901 LEOPARD 10TH FLOOR CORPUS CHRISTI, TEXAS 78401* |
| 07/11/2012 | Order Received<br>*ORDER DENYING MOTION TO QUASH/ SIGNED BY RETIRED VISITING JUDGE ALEX W GABERT/recvd at wrhs on 7-19-12* |



Date: _____ I, Arturo Guajardo, Jr. County Clerk, do hereby certify that this is a true and correct copy of the original document filed in my office.

By: _____ Deputy Clerk

JAN 16 2025

| | |
|---|---|
| 07/11/2012 | Motion to Quash<br>*SIGNED; NOT SENT TO WILL MCCARTHY, TERESA PARTAIN* |
| 06/18/2012 | Letter Received |
| 06/13/2012 | Bill of Cost |
| 06/13/2012 | Appeal |
| 06/13/2012 | File Checked In |
| 06/13/2012 | Appeal<br>*WALKED OVER TO 13TH COURT OF APPEALS* |
| 06/12/2012 | **Hearing (1:00 PM)**<br>*EVIDENTIARY HEARING ON J.PARTAINS MOTION TO QUASH JUDGMENT* |
| 06/12/2012 | Court Entries<br>*Hearing on whether the court had jurisdiction over the Motion to Quash was denied. Court found not applicable by the court. Order to be forthcoming* |
| 06/12/2012 | File Checked Out |
| 06/08/2012 | File Requested From Storage<br>*SPOKE TO ALEIDA* |
| 05/24/2012 | File Checked In |
| 05/22/2012 | Court Entries<br>*order quashing final judgment faxed to judge gabert for review 956-487-0404* |
| 05/11/2012 | Designation of Clerk's Record |
| 05/11/2012 | Designation of Court Reporter's Record |
| 05/03/2012 | Letter Received<br>*THIRTEENTH COURT OF APPEALS* |
| 04/27/2012 | Notice<br>*NOTICE OF APPEAL* |
| 04/18/2012 | Motion to Quash<br>*JUDGMENT CREDITOR'S MOTION TO QUASH THE JUDGMENT AND TO CONFORM TO TEXAS LAW/ OSH* |
| 04/17/2012 | File Checked Out |
| 04/13/2012 | Motion to Quash<br>*JUDGMENT CREDITOR'S MOTION TO QUASH THEJUDGMENT AND TO CONFIRM TO TEXAS LAW/OSH* |
| 04/02/2012 | Letter Received<br>*attorney* |
| 03/27/2012 | Letter Received |



*REQUEST DENIED*

03/16/2012 | **Hearing** (1:30 PM) (Judicial Officer: Cantu, Rolando)
*plea to the jurisdiction with judge gabert*

03/16/2012 | Motion Denied
*CL-29,530-G 03/16/2012 MOTION DENIED RE:JUDGE ALEZ GABERT'S JURISDICTION MOTION DENIED (MTNDEN)*

03/16/2012 |  Final Judgment, Signed
*FINAL JUDGMENT SIGNED (FJS)*

03/16/2012 | Disposition
*($DISP)*

03/01/2012 | File Checked Out
*FILE CHECKED OUT (FCO)*

02/28/2012 | Challenge
*CL-29,530-G 02/28/2012 CHALLENGE CHALLENGE TO JURISDICTION CHALLENGE (CHALLENGE)*

02/28/2012 | Judgment
*CL-29,530-G 02/28/2012 JUDGMENT FINAL JUDGMENT JUDGMENT (JUDGMENT)*

02/24/2012 | Challenge
*CL-29,530-G 02/24/2012 CHALLENGE CHALLENGE TOJUDGE ALEX W. GABERTS JURISDICTION CHALLENGE (CHALLENGE)*

02/21/2012 | Letter Received
*CL-29,530-G 02/21/2012 LETTER RECEIVED THIRTEEN COURT OF APPEALS LETTER RECEIVED (LR)*

01/27/2012 | **Final Hearing** (1:30 PM) (Judicial Officer: Cantu, Rolando)
*to be heard by Judge Gabert/ not sent to attorny's by noelia*

01/27/2012 | Court Entries
*CL-29,530-G 01/27/2012 COURT ENTRY PARTIES PRESENT IN COURT. PLFS REP HIMSELF REQUESTED HR ON THE OLD SHOW CAUSE MTNS. HR WAS SET ONLY THE COURTS MTN FOR JUDGMENT NOT FOR SHOW CAUSE. BOTH PLT AND DEF WERE ORDERED TO SUBMIT PROPOSED JUDGMENT BY 2.28.2012 COURT ENTRY (CE)*

01/12/2012 | Letter Received
*CL-29,530-G 01/12/2012 LETTER RECEIVED THIRTEENTH DISTRICT COURT OF APPEALS LETTER RECEIVED (LR)*

01/09/2012 | Letter Received
*CL-29,530-G 01/09/2012 LETTER RECEIVED COURT OF APPEALS LETTER RECEIVED (LR)*

01/09/2012 | Court Entries
*CL-29,530-G 01/09/2012 COURT ENTRY 13TH COURT OF APPEALS GRANTED MTN TO DISMISS APPEAL COURT ENTRY (CE)*

12/28/2011 | File Checked In
*FILE CHECKED IN (FCI)*

12/21/2011 | File Checked Out

Printed on 01/16/2025 at 3:03 PM

FILE CHECKED OUT (FCO)

| | |
|---|---|
| 12/20/2011 | **Court Entries**<br>*CL-29,530-G 12/20/2011 COURT ENTRY (CON)SUBMITTED STATUS REPORT REQUEST DATE FOR STATUS REPORT COURT ENTRY (CE)* |
| 12/20/2011 |  Order Setting Hearing, Received<br>*CL-29,530-G 12/20/2011 OSH/ORDERRCVD SUPPLEMENTAL ORDER ON ABATEMENT/SENT TO COURT OSH/ORDERRCVD (OSH/ORDERRCVD)* |
| 12/13/2011 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 12/09/2011 | **Hearing** (1:30 PM) (Judicial Officer: Cantu, Rolando)<br>*final judgment w/ Judge Gabert.* |
| 12/09/2011 | Court Entries<br>*CL-29,530-G 12/09/2011 COURT ENTRY HEARING HELD ON COURTS MTN FOR JUDGMENT. EVIDENCE PRESENTION CONDUCTED PROPOSED JUDGMENT ORDERED BY COURT TO BE REPORDEDLY SUBMITTED. INSTEAD SUBMISSION OF PROPOSED JUDGMENT , PARTIES ANNOUNCED JOINT AGREEMENT TO DISMISS APELLETS APPEAL. ORDER DISMISSING SAYING TO BE COURT ENTRY (CE)* |
| 12/09/2011 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 11/04/2011 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 11/03/2011 |  Letter Received<br>*CL-29,530-G 11/03/2011 LETTER RECEIVED FROM ALEX GABERT LETTER RECEIVED (LR)* |
| 11/02/2011 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 11/01/2011 |  Unknown<br>*CL-29,530-G 11/01/2011 ORDER OF TRANSFER SI & ACCEPTANCE; CASE TRANSFERRED BY COURT 1 TO COURT 7 ORDER OF TRANSFER SIGNED (OOT)* |
| 10/25/2011 |  Letter Received<br>*CL-29,530-A 10/25/2011 LETTER RECEIVED FROM THE 13TH COURT OF APPEALS/ APPELLEE'S MOT FOR EXTENSION GRANTED WITH SUPPLEMENTAL ABATEMENT ORDER/ ORDER ATTACHED LETTER RECEIVED (LR)* |
| 10/18/2011 | Clerk's Entry<br>*CL-29,530-A 10/18/2011 CLERK'S ENTRY LAST VOL FILED IN CABINET CLERK'S ENTRY (CLERKSENTRY)* |
| 10/17/2011 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 10/14/2011 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* |
| 09/09/2011 |  Audit Letter<br>*CL-29,530-A 09/09/2011 LETTER FROM 13TH COURT OF APPEAL TO JUDGE GONZALEZ ORDER ON ABATEMENT LETTER (LETTER)* |

JAN 16 2025

Date:
I, Arturo Guajardo, Jr. County Clerk the hereby certify that this is a true and correct copy of the original document filed in my office.
By: _____
Deputy Clerk

| | |
|---|---|
| 07/08/2011 | **Status Conference Hearing** (1:00 PM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*per Judge Gabert* |

*Vol./Book CASE HEARD BY, Page JUDGE A. GABERT*

07/08/2011     Court Entries

      *CL-29,530-A 07/08/2011 COURT ENTRIES JOHNNY PARTAIN, JAMES MAPLES & WILLIAM MCCARTHY PRESENT COURT ENTRIES (COURT) Internal Memo: STATUS REPORT HRG HELD; PROPOSED ORDERS FORTHCOMING; CASE R/S FOR RULING ON PROPOSED ORDERS*

07/08/2011     File Checked Out
      *FILE CHECKED OUT (FCO)*

06/21/2011     Letter Received
      *CL-29,530-A 06/21/2011 LETTER RECEIVED FROM JUDGE GABERT; CASE SET FOR STATUS HRG ON 7/8/11-1PM; COPY FORWARDED VIA FAX TO ATTY WILLIAM MCCARTY & PLTFF JOHNNY PARTAIN. LETTER RECEIVED (LR)*

06/06/2011     Order Signed
      *CL-29,530-A 06/06/2011 ORDER, SIGNED ORDER OF ASSIGNMENT /HON ALEX GABERT ORDER, SIGNED (OS)*

06/03/2011     Appeals Court
      *APPEAL WALKED TO 13TH. COURTS OF APPEAL ACROSS THE STREET (AWTCOA)*

05/26/2011     File Checked In
      *FILE CHECKED IN (FCI)*

05/26/2011     Order Signed
      *CL-29,530-A 05/26/2011 ORDER, SIGNED ORDER OF REFERRAL AND RECUSAL ON JUDGE'S OWN MOTION ORDER, SIGNED (OS)*

05/25/2011     Designation
      *CL-29,530-A 05/25/2011 DESIGNATION AMENDED DESIGNATION OF REPORTER'S RECORD DESIGNATION (DESIGNATION)*

05/23/2011     Other
      *CL-29,530-A 05/23/2011 OTHER MEMORANDUM OPINION FROM 13TH COURT OF APPEAL OTHER (OTH)*

05/16/2011     Other
      *CL-29,530-A 05/16/2011 OTHER FROM 13TH COURT OF APPEALS/ RESPONSE TO THE WRIT OF MANDAMUS OTHER (OTH)*

05/16/2011     Other
      *CL-29,530-A 05/16/2011 OTHER FROM 13TH COURT OF APPEALS/ REAL PARTY INTEREST'S AMENDED MOTION TO DISMISS THE WRIT OF MANDAMUS (MOTTNESS) OTHER (OTH)*

05/16/2011     Other
      *CL-29,530-A 05/16/2011 OTHER FROM 13TH COURT OF APPEALS/ RESPONDANTS MOTION TO DISMISS THE WRIT OF MANDAMUS (MOOTNESS) OTHER (OTH)*

05/12/2011     Designation
      *CL-29,530-A 05/12/2011 DESIGNATION DESIGNATION OF REPORTER'S RECORD*



I, Amalia Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office.

By: _____ Deputy Clerk

JAN 16 2025

*DESIGNATION (DESIGNATION)*

| | | |
|---|---|---|
| 05/11/2011 | Notice of Appeal | *CL-29,530-A 05/11/2011 NOTICE OF APPEAL SUPPLEMENTAL NOTICE OF APPEAL NOTICE OF APPEAL (NOTAPP)* |

05/11/2011    Notice of Appeal
*CL-29,530-A 05/11/2011 NOTICE OF APPEAL SUPPLEMENTAL NOTICE OF APPEAL NOTICE OF APPEAL (NOTAPP)*

05/11/2011    Designation of Clerk's Record
*CL-29,530-A 05/11/2011 DESIGNATION OF CLERK FILED BY: JOHNNY PARTAIN (956/687-4966) DESIGNATION OF CLERK'S RECORD (DESIGN.CR)*

05/09/2011    Audit Letter
*CL-29,530-A 05/09/2011 LETTER COPY OF LETTER TO JOHNNY PARTAIN FROM 13TH COURT OF APPEALS LETTER (LETTER)*

05/09/2011    File Sent to Court
*CL-29,530-A 05/09/2011 FILE SENT TO COURT 4 FOR REASSIGNMENT. FILE SENT TO COURT (FSTC)*

05/06/2011    Order Signed
*CL-29,530-A 05/06/2011 ORDER, SIGNED OF REFERRAL AND RECUSAL ON JUDGE'S OWN MOTION ORDER, SIGNED (OS)*

05/04/2011    **Motion for Continuance Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")
*& Final Hearing*

05/04/2011    Court Entries
*CL-29,530-A 05/04/2011 COURT ENTRIES ATTY BILL MCCARTHY PRESENT FOR HRG; ORDER OF RECUSAL TO BE SIGNED; CRT ENTERED NO RULING. COURT ENTRIES (COURT)*

05/03/2011    File Checked Out
*FILE CHECKED OUT (FCO)*

05/03/2011    Notice of Appeal
*NOTICE OF APPEAL (NOTAPP)*

04/29/2011    Petition
*FOR WRIT OF MANDAMUS*

04/11/2011    File Checked In
*FILE CHECKED IN (FCI)*

04/11/2011    File Sent to County Clerk
*FILE SENT TO COUNTY CLERK (FSCL)*

04/11/2011    Order Setting Hearing
*CL-29,530-A 04/11/2011 ORDER SETTING HEARIN RESP'S FINAL HRG SET: 5/04/11 AT 9 A.M. ORDER SETTING HEARING (OSH) Internal Memo: O/M WILLIAM J. MCCARTHY & JOHNNY & TERESA PARTAIN*

04/11/2011    Order Setting Hearing
*CL-29,530-A 04/11/2011 ORDER SETTING HEARIN MOVT'S M/COMTEMPT SET: 5/04/11 AT 9 A.M. ORDER SETTING HEARING SIGNED (OSHS) Internal Memo: O/M WILLIAM J. MCCARTHY & JOHNNY & TERESA PARTAIN*

04/05/2011    Motion
*CL-29,530-A 04/05/2011 MOTION TO STRIKE PARTAIN'S ORDER TO CORRECT THE*



*Printed on 01/16/2025 at 3:03 PM*

*COURT'S ORDER OF FEBRUARY 2, 2011 WITH ORDERS ATTACHED WALKED TO COURT BY mR. MCCARTHY MOTION (MOT)*

| | | |
|---|---|---|
| 04/05/2011 |  Motion | *CL-29,530-A 04/05/2011 MOTION MOTION FOR CONTEMPT WITH ORDER ATTACHED WALKED TO COURT BY WILLIAM MCCARTHY MOTION (MOT)* |

04/05/2011  Motion
*CL-29,530-A 04/05/2011 MOTION MOTION FOR CONTEMPT WITH ORDER ATTACHED WALKED TO COURT BY WILLIAM MCCARTHY MOTION (MOT)*

03/25/2011  File Checked In
*FILE CHECKED IN (FCI)*

03/25/2011  File Sent to County Clerk
*FILE SENT TO COUNTY CLERK (FSCL)*

03/24/2011  Order Signed
*CL-29,530-A 03/24/2011 ORDER, SIGNED GRANTING ATTY KELLY K. MCKINNIS' MTN TO W/D AS COUNSEL FOR DEFS ORDER, SIGNED (OS)*

03/17/2011  Motion to Withdraw as Attorney, Order Approving
*CL-29,530-A 03/17/2011 MOTION TO WITHDRAW A WITH ORDER ATTACHED MOTION TO WITHDRAW AS ATTY (COUNSEL)/ORDER APPROVING (MOT.WAA)*

03/01/2011  File Checked Out
*FILE CHECKED OUT (FCO)*

02/28/2011  Motion
*CL-29,530-A 02/28/2011 MOTION JUDGMENT CREDITOR'S MOT TO THE COURT TO CORRECT IT'S ORDER WITH ORDER ATTACHED MOTION (MOT)*

02/14/2011  Memorandum
*CL-29,530-A 02/14/2011 MEMORANDUM PER JUDGE, MOTION FILED ON 2/11 BY MR. MAPLES (WHO IS REPRESENTED BY NORMAN MCKINNIS) IS NOT ACCEPTED BY COURT MEMORANDUM (MEMO) Internal Memo: MOTION WILL NOT BE SET FOR HEARING*

02/11/2011  Motion
*CL-29,530-A 02/11/2011 MOTION DEF'S EMERGENCCY MOTION TO PREVENT SQUANDERING OF ASSETS WITH ORDER ATTACHED MOTION (MOT)*

02/04/2011  Copies Mailed to Attorney(s)
*CL-29,530-A 02/04/2011 COPIES MAILED TO ATT JOHNNY PARTAIN;WILLIAM CORCORAN;KELLY MCKINNIS / ONE PAGE WAS LEFT OUT OF THE FIRST COPY MAILED COPIES MAILED TO ATTY(S) (COPY)*

02/03/2011  Copies Mailed to Attorney(s)
*CL-29,530-A 02/03/2011 COPIES MAILED TO ATT JOHNNY PARTAIN;JAMES MAPLES;KELLY MCKINNIS;WILLIAM CORCORAN COPIES MAILED TO ATTY(S) (COPY)*

02/03/2011  File Checked In
*FILE CHECKED IN (FCI)*

02/02/2011  **Status Conference Hearing** (9:00 AM)  (Judicial Officer: Gonzalez, Rodolfo "Rudy")

02/02/2011  File Sent to County Clerk
*FILE SENT TO COUNTY CLERK (FSCL)*

02/02/2011  Order Signed
*CL-29,530-A 02/02/2011 ORDER, SIGNED CLERK TO SEND COPY TO ALL PARTIES ORDER, SIGNED (OS)*

JAN 16 2025

| | | |
|---|---|---|
| 02/02/2011 | **Court Entries**<br>*CL-29,530-A 02/02/2011 COURT ENTRIES ATTY KELLY MCKINNIS & PLTFF JOHNNY PARTAIN PRESENT FOR HRG; CRT TO ENTER RULING BY FRIDAY OF NEXT WEEK. COURT ENTRIES (COURT)* | |
| 01/12/2011 | Order Setting Hearing<br>*CL-29,530-A 01/12/2011 ORDER SETTING HEARIN STATUS HRG SET: 02/02/11 AT 9 A.M. ORDER SETTING HEARING SIGNED (OSHS) Internal Memo: O/M JOHNNY PARTAIN/T. PARTAIN, JAMES MAPLES & KATHERINE MAPLES, WILLIAM CORCORAN & KELLY MCKINNIS* | |
| 01/07/2011 | Motion<br>*CL-29,530-A 01/07/2011 MOTION FOR STATUS HEARING WITH ORDER ATTACHED MOTION (MOT)* | |
| 01/06/2011 | Clerk's Entry<br>*CL-29,530-A 01/06/2011 CLERK'S ENTRY AS PER DORA: JUDGE STATED A HEARING MUST BE SET BEFORE WRIT CAN BE ISSUED CLERK'S ENTRY (CLERKSENTRY)* | |
| 01/05/2011 | Request<br>*CL-29,530-A 01/05/2011 REQUEST FOR WRIT OF EXECUTION REQUEST (REQ)* | |
| 11/03/2010 | Certificate of Service, Filed<br>*CL-29,530-A 11/03/2010 CERTIFICATE OF SERVI ADDITIONAL EVIDENCE SUBMISSION PACKAGE WITH ORDER ATTACHED CERTIFICATE OF SERVICE (CERT.SERVICE)* | |
| 10/13/2010 | **Status Conference Hearing** (10:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*Notice given in open crt.* | |
| 10/13/2010 | Court Entries<br>*CL-29,530-A 10/13/2010 COURT ENTRIES ATTY KELLY MCKINNIS & PLTFF JOHNNY PARTAIN PRESENT FOR HRG; PROPOSED ORDERS TO BE SUBMITTED BY 11/3/10; COURT TO MAKE DECISION. COURT ENTRIES (COURT)* | *Vol./Book FILE I/C* |
| 10/12/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | |
| 10/12/2010 | Clerk's Entry<br>*CL-29,530-A 10/12/2010 CLERK'S ENTRY FILE 3 WAS SEND UP WITH DOCKET CLERK'S ENTRY (CLERKSENTRY)* | |
| 10/07/2010 | Other<br>*CL-29,530-A 10/07/2010 OTHER COPY OF ORDER FINDING CONTEMPT & REQUIRING INCARCERATION FROM U.S. BANKRUPTCY COURT OTHER (OTH)* | |
| 10/07/2010 | Other<br>*CL-29,530-A 10/07/2010 OTHER RELEASE OF LIEN OTHER (OTH)* | |
| 10/07/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 10/06/2010 | **Status Conference Hearing** (10:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*Notice given in open crt.* | |
| 10/06/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |



JAN 16 2025
Deputy Clerk

| | |
|---|---|
| 10/06/2010 | Court Entries<br>*CL-29,530-A 10/06/2010 COURT ENTRIES ATTYS KELLY MCKINNIS & VICKI SKAGGS PRESENT FOR HRG; PLTFF JOHNNY PARTAIN PRESENT AS WELL; COPY OF RELEASE OF LIEN SUBMITTED; CASE RESET FOR 10/13/10-10AM. COURT ENTRIES (COURT)* |
| 10/05/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 10/04/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 10/01/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* |
| 09/30/2010 | Order Signed<br>*CL-29,530-A 09/30/2010 ORDER, SIGNED CASE RESET FOR STATUS HRG ON 10/6/10-10AM--VICKI SKAGS TO APPEAR AS WELL; O/F TO KELLY MCKINNIS & VICKI SKAGGS; O/M TO JOHNNY/TERESA PARTAIN. ORDER, SIGNED (OS)* |
| 09/22/2010 | **Status Conference Hearing** (10:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*Notice given in open crt.* |
| 09/22/2010 | Court Entries<br>*CL-29,530-A 09/22/2010 COURT ENTRIES ATTY KELLY MCKINNIS & PLTFF JOHNNY PARTAIN PRESENT FOR HRG; CRT HEARD ARGUMENTS; ATTY TO BE CONTACTED REGARDING CONDO LIEN; CASE RESET FOR STATUS HRG ON 10/6/10-10AM. COURT ENTRIES (COURT)* |
| 09/21/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 08/30/2010 | **Show Cause Hearing (JP-OCA)** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| 08/30/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 08/30/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* |
| 08/30/2010 | Court Entries<br>*CL-29,530-A 08/30/2010 COURT ENTRIES ATTY KELLY MCKINNIS & PARTIES PRESENT FOR HRG; CRT RESET CASE FOR STATUS HRG ON 9/22/10-10AM. COURT ENTRIES (COURT)* |
| 08/30/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 07/23/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 07/23/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* |
| 07/23/2010 | Order Signed<br>*CL-29,530-A 07/23/2010 ORDER, SIGNED FOR APPEARANCE & A SHOW CAUSE HRG ON TURNOVER ORDER NO. 5 AND 6; HRG SET: 8/30/10 AT 9 A.M.; O/M JOHNNY PARTAIN & TERESA PARTAIN, JAMES MAPLES & KATHLEEN MAPLES & KELLY MCKINNIS ORDER, SIGNED (OS)* |

Vol./Book EJ

Vol./Book SENT
TO CLERK,
Page NO FILE



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office.

Deputy Clerk

JAN 16 2025

| 07/16/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | *Vol./Book DANNY* |
|---|---|---|
| 07/12/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 07/12/2010 | File Requested From Storage<br>*CL-29,530-A 07/12/2010 FILE REQUESTED FROM FOR ORDER FILE REQUESTED*<br>*FROM STORAGE (FREQ)* | *Vol./Book EJ* |
| 06/28/2010 | 🗋 Order Signed<br>*CL-29,530-A 06/28/2010 ORDER, SIGNED FOR RELEASE OF ATLAS TRANSPORTATION,*<br>*INC. EQUIPMENT ORDER, SIGNED (OS)* | *Vol./Book NO*<br>*FILE* |
| 06/25/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 06/25/2010 | File Requested From Storage<br>*CL-29,530-A 06/25/2010 FILE REQUESTED FROM ORDER FILE REQUESTED FROM*<br>*STORAGE (FREQ)* | *Vol./Book ART* |
| 06/23/2010 | 🗋 Motion<br>*CL-29,530-A 06/23/2010 MOTION PLAINTIFF'S MOTION FOR SHOW CAUSE HEARING*<br>*AND ENFORCEMENT OF TURNOVER ORDERS NO 5 & 6 WITH ORDER ATTACHED*<br>*MOTION (MOT)* | *Vol./Book EJ* |
| 05/26/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | *Vol./Book EJ* |
| 05/25/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 05/25/2010 | Court Entries<br>*CL-29,530-A 05/25/2010 COURT ENTRIES ATTY KELLY MCKENNIS PRESENT FOR HRG;*<br>*PLTF JOHNNY PARTAIN PRESENT FOR HRG; OTBS FOR BUSES TO BE TURNED OVER*<br>*TO MR. MAPLES COURT ENTRIES (COURT)* | |
| 05/25/2010 | File Checked Out<br>*CL-29,530-A 05/25/2010 FILE CHECKED OUT LAST FILE IN DISPOSED IN BOX FILE*<br>*CHECKED OUT (FCO)* | *Vol./Book EJ* |
| 05/20/2010 | Copies Mailed to Attorney(s)<br>*CL-29,530-A 05/20/2010 COPIES MAILED TO ATT KELLY MCKINNIES; JOHNNY*<br>*PARTAIN; JAMES MAPLES COPIES MAILED TO ATTY(S) (COPY)* | *Vol./Book EJ* |
| 05/20/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | *Vol./Book EJ* |
| 05/19/2010 | **Show Cause Hearing (JP-OCA)** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") | |
| 05/19/2010 | 🗋 Order, Signed<br>*TURNOVER ORDER NO. 6* | |
| 05/19/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 05/19/2010 | 🗋 Order Signed<br>*CL-29,530-A 05/19/2010 ORDER, SIGNED TURNOVER ORDER NO. 6 ORDER, SIGNED* | |



Date: **JAN 1 6 2025**
I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office
By:
Deputy Clerk

*(OS)*

| | | |
|---|---|---|
| 05/19/2010 | Court Entries<br>*CL-29,530-A 05/19/2010 COURT ENTRIES PLTFF JOHNNY PARTAIN & ATTY KELLY MCKINNIS PRESENT; 5/27/10 DATE RESET FOR 5/25/10-10AM. COURT ENTRIES (COURT)* | |
| 05/19/2010 | Court Entries<br>*CL-29,530-A 05/19/2010 COURT ENTRIES PETITIONER JOHNNY PARTAIN PRESENT FOR HRG; DEF NOR ATTY PRESENT; REQUEST FOR TURNOVER ORDER GRANTED; CASE RESET FOR 5/27/10; OTBS. COURT ENTRIES (COURT)* | |
| 05/04/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | Vol./Book EJ |
| 05/03/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book EJ |
| 05/03/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 05/03/2010 | Order Signed<br>*CL-29,530-A 05/03/2010 ORDER, SIGNED FOR APPEARANCES AND SCHEDULING OF A SHOW CAUSE HRG ON TURNOVER ORDER NO. 5; HRG SET FOR 5/19/10-9AM; O/M TO JOHNNY PARTAIN/TERESA PARTAIN, JAMES MAPLES/KATHY MAPLES & KELLY MCKINNIS. ORDER, SIGNED (OS)* | |
| 04/30/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | Vol./Book EJ |
| 04/28/2010 | Motion<br>*CL-29,530-A 04/28/2010 MOTION PLAINTIFF'S MOTION FOR HEARING WITH ORDER ATTACHED MOTION (MOT)* | Vol./Book EJ |
| 04/28/2010 | Order<br>*CL-29,530-A 04/28/2010 ORDER SIGNED ORDER REMANDING LAWSUIT ORDER SIGNED (ORD)* | Vol./Book EJ |
| 04/23/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book VICKY |
| 04/22/2010 | File Requested From Storage<br>*CL-29,530-A 04/22/2010 FILE REQUESTED FROM CASE REMANDED BACK TO CT 1 FILE REQUESTED FROM STORAGE (FREQ)* | Vol./Book EJ |
| 04/21/2010 | Clerk's Entry<br>*CL-29,530-A 04/21/2010 CLERK'S ENTRY FAXED COPY OF ORDER REMANDING LAWSUIT RECEIVED CLERK'S ENTRY (CLERKSENTRY)* | Vol./Book EJ |
| 03/02/2010 | Order, Signed<br>*ORDER DENYING DEBTOR'S EXPEDITED MOTIN FOR ORDER DECLARING THAT RETENTION OF REAL ESTATE BY JOHNNY PARTAIN SATISFIES CLAIM IN FULL* | |
| 02/09/2010 | **All Pending Motions** (9:30 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*Notice given in open crt.* | |
| 02/09/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book EJ |

JAN 16 2025

I, Arturo Guajardo, Jr. County Clerk do
hereby certify that this is a true and
correct copy of the original document
filed in my office.
By:

Deputy Clerk

| | | |
|---|---|---|
| 02/09/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 02/09/2010 | Court Entries<br>*CL-29,530-A 02/09/2010 COURT ENTRIES PLTFF JOHNNY PARTAIN PRESENT FOR HRG; NOTICE OF REMOVAL FILED; HRG PASSED AT THIS TIME. COURT ENTRIES (COURT)* | |
| 02/09/2010 | Notice of Removal<br>*NOTICE OF REMOVAL (NOR)* | Vol./Book EJ |
| 02/09/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | Vol./Book EJ |
| 02/08/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book ART |
| 02/08/2010 | File Requested From Storage<br>*CL-29,530-A 02/08/2010 FILE REQUESTED FROM DOCKET FILE REQUESTED FROM STORAGE (FREQ)* | Vol./Book ART |
| 01/08/2010 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book JOANN |
| 01/06/2010 | **Status Conference Hearing** (9:00 AM)  (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*Notice given in open crt.* | |
| 01/06/2010 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 01/06/2010 | Court Entries<br>*CL-29,530-A 01/06/2010 COURT ENTRIES ATTY KELLY MCKINNIS & PARTIES PRESENT FOR HRG; CASE RESET FOR 2/9/10-9:30AM. COURT ENTRIES (COURT)* | |
| 01/06/2010 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | Vol./Book EJ |
| 01/05/2010 | Clerk's Entry<br>*CL-29,530-A 01/05/2010 CLERK'S ENTRY VOL 3 OF BOX SENT UP FOR DOCKET 1/06/10 CLERK'S ENTRY (CLERKSENTRY)* | Vol./Book SAMANT |
| 12/29/2009 | Copies Mailed to Attorney(s)<br>*CL-29,530-A 12/29/2009 COPIES MAILED TO ATT JOHNNY & TERESA PARTAIN; JAMES &KATHERINE MAPLES;KELLY MCKINNIS COPIES MAILED TO ATTY(S) (COPY)* | Vol./Book EJ |
| 12/29/2009 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book EJ |
| 12/28/2009 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 12/28/2009 | Order Signed<br>*CL-29,530-A 12/28/2009 ORDER, SIGNED TURNOVER ORDER OF MINERAL RIGHTS ORDER, SIGNED (OS)* | |
| 12/22/2009 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | Vol./Book EJ |
| 12/22/2009 | File Checked In<br>*FILE CHECKED IN (FCI)* | Vol./Book EJ |



Date: _____ **JAN 1 6 2025**

I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

BY: _____

Deputy Clerk

| | | |
|---|---|---|
| 12/21/2009 | **Show Cause Hearing (JP-OCA)** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") <br> *on Turnover Order No. 5; notice given in open crt.* | |
| 12/21/2009 | File Sent to County Clerk <br> *FILE SENT TO COUNTY CLERK (FSCL)* | |
| 12/21/2009 | Court Entries <br> *CL-29,530-A 12/21/2009 COURT ENTRIES ATTY KELLY MCKINNIS & PARTIES PRESENT FOR HRG; CASE RESET FOR STATUS & TURNOVER REQUEST ON 1/6/10-9AM. COURT ENTRIES (COURT)* | |
| 12/21/2009 | 📄 Motion <br> *CL-29,530-A 12/21/2009 MOTION MOTION FOR TURNOVER RELIEF WITH ORDER ATTACHED MOTION (MOT)* | *Vol./Book EJ* |
| 12/18/2009 | File Checked Out <br> *FILE CHECKED OUT (FCO)* | *Vol./Book EJ* |
| 12/18/2009 | Clerk's Entry <br> *CL-29,530-A 12/18/2009 CLERK'S ENTRY SENT UP VOL 3 ONLY FOR DOCKET 12/21/09 CLERK'S ENTRY (CLERKSENTRY)* | *Vol./Book SAMAN₁* |
| 12/16/2009 | **Show Cause Hearing (JP-OCA)** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") <br> *on Turnover Order No. 5* | |
| 12/16/2009 | File Checked In <br> *FILE CHECKED IN (FCI)* | *Vol./Book JOANN* |
| 12/16/2009 | File Sent to County Clerk <br> *FILE SENT TO COUNTY CLERK (FSCL)* | |
| 12/16/2009 | Court Entries <br> *CL-29,530-A 12/16/2009 COURT ENTRIES ATTY TOM WAYLAND & PLTFF JOHNNY PARTAIN PRESENT FOR HRG; CASE RESET FOR 12/21/09-9AM. COURT ENTRIES (COURT)* | |
| 12/15/2009 | File Checked Out <br> *FILE CHECKED OUT (FCO)* | *Vol./Book EJ* |
| 12/15/2009 | Clerk's Entry <br> *CL-29,530-A 12/15/2009 CLERK'S ENTRY SENT UP VOL 3 ONLY W/ORDER (MOTION FOR CONTINUANCE) ATTACHED FOR DOCKET 12/16/09 CLERK'S ENTRY (CLERKSENTRY)* | *Vol./Book SAMAN₁* |
| 12/15/2009 | 📄 Motion for Continuance (OCA) <br> *CL-29,530-A 12/15/2009 MOTION FOR CONTINUAN DEFENDANT JAMES H. MAPLES MOTION FOR CONTINUANCE WITH ORDER ATTACHED MOTION FOR CONTINUANCE (MFCONT)* | *Vol./Book EJ* |
| 12/02/2009 | File Sent to County Clerk <br> *FILE SENT TO COUNTY CLERK (FSCL)* | |
| 12/02/2009 | 📄 Order Signed <br> *CL-29,530-A 12/02/2009 ORDER, SIGNED FOR APPEARANCE & SCHEDULING OF A SHOW CAUSE HRG ON TURNOVER ORDER NO. 5 SET: 12/16/09 AT 9:00 A.M.; O/M JOHNNY PARTAIN & TERESA PARTAIN, JAMES MAPLES & KATHERINE MAPLES & KELLY MCKINNIS ORDER, SIGNED (OS)* | |
| 12/01/2009 | | *Vol./Book EJ* |

File Checked In
*FILE CHECKED IN (FCI)*

| | | |
|---|---|---|
| 11/24/2009 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | *Vol./Book EJ* |
| 11/20/2009 | Clerk's Entry<br>*CL-29,530-A 11/20/2009 CLERK'S ENTRY SENT VOLUME 3 OF BOX WITH ORDER CLERK'S ENTRY (CLERKSENTRY)* | *Vol./Book SANDRA* |
| 11/19/2009 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 11/17/2009 | File Requested From Storage<br>*CL-29,530-A 11/17/2009 FILE REQUESTED FROM ORDER FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book SAMAN1* |
| 11/16/2009 | Motion<br>*CL-29,530-A 11/16/2009 MOTION PLAINTIFF'S MOTION FOR HEARING WITH ORDER FOR APPEARANCE AND SCHEDULING OF A SHOW CAUSE HEARING ON TURNOVER ORDER NO. 5 MOTION (MOT)* | *Vol./Book EJ* |
| 10/28/2009 | Other<br>*CL-29,530-A 10/28/2009 OTHER OFFICIAL NOTICE FROM SUPREME COURT OF TEXAS SEND TO COURT OTHER (OTH)* | *Vol./Book EJ* |
| 10/27/2009 | Other<br>*CL-29,530-A 10/27/2009 OTHER OFFICIAL NOTICE FROM SUPREME COURT OF TEXAS DENIED PETITION FOR WRIT OF MANDAMUS OTHER (OTH)* | *Vol./Book EJ* |
| 02/06/2009 | File Checked In<br>*FILE CHECKED IN (FCI)* | *Vol./Book DANNY* |
| 02/05/2009 | File Sent to County Clerk<br>*FILE SENT TO COUNTY CLERK (FSCL)* | |
| 02/05/2009 | Order Signed<br>*CL-29,530-A 02/05/2009 ORDER, SIGNED DENYING DEFS' M/RECONSIDER TURNOVER ORDER, M/STAY TURNOVER ORDER & IN THE ALTERNATIVE, M/EXTENSION OF TIME TO COMPLY WITH TURNOVER ORDER ORDER, SIGNED (OS)* | |
| 01/28/2009 | Order, Signed<br>*ORDER DENYING SECOND MOTION TO AMEND ORDERS AND FOR RECONSIDERATION* | |
| 01/22/2009 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | |
| 01/21/2009 | Clerk's Entry<br>*CL-29,530-A 01/21/2009 CLERK'S ENTRY SEND RECENT FILE UPSTAIRS TO COURT CLERK'S ENTRY (CLERKSENTRY)* | |
| 01/16/2009 | Supplemental<br>*CL-29,530-A 01/16/2009 SUPPLEMENTAL PLTFS SUPPLEMENTAL MOTION FOR A SHOW CAUSE HRG AND ENFORCEMENT OF TURNOVER ORDER NO 5-WITH ORDER SUPPLEMENTAL (SUPPLE)* | |
| 11/12/2008 | | |

I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

Date:

JAN 16 2025

By:

Deputy Clerk

Other
CL-29,530-A 11/12/2008 OTHER OFFICIAL NOTICE FROM SUPREME COURT-
MANDAMUS RECEIVED AND FILED IN SUPREME COURT OTHER (OTH)

10/27/2008    Other
CL-29,530-A 10/27/2008 OTHER LETTER FROM SUPREME COURT OF TEXAS - AUSTIN
TO: COUNSEL OTHER (OTH)

10/22/2008    Other
CL-29,530-A 10/22/2008 OTHER WRIT OF MANDAMUS RECIEVED IN THE 13 COURT
OF APPEALS OTHER (OTH)

10/21/2008    **Motion for Turnover Relief** (10:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")
*for Aug 2008 & pltff's M/Show Cause Hrg & Enforce of Turnover Order No. 5; notice given in
open crt. (to be heard by CC#5)*

10/21/2008    File Checked In
CL-29,530-A 10/21/2008 FILE CHECKED IN FILE FILE CHECKED IN (FCI)

10/21/2008    Letter Received
CL-29,530-A 10/21/2008 LETTER RECEIVED VIA FAX FROM SUPREME COURT OF
TEXAS ADVISING TEMPORARY RELIEF IN THE FORM OF ORDER STAYING
PROCEEDINGS LETTER RECEIVED (LR)

10/21/2008    Court Entries
CL-29,530-A 10/21/2008 COURT ENTRIES COURT 5 SCHEDULED TO HEAR CASE THIS
MORNING; SUPREME COURT STAYED PROCEEDINGS COURT ENTRIES (COURT)

10/20/2008    Writ of Mandamus
CL-29,530-A 10/20/2008 WRIT OF MANDAMUS FILED W/SUPREME COURT OF TEXAS
WRIT OF MANDAMUS (WRIT.M)

10/20/2008    File Checked Out
CL-29,530-A 10/20/2008 FILE CHECKED OUT LATEST FILE ONLY IN BOX - WALKED
UP BY MARTHA FILE CHECKED OUT (FCO)

10/15/2008    File Checked In                                     *Vol./Book CAROL*
CL-29,530-A 10/15/2008 FILE CHECKED IN LATEST VOLUME-CASE BELONGS IN A
BOX.. FILE CHECKED IN (FCI)

10/14/2008    **Motion for Turnover Relief** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")
*for Aug 2008 & Plf's M/Show Cause Hrg & Enforce of Turnover Ord No. 5*

10/14/2008    Special Appearance
CL-29,530-A 10/14/2008 SPECIAL APPEARANCE SPECIAL APPEARANCE OF
DEFENDANTS JAMES MAPLES AND KATHY MAPLES SPECIAL APPEARANCE (SPAPP)

10/14/2008    Court Entries
CL-29,530-A 10/14/2008 COURT ENTRIES ATTY KELLY MCKINNIS & JOHNNY PARTAIN
PRESENT FOR HRG; CASE RESET FOR 10/21/08-10AM. COURT ENTRIES (COURT)

10/10/2008    Other
CL-29,530-A 10/10/2008 OTHER FROM COURT OF APPEALS - DENIED WITH
MEMORANDUM OPINION OTHER (OTH)

10/09/2008    Order, Signed
*ORDER DENYING MOTION TO AMEND ORDER*



Date: JAN 16 2025
I, Arturo Guajardo, Jr. County Clerk do
hereby certify that this is a true and
correct copy of the original document
filed in my office
By:
Deputy Clerk

| 10/09/2008 | Clerk's Entry | *Vol./Book MARTH.* |
| | *CL-29,530-A 10/09/2008 CLERK'S ENTRY SEND RECENT FILE UP TO COURT CLERK'S ENTRY (CLERKSENTRY)* | |

| 10/09/2008 | 🗎 Order Setting Hearing | |
| | *CL-29,530-A 10/09/2008 ORDER SETTING HEARIN M/TURNOVER RELIEF FOR AUG 2008 & PLF'S M/SHOW CAUSE HRG & ENFORCE OF TURNOVER ORDER NO. 5 SET: 10/14/08 AT 9:00 A.M.; O/F WILLIAM E. CORCORAN & NOTICE GIVEN TO JUAN OF KELLY MCKINNIS' OFFICE (FAX NOT WORKING - MESSAGE ON FAX: CALL TECHNICIAN) & MAILED TO PARTAINS & MAPLES ORDER SETTING HEARING SIGNED (OSHS)* | |

| 10/09/2008 | File Checked Out | |
| | *CL-29,530-A 10/09/2008 FILE CHECKED OUT SEND RECENT FILE UP TO COURT FILE CHECKED OUT (FCO)* | |

| 10/09/2008 | 🗎 Order Setting Hearing, Received | |
| | *CL-29,530-A 10/09/2008 OSH/ORDERRCVD TURNOVER ORDER NO 6 FILED BY JOHNNY PARTAIN OSH/ORDERRCVD (OSH/ORDERRCVD)* | |

| 10/09/2008 | 🗎 Order Setting Hearing, Received | *Vol./Book DANNY* |
| | *CL-29,530-A 10/09/2008 OSH/ORDERRCVD ORDER FOR HEARING RECEIVED OSH/ORDERRCVD (OSH/ORDERRCVD)* | |

| 09/19/2008 | Other | |
| | *CL-29,530-A 09/19/2008 OTHER RE: JAMES MAPLES AND KATHY MAPLES - THIRTEENTH COURT OF APPEALS OTHER (OTH)* | |

| 09/16/2008 | 🗎 Notice | *Vol./Book MARTH.* |
| | *CL-29,530-A 09/16/2008 NOTICE RECEIVED FROM 13TH COURT OF APPEALS STATING THEY RECEIVED THE RELATOR'S PETITION ON 09-03-08(NOTICE DID NOT HAVE DATE STAMP NOTICE (NOTICE)* | |

| 09/09/2008 | 🗎 Appeals Court | |
| | *CL-29,530-A 09/09/2008 APPEALS COURT LTR REC'D ENCLOSING ORDER STAYING PROCEEDINGS APPEALS COURT (AC)* | |

| 09/04/2008 | **Motion** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") | |
| | *for turnover relief 2008 & Show Cause Hrg on Turnover Ord No. 5* | |

| 09/04/2008 | 🗎 Court Entries | |
| | *CL-29,530-A 09/04/2008 COURT ENTRIES ATTY KELLY MCKINNIS & JOHNNY PARTAIN-PRO SE PRESENT FOR HRG; ORDER STAYING PROCEEDINGS REC'D BY COURT OF APPEALS; CRT WILL TAKE NO ACTION UNTIL FURTHER NOTICE FROM THE COURT OF APPEALS. COURT ENTRIES (COURT)* | |

| 09/04/2008 | 🗎 Certificate of Service, Filed | |
| | *CERTIFICATE OF SERVICE (CERT.SERVICE)* | |

| 09/03/2008 | File Received From Storage | |
| | *FILE RECIEVED FROM STORAGE (FREC)* | |

| 09/03/2008 | File Checked In | |
| | *FILE CHECKED IN (FCI)* | |

| 09/03/2008 | Clerk's Entry | *Vol./Book CAROL1* |
| | *CL-29,530-A 09/03/2008 CLERK'S ENTRY FILE REQUESTED-HRG 9/4 CLERK'S ENTRY (CLERKSENTRY)* | |

I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

Date: JAN 16 2025

By: _____ Deputy Clerk

| | | |
|---|---|---|
| 08/29/2008 | Order Signed<br>*CL-29,530-A 08/29/2008 ORDER, SIGNED ORDER FOR APPEARANCE AND A SHOW CAUSE HEARING ON TURNOVER ORDER NO.5 ORDER, SIGNED (OS)* | *Vol./Book BRAND1* |
| 08/29/2008 | Motion to Show Cause Filed By Parties (OCA)<br>*CL-29,530-A 08/29/2008 MOTION TO SHOW CAUSE PLTFS MOTION FOR SHOW CAUSE HRG AND ENFORCEMENT OF TURNOVER ORDER NO 5 WITH ORDER MOTION TO SHOW CAUSE (MOTSC)* | |
| 08/29/2008 | Order Setting Hearing<br>*ORDER SETTING HEARING SIGNED (OSHS)* | |
| 08/28/2008 | Motion for Reconsideration, Filed<br><br>*CL-29,530-A 08/28/2008 MOTION FOR RECONSIDE DEF MOTION TO RECONSIDER TURNOVER ORDER MOTION TO STAY TURNOVER ORDER AND IN THE ALTERNATIVE MOTION FOR EXTENSION OF TIME TO COMPLY WITH TURNOVER ORDER WITH ORDER ATTACHED MOTION FOR RECONSIDERATION (MFR)* | *Vol./Book CAROL1*<br><br>*Page EFILED* |
| 08/25/2008 | Certificate of Service, Filed<br>*CL-29,530-A 08/25/2008 CERTIFICATE OF SERVI FILED BY JOHNNY PARTAIN CERTIFICATE OF SERVICE (CERT.SERVICE)* | |
| 08/18/2008 | Order Signed<br>*CL-29,530-A 08/18/2008 ORDER, SIGNED TURNOVER ORDER HRG; MTN FOR TURNOVER RELIEF 2008 SET FOR 9/4/08-9AM; O/M TO JOHNNY PARTAIN/TERESA PARTAIN, JAMES MAPLES/KATHERINE MAPLES & WILLIAM CORCORAN. ORDER, SIGNED (OS)* | |
| 08/18/2008 | Order Signed<br>*CL-29,530-A 08/18/2008 ORDER, SIGNED TURNOVER ORDER NO. 5 ORDER, SIGNED (OS)* | |
| 08/18/2008 | Court Entries<br>*CL-29,530-A 08/18/2008 COURT ENTRIES PLTFF JOHNNY PARTAIN PRESENT IN COURT; TURNOVER ORDER NO. 5 SIGNED; TURNOVER ORDER HEARING SIGNED. COURT ENTRIES (COURT)* | |
| 08/18/2008 | Clerk's Entry<br>*CL-29,530-A 08/18/2008 CLERK'S ENTRY MOTION FILED TODAY, WALKED UP BY BRANDY TO COURTROOM AS PER JUDGE'S REQUEST STILL WAITING ON FILE FROM STORAGE CLERK'S ENTRY (CLERKSENTRY)* | *Vol./Book CAROL1* |
| 08/18/2008 | Motion<br>*CL-29,530-A 08/18/2008 MOTION MOTION FOR TURNOVER RELIEF FOR AUGUST 2008 WITH EXHIBIT ATTACHED AND TURNOVER ORDER HRG ATTACHED MOTION (MOT)* | |
| 06/20/2008 | File Checked In<br>*FILE CHECKED IN (FCI)* | *Vol./Book ART* |
| 06/20/2008 | File Received From Storage<br>*FILE RECIEVED FROM STORAGE (FREC)* | *Vol./Book ART* |
| 06/18/2008 | File Requested From Storage<br>*CL-29,530-A 06/18/2008 FILE REQUESTED FROM FOR JOHNNY PARTAIN TO REVIEW FILE REQUESTED FROM STORAGE (FREQ)* | |

I, Arturo Guerardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office.

Date:
By:
Deputy Clerk

JAN 16 2025

| | | |
|---|---|---|
| 06/16/2008 | Order, Signed<br>*ORDER ON CREDITOR, JOHNNY PARTAIN'S THIRD COMPLAINT OF DEBTORS'<br>DEFAULT OF PLAN PAYMENT* | |
| 03/05/2007 | File Requested From Storage<br>*FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book BV* |
| 04/17/2006 | File Requested From Storage<br>*CL-29,530-A 04/17/2006 FILE REQUESTED FROM VIA PHONED TO<br>BRENDA/REQUESTED FOR KELLY MCCKINNIS FILE REQUESTED FROM STORAGE<br>(FREQ)* | *Vol./Book CRYSTA* |
| 04/04/2006 | File Sent to Storage<br>*FILE SENT TO STORAGE (FSTS)* | *Vol./Book NORMA* |
| 04/04/2006 | File Received From Storage<br>*FILE RECIEVED FROM STORAGE (FREC)* | *Vol./Book NORMA* |
| 03/27/2006 | File Sent to Storage<br>*CL-29,530-A 03/27/2006 FILE SENT TO STORAGE INFO OBATINED SENT BACK TO<br>STORAGE FILE SENT TO STORAGE (FSTS)* | *Vol./Book RAUDEl* |
| 03/23/2006 | File Received From Storage<br>*FILE RECIEVED FROM STORAGE (FREC)* | *Vol./Book NORMA* |
| 03/22/2006 | File Requested From Storage<br>*CL-29,530-A 03/22/2006 FILE REQUESTED FROM ATTY JOHNNY PARTAIN FILE<br>REQUESTED FROM STORAGE (FREQ)* | *Vol./Book RAUDEl* |
| 03/01/2006 | Letter Received<br>*CL-29,530-A 03/01/2006 LETTER RECEIVED FROM 13TH COURT OF APPEALS - CASE<br>DISMISSED FOR WANT OF PROSECUTION ON DEC 1, 2005 LETTER RECEIVED (LR)* | |
| 02/17/2006 | File Sent to Storage<br>*CL-29,530-A 02/17/2006 FILE SENT TO STORAGE NO FUTURE HRGS-IT'S A BOX<br>(BROWN) SENT TO STORAGE FILE SENT TO STORAGE (FSTS)* | *Vol./Book CAROL* |
| 11/22/2005 | Abstract of Judgement (Fee)<br>*CL-29,530-A 11/22/2005 ABSTRACT OF JUDGMENT ISSUED ON MAPLES BY JOHNNY<br>PARTAIN-PICKED UP BY JOHNNY PARTAIN ON SAME DAY ABSTRACT OF JUDGMENT<br>(ABST)* | *Vol./Book CELIND* |
| 11/04/2005 | File Received From Storage<br>*FILE RECIEVED FROM STORAGE (FREC)* | |
| 11/04/2005 | File Requested From Storage<br>*CL-29,530-A 11/04/2005 FILE REQUESTED FROM FOR COPIES REQ'D FOR ATLAS &<br>HALL FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book CAROL}* |
| 10/18/2005 | File Sent to Document Storage<br>*FILE SENT TO DOCUMENT STORAGE (DS)* | |
| 10/13/2005 | File Received From Storage<br>*CL-29,530-A 10/13/2005 FILE RECIEVED FROM S REQUESTED BY ROBERTO RAMOS -<br>ATTNY - IN THE FILE ROOM HUGE ACCORDIAN FILE RECIEVED FROM STORAGE<br>(FREC)* | *Vol./Book CAROL}* |
| 10/07/2005 | Abstract of Judgement (Fee) | |

Date: **JAN 1 6 2025**

I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

By: _____
Deputy Clerk

| | | |
|---|---|---|
| 10/07/2005 | File Requested From Storage<br>*CL-29,530-A 10/07/2005 FILE REQUESTED FROM FOR ROBERTO RAMOS FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book CAROL1* |
| 10/05/2005 | File Requested From Storage<br>*FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book CAROL1* |
| 10/03/2005 | File Requested From Storage<br>*FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book CAROL1* |
| 09/08/2005 | File Sent to Document Storage<br>*CL-29,530-A 09/08/2005 FILE SENT TO DOCUMEN CAME DOWN FROM UPSTAIRS, NO FUTURE HRGS FILE SENT TO DOCUMENT STORAGE (DS)* | *Vol./Book CAROL1* |
| 09/08/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 07/26/2005 | File Checked Out<br>*CL-29,530-A 07/26/2005 FILE CHECKED OUT TO CINDI COURT REPORTER FILE CHECKED OUT (FCO)* | *Vol./Book CAROL1* |
| 07/22/2005 | File Requested From Storage<br>*CL-29,530-A 07/22/2005 FILE REQUESTED FROM FOR CINDI COURT REPORTER FILE REQUESTED FROM STORAGE (FREQ)* | |
| 07/01/2005 | File Sent to Storage<br>*FILE SENT TO STORAGE (FSTS)* | *Vol./Book CAROL1* |
| 06/24/2005 | Other<br>*OTHER (OTH)* | |
| 06/13/2005 | Supplemental<br>*CLERK'S RECORD APPEAL* | |
| 06/09/2005 | Other<br>*BILL OF COSTS* | |
| 05/24/2005 | Supplemental<br>*CL-29,530-A 05/24/2005 SUPPLEMENTAL SUPPLEMENTAL APPEAL WALKED OVER - "MOTION FOR RECONSIDERATION" REQUESTED BY COURT OF APPEALS ON 5/23/05 SUPPLEMENTAL (SUPPLE)* | *Vol./Book CAROL1* |
| 05/23/2005 | Clerk's Record Filed<br>*APPEAL* | |
| 05/23/2005 | Phone Call<br>*CL-29,530-A 05/23/2005 PHONE CALL MADE A PHONE CALL TO COURT OF APPEALS-READY TO TURN IN DESGNATION OF MR. KELLY MCKINNIS RECORD TODAY-QUESTIONED MR. PARTAIN'S DESGNATION FILED ON 5/19/05 SHOULD I DO A SUPPLEMENTAL? COURTS OF APPEALS SAYS "YES" PHONE CALL (P/C)* | *Vol./Book CAROL1* |
| 05/19/2005 | Designation of Clerk's Record<br>*CL-29,530-A 05/19/2005 DESIGNATION OF CLERK FILED BY JOHNNY PARTAIN "DESIGNATION OF CLERKS RECORD"-NOT THE APPEALANT DESIGNATION OF CLERK'S RECORD (DESIGN.CR)* | *Vol./Book CAROL1* |
| 05/16/2005 | Clerk's Entry<br>*CL-29,530-A 05/16/2005 CLERK'S ENTRY MAILED OUT CERTIFIED BILL OF COSTS TO* | *Vol./Book CAROL1* |

Date: **JAN 1 6 2025**
I, Arturo Guajardo Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office
By:_____
Deputy Clerk

*Printed on 01/16/2025 at 3:03 PM*

*KELLY MCKINNIS ON TRANSCRIPT (APPEAL) TOTALING $112.00 CLERK'S ENTRY (CLERKSENTRY)*

| | | |
|---|---|---|
| 05/16/2005 | File Received From Storage<br>*CL-29,530-A 05/16/2005 FILE RECIEVED FROM S BY CAROLYN-CLERK CC#1 FILE RECIEVED FROM STORAGE (FREC)* | *Vol./Book CAROLI* |
| 05/13/2005 | File Requested From Storage<br>*CL-29,530-A 05/13/2005 FILE REQUESTED FROM REGARDING APPEAL FILE REQUESTED FROM STORAGE (FREQ)* | *Vol./Book CAROLI* |
| 05/13/2005 | Request for Clerk's Record<br>*CL-29,530-A 05/13/2005 REQUEST FOR CLERK'S REQUEST FOR PREPARATION OF CLERKS RECORD AND DESIGNATION OF MATTER TO BE INCLUDED FILED BY KELLY K MCKINNIS REQUEST FOR CLERK'S RECORD (RFCR)* | |
| 05/13/2005 | Request for Court Reporter's Record<br>*CL-29,530-A 05/13/2005 REQUEST FOR COURT RE REQUEST FOR COURT REPORTERS RECORD AND DESIGNATION OF MATTERS TO BE INCLUDED FILED BY ATTNY KELLY K MCKINNIS REQUEST FOR COURT REPORTER'S RECORD (RFCRR)* | |
| 05/13/2005 | Notice of Appeal<br>*CL-29,530-A 05/13/2005 NOTICE OF APPEAL DEFENDANTS NOTICE (JAMES H MAPLES AND KATHY MAPLES FILED BY ATTNY KELLY K MCKINNIS) NOTICE OF APPEAL (NOTAPP)* | |
| 04/11/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 04/07/2005 | **Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*(Def's Mtn. to Vacate Turnover Orders)* | |
| 04/07/2005 | Order Signed<br>*CL-29,530-A 04/07/2005 ORDER, SIGNED RE: DEF'S MOTION TO VACATE TURNOVER ORDERS: PREVIOUS ORDERS SIGNED ON 1/27/05 SHALL REMAIN EFFECTIVE; ORDER MAILED TO JOHNNY PARTAIN, HECTOR P. GONZALEZ, WILLIAM E. CORCORAN & KELLY MCKINNIS ORDER, SIGNED (OS)* | |
| 04/07/2005 | Court Entries<br>*CL-29,530-A 04/07/2005 COURT ENTRIES COURT WILL NOT VACATE PREVIOUS ORDER SIGNED ON 1/27/05 COURT ENTRIES (COURT)* | |
| 04/05/2005 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | |
| 04/05/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* | |
| 04/04/2005 | Order Setting Hearing<br>*CL-29,530-A 04/04/2005 ORDER SETTING HEARIN DEF'S MTN. TO VACATE TURNOVER ORDERS: 4.7.05; NOTICE MAILED TO ATTY. KELLY MCKINNIS & JOHNNY & TERESA PARTAIN ORDER SETTING HEARING (OSH)* | |
| 04/04/2005 | File Checked Out<br>*FILE CHECKED OUT (FCO)* | |
| 04/01/2005 | Notice of Appearance, Filed<br>*CL-29,530-A 04/01/2005 NOTICE OF APPEARANCE NOTICE OF APPEARANCE AS CO COUNSEL FOR DEF'S NOTICE OF APPEARANCE (NAPPEAR)* | |

Date: **JAN 1 6 2025**
I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office
By: _____
Deputy Clerk

| | |
|---|---|
| 04/01/2005 | Notice<br>*CL-29,530-A 04/01/2005 NOTICE DEFENDANTS NOTICE OF LISTING OF AUTOMATIC STAY NOTICE (NOTICE)* |
| 04/01/2005 | Motion to Vacate, Filed<br>*1029530 04/01/2005 MOTION TO VACATE DEF'S MOTION TO VACATE MOTION TO VACATE (MTV)* |
| 02/18/2005 | Letter Received<br>*1029530 02/18/2005 LETTER RECEIVED FROM AG EDWARDS & SONS INC. REGARDING TURNOVER ASSETS OF JAMES MAPLES ETC LETTER RECEIVED (LR)* |
| 02/16/2005 | **Temporary Restraining Order Hearing** (10:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| 02/16/2005 | **Motion for Reconsideration** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*(Def's Mtn for Reconsideration)(reset to 2.11.05)* |
| 02/16/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 02/16/2005 | Notice of Bankruptcy<br>*1029530 02/16/2005 NOTICE OF BANKRUPTCY DEFENDANT'S PLEA OF BANKRUPCTY FILED BY KELLY K MCKINNIS ATTNY NOTICE OF BANKRUPTCY (NOT)* |
| 02/15/2005 | Order Signed<br>*1029530 02/15/2005 ORDER, SIGNED ORDER FINDING COMPLAINCE BY TEXAS STATE BANK AND AWARDING ATTY FEES SIGNED ORDER, SIGNED (OS)* |
| 02/14/2005 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 02/14/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 02/11/2005 | **Motion to Stay** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| 02/11/2005 | **Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*(Motion for Turnover Relief)* |
| 02/11/2005 | **Motion for Reconsideration** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*(Def's Mtn for Reconsideration)* |
| 02/11/2005 | Letter Received |
| 02/11/2005 | Application for Turnover Relief (OCA)<br>*1029530 02/11/2005 APPLICATION FOR TURN THIRD APPLICATION FOR TURNOVER RELIEF APPLICATION FOR TURNOVER RELIEF (APP.TO)* |
| 02/11/2005 | Motion to Withdraw Funds, Filed<br>*CL-29,530-A 02/11/2005 MOTION TO WITHDRAW F FIRST MOTION TO RELEASE ASSETS FILED BY JOHNNY PARTIAN MOTION TO WITHDRAW FUNDS (MWF)* |
| 02/11/2005 | Motion for Hearing<br>*1029530 02/11/2005 MOTION FOR HEARING MOTION FOR HEARGIN ON CONTEMPT* |



*FILED BY JOHNNY PARTAIN MOTION FOR HEARING (MOTHEAR)*

02/11/2005 | Notice of Filing, Filed
*1029530 02/11/2005 NOTICE OF FILING NON PARTY TEXAS STATE BANK FILING IN COMPLIANCE WITH TURNOVER ORDER NOTICE OF FILING (NOTFIL)*

02/08/2005 | Application for Temporary Restraining Order (OCA)
*APPLICATION FOR TEMPORARY RESTRAINING ORDER (APP.TRO)*

02/04/2005 | Request
*1029530 02/04/2005 REQUEST PLTFS REQUEST FOR STANDARD OF CARE FILED BY JOHNNY PARTAIN XXX-REQUEST - DO NOT USE (REQUEST)*

02/04/2005 | Order Setting Hearing
*1029530 02/04/2005 ORDER SETTING HEARIN DEF'S MOTION TO STAY: 2.11.05 ORDER SETTING HEARING (OSH)*

02/04/2005 | File Checked Out
*FILE CHECKED OUT (FCO)*

02/04/2005 | First Amended
*1029530 02/04/2005 FIRST AMENDED DEFENDANT'S FIRST AMENDED MOTION TO STAY FIRST AMENDED (1ST)*

02/04/2005 | Order Signed
*1029530 02/04/2005 ORDER, SIGNED ORDER SETTING ASIDE DEFENDANTS' MOTION TO STAY SIGNED ON 2/1/05. ORDER, SIGNED (OS)*

02/02/2005 | File Checked In
*FILE CHECKED IN (FCI)*

02/02/2005 | File Checked Out
*FILE CHECKED OUT (FCO)*

02/01/2005 | Notice of Appearance, Filed
*1029530 02/01/2005 NOTICE OF APPEARANCE FILED BY ATTNY WILLIAM CORCORAN NOTICE OF APPEARANCE (NAPPEAR)*

02/01/2005 | File Checked In
*FILE CHECKED IN (FCI)*

02/01/2005 | Order Setting Hearing
*1029530 02/01/2005 ORDER SETTING HEARIN DEF'S MTN TO STAY SET FOR 2/11/05- 9:00A.M ORDER SETTING HEARING (OSH)*

02/01/2005 | Motion to Stay, Filed
*CL-29,530-A 02/01/2005 MOTION FOR STAY DEFENDANT'S MOTION TO STAY MOTION FOR STAY (MOTSTAY)*

01/31/2005 | Notice of Hearing
*1029530 01/31/2005 NOTICE OF HEARING COURT RESET DEF'S MTN FOR RECONSIDERATION FROM 2/16/05- TO 2/11/05 - 9:00 A.M- NOTICE OF HRG MAILED OUT TO JOHNNY PARTAIN & TERESA PARTAIN & JAMES & KATHERINE MAPLES NOTICE OF HEARING (NOT.H)*

01/31/2005 | Order Setting Hearing
*1029530 01/31/2005 ORDER SETTING HEARIN MTN FOR TURNOVER RELIEF SET FOR*



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office
Date:
JAN 16 2025
By:
Deputy Clerk

Printed on 01/16/2025 at 3:03 PM

*2/11/05- 9:00 A.M. ORDER SETTING HEARING (OSH)*

| | |
|---|---|
| 01/31/2005 | **Motion**<br>*1029530 01/31/2005 MOTION MOTION FOR TURNOVER RELIEF MOTION (MOT)* |
| 01/31/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 01/28/2005 | Order Setting Hearing<br>*1029530 01/28/2005 ORDER SETTING HEARIN MTN FOR RECONSIDERATION SET FOR 2/16/05- 9:00A.M. ORDER SETTING HEARING (OSH)* |
| 01/28/2005 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 01/28/2005 | Motion for Reconsideration, Filed<br>*MOTION FOR RECONSIDERATION (MFR)* |
| 01/27/2005 | **Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*(PL's 3rd attempt to collect Judgment & Substitute Mtn for Turnover)* |
| 01/27/2005 | Motion for Hearing<br>*1029530 01/27/2005 MOTION FOR HEARING MOTION FOR EXPARTE HEARING MOTION FOR HEARING (MOTHEAR)* |
| 01/27/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 01/27/2005 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 01/27/2005 | Order Signed<br>*1029530 01/27/2005 ORDER, SIGNED ORDER FOR TURNOVER MINERAL RIGHTS SIGNED, ACCT TURNOVER ORDER, ORDER ON JAMES MAPLES & KATHERINE MAPLES- ORDER ON GLOBAL LIMO INCORP. SIGNED 4 ORDERS ORDER, SIGNED (OS)* |
| 01/05/2005 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 01/04/2005 | Memorandum<br>*1029530 01/04/2005 MEMORANDUM REF TO DEF'S OBJECTIONS TO NOT. OF HR- MTN & FAIT DON'T MATCH- CAN'T SET THIS MTN. MEMORANDUM (MEMO)* |
| 12/14/2004 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 12/13/2004 | Objection<br>*1029530 12/13/2004 OBJECTION DEF'S OBJECTION TO NOTICE OF HEARING OBJECTION (OBJ)* |
| 12/08/2004 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 12/08/2004 | Notice of Hearing<br>*1029530 12/08/2004 NOTICE OF HEARING HRG SET FOR 1/27/05-9:00 A.M.- PL'S 3RD ATTEMPT TO COLLECT JUDGMENT & SUBSTITUTE MTN FOR TURNOVER NOTICE OF HEARING (NOT.H)* |



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

Date:

By: Deputy Clerk

JAN 16 2025

| 12/07/2004 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
|---|---|
| 12/01/2004 | Motion<br>*1029530 12/01/2004 MOTION PLTF THIRD ATTEMPT TO COLLECT JUDMT AND SUBSTITUTE MOTION FOR TURNOVER MOTION (MOT)* |
| 10/25/2004 | Order, Signed<br>*FOREGOING MOTION* |
| 10/25/2004 | File Checked In<br>*FILE CHECKED IN (FCI)* |
| 10/25/2004 | Court Entries<br>*1029530 10/25/2004 COURT ENTRIES NEED "MOTION FOR TURNOVER RELIEF" FILED BEFORE CASE CAN BE SET FOR HEARING. PLAINTIFF FILED ONLY A "NOTICE OF HEARING". COURT ENTRIES (COURT)* |
| 10/05/2004 | File Checked Out<br>*FILE CHECKED OUT (FCO)* |
| 05/10/2004 | Letter Received<br>*1029530 05/10/2004 LETTER RECEIVED FROM SUPREME COURT OF TX LETTER RECEIVED (LR)* |
| 04/05/2004 | Notice<br>*1029530 04/05/2004 NOTICE OFFICIAL NOTICE FROM SUPEME COURT OF TEXAS "SUPREME COURT RECEIVED AND FILED A RELATORS MOTION FOR REHEARING OF THE PETITION FOR WRIT OF MANDAMUS NOTICE (NOTICE)* |
| 03/26/2004 | Memorandum<br>*1029530 03/26/2004 MEMORANDUM COPY OF "MOTION FOR REHEARING PETITION FOR WRIT OF MANDAMUS AND RENDITION OF LAW" FILED BY PARTAIN MEMORANDUM (MEMO)* |
| 03/16/2004 | Letter Received<br>*1029530 03/16/2004 LETTER RECEIVED FROM SUPREME COURT COURT-DENIED THE PETITION FOR WRIT OF MANDAMUS IN CASE LETTER RECEIVED (LR)* |
| 02/19/2004 | Certified Mail<br>*CERTIFIED MAIL (CM)* |
| 02/19/2004 | Notice<br>*1029530 02/19/2004 NOTICE RECEIVED OFFICIAL NOTICE FROM COURT OF APPEALS MOTIO TO WITHDRAW RECORD WAS GRANTED BY COURT ON THURS. 1/29/04 NOTICE (NOTICE)* |
| 02/19/2004 | Notice<br>*1029530 02/19/2004 NOTICE RECEIVED FROM SUPREME COURT : PETITION FOR WRIT OF MANDAMUS WAS RECVD AND FILED NOTICE (NOTICE)* |
| 02/05/2004 | Writ of Mandamus<br>*1029530 02/05/2004 WRIT OF MANDAMUS NOTICE FROM SUPREME COURT WRIT OF MANDAMUS REC'VD AND FILED IN SUPREME COURT OF TEXAS CASE #04-118 WRIT OF MANDAMUS (WRIT.M)* |
| 02/02/2004 | File Checked In<br>*FILE CHECKED IN (FCI)* |



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

Date:
JAN 16 2025
By:
Deputy Clerk

*Printed on 01/16/2025 at 3:03 PM*

| 01/29/2004 | **Motion to Withdraw** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |

01/29/2004    Order Granting Motion to Withdraw as Counsel, Signed
*ORD. GRANT.MOT.TO WITHDRAW AS COUNSEL, SIGNED (OGMTWAC)*

01/28/2004   File Checked Out
*FILE CHECKED OUT (FCO)*

01/21/2004   Motion
*CL-29,530-A 01/21/2004 MOTION TO WITHDRAW AS COUNSEL MOTION (MOT)*

01/21/2004   File Checked In
*FILE CHECKED IN (FCI)*

01/14/2004   Order Setting Hearing
*1029530 01/14/2004 ORDER SETTING HEARIN ORD TO WITHDRAW AS ATTY OF RECORD ORDER SETTING HEARING (OSH)*

01/14/2004   Motion
*1029530 01/14/2004 MOTION TO WITHDRAW RECORD MOTION (MOT)*

01/12/2004   Complaint
*CL-29,530-A 01/12/2004 COMPLAINT PAINTIFF"S ORIGINAL COMPLAINNT FOR WRIT IN THE NATURE OF MANDAMUS COMPLAINT (COMPLAINT)*

01/12/2004   Writ of Mandamus
*1029530 01/12/2004 WRIT OF MANDAMUS COPY (ORIGINAL SENT 1/12/04 TO SUPREME COURT WRIT OF MANDAMUS (WRIT.M)*

01/08/2004   Notice of Change of Address
*1029530 01/08/2004 NOTICE OF CHANGE OF LAW OFFICES OF M. MARIO GARCIA, P.C., 5109 S MCCOLL EDINBURG, TX 78539 NOTICE OF CHANGE OF ADDRESS (NCA)*

01/06/2004   File Checked Out
*FILE CHECKED OUT (FCO)*

01/05/2004   Motion to Withdraw as Attorney, Order Approving
*MOTION TO WITHDRAW AS ATTY (COUNSEL)/ORDER APPROVING (MOT.WAA)*

11/13/2003   Writ of Mandamus
*WRIT OF MANDAMUS (WRIT.M)*

11/03/2003   Report
*1029530 11/03/2003 REPORT REPORTERS RECORD "MASTER INDEX" REPORT (REPORT)*

10/06/2003   File Checked In
*FILE CHECKED IN (FCI)*

07/31/2003   File Checked In
*FILE CHECKED IN (FCI)*

07/29/2003   Audit Letter
*LETTER (LETTER)*

| | |
|---|---|
| 06/17/2003 | **File Checked Out**<br>*1029530 06/17/2003 FILE CHECKED OUT VIA CINDY COURT REPORTER CC#1 FILE CHECKED OUT (FCO)* |
| 06/03/2003 | **Memorandum**<br>*1029530 06/03/2003 MEMORANDUM COPY OF MOTION FOR REHEARING ON PETITION FOR WRIT OF MANDAMUS MEMORANDUM (MEMO)* |
| 05/29/2003 | **Notice of Appeal**<br>*1029530 05/29/2003 NOTICE OF APPEAL FILED BY KEITH C. LIVESAY NOTICE OF APPEAL (NOTAPP)* |
| 05/23/2003 | **Motion**<br>*FOR REHEARING ON PETITION FOR WRIT OF MANDAMUS* |
| 05/15/2003 | **Ruling**<br>*1029530 05/15/2003 COURT RULING COURT OF APPEALS DENIED ORDER ON PETITION FOR WRIT OF MANDAMUS COURT RULING (CTR)* |
| 05/02/2003 | **Memorandum**<br>*1029530 05/02/2003 MEMORANDUM RECEIVED DOCUMENTS "IN THE APPEALS COURT OF TEXAS IN RE: JOHNNY PARTAIN AND TERESA PARTAIN" PLTFS ORIGINAL COMPLAINT FOR WRIT IN THE NATURE OF MANDAMUS MEMORANDUM (MEMO)* |
| 04/03/2003 | **Answer**<br>*1029530 04/03/2003 ANSWER PLTF ANSWER TO PETITION FOR INTERVENTION ANSWER (ANS)* |
| 03/26/2003 | **Petition in Intervention, Filed** |
| 03/24/2003 | **Motion for New Trial**<br>*CL-29,530-A 03/24/2003 MOTION FOR NEW TRIAL FOR NEW TRIAL FROM THIRD AMENDED JUDGMENT XXX-DO NOT USE-MOTION FOR NEW TRIAL (MFNT)* |
| 02/27/2003 | **Third Amended**<br>*1029530 02/27/2003 THIRD AMENDED 3RD AMENDED JUGMENT SIGNED THIRD AMENDED (THIRD)* |
| 02/25/2003 | **Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")<br>*(Mtn to Amend or Modify Judgment or Alteratively, Mtn for New trial)* |
| 02/25/2003 | **Ruling**<br>*1029530 02/25/2003 COURT RULING PREVIOUS ORDER REF: ATTY'S FEES REMAINS ORDERED EXCEPT APPELLATE ATTY FEES UPON SUCCESS OTBS COURT RULING (CTR)* |
| 02/25/2003 | **Court Entries**<br>*1029530 02/25/2003 COURT ENTRY PREVIOUS ORDER RE: ATTYS FEES REMAINS ORDERED EXCEPT APPELLATE ATTY. FEES UPON SUCCESS. OTBS COURT ENTRY (CE)* |
| 01/21/2003 | **Order Setting Hearing**<br>*1029530 01/21/2003 ORDER SETTING HEARIN HRG SET FOR 2/25/03 @ 9:00 A.M. ON MTN TO AMEND OR MODIFY JUDGMENT OR ALTERNATIVELY, MTN FOR NEW TRIAL ORDER SETTING HEARING (OSH)* |
| 01/16/2003 | |



Date:
I, Artura Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

By:

Deputy Clerk

JAN 16 2025

| | |
|---|---|
| |  Motion |
| | *TO AMEND OR MODIFY JUDGMENT OR ALTERATIVELY, MOTION FOR NEW TRIAL. CL-29,530-A JANUARY 16, 2003* |
| 12/24/2002 | Final Judgment, Signed |
| | *SECOND AMENDED* |
| 12/18/2002 | **Final Judgment after Non-Jury Trial** (Judicial Officer: Cantu, Rolando) |
| | Party (MAPLES, JAMES H) |
| | Judgment: (P) - **for Plaintiff SECOND AMENDED FINAL JUDGMENT** |
| | Converted Disposition: |
| | Party: MAPLES, JAMES H |
| | Disposition: FINAL JUDGMENT AFTER NON-JURY TRIAL |
| | Judgment : For Plaintiff |
| 12/18/2002 | Final Judgment, Signed |
| | *1029530 12/18/2002 FINAL JUDGMENT SIGNE 2ND AMENDED FINAL JUDGMENT SIGNED FINAL JUDGMENT SIGNED (FJS)* |
| 12/16/2002 | **Hearing** (10:30 AM)  (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| | *(Pl's Mtn to Vacate Amended Final Judgment)* |
| 12/13/2002 | Motion for New Trial |
| | *1029530 12/13/2002 MOTION FOR NEW TRIAL DEFENDANTS RENEWED MOTION FOR NEW TRIAL XXX-DO NOT USE-MOTION FOR NEW TRIAL (MFNT)* |
| 12/05/2002 | Order Setting Hearing |
| | *1029530 12/05/2002 ORDER SETTING HEARIN HRG SET FOR 12/16/02 @ 10:30 A.M ON PL'S MTN TO VACATE AMENED FINAL JUDGMENT ORDER SETTING HEARING (OSH)* |
| 11/27/2002 | Motion to Vacate, Filed |
| | *1029530 11/27/2002 MOTION TO VACATE MOTION TO VACATE AMENDED FINAL JUDGMENT MOTION TO VACATE, FILED (MOTVAC)* |
| 11/20/2002 | Letter Received |
| 11/19/2002 | **Hearing** (9:30 AM)  (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| | *(Pl's Mtn to Compel and for Sanctions Post Judgment Discovery and on Judgment Creditor's Pettion for Aid in Enforcing Jugment)* |
| 11/19/2002 | Amended |
| | *JUDGMENT CREDITOR'S PETITION FOR AID IN ENFORCING JUDGMENT* |
| 11/19/2002 | Amended Judgment Signed |
| | *AMENDED JUDGMENT, SIGNED (AMD.JUD)* |
| 11/19/2002 | Court Entries |
| | *1029530 11/19/2002 COURT ENTRY NO RULINGS ENTERED BY COURT ON PENDING MOTIONS , AMENDED FINAL JUDGMENT SIGNED COURT ENTRY (CE)* |
| 10/29/2002 | **Motion For New Trial** (9:30 AM)  (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| | *(Def's Mtn for New Trial)* |
| 10/29/2002 | **Hearing** (9:30 AM)  (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| | *(Def's Mtn for Extension of Effective Date of Judgment)* |
| 10/29/2002 | Court Entries |

Date: JAN 1 6 2025
I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office
By:
Deputy Clerk

*1029530 10/29/2002 COURT ENTRY COURT MAINTAINED ITS PREVIOUS ORDER OF 9/16/02 GRANTING DEF'S EXTENSION OF EFFECTIVE DATE OF JUDGMENT. DEF'S MTN FOR NEW TRIAL IS TRIAL. COURT MODIFIED THE PREVIOUS JUDGMENT AND APPROVED ONE RECOVERY ONLY OF $58,500.00 & PRE-JUDGMENT INTERESET AND $15,000.00 ATTY FEES. jUDGMENT TO BE SUBMITTED FOR SIGNATURE. COURT ENTRY (CE)*

10/28/2002    Other
*BILL OF COSTS*

10/22/2002    Order Setting Hearing
*1029530 10/22/2002 ORDER SETTING HEARIN CASE SET FOR 11/19/02 @ 9:30 FOR PL'S MTN TO COMPEL AND FOR SANCTIONS POST JUDGMENT DISCOVERY AND ON JUDGMENT ORDER SETTING HEARING (OSH)*

10/18/2002    Affidavit

10/18/2002    Judgment
*1029530 10/18/2002 JUDGMENT JUDGMENT CREDITOR'S PETITION FOR AID IN ENFORCING JUDGMENT JUDGMENT (JUDGMENT)*

10/18/2002    Motion to Compel (OCA)
*1029530 10/18/2002 MOTION TO COMPEL PLAINTIFFS MOTION TO COMPEL AND FOR SANCTIONS POST JUDGMENT DISCOVERY MOTION TO COMPEL (MOTCOMP)*

10/17/2002    Subpoena Issued
*SUBPOENA ISSUED (SUB)*

10/10/2002    Order Setting Hearing
*1029530 10/10/2002 ORDER SETTING HEARIN HRG SET FOR 10/29/02 @ 9:30 A.M. ON DEF'S MTN FOR NEW TRIAL ORDER SETTING HEARING (OSH)*

10/10/2002    Order Setting Hearing
*1029530 10/10/2002 ORDER SETTING HEARIN HRG SET FOR 10/29/02 ON PL'S MTN-SUBSTITUTUE MTN FOR REHEARING OF DEF'S MTN FOR EXTENSION OF EFFECTIVE DATE OF JUDGMENT ORDER SETTING HEARING (OSH)*

10/03/2002    Response
*1029530 10/03/2002 RESPONSE DEFENDANTS RESPONSE TO PLAINTIFFS' POST JUDGMENT DISCOERY RESPONSE (RESPONSE) & CERTIFICATE OF DISCOVERY*

10/03/2002    Certificate of Written Discovery
*CERTIFICATE OF WRITTEN DISCOVERY (CERTWD)*

10/01/2002    Motion
*1029530 10/01/2002 MOTION PLAINTIFFS' SUBSTITUTE MOTION FOR REHEARING OF DEFENDANT'S MOTION FOR EXTENSION OF EFFECTIVE DATE OF JUDGMENT MOTION (MOT)*

09/26/2002    Order Setting Hearing
*1029530 09/26/2002 ORDER SETTING HEARIN HRG SET FOR 10/29/02 @ 9:30 A.M ON DEF'S MTN FOR EXTENSION OF EFFECTIVE DATE OF JUDGMENT ORDER SETTING HEARING (OSH)*

09/24/2002    Motion for New Trial
*XXX-DO NOT USE-MOTION FOR NEW TRIAL (MFNT)*



Printed on 01/16/2025 at 3:03 PM

| 09/16/2002 | Order Signed |
| --- | --- |
| | *1029530 09/16/2002 ORDER, SIGNED ORDER GRANTING DEF'S MTN FOR EXTENSION OF EFFECTIVE DATE OF JUDGMENT SIGNED-DEF SHALL BE PERMITTED TO FILE ALL POST JUDGMETN MTNS UNTIL 9/28/02 ORDER, SIGNED (OS)* |
| 09/12/2002 | Motion |
| | *FOR REHEARING OF DEFENDANT'S MOTION FOR EXTENSION OF EFFECTIVE DATE OF JUDGMENT* |
| 09/04/2002 | **Hearing** (10:30 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| | *(Def's mtn for Extension of Effective Date of Judgment)* |
| 09/03/2002 | Discovery |
| | *1029530 09/03/2002 DISCOVERY PLAINTIFF'S DISCOVERY IN AID OF ENFORCEMENT OF JUDGMENT DISCOVERY (DISC)* |
| 08/29/2002 | Motion |
| | *1029530 08/29/2002 MOTION MOTION FOR EXTENSIONOF EFFECTIVE DATE OF JUDGEMNT MOTION (MOT)* |
| 08/29/2002 | Order Setting Hearing |
| | *1029530 08/29/2002 ORDER SETTING HEARIN DEF'S MTN FOR EXTENSION FOR EXTENSION DATE OF JUDGEMENT SET FOR 9/4/02 ORDER SETTING HEARING (OSH)* |
| 08/22/2002 | Abstract of Judgement (Fee) |
| 08/12/2002 | Motion |
| | *1029530 08/12/2002 MOTION MOTION FOR APPROVAL OF ATTORNEY FEES AND ORDER, EX PARTE MOTION (MOT)* |
| 08/09/2002 | Affidavit |
| | *1029530 08/09/2002 AFFIDAVIT AN ITEMIZED STATEMENT OF LEGAL SERVICES AFFIDAVIT (AFF)* |
| 07/25/2002 | Counter Claim/Counter Petition (Fee) |
| | *1029530 07/25/2002 COUNTER CLAIM DEFS' SECOND SUPPLEMENTAL COUNTER CLAIM COUNTER CLAIM (CCLAIM)* |
| 07/24/2002 | Other |
| | *BILL OF COSTS* |
| 07/24/2002 | Final Judgment, Signed |
| | *FINAL JUDGMENT SIGNED (FJS)* |
| 07/23/2002 | Writ of Execution |
| | *1029530 07/23/2002 WRIT OF EXECUTION RETURNED NOLLA/BONA WRIT OF EXECUTION (WRIT.EXEC)* |
| 07/03/2002 | **Entry of Judgment Hearing** (10:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| 06/26/2002 | **Hearing** (8:30 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |
| | *(Objection to Finding of Fact and Conclusions of Law)* |
| 06/26/2002 | **Hearing** (8:30 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") |



Date:
I, Arturo Guejardo, Jr. County Clerk do
hereby certify that this is a true and
correct copy of the original document
filed in my office
By:
Deputy Clerk
JAN 16 2025

06/24/2002       Response
*1029530 06/24/2002 RESPONSE DEFS' RESPONSE TO PLTFS' REQUEST FOR TEMPORARY INJUNCTION RESPONSE (RESPONSE)*

06/18/2002       Counter Claim/Counter Petition (Fee)
*1029530 06/18/2002 COUNTER CLAIM SUPPLEMENTAL COUNTER CLAIM (CCLAIM)*

06/13/2002       Petition (OCA)
*1029530 06/13/2002 PETITION PLTFS' THIRD AMENDED ORIGINAL PETITION PETITION FOR NON-DISCLOSURE (PET)*

06/04/2002       Objection
*TO ENTRY OF ANY JUDGMENT*

06/04/2002       Response
*1029530 06/04/2002 RESPONSE DEFS' RESPONSE TO PLTFS' REPLY TO DEFS' RESPONSE TO PLTFS' MOTION FOR ENTRY OF JUDGMENT AND DEFS' OBJECTION TO ENTRY OF ANY JUDGMENT RESPONSE (RESPONSE)*

05/30/2002       Order Setting Hearing
*1029530 05/30/2002 ORDER SETTING HEARIN FOR 06/26/02 @ 9:30 AM ORDER SETTING HEARING (OSH)*

05/28/2002       Objection
*1029530 05/28/2002 OBJECTION OBJECTION TO FINDINGS OF FACT AND CONCLUSIONS OF LAW OBJECTION (OBJ)*

05/24/2002       Motion
*1029530 05/24/2002 MOTION MOTION FOR INJUNCTION AGAINST DEF MOTION (MOT)*

05/23/2002       Findings of Fact and Conclusions of Law
*ADMENDMENT*

05/22/2002       Brief
*1029530 05/22/2002 BRIEF PLTFS' POST-VERDICT TRIAL BRIEF BRIEF (BRIEF)*

05/22/2002       Brief
*1029530 05/22/2002 BRIEF PLTFS' POST-VERDICT TRIEL BRIEF. BRIEF (BRIEF)*

05/15/2002       Findings of Fact and Conclusions of Law
*FINDINGS OF FACT AND CONCLUSIONS OF LAW SIGNED (FOFCOLS)*

05/15/2002       Other
*1029530 05/15/2002 OTHER JOHNNY PARTAIN FILED FINDINGS OF FACTS & CONCLUSIONS OF LAW OTHER (OTH)*

05/14/2002       Findings of Fact and Conclusions of Law
*FINDINGS OF FACT AND CONCLUSIONS OF LAW (FOFACOL)*

05/10/2002       Motion
*1029530 05/10/2002 MOTION PLTF'S MOTION TO TERMINATE SIDNEY R. MEADOWS, ATTORNEY TO THE PLAINTIFFS, AND NOTIFICATION CERTIFICATE MOTION (MOT)*



| | | |
|---|---|---|
| 04/19/2002 | Motion | *1029530 04/19/2002 MOTION FOR ENTRY OF JUDGMENT MOT SITHST ANDING THE JUTY VERDICT MOTION (MOT)* |
| 03/05/2002 | Response | *1029530 03/05/2002 RESPONSE DEFS' RESPONSE TO PLTFS' MOTION FOR ENTRY OF JUDGMENT RESPONSE (RESPONSE)* |
| 02/21/2002 | **Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") | *(Pl's Mtn for Entry of Judgment)* |
| 02/06/2002 | Order Setting Hearing | *1029530 02/06/2002 ORDER SETTING HEARIN PL'S MTN FOR ENTRY OF JUDGMENT ON 2/21/02 @ 9:00 A.M. ORDER SETTING HEARING (OSH)* |
| 02/04/2002 | Motion | *1029530 02/04/2002 MOTION PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT MOTION (MOT)* |
| 01/31/2002 | Charge of the Court | *CHARGE OF THE COURT (COC)* |
| 01/31/2002 | Order Signed | *1029530 01/31/2002 ORDER, SIGNED CHARGE OF THE COURT SIGNED. ORDER, SIGNED (OS)* |
| 01/29/2002 | Certificate | *1029530 01/29/2002 CERTIFICATE DEPOSITION OF JAMES HAROLD MAPLES CERTIFICATE (CERT)* |
| 01/28/2002 | Motion in Limine, Filed | *ORDER ATTACHED* |
| 01/28/2002 | Subpoena Issued | *1029530 01/28/2002 SUBPOENA ISSUED SERVED RICHARD ESTEVANES SOUTH TEXAS FREIGHTLINER SUBPOENA ISSUED (SUB)* |
| 01/22/2002 | **Jury Trial** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") | *(PT & JT)* |
| 01/22/2002 | Motion | *1029530 01/22/2002 MOTION FOR LIMINE MOTION (MOT)* |
| 01/17/2002 | **Motion to Compel** (9:30 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy") | *(Pl's Mtn to Compel)* |
| 01/14/2002 | Order Setting Hearing | *1029530 01/14/2002 ORDER SETTING HEARIN HRG SET FOR PL'S MTN TO COMPEL SET FOR 1/17/02 ORDER SETTING HEARING (OSH)* |
| 01/09/2002 | Affidavit | *AFFIDAVIT (AFF)* |
| 01/09/2002 | Certificate | |



*1029530 01/09/2002 CERTIFICATE DEPOSITION OF JAMES HARLD MAPLES*
*CERTIFICATE (CERT)*

12/26/2001     Certificate of Written Discovery
*CERTIFICATE OF WRITTEN DISCOVERY (CERTWD)*

12/26/2001     Motion
*1029530 12/26/2001 MOTION TO COMPEL AND FOR SANCTIONS MOTION (MOT)*

11/26/2001     **Jury Trial** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")
*(Passed)*

11/15/2001     **Final Pre-Trial Hearing** (9:00 AM) (Judicial Officer: Gonzalez, Rodolfo "Rudy")
*(Passed)*

10/11/2001     Notice
*1029530 10/11/2001 NOTICE OF FILING RULE 11 AGREEMENT NOTICE (NOTICE)*

09/26/2001     Docket Control Conference
*1029530 09/26/2001 DOCKET CONTROL CONFE FINAL PRE-TRIAL CONF SET FOR*
*11/15/01 @ 9:00 A.M. & JURY TRIAL SET FOR 11/26/01 @ 9:00 A.M. DOCKET CONTROL*
*CONFERENCE (DCC)*

08/24/2001     **Docket Control Conference Hearing/Telephonic** (3:00 PM) (Judicial Officer: Gonzalez,
Rodolfo "Rudy")

08/07/2001     Docket Control Order
*1029530 08/07/2001 DOCKET CONTROL ORDER DOCKET CONTROL CONFERENCE*
*SSET FOR 8/24/01 @ 3:00 P.M. DOCKET CONTROL ORDER (DCO)*

06/22/2001     Docket Control Conference

05/29/2001     **Jury Trial** (9:30 AM) (Judicial Officer: Garza, Homero)
*MOT/4/CONT GRANTED 5/25/01*

05/29/2001     Order
*1029530 05/29/2001 ORDER SIGNED ORDER GRANTING PLTFS' UNOPPOSED*
*VERIFIED MOTION FOR CONTINUANCE ORDER SIGNED (ORD)*

05/24/2001     Motion
*1029530 05/24/2001 MOTION PLTFS' UNOPPOSED VERIFIED MOTION FOR*
*CONTINUANCE MOTION (MOT)*

05/17/2001     Order Setting Hearing
*1029530 05/17/2001 ORDER SETTING HEARIN FOR 05-29-01 @ 9:30 AM ORDER*
*SETTING HEARING (OSH)*

02/12/2001     **Jury Trial** (9:30 AM) (Judicial Officer: Garza, Homero)
*PLTS/CTNR/DEFS/SPEX*

02/12/2001     Subpoena Filed

02/06/2001     Order
*1029530 02/06/2001 ORDER SIGNED ORDER SETTING HEARING ORDER SIGNED*
*(ORD)*



Date:
I, Arturo Guajardo, Jr. County Clerk do
hereby certify that this is a true and
correct copy of the original document
filed in my office
By:
Deputy Clerk
JAN 16 2025

| | |
|---|---|
| 02/02/2001 | Notice<br>*1029530 02/02/2001 NOTICE NOTICE OF APPEARANCE NOTICE (NOTICE)* |
| 02/02/2001 | Special Exceptions<br>*1029530 02/02/2001 SPECIAL EXCEPTIONS PLTFS/COUNTER-DEFS' SPECIAL EXCEPTIONS TO DEFS/COUNTER/PLTFS' FIRST AMENDED COUNTERCLAIM SPECIAL EXCEPTIONS (SPEX)* |
| 11/06/2000 | **Jury Trial** (9:30 AM) (Judicial Officer: Garza, Homero)<br>*MOTION FOR CONTINUANCE GRANTED* |
| 11/01/2000 | Officer's Certification (Deposition)<br>*1029530 11/01/2000 OFFICERS CERTIFICATI ORAL DEPOSITION OF KATHY MAPLES OFFICERS CERTIFICATION (DEPOSITION) (OFFCERT)* |
| 10/18/2000 | **Pre Trial Hearing** (9:30 AM) (Judicial Officer: Garza, Homero)<br>*MOTION FOR CONTINUANCE GRANTED 10/4/00* |
| 10/10/2000 | Officer's Certification (Deposition)<br>*1029530 10/10/2000 OFFICERS CERTIFICATI DEPOSITION OF JOHNNY PARTAIN OFFICERS CERTIFICATION (DEPOSITION) (OFFCERT)* |
| 10/04/2000 | **Motion to Withdraw** (9:30 AM) (Judicial Officer: Garza, Homero) |
| 10/03/2000 | Motion<br>*1029530 10/03/2000 MOTION FIRST SUPPLEMENTAL MOTION FOR WITHDRAWAL OF COUNSEL MOTION (MOT)* |
| 09/21/2000 | Rule 11 Agreement, Filed<br>*RULE 11 AGREEMENT (RULE11)* |
| 09/21/2000 | Order<br>*1029530 09/21/2000 ORDER SIGNED ORDER SETTING HEARING FOR 10-04-00 ORDER SIGNED (ORD)* |
| 09/20/2000 | Motion<br>*1029530 09/20/2000 MOTION MOTION FOR WITHDRAWAL OF COUNSEL MOTION (MOT)* |
| 08/29/2000 | Counter Claim/Counter Petition (Fee)<br>*1029530 08/29/2000 COUNTER CLAIM DEF/COUNTER-PLTF'S FIRST AMENDED COUNTERCLAIM AGAINST PLTF/COUNTER-DEFS JOHNNY AND TERESA PARTAIN. COUNTER CLAIM (CCLAIM)* |
| 08/11/2000 | Discovery<br>*1029530 08/11/2000 DISCOVERY CERTIFICATE OF WRITTEN DISCOVERY DISCOVERY (DISC)* |
| 08/09/2000 | **Motion for Sanctions** (9:30 AM) (Judicial Officer: Garza, Homero) |
| 08/08/2000 | Amended Petition<br>*SECOND AMENDED ORIGINAL PETITION* |
| 06/22/2000 | Order Setting Hearing, Signed |



*Printed on 01/16/2025 at 3:03 PM*

| 06/22/2000 | Discovery |
| | *1029530 06/22/2000 DISCOVERY PLTFS' REQUEST FOR RULING ON DEFS' OBJECTIONS TO DISCOVERY DISCOVERY (DISC)* |
| 06/19/2000 | **Jury Trial** (9:30 AM) (Judicial Officer: Garza, Homero) |
| | *MOT/2/CMPL - 3 DAYS* |
| 06/19/2000 | Motion |
| | *Plaintiff's response to defendants' MOTION TO COMPEL, Johnny Partain and Teresa C. Partain, to RESPOND TO FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION, AND DEFENDANTS' SECOND SET OF REQUEST FOR PRODUCTION.* |
| 06/19/2000 | Motion |
| | *1029530 06/19/2000 MOTION MTN. FOR SANCTIONS FOR FAILURE TO APPEAR FOR DEPOSITION MOTION (MOT)* |
| 06/19/2000 | Notice of Bankruptcy |
| | *1029530 06/19/2000 NOTICE COURT REPORTER'S CERTIFICATE OF NON-APPEARANCE NOTICE OF BANKRUPTCY (NOT)* |
| 06/19/2000 | Notice of Bankruptcy |
| | *1029530 06/19/2000 NOTICE NOTICE OF INTENTION TO TAKE ORAL AND/OR VIDEOTAPED DEPOSITION OF KATHY H. MAPLES NOTICE OF BANKRUPTCY (NOT)* |
| 05/25/2000 | Fiat, Signed |
| 05/25/2000 | Defendant Original Answer |
| | *THIRD AMENDED ORIGINAL ANSWER* |
| 05/25/2000 | Original Petition |
| | *DEFENDANTS' SPECIAL EXCEPTIONS TO PLAINTIFFS; FIRST AMENDED ORIGINAL PETITION* |
| 05/23/2000 | Fiat, Signed |
| 05/19/2000 | Motion |
| | *MOTION TO COMPEL PLAINTIFFS, JOHNNY PARTAIN AND TERESA C. PARTAIN, TO RESPOND TO FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION, AND DEFENDANTS' SECOND SET OF REQUEST FOR PRODUCTION* |
| 05/17/2000 | **Pre Trial Hearing** (9:30 AM) (Judicial Officer: Garza, Homero) |
| | *MOT/4/CONT-J/T-6/19/00* |
| 05/16/2000 | Order Setting Hearing, Signed |
| | *MOTION FOR CONTINUANCE* |
| 05/10/2000 | Motion |
| | *for Continuance* |
| 01/28/2000 | Order, Signed |
| | *ORDER IN LIMINE SIGNED 1/28/2000* |
| 11/08/1999 | Docket Control Order |



I, Arturo Guerjardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

Date:

By:_____
Deputy Clerk

JAN 16 2025

| | |
|---|---|
| 11/05/1999 | **Docket Control Conference Hearing/Telephonic** (9:30 AM) (Judicial Officer: Garza, Homero) |
| 10/19/1999 | Docket Control Conference<br>*ORDER SIGNED 10/19/1999* |
| 07/12/1999 | Order<br>*1029530 07/12/99 ORDER SIGNED GRANTING MOTION FOR SUBSTITUTION OF COUNSEL ORDER SIGNED (ORD)* |
| 07/06/1999 | Amended<br>*DEFENDANTS' SECOND AMENDED ORIGINAL ANSWER* |
| 07/01/1999 | Notice to Defendant<br>*SERVER'S RETURN ATTACHED* |
| 06/24/1999 | Amended Petition<br>*PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION* |
| 06/21/1999 | Order to Withdraw as Attorney of Record, Signed<br>*ORDER TO WITHDRAW AS ATTY OF RECORD SIGNED (OW.AORS)* |
| 06/15/1999 | Supplemental Petition<br>*PLAINTIFFS' FIRST SUPPLEMENT TO ORIGINAL PETITION* |
| 03/03/1999 | **Pre Trial Hearing** (9:30 AM) (Judicial Officer: Garza, Homero) |
| 03/03/1999 | Agreed Order, Signed<br>*1029530 03/03/99 AGREED ORDER SIGNED AGREED ORDER FOR CONTINUANCE - SIGNED AGREED ORDER SIGNED (AOS)* |
| 02/12/1999 | Answer<br>*DEFENDANT'S FIRST AMENDED ORIGINAL ANSWER* |
| 01/11/1999 | Letter Received |
| 01/08/1999 | Supplemental<br>*Defendant's Supplemental Answer and Objections to Plaintiffs Interrogatories Accompanying Requests* |
| 01/06/1999 | **Motion to Compel** (9:30 AM) (Judicial Officer: Garza, Homero) |
| 11/16/1998 | Fiat, Signed |
| 11/12/1998 | Motion<br>*MOTION TO COMPEL ANSWERS TO INTERROGATORIES* |
| 11/06/1998 | Other<br>*DEFENDANT/COUNTER-PLAINTIFF'S CONTEERCLAIM AGAINST PLAINTIFF/COUNTER-DEFENDANTS JOHNNY PARTAIN AND TERESA PARTAIN* |
| 10/30/1998 | Affidavit |



I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

Date: JAN 16 2025

By: _____
Deputy Clerk

| | | |
|---|---|---|
| 10/21/1998 | Answer | |
| | *defendant's answers and objections to plaintiffs interrogatories accompanying requests* | |
| 10/21/1998 | Answer | |
| | *DEFENDANT'S ANSWERS TO PLAINTIFFS REQUESTS FOR ADMISSIONS* | |
| 09/29/1998 | Request for Admission | |
| | *PLAINTIFF'S REQUEST FOR ADMISSIONS AND INTERROGATORIES ACCOMPANYING REQUESTS* | |
| 09/17/1998 | Docket Control Order | |
| 09/09/1998 | Other | |
| | *RECEIPT* | |
| 09/09/1998 | Application | |
| | *AND DEMAND FOR JURY TRIAL* | |
| 09/04/1998 | Notice of Filing, Filed | |
| 06/15/1998 | Docket Control Order, Signed | |
| 06/11/1998 | Motion for Trial Setting | |
| | *with CERTIFICATE OF SERVICE attached* | |
| 04/13/1998 | Defendant Original Answer | |
| 04/03/1998 | Notice | |
| 01/26/1998 | Notice | |
| 01/26/1998 | Other | |
| | *Receipt* | |
| 01/26/1998 | Unknown | |
| | *1029530 01/26/98 Doc Comment from Conv Original Petition; * PLAINTIFF'S ORIGINAL PETITION,FILED DOC COMM FROM CONV (DOCC)* | |
| 01/26/1998 | Original | |
| | *XXX-DO NOT USE-ORIGINAL (ORG)* | |

Date: JAN 1 6 2025

I, Arturo Guajardo, Jr. County Clerk do hereby certify that this is a true and correct copy of the original document filed in my office

By:_____
            Deputy Clerk

| DATE | FINANCIAL INFORMATION |
|---|---|

**Defendant MAPLES, JAMES H**

| | |
|---|---|
| Total Charges | 241.00 |
| Total Payments and Credits | 241.00 |
| **Balance Due as of 1/16/2025** | **0.00** |

**Plaintiff PARTAIN, JOHNNY**

| | |
|---|---|
| Total Charges | 795.00 |
| Total Payments and Credits | 795.00 |
| **Balance Due as of 1/16/2025** | **0.00** |

UNKNOWN Registry Beneficiary for CV10015
TRUST ACCOUNT (CC-TRUST-CV) Balance as of  1/16/2025

30.90



Date: **JAN 1 6 2025**
I, Arturo Guajardo, Jr. County Clerk do
hereby certify that this is a true and
correct copy of the original document
filed in my office
By:_____
Deputy Clerk

8. Governor Abbott's Press Release



G O V E R N O R   G R E G   A B B O T T

January 24, 2024

The federal government has broken the compact between the United States and the States.  The Executive Branch of the United States has a constitutional duty to enforce federal laws protecting States, including immigration laws on the books right now.  President Biden has refused to enforce those laws and has even violated them.  The result is that he has smashed records for illegal immigration.

Despite having been put on notice in a series of letters—one of which I delivered to him by hand—President Biden has ignored Texas's demand that he perform his constitutional duties.

- President Biden has violated his oath to faithfully execute immigration laws enacted by Congress. Instead of prosecuting immigrants for the federal crime of illegal entry, President Biden has sent his lawyers into federal courts to sue Texas for taking action to secure the border.

- President Biden has instructed his agencies to ignore federal statutes that mandate the detention of illegal immigrants.  The effect is to illegally allow their *en masse* parole into the United States.

- By wasting taxpayer dollars to tear open Texas's border security infrastructure, President Biden has enticed illegal immigrants away from the 28 legal entry points along this State's southern border— bridges where nobody drowns—and into the dangerous waters of the Rio Grande.

Under President Biden's lawless border policies, more than 6 million illegal immigrants have crossed our southern border in just 3 years.  That is more than the population of 33 different States in this country.  This illegal refusal to protect the States has inflicted unprecedented harm on the People all across the United States.

James Madison, Alexander Hamilton, and the other visionaries who wrote the U.S. Constitution foresaw that States should not be left to the mercy of a lawless president who does nothing to stop external threats like cartels smuggling millions of illegal immigrants across the border.  That is why the Framers included both Article IV, § 4, which promises that the federal government "shall protect each [State] against invasion," and Article I, § 10, Clause 3, which acknowledges "the States' sovereign interest in protecting their borders." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., dissenting).

The failure of the Biden Administration to fulfill the duties imposed by Article IV, § 4 has triggered Article I, § 10, Clause 3, which reserves to this State the right of self-defense.  For these reasons, I have already declared an invasion under Article I, § 10, Clause 3 to invoke Texas's constitutional authority to defend and protect itself.  That authority is the supreme law of the land and supersedes any federal statutes to the contrary.  The Texas National Guard, the Texas Department of Public Safety, and other Texas personnel are acting on that authority, as well as state law, to secure the Texas border.

Greg Abbott
Governor of Texas

9. Petition To Texas Legislature



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

THE 87TH TEXAS LEGISLATURE
1100 Congress Avenue
Austin, Texas 78701

January 12, 2021

Re: Johnny Partain – Petition For Relief Through Private Bills And General Constitutional Amendment

Greetings THE 87TH TEXAS LEGISLATURE;

    Attached is a Petition For Relief Through Private Bills And General Constitutional Amendment. It is intended to finally resolve issues that have evolved over 20 years of successful but ultimately unproductive litigation that continues to effect my businesses and my person. I am requesting assistance, and ultimately, I am requesting a solution to a well recognized and endemic problem afflicting our government. I leave my contact information below to help move this process.

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

IN RE JOHNNY RAY PARTAIN          §          IN THE 87TH TEXAS LEGISLATURE

§
§
§
§
§

## PETITION FOR RELIEF THROUGH PRIVATE BILLS AND GENERAL CONSTITUTIONAL AMENDMENT

Relief Requested

1. A Private Bill removing all immunities and allocating up to $250 million to Johnny Ray Partain on judgment for inverse condemnation claims against the State of Texas and its agencies.
2. A Private Bill removing all immunities and accepting liability for the state's and counties' respective employees including Texas District Judges, County Judges, District Attorneys in Cameron County, and District Attorneys in Hidalgo County for their constitutional torts against Johnny Ray Partain, allowing him to proceed with a lawsuit against same.
3. A constitutional amendment implementing comprehensive definitions, rules, and regulations regarding state immunities and liabilities from civilian constitutional and civil tort complaints, consistent with the Texas Constitution, including disposing of absolute immunities for all public officers, and providing at least one cause of action to protect Texan's constitutional rights in the judiciary.
4. Alternately, a constitutional amendment immunizing citizens from prosecution for directly protecting their civil rights.
5. Adding a felony level offense to official oppression.

An Argument To Diminish Corruption[1] In Texas

In 2014, Texas Attorney General Greg Abbott stated of South Texas, "The creeping corruption resembles third-world country practices that erode the social fabric of our communities and destroy Texans' trust and confidence in government." Presumably, solutions have been pursued after Gov. Greg Abbott became governor of Texas in January 2015 to combat government corruption - but corruption hasn't abated. The State of Texas is still currently able to violate contracts, property rights, and civil rights outlined by the United States and Texas

---

[1] Corruption defined as - Illegality; a vicious and fraudulent intention to evade the prohibitions of the law. The act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person, contrary to duty and the rights of others. U. S. v. Johnson (C. C.) 20 Fed. 082; State v. Ragsdale. 59 Mo. App. 003; Wight v. Rindskopf, 43 Wis. 351; Worsham v. Murchison, 00 Ga. 719; U. S. v. Edwards (C. C.) 43 Fed. 07.

Constitution with impunity because the state claims immunity to suit and liability, and because there is no civil cause of action available to prosecute constitutional torts against the state or her agencies. Governmental entities that enjoy sovereign immunity are not liable for the torts of their employees, absent a constitutional or statutory waiver of that immunity. *Tex. Dep't of Transp. v. Able, 35 S.W.3d 608, 611 (Tex. 2000); Lowe v. Tex. Tech Univ. 540 S.W.2d 297, 298 (Tex. 1976).* Government employees also enjoy other personal immunities invented by the courts known as absolute immunity, qualified immunity, and official immunity making fertile ground for incompetence and corruption. Consequently, certain citizens and businesses are directly burdened with prejudices and losses separate from the rest of the population, with little or no recourse at law. There is virtually no accountability or recourse against judges (except probate judges) who close their courts to complainants or engage in crimes and constitutional torts against citizens, for prosecutors who abuse their authority to prejudice defendants and violate their due process, for police who target, lie, and kill, for counties and cities who form sanctuaries to protect illegal activity, or even when the healthy public is declared closed to the public as in recent COVID 19 lockdowns. The solution to this systemic incompetence or corruption is to make the concept of government immunity something the citizens of Texas can agree upon, so that legal recourse to incompetence and corruption can be obvious and obtainable through black letter law instead of shrouded in tenuous opinions and personalities of the courts in whatever era relief is attempted by the state's victims.

Additionally, the practice of "Absolute Immunity" must be abolished. It serves no purpose than to protect incompetence and corruption. It is contrary to accountability because it denies any meaningful civil protest or discussion against illegal acts by the judiciary. Even the Texas State Commission on Judicial Conduct and the State Bar of Texas (both departments under the Texas Supreme Court) recognize absolute immunity as they conduct their inquiries in secret, with severe limitations on who can complain, what they can do, and what they will disclose. For example, attached is correspondence from the State Commission on Judicial Conduct regarding one of four complaints against four different judges engaged in constitutional torts and illegal property seizures belonging to Johnny Ray Partain - whom may not even be a party to their courts. The correspondence makes it clear that whoever the unidentified judicial officer may be, their official discretion usurps all restraints of the law and is beyond reproach (absolute immunity). Because of the secrecy the petitioner is not even able to identify or make a response to the correspondence, and consequently, there is no meaningful recourse through the commission. The State Bar of Texas is even worse because they will preempt a claim with prejudice on terms and procedure that they "instigate" after the fact without ever addressing the issue raised. These government watchdogs are feckless because they don't have an interest or a charter to police constitutional violation, much less criminality. They barely respond to, and resist, the complaints filed. Consequently an amendment, or at least a statute, is necessary to eradicate government immunities derived by the courts and to legally define the boundaries of government immunity with respect to our civil rights so that we citizens may exercise our burdens and plainly petition our grievances to the judiciary without continuing hitting imaginary firewalls. Texans need a cause of action for constitutional torts, a version of 42 USC §1983 that includes liability for the State of Texas and her employees, to give ourselves a civil means to protect our rights under the constitution and to be made whole. Alternately, Texans need legal

immunity to prosecution when acting to self-execute our civil rights just as government claims immunity to complaints when it violates our civil rights.

Government immunity to the law isn't a novel issue. The Texas Supreme Court (*Hosner v. De Young, 1 Tex. 764, 769 (1847)*) arbitrarily imposed immunity from evolving English common law in 1847 to cloak the new Republic of Texas with immunity on the idea that the King can't be sued in his own courts, that the King can do no wrong. Under this doctrine, the State is not liable for the torts of its officers or agents in the absence of a constitutional or statutory provision creating such liability. *Texas Highway Department v. Weber, 147 Tex. 628, 219 S.W.2d 70 (1949).* But…toward the end of the 1960 race wars government immunity became a major topic in the 61st Texas Legislature (1969) who almost reversed these crippling court invented immunities through Bill 117 before falling to a veto by Texas Governor Preston Smith on account that he feared the costs for government accountability. The 61st Legislature finally passed a weak tort claims reform in response to the governor's veto, leaving the doctrine of common law governmental immunity in place to dominate regardless of the birth of its new Texas Tort Claims Act (TTCA allows suits in auto accidents, with exceptions, and some suits against municipalities provided strict conformance to the statute is met). While government immunity to the constitution wasn't rendered in our original governing documents, it has been recognized by lawyers and students of the courts, which later led to a constitutional amendment in 1987 authorizing the legislature to identify municipal governmental functions and proprietary functions responsive to the court's opinion of waiver for judicial immunity on municipalities. This amendment does not apply to the state or counties in any way, only to municipalities. Why? Because lawyers know that it was established by a Texas appeals court in State v. Brannan, 111 S.W.2d 347 (Tex. Civ. App.--Waco 1937, writ ref'd), that "All authority possessed by a state is that conferred on it as a sovereignty by the people and consequently it can act in no other capacity than that of a sovereignty. It is inherently and exclusively sovereign and must necessarily act as such at all times and in all capacities. As a sovereignty, it is immune from liability for torts and since it can act in no other capacity than that of a sovereignty, it is necessarily immune from liability for torts at all times and in all its capacities." However, the lawyers elected as legislators should also know there is a constitutional separation of powers and it is the domain of the legislators who represent the people, not the courts, to determine policy regarding the range of accountability and immunity to the law pursuant to our constitution. Until that happens this time worn judicially derived immunity which allows the State of Texas and its officials to trespass with impunity on the civil rights of the average Texas citizen remains a large factor in sustaining government corruption and incompetence.

There is also no recourse available under the federal civil action statute 42 U.S.C. §1983 because it doesn't apply to states, and the court's resist applying it to municipalities. Accordingly, there is no direct recourse or cause of action for the violation of the Texas Constitution. *See City of Beaumont v. Bouillion, 896 S.W.2d 143 (Tex. 1995).* 50 years after Bill 117 was vetoed, after the last race wars waned, very little substantive has happened and we seem to have entered civil unrest again with Antifa, Black Lives Matter, Black Panthers, Proud Boys, Patriot Prayer, and other political organizations foregoing policy and resorting to direct force (to violence) to achieve their goals since government appears to be the tool creating problems. It is

poignantly evident that court derived government immunities are a necessary component for police brutality, poverty, antagonism among races, sanctuary city proclamations, unconstitutional lockdowns of healthy citizens[2], the closing of businesses, destruction of freedoms, and destruction of lives. The "King" can do a lot of wrong, and the worse is still coming.  Criminal organizations (cartels) can easily, and probably already have, infiltrate the government at all levels to be immune to the law. Above the law.  Isn't that a problem?

The solution has been banging on the doors of the Texas legislature for years. The Texas Supreme Court states, "While it may have been a decision of the Texas Supreme Court that first interjected sovereign immunity into Texas jurisprudence, the court has consistently held that any waiver of immunity rests within the sole discretion of the Texas Legislature. Most sovereigns have long abandoned the fiction that governments and their officials can 'do no wrong.' To varying degrees, states and the federal government have voluntarily relinquished the privilege of absolute immunity by waiving immunity in certain contexts. ⋯ Courts in other jurisdictions have occasionally abrogated sovereign immunity by judicial decree. We have held, however, that the Legislature is better suited to balance the conflicting policy issues associated with waiving immunity." *Wichita Falls State Hosp., 106 S.W.3d 692 (Tex. 2003).*  Texas Supreme Court Chief Justice Hecht and Justice Enoch have written concurring opinions in which they have noted that unless the Legislature addresses certain problems with sovereign immunity and/or the Tort Claims Act, the Texas Supreme Court may act to abrogate immunity for the purpose of forcing the Legislature to act. *See IT-Davy, 74 S.W.3d 863 (Enoch, J. Dissenting) (stating the Supreme Court should abrogate sovereign immunity in all breach of contract cases). Tex. Dep't of Criminal Justice v. Miller, 51 S.W.3d 583, 590-592 (Tex. 2001) (Hecht, J., concurring) (noting that the distinction between use of property for which immunity has been waived and non-use of property for which there is no waiver creates distinctions that cannot be justified, articulated, explained, or understood; thus, judicial abolition of immunity may be necessary to prompt Legislature to enact legislation for determining when immunity is waived for the non-use of property).* Further, the Texas Supreme Court has repeatedly stated that immunity from suit serves the purpose of allowing governmental entities to avoid contractual obligations. While Justice Hecht has stated that sovereign immunity must not be used as a means of stealing goods or services from contractors, a majority of that court continues to hold out the possibility that a governmental entity may waive immunity by contract.  To date the Texas Supreme Court has not found a single instance in which a governmental entity has waived its immunity from suit by its conduct. *See IT-Davy, 74 S.W.3d 860-61 (Hecht, J., concurring), 863-64 (Enoch, J.,dissenting).*

Allegedly, sovereign immunity does not bar claims for violation of the constitution, including takings claims, or ultra vires claims. *City of Dallas v Stewart, 361 S.W.3d 562 (Tex. 2012); Tex. Parks & Wildlife Dept v. Sawyer Trust, 354 S.W.3d 384, 388–89 (Tex. 2011).* The Supreme Court acknowledged that prior to 1980 its opinions could be read to hold that sovereign immunity barred takings claims (see Sawyer Trust), but following its decision in Steele v. City of Houston, 603 S.W.2d 786 (Tex. 1980), the Supreme Court has consistently held that immunity does not bar constitutional claims, including takings claims. *City of Dallas v Stewart, 361 S.W.3d 562 (Tex. 2012).* You see how the principles change overnight?  The court now says to establish

---

[2] How is a citizen, a human being, non-essential?

a taking of property the plaintiff is required to plead and prove that the government exercised dominion and control over the property. *Sawyer Trust at 390, 391.* But that's not necessarily true being that immunity is dependent on the mood, competency, and personality of the judge hearing a takings claim since immunity is a court contrivance - not black letter law. See the Case In Point below for example.

Case In Point

Johnny Ray Partain, petitioner hereof, has been severely abused and left behind by the Texas judiciary. Nearly nine years ago (9 years), Johnny Partain, an owner of several businesses, filed a lawsuit in 2012 in Hidalgo County District Court case no. C-0929-12-F, to prevent the seizure of his real property which had been ordered taken through advice of the Hidalgo Attorneys Office, without any due process at all on Mr. Partain after he had been warned by a commander of the Hidalgo County Sheriff Office that he "had pissed off the power that be" with his United States congressional campaign against public corruption; that they were going to retaliate. *See Texas Supreme Court case no. 20-0362.* Just prior to this time, approximately seven county and district judges from Hidalgo County, Starr County, and Nueces County threatened Johnny Partain with incarceration for contempt, even before a first hearing, for complaining about many specific judges engaging in bank fraud, bribery, money laundering, conspiracy, and official oppression. Seven judges started collaterally attacking Johnny Partain's final judgment from a Hidalgo County court which had survived a bankruptcy discharge against the judgment debtor. Johnny Partain had become a super-creditor in bankruptcy against the judgment debtor who was neighbors and close friends to the president of a large local bank whom interfered in their litigation (not necessarily as a party) to sway court judges and to protect bank's interests in the judgment debtor. The president was also a member of the Texas State Commission on Judicial Conduct.

Instead of the courts enforcing Johnny Partain's hard won final judgment per statute, he was forced to face down a SWAT team (approved by the district court he had petitioned for protection, per police records) who tried to seize his property that he was using as a congressional campaign headquarters. The SWAT team backed off after the District Attorney affirmed that there was no legal way to enter the property. Johnny Partain's property was eventually broken into, seized, and destroyed on court order days after the SWAT team left and while Johnny Partain was away from his office. The original order taking Johnny Partain's real property was later determined to be illegal and void, not voidable, after the Texas Supreme Court communicated directly with the 13th Court of Appeals - who had lost Johnny Partain's complaint regarding the illegal seizure the year before. *See 13th Court of Appeals case no. 13-12-00267-CV.* The 13th Court of Appeals opined that Johnny Partain had to be sued first before his property could be taken. But the lower courts refused to return his property and continued to threaten Johnny Partain with incarceration for complaining. Johnny Partain eventually recovered his property using self-help, and then another court order was issued to seize his real property again (Johnny Partain was campaigning for Congress again) despite the 13th Court of Appeal Opinion that Johnny Partain had to be sued first before taking his property. Strangely this order went all the way up to the Texas Supreme Court and was allowed to stand because Mr. Partain had not been sued and he wasn't part of any litigation, even though he had petitioned for intervention:

Same complaint, different results and Johnny Partain was deprived his real property without any due process of the law under the constitution because he was artificially denied standing. *See Texas Supreme Court case no. 15-0720.* Johnny Partain amended his petition in District Judge Mario Ramirez' Court, case no. C-0929-12-F, to include all the bad public actors. Judge Mario Ramirez immediately dismissed the case on his "authority as a judge" after he received the 13th Court of Appeals Opinion vindicating Johnny Partain. Again, Johnny Partain appealed to the 13th Court of Appeals who again lost his complaint for another two years until Johnny Partain reported eight judges to the Texas Supreme Court for engaging in tortious and criminal acts, including (but not exclusive to) ordering the title of his real property to be put into the name of a dead man, refusing to enforce court decrees, protecting crimes and civil right violations in the judiciary, using the State of Texas as a racketeering enterprise, and again for seizing and destroying his property. *See Texas Supreme Court case no. 15-0343.* Johnny Ray Partain requested a district judge be assigned who would then assign a special prosecutor since the Hidalgo County District Attorney was involved and on the wrong side of the law, but the Texas Supreme Court refused to get involved. Chief Justice Hecht did however assign a judge from the 14th Court of Appeals to review Johnny Partain's complaint regarding his missing 13th Court of Appeals case (case no. 13-13-00341-CV) and the district court's dismissal. The appellant judge agreed with Johnny Partain and re-opened case no. C-0929-12-F, with a mandate that District Judge Mario Ramirez would conform to his opinion, that the judge would take Johnny Partain to trial, and that the defendants would pay for Johnny Partain's legal cost. None of this mandate ever happened and the 13th Court of Appeals and Texas Supreme Court refused to enforce it. At a hearing approximately 5 months later the Texas Attorney General argued that all the judges were protected with sovereign immunity even if Johnny Partain were correct that they lacked jurisdiction and didn't have absolute immunity. Johnny Ray Partain sued the State of Texas for inverse condemnation after District Judge Ramirez stated that he may have to take Johnny Partain to trial but Mr. Partain wouldn't have a defendant. Thereafter, Judge Ramirez closed his court and refused to respond to Johnny Partain or the defendants for over four years.[3] Johnny Partain petitioned for enforcement of the higher court mandates and for writ of mandamus but the judiciary would never enforce their decrees. The district court finally opened after Johnny Partain sent Governor Greg Abbott a request for compensation for his seized property pursuant to Texas Constitution Article 1, Section 17, and after the Texas State Commission for Judicial Conduct reported they were investigating four judges. *See the attached Request for Property Compensation to Gov. Greg Abbott.*

At the same time, Mr. Partain was threatened that the District Attorneys Office <u>was looking for a way</u> to prosecute him. To felonized him to prevent him from campaigning for public office. Almost exactly one month after being threatened Mr. Partain was prosecuted for a felony based solely on the fraudulent affidavit of a police detective. Johnny Partain eventually survived the prosecution and was acquitted because it was well established law that there could be no crime, but again only after the Texas Supreme Court had to remove a 13th Court of Appeals judge whom refused to follow the rules of appellant procedure and instead attempted to

---

[3] District Court's case no. C-0929-12-F Register of Actions was significantly altered and cleaned after Texas Supreme Court case no. 20-0362.

hang Mr. Partain on her authority as a judge (the same appellant judge that Johnny Partain had previously reported to the Hidalgo County District Attorneys Office on three separate occasions for official oppression). After acquittal, Johnny Partain requested another judge sitting over the original criminal proceedings to return over $23,000 that had been taken from him. *Nelson v. Colorado, 137 S. Ct. 1249, 197 L. Ed. 2d 611 (2017) (To comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated.).* This judge also refused to conform to the law or the opinions of the highest court in the land arguing that Johnny Partain was a rich man and he didn't need it. This judge was just voted onto the 13th Court of Appeals.

Johnny Ray Partain is constitutionally entitled to be compensated his property losses under Texas Constitution Article 1, Section 17, because the Texas Supreme Court alleges that the State of Texas waived its immunity under that particular section in our bill of rights. But the 332nd District Court in case no. C-0929-12-F recently reported that Judge Mario Ramirez has again decided to ignore the Texas Supreme Court and the Texas Constitution to bless all public officials who are defendants in the case, whom engaged in the seizure and destruction of Johnny Partain's property, whom engaged in ultra vires acts, with immunity above the law - nine years into the case. Multiple appeals to higher courts to constantly correct illegal acts based on "official discretion" for almost a decade is not recourse and is a mathematically losing proposition for most litigants. What kind of government do we want?

Prayer

Obviously, our constitutional rights under the Texas Constitution are not self-executing and Johnny Ray Partain is requesting relief and fairness through private bills to be compensated his losses and to expose blatant corruption in South Texas to the consequences of law as any ordinary citizen would be. *See Requested Relief above*. Johnny Ray Partain is also requesting this Legislature's consideration for a constitutional amendment regulating sovereign immunity or establishing public immunity to prosecution from government overreach, to legally protect his neighbors from the same unfettered governmental assaults. Finally, Johnny Ray Partain requests an amendment to statute that official oppression should have a felony level offense, especially if two or more public officials conspire to violate the rights of citizens.

Respectfully submitted,

Johnny Ray Partain
7020 N 16th Street
McAllen, Texas 78504
956-240-1821



Johnny Partain
7020 N 16th Street
McAllen, Texas 78504
partain@atlastechnologies.biz

Governor Greg Abbott
Office of the Governor
P.O. Box 12428
Austin, Texas 78711-2428

August 3, 2020

Re: Johnny Partain – Request For Property Compensation Pursuant To Texas
Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5.

Governor Greg Abbott;

I am currently in the Texas Supreme Court, <u>In Re Johnny Partain</u>, case no. 20-0362, regarding an inverse condemnation complaint against public officials and the State of Texas with additional complaints of public officials engaging in and protecting institutionalized incompetence and public corruption – the status quo. I'm certain that you, Governor Abbott, know of what I speak since you raised the issue of public corruption in South Texas by comparing it to "third-world country practices" in your campaign near the Fort Bliss Army base in February of 2014 as you campaigned for governor. Unfortunately, the corruption hasn't changed since your inauguration and the Texas judiciary has, in a most obvious and spectacular way, placed itself in the embarrassing situation of engaging in and then protecting this well documented public corruption in South Texas with sovereign immunity. *See Hidalgo District Court case no. C-0929-12-F.* Case no. C-0929-12-F is a case I petitioned in 2012 to protect my property and my final judgment in Hidalgo County case no. CL-29,530-A from retaliatory seizure and destruction. The litigation didn't work, the rule of law did not prevail, because too many large extrajudicial interests connected to the Hidalgo County courthouse with stake in sustaining local government corruption and protecting the county interfered with the judicial process placing the judiciary into its instant embarrassment. *See In Re Johnny Partain, case no. 20-0362, Petition For Writs of Mandamus.*

You can relax. I am not mixing current judicial process with my request to you for reimbursement of my seized and destroyed property, as required under Texas Constitution, Art. 1, Sec. 17 and US Constitution, Amendment 5. Due process as

explained by the United State Supreme Court[1] is not necessarily judicial:  It only requires some kind of meaningful and timely process.  You will find that while case no. C-0929-12-F was reinstated by a 14th Appeals Court judge assigned by Texas Supreme Court Justice Nathan L. Hecht in 2015 after it was illegally dismissed only "on the authority" of a district judge, that same district judge has since then refused to answer any of my motions or to take me to trial as mandated by the 14th Appeals Court justice.  Many judges I've encountered over the past 22 years routinely demonstrate contempt for their own judiciary and the rule of law.  I am denied justice under any common judicial practice and there is nothing you could add or subtract from the process.  Even the Texas Supreme Court appears to abuse its own discretion[2] by refusing to enforce the appeal court's mandate or the constitution when it obviously has the authority to do so, apparently to protect the appearance of propriety in the system.  The courts, not the issue, were closed to me exactly four years ago without any adjudication except to bless nearly all parties with immunity for invading, seizing, and destroying my property.

Regardless of what little scant processes are available that can be used to enforce a person's civil rights under the constitution, the required lawful reimbursement for my property losses by the state always leads to your office to negotiate an order for repayment from the Secretary of State. I think that after 22 years of litigating the same issues over and over without resolution or enforcement in the judiciary only to be finally excluded from all court processes, that its reasonable for any man or the public to conclude the Texas Judiciary is an impotency relying on its court concocted immunity to escape public accountability while at the same time collecting paychecks and consuming public resources.  The judiciary is failed and is probably irrelevant anyways to those who know its workings.  Bringing me to a bigger point.

The courts go further to bless nearly all other public offices with immunity from accountability - and the status quo embraces it.  I'm not certain how the Executive or Legislative branches will respond to my efforts in this upcoming 87th Legislature to pierce this immunity to accountability, but it appears the political environment is ripe to raise the issue.  There is a poignant point to be made by recent protests and

---

[1] Mathews v. Eldridge, 424 U.S. 319 (1976) - This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. Wolff v. McDonnell, 418 U. S. 539, 418 U. S. 557-558 (1974). See, e.g., Phillips v. Commissioner, 283 U. S. 589, 283 U. S. 596-597 (1931). See also Dent v. West Virginia, 129 U. S. 114, 129 U. S. 124-125 (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Joint Anti-Fascist Comm. v. McGrath, 341 U. S. 123, 341 U. S. 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U. S. 545, 380 U. S. 552 (1965). See Grannis v. Ordean, 234 U. S. 385, 234 U. S. 394 (1914).  Nelson v. Colorado, 137 S. Ct. 1249, 197 L. Ed. 2d 611 (2017) To comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions.

[2] A judge abuses his discretion if he acts in an arbitrary or unreasonable manner or if he acts without reference to any guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

riots that injustice is rooted in institutionalized bias and corruption, that there is a serious problem with our government, and that there is no rule of law. Public corruption, immunities, and injustice are the root of anger[3], inciting Black Lives Matter, Antifa, and even the Democratic Party to protest and to riot. Its not even a new issue being that the piercing of government immunity was an issue that was voted through the Sixty-first Legislature in 1969 under House Bill 117 (vetoed by the governor). That was over 50 years ago when protests and race riots were just about as they are now. 50 years ago and so little progress has been made regarding the accountability of our government to corruption and injustice.

Article 1 of the Texas Constitution is our bill of rights which describes a compact defining the relationship of our Texas republic and our citizens. It includes the rights to be secured in our persons, houses, papers and possessions and to enjoy life, liberty, property, privileges, and certain immunities. Our Bill of Rights is declared in the constitution to be inviolate and excepted to modification to "guard against transgressions of the high powers herein delegated … [wherein] all laws contrary thereto … shall be void." But the fact is that our bill of rights is already violated, that my rights have been serially violated, and that our civil rights are mostly unactionable, unenforceable, and not self-executing, pursuant to public corruption protected by the courts implementation of its own "common law" which modify the effect of our constitutional compact - to protect the State of Texas from its own citizens. These immunities displace the "rule of law" and cultivate injustices by undermining official accountability and by protecting public corruption and malfeasance under the veil of state propriety.

You see, I am in the middle of a political crisis because I cannot prosecute or punish state corruption. I cannot force the Judiciary to perform or to dispense justice, especially when it will discredit itself. I can only request reimbursement for my significant losses as required by the Texas Constitution which will always end up in your office under current Texas law for consideration of payment. Your consideration is certainly political - even if the judiciary had timely performed its job, had my due process been respected.

My property losses include, my hard won civil judgment ($2,720,126) in Hidalgo County Court No. 1 case no. CL-29,530-A which was finally destroyed through dismissal for want of prosecution (16 years after the judgment became final and 3 executions had been attempted); my real property ($116,000) which was invaded and first seized after an assault by a SWAT team as directed by the Hidalgo County District Attorney to interfere with my US Congressional campaign against public corruption; about eight years of rents ($96,000) after the seizure of my house; my transportation business and assets ($19 million) which were never return per court order (the court's refused to enforce their decrees and instead threatened me with contempt and incarceration for insisting that the courts enforce their decrees); my established and prospective business interests in one of my electrical service companies ($55 million) which was partially destroyed after a failed attempt to "felonize" me following a threat by a Justice of the Peace that the

---

[3] Racial injustice is a subset of the bigger problem.

District Attorney looking for a way to prosecute me (my company[ies] requires security clearance); and treble damages for the aforementioned losses that I am denied because the courts are closed to me.[4] I can currently prove to a jury or the public that my property losses are approximately $236,796,378 and rising, and I've won a plethora of court opinions and orders supporting my claims - a stinging and constitutional rebuke against established south Texas corruption that you have already identified, and that has now landed in your office. Its an opportunity for you to address corruption in South Texas and right some wrongs. Should the corruption continue to be protected at the highest office in Texas? Should I be denied my constitutional rights to my property or its value? What will you do?

I am requesting a timely scheduled meeting with you to negotiate reasonable compensation for my property losses so that I might finally resume my life, liberty, property, privileges, and immunities with my family as promised under our Texas Constitution. I would also like to bend your ear regarding accountability in our Texas government by considering new legislation in the 87th Legislature to modify common law government immunities imposed by the courts which are intrinsically unjust. Thank you in advance for your time and efforts.

Respectfully,

Johnny Partain
956-240-1821
partain@atlastechnologies.biz

---

[4] "All courts shall be open, and every person for injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, §13

# State Commission on Judicial Conduct

**Officers**
David C. Hall, Chair
Ronald E. Bunch, Vice-Chair

**Members**
David M. Patronella
Darrick L. McGill
Sujeeth B. Draksharam
Ruben G. Reyes
Valerie Ertz
Frederick C. "Fred" Tate
Janis Holt
M. Patrick Maguire
David Schenck



November 20, 2020

**Executive Director**
Jacqueline R. Habersham

**CONFIDENTIAL**

Johnny Partain
7020 N. 16th Street
McAllen, Texas 78504

Re:    CJC No. 20-1178

Dear Mr. Partain:

We appreciate the concerns raised in your letter. However, the matters raised in your complaint pertain to decisions or rulings made by the judge while exercising his/her discretion. As a general rule, a judge's discretionary decisions – even if they are wrong – are not examples of judicial misconduct. This Agency has no authority to intervene in a court case, ask a judge to step down from a case, or change a judge's rulings. Therefore, based on laws that govern this Agency's authority and define what actions can be considered judicial misconduct, this case has been dismissed.

You may, on a one-time basis, request that the Agency reconsider its decision to dismiss your complaint. In order to do so, please fill out the Request for Reconsideration form included with this letter as instructed. Please note that the Reconsideration request must be postmarked no later than thirty days from the date of this letter.

While we were not able to assist you with your concerns, we appreciate your interest in assisting us in maintaining the high ethical standards of the Texas judiciary. Thank you for bringing these issues to our attention.

STATE COMMISSION ON JUDICIAL CONDUCT